IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 14-1049

BRUCE CARNEIL WEBSTER,

Petitioner-Appellant,

v.

JOHN F. CARAWAY, Warden,

Respondent-Appellee.

On Appeal from the United States District Court
For the Southern District of Indiana
Judge William T. Lawrence
District Court No. 2:12-cv-00086-WTL-WGH

**APPELLANT'S BRIEF**

**THIS IS A DEATH PENALTY CASE**

**ORAL ARGUMENT REQUESTED**

Steven J. Wells
    *Counsel of Record*
Kirsten E. Schubert
Timothy J. Droske
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:   (612) 340-2600

Dated: February 18, 2014

*Attorneys for Petitioner-Appellant Bruce Carneil Webster*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 14-1049

Short Caption: Webster v. Caraway

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Bruce Carneil Webster

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Dorsey & Whitney LLP;

Eric K. Koselke, Attorney at Law

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Steven J. Wells     Date: 1/23/2014

Attorney's Printed Name: Steven J. Wells

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ✗   **No** _____

Address: Suite 1500, 50 South Sixth Street

Minneapolis, MN 55402

Phone Number: 612-340-2600     Fax Number: 952-516-5526

E-Mail Address: wells.steve@dorsey.com

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...................................................i

TABLE OF CONTENTS..........................................................................................ii

TABLE OF AUTHORITIES ................................................................................... v

REQUEST FOR ORAL ARGUMENT.................................................................... 1

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................................ 2

STATEMENT OF THE CASE AND THE FACTS ................................................... 4

    I.    Statement of the Case.................................................................. 4

        A.    Webster's Trial and Conviction..................................... 4

        B.    Webster's Initial § 2255 Motion ................................... 5

        C.    Webster's Motion for Authorization to File a Successive
              Motion To Vacate His Death Sentence Under § 2255(h)(1)......... 6

        D.    Webster's Petition for Writ of Habeas Corpus Under
              § 2241 ............................................................................. 8

    II.    Statement of Facts ...................................................................... 9

        A.    The Newly Available Evidence Webster Seeks to Present
              for the First Time ........................................................ 10

            1.    Medical Diagnoses of Mental Retardation in Social
                Security Records ............................................... 10

                a)    Dr. Charles Spellman's Diagnosis of Mental
                    Retardation and IQ of 69 or Lower........................ 11

                b)    Dr. Edward Hackett's Diagnosis of Mild
                    Mental Retardation and IQ of 59 ......................... 12

                c)    Dr. C.M. Rittelmeyer's Diagnosis of Mental
                    Retardation.......................................................... 12

            2.    Evidence that Webster Was Enrolled in Special
                Education Classes ............................................ 13

3. Additional Evidence of Webster's Adaptive Functioning ................................................................. 13

B. Mental Retardation Evidence Presented at Trial ...................... 14

1. Evidence of Mental Retardation Presented At Trial By Webster ................................................................ 14

2. The Government's Evidence and Arguments At Trial ......................................................................... 16

SUMMARY OF THE ARGUMENT ......................................................... 18

STATEMENT OF APPELLATE STANDARD OF REVIEW ................................... 21

ARGUMENT ......................................................................................... 21

I. Newly Discovered Evidence in the Possession of the Social Security Administration Establishes that Webster is Mentally Retarded and Thus Categorically Ineligible for the Death Penalty ................................................................................. 21

A. Mental Retardation Standard ................................................. 22

B. The Diagnoses Contained in the Social Security Records Establish Webster's Mental Retardation and Directly Refute the Government's Case at Trial ...................................... 22

C. The Adaptive Deficits Apparent From the Social Security Records Is Strong Evidence of Mental Retardation and Directly Refutes the Government's Case at Trial ...................... 26

II. Webster Has Satisfied the Requirements of the Savings Clause Under This Court's Existing Precedent ...................................... 28

A. A Structural Defect In § 2255 Prevents Webster From Challenging the Fundamental Legality of His Detention ......... 29

1. The Fifth Circuit Has Ruled There is No Mechanism Under § 2255 to Address New Evidence Conclusively Establishing That an Individual is Constitutionally Ineligible for the Death Penalty ........... 29

2. Where Webster Did Not Have an Opportunity to Present This Evidence Before, § 2255 Provides an Inadequate Substitute For Habeas Corpus ..................... 32

|     | B. | Webster Has Satisfied this Court's "Actual Innocence" Requirements | 36 |

   1. Webster Has Established He Is "Actually Innocent" Under Longstanding Habeas Jurisprudence ................... 36

   2. The Fifth Circuit's Interpretation of "Not Guilty Of The Offense" in § 2255 Does Not Preclude a Finding Of "Actual Innocence" Under § 2241 ............................... 37

   3. This Court Has Not Limited § 2241 Review to Prisoners Who Challenge Their Convictions ................... 40

III. In the Alternative, Recent Supreme Court Decisions Require that Credible New Evidence of Categorical Ineligibility – of "Actual Innocence" Within the Meaning of *Sawyer* – Is A Gateway for Suspension of Procedural Bars ................................................ 41

IV. Any Interpretation of §§ 2255(e) and 2241 Which Would Present an Absolute Bar to the Presentation of New Evidence Establishing Ineligibility For the Death Penalty Is Contrary to the Rules of Statutory Construction and Would Result in an Unconstitutional Suspension of the Writ .............................. 43

  A. The Severe Limitations on Savings Clause Actions Imposed by the District Court Are Not Based on the Statutory Language or Legislative History and They Are Inconsistent With and Unsupported By Supreme Court Precedent ................................................................. 43

  B. Congressional Failure To Provide A Path For Review of Conclusive Evidence of Constitutional Ineligibility Would Be A Suspension of the Writ ....................................... 47

CONCLUSION ............................................................................. 52

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7) ...................... 53

CIRCUIT RULE 30(d) STATEMENT ................................................... 54

REQUIRED SHORT APPENDIX .......................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atkins v. Virginia,*
536 U.S. 304 (2002) ..............................................................*passim*

*Brown v. Caraway,*
719 F.3d 583 (7th Cir. 2013) ...............................................*passim*

*Coble v. State,*
330 S.W. 3d 253 (Tex. Crim. App. 2010)............................................. 24

*In re Davenport,*
147 F.3d 605 (7th Cir. 1998) .................................................*passim*

*In re Dorsainvil,*
119 F.3d 245 (3d Cir.1997)............................................................ 49

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.*
*Trades Council,* 485 U.S. 568 (1988) ............................................ 44, 45

*Eli Lilly & Co. v. Medtronic, Inc.,*
496 U.S. 661 (1990) ................................................................ 45

*Felder v. McVicar,*
113 F.3d 696 (7th Cir. 1997) ........................................................ 33

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
505 U.S. 88 (1992) .................................................................. 45

*Garza v. Lappin,*
253 F.3d 918 (7th Cir. 2001) ...............................................*passim*

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.,*
484 U.S. 49 (1987) .................................................................. 45

*United States v. Hardy,*
762 F. Supp. 2d 849 (E.D. La. 2010)................................................. 22

*In re Hill,*
715 F.3d 284 (11th Cir. 2013) ................................................... 33, 39

*Holladay v. Allen,*
555 F.3d 1346 (11th Cir. 2009) ....................................................... 19, 27

*Holland v. Florida,*
560 U.S. 631 (2010) ............................................................ 44, 47, 48

*Holloway v. Jones,*
166 F. Supp. 2d 1185 (E.D. Mich. 2001) ........................................... 49

*Hope v. United States,*
108 F.3d 119 (7th Cir. 1997) ........................................................ 39

*INS v. St. Cyr,*
533 U.S. 289 (2001) ...........................................................*passim*

*James v. Walsh,*
308 F.3d 162 (2d Cir. 2002) ......................................................... 39

*Martinez v. Ryan,*
132 S. Ct. 1309 (2012) .............................................................. 35

*Martinez-Villareal v. Stewart*
118 F. 3d 628 (9th Cir. 1997), *aff'd* 523 U.S. 637 (1998)...................... 48

*McCleskey v. Zant,*
499 U.S. 467 (1991) ................................................................. 42

*McQuiggin v. Perkins,*
133 S. Ct. 1924 (2013) ........................................................*passim*

*Moore v. Olson,*
368 F.3d 757 (7th Cir. 2004) ......................................................... 1

*Public Citizen v. United States Dep't of Justice,*
491 U.S. 440 (1989) ................................................................. 45

*Rivera v. Quarterman,*
505 F.3d 349 (5th Cir. 2007) ........................................................ 19

*Sawyer v. Whitley,*
505 U.S. 333 (1992) ...........................................................*passim*

*Schlup v. Delo,*
513 U.S. 298 (1995) ................................................................. 42

*Taylor v. Gilkey,*
314 F.3d 832 (7th Cir. 2002) ..................................................*passim*

*Triestman v. United States*
124 F.3d 361 (2d Cir.1997) ............................................................. 48

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs.,*
484 U.S. 365 (1988), (2) ................................................................ 45

*United States v. Davis,*
611 F. Supp. 2d 472 (D. Md. 2009) ........................................... 19, 22

*United States v. Hayman,*
342 U.S. 205 (1952) .................................................................. 45, 49

*United States v. Lewis*
2010 WL 5418901 (N.D. Ohio Dec. 23, 2010) ............................ 19, 22

*United States v. Webster,*
421 F.3d 308 (5th Cir. 2005), *cert. denied,* 549 U.S. 828 (2006) ............................ 6

*United States v. Webster,*
No. 4:94-cr-00121-Y (N.D. Tex.) ....................................................... 1

*Unthank v. Jett,*
549 F.3d 534 (7th Cir. 2008) ..................................................... 20, 41

*In re Webster,*
605 F.3d 256 (5th Cir. 2010), *cert. denied,* 131 S. Ct. 794 (2010)
............................................................................................... *passim*

*In re Webster,*
No. 09-11039 (5th Cir.) ............................................................ 7, 8, 30

*In re Webster,*
No. 1-150, 2010 WL 4278712 (S. Ct. Oct. 29, 2010) ..................... 8, 50

*Webster v. Lockett,*
2013 WL 6007593 .......................................................................... 38

*Webster v. Lockett,*
No. 2:12-cv-86-WTL-WGH (S.D. Ind.) ............................................... 1

*Webster v. United States,*
131 S.Ct. 794 (2010) ........................................................................ 8

*Wiley v. Epps,*
625 F.3d 199 (5th Cir. 2010) .......................................................... 12

*Woodson v. North Carolina,*
428 U.S. 280 (1976) ....................................................................... 49

*Ex parte Yerger,*
75 U.S. 85 (1869) ..................................................................... 44, 48

**Statutes**

18 U.S.C. § 1201(a)(1) ..................................................................... 4

18 U.S.C. § 1201(a)(2) ..................................................................... 4

28 U.S.C. § 1131 .............................................................................. 1

28 U.S.C. § 1291 .............................................................................. 1

28 U.S.C. § 2241 .....................................................................*passim*

28 U.S.C. § 2244(b)(1) ................................................................... 49

28 U.S.C. § 2244(b)(2) ................................................................... 49

28 U.S.C. § 2244(d)(1)(D) .............................................................. 41

28 U.S.C. § 2253(a) .......................................................................... 1

28 U.S.C. § 2254........................................................................ 33, 39

28 U.S.C. § 2255.......................................................................*passim*

28 U.S.C. § 2255(e)...................................................................*passim*

28 U.S.C. § 2255(h) ..................................................................*passim*

28 U.S.C. § 2255(h)(1)...............................................................*passim*

28 U.S.C. § 2255(h)(2)........................................................ 33, 34, 39

28 U.S.C. § 3596.............................................................................. 4

Pub. L. No. 104-132, 110 Stat. 1214 (1996) ................................. 39

**Other Authorities**

Eighth Amendment ...................................................................*passim*

*The American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition Classification, and Systems of Supports* 60 tbl. 6.1 (11th ed. 2010) ...................................................... 13

DAVID WECHSLER, *WAIS-III ADMINISTRATION AND SCORING MANUAL* 24 (3d ed. 2003) ................................................................................................ 19

Fed. R. App. P. 32(a)(5) ................................................................................. 53

Fed. R. App. P.32(a)(6) .................................................................................. 53

Fed. R. App. P. 32(a)(7) ................................................................................. 53

Fed. R. App. P. 32(a)(7)(B) ........................................................................... 53

Fed. R. App. P. 32(a)(7)(B)(iii) ...................................................................... 53

J. Gregory Olley & Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II, in* ..................................................................................................... 28

Rule 30(a) ....................................................................................................... 54

Rule 30(b) ....................................................................................................... 54

Rule 30(d) ....................................................................................................... 54

Rule 34(f) .......................................................................................................... 1

U.S. Const. art. I, § 9, cl. 2 ............................................................................ 47

## REQUEST FOR ORAL ARGUMENT

Pursuant to Circuit Rule 34(f), Appellant Bruce Carneil Webster respectfully requests oral argument. Oral argument will assist in deciding this appeal, which presents a novel legal issue.

## JURISDICTIONAL STATEMENT

Petitioner-Appellant Bruce Webster brings this appeal from a final judgment of the United States District Court for the Southern District of Indiana denying his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("2241 Petition"). (Dkt.1.)[1] The District Court entered judgment on November 13, 2013. (Dkt.30.) Webster appeals from that final judgment and from all orders subsumed therein, including the District Court's November 13, 2013 Entry on Petition for Writ of Habeas Corpus. (App.1-13.) Webster timely filed his Notice of Appeal in this matter on January 9, 2014. (Dkt.31.) No motions were filed to toll the time for filing a notice of appeal, and this is not a direct appeal from the decision of a magistrate judge.

The District Court had jurisdiction over the 2241 Petition under 28 U.S.C. § 1131. *See Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004). The United States Court of Appeals for the Seventh Circuit has appellate jurisdiction over this matter pursuant to 28 U.S.C. §§ 1291 and 2253(a), in that this is an appeal from a final judgment and order in a habeas corpus proceeding.

---

[1] Citations to "Dkt.\_" are to the District Court docket below, *Webster v. Lockett*, No. 2:12-cv-86-WTL-WGH (S.D. Ind.), which comprises the record on appeal. Citations to "N.D. Tex. Dkt.\_" refer to the criminal docket entry in *United States v. Webster*, No. 4:94-cr-00121-Y (N.D. Tex.). Citations to "App.\_" are to the short appendix bound with this brief. Citations to "S.App.\_" are to the separate appendix filed with this brief.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Bruce Webster is a mentally retarded prisoner held under the sentence of death in the United States Penitentiary in Terre Haute, Indiana. Webster challenges the November 13, 2013 Order of the United States District Court for the Southern District of Indiana denying his 2241 Petition and finding that he is barred, as a matter of law, from presenting significant new evidence, only recently disclosed from government agencies, that he is mentally retarded and therefore categorically ineligible for execution under the Eighth Amendment (the "Order"). (App.1-13.). If considered, this evidence—primarily the results of examinations by government doctors and psychologists from before the time of his arrest that, despite request from Webster's trial counsel, remained buried in government files for over 15 years—would prove that executing Webster would be in direct violation of the Constitution.

Webster has moved for, and been denied, the opportunity to present this evidence in a successive motion under 28 U.S.C. § 2255(h)(1) because the evidence—though "virtually guaranteed" (in the words of a concurring judge of the Fifth Circuit) to establish Webster's mental retardation and therefore his categorical ineligibility for the death penalty—did not establish that he was "not guilty of the offense" for which he was convicted. *In re Webster*, 605 F.3d 256 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 794 (2010). The Fifth Circuit's decision calls into stark relief a "glitch" in § 2255(h): while that statute allows for the presentation of newly discovered evidence which could establish that a prisoner did not commit the crime for which he stands convicted, as interpreted by the Fifth Circuit it fails to provide a

mechanism for a prisoner to present previously undisclosed evidence that he is categorically ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) and the Eighth Amendment.

Section 2255(e), the "Savings Clause," was enacted to address and remedy just such a deficiency in § 2255, which, in the words of the Fifth Circuit concurrence, produces "an absurd and Kafkaesque result" that "ties our judicial hands so illogically," *Webster*, 605 F.3d at 259-60, and is thus ineffective to prevent a clearly unconstitutional execution. Yet the District Court here held that, no matter how conclusive the newly discovered evidence of mental retardation and thus of the unconstitutionality of Webster's sentence of death, it could not, "unfortunately," allow Webster to present that evidence under § 2241. (App.13.)

The issues presented for review are:

(1) Whether 28 U.S.C. § 2241 provides a vehicle for a mentally retarded prisoner to present previously unavailable evidence establishing his mental retardation and constitutional ineligibility for the death penalty.

(2) If 28 U.S.C. § 2241 does not provide him a remedy under these circumstances, does that statute, taken together with 28 U.S.C. § 2255, constitute an unconstitutional suspension of the writ of habeas corpus.

<u>**STATEMENT OF THE CASE AND THE FACTS**</u>

**I.     Statement of the Case**

**A.     Webster's Trial and Conviction**

On November 4, 1994, Webster was indicted on six counts in the United States District Court for the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), along with various noncapital offenses. (S.App.5.) Webster was tried and convicted; he was sentenced to death on the capital charge on September 24, 1996. (S.App.1-4.) As set forth in Part II.B.1 below, in the punishment phase of the trial, Webster presented the testimony of four physicians and psychologists that he is mentally retarded and has IQ scores clearly in the range of mental retardation: 48, 51, 55, 59, 65. (S.App.124-25, 150-79.) The government presented the testimony of two expert witnesses (one psychologist and one psychiatrist) who claimed that he was motivated to fake his IQ scores to secure a mental retardation defense. (S.App.301-29.) The jury was given no instructions as to the legal standard to be used in determining mental retardation. (S.App.335-36.) The jury found the government had proven beyond a reasonable doubt certain aggravating factors that support a sentence of death, that the aggravating factors sufficiently outweighed any mitigating factors, and that Webster should receive the penalty of death.[2] (S.App.340-42.) Four jurors, however, found that the defense had proven by a preponderance of the evidence that Webster "is or

---

[2]     Mr. Webster was tried six years before the U.S. Supreme Court decided *Atkins*, 536 U.S. 304. Mr. Webster's mental retardation claim was therefore evaluated under the federal statutory bar against the execution of mentally retarded individuals under 28 U.S.C. § 3596 at trial and on direct appeal.

may be mentally retarded." (S.App.335-36, 341 (Nonstatutory Mitigating Factor No. 1).) The Fifth Circuit affirmed Webster's sentence and conviction on direct appeal. (S.App.5. (*cert. denied*, 528 U.S. 829 (1999).)

### B. Webster's Initial § 2255 Motion

Webster filed his initial Motion to Vacate Conviction and Sentence under § 2255 on September 29, 2000. (*See* N.D. Tex. Dkt.998.) While his 2255 Motion was pending, Webster filed a Motion for Leave to Conduct Discovery requesting discovery on several issues related to the mental retardation claim he presented in that motion. (*See* S.App.507-35.) Importantly, one of Webster's discovery requests, Request for Discovery No. 8, specifically asked that the government be compelled to produce "any reports prepared by a mental health professional in the Government's possession which, in any manner, questions or rebuts the testimony by the government's witnesses at trial (i.e., Dr. [Richard] Coons and Dr. [George] Parker) on the issue of petitioner's mental retardation." (S.App.517.) The government opposed the request, (S.App.537), and the district court denied it (S.App.537-54).

Two days after the district court denied Webster's request for discovery, the Supreme Court issued its decision in *Atkins*, finding that because mentally retarded persons suffer from "disabilities in areas of reasoning, judgment, and control of their impulses, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct," and that the execution of the mentally retarded constitutes cruel and unusual punishment under the Eighth Amendment. 536 U.S. at 321.

Webster filed his Amended § 2255 Motion to Vacate Conviction and Sentence on August 16, 2002. (N.D. Tex. Dkt.1027, 1064.) The district court denied his amended motion in full on September 30, 2003. (*See* S.App. 74-89.) The Fifth Circuit ultimately denied Webster's application for certificates of appealability and the U.S. Supreme Court denied certiorari. *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006).

**C.      Webster's Motion for Authorization to File a Successive Motion To Vacate His Death Sentence Under § 2255(h)(1)**

More than 15 years after he was convicted, undersigned counsel for Webster uncovered previously undisclosed evidence in the possession of a federal agency confirming Webster's mental retardation. As discussed more fully below, Part II.A, this evidence consists primarily of records obtained from the Social Security Administration showing that three separate government physicians and psychologists examined Webster a year before the commission of the crime when he was 20 years old and applying for benefits relating to sinus problems; that the one psychologist who administered a full-scale IQ test on Webster found had an IQ of 59; that a second psychologist conducting a partial IQ test estimated that he had an IQ of "69 or lower;" and that each of the three doctors who examined Webster diagnosed him as mentally retarded. (*See* S.App.354-59, 361-68.) These newly uncovered Social Security records also reflect the doctors' opinions that Webster suffered from adaptive deficits, and contain previously unavailable evidence that Webster was enrolled in special education classes, a fact vehemently contested by the prosecution at trial. (*See* S.App.360.)

On October 22, 2009, Webster moved the Fifth Circuit for authorization to file a successive motion to vacate his death sentence under § 2255(h)(1), arguing that this newly available evidence directly refutes the government's case at trial that Webster was motivated to fake his low IQ scores in order to secure a mental retardation defense, that his adaptive functioning was normal, and that he was never enrolled in special education classes; and that, together with the evidence presented at trial, no reasonable factfinder could find that Webster is not mentally retarded. *In re Webster*, No. 09-11039 (5th Cir.), Mot. For Authorization to File Successive 2255 Mot. 2-3, Oct. 22, 2009, ECF Doc. No. 0051946905.

The Fifth Circuit denied Webster's motion, finding that it lacked jurisdiction to entertain the application under § 2255(h). *In re Webster*, 605 F.3d 256, 259 n.8 (5th Cir. 2010). Reading the language of § 2255(h)(1) narrowly, the court concluded that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *Id.* at 257. The majority did not address Webster's newly uncovered evidence of mental retardation.

Judge Wiener, however, did address the evidence in an opinion concurring in the result as "a correct interpretation of 28 U.S.C. § 2255(h)," but stating that he

> write[s] separately to emphasize the absurdity of its Kafkaesque result: Because Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty—and not that he is factually innocent of the crime—we must sanction his execution. If the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded.

*Id.* at 259. Judge Wiener continued:

> These reports, the merits of which have never been considered by any judge or jury, refute much of the evidence introduced by the government at the penalty phase of Webster's trial. . . . Under § 2255(h), however, we must turn a blind eye to this evidence, as it speaks to Webster's constitutional eligibility for the death penalty and not his factual guilt or innocence of the crime. . . . Although I concur in the majority's opinion as a correct statement of the law, I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment.

*Id.* at 259-60. Webster filed a petition for writ of certiorari, challenging the Fifth Circuit's interpretation of § 2255(h)(1), on July 27, 2010. *In re Webster*, No. 09-11039 (5th Cir.), Notice that Pet. for Writ of Cert. was Filed, Aug. 2, 2010, ECF Doc. No. 00511191247. The government opposed Webster's petition, relying in part on the fact that Webster would be able to bring his claim under § 2241. Br. for the United States in Opp'n, *In re Webster*, No. 1-150, 2010 WL 4278712, at *17 (S. Ct. Oct. 29, 2010). The Supreme Court denied certiorari. *Webster v. United States*, 131 S.Ct. 794 (2010).

**D.      Webster's Petition for Writ of Habeas Corpus Under § 2241**

On April 6, 2012, Webster filed a Petition for Writ of Habeas Corpus under § 2241, asking the court to consider the same previously unavailable evidence that formed the basis for his motion for authorization under § 2255(h)(1). (Dkt.1.) Webster argued that, pursuant §§ 2255(e) and 2241, § 2255 is "inadequate or ineffective" to test the legality of his death sentence and he is entitled to review of the newly discovered evidence under § 2241. (Dkt.1 at 26-34.) The District Court (Judge William T. Lawrence) denied Webster's Petition, finding that Webster failed to meet

the Seventh Circuit's requirements for jurisdiction under § 2241. (App.8-13.) In particular, the District Court concluded that because the previously unavailable evidence did not show that Webster was factually innocent of the underlying crime, the District Court was, "unfortunately . . . unable to consider the merits of Webster's petition." (App.13.) The District Court also noted that Webster failed to show that "the law on this topic had not recently changed such that Webster was *unable* to argue that he was mentally retarded prior to the instant petition." (App.11.) The District Court made no factual findings on the evidence Judge Wiener found conclusive; it held instead that Webster was barred from presenting *any* newly discovered evidence of Webster's mental retardation, without regard to its quality or persuasiveness, because he could not also prove innocence of the underlying offense. (App.12-13.)

## II.  Statement of Facts

In 2009, counsel for Webster uncovered previously unavailable evidence going directly to the issue of Webster's mental retardation. Although Webster's trial counsel requested these records before trial, and post-conviction counsel again sought all relevant records from the government in the § 2255 proceedings, these records were withheld from Webster until February 9, 2009. (*See* S.App.499 ¶ 4, 557 ¶ 12.) The records show that three separate physicians and psychologists working on behalf of the Social Security Administration, who were examining Webster in connection with his application for benefits based on sinus problems, examined Webster when he was 20, almost a year before the commission of the crime. (S.App.354-59, 361-68.) The two psychologists who administered IQ tests to Webster

9

each found his IQ to be well within the range of mental retardation: 59 and 69 or lower. (S.App.354-59.) Each of these professionals concluded he is mentally retarded. (S.App.354-59, 361-68.) The newly released Social Security records also contain previously unavailable evidence that he was, in fact, enrolled in special education classes, and that he suffered from adaptive deficits, including his inability to care for himself, to function in a work or community setting, his inability to understand simple language concepts and basic tasks, and his poor performance in school.[3] (S.App.354-413.) Finally, Webster seeks to present newly obtained testimony confirming these adaptive deficits. (S.App.421-68.)

It is this new evidence, considered together with the evidence presented at trial, described below at Part B of this section, that Webster sought to present to the District Court.

### A. The Newly Available Evidence Webster Seeks to Present for the First Time

#### 1. Medical Diagnoses of Mental Retardation in Social Security Records

On September 9, 1993, Webster applied for Social Security benefits, claiming a disabling condition of sinus problems and headaches. (S.App.379.) In order to determine whether Webster was eligible for Social Security benefits based on this claim, the Social Security Administration had him evaluated by three separate medical professionals. (S.App.354-59, 361-68.) Although the young Webster came presenting a sinus complaint, the evaluating physicians and other professionals

---

[3] "*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV-TR at 42.

nevertheless addressed the question of intellectual disability. It is clear from the records that two of these doctors performed psychological evaluations concluding that Webster has an IQ that falls well within the range of mental retardation, and each of these three doctors independently diagnosed Webster with extremely low IQ and/or mental retardation. (S.App.354-59; 361-68.)

a) **Dr. Charles Spellman's Diagnosis of Mental Retardation and IQ of 69 or Lower**

On December 22, 1993, Dr. Charles Spellman completed a psychological evaluation for the diagnosis of mental disorders to "better ascertain eligibility for Social Security benefits." (S.App.354.) Dr. Spellman notes that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness. He came across as a slow fellow who did not know much and did not know how to communicate well." (S.App.355.) Regarding intellectual function, Dr. Spellman stated that "[Webster] was not able to register three objects. . . . He was not able to do simple calculations. He did not know what the sayings meant." (*Id.*) Dr. Spellman estimated Webster's IQ to be 69 or lower. (S.App.356.) In regard to Webster's level of adaptive functioning, Dr. Spellman stated: "[Webster] lives with his mother. He watches television, listens to the radio and goes walking. . . . He does no chores around the house. Mostly he seems to be idle around the house and on the streets." (S.App.356.) Dr. Spellman's only diagnoses of Webster were "1. Mental Retardation" and "2. Antisocial Personality by History." (S.App.356.) Dr. Spellman also noted that "[t]here was no evidence of exaggeration or malingering" and that "[Webster] will not get any better." (S.App.356.)

### b) **Dr. Edward Hackett's Diagnosis of Mild Mental Retardation and IQ of 59**

In October of 1993, Dr. Edward Hackett conducted a Full Scale Wechsler Adult Intelligence Scale – Revised ("WAIS-R") IQ test on Webster in connection with his application for social security benefits. In Dr. Hackett's Psychometric Evaluation report dated October 22, 1993, Webster's Full Scale WAIS-R IQ score is 59, with a Performance IQ of 49 and a Verbal IQ of 71. (S.App.358.) Dr. Hackett's evaluation states "[Webster] is mildly retarded, but is also antisocial."[4] (S.App.359.) Under his diagnoses section, he lists "Mild Mental Retardation." (S.App.359.) Dr. Hackett's Medical Report containing additional information, dated November 10, 1993, states that "[Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." (S.App.357.) Dr. Hackett "did not feel that [Webster] could manage his own benefits. His behavior was somewhat bazaar [sic]. On the IQ scores[,] performance was estimated lower than verbal . . . . [and] Dr. Hackett felt some organic function may be involved." (S.App.357.)

### c) **Dr. C.M. Rittelmeyer's Diagnosis of Mental Retardation**

In a report dated October 25, 1993 and entitled "General Physical Examination," Dr. C.M. Rittelmeyer also evaluated Webster's mental and physical condition. (S.App.361.) Although Dr. Rittelmeyer's descriptions of Webster's physical health are unremarkable, his diagnosis of Webster is significant: "Mental

---

[4] "Mild" mental retardation is the term traditionally used to describe individuals within the IQ range of 50-55 to 70-75. *Mental Retardation: Definition, Classification, and Systems of Support* 27 (10th ed. 2002). Most individuals found to meet the *Atkins* criteria suffer from mild mental retardation. *See, e.g.*, *Wiley v. Epps*, 625 F.3d 199, 214, 222 (5th Cir. 2010).

retardation. Flat Feet. Chronic sinus problems and Allergies by history."
(S.App.364.)

### 2. Evidence that Webster Was Enrolled in Special Education Classes

Additionally, the Social Security records contain evidence that Webster was enrolled in special education classes: a previously undisclosed letter dated November 8, 1993, from Lou Jackson, Watson Chapel Schools Special Education Supervisor, explains that Webster's Special Education records had been destroyed in 1988. (S.App.360.)[5]

### 3. Additional Evidence of Webster's Adaptive Functioning

Webster sought to present additional evidence of his adaptive functioning. Even alone, the form completed by Webster to apply for Social Security disability benefits provides a clear example of Webster's deficits in syntax, spelling, punctuation, grammar, ability to answer a question, ability to write a complete sentence, and penmanship. (S.App.371-72; S.App.373-78.) For example, in response to the application's prompt to describe the pain or other symptoms, Webster wrote: "it causes me to bet up set Easily headhurtsdiffiernt of bredth." (S.App.371.) When asked what side effects his medication caused, Webster responded "Is leep bettEr." (*Id.*) When asked what he does on a normal day, Webster answered "I sleeps look at. cartoon." (S.App.373.)

---

[5] Mr. Webster's counsel also uncovered government records showing a pattern of abuse and violence in Mr. Webster's family. Child abuse and domestic violence are risk factors for mental retardation. *See The American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition Classification, and Systems of Supports* 60 tbl. 6.1 (11th ed. 2010); S.App.482 ¶ 26.

This evidence of poor communication ability permeated the application. When asked to describe changes in his condition since onset, Webster replied "ain't got no chang." (*Id.*) When asked whether he was involved in any clubs or other groups, Webster answered "Iwalk around in the club." (S.App.377.)[6]

**B.      Mental Retardation Evidence Presented at Trial**

**1.      Evidence of Mental Retardation Presented At Trial By Webster**

Even without these newly uncovered diagnoses of government doctors that Webster suffered from mental retardation, Webster's evidence at trial was strong. It included evidence of five IQ scores (48, 51, 55, 59, 65) and testimony from four psychologists and psychiatrists who had examined him and determined that his IQ fell within the range of the mentally retarded.

Dr. Raymond Finn, a clinical psychologist certified and trained in diagnosing mental retardation, administered a full-scale WAIS-R intelligence test, to Webster near the time of his arrest, and determined Webster has an IQ of 59. (S.App.121, 124-25.) Dr. Finn stated that Webster's intelligence is in the lowest .3 percentile—"below the first percentile in terms of intelligence compared to the rest of the population,"—and that Webster is "clearly mentally retarded" under the accepted definitions.[7] (S.App.125.) Dr. Denis Keyes, a psychologist specializing in mental

---

[6]      Additionally, Mr. Webster seeks to submit newly obtained declarations obtained from childhood friends, relatives, and acquaintances of Mr. Webster over the course of multiple interviews with experts. (*See* S.App.421-68.) These declarations provide further evidence of Mr. Webster's mental retardation, including his limitations in functional academics, home living, communication, and social and interpersonal skills.

[7]      Dr. Finn administered a second WAIS-R test to Mr. Webster during the trial and the results were again consistent with mental retardation. (S.App.126-27.)

retardation, testified that he administered two intelligence tests, the Stanford-Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and found that Webster's composite IQ score was 51, putting him in the lowest .2-.3 percent of the population. (S.App.132-41.) Dr. Keyes also tested Webster's adaptive deficits and found that Webster functioned at the level of a seven-year old. (S.App.142-49.) Dr. Keyes concluded that Webster is in fact mentally retarded. (S.App.150-52.)

Dr. Robert Fulbright, a neuro-psychologist, performed a battery of neuro-psychological tests on Webster and concluded that Webster has significant impairment in his intellectual capacity, attention capacity, reasoning abilities, and suffered from limited language and memory capabilities. (S.App.154-74.) Finally, Dr. Mark Cunningham, who had examined Webster and interviewed Webster's family, concluded that Webster suffers from mild mental retardation. (S.App.175-79.)

Additional evidence that Webster received a score of 48 on an IQ test administered by an Arkansas state mental health center in 1992 was also presented during the trial. (S.App.122-23.) Notably, of the four complete, individually administered IQ tests admitted into evidence at trial, only one was administered before commission of the crime, when Webster was 19 years old. (S.App.122-23.)

Webster also presented evidence of his adaptive deficits in three of the categories designated by the DSM-IV-TR—functional academics, home living, and communication and conceptual skills. Dr. Keyes administered a Vineland adaptive skills test to Webster. That test showed that Webster is not able to live on his own and function in the real world, (S.App.149) (home living), and that Webster is not

able to communicate regarding abstract thoughts, (S.App.153) (communication and conceptual skills). Dr. Finn testified that Webster is better at speaking than understanding, and that concepts have to be simplified in order for Webster to understand them, (S.App.127-28) (communication and conceptual skills). Dr. Finn also noted that Webster's speech patterns, "marginal" school achievement, "marginal" employment history, and his inability to live on his own, supported his diagnosis of mental retardation. (S.App.127, 129.)

Webster's friends and family testified that classmates helped him with his homework and on exams, and that Webster repeated grades twice—in second grade and again in junior high, (S.App.115, 119) (functional academics); that Webster was never able to live away from his mother's home, and that he only received income from welfare, food stamps, family members and girlfriends (S.App.113, 114, 120) (home living); and that Webster may have been able to write letters, but that his handwriting was illegible (S.App.117-18) (communication and conceptual skills).

### 2. The Government's Evidence and Arguments At Trial

In the face of the evidence of Webster's consistently low IQ scores and his adaptive deficits, the government argued that Webster was not mentally retarded because he was malingering. The government presented testimony from Dr. George Parker, who administered a partial WAIS-R test and estimated that Webster's composite IQ score was 72. (S.App.301-02, 309-11, 312.) Dr. Parker suggested repeatedly that Webster's scores were artificially deflated because he was "motivated" to do poorly on the tests administered in order to avoid the death penalty, and concluded that Webster is not mentally retarded. (S.App.301, 302-03,

304-05, 308, 313.) Dr. Richard Coons, a psychiatrist who did not conduct an IQ test or a Vineland adaptive skills test, likewise testified that he did not believe Webster was mentally retarded and that Webster was manipulating his performance on the IQ exams. (S.App.316-19.) Specifically, Dr. Coons stated that Webster lied when he told Dr. Finn that he was in special education classes, and that this lie was consistent with "an attempt to persuade that person that you had mental deficiencies that you didn't actually have." (S.App.317-18.) In addition to its evidence that Webster had adapted to institutional life,[8] the government presented testimony from two Watson Chapel Schools representatives who indicated that Webster was not placed in special education classes and therefore was not retarded. (S.App.200-230.)

At the close of the punishment phase of trial, the government argued that the jury should discount the evidence of mental retardation, claiming that the evidence showed Webster was an average student (because he had not been in special education classes) who could function normally in prison, and that his low IQ scores were irrelevant because Webster was "motivated" to fake low scores on the IQ and behavioral skills tests in order to avoid a death sentence. (S.App.337-39.)

---

[8]    This includes testimony from Drs. Parker and Coons, who visited Mr. Webster in prison together, other inmates, and guards. (S.App. 251-76, 281-89, 306-307, 320-23, 325-26.)

## SUMMARY OF THE ARGUMENT

Webster was convicted and sentenced to death at a federal capital trial more than six years before *Atkins* was decided. Now, Webster seeks to present evidence which he only recently obtained—most of it from government files—that firmly establishes his mental retardation and directly refutes the evidence the government presented at trial to contest mental retardation. Previously undisclosed records in the possession of the Social Security Administration demonstrate that one government physician and two government Ph.D. psychologists examined Webster *prior to the commission of the crime*, when he was just 20 years old. The government records indicate that Webster tested at IQ scores (59 and 69) and exhibited deficits in adaptive functioning well within the range of mental retardation, and include explicit diagnoses of "mental retardation." One of these government physicians expressly noted that there was no evidence that Webster was faking his condition. In addition, previously undisclosed records in the possession of the Social Security Administration demonstrate that Webster had, in fact, been placed in special education classes, contrary to the testimony of government witnesses at trial. The newly available evidence directly undercuts the government's theory—central to its case at the punishment phase of the trial—that Webster was faking his IQ tests, that he was not in special education classes in school, and that his adaptive functioning was normal.

While the District Court denied Webster's 2241 Petition without assessing the quality of the newly discovered evidence, it is clear that Webster is mentally retarded. His lowest IQ score, 48, puts him at least three and one-third standard

18

deviations below the mean, with an IQ higher than less than 0.1 percent of the population. *See* DAVID WECHSLER, *WAIS-III ADMINISTRATION AND SCORING MANUAL* 24 (3d ed. 2003); (S.App.477 ¶ 15). Furthermore, Webster's IQ scores are significantly lower than those of prisoners recently found to be mentally retarded by the federal courts. *See, e.g.*, *Holladay v. Allen*, 555 F.3d 1346, 1357 (11th Cir. 2009) (IQ scores up to 73); *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007) (IQ scores up to 92), *United States v. Lewis* 2010 WL 5418901, *12 (N.D. Ohio Dec. 23, 2010) (IQ scores up to 75); *United States v. Davis*, 611 F. Supp. 2d 472, 478 (D. Md. 2009) (IQ scores up to 76). The Government has not identified, and counsel has not been able to find, any case decided since *Atkins* holding that a person with such consistently low IQ scores is *not* mentally retarded. Despite the conclusive evidence Webster now seeks to offer, he sits on death row in violation of the Constitution because the District Court has ruled that he will never have the opportunity to present the newly discovered evidence that proves his categorical ineligibility for the death penalty.

Section 2255 is inadequate and ineffective to test the legality of Webster's detention. On October 21, 2009, Webster moved the Fifth Circuit, based on the same new evidence that is the basis for his 2241 Petition, for authorization to file a successive motion to vacate his death sentence under § 2255(h)(1). The Fifth Circuit denied Webster's motion for authorization, holding that it lacked jurisdiction to entertain the application under § 2255(h). *Webster*, 605 F.3d at 259 n.8. Reading the language of § 2255(h)(1) narrowly, the court concluded that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly

discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *Id.* at 257. The Fifth Circuit held in essence that no matter how conclusive Webster's proof that he is in fact retarded, § 2255(h)(1) precluded the court from considering it because he is not also innocent of the crime.

As the Fifth Circuit's concurrence found, however, the limitations expressed in § 2255(h)(1) can lead, and here have led, to an unconstitutional result. Judge Wiener concluded that the new evidence "virtually guaranteed that [Webster] would be found to be mentally retarded." *Webster*, 605 F.3d at 259 (Wiener, J., concurring). Yet, for Webster, the express limitations in § 2255(h) produce an "absurdity" and a "Kafkaesque result," and would require the courts to "condone . . . an unconstitutional punishment." *Id.* at 259-60.

There is, then, a "glitch," *Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008), in § 2255: the Fifth Circuit has ruled there is no mechanism for the federal courts to consider newly discovered evidence that proves a defendant is categorically, constitutionally ineligible for a death sentence under § 2255. Accordingly, Webster's claim falls squarely within § 2255's Savings Clause and meets the requirements of the plain language and purpose of § 2241. Under the Supreme Court's decision in *Sawyer v. Whitley*, 505 U.S. 333 (1992), equating actual innocence with innocence of the death penalty, and this Court's decisions in *Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001), *In re Davenport*, 147 F.3d 605 (7th Cir. 1998), and *Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013), finding jurisdiction under § 2241 where the prisoner had no prior opportunity to present the argument testing the validity of his detention,

20

Webster is entitled to present this conclusive new evidence showing he is constitutionally ineligible for the death penalty under *Atkins* and the Eighth Amendment to the Constitution. Should this Court find that Webster is precluded from challenging his death sentence under § 2241 because he relies on newly discovered evidence that shows he is innocent of the death penalty, that finding would constitute an impermissible repeal of habeas and exercise of judicial rulemaking. Absent action by this Court, Bruce Webster will be executed in violation of the Constitution, resulting in an unconstitutional suspension of the writ of habeas corpus.

In these extraordinary circumstances, because Webster's claims meet the plain language and purpose of both § 2241 and § 2255(e), this Court should vacate the District Court's order, find jurisdiction, and allow him to proceed on the merits of his Petition.

## STATEMENT OF APPELLATE STANDARD OF REVIEW

This Court reviews the denial of a § 2241 petition *de novo*. *Brown*, 719 F.3d at 586.

## ARGUMENT

I. **Newly Discovered Evidence in the Possession of the Social Security Administration Establishes that Webster is Mentally Retarded and Thus Categorically Ineligible for the Death Penalty**

The previously undisclosed evidence demonstrates that Webster is mentally retarded and therefore ineligible for the death penalty. It directly undercuts the government's argument at trial that Webster was faking his IQ tests and that his

adaptive functioning was normal. The only expert to evaluate this newly discovered evidence states that it "contains compelling psychological evaluation results showing that Webster has subaverage intellectual functioning . . . consistent with a diagnosis of mental retardation." (S.App.494-95.) Together with the evidence presented at trial, no reasonable factfinder could find that Webster is not mentally retarded.

### A. Mental Retardation Standard

The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) defines mental retardation as (a) significantly subaverage intellectual functioning demonstrated by a full-scale IQ score of between 70-75 or lower; (b) concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (c) onset before age 18 years. *See* Am. Psychiatric Ass'n, DSM-IV-TR 41-42, 49 (4th ed. text rev. 2000); (S.App.476 ¶ 12). This standard is routinely applied by courts in determining whether an individual suffers from mental retardation. *See e.g.*, *United States v. Hardy*, 762 F. Supp. 2d 849, 852-55 (E.D. La. 2010); *Lewis*, 2010 WL 5418901, at *4-7; *Davis*, 611 F. Supp. 2d at 474-77.[9]

### B. The Diagnoses Contained in the Social Security Records Establish Webster's Mental Retardation and Directly Refute the Government's Case at Trial

The newly disclosed government records show complete and unbiased findings of mental retardation by government doctors buttressing the evidence of Webster's

---

[9] While the APA's recently released DSM-V, contains updated diagnostic criteria, Webster relies here on the DSM-IV criteria presented to the District Court.

mental retardation, and directly refuting the government's arguments at trial that Webster was faking his IQ tests to avoid the death penalty.

Each of the individual reports provide a previously unavailable window into Webster's subaverage functioning and show that he is mentally retarded. The reports were prepared by one physician and two Ph.D. psychologists working on behalf of the Social Security Administration and they date back to more than nine months before the underlying crime when Webster was just 20 years old. First, in a psychometric evaluation conducted on October 22, 1993, Dr. Hackett administered a full-scale WAIS-R intelligence test to Webster—one of the earliest IQ tests on record—in which Webster achieved a Full Scale IQ of 59, Performance IQ of 49, and Verbal IQ of 71. (S.App.358.) Dr. Hackett diagnosed Webster with mental retardation. (S.App.359.) This diagnosis was reiterated in Dr. Hackett's November 10, 1993 report, where it is noted further that Webster's behavior was bizarre and that he did not believe Webster could manage his own benefits or function well in a work setting or the community. (S.App.357) A second Social Security doctor, Dr. Rittelmeyer, who conducted a physical examination on Webster, made the same diagnosis: "Mental retardation. Flat Feet. Chronic sinus problems and Allergies by history." (S.App.364.) Finally, a third Social Security doctor evaluating Webster in December 1993 came to the same conclusion. Dr. Spellman reported an estimated IQ score of "69 or lower" and he diagnosed Webster with mental retardation. (S.App.356.) Dr. Spellman further reported an absence of malingering by Webster and found him to be disabled. (S.App.356; *see also* S.App.493-94 ¶¶ 53-54.)

Taken together, these reports are powerful evidence of Webster's mental retardation. Most importantly for the purposes of the present action, they demolish the case the government relied on at trial to prove otherwise. Here there is evidence that three doctors working on behalf of a government agency, long before the commission of the crime, diagnosed Webster as mentally retarded—two Ph.D.-level psychologists whose conclusions were supported by intelligence testing, and the third a physician who was tasked only with conducting a physical examination. By contrast, the government's two punishment-phase witnesses offered diagnoses made while Webster was incarcerated, years after the newly available evaluations were completed. (S.App.307, 314-15.)[10]

The government attacked Webster's strong evidence of mental retardation at trial by questioning Webster's "motivations" and accusing him of faking. As Dr. Parker testified, in describing the difference in the way he determines mental retardation in criminal subjects versus "real world" patients:

> [I]f you're sitting in your office and the patient comes in because he or she is having problems and they want help with it, and they are soliciting your professional services on their own hook, their own motivation, then the likelihood of trying to manipulate you or lie to you or deceive you or not do very well, it would be a pretty silly person to go to a doctor and then sit there and tell the doctor a bunch of lies about why he or she is there. But in forensic settings, of course, there is often serious motivation to mislead or deceive or get over on you or whatever, because the nature of the contract is different.

---

[10]    One of these witnesses, Dr. Coons, admitted that he was not certified or practiced in conducting evaluations for the purpose of determining mental retardation. (S.App.330.) Notably, the Texas Court of Criminal Appeals has deemed Dr. Coons's methodology inadmissible because it lacked "scientific reliability" under *Daubert*. *Coble v. State*, 330 S.W. 3d 253, 279-280 (Tex. Crim. App. 2010).

(S.App.305.) Meanwhile, the prosecution argued at the close of the trial's punishment phase that Webster was "motivated" to fake low scores on IQ and behavioral skills tests in order to avoid a death sentence. (E.g., S.App.303-05, 316 ("But in forensic settings, of course, there is often serious motivation to mislead or deceive or get over on you or whatever . . .").) By contrast, Dr. Spellman specifically stated that he did not believe Webster was malingering. (S.App.356.)

Because these newly available diagnoses were made before his incarceration, when Webster was a "real world" patient, and expressly conclude that there is no evidence of malingering, they directly undermine the government's evidence and argument that Webster consistently was faking later tests in order to secure a mental retardation defense. (*See* S.App.331-32, 337-39; Trial Tr. Vol. 27, 63:16 – 65:11; S.App.494-95 ¶¶ 51, 54, 59 ("This is significant because at the time of his performance on Dr. Hackett's WAIS-R, Webster was not accused of murder nor trying to escape the death penalty—a claim often raised as a possible motivation for malingering on a test of intelligence.").)

It is clear from the reports issued by three government doctors, evaluating Webster in a non-criminal setting when he was 20 years old and well before the commission of the crime, that Webster is mentally retarded and therefore categorically ineligible for the death penalty. Were this evidence ever considered together with the evidence of subaverage intellectual functioning presented at Webster's trial, including five IQ scores (48, 51, 55, 59, 65) and testimony from four psychologists and psychiatrists who had examined him and determined that his IQ

fell within the range of the mentally retarded, a court would find Webster mentally retarded and vacate his death sentence.

C.     **The Adaptive Deficits Apparent From the Social Security Records Is Strong Evidence of Mental Retardation and Directly Refutes the Government's Case at Trial**

The Social Security records contain significant new evidence of Webster's adaptive deficits that both establish he is mentally retarded and directly refute the government's evidence at trial.

First, as discussed above, the reports by Drs. Hackett and Spellman provide some of the earliest evidence of Webster's adaptive deficits. Dr. Hackett's evaluation of Webster demonstrates that Webster has significant limitations in conceptual skills (such as managing daily life) and practical skills (such as seeking or keeping a job). (S.App.357-59.) Similarly, Dr. Spellman's evaluation of Webster demonstrates that Webster has significant limitations in conceptual skills (such as self-direction, communication, and functional academics), social skills (such as taking responsibility), and practical skills (such as personal activities of daily life). (S.App.354-56.)

Second, the previously undisclosed Social Security records establish that Webster was, contrary to the government's strenuous assertions at trial, placed in special education classes as a child. The letter from Watson Chapel Schools Special Education Supervisor Lou Jackson explaining that Webster's Special Education records had been destroyed in 1988, (S.App.360), shows that Webster was enrolled in special education classes and directly contradicts the evidence presented by two Watson Chapel Schools representatives who testified, as witnesses for the

government, that Webster was not placed in special education classes. (S.App.187-90; S.App.493 ¶ 49 ("The one salient element of this school district letter is an acknowledgement that Webster did receive special education services.").)

The letter also directly contradicts Dr. Coons's testimony that Webster lied about being in special education classes in an attempt to manipulate a diagnosis of mental retardation. (S.App.317-18.) It establishes that Webster was in fact enrolled in special education classes in the Watson Chapel Schools as a youngster and demonstrates that Webster has significant limitations in intellectual functioning and adaptive behavior, including impairments in functional academic skills.

Finally, the incomprehensible answers, along with the nearly illegible penmanship, lack of syntax, capitalization, and punctuation, found in the Social Security application completed by Webster demonstrate Webster's significant limitations in intellectual functioning as well as in conceptual skills (such as language, writing, and communication). (S.App.369-98.) These government documents, found in the possession of a government agency, bolster the mental retardation evidence Webster offered at trial and directly contradict the government's argument that although Webster's IQ scores may be within the range of mental retardation, Webster does not have the required adaptive deficits.[11]

---

[11] The declarations recently obtained from childhood friends, relatives, and acquaintances of Mr. Webster over the course of multiple interviews with experts further bolster this new evidence of Mr. Webster's mental retardation, and in particular, his limitations in adaptive behavior in functional academics, home living, communication, and social and interpersonal skills. (*See* S.App.421-68.) In evaluating a defendant's adaptive deficits, courts have accorded great weight to testimony from family members and others who have had regular contact with the defendant (including parents, teachers, employers, and childhood friends). *See, e.g.*, *Holladay*, 555 F.3d at 1349-50, 1364; (S.App.495 ¶ 60).

As a whole, this new evidence demonstrates that Webster has shown an inability to care for himself, manage his benefits, seek or keep a job, and highlights his deficits in communication and conceptual skills and functional academics. It further directly refutes the government's theory that Webster was not only not enrolled in special education classes, but that he lied about it in an attempt to avoid the death penalty.[12]

As a whole, the previously undisclosed records reflecting three diagnoses of mental retardation by government doctors, two IQ tests showing scores of 59 and 69, and a wealth of adaptive behavioral deficits recorded when Webster was 20 years old, demonstrates that Webster is mentally retarded and constitutionally ineligible for the death penalty. (S.App.494-95 ¶¶ 58, 60, 61.)

## II. Webster Has Satisfied the Requirements of the Savings Clause Under This Court's Existing Precedent

The District Court precluded Webster from presenting the previously unavailable evidence under § 2241 because he did not show, under this Court's precedent as applied (incorrectly) by the District Court, that a new rule of law previously unavailable to him renders him "actually innocent" of the offense. (App.11-13.) That was error. First, Webster has established that a structural defect in § 2255(h)(1) prevents him from challenging the fundamental legality of his detention, which, left unaddressed, will result in an unconstitutional execution.

---

[12] Further, to the extent the government relied on statements about Webster's ability to function in prison, those should be discounted. *See, e.g.*, J. Gregory Olley & Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II, in ABAS-II CLINICAL USE AND INTERPRETATION* 381, 386 (Thomas Oakland & Patti L. Harrison eds., 2008); DSM-V at 38.

Second, Webster has satisfied this Court's "actual innocence" requirement. As the Supreme Court recognized in *Sawyer*, 505 U.S. at 336, categorical ineligibility for the death penalty is encompassed within the concept of "actual innocence," and the enactment of AEDPA did nothing to change that principle of constitutional law. Even if this Court were to find that categorical ineligibility for the death penalty does not constitute "actual innocence," Webster is in the rare class of prisoner entitled to challenge his sentence under § 2241 regardless of actual innocence.

### A. A Structural Defect In § 2255 Prevents Webster From Challenging the Fundamental Legality of His Detention

#### 1. The Fifth Circuit Has Ruled There is No Mechanism Under § 2255 to Address New Evidence Conclusively Establishing That an Individual is Constitutionally Ineligible for the Death Penalty

To invoke jurisdiction under § 2241, Webster must show that § 2255 is inadequate or ineffective to test the legality of his sentence of death. 28 U.S.C. § 2255(e); *Garza*, 253 F.3d at 921 ("This is the so-called 'savings clause' of § 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy 'is inadequate or ineffective to test the legality of [the prisoner's] detention.'") (quoting § 2255(e)) (alteration in original). The existence of "inadequacy" is determined by considering whether, in the circumstances of the case, the "essential function" served by habeas corpus is impaired "by the limitations on the use of the remedy provided in section 2255." *Davenport*, 147 F.3d at 609 (the "essential function" of habeas corpus is to "give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence"); *see also Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002). "Inadequacy" is

demonstrated when § 2255 is "so configured as to deny a convicted defendant any opportunity for judicial rectification" of a fundamental defect in his conviction or sentence. *Davenport*, 147 F.3d at 611 (emphasis in original omitted). Therefore, a petitioner with claims of the sort that "justif[y] collateral review, [but do not] justify sequential collateral attacks under [§ 2255(h)]" may be able to pursue those claims via § 2241. *Taylor*, 314 F.3d at 835 (internal citations omitted).

On October 21, 2009, Webster moved the Fifth Circuit for authorization to file a successive motion to vacate his death sentence under § 2255(h)(1) based on the same evidence that Webster sought to present to the District Court here. *In re Webster*, No. 09-11039 (5th Cir.), Mot. For Authorization to File Successive 2255 Mot. 2-3, Oct. 22, 2009, ECF Doc. No. 0051946905. The Fifth Circuit, however, denied Webster's motion for lack of jurisdiction and held that a federal prisoner cannot challenge his eligibility for the death penalty under § 2255(h)(1) "where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *Webster*, 605 F.3d at 259 n.8. Reading the language of § 2255 narrowly, the court concluded that such a result is "compelled by the plain language of § 2255(h)(1), which does not encompass challenges to a sentence." *Id.* While the court noted that reading "offense" to encompass "not only a claim that a prisoner is not guilty of the offense of conviction but also a claim that he is merely 'not guilty of the death penalty'" would accord with prior habeas corpus law construing "actual innocence" to include "innocence of the death penalty," it

nevertheless found that "there is no reason to believe that Congress intended the language 'guilty of the offense' to mean 'eligible for a death sentence.'" *Id.* at 258.

Under this strict reading of the statute, which results in what Judge Wiener deemed in his concurrence "an absurd and Kafkaesque result" that "ties our judicial hands so illogically," § 2255(h)(1) provides no mechanism for a person constitutionally ineligible for the death penalty—such as a mentally retarded person or juvenile—to challenge that eligibility based on previously unreleased evidence. *Id.* at 259-60. Surveying the evidence presented in the motion (the same evidence presented to the District Court here), Judge Wiener concluded that "it is virtually guaranteed" that Webster would be found mentally retarded if the newly discovered evidence could be considered on the merits, but noted that "we must turn a blind eye to this evidence, as it speaks to [Mr.] Webster's constitutional eligibility for the death penalty and not his factual innocence of the crime." *Id.*

Thus, Webster has been told that regardless of the persuasiveness of his newly uncovered evidence or the circumstances under which the new evidence was discovered, § 2255 provides him no remedy; this entire class of argument relating to the constitutionality eligibility for the death penalty is excluded from relief under § 2255. The constitutionality of Webster's sentence is directly in question—yet there is no avenue for *any* consideration on the merits under § 2255(h). This is just the type of "fundamental defect" in the post-conviction statute that § 2241 is designed to remedy. *See Davenport,* 147 F.3d at 611; *see also Brown*, 719 F.3d at 597 (suggesting §2255 is ineffective "if a class of argument were categorically excluded").

**2. Where Webster Did Not Have an Opportunity to Present This Evidence Before, § 2255 Provides an Inadequate Substitute For Habeas Corpus**

The facts and circumstances Webster presents here meet the requirements and purpose of § 2255(e). Webster can prove, based on facts that were unavailable to him at the time of his trial and his postconviction proceedings, that his detention—in this case, his death sentence—is fundamentally defective, but a "glitch" in § 2255 precludes him from challenging his death sentence under the federal habeas statute. This showing satisfies this Court's requirements for jurisdiction under § 2241. *See Garza*, 254 F.3d at 923 (finding § 2255 inadequate when it "does not now and has never provided an adequate avenue for testing Garza's present challenge to the legality of his sentence"); *Davenport*, 147 F.3d at 609, 611 (noting that "[i]f in a particular case section 2255 as amended by the Act does not provide an adequate substitute for habeas corpus, the prisoner can seek habeas corpus," and granting relief where Nichols had not had a "reasonable chance to correct an error" in his detention); *see also Brown*, 719 F.3d at 588.

In *Garza*, which the Order does not address, this Court found it had jurisdiction under § 2241 to consider the legality of a prisoner's death sentence in light of a report issued by the Inter-American Commission on Human Rights advising that the prisoner's human rights under the American Declaration of the Rights and Duties of Man had been violated and recommending his death sentence be vacated. *Garza*, 253 F.3d at 923. The report was based on evidence that Garza had raised in his prior postconviction proceedings—that the sentencing court improperly considered evidence of murders in Mexico for which Garza was neither charged nor

convicted in imposing his death sentence. *Id.* at 920. The Court found that the prisoner had no previous opportunity to present the Commission's report and recommendations at his trial or in his postconviction proceedings and was thus entitled to review under § 2241. *Id.* at 923. The *Garza* Court reasoned that, unlike the unsuccessful prisoner in *Davenport,* where "nothing in the relevant facts or law had changed since [his] trial," Garza had never had a reasonable opportunity to raise this challenge to the legality of his sentence. *Id.* at 922. This Court specifically found that Garza made "the type of argument that Davenport envisions will fall within the savings clause of § 2255," *id.* at 923, despite the fact that Garza did not present the change in law described in either § 2255(h)(2) or *Davenport*. While the District Court focuses on *Taylor*, 314 F.3d 832, that case is not analogous because the prisoner there was applying for relief from § 2255(h)(2)'s successor requirements (which contemplate a change of law as the basis for review)—not § 2255(h)(1), as Webster is here. (App.9-11.)

Section 2241 is the only mechanism that can remedy the grave and fundamental defect in Webster's sentence. As in *Garza, Davenport*, and *Brown*, Webster has had no opportunity to present this evidence at an earlier time. Despite earlier requests by counsel, the government only recently disclosed the evidence. *See Webster*, 605 F.3d at 259 n.1 (Wiener, J., concurring); (S.App.476 ¶ 12; S.App.502-03 ¶ 4; S.App.556-57 ¶ 2).[13] Webster did not have the opportunity to present, or the

---

[13]     The District Court relied in part on *Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997) and *In re Hill*, 715 F.3d 284, 292 (11th Cir. 2013) to deny Mr. Webster's Petition. Those cases both addressed successive § 2254 motions and are not applicable here.

undeniable benefit of, this powerful evidence that refutes the government's trial evidence, at either his trial or his § 2255 proceedings.

Although this Court has recognized that a change in statutory law is *one* circumstance in which the Savings Clause affords relief to a prisoner who would otherwise barred by § 2255(h)(2), *see e.g.*, *Davenport*, 147 F.3d at 611-12, it is clear from the Court's decision in *Garza*, in which the prisoner presented neither a change in law nor newly discovered evidence, 253 F.3d at 922-23, that this is not the only circumstance. And the circumstances here are extreme: The evidence sought to be presented does not go to some minor procedural infraction but rather to the heart of whether Webster could ever be eligible for a death sentence, and thus whether his execution would be a direct violation of the Eighth Amendment's ban on cruel and unusual punishment. Indeed, the District Court's restrictive interpretation of the Savings Clause would likewise prevent an individual who was sentenced to death for a crime committed when he was ostensibly 18 years old from presenting conclusive later-discovered evidence that he was actually 17 when the crime was committed. Could he then be executed because he was not relying on new precedent? The Fifth Circuit's holding, taken together with that of the District Court, completely forecloses the presentation of any new evidence, no matter how conclusive, proving that an individual is categorically ineligible for the death penalty.

This Court has not consistently limited § 2241 relief to prisoners who can show a change in statutory law, *see, e.g., Garza*; and it should not do so when the relief sought is the presentation of newly discovered evidence establishing categorical

34

ineligibility for the death penalty. Indeed, to do so would, as set forth in Part IV.B below, misinterpret § 2255(e) and result in an unconstitutional suspension of the writ.

Finally, Congress's traditional concerns with ensuring finality in the habeas context are not threatened in this rare and exceptional case, where there is no evidence that the Social Security records were previously available to Webster. *C.f., Brown*, 719 F.3d at 588 (noting that Congress's concerns with finality are not implicated where erroneous interpretations of the mandatory guidelines bear upon the legality of a prisoner's detention). There has been no finding that Webster's lawyers failed to exercise diligence in collecting and presenting evidence,[14] nor is this an instance where Webster is merely presenting *newly* generated evidence in an effort to keep returning for another "bite at the apple." Nevertheless, under the District Court's rationale, a federal prisoner who discovers new evidence proving that he is ineligible for the death penalty after his initial round of § 2255 proceedings would *never* be entitled to present that evidence to a court, no matter how conclusive the evidence or when it was discovered.

Here, § 2255 does not provide an "adequate substitution" for habeas corpus where Webster has had no "adequate avenue" for testing his present challenge to the legality of his sentence; he is, therefore, entitled to review. The newly discovered,

---

[14] Even if the evidence wasn't technically "newly discovered" under the successive petition requirements of § 2255(h), it would still be appropriate for the District Court to evaluate it under § 2241 because it reveals a fundamental defect in Mr. Webster's capital sentence. Nevertheless, as Mr. Webster argued to the District Court, even if his counsel's failure to obtain the Social Security records sooner had formed the basis for the District Court's denial, which it did not, Mr. Webster may have an actionable claim for ineffective assistance of counsel under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

contemporaneous evidence that Webster sought to present to the District Court, viewed in light of the evidence as a whole, establishes by clear and convincing evidence that Webster is constitutionally ineligible for the death penalty. This is exactly the type of "glitch" the § 2255 safety valve and § 2241 were designed to remedy.

**B.  Webster Has Satisfied this Court's "Actual Innocence" Requirements**

**1.  Webster Has Established He Is "Actually Innocent" Under Longstanding Habeas Jurisprudence**

The District Court erred in requiring Webster to establish that he is "actually innocent" of the *underlying offense*. (App.13.) Nevertheless, the new evidence that Webster sought to present to the District Court establishes that he is "actually innocent" because, in the context of a capital case, "innocence of the death penalty" *is* "actual innocence." *See Sawyer*, 505 U.S. at 336 ("[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty...."). Thus, under *Sawyer*, a prisoner who is subject to a categorical exclusion such as mental retardation or juvenile status is "actually innocent" for purposes of § 2241.

Neither *Taylor* nor *Davenport* expressly equates the "actual innocence" requirement imposed upon § 2241 petitioners with the requirement that petitioners be "not guilty of the offense" as required for a motion for a successive petition under § 2255(h)(1). *See Taylor*, 314 F.3d at 835-36 (foreclosing § 2241 review to prisoners who do not "illuminate any structural defect in § 2255 or present any fundamental error equivalent to actual innocence"); *Davenport*, 147 F.3d at 609-10. Instead, in

both cases, the court's § 2241 analysis evinces prudential concern for the preservation of judicial resources otherwise squandered by repeatedly testing the validity of convictions and for preventing petitioners from evading procedural requirements with comparatively minor technical failures. *Taylor*, 314 F.3d at 835-36; *Davenport*, 147 F.3d at 609-10.

Webster's Petition, however, does not implicate these concerns. He does not seek to test the validity of his conviction or to raise technical pleading issues. Nor, as described above, does he seek to re-hash arguments he has already presented on collateral review. Instead, he respectfully requests that the Court allow him the opportunity to present—for the first time—newly discovered evidence of his mental retardation, rendering his execution unconstitutional. As Judge Wiener noted, the "not guilty of the offense" requirement in § 2255(h)(1) produces an "absurdity" and a "Kafkaesque result" in this context and would require the courts to "condone . . . an unconstitutional punishment." *Webster*, 605 F.3d at 259-60. Section 2241 does not require the same result.

> ## 2. The Fifth Circuit's Interpretation of "Not Guilty Of The Offense" in § 2255 Does Not Preclude a Finding Of "Actual Innocence" Under § 2241

In denying Webster's 2241 Petition, the District Court incorrectly—but expressly—imported the Fifth Circuit's interpretation of the phrase "not guilty of the offense" from § 2255(h)(1) and applied it to the entirely separate "actual innocence" showing that this Court has required of some § 2241 petitioners: "the Fifth Circuit . . . conclud[ed] that the judge-made exception noted in *Sawyer* no longer applied

[and held that] actual innocence means innocent of the offense—not innocent of the death penalty." *Webster v. Lockett*, 2013 WL 6007593, at *7.

That was error. Section 2255(h)(1) limits a second or successive motion to circumstances when newly discovered evidence "would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant *guilty of the offense.*" (emphasis added). The Fifth Circuit's inquiry was, therefore, limited to the very narrow question of whether new evidence establishing ineligibility for the death penalty constitutes evidence that the movant was "not guilty of the offense" under § 2255(h)(1). *Webster*, 605 F.3d at 257 ("We now conclude that a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.,* capital murder."). The Fifth Circuit ruled that Congress, in enacting § 2255, did not intend for the statutory phrase "guilty of the offense" to mean "eligible for a death sentence," but made no finding regarding *Sawyer*'s application or continued vitality beyond the specific wording of § 2255(h)(1). *Id.*

This Court, however, has not imported the language of § 2255(h)(1) to the § 2241 context; it has instead imposed a different restriction—a showing of "a fundamental error equivalent to actual innocence"—upon prisoners bringing an action under the Savings Clause. *See Taylor*, 314 F.3d at 836. The question of whether Webster has shown he is "actually innocent" for purposes of § 2241, however, is distinct and separate from whether the evidence negated his guilt of the offense in his successive § 2255 motion. Thus, the District Court clearly erred when it

equated "actual innocence" with the Fifth Circuit's finding that Webster's new evidence did not address the issue of his "guilt of the underlying offense.[15]

Furthermore, allowing an action under § 2241 based newly-discovered evidence of a categorical eligibility for the death penalty—"actual innocence" within the meaning of *Sawyer*—is consistent with both *Taylor* and *Brown*. In those cases, the Court recognized that jurisdiction may exist under 2241 where, in the § 2255(h)(2) context, Congress "may have overlooked the possibility that new and retroactive statutory decisions could justify collateral review." *See Taylor*, 314 F.3d at 835; *Brown*, 719 F.3d at 587 n.1. Similarly, there is no evidence here that, in enacting AEDPA, Congress rejected the possibility that an individual would be entitled to relief for categorical ineligibility for the death penalty. Further, the "gatekeeping" requirements of § 2255—so crucial to AEDPA's reforms—do not apply to § 2241 petitions. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996); *see also James v. Walsh*, 308 F.3d 162, 166 (2d Cir. 2002).

The District Court's reliance on *Hope*, 108 F.3d at 120, and *Hill*, 715 F.3d at 300, is likewise misplaced. *Hope* and *Hill* addressed AEDPA's effects on the successive petition requirements of §§ 2255 and 2254, respectively, and neither case interpreted § 2241. Additionally, as discussed below, *infra* Part III, the Supreme

---

[15]    While the Fifth Circuit cited *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997), to define the limits of "offense" in § 2255, it did not rely on the decision to find, as the District Court assumed, that the Supreme Court's ruling in *Sawyer* equating "actual innocence" to "innocent of the death penalty" had been subsumed by AEDPA. In fact, AEDPA amended only § 2255—not § 2241—and there is no evidence that Congress intended to overrule *Sawyer* in the § 2241 context when it enacted AEDPA. *See Brown*, 719 F.3d at 600. The District Court's finding that "actual innocence" *derives* from 2255(h)(1)'s successive motion provisions is also wrong. (*See* App.12.)

Court has held that the miscarriage of justice exception, which encompasses "actual innocence," survived AEDPA. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1932 (2013).

Here, it is clear that the judge-fashioned rule requiring petitioners to show actual innocence under § 2241 should incorporate the Supreme Court's long-established holding that categorical ineligibility for the death penalty constitutes "actual innocence." Because the restrictions of § 2255 leave no avenue through which Webster can present previously unavailable evidence that he is ineligible for the death penalty, § 2241 is his last resort.

### 3. This Court Has Not Limited § 2241 Review to Prisoners Who Challenge Their Convictions

In addition to confusing the Fifth Circuit's interpretation of 2255(h)(1) with this Court's "actual innocence" limitation, the District Court also ignored the fact that this Court has, in appropriate cases, allowed a § 2241 action where the prisoner did not allege that he was not guilty of the crime for which he was convicted. In *Garza*, the Court granted review of a prisoner's § 2241 petition on the basis that the death sentence was imposed in error, even in the absence of any challenge to his guilt of the underlying crime." 253 F.3d at 923. Further, in its recent decision in *Brown*, this Court made it clear that § 2241 is not limited to testing the legality of the underlying criminal conviction: "As an initial matter, the district court erred in concluding that challenges to a sentence (rather than the underlying conviction) are categorically barred under 28 U.S.C. § 2241." 719 F.3d at 584.

In *Brown*, this Court reversed the district court's holding that the Savings Clause requires a claimant to show (as the same District Court Judge required here)

"actual innocence directed to the underlying conviction, not merely the sentence." *Brown*, at 584, 587 n.1. ("Brown's claim therefore falls into the 'special and very narrow exception' to the general rule, emphasized in *Unthank*, that sentencing errors are generally not cognizable on collateral review"). The Court directly rejected the contention that § 2241 does not permit challenges to a sentence, stating "[t]he text of the [savings] clause focuses on the legality of the prisoner's detention…; it does not limit its scope to testing the legality of the underlying criminal conviction." *Id.* at 588.

Like the petitioners in *Garza* and *Brown*, Webster is a rare exception who is entitled to relief under § 2241. The newly discovered evidence that Webster sought to present to the District Court establishes that he is mentally retarded and ineligible for the death penalty, but due to a glitch in § 2255, he is unable to challenge his sentence under the successive habeas rules and, absent redress through § 2241, he will be executed in violation of the Constitution. This is a dire and exceptional case that warrants the important judicial redress guaranteed by § 2241.

III. **In the Alternative, Recent Supreme Court Decisions Require that Credible New Evidence of Categorical Ineligibility – of "Actual Innocence" Within the Meaning of *Sawyer* – Is A Gateway for Suspension of Procedural Bars**

Even if this Court concludes that Webster has not satisfied the requirements for a "savings clause" case under existing Seventh Circuit case law, his proof that he is categorically ineligible for the death penalty establishes an equitable exception to any procedural bars to relief. *See Perkins,* 133 S. Ct. 1924.

In *Perkins*, the petitioner sought habeas relief after expiration of the one-year limitations period established in § 2244(d)(1)(D). *Id*. at 1930. After acknowledging

the untimeliness of the petition, the Supreme Court invoked the "miscarriage of justice exception" and recognized that "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *Id.* at 1931.

The purpose of the miscarriage-of-justice exception is to relieve an actually innocent person from harm that has resulted from a constitutional error, even if the petitioner is otherwise procedurally barred from seeking relief. *See id.*; *accord McCleskey v. Zant*, 499 U.S. 467, 495 (1991) (explaining that the miscarriage-of-justice exception serves as a "safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty" (internal quotation marks omitted)). As the *Perkins* Court noted, decisions applying the miscarriage-of-justice exception " 'seek to balance the societal interests in finality, comity, and conservation of scarce judicial resources with individual interest in justice that arises in the extraordinary case.' " 133 S. Ct. at 1932 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). Webster's circumstances present exactly the sort of extraordinary case in which prudential concerns should give way to an individual's interest in justice.

Although the specific procedural bar in *Perkins* is not at issue here, the Court recognized that the miscarriage-of-justice exception can "overcome various procedural defaults." 133 S. Ct. at 1931. Here, the relief Webster seeks is a writ of habeas corpus under § 2241 based on his categorical ineligibility for the death penalty. If this Court holds that any of the judicially created limitations to a Savings Clause action set forth in *Taylor* and its progeny bars relief here, those bars should

nevertheless fail in light of *Perkins.* Indeed, even the dissent in *Perkins* acknowledged that the miscarriage-of-justice exception may appropriately be applied to judge-made, prudential barriers to relief. *Id.* at 1938.

The practical effect of the District Court's decision is that a prisoner who files a motion under § 2255—on any basis—thereby forfeits his right to ever again test the legality of his sentence on the basis even of powerful newly-discovered proof of categorical ineligibility. That obstacle is analogous to the types of procedural bars to relief that previously have been subject to the miscarriage-of-justice exception. *See Perkins*, 133 S. Ct. at 1931-32. Thus, under *Perkins*, Webster's credible showing of actual innocence of the death penalty provides a "gateway" for consideration of new evidence. *Id.* at 1932.

## IV. Any Interpretation of §§ 2255(e) and 2241 Which Would Present an Absolute Bar to the Presentation of New Evidence Establishing Ineligibility For the Death Penalty Is Contrary to the Rules of Statutory Construction and Would Result in an Unconstitutional Suspension of the Writ

### A. The Severe Limitations on Savings Clause Actions Imposed by the District Court Are Not Based on the Statutory Language or Legislative History and They Are Inconsistent With and Unsupported By Supreme Court Precedent

Webster's Petition meets the plain language and purpose of both § 2241 and § 2255(e), and he is entitled to review. To sanction the heightened requirements imposed by the District Court—that Webster show a change in law that negates his guilt of the offense—would be in direct contravention of the plain language and purpose of the statute and would effectively eliminate the Savings Clause. These obstacles are not based on statute or legislative history and do not reflect

43

Congressional intent. Section 2255(h)(1) expressly contemplates successor actions based on newly discovered evidence. They are further completely unsupported by Supreme Court case law equating "actual innocence" to "innocence of the death penalty." While the circuit courts have fashioned their own rules regarding the application of § 2255(e) and § 2241, foreclosing review of the evidence under § 2241 in this circumstance—as the District Court ordered—would be contrary to the statute and constitute an impermissible exercise of judicial rulemaking.

In the § 2241 context, habeas corpus jurisdiction may only be restricted when Congress has expressed clear intent to do so. *See INS v. St. Cyr*, 533 U.S. 289, 298 (2001) (requiring the government to overcome the "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction") (citing *Ex parte Yerger*, 75 U.S. 85, 102 (1869) ("We are not at liberty to except from [habeas corpus jurisdiction] any cases not plainly excepted by law")). "Implications from statutory text or legislative history are not sufficient to repeal habeas corpus jurisdiction [under § 2241]; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal." *St. Cyr*, 533 U.S. at 299 (citing *Yerger*, 75 U.S. at 105 ("Repeals by implication are not favored. They are seldom admitted except on the ground of repugnancy; and never, we think, when the former act can stand together with the new act.")). As recognized by the Supreme Court in *St. Cyr*, when the interpretation of a particular statute "invokes the outer limits of Congress's power, we expect a clear indication that Congress intended that result." *St. Cyr*, 533 U.S. at 299; *see also Holland v. Florida,* 560 U.S. 631, 646 (2010); *Edward J.*

*DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

Further, courts are directed to avoid interpreting a statutory provision in a way that is (1) inconsistent with the policy of another provision, *see United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988), (2) inconsistent with a necessary assumption of another provision, *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 100-101 (1992), or (3) inconsistent with the structure of the statute, *see Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 668-69, 676 (1990); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 59-61 (1987). Finally, courts should avoid interpreting statutes in a way that would render an otherwise acceptable statute unconstitutional. *See St. Cyr*, 533 U.S. at 299-300; *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 465-66 (1989); *Edward J. DeBartolo Corp.*, 485 U.S. at 575.

Here, Congress has expressed no intent to rigidly restrict the availability of § 2241 to the heightened requirements imposed by the District Court. Section 2241 is the historical source for prisoners seeking habeas corpus relief. The Supreme Court has found that by enacting § 2255 as a convenient substitute for habeas corpus, Congress did not suspend the right of federal prisoners to access the writ of habeas corpus. *United States v. Hayman*, 342 U.S. 205, 212, 219, 223 (1952); *see also Davenport*, 147 F.3d at 609 ("[t]he purpose behind the enactment of section 2255 was to change the venue of postconviction proceedings brought by federal prisoners"). While AEDPA limited the rights of prisoners seeking collateral review, the text of

§ 2241 and the Savings Clause was left untouched by AEDPA's amendments; federal courts are still instructed to grant writs of habeas corpus to a federal prisoner pursuant to § 2241 when it "appears that the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention." While the text of § 2255(h) is narrow and restrictive, the text of § 2241 is broad. It does not restrict the bases for permissible review, especially where it is clear from § 2255(h)(1) that Congress deemed newly discovered evidence a basis for successive review. And, as this Court recently noted, the text of the Savings Clause focuses on the legality of the *detention*, and does not limit its scope to testing the legality of the underlying criminal conviction. *Brown*, 719 F.3d at 588.

Prescribing rigid limits on the jurisdiction of § 2241, as the District Court has done here, is exactly the opposite of Congress's broad instruction to provide habeas relief when § 2255 provides an inadequate substitute. *See Davenport*, 147 F.3d at 609. As shown above, Webster satisfies the requirements of § 2255(e) and he is entitled to review under § 2241. Despite the Supreme Court's instruction that repeal of habeas corpus must be supported by specific Congressional intent, *see St. Cyr*, 533 U.S. at 299, neither the District Court nor the Government have cited any statutory or legislative support for the District Court's restrictive reading of the statute. The heightened standards imposed by the District Court, if sanctioned by this Court, are indeed a repeal: they effectively rule out any opportunity for judicial review for an entire extraordinary class of case where § 2255(h)(1) has proven to be inadequate or ineffective—the consideration of newly discovered evidence, never seen by any court,

46

proving that an individual is categorically ineligible for the death penalty and detained under an unconstitutional sentence of death. The District Court's narrow interpretation completely abdicates the Savings Clause and eliminates any equity or flexibility that § 2241 was intended to preserve and, as discussed below, Part IV.B, would implicate strongly the constitutionality of § 2255(e) and should be avoided. *See St. Cyr*, 533 U.S. at 299.

**B.   Congressional Failure To Provide A Path For Review of Conclusive Evidence of Constitutional Ineligibility Would Be A Suspension of the Writ**

The Constitution forbids Congress from suspending the writ of habeas corpus except during periods of invasion or rebellion. U.S. Const. art. I, § 9, cl. 2.; *see Davenport*, 147 F.3d at 609 (suggesting that Congress may have retained the § 2255 safety hatch in order to avoid suspending the writ). Where, as here, § 2255 is not available, § 2241 is the only avenue for review. Taking the District Court's order to its logical conclusion, a federal prisoner under the sentence of death has no judicial means of challenging his death sentence where evidence discovered after his initial § 2255 proceeding demonstrates that he is constitutionally ineligible for the death penalty.   This result is, in the words of Judge Wiener, "Kafkaesque."   It is also unconstitutional.

In *Holland v. Florida*, the Supreme Court explained:

> When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the "writ of habeas corpus plays a vital role in protecting constitutional rights." . . .   It did not seek to end every possible delay at all costs. . . . The importance of the Great Writ, the only writ explicitly protected by the Constitution . . . , along with congressional efforts to harmonize the new statute with

> prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

560 U.S. at 649 (citations omitted); *see also St. Cyr*, 533 U.S. at 298-314 (referencing constitutional questions that would be presented under the Suspension Clause if habeas relief were unavailable, and concluding that, at the "absolute minimum," "the Suspension Clause protects the writ 'as it existed in 1789'"); *Yerger*, 75 U.S. at 95 ("The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defence [sic] of personal freedom[;]" the Constitution's manifest intent with respect to habeas corpus is "that every citizen may be protected by judicial action from unlawful imprisonment.").

In *Triestman v. United States*, the Second Circuit noted that "serious Eighth Amendment and due process questions would arise with respect to [] AEDPA if we were to conclude that, by amending § 2255, Congress had denied [petitioner] the right to collateral review. . . ." 124 F.3d 361, 378-79 (2d Cir.1997). The *Triestman* court did not decide the Suspension Clause issue, but noted potential Suspension Clause issues were AEDPA to be interpreted to preclude collateral review when "Congress has arguably cut off all post-conviction relief for a claim of actual innocence that was based on the existing record and that could not have been effectively brought previously." *Id.* at 378 n. 21. Concurring in *Martinez-Villareal v. Stewart*, Judge Nelson wrote that AEDPA "unconstitutionally suspends the writ of habeas corpus . . . in an unambiguous fashion, by prohibiting the consideration of claims in second or successive petitions that do not fit the exceptions found in

§ 2244(b)(1) and (2)." 118 F. 3d 628, 635 (9th Cir. 1997), *aff'd* 523 U.S. 637 (1998); *see also Hayman*, 342 U.S. at 223; *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir.1997) ("Were no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent as a result of a previously unavailable statutory interpretation, we would be faced with a thorny constitutional issue."); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1190 (E.D. Mich. 2001) (finding that utilizing the one-year statute of limitations in AEDPA to deny relief to a petitioner who can demonstrate factual innocence would constitute violation of the Suspension Clause).

If the Savings Clause cannot operate as intended, as a failsafe mechanism to prevent injustice, then the writ of habeas corpus is unconstitutionally suspended. There can be no question that to execute a prisoner who is *constitutionally ineligible* for the death penalty, and whose execution therefore violates the Eighth Amendment, would be a profound injustice and precisely the sort of fundamental defect the writ of habeas corpus is intended to remedy. Indeed, as the Supreme Court has recognized for over 40 years, a sentence of death is a punishment in a category of its own: "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Where, as here, § 2255 is not available, failure to consider the newly available evidence of Webster's categorical ineligibility for the death penalty would result in an unconstitutional suspension of the writ of habeas corpus. Under the District Court's

order, no federal prisoner would be permitted to challenge his eligibility for the death penalty based upon evidence discovered after his initial round of § 2255 review, regardless of the persuasiveness of the evidence, and regardless of whether he had the opportunity to bring the claim before. By requiring that a petitioner present a change in law proving he is actually innocent of the offense, an entire class of argument attacking the constitutionality of a death sentence is categorically excluded from any judicial consideration.

Indeed, even the government, in its response to Webster's petition for certiorari upon the Fifth Circuit's decision, acknowledged the importance of the existence of a remedy under § 2241 when § 2255 is jurisdictionally unavailable. In attempting to dissuade the Supreme Court from granting certiorari, the government strongly suggested to the Court that absence of jurisdiction under § 2255 did not result in a suspension of the writ because Petitioner had another avenue of relief—§ 2241. Br. for the United States in Opp'n, *In re Webster*, No. 1-150, 2010 WL 4278712, at *17 (S. Ct. Oct. 29, 2010).

Denying review under § 2241 would preclude all review of previously unavailable evidence establishing the unconstitutionality of Webster's death sentence, and would therefore constitute an unconstitutional suspension of the writ of habeas corpus.

*　　*　　*

Webster is mentally retarded and categorically ineligible for the death penalty; executing him would violate the Eighth Amendment's ban on cruel and

unusual punishment under *Atkins*. While the Fifth Circuit determined that it is precluded from considering the newly uncovered evidence establishing Webster's mental retardation under § 2255(h)(1), this Court is under no such restriction. Section 2255(h)(1) is inadequate and ineffective and, as it did in *Garza*, this Court should grant relief. Foreclosing jurisdiction here would, contrary to Supreme Court precedent, violate the Savings Clause , result in an unconstitutional suspension of the writ of habeas corpus, and allow the execution of an individual not subject to that sentence.

**CONCLUSION**

Webster respectfully requests that this Court: (1) reverse the District Court's order; (2) find that Webster is entitled to review of the previously unavailable evidence under 28 U.S.C. § 2241; and (3) remand to the District Court for discovery and an evidentiary hearing.

Dated: February 18, 2014          DORSEY & WHITNEY LLP


By:   s/ Kirsten E. Schubert
       Steven J. Wells
        *Counsel of Record*
       Kirsten E. Schubert
       Timothy J. Droske
    Suite 1500, 50 South Sixth Street
    Minneapolis, MN 55402-1498
    Telephone:   (612) 340-2600

    *Attorneys for Petitioner-Appellant*
    *Bruce Carneil Webster*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,986 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point Century Schoolbook font for the main text and 11-point Century Schoolbook font for footnotes.

Dated: February 18, 2014      By:  s/ Kirsten E. Schubert
          Kirsten E. Schubert

DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorneys for Petitioner-Appellant Bruce Carneil Webster*

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I, Kirsten Schubert, an attorney and undersigned counsel for Bruce Carneil Webster, certify that all materials required by Circuit Rule 30(a) are included in the appendix bound with this brief.   I further certify that all materials required by Circuit Rule 30(b) are included in Petitioner's Separate Appendix filed with this brief.

Dated: February 18, 2014          By:  s/ Kirsten E. Schubert
                                       Kirsten E. Schubert

                                  DORSEY & WHITNEY LLP
                                  Suite 1500, 50 South Sixth Street
                                  Minneapolis, MN 55402-1498
                                  Telephone:   (612) 340-2600
                                  Facsimile:   (612) 340-2868

                                  *Attorneys for Petitioner-Appellant Bruce Carneil Webster*

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

Entry on Petition for Writ of Habeas Corpus, Nov. 13, 2013 (Dkt.29) ................App.1

Judgment, Nov. 13, 2013 (Dkt.30) .......................................................................App.14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Cause No. 2:12-cv-86-WTL-WGH |
| | ) | |
| CHARLES  LOCKETT Warden, United | ) | |
| States Penitentiary, Terre Haute (USP), | ) | |
| | ) | |
| Respondent. | ) | |

ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS

This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2241.[1] Dkt. No. 1. Webster's motion is fully briefed, and

the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

I.      BACKGROUND

During the fall of 1994, Webster, Orlando Hall, and Marvin Holloway operated a

marijuana trafficking business in Pine Bluff, Arkansas.[2] With the help of Steven Beckley, the

men regularly purchased marijuana from the Dallas/Fort Worth area in Texas and transported the

drugs back to Arkansas. On September 21, 1994, Hall flew to Dallas to purchase marijuana from

two local drug dealers, Stanfield Vitalis and Neil Rene. That same day, Hall and Beckley met

with Vitalis and Rene at a car wash and gave them $4,700 for the purchase of marijuana. The

---

[1] Although Webster received a sentence of death and is currently incarcerated in the
Special Confinement Unit in Terre Haute, Indiana,  his execution has been stayed pending the
outcome of *Roane v. Gonzalez*, 1:05-cv-2337 (D. D.C.). *Roane* involves a constitutional
challenge to the method of lethal injection used by the federal government. Webster's Pet. at 2,
n. 1, Dkt. No. 1.

[2] The circumstances that led to Webster's arrest and convictions are discussed in more
detail in *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) ("*Webster Direct Appeal*").

men agreed to return to the car wash later that that day to transfer the drugs. Vitalis and Rene, however, never returned to the car wash and later claimed they were robbed of the $4,700.

On September 24, 1994, Webster flew to Dallas where he met with Hall, Hall's brother Demetrius Hall, and Beckley. After they discovered where Neil Rene lived, the four men drove to Rene's apartment and knocked on his door. Lisa Rene, Neil Rene's sixteen-year-old sister, was the only one home. She refused to let the men in and called police. Armed with handguns, a baseball bat, duct tape, and gasoline, the men forced their way into the apartment and kidnapped Lisa before police arrived. Lisa was eventually taken to a motel in Pine Bluff, Arkansas where she was held for several days. During the ordeal, she was repeatedly sexually assaulted by Webster and the other men. After two days of captivity, Webster, Hall, and Beckley drove Lisa to a park where they placed a sheet over her head and beat her with a shovel. "Webster then gagged her and dragged her into [a] grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave." *Webster Direct Appeal*, 162 F.3d at 319. Although she was "likely still breathing," Webster, Hall, and Beckley buried Lisa and returned to the motel. *Id.*

Shortly thereafter, Beckley was arrested and confessed to police. As a result, Webster was charged by indictment with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), traveling in interstate commerce with the intent to promote extortion in violation of 18 U.S.C. § 1952 (count five), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). In February 1995, the Government filed its notice of intent to seek the death penalty against Webster.

App.2

In 1996, a jury found Webster guilty of counts one, two, and six of the indictment.[3] During a separate sentencing hearing before the same jury, Webster's defense team argued that Webster is mentally retarded and thus could not be sentenced to death pursuant to 18 U.S.C. § 3596(c).[4] In support of this argument, defense counsel introduced as evidence Webster's low IQ scores, testimony from Webster's friends and family, and testimony from four psychologists and psychiatrists who examined Webster after his arrest.[5]

During the hearing, clinical psychologist Dr. Raymond Finn testified that he administered a full-scale intelligence test on Webster, the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), and Webster received an IQ score of 59. Dr. Finn also opined that Webster is "clearly mentally retarded." Similarly, psychologist Dr. Denis Keyes testified that he administered two intelligence tests on Webster, the Stanford-Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and Webster's IQ scores were 51 and 55, respectively. Dr. Keyes also conducted a Vineland adaptive skills test on Webster to measure his "adaptive functioning."[6] Dr. Keyes ultimately concluded that Webster functions at the level of a seven-year-old and is mentally retarded. Neuropsychologist Dr. Robert Fulbright testified that he performed several neuropsychological tests on Webster. Based on the results, he believed Webster had significant impairment in his intellectual capacity, attention capacity, and reasoning

---

[3] The Government agreed to dismiss count five.

[4] Section 3596(c) provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."

[5] A fifth medical expert was presented on surrebuttal to critique the methodology used by one of the Government's experts.

[6] The term "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, Text Revision (DSM-IV-TR) at 42.

abilities, and suffered from limited language and memory capabilities. The fourth expert, Dr. Mark Cunningham, testified that he spoke with Webster's family and examined Webster while he was in prison. Dr. Cunningham further testified that Webster suffers from mild mental retardation

Defense counsel also introduced evidence of an IQ test that was given to Webster by an Arkansas state mental health center in 1992. The test demonstrated that Webster had an IQ of only 48 more than a year before Lisa's kidnapping and murder. Webster's friends and family also testified at the hearing. They stated that Webster had to repeat two grades in school, was in special education classes, was unable to live away from his mother, received income from welfare, food stamps, family members, and girlfriends, and had illegible handwriting.

To rebut Webster's evidence of mental retardation, the Government presented testimony from two experts. Dr. George Parker testified that he administered a partial WAIS-R and estimated Webster's IQ to be 72. He also testified that Webster does not suffer from mental retardation, and Webster's IQ scores were artificially deflated because he was motivated to do poorly on the tests to avoid the death penalty. Dr. Richard Coons, a psychiatrist, testified similarly. Dr. Coons further claimed that Webster had lied about taking special education classes in his youth.[7]

The Government also focused on Webster's apparent ability to adapt to life in jail. Dr. Parker and Dr. Coons testified that Webster made his bed, put away his clothes, and kept an organized cell while awaiting trial. Fellow inmates and corrections officers also testified that Webster had written letters, grievances, and requests for various services, read newspapers aloud, submitted names and addresses for his visitation list, appeared to be reading from law books and

---

[7] Two witnesses from Watson Chapel Schools testified at the sentencing hearing that Webster did not attend special education classes while in school.

taking notes in the law library, and on one occasion, Webster complained because he received incorrect change from the commissary.

At the conclusion of the hearing, the jury determined that several statutory and non-statutory aggravating factors existed, *see* 18 U.S.C. § 3592, and concluded that the death penalty was an appropriate sentence for Webster's actions. On September 30, 1996, the court agreed with the jury's recommendation and sentenced Webster to death on count one, life imprisonment on count two, and sixty months' imprisonment on count six. The court also issued an entry entitled Factual Finding Regarding Mental Retardation stating that, "Webster is not mentally retarded and . . . he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." *Webster Direct Appeal*, 162 F.3d at 351.

Webster appealed his convictions and sentence to the Fifth Circuit arguing, among other things, that his death sentence was unconstitutional because he is, in fact, mentally retarded. The court disagreed, however, noting that "[t]he government presented substantial evidence to support the finding" the he was not mentally retarded. *Id.* at 353. Webster's conviction and death sentence were ultimately affirmed by the Fifth Circuit, and the Supreme Court of the United States denied his petition for certiorari. *Webster v. United States*, 528 U.S. 829 (1999).

Thereafter, on September 29, 2000, Webster timely filed a motion for relief pursuant to 28 U.S.C. § 2255.[8] Again, Webster argued that his death sentence is improper because he is mentally retarded. Webster also argued that counsel was ineffective in failing "to investigate and present additional evidence demonstrating mental retardation and the extreme abuse Webster suffered as a child." *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) ("*Webster 2255*

---

[8] An amended motion was filed on August 16, 2002.

*I*"). The district court denied his motion, but granted a certificate of appealability as to two of Webster's claims: "first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005) ("*Webster 2255 II*").

Once more, however, the Fifth Circuit rejected Webster's arguments regarding his alleged mental retardation and provided the following explanation for its decision:

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but . . . Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

> Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," and Webster failed to convince either the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded.

*Id.* at 313-14 (citation omitted) (emphasis in original). Webster's petition for a writ of certiorari was denied by the Supreme Court. *Webster v. United States*, 549 U.S. 828 (2009).

Webster also separately appealed the district court's denial of a certificate of appealability on the remainder of his § 2255 claims, including the allegation that counsel was ineffective in failing to present additional evidence of his mental retardation during the sentencing hearing. The Fifth Circuit, however, agreed with the district court's assessment of Webster's ineffective assistance of counsel claim noting that

> [a]fter engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not constitutionally ineffective for failing to present more of the same.

*Webster 2255 I*, 392 F.3d at 793. The Fifth Circuit further stated:

> Indeed, our review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing Webster's cognitive abilities.

*Id.* at 793-94.

Webster's appeals did not stop there, however. On October 22, 2009, Webster moved the Fifth Circuit for authorization to file a second motion for relief under 28 U.S.C. § 2255. Pursuant to § 2255(h)(1),

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Webster argued that a successive 2255 motion was warranted because he had newly discovered evidence "in the form of government and school records and additional testimony" establishing that he is mentally retarded, and thus, ineligible for the death penalty. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) ("*Webster 2255 III*"). Webster's "newly discovered evidence" included records from the Social Security Administration indicating that he was diagnosed with mental retardation months before he kidnapped, assaulted, and murdered Lisa and a letter from his school indicating that he was, in fact, enrolled in special education classes. Webster argued that, had this evidence been presented at trial, it would have refuted the Government's arguments that he was pretending to be mentally retarded to avoid the death penalty and he was lying when he said he attended special education classes. The Fifth Circuit, however, held that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital

murder." *Id.* at 257. Because Webster's newly discovered evidence challenged only his sentence, i.e., his death sentence, the court denied Webster's request to file a subsequent § 2255 motion without considering the merits of the new evidence.[9]

Webster now seeks relief from this Court pursuant to 28 U.S.C. § 2241 based on the same newly discovered evidence addressed in his motion for authorization to file a second motion under 28 U.S.C. § 2255. Webster argues that "because section 2255 is inadequate and ineffective, section 2241 is the appropriate mechanism for Petitioner to challenge the unconstitutionality of his death sentence based on previously unavailable evidence." Webster's Pet. at 26.

## II.  STANDARD

A federal court may issue a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3) if it finds the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Webster seeks such a writ from this Court.

## III.  DISCUSSION

Before the Court may consider the merits of Webster's petition, the Court must determine whether he satisfies the savings clause of § 2255, and is thus entitled to attack his sentence under § 2241.

> In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255. Furthermore, in the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions to sentences through a habeas petition under § 2241. There is, however, a recognition in the statute that it will not apply in a narrow class of cases. This is the so-called "savings clause" of

---

[9] The court, however, was not unsympathetic to Webster's situation, as one concurring judge wrote that the court's holding, although legally correct, was absurd and "Kafkaesque." *Id.* at 259. He believed that if Webster were allowed to present the newly discovered evidence "to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded," and thus, ineligible for the death penalty. *Id.*

> § 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's] detention."

*United States v. Prevatte*, 300 F.3d 792, 799 (7th Cir. 2002) (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)). According to the Seventh Circuit, "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion." *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998); *see also Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007) (if § 2255 offers "one full and fair opportunity to contest" one's conviction, a § 2241 petition must be dismissed under § 2255), *Potts v. United States*, 210 F.3d 770, 770 (7th Cir. 2000) ("The essential point is that a prisoner is entitled to one unencumbered opportunity to receive a decision on the merits."). The following qualifications, however, apply to this rule:

> The first is that the change of law has to have been made retroactive by the Supreme Court. . . . The second is that it must be a change that eludes the permission in section 2255 for successive motions. . . . Third, "change in law" is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is incarcerated.

*Id.* at 611-12.

Post-*Davenport*, the Seventh Circuit has concluded that "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002); *see also Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008) ("§ 2255 is inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence"). In other words, a petitioner cannot show that a motion under § 2255 is "ineffective" simply

because that remedy is no longer available, either because the deadline for filing such a motion has passed or because petitioner filed a previous motion under § 2255 and cannot satisfy the requirements for filing a second motion under § 2255(h). *Unthank*, 549 F.3d at 535-36 (citing *Taylor*, 314 F.3d at 836) (further rejecting argument that "whenever § 2255(h) closes the door to a renewed challenge under § 2255, then § 2255(e) must open the door to a challenge under § 2241").

In *Taylor*, the petitioner was convicted of several drug and firearms offenses. After the Seventh Circuit affirmed his convictions and sentences, Taylor filed a motion for relief pursuant to § 2255 with the district court arguing that "an error in applying the Sentencing Guidelines' grouping rules had elevated his range by 6 to 21 months, and that the judge should correct this error by reducing his sentence." *Id.* at 833. The court denied his motion under then prevailing Circuit law without investigating whether "counsel's failure to call this to the attention of the trial and appellate courts was constitutionally deficient." *Id.*

Thereafter, the Supreme Court issued a decision unrelated to Taylor's case that suggested that the district court erred in denying Taylor's § 2255 motion. As a result, Taylor filed a petition for writ of habeas corpus under § 2241, arguing effectively that "his lawyer furnished ineffective assistance by failing to argue at sentencing or on appeal that his convictions should have been grouped under U.S.S.G. § 3D1.2," as the Supreme Court had ruled in a similar case. *Id.* at 836. In determining whether Taylor's petition satisfied the savings clause of § 2255, the court reasoned that "the sort of argument Taylor want[ed] to present . . . has been around for a long time. . . . It does not illuminate any structural defect in § 2255 or present any fundamental error equivalent to actual innocence." *Id.* Moreover, the court noted that, although the Supreme Court issued a decision showing that the disposition of his first § 2255 proceeding had been mistaken,

App.10

"[t]he intervening decision did not . . . create a new and retroactive rule of constitutional law; at most it just showed that an error had been made in applying an old rule to Taylor's situation." *Unthank*, 549 F.3d at 535. Accordingly, Taylor's petition was denied.

Here, Webster argues that he is mentally retarded and thus ineligible for the death penalty. This sort of argument, however, is by no means new. *See Atkins v. Virginia*, 536 U.S. 304, 314 (2002) ("In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally retarded.'"). Thus, the law on this topic has not recently changed such that Webster was *unable* to argue that he was mentally retarded prior to the instant petition. Rather, it is clear from the record that Webster's mental ability was a highly contested issue at every stage of the proceedings.[10] *Cf. Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997) ("A newly discovered factual basis for a claim may permit filing a successive petition raising a new claim, . . . but it does not permit filing a successive petition raising the same claim that was presented in a previous petition."); *In re Hill*, 715 F.3d 284, 292 (11th Cir. 2013) (Petitioner "cannot convert his previously asserted 'claim' into a wholly new 'claim' merely by coming forward with new supporting evidence or even new legal arguments.").

Notwithstanding the foregoing, Webster argues that "[t]he newly available evidence . . . taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded

---

[10] Webster argues that "it was simply not possible for [him] to bring his claim in connection with his original petition because most of the new evidence upon which [his] Petition is based was in government files that were neither produced to [him] nor made available to him, despite his request." Webster's Br. at 31. Based on the affidavits provided by Webster, trial counsel requested the information prior to Webster's trial, but the documents were never produced. Apparently, trial counsel did not follow-up on his request. The information was not requested again until October 2008, more than twelve years after his trial and several years after his direct appeals and his initial § 2255 motion were unsuccessful. Unfortunately, it is now too late to present this evidence.

and, therefore, 'actually innocent' of the death penalty." Webster's Br. at 32. Thus, like one of the petitioners in *Davenport*, he is "actually innocent" of the offense and the Court should consider the merits of his petition. The Government argues, on the other hand, that "a challenge to a sentence does not amount to a claim that a prisoner is innocent of the offense." Government's Resp. at 13, Dkt. No. 17.

The term "actual innocence" is derived from § 2255(h)(1), which allows for successive 2255 motions under limited circumstances. The rule provides as follows:

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Before it was codified in § 2255 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "the 'actual innocence' exception . . . was judge-made." *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997). The Supreme Court discussed the judge-made actual innocence exception as it applies in capital cases in *Sawyer v. Whitley*, 505 U.S. 333 (1992). In that case, the Court held that "to show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336. In other words, "actual innocence" could mean "innocent of the death penalty." Webster argues that this Court should apply this definition and allow his petition to proceed.

Webster, however, made this exact argument before the Fifth Circuit on his motion for authorization to file a second motion for relief under 28 U.S.C. § 2255, and the Fifth Circuit rejected his argument, concluding that the judge-made exception noted in *Sawyer* no longer applied. It decided that

App.12

there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence." Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255. Or if Congress had intended to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence." Instead, it elected to couch § 2255(h)(1) . . . in the markedly different, unmistakable terms of *guilt of the offense*.

*Webster 2255 III*, 605 F.3d at 258-59 (emphasis in original). Moreover, since the actual innocence exception was codified, Circuit courts, including the Seventh Circuit, have unanimously held that the *Sawyer* exception did not survive the enactment of AEPDA. *See, e.g.*, *Hope*, 108 F.3d at 120; *Hill*, 715 F.3d at 300; *Webster 2255 III*, 605 F.3d at 258. Therefore, as the Government contends, actual innocence means innocent of the offense—not innocent of the death penalty.

Webster does not argue that he is actually innocent of his crimes. He argues only that he is not eligible for the death penalty because he is mentally retarded. Thus, based on the foregoing case law, Webster is unable to show that § 2255 is an inadequate or ineffective remedy such that he may bring a petition for writ of habeas corpus under § 2241.  Accordingly, and unfortunately, the Court is unable to consider the merits of Webster's petition.

## IV.   CONCLUSION

For the foregoing reasons, Webster's petition for writ of habeas corpus under 28 U.S.C. § 2241 is **DENIED**.

SO ORDERED:  11/13/2013

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

App.13

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 2:12-cv-86-WTL-WGH** |
| | ) | |
| **CHARLES  LOCKETT Warden, United** | ) | |
| **States Penitentiary, Terre Haute (USP),** | ) | |
| | ) | |
| **Respondent.** | ) | |

### JUDGMENT

The Court having this day made its Entry, **IT IS THEREFORE ADJUDGED** that the

Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241,

and the civil action docketed as Cause No. 2:12-cv-86-WTL-WGH is **DISMISSED WITH**

**PREJUDICE**.

SO ORDERED:

Copies to all counsel of record via electronic communication.

App.14

# CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2014, I electronically filed the foregoing Appellant's Brief including Required Short Appendix with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> James Wesley Hendrix, Esq.
> Office of the U.S. Attorney
> Northern District of Texas
> 1100 Commerce Street, Suite 300
> Dallas, TX 75242-1699
> 214-659-8684
> Email: wes.hendrix@usdoj.gov

Pursuant to ECF Procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the foregoing to be transmitted to the Court within 7 days of that notice date.

Dated: February 18, 2014        DORSEY & WHITNEY LLP

> By   s/ Kirsten E. Schubert
> Kirsten E. Schubert
> Suite 1500, 50 South Sixth Street
> Minneapolis, MN 55402-1498
> Telephone: (612) 340-2600
> Facsimile: (612) 340-2868
>
> *Attorney for Petitioner-Appellant Bruce Carneil Webster*