IN THE
## UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

---

## No. 14-1049

---

BRUCE CARNEIL WEBSTER,

              Petitioner-Appellant,

v.

JOHN F. CARAWAY, Warden,

              Respondent-Appellee.

---

On Appeal from the United States District Court
For the Southern District of Indiana
District Court No. 2:12-cv-00086-WTL-WGH

---

## PETITIONER-APPELLANT'S SEPARATE APPENDIX

## VOLUME I

---

**THIS IS A DEATH PENALTY CASE**

**ORAL ARGUMENT REQUESTED**

Dorsey & Whitney LLP
Steven J. Wells
Kirsten E. Schubert
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

*Attorneys for Petitioner-Appellant Bruce Carneil Webster*

## TABLE OF CONTENTS

### VOLUME I

Judgment In A Criminal Case, Sept. 30, 1996, 4:94-CR-121-Y (1)
(N.D. Tex.) (N.D. Tex. Dkt.824)..............................................................................S.App.1

*United States v. Webster*, No. 96-11224, 162 F.3d 308 (5th Cir.
1998), *cert. denied*, 528 U.S. 829 (1999)...............................................................S.App.5

*Webster v. United States*, No. Civ.A. 4:00-CV-1646, 2003 WL 23109787
(N.D. Tex. Sept. 30, 2003) (N.D. Tex. Dkt.1110) ................................................ S.App.74

*United States v. Webster*, No. 03-11194, 421 F.3d 308 (5th Cir.
2005), *cert. denied*, 549 U.S. 828 (2006) ........................................................... S.App.90

*United States v. Webster*, No. 09-11039 (5th Cir. 2010), *cert. denied*,
131 S.Ct. 794 (2010)............................................................................................ S.App.97

Declaration of Steven Wells ("Wells Decl.") in Support of Petition for
Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, Mar. 23, 2012
(Dkt.3) ...............................................................................................................S.App.106

Exhibit B to Wells Decl., excerpts from Vol. 23 of trial transcript,
June 12, 1996, 4:94-CR-121-Y (Dkt.3-2) ...........................................................S.App.111

Exhibit C to Wells Decl., excerpts from Vol. 24 of trial transcript,
June 13, 1996, 4:94-CR-121-Y (Dkt.3-3) ...........................................................S.App.130

Exhibit D to Wells Decl., excerpts from Vol. 25 of trial
transcript, June 14, 1996, 4:94-CR-121-Y (Dkt.3-4)..........................................S.App.191

Exhibit E to Wells Decl., excerpts from Vol. 26 of trial transcript,
June 18, 1996, 4:94-CR-121-Y (Dkt.3-4) ...........................................................S.App.290

Exhibit F to Wells Decl., excerpts from Vol. 27 of trial transcript,
June 19-20, 1996, 4:94-CR-121-Y (Dkt.3-5).......................................................S.App.333

### VOLUME II

Exhibit G to Wells Decl., Social Security Administration Records of
Bruce Webster, rec'd by Dorsey & Whitney on Feb. 9, 2009 (Dkt.3-6).............S.App.343

**VOLUME III**

Exhibit H to Wells Decl., Social Security Administration Records of
Willie Webster, rec'd by Dorsey & Whitney on Feb. 9, 2009 (Dkt.3-7).............S.App.414

Exhibit I to Wells Decl., Department of Human Services Child
Maltreatment Division Records rec'd by Dorsey & Whitney on Oct. 31,
2008 (Dkt.3-8) ...........................................................................................................S.App.417

Exhibit J to Wells Decl., Declaration of Leonda Daniels, Dec. 9, 2008
(Dkt.3-9) ....................................................................................................................S.App.421

Exhibit K to Wells Decl., Declaration of Lanetra Evans, Nov. 12, 2008
(Dkt.3-10) ..................................................................................................................S.App.425

Exhibit L to Wells Decl., Declaration of Luketha Fraizer, Dec. 11, 2008
(Dkt.3-11) ..................................................................................................................S.App.428

Exhibit M to Wells Decl., Declaration of Marvin Holloway, Dec. 7, 2008
(Dkt.3-12) ..................................................................................................................S.App.432

Exhibit N to Wells Decl., Declaration of Angela Madison, Dec. 9, 2008
(Dkt.3-13) ..................................................................................................................S.App.435

Exhibit O to Wells Decl., Declaration of Theressia Martin Moten,
Dec. 9, 2008 (Dkt.3-14) ...........................................................................................S.App.438

Exhibit P to Wells Decl., Declaration of Michael Parks, Dec. 8, 2008
(Dkt.3-15) ..................................................................................................................S.App.441

Exhibit Q to Wells Decl., Declaration of Jodin Smith, Nov. 11, 2008
(Dkt.3-16) ..................................................................................................................S.App.444

Exhibit R to Wells Decl., Declaration of Dorothy Harris Wallace,
Nov. 11, 2008 (Dkt.3-17)..........................................................................................S.App.449

Exhibit S to Wells Decl., Declaration of Sharon Webster, Nov. 11, 2008
(Dkt.3-18) ..................................................................................................................S.App.458

Exhibit T to Wells Decl., Declaration of Tony Webster, Nov. 11, 2008
(Dkt.3-19) ..................................................................................................................S.App.463

Exhibit U to Wells Decl., Declaration of Dr. Marc J. Tassé,
Ph.D., Sept. 29, 2011 (Dkt.3-20).............................................................................S.App.469

Exhibit V to Wells Decl., Declaration of Kristen K. LeRoux,
Mar. 23, 2012 (Dkt.3-21) .........................................................................................S.App.496

Exhibit W to Wells Decl., Declaration of Larry M. Moore,
Oct. 20, 2009 (Dkt.3-22)..................................................................S.App.500

Exhibit X to Wells Decl. Motion of Bruce Carniel Webster for Leave to
Conduct Discovery, N.D. Tex. Docket No. 1028, filed on Apr. 30, 2001
(Dkt.3-23) ......................................................................................S.App.507

Exhibit Y to Wells Decl., Memorandum Opinion and Order Denying
Petitioner's Motion for Discovery, N.D. Tex. Docket No. 1063, filed on
June 18, 2002 (Dkt.3-24) ...............................................................S.App.536

Entry and Order to Show Cause, Apr. 19, 2012, 2:12-cv-86
(Dkt.9) ...........................................................................................S.App.555

Supplemental Declaration of Kristen LeRoux ("LeRoux Decl.") in
Support of Petitioner's Reply to Respondent's Return to Order to Show
Cause, Oct. 10, 2012, 2:12-cv-86 (Dkt.25).......................................S.App.556

Exhibit A to LeRoux Decl., Facsimile Transmission to the SSA office
requesting records, Mar. 5, 1996 (Dkt.25-1)....................................S.App.561

Exhibit B to LeRoux Decl., Letter to SSA office requesting records,
Oct. 27, 2008 (Dkt.25-2)................................................................S.App.566

Exhibit C to LeRoux Decl., Letter to SSA office requesting records,
Dec. 15, 2008 (Dkt.25-3) ...............................................................S.App.569

Exhibit D to LeRoux Decl., Letter to SSA office requesting records,
Oct. 8, 2009 (Dkt.25-4)..................................................................S.App.573

Exhibit E to LeRoux Decl., SSA Letter to Dorsey & Whitney denying
request for additional records, Oct. 22, 2008 (Dkt.25-5).................S.App.580

Exhibit F to LeRoux Decl., Letter to SSA requesting records,
Nov. 23, 2009 (Dkt.25-6)................................................................S.App.584

Exhibit G to LeRoux Decl., SSA Letter to Dorsey & Whitney stating
that Webster's folder has been destroyed, Dec. 7, 2009 (Dkt.25-7) ..................S.App.591

Case: 14-1049     Document: 8-2     Filed: 02/18/2014     Pages: 346

ORIGINAL
# United States District Court
## NORTHERN DISTRICT OF TEXAS
### Fort Worth Division

| | |
|---|---|
| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
| | (For Offenses Committed on or After November 1, 1987) |
| v. | |
| | Case Number:     4:94-CR-121-Y (1) |
| Bruce Carneil Webster (1) | Larry Moore/Allan Butcher, Defendant's Attorney |

The defendant was found guilty upon a jury verdict on counts 1, 2 and 6 of the six-count Superseding Indictment after a plea of not guilty. Accordingly, the defendant is adjudged guilty of such counts, which involve the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §§ 1201(a)(1) and 2 | Kidnapping Resulting in Death and Aiding and Abetting, a Class A Felony | September 24, 1994 | 1 |
| 18 U.S.C. § 1201(c) | Conspiracy to Commit Kidnapping, a Class A Felony | September 30, 1994 | 2 |
| 18 U.S.C. § 924(c)(1) and 2 | Use and Carrying a Firearm During and in Relation to a Crime of Violence and Aiding and Abetting, a Class D Felony | September 24, 1994 | 6 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay a special assessment of $150.00 for counts 1, 2, and 6 of the six-count Indictment, which shall be due immediately.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within thirty (30) days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.:     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
Defendant's U.S. Marshal No.:     26177-077
Defendant's Date of Birth:     May 31, 1973

Defendant's Mailing Address:

Federal Medical Center (Jail)
3150 Horton Road
Fort Worth, Texas 76119-5996

Certified a true copy of an instrument on file in my office on 4/9/97
NANCY HALL DOHERTY, Clerk, U.S. District Court, Northern District of Texas
By _____ Deputy

September 24, 1996
Date of Imposition of Sentence

TERRY R. MEANS
U.S. DISTRICT JUDGE

SIGNED September __30__, 1996

Defendant's Residence Address:

same
same

SEP 30 1996

THIS DOCUMENT ENTERED ON DOCKET ON 96

S.App.1

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

Defendant:   Bruce Carneil Webster (1)                                    Judgment – Page 2 of 4
Case Number:   4:94-CR-121-Y (1)

## EXECUTION

It is the judgment of the Court that the defendant is sentenced to death on count 1 of the six-count Indictment. The defendant is hereby committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and review of sentence. When the sentence is to be implemented the defendant shall be released to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of the State of Texas.

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of LIFE on count 2 of the six-count Superseding Indictment. Furthermore, it is the order of the Court that the defendant shall be committed to the custody of the United States Bureau of Prisons for a period of 60 months on count 6 of the six-count Superseding Indictment. The sentence imposed on count 6 of the Superseding Indictment is a mandatory sentence which shall run consecutively to the sentence imposed on count 2 of the Superseding Indictment.

The defendant is remanded to the custody of the United States Marshal.

## SUPERVISED RELEASE

It is further ordered that if the defendant is ever released from imprisonment, he shall be on supervised release for a term of 5 years on count 2 of the Superseding Indictment and for a term of 3 years on count 6 of the six-count Superseding Indictment. All terms of supervised release shall run concurrently.

While on supervised release, the defendant shall comply with the standard conditions of supervision adopted by this Court (set forth below). In addition, the defendant shall:

not commit another federal, state, or local crime;

not possess illegal controlled substances;

not possess a firearm, destructive device, or other dangerous weapon;

report in person to the probation office in the district to which he is released within seventy-two (72) hours of release from the custody of the Bureau of Prisons;

notify the probation officer at least 10 days prior to any change of residence (Standard Condition No. 6 will apply only to changes in employment);

participate in a program approved by the probation office for treatment of narcotic or drug or alcohol dependency which will include testing for the detection of substance use or abuse, and contribute to the costs of services rendered (co-payment) in an amount to be determined by the probation officer, based on ability to pay or availability of third-party payment;

participate in a mental health treatment program, including medication if prescribed, as directed by the probation officer until successfully discharged. The defendant is further ordered to contribute to the costs of services rendered in an amount to be determined by the probation officer, based on ability to pay or availability of third-party payment; and,

refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer, pursuant to the mandatory drug testing provision of the 1994 crime bill.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

Defendant: Bruce Carnell Webster (1)    Judgment -- Page 3 of 4
Case Number: 4:94-CR-121-Y (1)

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall:

( 1)  not leave the judicial district without the permission of the Court or probation officer;

( 2)  report to the probation officer as directed by the Court or probation officer and submit a truthful and complete written report within the first five (5) days of each month;

( 3)  answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

( 4)  support his or her dependents and meet other family responsibilities;

( 5)  work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

( 6)  notify the probation officer within seventy-two (72) hours of any change in residence or employment;

( 7)  refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

( 8)  not frequent places where controlled substances are illegally sold, used, distributed, or administered;

( 9)  not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(10)  permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

(11)  notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

(12)  not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court; and

(13)  notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement, as directed by the probation officer.

## FINE/RESTITUTION

The Court did not order a fine or restitution because the defendant does not have the financial resources or future earning capacity to pay a fine or restitution.

## STATEMENT OF REASONS

The Court adopts as its findings of fact the statements and guideline applications in the presentence report, paragraphs 1 through 82, and the addendum filed on September 9, 1996, subject to and including any findings made by the Court at the defendant's sentencing hearing.

**Guideline Range Determined by the Court:**

Total Offense Level:                43

Criminal History Category:          VI

Imprisonment Range:                 Life:  count 2
                                    60 months: count 6, consecutive to any other sentence

Supervised Release Range:           3 to  5 years: count 2
                                    2 to  3 years: count 6

Fine Range:                         $25,000  to $250,000 (plus cost of imprisonment/supervision)

The sentence is within the guideline range, that range does not exceed twenty-four (24) months, and the Court finds no reason to depart from the sentence called for by application of the guidelines.

1627

Case 4:14-cv Document: 8-2 Filed: 02/18/2014 Judgmt 346 -- Page 4 of 4

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
United States Marshal

BY _____
Deputy Marshal

162 F.3d 308
**(Cite as: 162 F.3d 308)**

▷

United States Court of Appeals,
Fifth Circuit.
UNITED STATES of America, Plaintiff–Appellee,
v.
Bruce Carneil WEBSTER, a/k/a B–Love,
Defendant–Appellant.

No. 96–11224.
Dec. 3, 1998.
Rehearing Denied Jan. 29, 1999.

Defendant was convicted in the United States District Court for the Northern District of Texas, Terry R. Means, J., of kidnaping resulting in death, conspiring to kidnap, and using and carrying firearm during crime of violence, and sentenced to death. Defendant appealed. The Court of Appeals, Jerry E. Smith, Circuit Judge, held that: (1) jury was not limited to considering only defendant's intent and conduct in assessing aggravating factors; (2) instructions did not improperly allow jury to "double-weigh" intent; (3) statutory and non-statutory aggravating factors did not overlap; (4) instruction which incorrectly applied "substantial planning and premeditation" aggravating factor to kidnapping and not just murder was harmless; (5) trial court did not commit constitutional error in rejecting mitigating factors; (6) jurors were not required to weigh each mitigating factor found by at least one juror; (7) kidnapping instruction was proper; (8) police had probable cause to arrest defendant; (9) defendant was not singled out for selective prosecution; (10) trial court did not abuse its discretion in denying defendant's motion for post-trial discovery; (11) district court had authority to order psychiatric exam; (12) juror was properly struck for her views on capital punishment; (13) district court properly denied challenges for cause; (14) defendant was not prejudiced by improper substitution of alternate; (15) government proffered race-neutral explanations for peremptory challenges of black

jurors; (16) trial court did not plainly err in its sua sponte finding that defendant was not mentally retarded; (17) death sentence was warranted; (18) Federal Death Penalty Act (FDPA) is constitutional; and (19) trial court did not commit plain error in failing to sua sponte suppress testimony of co-defendants.

Affirmed.

West Headnotes

**[1] Sentencing and Punishment 350H ☞1762**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)2 Evidence
                350Hk1755 Admissibility
                    350Hk1762 k. Other offenses, charges, or misconduct. Most Cited Cases
    (Formerly 110k1208.1(6))

Testimony which allegedly revealed unadjudicated offenses was sufficiently reliable to be admitted at penalty phase of capital trial for kidnapping with death resulting; testimony was based on first-hand observations, defendant had opportunity to confront and challenge each witness, defendant was given advance notice that government would introduce such evidence, government introduced corroborating evidence for several of the incidents, and statements of which defendant complained were not related to unadjudicated offenses but rather were statements made to law enforcement officers after his arrest.

**[2] Criminal Law 110 ☞822(1)**

110 Criminal Law
    110XX Trial
        110XX(G) Instructions: Necessity, Requisites, and Sufficiency
            110k822 Construction and Effect of Charge as a Whole
                110k822(1) k. In general. Most Cited

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cases

Conviction will not be reversed for alleged error in instructions unless, when viewed in their entirety, they fail correctly to state the law.

**[3] Criminal Law 110 ⚷822(1)**

110 Criminal Law
    110XX Trial
            110XX(G) Instructions: Necessity, Requisites, and Sufficiency
                110k822 Construction and Effect of Charge as a Whole
                110k822(1) k. In general. Most Cited Cases

Technical errors will be overlooked, and court's instructions will be affirmed, if charge in its entirety presents jury with reasonably accurate picture of the law.

**[4] Criminal Law 110 ⚷835**

110 Criminal Law
    110XX Trial
        110XX(H) Instructions: Requests
                110k835 k. Refusal of requests. Most Cited Cases

**Criminal Law 110 ⚷1173.1**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
                110k1173 Failure or Refusal to Give Instructions
                110k1173.1 k. In general. Most Cited Cases

Refusal to give requested instruction constitutes reversible error only if proposed instruction (1) is substantially correct, (2) is not substantively covered in jury charge, and (3) pertains to important issue in trial, such that failure to give it seriously impairs presentation of effective defense.

**[5] Sentencing and Punishment 350H ⚷1652**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(C) Factors Affecting Imposition in General
                350Hk1652 k. Aggravating circumstances in general. Most Cited Cases
    (Formerly 110k1208.1(5))

Once minimum level of culpability constitutionally required for death sentence is found, jury need not limit itself exclusively to defendant's conduct or intent; indeed, aggravating factor properly may focus on defendant, on circumstances of crime itself, or on characteristics of victim.

**[6] Sentencing and Punishment 350H ⚷368.5**

350H Sentencing and Punishment
    350HII Sentencing Proceedings in General
        350HII(G) Hearing
                350Hk368.5 k. Instructions. Most Cited Cases
    (Formerly 110k796)

Instruction that "[i]n considering the question of intent, as it related to aggravating factors, you may consider only the intent of the defendant" sufficiently pointed jury to defendant's conduct and intent.

**[7] Sentencing and Punishment 350H ⚷1780(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                350Hk1780(3) k. Instructions. Most Cited Cases
    (Formerly 203k311)

Instructions on elements of intent did not improperly allow jury to "double-weigh" intent in imposing death penalty; jury was specifically instructed to weigh aggravating and mitigating factors with no mention of elements of intent, and special jury form segregated elements of intent

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

from lists of aggravating and mitigating factors, and made clear sequential nature of the process. 18 U.S.C.A. § 3591(a)(2).

**[8] Sentencing and Punishment 350H ☞368.5**

350H Sentencing and Punishment
    350HII Sentencing Proceedings in General
        350HII(G) Hearing
           350Hk368.5 k. Instructions. Most Cited Cases
    (Formerly 110k796)

Instructions on statutory factor that defendant committed offense in "especially henious, cruel and depraved manner" and on non-statutory factor of "emotional injury and anguish" to victim did not improperly allow jury to weigh same factor twice; statutory factor focused attention on defendant's actions and intent, while non-statutory victim impact factor directed jury's attention to harm caused by defendant to victim and her family. 18 U.S.C.A. § 3592(c)(6).

**[9] Criminal Law 110 ☞1137(3)**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
           110XXIV(L)11 Parties Entitled to Allege Error
           110k1137 Estoppel
           110k1137(3) k. Instructions. Most Cited Cases

Defendant's misstatement in requested instruction did not invite instruction incorrectly applying "substantial planning and premeditation" aggravating factor to kidnapping and not just murder, where defendant also proffered correct instructions. 18 U.S.C.A. § 3592(c)(9).

**[10] Sentencing and Punishment 350H ☞ 1788(10)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
           350HVIII(G)4 Determination and Disposition
           350Hk1788 Review of Death Sentence
           350Hk1788(10) k. Harmless and reversible error. Most Cited Cases
    (Formerly 110k1177)

When jury finds invalid aggravating factor, reviewing court must strike the factor and either reweigh remaining factors against mitigating evidence or apply harmless error review. 18 U.S.C.A. § 3595(c)(2)(C).

**[11] Sentencing and Punishment 350H ☞ 1788(10)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
           350HVIII(G)4 Determination and Disposition
           350Hk1788 Review of Death Sentence
           350Hk1788(10) k. Harmless and reversible error. Most Cited Cases
    (Formerly 110k1177)

In determining whether jury's finding of invalid aggravating factor was harmless, reviewing court may inquire into whether, beyond reasonable doubt, either (1) death sentence would have been imposed had invalid aggravating factor been properly defined in jury instructions or (2) death sentence would have been imposed absent invalid aggravating factor. 18 U.S.C.A. § 3595(c)(2)(C).

**[12] Sentencing and Punishment 350H ☞ 1788(10)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
           350HVIII(G)4 Determination and Disposition
           350Hk1788 Review of Death Sentence
           350Hk1788(10) k. Harmless and reversible error. Most Cited Cases
    (Formerly 110k1177)

If jury's finding of invalid aggravating factor is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

harmless beyond reasonable doubt, death sentence may not be reversed or vacated unless such error denies constitutional rights. 18 U.S.C.A. § 3595(c)(2)(C).

**[13] Criminal Law 110 ⚷1172.9**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1172 Instructions
                110k1172.9 k. Instructions as to punishment. Most Cited Cases

Instruction which incorrectly applied "substantial planning and premeditation" aggravating factor to kidnapping and not just murder was harmless, where jury would have found the aggravating factor if instructions had properly charged jury on it, and facts supporting "especially heinous, cruel or depraved" factor alone, when weighed against extant mitigating factors, justified finding that jury still would have imposed death sentence even absent the invalid aggravating factor. 18 U.S.C.A. §§ 3592(c)(9), 3595(c)(2)(C).

**[14] Criminal Law 110 ⚷1134.51**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)4 Scope of Inquiry
                110k1134.51 k. Instructions. Most Cited Cases
    (Formerly 110k1134(3))

Standard for reviewing jury instructions on mitigation is whether there is reasonable likelihood that jury has applied challenged instruction in way that prevents consideration of constitutionally relevant evidence.

**[15] Sentencing and Punishment 350H ⚷1780(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings

            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(3) k. Instructions. Most Cited Cases
    (Formerly 110k796)

Trial court's refusal to submit several nonstatutory mitigating factors did not allow jury to ignore constitutionally relevant evidence, in capital prosecution for kidnapping with death resulting, where many of the mitigating factors presented touched on ones defendant complained were omitted, and court's special findings form included catch-all mitigation factor.

**[16] Sentencing and Punishment 350H ⚷1658**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(C) Factors Affecting Imposition in General
            350Hk1658 k. Manner and effect of weighing or considering factors. Most Cited Cases
    (Formerly 110k1208.1(5))

Under Federal Death Penalty Act (FDPA), once any juror finds mitigating factor, it is not necessary that all jurors weigh that factor; rather, each juror may consider factor regardless of whether others concur. 18 U.S.C.A. § 3593(e).

**[17] Kidnapping 231E ⚷32**

231E Kidnapping
    231Ek32 k. Indictment and information. Most Cited Cases
    (Formerly 232k4)

Although kidnapping indictment must allege that defendant held victim for some purpose, specificity in factual basis of the benefit is not required. 18 U.S.C.A. § 1201.

**[18] Criminal Law 110 ⚷872.5**

110 Criminal Law
    110XX Trial
        110XX(K) Verdict
            110k872.5 k. Assent of required number

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

of jurors. Most Cited Cases

To determine which facts jurors must agree on unanimously, court examines statutory language and construction, legislative intent, historical treatment of the crime by courts, duplicity concerns with respect to defining the offense, and likelihood of jury confusion in light of specific facts presented.

**[19] Criminal Law 110 ⟨key⟩872.5**

110 Criminal Law
    110XX Trial
        110XX(K) Verdict
            110k872.5 k. Assent of required number of jurors. Most Cited Cases

**Kidnapping 231E ⟨key⟩19**

231E Kidnapping
    231Ek14 Elements
        231Ek19 k. Motive; ransom. Most Cited Cases
    (Formerly 232k1)

To convict defendant of kidnapping, jury need not concur on benefit defendant derived from holding the victim; actus reus proscribed is the "holding" of a victim, and benefit, "for ransom, reward, or otherwise," merely adds purpose to act of holding. 18 U.S.C.A. § 1201.

**[20] Criminal Law 110 ⟨key⟩1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)13 Review De Novo
                110k1139 k. In general. Most Cited Cases

**Criminal Law 110 ⟨key⟩1158.2**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158.2 k. Search and arrest. Most Cited Cases

(Formerly 110k1158(2))

Issues of probable cause and reasonable suspicion are mixed questions of law and fact, and thus historical facts are reviewed for clear error and ultimate legal determinations are reviewed de novo.

**[21] Arrest 35 ⟨key⟩63.4(7.1)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(7) Information from Others
                    35k63.4(7.1) k. In general. Most Cited Cases

**Arrest 35 ⟨key⟩63.4(12)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(7) Information from Others
                    35k63.4(12) k. Identification or description of offender or vehicle. Most Cited Cases

Police had probable cause to arrest defendant based on inculpatory statement by partner-in-crime, suggesting defendant's criminal involvement in kidnaping and murder, and motel security guard's description of defendant was sufficiently detailed and accurate to provide police with probable cause to believe that man they were arresting was defendant. U.S.C.A. Const.Amend. 4.

**[22] Arrest 35 ⟨key⟩63.4(11)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(7) Information from Others
                    35k63.4(11) k. Other officers or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

official information. Most Cited Cases

Although arresting officers did not have personal knowledge of defendant's specific wrongdoings, they were permitted to act on probable cause determination of others in their department. U.S.C.A. Const.Amend. 4.

**[23] Arrest 35 ⛀63.4(18)**

35 Arrest
   35II On Criminal Charges
      35k63 Officers and Assistants, Arrest Without Warrant
        35k63.4 Probable or Reasonable Cause
          35k63.4(18) k. Evidence. Most Cited Cases

Veracity of description of defendant by motel security guard, as disinterested witness, was presumed, for purposes of determination of probable cause to arrest. U.S.C.A. Const.Amend. 4.

**[24] Criminal Law 110 ⛀1158.2**

110 Criminal Law
   110XXIV Review
      110XXIV(O) Questions of Fact and Findings
        110k1158.2 k. Search and arrest. Most Cited Cases
   (Formerly 110k1158(2))

Since sufficiency of particular description is largely a factual matter, reviewing court gives greater deference to district court's finding of probable cause to arrest under these circumstances.

**[25] Arrest 35 ⛀60.2(10)**

35 Arrest
   35II On Criminal Charges
      35k60.2 Investigatory Stop or Stop and Frisk
        35k60.2(6) Grounds for Stop or Investigation
          35k60.2(10) k. Reasonableness; reason or founded suspicion, etc. Most Cited Cases
   (Formerly 35k63.5(4))

Reasonable suspicion sufficient to justify *Terry* stop exists when law enforcement officials are able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. U.S.C.A. Const.Amend. 4.

**[26] Arrest 35 ⛀60.2(5)**

35 Arrest
   35II On Criminal Charges
      35k60.2 Investigatory Stop or Stop and Frisk
        35k60.2(5) k. Necessity for cause for arrest. Most Cited Cases
   (Formerly 35k63.5(5))

Stop of defendant was supported by reasonable suspicion, based on matching description of defendant, taken together with motel security guard's identification of him as drug dealer and his presence at the motel. U.S.C.A. Const.Amend. 4.

**[27] Arrest 35 ⛀60.2(19)**

35 Arrest
   35II On Criminal Charges
      35k60.2 Investigatory Stop or Stop and Frisk
        35k60.2(19) k. Justification for pat-down search. Most Cited Cases
   (Formerly 35k63.5(8))

**Arrest 35 ⛀60.2(20)**

35 Arrest
   35II On Criminal Charges
      35k60.2 Investigatory Stop or Stop and Frisk
        35k60.2(20) k. Duration of detention and extent or conduct of investigation or frisk. Most Cited Cases
   (Formerly 35k63.5(9))

After stopping defendant, police were within their constitutional authority to pat him down for their personal safety, and to handcuff him, even if probable cause to arrest him was lacking. U.S.C.A. Const.Amend. 4.

**[28] Criminal Law 110 ⛀411.39**

110 Criminal Law
   110XVII Evidence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused

110XVII(M)13 Interrogation in General

110k411.36 What Constitutes Interrogation

110k411.39 k. Particular cases or questions. Most Cited Cases

(Formerly 110k412.1(4))

After stopping defendant, police acted constitutionally when they asked him whether he had any needles in his pockets that could injure them during their pat down; such questioning, needed to protect the officers, did not constitute interrogation under *Miranda.* U.S.C.A. Const.Amend. 4.

**[29] Arrest 35 ☜63.4(15)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(15) k. Appearance, acts, and statements of persons arrested. Most Cited Cases

Defendant's admission that he possessed marihuana gave police probable cause to arrest him, at the very least, for narcotics possession. U.S.C.A. Const.Amend. 4.

**[30] Arrest 35 ☜63.4(15)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(15) k. Appearance, acts, and statements of persons arrested. Most Cited Cases

(Formerly 35k63.5(8))

Officers' reasonable suspicion to stop developed into probable cause to arrest when defendant indicated that he possessed drugs, and when police uncovered, on defendant's person, key to motel room where suspected kidnapping took place. U.S.C.A. Const.Amend. 4.

**[31] Searches and Seizures 349 ☜62**

349 Searches and Seizures

349I In General

349k60 Motor Vehicles

349k62 k. Probable or reasonable cause. Most Cited Cases

Police search of defendant's car for evidence of kidnapping was justified by room key found on defendant's person, linking him to kidnapping. U.S.C.A. Const.Amend. 4.

**[32] Searches and Seizures 349 ☜198**

349 Searches and Seizures

349VI Judicial Review or Determination

349k195 Weight and Sufficiency of Evidence

349k198 k. Validity of consent. Most Cited Cases

Consent to search operates as waiver of Fourth Amendment rights if, by preponderance of evidence, it is found to have been given voluntarily under totality of circumstances. U.S.C.A. Const.Amend. 4.

**[33] Searches and Seizures 349 ☜180**

349 Searches and Seizures

349V Waiver and Consent

349k179 Validity of Consent

349k180 k. Voluntary nature in general. Most Cited Cases

Factors to consider in determining voluntariness of consent to search are coerciveness of police procedures, extent of defendant's cooperation, his awareness of his right to refuse consent, his education and intelligence, and his belief as to whether incriminating evidence will be found. U.S.C.A. Const.Amend. 4.

**[34] Searches and Seizures 349 ☜181**

349 Searches and Seizures

349V Waiver and Consent

349k179 Validity of Consent

349k181 k. Particular concrete applications. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

Defendant's consent to search of his automobile was voluntary, considering his experience in police procedure, resulting from his lengthy criminal record, and fact that police asked him not once but twice for permission to search his automobile. U.S.C.A. Const.Amend. 4.

**[35] Criminal Law 110 ⚷1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
          110XXIV(L)13 Review De Novo
            110k1139 k. In general. Most Cited Cases

Constitutional claims are reviewed de novo.

**[36] Criminal Law 110 ⚷1148**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
          110k1148 k. Preliminary proceedings. Most Cited Cases

District court's decisions in overseeing criminal discovery are reviewed for abuse of discretion and will be reversed only if defendant establishes prejudice to substantial rights.

**[37] District and Prosecuting Attorneys 131 ⚷8(6)**

131 District and Prosecuting Attorneys
    131k8 Powers and Proceedings in General
        131k8(6) k. Charging discretion. Most Cited Cases
    (Formerly 131k8)

Decision to prosecute one person and not another is proper exercise of executive discretion with which Court of Appeals is reticent to interfere.

**[38] Criminal Law 110 ⚷37.10(1)**

110 Criminal Law
    110II Defenses in General
        110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith

        110k37.10 Discriminatory or Selective Prosecution
          110k37.10(1) k. In general. Most Cited Cases

To establish that government has engaged in unconstitutionally discriminatory selective prosecution, defendant must first make out prima facie showing that he has been singled out for prosecution but others similarly situated of different race were not prosecuted, and then he must demonstrate that discriminatory selection of him for prosecution was invidious or in bad faith, in that it rested on such impermissible considerations as race, religion, or desire to prevent his exercise of his constitutional rights.

**[39] Criminal Law 110 ⚷37.10(1)**

110 Criminal Law
    110II Defenses in General
        110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
        110k37.10 Discriminatory or Selective Prosecution
          110k37.10(1) k. In general. Most Cited Cases

It is presumed that government made its decision to prosecute in good faith and in nondiscriminatory manner; to dispel that presumption, defendant must present clear evidence to the contrary.

**[40] Criminal Law 110 ⚷632(5)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
        110k632 Dockets and Pretrial Procedure
          110k632(5) k. Pretrial conference or hearing; order. Most Cited Cases

To be entitled to evidentiary hearing on claim of unconstitutionally discriminatory selective prosecution, defendant must first present facts sufficient to create reasonable doubt about constitutionality of his prosecution resulting from selective prosecution.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

**[41]  Sentencing and Punishment 350H ⚷ 1758(2)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)2 Evidence
            350Hk1755 Admissibility
               350Hk1758 Death Penalty
                  350Hk1758(2) k. Discriminatory impact. Most Cited Cases
    (Formerly 110k1208.1(6))

   Mere statistical evidence of racial disparity usually will be per se insufficient to support inference of any unacceptable risk of racial discrimination in administration of capital punishment.

**[42]  Sentencing and Punishment 350H ⚷ 1620**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(A) In General
         350Hk1620 k. Existence and effect of racial or other discriminatory impact. Most Cited Cases
    (Formerly 110k1208.1(4.1))

   Statistical evidence that 66% of federal death penalty cases involved black defendants did not present stark enough picture to show that defendant was singled out for selective prosecution.

**[43]  Sentencing and Punishment 350H ⚷ 1648**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
         350Hk1648 k. Matters relating to racial or other prejudice. Most Cited Cases
    (Formerly 110k1208.1(4.1))

   Refusal of Department of Justice to consider disproportionality of federal death penalty cases involving black defendants as factor mitigating against authorization of death penalty in defendant's case did not establish discriminatory purpose in

selection of defendant for prosecution.

**[44]  Sentencing and Punishment 350H ⚷ 1620**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(A) In General
         350Hk1620 k. Existence and effect of racial or other discriminatory impact. Most Cited Cases
    (Formerly 110k1208.1(4.1))

   Decision to seeking death penalty against defendant claiming selective prosecution based on racial discrimination may be justified by objective circumstances of the crime and sufficiency and availability of evidence to prove required elements under the law.

**[45]  Criminal Law 110 ⚷ 627.8(3)**

110 Criminal Law
   110XX Trial
      110XX(A) Preliminary Proceedings
         110k627.5 Discovery Prior to and Incident to Trial
            110k627.8 Proceedings to Obtain Disclosure
               110k627.8(3) k. Application, motion or request; affidavits. Most Cited Cases

   Rigorous standard for elements of selective prosecution claim require correspondingly rigorous standard for discovery in aid of such a claim. Fed.Rules Cr.Proc.Rule 16, 18 U.S.C.A.

**[46]  Criminal Law 110 ⚷ 627.8(3)**

110 Criminal Law
   110XX Trial
      110XX(A) Preliminary Proceedings
         110k627.5 Discovery Prior to and Incident to Trial
            110k627.8 Proceedings to Obtain Disclosure
               110k627.8(3) k. Application, motion or request; affidavits. Most Cited Cases
   Defendant was required to make out prima

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346    Page 10

facie showing of discriminatory selective prosecution before being entitled to discovery to establish mitigating evidence that death sentence would propagate racially discriminatory application of federal death penalty.

**[47] Criminal Law 110 ☞1148**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
            110k1148 k. Preliminary proceedings. Most Cited Cases

Discovery rulings are reviewed for abuse of discretion.

**[48] Criminal Law 110 ☞1166(10.10)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1166 Preliminary Proceedings
                110k1166(10.10) k. Discovery and disclosure; transcripts of prior proceedings. Most Cited Cases

New trial will be ordered based on discovery violations only where party demonstrates prejudice to his substantial rights.

**[49] Criminal Law 110 ☞627.6(1)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
            110k627.5 Discovery Prior to and Incident to Trial
                110k627.6 Information or Things, Disclosure of
                    110k627.6(1) k. In general. Most Cited Cases

Criminal Law 110 ☞627.8(2)

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
            110k627.5 Discovery Prior to and Incident to Trial
                110k627.8 Proceedings to Obtain Disclosure
                    110k627.8(2) k. Time when disclosure is permitted. Most Cited Cases

Trial court did not abuse its discretion in denying defendant's motion for post-trial discovery on issue of whether investigator had "purchased" testimony of prosecution witness by allowing conjugal visit at private residence in violation of agency guidelines, where witness was only one of many who testified to rebut defendant's claim of mental retardation, including school teachers, counselors, principals, employers, and detention center personnel.

**[50] Criminal Law 110 ☞1043(3)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1043 Scope and Effect of Objection
                    110k1043(3) k. Adding to or changing grounds of objection. Most Cited Cases

Defendant failed to preserve for appeal claim that government expert's psychiatric testimony exceeded scope of examination ordered, where he failed to object on that basis.

**[51] Sentencing and Punishment 350H ☞1789(9)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
                350Hk1789 Review of Proceedings to Impose Death Sentence
                    350Hk1789(9) k. Harmless and reversible error. Most Cited Cases
    (Formerly 110k1177)

Admission of psychiatric testimony regarding

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

defendant's future dangerousness was harmless, where there was ample independent evidence to support finding of future dangerousness, in penalty phase of capital prosecution for kidnapping resulting in death.

**[52] Sentencing and Punishment 350H ⟜1769**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)2 Evidence
          350Hk1755 Admissibility
            350Hk1769 k. Expert evidence. Most Cited Cases
   (Formerly 110k1208.1(6))

Although district court lacked statutory authority to order defendant to submit to psychiatric exam, court had inherent power to compel defendant to submit to examination by government expert as prerequisite to introducing his own expert psychiatric testimony at capital sentencing hearing. 18 U.S.C.A. § 3593(c).

**[53] Criminal Law 110 ⟜627.5(1)**

110 Criminal Law
   110XX Trial
      110XX(A) Preliminary Proceedings
        110k627.5 Discovery Prior to and Incident to Trial
          110k627.5(1) k. In general; examination of victim or witness. Most Cited Cases

**Federal Civil Procedure 170A ⟜31**

170A Federal Civil Procedure
   170AI In General
      170AI(B) Rules of Court in General
        170AI(B)2 Rules of Civil Procedure
          170Ak31 k. In general. Most Cited Cases

District court possesses inherent powers reasonably useful to achieve justice, including certain powers over administration of civil and criminal discovery; existence of federal rules does not preempt this power, if rules do not exclude exercise of the specific putative inherent power. Fed.Rules Cr.Proc.Rule 57(b), 18 U.S.C.A.

**[54] Jury 230 ⟜108**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
      230k104 Personal Opinions and Conscientious Scruples
        230k108 k. Punishment prescribed for offense. Most Cited Cases

Court may excuse prospective juror for cause because of his views on capital punishment if those views would prevent or substantially impair performance of his duties as juror in accordance with instructions and oath.

**[55] Jury 230 ⟜97(1)**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
      230k97 Bias and Prejudice
        230k97(1) k. In general. Most Cited Cases

Court has discretion in capital case to excuse juror when it is left with definite impression that prospective juror would be unable to faithfully and impartially apply the law.

**[56] Jury 230 ⟜108**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
      230k104 Personal Opinions and Conscientious Scruples
        230k108 k. Punishment prescribed for offense. Most Cited Cases

Prospective juror's wavering on whether she could sentence defendant to death if life sentence without parole option were viable alternative supported her dismissal for cause, despite juror's other statements that she believed capital punishment was a deterrent to crime and that "the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

Case: 14-1049    Document: 8-2        Filed: 02/18/2014    Pages: 346

possibility is there" that situations existed in which she could impose death sentence.

**[57] Jury 230 ⚷33(2.10)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k33 Constitution and Selection of Jury
            230k33(2) Competence for Trial of Cause
               230k33(2.10) k. In general. Most Cited Cases

Sixth Amendment right to fair trial includes right to impartial jury. U.S.C.A. Const.Amend. 6.

**[58] Jury 230 ⚷108**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
         230k104 Personal Opinions and Conscientious Scruples
         230k108 k. Punishment prescribed for offense. Most Cited Cases

In capital sentencing context, there is right to challenge for cause a juror whose views on capital punishment would prevent or substantially impair performance of his duties as juror in accordance with his instructions and his oath.

**[59] Jury 230 ⚷108**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
         230k104 Personal Opinions and Conscientious Scruples
         230k108 k. Punishment prescribed for offense. Most Cited Cases

Government has right to challenge for cause those veniremen whose views in opposition to death penalty will substantially impair their duty, and defendant has right to challenge for cause any juror who will automatically vote for death penalty in every case, because that juror will fail in good faith to consider evidence of aggravating and mitigating circumstances as instructions require him to do.

**[60] Jury 230 ⚷33(2.10)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k33 Constitution and Selection of Jury
             230k33(2) Competence for Trial of Cause
               230k33(2.10) k. In general. Most Cited Cases

Failure properly to grant challenge for cause violates defendant's Sixth Amendment right to impartial jury only if defendant exhausts all peremptory challenges and incompetent juror is forced upon him. U.S.C.A. Const.Amend. 6.

**[61] Jury 230 ⚷108**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
         230k104 Personal Opinions and Conscientious Scruples
         230k108 k. Punishment prescribed for offense. Most Cited Cases

Juror who said that if she found defendant guilty of intentional kidnaping that resulted in death, she always would find statutory aggravating factor that defendant had caused the death during kidnapping was not subject to challenge for cause; juror's finding of guilt would not automatically lead her to recommend sentence of death. 18 U.S.C.A. § 3592(c)(1).

**[62] Jury 230 ⚷107**

230 Jury
   230V Competency of Jurors, Challenges, and Objections
         230k104 Personal Opinions and Conscientious Scruples
         230k107 k. Weight and effect of evidence.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Most Cited Cases

Trial court did not abuse its discretion in denying challenge for cause against venireman who stated that he leaned toward the prosecution, where venireman, when questioned by court, agreed that verdict must be based on evidence presented in courtroom, and believed he could limit himself to such evidence, affirmed that prosecution carried burden of proving guilt beyond reasonable doubt and that he would require as much with respect to every element, and said believed he could give fair trial to both defense and prosecution, putting his predisposition aside.

**[63] Jury 230 ☞103(14)**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k98 Formation and Expression of Opinion as to Cause
        230k103 Influence of Opinion on Verdict
        230k103(11) Opinion Founded on Rumor or Newspaper Reports
        230k103(14) k. Opinion which will yield to evidence. Most Cited Cases

**Jury 230 ☞107**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k104 Personal Opinions and Conscientious Scruples
        230k107 k. Weight and effect of evidence. Most Cited Cases

Trial court did not abuse its discretion in denying challenge for cause of venireman who had listened to news reports as recently as previous day and admitted she was more prone to look for evidence to convict rather than evidence not to convict, where venireman agreed she would follow instructions to avoid the news, assume anything she heard outside courtroom was false, and base her decision solely on the evidence, she recognized that government carried burden of proving guilt beyond

reasonable doubt and affirmed that she would follow her oath as juror and court's instructions, including not discussing case with her husband.

**[64] Jury 230 ☞108**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k104 Personal Opinions and Conscientious Scruples
        230k108 k. Punishment prescribed for offense. Most Cited Cases

In prosecution for murder of 16–year–old girl, trial court did not abuse its discretion in refusing to grant challenge for cause to venireman, despite his statement that he might find it difficult to "wall off" thoughts of his own daughter during sentencing.

**[65] Criminal Law 110 ☞1155**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
        110k1155 k. Issues related to jury trial. Most Cited Cases

Refusal to grant mistrial is reviewed for abuse of discretion.

**[66] Criminal Law 110 ☞1166.16**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
        110k1166.5 Conduct of Trial in General
        110k1166.16 k. Impaneling jury in general. Most Cited Cases

Decision to substitute jurors after jury has retired to consider its verdict is reviewed for prejudice. Fed.Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**[67] Jury 230 ☞149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

pending trial. Most Cited Cases

District court has discretion to remove juror whenever judge becomes convinced that juror's abilities to perform his duties becomes impaired.

**[68] Jury 230 ☞149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

When juror is disqualified after jury retires, court has authority to require jury to proceed to verdict with only eleven members, with or without stipulation by parties, and this should be done particularly in lengthy and complicated trials. Fed.Rules Cr.Proc.Rule 23(b), 18 U.S.C.A.

**[69] Jury 230 ☞149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

In bifurcated proceeding under Federal Death Penalty Act (FDPA), once jury retires at end of guilty-innocence phase, alternates must be dismissed, leaving no alternates to be substituted for jurors whom court might have to discharge before end of second phase. 18 U.S.C.A. § 3593(b); Fed.Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**[70] Jury 230 ☞150**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k150 k. Objections and exceptions. Most Cited Cases

Defendant waived objection to trial court's failure to dismiss alternates at end of first phase of bifurcated proceeding, by not objecting on that basis at that time. Fed.Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**[71] Jury 230 ☞149**

230 Jury

230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

When court, before jury retired for deliberations at penalty phase of bifurcated trial, excused juror for health reasons, defendant was not prejudiced by elevation of alternate juror who had sat through guilt-innocence phase and through penalty phase testimony, where court provided jury with instruction to include new juror equally in all deliberations, penalty phase issues were distinct from those decided at guilt-innocence phase, and jury failed to find aggravating factor that overlapped with offense decided in first phase. 18 U.S.C.A. § 3593(b); Fed.Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**[72] Jury 230 ☞149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

Upon learning that, in response to juror questionnaire, juror had not disclosed past encounters with judicial system, district court acted within its discretion in excusing juror, even absent further questioning to determine whether he had lied.

**[73] Jury 230 ☞149**

230 Jury
    230VI Impaneling for Trial, and Oath
        230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

Trial court has discretion to excuse untruthful juror.

**[74] Criminal Law 110 ☞868**

110 Criminal Law
    110XX Trial
        110XX(J) Issues Relating to Jury Trial
            110k868 k. Objections and disposition thereof. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049     Document: 8-2     Filed: 02/18/2014     Pages: 346

**(Cite as: 162 F.3d 308)**

Scope of examination, if any, into juror misconduct rests within trial court's sound discretion; no evidentiary hearing is necessary.

**[75] Constitutional Law 92 ⟜3309**

92 Constitutional Law
   92XXVI Equal Protection
     92XXVI(B) Particular Classes
       92XXVI(B)8 Race, National Origin, or Ethnicity
         92k3305 Juries
          92k3309 k. Peremptory challenges. Most Cited Cases
   (Formerly 92k221(4))

Use of peremptory challenges to exclude veniremen solely on account of race violates equal protection component of due process clause of fifth amendment. U.S.C.A. Const.Amend. 5.

**[76] Jury 230 ⟜33(5.15)**

230 Jury
   230II Right to Trial by Jury
     230k30 Denial or Infringement of Right
      230k33 Constitution and Selection of Jury
       230k33(5) Challenges and Objections
        230k33(5.15) k. Peremptory challenges. Most Cited Cases

In determining whether peremptory strikes have been applied in discriminatory manner, claimant must make prima facie showing that peremptory challenges have been exercised on basis of race; if this requisite showing has been made, burden shifts to party accused of discrimination to articulate race-neutral explanations for peremptory challenges; finally, trial court must determine whether claimant has carried his burden of proving purposeful discrimination. U.S.C.A. Const.Amend. 5.

**[77] Jury 230 ⟜33(5.15)**

230 Jury
   230II Right to Trial by Jury
     230k30 Denial or Infringement of Right
      230k33 Constitution and Selection of Jury
       230k33(5) Challenges and Objections
        230k33(5.15) k. Peremptory challenges. Most Cited Cases

Unless discriminatory intent is inherent in party's explanation for peremptory challenge of juror, reason offered should be deemed race-neutral; race-neutral explanation need not be persuasive, or even plausible. U.S.C.A. Const.Amend. 5.

**[78] Criminal Law 110 ⟜1158.17**

110 Criminal Law
   110XXIV Review
     110XXIV(O) Questions of Fact and Findings
      110k1158.17 k. Jury selection. Most Cited Cases
   (Formerly 110k1158(3))

Trial court's assessments of race-neutral explanation for peremptory challenge of juror and whether that explanation is pretextual are reviewed for clear error.

**[79] Jury 230 ⟜33(5.15)**

230 Jury
   230II Right to Trial by Jury
     230k30 Denial or Infringement of Right
      230k33 Constitution and Selection of Jury
       230k33(5) Challenges and Objections
        230k33(5.15) k. Peremptory challenges. Most Cited Cases

Government's concern that black juror had established rapport with defense counsel was race-neutral explanation for government's peremptory challenge. U.S.C.A. Const.Amend. 5.

**[80] Jury 230 ⟜33(5.15)**

230 Jury
   230II Right to Trial by Jury
     230k30 Denial or Infringement of Right
      230k33 Constitution and Selection of Jury
       230k33(5) Challenges and Objections
        230k33(5.15) k. Peremptory

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

challenges. Most Cited Cases

Government's fear that black jurors would not be able to recommend death sentence when time came was race-neutral explanation for peremptory challenges. U.S.C.A. Const.Amend. 5.

**[81] Jury 230 ⚷33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases

Government's concern that prospective jurors had relatives with criminal records was race-neutral explanation for peremptory challenges of black jurors. U.S.C.A. Const.Amend. 5.

**[82] Jury 230 ⚷33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases

Government's concern that prospective jurors had relatives living in city where murder took place was race-neutral explanation for peremptory challenges of black jurors. U.S.C.A. Const.Amend. 5.

**[83] Constitutional Law 92 ⚷4677**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)5 Evidence and Witnesses
                92k4677 k. Right to present witnesses; compulsory process. Most Cited Cases
    (Formerly 92k268(10))

**Constitutional Law 92 ⚷4679**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)5 Evidence and Witnesses
                92k4679 k. Cross-examination. Most Cited Cases
    (Formerly 92k268(10))

Due process requires fair opportunity to defend against charges, including calling and cross-examining witnesses. U.S.C.A. Const.Amend. 5.

**[84] Constitutional Law 92 ⚷4677**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)5 Evidence and Witnesses
                92k4677 k. Right to present witnesses; compulsory process. Most Cited Cases
    (Formerly 92k266(1))

**Criminal Law 110 ⚷490**

110 Criminal Law
    110XVII Evidence
        110XVII(R) Opinion Evidence
            110k482 Examination of Experts
                110k490 k. Rebuttal. Most Cited Cases

Even if due process extended to presenting witnesses at surrebuttal, trial court's limitation of defendant's surrebuttal to one of two expert psychiatric witnesses whom court considered cumulative was not so arbitrary and fundamentally unfair as to deprive him of due process. U.S.C.A. Const.Amend. 5.

**[85] Criminal Law 110 ⚷1030(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1030 Necessity of Objections in General
                    110k1030(1) k. In general. Most

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

Cited Cases

To find plain error, Court of Appeals must perceive (1) error by district court, in that it deviated from legal rule, (2) that was clear and, at minimum, obvious under current law at time of trial, and (3) error must affect substantial rights.

**[86] Sentencing and Punishment 350H ☞ 1789(3)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
            350Hk1789 Review of Proceedings to Impose Death Sentence
               350Hk1789(3) k. Presentation and reservation in lower court of grounds of review.
Most Cited Cases
   (Formerly 110k1042)

Trial court did not plainly err in its sua sponte finding that defendant was not mentally retarded as would exempt him from implementation of death penalty; Federal Death Penalty Act (FDPA) was unclear as to whether issue was for jury. 18 U.S.C.A. § 3596(c).

**[87] Criminal Law 110 ☞ 1166.10(1)**

110 Criminal Law
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1166.5 Conduct of Trial in General
            110k1166.10 Counsel for Accused
               110k1166.10(1) k. In general. Most Cited Cases

Even if trial court's sua sponte finding that defendant was not mentally retarded, as would exempt him from implementation of death penalty, implicated defendant's right to effective assistance of counsel, defendant was not harmed, where court had ample information to make its decision. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3596(c).

**[88] Sentencing and Punishment 350H ☞**

1788(9)

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
            350Hk1788 Review of Death Sentence
               350Hk1788(9) k. Questions of fact.
Most Cited Cases
   (Formerly 110k1158(1))

Finding that defendant is not mentally retarded, as would exempt him from implementation of death penalty under Federal Death Penalty Act (FDPA), is reviewed for clear error. 18 U.S.C.A. § 3596(c).

**[89] Sentencing and Punishment 350H ☞ 1793**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)5 Mental Illness or Disorder
            350Hk1793 k. Evidence. Most Cited Cases
   (Formerly 110k981(2))

Finding that defendant was not mentally retarded, as would exempt him from implementation of death penalty under Federal Death Penalty Act (FDPA), was not clearly erroneous; government presented substantial evidence to support the finding, and only four of twelve jurors found that defendant was or could be mentally retarded and that he suffered from low intellectual functioning. 18 U.S.C.A. § 3596(c).

**[90] Sentencing and Punishment 350H ☞ 1788(9)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
            350Hk1788 Review of Death Sentence
               350Hk1788(9) k. Questions of fact.
Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Formerly 110k1158(1))

Court of Appeals applies its usual standard of sufficiency of evidence in determining, under Federal Death Penalty Act (FDPA), whether evidence supports jury's special findings of aggravating factors. 18 U.S.C.A. § 3596(c).

**[91] Sentencing and Punishment 350H ⚷1681**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(D) Factors Related to Offense
            350Hk1681 k. Killing while committing other offense or in course of criminal conduct. Most Cited Cases
    (Formerly 110k1208.1(5))

**Sentencing and Punishment 350H ⚷1772**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)2 Evidence
                350Hk1772 k. Sufficiency. Most Cited Cases
    (Formerly 110k1208.1(5))

Death sentence for kidnapping resulting in death was not imposed under influence of passion, prejudice, or any other arbitrary factor, and evidence supported jury's special findings of four aggravating factors. 18 U.S.C.A. § 3595(c)(1).

**[92] Sentencing and Punishment 350H ⚷1626**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1622 Validity of Statute or Regulatory Provision
                350Hk1626 k. Procedure. Most Cited Cases
    (Formerly 110k1206.1(2))

Federal Death Penalty Act (FDPA) provides sufficient safeguards to prevent arbitrary imposition of death penalty. 18 U.S.C.A. §§ 3591–3598.

**[93] Constitutional Law 92 ⚷2415(4)**

92 Constitutional Law
    92XX Separation of Powers
        92XX(B) Legislative Powers and Functions
            92XX(B)4 Delegation of Powers
                92k2410 To Executive, Particular Issues and Applications
                    92k2415 Criminal Law
                        92k2415(4) k. Sentencing and punishment. Most Cited Cases
    (Formerly 92k62(5.1))

**Sentencing and Punishment 350H ⚷1626**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1622 Validity of Statute or Regulatory Provision
                350Hk1626 k. Procedure. Most Cited Cases
    (Formerly 110k1206.1(2))

Federal Death Penalty Act (FDPA) sufficiently circumscribes its delegated authority with intelligible principles to avoid violating nondelegation doctrine. 18 U.S.C.A. §§ 3591–3598.

**[94] Criminal Law 110 ⚷1134.78**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)8 Sentencing
                110k1134.78 k. Proportionality review. Most Cited Cases
    (Formerly 110k1134(3))

Constitution does not mandate "proportionality review," that is, comparison of penalties imposed in similar cases.

**[95] Sentencing and Punishment 350H ⚷1626**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1622 Validity of Statute or Regulatory Provision

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

350Hk1626 k. Procedure. Most Cited Cases

(Formerly 110k1206.1(2))

Federal Death Penalty Act's (FDPA) relaxed evidentiary standard at sentencing hearing is constitutional. 18 U.S.C.A. §§ 3591–3598.

**[96] Sentencing and Punishment 350H ⚷1625**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(A) In General
         350Hk1622 Validity of Statute or Regulatory Provision
            350Hk1625 k. Aggravating or mitigating circumstances. Most Cited Cases

(Formerly 110k1206.1(2))

"Especially heinous, cruel or depraved manner" aggravating factor of Federal Death Penalty Act (FDPA) is not impermissibly vague, at least where vagueness is cured by statutory limitation that offense involve torture or serious physical abuse and by further limitation in jury instructions. 18 U.S.C.A. § 3592(c)(6).

**[97] Sentencing and Punishment 350H ⚷1625**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(A) In General
         350Hk1622 Validity of Statute or Regulatory Provision
            350Hk1625 k. Aggravating or mitigating circumstances. Most Cited Cases

(Formerly 110k1206.1(2))

Federal Death Penalty Act's (FDPA) inclusion of "mere fact" that defendant was convicted of kidnaping and murdering victim as aggravating factor did not constitute constitutionally impermissible "stacking," or double-counting. 18 U.S.C.A. §§ 3591–3598.

**[98] Sentencing and Punishment 350H ⚷1624**

350H Sentencing and Punishment
   350HVIII The Death Penalty

350HVIII(A) In General
   350Hk1622 Validity of Statute or Regulatory Provision
      350Hk1624 k. Provision authorizing death penalty. Most Cited Cases

(Formerly 203k351)

Federal Death Penalty Act (FDPA) properly limits imposition of death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life; the four mental states of murder do not set forth aggravating factors, but rather serve as preliminary qualification threshold. 18 U.S.C.A. § 3591(a).

**[99] Sentencing and Punishment 350H ⚷1660**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
         350Hk1660 k. Dual use of evidence or aggravating factor. Most Cited Cases

(Formerly 110k1208.1(5))

**Sentencing and Punishment 350H ⚷1670**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(D) Factors Related to Offense
         350Hk1670 k. Intent of offender. Most Cited Cases

(Formerly 110k1208.1(5))

Federal Death Penalty Act's (FDPA) four mens rea factors do not result in multiple weighing of aggravating factors, but rather serve as preliminary qualification threshold. 18 U.S.C.A. § 3591(a)(2).

**[100] Constitutional Law 92 ⚷3811**

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(F) Criminal Law
         92k3807 Sentencing and Punishment
            92k3811 k. Capital punishment; death penalty. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Formerly 92k250.3(1))

**Sentencing and Punishment 350H ⚷1625**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1622 Validity of Statute or Regulatory Provision
                350Hk1625 k. Aggravating or mitigating circumstances. Most Cited Cases
    (Formerly 110k1206.1(2))
    Federal Death Penalty Act (FDPA) satisfies equal protection by precluding consideration of "race, color, religious beliefs, national origin, or sex of the defendant or of any victim" as mitigating factor. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. § 3593(f).

**[101] Constitutional Law 92 ⚷3250**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(B) Particular Classes
            92XXVI(B)8 Race, National Origin, or Ethnicity
                92k3250 k. In general. Most Cited Cases
    (Formerly 92k215)
    Equal Protection Clause protects from purposeful state discrimination on basis of race. U.S.C.A. Const.Amend. 14.

**[102] Constitutional Law 92 ⚷3861**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(A) In General
            92k3861 k. Relationship to equal protection guarantee. Most Cited Cases
    (Formerly 92k253.2(2))
    Due Process Clause of Fifth Amendment provides "equal protection" against federal government. U.S.C.A. Const.Amend. 5.

**[103] Constitutional Law 92 ⚷3021**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(A) In General
            92XXVI(A)4 Applicability to Governmental or Private Action; State Action
                92k3021 k. Branches of state government involved. Most Cited Cases
    (Formerly 92k213(2))
    Court proceedings, especially criminal trials, implicate state action, therefore bringing them under equal protection scrutiny. U.S.C.A. Const.Amends. 5, 14.

**[104] Constitutional Law 92 ⚷3078**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(A) In General
            92XXVI(A)6 Levels of Scrutiny
                92k3069 Particular Classes
                    92k3078 k. Race, national origin, or ethnicity. Most Cited Cases
    (Formerly 92k215)
    Equal Protection Clause prohibits state from using race in its decision-making, unless it can meet the most exacting scrutiny justified by compelling government interest. U.S.C.A. Const.Amend. 14.

**[105] Constitutional Law 92 ⚷990**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)3 Presumptions and Construction as to Constitutionality
                92k990 k. In general. Most Cited Cases
    (Formerly 92k48(1))
    Court is obligated to interpret statute in such a way as to preserve, if possible, its constitutionality.

**[106] Sentencing and Punishment 350H ⚷308**

350H Sentencing and Punishment

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

350HII Sentencing Proceedings in General
    350HII(F) Evidence
        350Hk307 Admissibility in General
            350Hk308 k. In general. Most Cited Cases
    (Formerly 110k986.2(1))

Although race per se is irrelevant and inadmissible sentencing factor, effects and experiences of race may be admissible.

**[107] Sentencing and Punishment 350H ☞308**

350H Sentencing and Punishment
    350HII Sentencing Proceedings in General
        350HII(F) Evidence
            350Hk307 Admissibility in General
                350Hk308 k. In general. Most Cited Cases
    (Formerly 110k986.2(1))

**Sentencing and Punishment 350H ☞312**

350H Sentencing and Punishment
    350HII Sentencing Proceedings in General
        350HII(F) Evidence
            350Hk312 k. Defendant's character. Most Cited Cases
    (Formerly 110k986.2(1))

If defendant can show that his life has been marked by discrimination, or some other set of experiences, irrespective of whether the result, in part, of his race, that properly may be admitted at sentencing as relevant mitigating background or character evidence.

**[108] Criminal Law 110 ☞1030(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1030 Necessity of Objections in General
                    110k1030(1) k. In general. Most Cited Cases

Even if court of appeals finds plain error, it will not exercise its discretion to correct such error unless error seriously affects fairness, integrity, or public reputation of judicial proceedings.

**[109] Criminal Law 110 ☞1030(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1030 Necessity of Objections in General
                    110k1030(1) k. In general. Most Cited Cases

"Plain error" is error which is clear or obvious and at a minimum contemplates error which was clear under current law at time of trial, and requirement that error be one "affecting substantial rights" is understood to mean that error must affect the outcome of the proceeding.

**[110] Criminal Law 110 ☞1036.2**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
            110k1036 Evidence
                110k1036.2 k. Competency, examination, and impeachment of witnesses. Most Cited Cases

Trial court did not commit plain error in failing to sua sponte suppress testimony of codefendants on ground of government's promises of value to witnesses in exchange for testimony, where decision from another circuit supporting defendant's claim had not yet been handed down and Fifth Circuit precedent did not support claim. 18 U.S.C.A. § 201(c)(2).

**\*317** Christopher Allen Curtis, Asst. U.S. Atty., Fort Worth, TX, Delonia Anita Watson, Dallas, TX, for Plaintiff–Appellee.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

Allan K. Butcher, Larry M. Moore, Fort Worth, TX, for Defendant–Appellant.

Appeal from the United States District Court for the Northern District of Texas.

Before SMITH, DUHÉ and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Bruce Webster challenges his conviction of, and sentence for, kidnaping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence. We affirm.

I.

The facts are the same as in the case of Webster's co-conspirator, Orlando Hall. *See United States v. Hall,* 152 F.3d 381 (5th Cir.1998). Webster, Hall, and Marvin Holloway ran a marihuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marihuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marihuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

**\*318** On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marihuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marihuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run

Apartments in Arlington, Texas, from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

On September 24, Hall contacted Holloway and had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

eventually returned to Ross's apartment. From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned **\*319** Lisa Rene's back toward the grave, placed a sheet over her head, and hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

Based on information from the victim's brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B–Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B–Love. A security guard at the motel informed the agents and officers that Webster went by the name B–Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.

II.

In November 1994, a six-count superseding indictment charged Webster, Hall, D. Hall, Beckley, and Holloway with various offenses related to the kidnaping and murder of Lisa Rene. Specifically, the indictment charged Webster with kidnaping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count 1), conspiracy to commit kidnaping in violation of 18 U.S.C. § 1201(c) (count 2), traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952 (count 5), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count 6). In February 1995, the government filed its notice of intent to seek the death penalty against Webster pursuant to § 3593(a) of the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591–3598.

Webster's trial was severed from that of his co-defendants. The jury returned a verdict of guilty on counts 1, 2 and 6, and count five was dismissed on the government's motion. The court conducted a separate sentencing hearing before the same jury. *See* § 3593. After the penalty phase, the jury returned special findings that Webster satisfied the requisite elements of intent, *see* § 3591(a), and that three statutory and two non-statutory aggravating

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

factors existed.[FN1] *See* § 3592. Varying numbers of jurors found nine mitigating factors.[FN2] *See* § 3592. **\*320** The court sentenced Webster to death on count one of the superseding indictment; life imprisonment on count two; and sixty months' imprisonment on count six to run consecutively to the sentence in count 2.

> FN1. The jury unanimously found all but the first of the following statutory aggravating factors:
>
> II(A). The defendant, Bruce Carneil Webster, caused the death of Lisa Rene, or injury resulting in death of Lisa Rene, which occurred during the commission of the offense of kidnapping.
>
> II(B). The defendant ... committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of Lisa Rene.
>
> II(C). The defendant ..., after substantial planning and premeditation, committed the offense of kidnapping in which the death of Lisa Rene resulted.
>
> II(D). The victim, Lisa Rene, was particularly vulnerable due to her age.
>
> In addition, the jury unanimously found both of the proposed non-statutory aggravating factors:
>
> III(A). The defendant ... constitutes a future danger to the lives and safety of other persons.
>
> III(B). The effect of the instant offense on Lisa Rene's family.
>
> FN2. Webster proposed the following statutory mitigating factors (with the number of jurors finding each mitigating factor shown in brackets):

> 1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. [0]
>
> 2. The defendant was under unusual and substantial duress. [0]
>
> 3. Another defendant or defendants, equally culpable in the crime, will not be punished by death. [4]
>
> 4. The defendant does not have a significant prior history of other criminal conduct. [0]
>
> 5. The defendant committed the offense under severe mental or emotional disturbance. [0]
>
> Webster proposed the following non-statutory mitigating factors (with the number of jurors finding each mitigating factor shown in brackets):
>
> 1. The defendant is or may be mentally retarded. [4]
>
> 2. The defendant has low intellectual functioning. [4]
>
> 3. The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing. [12]
>
> 4. The defendant, as a result of a personality disorder, a mental illness, and/or low intellectual functioning, has a lesser capability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law than that of a normal person. [0]
>
> 5. The defendant was youthful at the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

time of the commission of the crime, although not under the age of eighteen. [0]

6. The defendant has talents, capabilities, or qualities which are of some value to society (such as musical talent, religious devotion, etc.). [0]

7. The defendant is unduly susceptible to influence by others. [0]

8. The defendant's level of participation in the commission of this offense was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime. [4]

9. The defendant grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct. [6]

10. The defendant can be controlled in a prison setting. [2]

11. The defendant can be of some productive value in a prison setting. [0]

12. The defendant has the love and support of other members of his family. [11]

13. The defendant does not have a significant prior history of violent crime. [0]

14. The defendant is the product of an impoverished background which virtually precluded his integration into the social and economic mainstream of the community. [0]

15. The defendant has responded well to structured environments and would likely adapt to prison life if he were sentenced to life imprisonment. [2]

16. Any other factor or factors in the defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of the death sentence. [0]

III.

[1] Webster raises several grounds for reversing his conviction and/or sentence that we already have ruled on in *Hall:*

1. The district court violated Webster's Fifth and Eighth Amendment rights by conditioning the admission of psychiatric testimony in mitigation of punishment upon Webster's submission to a government psychiatric examination. FN3

> FN3. Webster raises an additional Fifth Amendment argument relating to his compelled examination, not addressed in *Hall,* with which we deal *infra.*

2. The district court abused its discretion by admitting certain unfairly prejudicial materials into evidence, namely photographs and a videotape. FN4

> FN4. Webster attempts to parlay his evidentiary objection into a constitutional claim; having upheld the evidence's admissibility as an evidentiary matter, we cannot conclude that its admission nonetheless violated his constitutional rights.

3. The admission of evidence regarding unadjudicated offenses FN5 during the penalty *321 phase and a lack of a jury instruction requiring the jury to apply some burden of proof to this evidence rendered the death sentence unreliable.

> FN5. Webster specifically complains about

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

the following evidence:

• the oral statement "If I was out now, I'd kill the bitch" that gave him a venereal disease.

• the oral statement that killing Lisa Rene wasn't personal, "it was strictly business."

• an escape attempt where he entered an unauthorized area (the women's shower) of the Mansfield jail.

• the sexual rendezvous with female inmates planned with fellow inmate John Clay.

• the alleged shooting at a store owner after an attempted theft.

• the assault of Sheila Henry, a girlfriend.

• a shoving match over a piece of candy.

Webster also argues these should have been excluded because of the need for sufficient reliability of evidence in capital proceedings. *See Caldwell v. Mississippi,* 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

We find ample support in the record of the evidence's reliability, which justifies putting it before the jury. First, it was testimony based on first-hand observations; Webster had the opportunity to confront and challenge each of the witnesses. Second, because Webster was given advance notice that the government would be introducing evidence of unadjudicated offenses, he had the opportunity independently to investigate and respond to the evidence. Third, the government introduced corroborating evidence for several of the

incidents. Fourth, the statements of which Webster complains were not related to unadjudicated offenses; rather, they were statements made to law enforcement officers after his arrest. Finally, Webster provides no reason why we should be reticent to believe any of the testimony or that the incidents occurred.

4. The admission of nontestimonial victim impact statements violated due process and the Eighth Amendment, Webster's Sixth Amendment right of confrontation, and the FDPA's evidentiary standards.

We addressed and rejected each of these arguments in *Hall,* which controls the outcome here.[FN6]

> FN6. *See Hall,* 152 F.3d at 398 (compelled psychiatric exam), *id.* at 400–03 (evidentiary rulings on photographs and videotape), *id.* at 403–04 (unadjudicated offenses), *id.* at 404–06 (nontestimonial victim impact statements).

### IV.

Webster appeals his judgment of conviction and death sentence on the following grounds that we must address, as we did not consider them in *Hall:*

1. The court erroneously instructed and materially misdirected the jury in numerous ways at the penalty phase.

2. The court failed to instruct the jury accurately regarding on which non-monetary benefit(s) of the kidnapping the government relied and regarding the need for the jury to agree on such a benefit unanimously in order to convict in the guilt-innocence phase.

3. The court admitted the fruits of a search pursuant to, and statements given after, an arrest contravening the Fourth Amendment.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

4. The court erred by refusing to dismiss the government's notice to seek the death penalty based on allegations of racial discrimination in death penalty charging decisions and by refusing Webster's request for discovery on that claim.

5. The court abused its discretion by refusing Webster's motion for post-trial discovery on a claim that the government had provided sexual favors to a prisoner-witness.

6. The court lacked authority to order Webster to undergo a government psychiatric exam as a condition to admitting psychiatric testimony in mitigation of punishment.

7. The court abused its discretion in granting the government's *Witt* challenge to a venireman.

8. The court's rejection of defense challenges for cause to impaired and biased veniremen denied Webster an impartial jury and his statutory right to free exercise of peremptory challenges.

9. The court erred in excusing a venireman whose juror questionnaire contained false information.

10. The court clearly erred in denying Webster's *Batson* claims.

11. The court erred by impaneling an alternate juror during the penalty phase who did not deliberate during the guilt-innocence phase.

12. The court violated Webster's constitutional rights and abused its discretion by limiting surrebuttal.

13. The court plainly erred and violated Webster's constitutional rights by entering a factual finding that he is not mentally retarded.

14. There is insufficient evidence to support the sentence of death.

15. Certain provisions of the FDPA are unconstitutional.

16. The court *sua sponte* should have suppressed the testimony of Webster's co-conspirators, who testified in exchange for leniency.

We address each of these issues in turn.

### A.

Webster contends that the district court erroneously instructed and materially misdirected the jury at the penalty phase. District courts enjoy substantial latitude in formulating a jury charge, and hence we review **\*322** all challenges to, and refusals to give, jury instructions for abuse of discretion. FN7

> FN7. *United States v. Jones,* 132 F.3d 232, 242–43 (5th Cir.1998), *cert. granted,* 525 U.S. 809, 119 S.Ct. 39, 142 L.Ed.2d 31 (1998); *United States v. Manges,* 110 F.3d 1162, 1176 (5th Cir.1997), *cert. denied,* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998).

[2][3][4] A conviction will not be reversed for an alleged error in the instructions unless, when viewed in their entirety, they fail correctly to state the law. *Jones,* 132 F.3d at 243; *United States v. Flores,* 63 F.3d 1342, 1374 (5th Cir.1995). Technical errors will be overlooked, and the court's instructions will be affirmed, if the charge in its entirety presents the jury with a reasonably accurate picture of the law. *Jones,* 132 F.3d at 243. A refusal to give a requested instruction constitutes reversible error only if the proposed instruction (1) is substantially correct, (2) is not substantively covered in the jury charge, and (3) pertains to an important issue in the trial, such that failure to give it seriously impairs the presentation of an effective defense. *United States v. Garcia Abrego,* 141 F.3d 142, 153 (5th Cir.), *cert. denied,* 525 U.S. 878, 119 S.Ct. 182, 142 L.Ed.2d 148 (1998); *Jones,* 132 F.3d at 242.

### 1.

Webster argues that the court erred in refusing to instruct the jury that, in assessing the aggravating

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

factors, it could consider only his intent and conduct and not the words or acts of any other codefendant or participant in the crime. The argument is without merit.

a.

Webster's reasoning hinges on *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). He contends that these cases require a two-pronged focus in the decision-making process to impose a death sentence: the defendant's participation (conduct) and his intent (state of mind). It follows, Webster believes, that the court should have instructed the jury to consider only his conduct in assessing the aggravating factors.

b.

Webster misreads *Enmund* and *Tison.* In those cases, the Court addressed the degree of culpability required of a defendant to impose a death sentence under the felony-murder doctrine. The Court did require a certain level of culpable conduct and state of mind. *See Enmund,* 458 U.S. at 801, 102 S.Ct. 3368; *Tison,* 481 U.S. at 158, 107 S.Ct. 1676. But Webster takes the requirement too far.

The point of *Tison* and *Enmund* is that a death sentence may not be imposed unless the sentencer has examined the defendant's "own personal involvement in the crimes." *Tison,* 481 U.S. at 158, 107 S.Ct. 1676. Enmund escaped capital punishment because he "did not kill or attempt to kill," nor did he have "any intention of participating in or facilitating a murder." *Enmund,* 458 U.S. at 798, 102 S.Ct. 3368. The Tisons, on the other hand, failed to obtain a reversal, because they were sufficiently involved in the crimes. *See Tison,* 481 U.S. at 158, 107 S.Ct. 1676.

The gist of these cases is that before a death sentence may be recommended, the Eighth Amendment requires that the defendant, for example, killed, inflicted serious bodily injury resulting in death, or participated in a felony with

reckless disregard for human life resulting in death. The FDPA meets this requirement in § 3591, by limiting even the possibility of a death sentence to those defendants with sufficient culpability. The jury found Webster guilty of "engaging in conduct intending death to result or that lethal force would be used" and of "engaging in conduct knowing that it created grave risk of death."

[5] Once the constitutionally-required minimum level of culpability is found, however, there is no reason why the jury cannot take a broader look at the crime in assessing the aggravating factors; it need not limit itself exclusively to the defendant's conduct or intent. Indeed, an aggravating factor properly may focus on the defendant, on the **\*323** circumstances of the crime itself, or on characteristics of the victim.[FN8]

> FN8. *See Tuilaepa v. California,* 512 U.S. 967, 976, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (holding that "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer," and may include factors such as the defendant's age); *Roberts v. Louisiana,* 431 U.S. 633, 636, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) (holding that a murder victim's status as peace officer performing regular duties constitutes permissible aggravating factor).

c.

Furthermore, one of the FDPA's aggravating factors requires a jury to examine a factor that has nothing to do with the defendant's conduct or intent—the victim's vulnerability. *See* § 3592(c)(11); *cf. Tuilaepa,* 512 U.S. at 977, 114 S.Ct. 2630. The government alleged that Lisa Rene's young age rendered her particularly vulnerable, hence constituting an aggravating factor. Because the factor has nothing to do with Webster's conduct or intent, his proffered general instruction would have incorrectly stated the law.

[6] In addition, the charge as a whole substantially covered the proffered instruction and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

sufficiently pointed the jury to Webster's conduct and intent. The court instructed that "[i]n considering the question of intent, as it related to aggravating factors, you may consider only the intent of the defendant, Bruce Carneil Webster." The aggravating factors, other than the victim vulnerability factor, all pointed to Webster's conduct. The instructions explaining the factors repeatedly referred to Webster's conduct and intent. FN9 The non-statutory factor Webster specifically attacks, "the effect of the offense on Lisa Rene and her family," focuses on the harm caused by Webster's "commission of the offense." The court did not abuse its discretion in refusing this instruction; including it would have misstated the law.

> FN9. The court's examples included the following: " 'Cruel' means that the defendant intended to inflict a high degree of pain ...," " '[d]epraved' means that the defendant relished the killing or showed indifference ...," and "[t]he government must prove beyond a reasonable doubt that the defendant committed the offense after substantial planning and premeditation."

2.

Webster objects to the instruction on the "elements of intent." He argues that the court failed to require the jury to select a single element of intent, and to do so unanimously. This failure allegedly allowed the jury impermissibly to "double-weigh" a single factor—intent—in imposing the death penalty, skewing the process toward capital punishment.

[7] Although Webster rightly points out the risk of unconstitutionally arbitrary application of the death penalty if the jury is permitted to double-count aggravating factors, *see Jones,* 132 F.3d at 250–51, the court did not err in this regard. The instructions on the elements of intent properly followed the language of § 3591(a)(2). They stated that the jury's findings as to the "elements of intent" had to be unanimous. FN10 If any doubt remained,

the special findings form that the jury filled out prominently displayed the word "unanimously" before the "yes" and "no" lines to be checked for each of the four elements.

> FN10. The court instructed that "you must as a preliminary matter unanimously agree that the government has proven beyond a reasonable doubt that the defendant ... either ...," followed by a list of the four possible intents, and "if you unanimously find ..." one or more of the elements of intent, the jury was to consider aggravating factors.

In addition, the instructions accurately charged that the jury was not to weigh the elements of intent in deciding whether to impose the death penalty. At least one of the elements of intent needs to be found only as a threshold, or gateway, matter; and only once at least one is found does the weighing of aggravating factors and mitigating factors take place—with no further consideration of the "elements of intent."

The instructions walked the jury through this sequential process. The court instructed the jury first to determine whether one of the requisite elements of intent existed. Then the instructions set forth the aggravating and mitigating factors.

The instructions nowhere indicated that the jury was to consider the elements of **\*324** intent once it began to weigh the aggravating and mitigating factors. In fact, the jury specifically was instructed to weigh aggravating and mitigating factors with no mention of the elements of intent. The special jury form also segregated the elements of intent from the lists of aggravating and mitigating factors, and made clear the sequential nature of the process.

Finally, the court specifically instructed the jury to consider and weigh only the aggravating and mitigating factors outlined in the instructions, which did not include the elements of intent.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

Assuming, as we must, that the jury followed its instructions, it did not weigh the elements of intent even once. The court did not abuse its discretion in denying the proffered instruction.

### 3.
#### a.

In a similar vein, Webster argues that two of the aggravating factors overlapped, allowing the jury to weigh the same factor twice. Specifically, one statutory factor read: "the defendant committed the offense in an especially heinous, cruel and depraved manner in that it involved torture and serious physical abuse to the victim, Lisa Rene." One non-statutory factor addressed "the effect of the offense on Lisa Rene and her family, namely, that the commission of the offense caused emotional injury and anguish to Lisa Rene, and emotional injury, anguish, sorrow, and loss to her family." Webster contends that these aggravating factors are duplicative because "there is no effective distinction between infliction of 'severe mental and physical pain or suffering upon the victim' (authorized by the court's instructions for a finding on the statutory aggravating factor) and the 'emotional injury and anguish to Lisa Rene' focused upon in the 'non-statutory' aggravating factor."

Webster points out that the charge allowed the jury to find that the statutory factor existed based on a finding of "torture," defined to include "mental as well as physical abuse" and the intent to "inflict severe mental or physical pain or suffering upon the victim," of which the victim must be conscious. Webster alleges that there is no distinction between the statutory factor's "severe mental or physical pain or suffering" and the non-statutory factor's "emotional injury and anguish."

#### b.

[8] Webster failed to object to these instructions, so we review for plain error. *See Jones,* 132 F.3d at 243. The court did not err in instructing on both factors because, although they may rely on similar underlying facts, they focus on different aspects of the crime and its results.

The statutory factor directs the jury to consider whether Webster committed the offense in an especially heinous, cruel, and depraved manner, hence focusing attention on his actions and intent. The non-statutory victim impact factor, on the other hand, directs the jury's attention to the harm caused by Webster to the victim and her family. This factor looks not to his actions but to their result. Because one factor addresses directly Webster's conduct and intent (the "manner" of commission), and the other the impact of that conduct and intent, the two factors are not duplicative.

Webster's reliance on *Jones* proves unavailing. In *Jones,* we found two non-statutory aggravating factors duplicative. One addressed the victim's "young age, her slight stature, her background, and her unfamiliarity with [the locale where the crime took place]," and another dealt with the victim's "personal characteristics" and the impact of the crime. We held the factors duplicative because " 'personal characteristics' ... necessarily includes 'young age, slight stature, background, and unfamiliarity.' " *Id.* at 250.

But the difference between the challenged factors in the case *sub judice* proves to be more than semantic. The "heinous, cruel and depraved" manner in which a crime is carried out, even though the instructions require that the victim is conscious of the emotional abuse, does not necessarily include, nor even overlap with, consideration of the effects of the crime on the victim and her family. The court did not plainly err in providing both instructions.

**\*325** 4.
#### a.

Webster argues, and the government concedes, that, by allowing the jury to consider premeditation with respect to the kidnaping and not just the murder, the court improperly charged the jury on the statutory aggravating factor of whether Webster engaged in "substantial planning and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

premeditation" of the offense.[FN11] The special findings form also contained language relating the premeditation to the kidnaping rather than to causing death. The statute requires a finding that "the defendant committed the offense after substantial planning and premeditation to cause the death of a person," § 3592(c)(9), obviously directing the premeditation to causing death and not to mere commission of the offense when the two diverge. The parties disagree, however, as to whether this constitutes reversible error. We find it does not.

> FN11. The court charged that "[t]o establish the existence of the aggravating factor of substantial planning and premeditation, the government must prove beyond reasonable doubt that the defendant committed the offense after substantial planning and premeditation.... The amount of time needed for *premeditation of a kidnapping* in which a death occurs depends on the person and the circumstance." (Emphasis added.)

c.

The error notwithstanding, we affirm the sentence. The FDPA provides that a "court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." § 3595(c)(2)(C).

[10] Our duty when the jury finds an invalid aggravating factor is to strike the factor and either reweigh the remaining factors against the mitigating evidence or apply harmless error review. *See Jones,* 132 F.3d at 251; *see also Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). If we choose to reweigh the evidence, we must determine what the jury would have done absent the invalid aggravator. *See Jones,* 132 F.3d at 251.

b.

[9] The government argues that Webster invited the erroneous instruction and now should not be heard to complain. *See United States v. Baytank (Houston), Inc.,* 934 F.2d 599, 606 (5th Cir.1991). Although Webster's requested jury instruction properly focused on substantial planning and premeditation for the murder, the government points to his proposed changes to the special findings form in which Webster proposed the following language: "Beyond a reasonable doubt and looking only to the conduct and intentions of the defendant, Bruce Carneil Webster, he, Bruce Carneil Webster, committed the killing of Lisa Rene after substantial planning and premeditation to commit the kidnaping of Lisa Rene." The government surmises that the court adopted this language in formulating the instructions and special issue.

Although it is possible that Webster's

misstatement influenced the instructions, Webster also proffered instructions correctly applying the substantial planning and premeditation to the killing rather than to the kidnaping. Given the inconstant way in which Webster addressed the issue, we cannot conclude he invited the error.

[11][12] In conducting a harmless error review, on the other hand, we may inquire into whether, beyond a reasonable doubt, either (1) the death sentence would have been imposed had the invalid aggravating factor been properly defined in the jury instructions or (2) the death sentence would have been imposed absent the invalid aggravating factor. *See id.* at 252. If the government establishes that the error is harmless beyond a reasonable doubt, we may not reverse or vacate the death sentence unless such error denies constitutional rights. *See* § 3595. We may decide which of the three methods to apply, although "[i]t matters not which standard of review an appellate court chooses to apply because all three standards lead to the same conclusion." *Jones,* 132 F.3d at 252.

**\*326** [13] The parties expend a great deal of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

effort arguing whether the jury would have found the factor had it been accurately stated. The effort is wasted, however, because the sentence may be affirmed without that aggravating factor. We opt to apply the second method of harmless error review, and inquire into whether the sentence would have been imposed absent the invalid aggravator.[FN12]

> FN12. We also find that the government has established beyond a reasonable doubt that the jury would have found the aggravating factor if the instructions properly had charged the jury on it; thus we can affirm under the first harmless error review, as well.

After removing the offensive statutory aggravating factor, we are left with two statutory factors (that Webster committed the offense in an especially heinous, cruel, or depraved manner, and that Lisa Rene was vulnerable), two non-statutory aggravating factors (Webster's future danger to others, and the effect of the crime on Lisa Rene's family), and nine mitigating factors found to exist by varying numbers of jurors. The government contends, and we agree, that the facts supporting the "especially heinous, cruel or depraved" factor alone, when weighed against the extant mitigating factors, justify a finding that the jury still would have imposed a death sentence. The addition of the other three factors merely buttresses the conclusion.[FN13]

> FN13. Webster asserts that we should give the aggravating factor dealing with victim vulnerability little weight because the *Hall* jury did not find it. But Webster's jury did, and we refuse to question that determination.

Furthermore, we fail to see why the jury would have placed much emphasis on the invalid factor as it was improperly defined and charged. The import of substantial planning and premeditation to commit the offense of kidnaping pales in comparison to the brutal nature of Webster's actions

and the suffering Lisa Rene must have felt as a result, so we do not think the jury would have placed significant weight on the invalid factor relative to the others.

Finally, the paltry mitigating factors that the jury found fail to indicate that it placed much weight on countervailing factors. No juror found that Webster had talents, capabilities, or qualities of some value to society or that he could be of some productive value in a prison setting. Only two jurors believed that he even could be controlled in a prison setting, and only two found he likely would adapt to prison. The jury found only one factor unanimously: Webster suffered from physical or emotional abuse or parental neglect during his upbringing; and yet no juror believed that this abuse caused significant impairment of Webster's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The government has proven beyond a reasonable doubt that the jury would have imposed the death sentence absent the invalid aggravating factor, so its inclusion was harmless error.[FN14]

> FN14. We see no reason why the inclusion of the invalid factor rises to the level of a denial of constitutional rights that would require vacating the sentence.

### 5.

Webster contends that the court erred when it refused to submit several nonstatutory mitigating factors.[FN15] Just this past Term, however, in *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998), the Court squarely held that, although "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence," a death penalty scheme "may shape and structure the jury's consideration of mitigation so long as it does not preclude *327 the jury from giving effect to any relevant mitigating evidence." The Court further explained that its "decisions suggest complete jury discretion is constitutionally

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

permissible." *Id.*

FN15. The rejected factors are:

8. The defendant ... suffers from a mental disease, illness, defect, or personality disorder; ...

13. The defendant ... has personal qualities which are worth saving; ...

14. The defendant ..., due to circumstances of intellectual impairment, and dysfunctional family background, and upbringing, should be extended mercy; ...

21. The defendant ..., if not sentenced to death, will be sentenced to life in prison without any possibility of parole or release[.]

[14] The standard for reviewing jury instructions on mitigation is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* (quotation and citation omitted). Indeed, in *Buchanan,* refusing to submit four *statutory* mitigating factors during the penalty phase of the capital trial fell short of constitutional error.

[15] Many of the mitigating factors presented to the jury touched on the ones Webster complains were omitted. To ensure that the jury considered all potentially mitigating evidence, the special findings form included a catch-all mitigation factor. The charge specifically instructed the jury that it "must consider" any other mitigating factors it found, "whether or not specifically argued by defense counsel."

The instructions left no room for the jury to ignore constitutionally relevant evidence. The court neither committed constitutional error nor abused its discretion in rejecting the mitigating factors.

6.

[16] Webster avers that the instructions misstated the law by not requiring, once one or more jurors had found a mitigating factor to exist by a preponderance of the evidence, that all jurors consider a mitigating factor in weighing aggravating and mitigating factors.FN16 Webster misreads the statute; although any one juror may find and weigh a mitigating factor, the others may make their own determinations with respect to each mitigator.

FN16. The court charged that

[a] finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established regardless of whether any other jurors agree that such mitigating factor has been established.... In determining whether a sentence of death is appropriate, each of you must weigh in your own mind, any aggravating factor or factors that the jury unanimously finds to exist beyond a reasonable doubt—whether statutory or non-statutory—against any mitigating factor or factors that you individually find to exist by a preponderance of the evidence.

Webster relies on § 3593(e), which reads, in part, "the jury ... shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." Webster reads this provision to say that once any juror finds a mitigating factor, *all* jurors *must* weigh the factor. But the quoted language does not require Webster's reading; the provision lacks any modifier indicating who must find or weigh the mitigating factor(s).

Reading the section as a whole, we conclude

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

that Congress did not intend Webster's reading. The prior subpart states that "[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for the purposes of this section regardless of the number of jurors who concur that the factor has been established." § 3593(d). Reading the two sections *in pari materia,* we reason that the language does not contemplate forcing all jurors to consider a mitigator when any one or more finds it to exist. Rather, each juror may consider a factor regardless of whether others concur. In addition, it would be nonsensical for Congress to require a juror to weigh a factor that he or she does not believe the evidence warrants.

Webster, in an apparent attempt to avoid this last problem, argues that "[o]nce a mitigating factor has been established, then the sentencer *must* consider it, even though it may be assigned whatever weight it is deemed to deserve." But, naturally, those jurors who did not find the mitigating factor to exist would assign it no weight, which does not differ from the result Webster hopes to avoid, i.e., not requiring them to consider it at all. Because the plain language of the statute does not compel every juror to weigh each mitigating factor found by at least one **\*328** juror, the court did not abuse its discretion in denying the instruction that would have required it.

### B.
### 1.

The indictment alleged, *inter alia,* that Webster and others violated 18 U.S.C. § 1201(a), proscribing kidnaping. Pursuant to that indictment, the court charged the jury that to convict, it had to find beyond a reasonable doubt the element "[t]hat the defendant held such person for ransom, reward, or some other benefit that the defendant intended to derive from the kidnapping." The court further charged that "a benefit is any legal or illegal object of the kidnaping which a perpetrator might consider sufficient motive to induce him to undertake the

kidnaping. The government has the burden of proving whatever benefit alleged by proof beyond a reasonable doubt."

Webster objects to this instruction on the ground that, because the indictment failed to allege any specific benefit other than ransom or reward, the jury should not be able to consider any other benefit, and because the instruction fails to require unanimity on the benefit found. The government responds that the benefit is not a specific element of the crime, so it need not allege one in the indictment, nor does one need to be specified in the jury instructions; furthermore, unanimity is not required.

### 2.

We review alleged errors in jury instructions for abuse of discretion; a conviction will not be reversed for an alleged error in the instructions unless, when viewed in their entirety, they failed to state the law correctly. *Jones,* 132 F.3d at 243. These instructions did not fail to state the law correctly.

### a.

The parties agree that the kidnaping statute protects those who have been kidnaped and held for any reason. Before 1934, the Federal Kidnaping Act applied only if the captive was held for ransom or reward. *See United States v. Healy,* 376 U.S. 75, 81, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964). Congress amended the Act in 1934 to encompass persons held "for ransom or reward or otherwise." *Id.* In *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936), the Court interpreted the "or otherwise" amendment to encompass any benefit a captor might attempt to receive. Subsequently, in *Healy,* the Court held the Act is not limited to kidnapings for an ultimately illegal purpose.[FN17]

> FN17. *See Healy,* 376 U.S. at 82, 84 S.Ct. 553 (stating that "we find no compelling correlation between the propriety of the ultimate purpose sought to be furthered by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

a kidnaping and the undesirability of the act of kidnaping itself").

[17]    Consistent    with    the    Court's pronouncements, this court held in *Clinton v. United States,* 260 F.2d 824, 825 (5th Cir.1958), that an indictment need not include the words "for ransom, reward or otherwise." The panel reasoned that the phrase would add nothing "because obviously 'otherwise' comprehends any purpose at all." *Id.*

Webster asserts that we overruled *Clinton* in *United States v. Osborne,* 68 F.3d 94 (5th Cir.1995) . In *Osborne,* we held that the government must prove four elements of the kidnaping offense: "1) the transportation in interstate commerce; 2) of an unconsenting person who is 3) held for ransom, reward, or otherwise; and 4) the acts were done knowingly and willingly." *Id.* at 100. According to Webster, the third element requires the government to plead in the indictment and prove up at trial, and the court to instruct the jury on, some specific purpose(s) for the kidnaping.

*Osborne* does not compel this conclusion. We certainly did not purport to overrule *Clinton* 's holding that the indictment need not include a benefit; the issue was not before us in *Osborne.* And nothing in *Osborne* contravenes *Clinton.* More accurately, the gravamen of the third element is the act of holding, not the benefit. If "otherwise" can include any purpose, adding it to the indictment—irrespective of whether it specifies the "otherwise" benefit—adds nothing.**\*329** This view consists with that of our sister circuits.[FN18]

> FN18. *See United States v. Adams,* 83 F.3d 1371, 1372–74 (11th Cir.1996) (indictment sufficient that alleged only that the victim was "held"); *United States v. Martell,* 335 F.2d 764, 766 (4th Cir.1964) (same); *Hayes v. United States,* 296 F.2d 657, 665–67 (8th Cir.1961) (same); *United States v. Atchison,* 524 F.2d 367, 369–71 (7th Cir.1975) (indictment sufficient that

merely alleged victim was held for "ransom, reward, or otherwise"); *United States v. Bentley,* 310 F.2d 685, 685 (6th Cir.1962) (same); *Hall v. United States,* 410 F.2d 653, 659–60 (4th Cir.1969) (same); *Loux v. United States,* 389 F.2d 911, 914–16 (9th Cir.1968) (same).

b.

Webster points out that in many of the above-mentioned cases, including *Clinton,* one reason the court gave for finding the lack of specificity unproblematic is that the defendant can request a bill of particulars to clarify on what benefit the government will rely. Webster made such a request, which the court denied; he complains that this prevented him from presenting an effective defense. We fail to see how.

Although the government must plead and prove that the defendant held the victim for some purpose, the exact nature of that purpose is inconsequential. Indeed, as noted, any purpose will do. In arguments to the jury, the government mentioned several possible benefits, including retribution and revenge, sexual gratification, greed, and that Lisa Rene knew too much; all are valid benefits. In light of this breadth, Webster's claim that the failure to specify a benefit in the indictment or jury instructions denied him a defense is vapid.

If any benefit will do, the only possible defense is that the defendant obtained absolutely no benefit at all—and no pleading or jury instruction is needed to prepare the defendant for this defense. Accordingly, we decline to require specificity in the factual basis of the benefit.[FN19]

> FN19. *Cf. United States v. Barnhart,* 889 F.2d 1374, 1378 (5th Cir.1989) (holding factual basis for falsity in perjury indictment not required).

c.

The only circumstance under which a jury might need to be instructed on specific potential

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

benefits is if the jurors must agree unanimously on what benefit the defendant derived; if that is the case, failure to instruct on particular benefits (as well as the failure to instruct on the required unanimity, of course) might constitute reversible error. On the other hand, if unanimity is not required, an instruction on specific benefits proves pointless, because each juror can pick a benefit from among the facts presented at trial.

The question, then, should be framed as follows: If some jurors believed that Webster held Lisa Rene for one purpose, e.g., sexual gratification, and others believe for another benefit, e.g., revenge for a drug deal gone bad, does that disagreement, that lack of unanimity, evidence a reasonable doubt that Webster held Lisa Rene for some benefit? The inquiry is governed by *United States v. Correa–Ventura,* 6 F.3d 1070 (5th Cir.1993).

In *Correa–Ventura,* we analyzed whether a jury needed to reach unanimous consensus on which of several weapons seized from the defendant's apartment had been used in the commission of a drug trafficking offense. In the process of holding factual unanimity was not required, we explicated the case-by-case analysis we must follow here. *See id.* at 1081.

[18][19] As we explained, the unanimity rule ensures that the jury has found guilt beyond reasonable doubt, and disagreement as to critical facts may reflect such doubt. *Id.* at 1078. But not all facts require unanimity. To determine which ones do, we examine "[s]tatutory language and construction, legislative intent, historical treatment of the crime by the courts, duplicity concerns with respect to defining the offense, and the likelihood of jury confusion in light of the specific facts presented." *Id.* at 1082. After considering these factors, we conclude that the jury need not concur on the benefit the defendant derived from holding the kidnaping victim.

**\*330** Looking at the language of the element,

we see that the *actus reus* proscribed is the "holding" of a victim. The benefit, "for ransom, reward, or otherwise," merely adds purpose to the act of holding. Looking to the offense as a whole, we see that the essential elements, stripped to the bones, are transporting and holding against consent with a *mens rea.* The "interstate commerce" serves as a mere jurisdictional hook, and the benefit language simply provides guidance to a jury in understanding the crime—why the defendant may have committed the offense. The essence of kidnaping is a non-consensual transporting and holding, done wilfully or knowingly; the language in no way implies that the benefit serves an important function in singling out the guilty from the innocent or in deterring future conduct.

The history of the offense also points to the insubstantial role of the benefit. The Supreme Court has admonished that Congress added the "or otherwise" language because "ransom or reward" proved too narrow; Congress desired to expand the statute by eliminating the limiting effect that the phrase had. *See Gooch,* 297 U.S. at 128, 56 S.Ct. 395; *Healy,* 376 U.S. at 81–82, 84 S.Ct. 553. We should not circumscribe the statute's reach, once again giving the phrase a narrowing function, by requiring factual concurrence among the jurors.

Interpretive caselaw and the issue of duplicative convictions also support rejecting a unanimity requirement. As cited above, we and our sister circuits always have emphasized the breadth of the benefit phrase. We are aware of no case in which a court has limited the kidnaping offense through the benefit requirement.

In addition, concerns regarding duplicative convictions have not arisen. Webster does not argue that a lack of concurrence on the factual predicate of a benefit risks duplicative convictions for a single act of holding and transporting. We know of no case in which a defendant was convicted of or even charged with multiple kidnaping offenses of the same victim because it was done for more than one benefit.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Finally, the circumstances of the instant case do not justify vacating the sentence and requiring unanimity on the benefit. Several benefits were argued to the jury. There was sufficient evidence from which a juror could find that Webster was motivated by the lure of those benefits. Indeed, if unanimity had been required, it is likely that the jury unanimously would have found several benefits garnered by Webster, including revenge and sexual gratification. The court provided a general unanimity instruction, focusing the jury's attention on the need to agree on the essential elements of the crime. Unanimity on the factual basis of the benefit is not required, and the court did not abuse its discretion in refusing Webster's instruction.[FN20]

> FN20. *Cf. Correa–Ventura,* 6 F.3d at 1076–86 (no unanimity requirement as to particular firearm used in 18 U.S.C. § 924(c) prosecution); *United States v. Linn,* 889 F.2d 1369, 1374 (5th Cir.1989) (holding that jury need not be unanimous as to identity of five individuals in prosecution for continuing criminal enterprise); *United States v. Sutherland,* 656 F.2d 1181, 1202 (5th Cir. Unit A Sept.1981) (no unanimity requirement as to overt acts in multiple-object conspiracy).

### C.

Webster contends that his arrest was unconstitutional and that the fruits obtained from it should have been suppressed. More specifically, he argues that the court erred by failing to suppress the fruits of the search of Webster and his automobile following his arrest, that any purported consent given by him was nullified by the illegality of the arrest, and that the court erred by failing to suppress his statements following his arrest. It readily becomes apparent that Webster's arguments hinge on his view that the arrest was unconstitutional. Because we find both this arrest and subsequent police conduct fully constitutional, the court properly admitted the fruits of the search and the subsequent statements.

### 1.

[20] The issues of probable cause and reasonable suspicion, which, in this case, control the constitutionality of Webster's arrest, are mixed questions of law and fact. *See* ***331** United States v. Tompkins,* 130 F.3d 117, 120 (5th Cir.1997), *cert. denied,* 523 U.S. 1036, 118 S.Ct. 1335, 140 L.Ed.2d 495 (1998). So, we review the historical facts for clear error and ultimate legal determinations *de novo. Id.* Because Webster does not challenge the findings of fact, our review is limited to a *de novo* review of the legal conclusions.

### 2.

[21] The Fourth Amendment requires that all arrests be based on probable cause. *See* U.S. CONST. amend. IV; *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Gerstein,* 420 U.S. at 111, 95 S.Ct. 854 (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (alteration in original). Based on this standard, the police had probable cause to arrest Webster.

The day before the arrest, police took a written statement from Beckley, Webster's partner-in-crime. This inculpatory statement suggested Webster's criminal involvement in the kidnaping (and ultimate murder) of Lisa Rene. Such statements taken from an accomplice give rise to probable cause to arrest those so implicated. *United States v. Barfield,* 507 F.2d 53, 58 (5th Cir.1975).

Matters admittedly are complicated by the fact that, although the police had probable cause to arrest Webster following Beckley's statements, they did not know exactly who Webster was. That is, the issue of identification comes into play, as the police must have had probable cause to believe that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308
**(Cite as: 162 F.3d 308)**

man whom they arrested was indeed Webster. Based on the totality of the circumstances, we find that such probable cause existed.

Beckley identified Webster as "B–Love" and described him as "a black dude about 20 years old, about 5'9", 150–160 pounds, black low cut hair, brown skinned." Beckley explained how he and B–Love were involved in the sale of marihuana and how the kidnaping of Lisa Rene arose from Beckley and Webster's drug transactions.

Beckley told the police that he and B–Love took Lisa Rene to a cheap motel, tying her to a chair in a room that ended in the digits "13." Beckley led Detective Ford and FBI Special Agent Floyd to this motel, called the Pine Bluff Motel. He took them to room 513, which he identified as the room in which he and B–Love had taken Rene. Floyd interviewed the hotel manager, obtaining a receipt for room 513 in the name of Bruce Webster.

FBI Special Agent Mason and Agent McCall were assigned to assist Ford and Floyd by going to the motel to help gather evidence. They were told to be on the lookout for "B–Love," who had kidnaped Lisa Rene and kept her in room 513. Mason and McCall questioned a security guard about the guests of room 513 and were told that a local man named Bruce Webster had stayed in that room, along with three other black men, on the dates in question. The guard added that Webster went by the nickname of "B–Love" and described him as "a black male, approximately 5'8" tall and 150 pounds," seen wearing a black leather cap and driving an older American, dark blue, square-looking sedan. The guard also told the agents that Webster was a drug dealer.

Later that day, the agents observed a black man driving an older American, dark blue, square-looking car and wearing a black leather cap; a woman was in the passenger seat. The agents signaled the suspect to stop; in response, the suspect sped up, apparently attempting to flee. The agents pursued, and when one of them shouted

"B–Love, this is the F.B.I. Stop where you are and put your hands up," the driver stopped. The driver was, of course, Webster, also known as B–Love. At that point, the police placed Webster on the ground and handcuffed him.

[22] The agents had probable cause to arrest Webster for kidnaping. Although they did not have personal knowledge of his specific wrongdoings, they are permitted to act on the probable cause determination of others in their department. *See Charles v. Smith,* 894 F.2d 718, 724 (5th Cir.1990).

**\*332** [23] The security guard's description of B–Love was sufficiently detailed and accurate to provide the police with probable cause to believe that the man they were arresting was B–Love.[FN21] The reliability (in terms of veracity) of the guard, as a disinterested witness, is presumed. *See United States v. Hernandez,* 825 F.2d 846, 849 (5th Cir.1987).

> FN21. *See, e.g., United States v. Pollack,* 739 F.2d 187, 190 (5th Cir.1984) (holding that probable cause existed to arrest individual described as "a white male, approximately 50 years old, 5'8 or 5'9, with a short, stocky, medium build, glasses, and a receding hairline, wearing a dark blue or black coat, a light colored shirt and blue jeans"); *United States v. Maryland,* 479 F.2d 566, 569 (5th Cir.1973) (declaring that probable cause existed to arrest individuals described as "four Negroes, two men and two women ... traveling in a 'black and white vinyl over green Cadillac' ").

[24] Moreover, "the sufficiency of a particular description is largely a factual matter," so we give greater deference to the district court's finding of probable cause under these circumstances. *See Pollack,* 739 F.2d at 190. And in doing so, we must recall that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment."[FN22]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN22. *Hill v. California,* 401 U.S. 797, 804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (holding that probable cause existed even though the police arrested the *wrong person* because of an imperfect description).

3.

Even if the police initially lacked probable cause to arrest Webster, they most certainly had reasonable suspicion to stop him. *See Terry v. Ohio,* 392 U.S. 1, 22–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Watson,* 953 F.2d 895, 897 (5th Cir.1992). Their actions following this legitimate stop were likewise constitutional, so all the evidence and statements gathered from Webster are admissible.

[25][26] Reasonable suspicion is a standard lower than probable cause. *Terry,* 392 U.S. at 16–22, 88 S.Ct. 1868; *Watson,* 953 F.2d at 897 n. 1. Reasonable suspicion sufficient to justify a *Terry* stop exists when law enforcement officials are able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. The matching description of Webster, taken together with the guard's identification of him as a drug dealer and his presence at the motel, satisfy this test of reasonable suspicion.

[27] After stopping Webster, the police were within their constitutional authority to pat him down for their personal safety. *Terry,* 392 U.S. at 27–28, 88 S.Ct. 1868; *United States v. Michelletti,* 13 F.3d 838, 840–41 (5th Cir.1994) (en banc). They also were within their authority to handcuff Webster, even if probable cause to arrest him was lacking. *See United States v. Sanders,* 994 F.2d 200, 205–07 (5th Cir.1993).

[28] In addition, the police acted constitutionally when they asked Webster whether he had any needles in his pockets that could injure them during their pat down; such questioning,

needed to protect the officers, does not constitute interrogation under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Accordingly, Webster's response, indicating that he had marihuana in his pocket, was not obtained in violation of *Miranda* and was fully admissible.

[29] Webster's admission that he possessed marihuana gave the police probable cause to arrest him, at the very least for narcotics possession. This renders unproblematic the lengthy (1 1/2 –hour) detention of which Webster complains.

[30] Lengthy detentions following *Terry* stops are often problematic, because they serve to escalate an investigatory stop, which can be initiated with only reasonable suspicion, into an arrest, which requires probable cause. FN23 In this case, however, the officers' **\*333** reasonable suspicion developed into probable cause when Webster indicated that he possessed drugs, and when the police uncovered the key to room 513 on his person. Consequently, the conversion of Webster's investigatory stop into an arrest is both proper and to be expected. *Adams,* 407 U.S. at 148–49, 92 S.Ct. 1921. The search of Webster's person was in order as a valid search incident to a valid arrest. *United States v. Edwards,* 415 U.S. 800, 802, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

FN23. *See Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also California v. Beheler,* 463 U.S. 1121, 1123–25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding that whether an individual has been arrested, in the constitutional sense, is an objective, legal determination based on the circumstances of his restraint).

[31] Next, the police searched Webster's car, revealing two guns and other incriminating items. There are two valid, independent justifications for this police action, although only one is needed to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

affirm.

First, as the search of Webster's person revealed a key to room 513, police now had undisputable probable cause to arrest for the kidnaping. Therefore, it was reasonable for the police thoroughly to search Webster's car for evidence of the kidnaping. *See California v. Acevedo,* 500 U.S. 565, 579–80, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

[32][33] Second, Webster orally consented to this search. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 235, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Such consent operates as a waiver of Fourth Amendment rights if, by a preponderance of the evidence, it is found to have been given voluntarily under the totality of the circumstances. *See id.* at 235–40, 93 S.Ct. 2041; *United States v. Cooper,* 43 F.3d 140, 144 (5th Cir.1995). Factors to consider in making this determination are the coerciveness of police procedures, the extent of the defendant's cooperation, his awareness of his right to refuse consent, his education and intelligence, and his belief as to whether incriminating evidence will be found. *Cooper,* 43 F.3d at 144.

[34] Webster's experience in police procedure, resulting from his lengthy criminal record, belies the assertion that he was unaware of his rights or uneducated as to the situation he faced. And the fact that the police asked him not once but twice for permission to search his automobile (the second time being when they came to the trunk of the car) undercuts the argument that the police were coercive in their request. Under these facts, Webster's consent was freely given.

### D.

Webster argues that the court erred by denying his motion to dismiss the government's notice to seek the death penalty based on racial discrimination in the charging decision and by denying his discovery request on this issue. To support the motion to dismiss, Webster offered an affidavit showing that 66% of federal death penalty

cases involved black defendants. The court denied both the motion to dismiss and the motion for discovery and an evidentiary hearing, noting that Webster had failed to make out the requisite *prima facie* case that he had been singled out for prosecution but others similarly situated were not prosecuted.

### 1.

[35][36] We review constitutional claims *de novo. See United States v. Estrada–Trochez,* 66 F.3d 733, 735 (5th Cir.1995). A district court's decisions in overseeing criminal discovery, however, receive great deference on appeal. Alleged errors are subject to review for abuse of discretion, and we reverse only if a defendant establishes prejudice to substantial rights. *United States v. Mora,* 994 F.2d 1129, 1138 (5th Cir.1993).

### 2.
#### a.

[37][38] The decision to prosecute one person and not another is a proper exercise of executive discretion with which we are reticent to interfere. *United States v. Hoover,* 727 F.2d 387, 389 (5th Cir.1984). To establish that the government has engaged in unconstitutionally discriminatory selective prosecution, a defendant must make a two-pronged showing.

First, he needs to make out a *prima facie* showing that he has been singled out for prosecution but others similarly situated of a **\*334** different race were not prosecuted. *See United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *United States v. Sparks,* 2 F.3d 574, 580 (5th Cir.1993); *Hoover,* 727 F.2d at 389. In *Armstrong,* the Court stated, "The vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law." *Armstrong,* 517 U.S. at 469, 116 S.Ct. 1480. Second, he must demonstrate that the discriminatory selection of him for prosecution is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights. *See Sparks,* 2 F.3d at 580; *Hoover,* 727 F.2d at 389.

[39] In making these requisite showings, the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner. *Hoover,* 727 F.2d at 389. To dispel the presumption of prosecutorial good faith, "a criminal defendant must present 'clear evidence to the contrary.'" *Id.* at 465, 116 S.Ct. 1480 (quoting *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)).

[40][41] A defendant is not automatically entitled to an evidentiary hearing to make the required showing. He must first present facts "sufficient to create a reasonable doubt about the constitutionality of [his] prosecution" resulting from selective prosecution.[FN24] Mere statistical evidence of racial disparity usually will be *per se* insufficient to support an inference of any "unacceptable risk" of racial discrimination in the administration of capital punishment. *McCleskey v. Kemp,* 481 U.S. 279, 294–97, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

> FN24. *United States v. Jennings,* 724 F.2d 436, 445–46 (5th Cir.1984) (finding bare generic allegations concerning the selective prosecution of racial groups insufficient to justify an evidentiary hearing); *United States v. Ramirez,* 765 F.2d 438, 440 (5th Cir.1985) (holding "conclusional allegations of impermissible motive are not sufficient" to demonstrate the government acted in bad faith).

b.

[42] Webster has failed to make a sufficient showing that he was singled out for selective prosecution. He has not even attempted to show that other similarly situated individuals committing similar acts were not prosecuted. Such a showing would be challenging under the FDPA, as no one yet had been prosecuted under that Act when Webster was indicted. But Webster also did not attempt to make the showing under other federal death penalty acts.

Webster relies primarily on his statistical evidence, which under *McCleskey* fails to rebut the good faith presumption. Webster cites *McCleskey,* 481 U.S. at 293 n. 12, 107 S.Ct. 1756, which may allow finding a constitutional violation (or *prima facie* finding thereof) in very limited circumstances if the data presents a "stark" enough picture. But the 66% figure Webster provides is no more stark than were the statistics in the Baldus Study at issue in *McCleskey.*[FN25]

> FN25. Baldus reported that Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, 32% of the cases involving white defendants and white victims, 15% of the cases involving black defendants and black victims, and 19% of the cases involving white defendants and black victims. *See McCleskey,* 481 U.S. at 287, 107 S.Ct. 1756.

[43] Webster also argues that counsel would have shown that they had requested that the Department of Justice consider this racial disproportionality as a factor mitigating against authorization of the death penalty in this case, and the government refused because of "the purported 'race neutrality' required by DOJ policies in capital charging decisions." Likewise, Webster contends that "failure of the Government to 'affirmatively act' to overcome such racially discriminatory application" of the death penalty "amounted to purposeful discrimination." This, however, fails to establish the discriminatory purpose required under the second prong of the selective prosecution test.

**\*335** Discriminatory purpose "implies that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 291, 107 S.Ct. 1756 (quotation omitted). The above evidence, at best, shows action in spite of a putatively adverse discriminatory effect and not purposeful discrimination.

[44] Furthermore, a non-discriminatory explanation for seeking the death penalty against Webster is evident on the facts: It is justified by the objective circumstances of the crime and the sufficiency and availability of evidence to prove the required elements under the law. These are the precise considerations the Supreme Court identified as proper and legitimate grounds for such a decision. *See id.* at 307 n. 28, 107 S.Ct. 1756. The verdict attests to the objective considerations, and Webster has made no effort to rebut them.

3.

Webster's attempt to obtain discovery on the issue stands on equally faulty ground. In *Armstrong,* the Court addressed the issue of the showing necessary to obtain discovery on a claim of selective prosecution based on racial discrimination. The Court first quickly disposed of any claim for discovery under FED.R.CRIM.P. 16, stating, "We hold that Rule 16(a)(1)(C) authorizes the defendants to examine Government documents material to the preparation of their defense against the Government's case-in-chief, but not to the preparation of selective-prosecution claims." *Armstrong,* 517 U.S. at 463, 116 S.Ct. 1480.

[45] Webster contends that a defendant "necessarily has a lesser burden when seeking discovery to aid in proving the elements of a prima facie case of selective prosecution." The Court, however, held squarely against Webster's assertion, stating, "The justification for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468, 116 S.Ct. 1480.

[46] Finally, Webster argues that he requested the discovery also to establish mitigating evidence that a death sentence would propagate a racially discriminatory application of the federal death penalty. Webster makes no argument other than that a defendant is entitled to present any mitigating evidence, which he was denied by denial of the discovery request.

The government aptly responds that the *Armstrong* discovery rule for selective prosecution applies, requiring a *prima facie* showing. Any other rule would allow circumvention of *Armstrong*'s requirements.

Furthermore, the Court in *Armstrong* justified its high standard for discovery in selective prosecution claims, explaining:

Judicial deference to the decisions of [prosecutors] rests in part on an assessment of the relative competence of prosecutors and the courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis courts are competent to undertake. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Governments enforcement policy.

517 U.S. at 465, 116 S.Ct. 1480 (citations and quotations omitted). The competency concerns apply a *fortiori* when lay jurors are asked to analyze prosecutorial decisions.

In addition, Webster had the statistical evidence regarding the allegedly discriminatory manner in which the modern federal death penalty

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

has been applied and yet chose not to attempt to introduce it during the sentencing hearings; this may indicate his lack of confidence in this evidence's mitigating value.

**\*336 E.**

Webster contends that the district court erred in denying his motion for post-trial discovery on the issue of whether one of the case's lead law enforcement investigators, Special Agent Floyd, had "purchased" the testimony of a prosecution witness, John Clay, by allowing a conjugal visit at a private residence in violation of agency guidelines. Webster argues that if discovery had verified this claim, it would have impeached the testimony of Clay and Floyd, thus constituting grounds for a new trial.

### 1.

[47][48] We review discovery rulings for abuse of discretion. *United States v. Dukes,* 139 F.3d 469, 476 (5th Cir.), *cert. denied,* 525 U.S. 894, 119 S.Ct. 215, 142 L.Ed.2d 177 (1998); *United States v. Johnston,* 127 F.3d 380, 391 (5th Cir.1997), *cert. denied,* 522 U.S. 1152, 118 S.Ct. 1174, 140 L.Ed.2d 183 (1998). We will order a new trial based on discovery violations only where the party demonstrates prejudice to his substantial rights. *Dukes,* 139 F.3d at 476. To prevail, then, Webster must establish that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.... [A] reasonable probability is shown where the nondisclosure 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict.' " *United States v. Fisher,* 106 F.3d 622, 634 (5th Cir.1997) (quoting *Westley v. Johnson,* 83 F.3d 714, 725 (5th Cir.1996), *cert. denied,* 519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997)).

### 2.

[49] The government introduced testimony from Clay during the rebuttal portion of the penalty phase. Clay, who had charges pending against him for drug dealing that included the possibility of a life sentence, was taken to the holdover cell on the second floor of the federal courthouse. When he arrived from the Mansfield Correctional Enforcement Center, Webster was present in the holdover cell. Webster then left and came back and began jumping around, saying that "there has got to be a God" because his trial had been set to a later day. Clay testified that Webster also preached a thirty-minute sermon, "quot[ing] scriptures out of the Bible that has to be photographic in his mind because it was so accurate." Clay and Webster conversed in "pig latin" after Webster started using it. Clay demonstrated pig latin for the jury.

Webster then told Clay about a "master mind plan" to arrange for each of them to have sexual contact with a female inmate by manipulating the visiting process. Before the two men were taken back to Mansfield, Webster told Clay that he would write a letter to him in pig latin to explain the plan. Webster in fact sent such a letter to Clay—the letter was introduced into evidence, with the defense stipulation that Webster had authored it. With the prosecutor reading the letter, Clay interpreted some of the slang used.

Clay also testified that he was cooperating with the government in hopes of a sentence reduction. Counsel for Webster questioned Clay about his criminal background and his current charges, and attempted to impeach Clay by implying that he was angry with Webster because Webster allegedly had written a letter to Clay's girlfriend, who also was a prisoner at the Mansfield Correctional Center.

Floyd testified during the penalty phase regarding oral statements Webster made while in custody. The statements included that killing Lisa Rene was "just business." [FN26]

> FN26. Floyd also provided some of the testimony relevant to the admission of Webster's confession. As discussed above, the district court properly denied the motion to suppress the confession; the questions Webster raises regarding Floyd's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

credibility do not alter that determination.

Approximately two months after trial and two days after filing a motion for new trial, Webster filed an addendum to his motion for new trial, setting forth an allegation from a local newscast that Floyd had permitted Clay to engage in a conjugal visit with Clay's girlfriend after Floyd had taken Clay from **\*337** the detention center for an unrelated investigation. Webster alleged that this "reward" to Clay should have been reported to the defense pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Webster asked the court to order the government to disclose any information that reasonably could be obtained regarding inducements given by Floyd to Clay and, specifically, that the government be ordered to disclose the results of any investigation relating to the matter. The government already had volunteered to provide the requested information to Webster, subject to confidentiality limitations.

In its response to the motion for new trial, the government reaffirmed its continuing obligation and intention to disclose any mitigating or impeaching evidence. The government further noted that it would work with Webster's counsel to help them secure affidavits that had been filed in other cases in connection with the allegations. Webster then filed a motion in which he requested the court to

> order the attorneys for the government to produce and hand over to the defense counsel all information associated with the activities of Special Agent Garrett Floyd of the Federal Bureau of Investigation that are related to the granting of inducements, favors, privileges, rewards, concessions or anything of value to any witness directly or indirectly associated with this instant case. This order should extend as well to any other case which is, or may be, a part of a systematic action on the part of Agent Floyd or other government actors to grant favors to witnesses in return for their testimony.

Counsel for Webster acknowledged that he had received copies of the affidavits used in other cases involving the same allegation and that defense investigators were looking into other possible sources of information.

In response to the motion for post-trial discovery, the government noted that the district court having jurisdiction over the cases in which this allegation had been made had determined that Floyd was unaware that Clay had had sexual contact while in Floyd's custody and that a new trial was not warranted. The government asked the court to deny Webster's post-trial motion because the motion was too broad, and again reiterated its continuing discovery obligation.

The court denied Webster's motion, stating that even

> assuming that all of the facts asserted in [Webster's] motion and the addendum are true—that the Federal Bureau of Investigation Special Agent assigned with primary responsibility for investigating this case took federal prisoner John Clay from his detention facility, transported him to the home of a female friend, and knowingly allowed Clay and the female to engage in sexual activities, all in exchange for Clay's testimony in this cause, and the prosecutor knowingly withheld this information from Defendant,

the evidence was not material. Citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the court found that even if this information had been disclosed before trial, the result would have been the same.

3.

The court did not abuse its discretion in denying the motion for post-trial discovery. Even assuming the allegations are true, they fail to undermine confidence in the verdict. Clay was only one of many government witnesses who testified to rebut Webster's claim of mental retardation,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

including school teachers, counselors, principals, employers, and detention center personnel. Much of Clay's testimony focused on the letter written by Webster's own hand that set forth the "plan" for a sexual rendezvous with female inmates. It is evident from the record that Webster concocted the elaborate scheme to manipulate the detention center's visitation system and sought Clay's assistance. Clay's other testimony could be redacted, and there would still be ample evidence to support the jury's findings regarding Webster's mental abilities.

Furthermore, Clay admitted that he had testified in hopes of a reduced sentence, and the defense impeached his testimony with the allegation that Clay held a grudge against Webster. Further impeachment via the possible *quid pro quo* of sex for testimony likely **\*338** would not have affected more than marginally the weight the jury gave to Clay's testimony.

With respect to Floyd's testimony, he too was only one of many witnesses who testified regarding Webster's future dangerousness. Other witnesses included Special Agent William Eppright, who testified that, on an occasion separate from the one testified to by Floyd, Webster said killing Lisa Rene was "strictly business." Mohamed Ghene testified regarding Webster's attempted robbery of his clothing store and the shots Webster fired at him from across the street. Tlisha Booth presented testimony pertaining to a shoving match over a piece of candy. Sylvia Henry, corroborated by a security guard and Booth, testified that Webster had assaulted her at a nightclub. Pine Bluff Police Department Officer Lance Lawhorn testified that, while he was transporting Webster, Webster stated that if he was not in custody he would "kill the bitch" who gave him a venereal disease. Even if Floyd's testimony regarding Webster's oral statements were redacted, the record provides ample evidence of future dangerousness.

Moreover, any damage to Floyd's credibility caused by these allegations would be mitigated by the finding of the district court with jurisdiction over the cases where the allegations were initially made that Floyd was unaware that Clay had any sexual contact while in his custody and that a new trial was not warranted. There is no reasonable probability that the verdict would have been different had the jury known of the alleged Floyd–Clay incident, so the court did not abuse its discretion in denying discovery.

### F.

Webster argues the district court lacked a statutory or constitutional (Fifth Amendment) basis to compel him to submit to a mental health exam by a government expert as a prerequisite to introducing his own expert psychiatric testimony. We find no error.

### 1.

Although compelling Webster to a government psychiatric exam, the court also granted, in part, Webster's motion to limit the scope of the exam. Specifically, the court barred examination of Webster's future dangerousness. The government's witness, Dr. George Parker, however, testified that he found that Webster's incarceration would lead to "a potentially very dangerous situation." Webster argues this aspect of the testimony constitutes a Fifth Amendment violation.

Webster's argument falls well short of reversible error. First, he mischaracterizes the record. There is no evidence that any government expert was asked to FN27 or did conduct an examination of Webster with regard to his future dangerousness. The reports of Dr. Coons and Dr. Parker state that they had sufficient data to assess Webster's future dangerousness without examination designed to uncover that. Our reading of the record leads us to conclude that, contrary to Webster's assertion, Coon's testimony regarding Webster's future dangerousness did not turn on an examination in violation of the court ordered limits.

> FN27. When first contacted and hired, before the court's limiting order, Dr. Coons

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

was informed that part of the exam would be for future dangerousness. But nothing in the record indicates that either Coons or Dr. Parker actually conducted an exam for future dangerousness.

[50][51] Second, Webster never objected on these grounds, so he failed to preserve the issue for appeal. Finally, even if such testimony were given and properly objected to, the error of allowing the testimony proves harmless, because there is ample independent evidence to support a finding of future dangerousness.[FN28]

> FN28. *See Satterwhite v. Texas,* 486 U.S. 249, 257–58, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (citing numerous cases for proposition that constitutional errors in criminal trial are usually subject to harmless error review).

### 2.

The *Hall* panel avoided the question of statutory authority because it had not been properly briefed. *See Hall,* 152 F.3d at 398. We now face the issue and conclude that the **\*339** district court had the authority to order the exam.

#### a.

A district court's decisions in overseeing criminal discovery are entitled to great deference. Alleged error is subject to review for abuse of discretion, and we will reverse only if a defendant establishes prejudice to substantial rights. *Dukes,* 139 F.3d at 476; *Johnston,* 127 F.3d at 391. Because the court-ordered exam did not violate Webster's constitutional rights, and he makes no other claim of prejudice, any finding of authority to order the exam negates prejudice to substantial rights.

#### b.

[52][53] Although Webster correctly asserts that the court lacked statutory authority to order the psychiatric exam, a district court possesses inherent powers "reasonably useful to achieve justice," *In re*

*Stone,* 986 F.2d 898, 902 (5th Cir.1993) (recognizing several categories of inherent court powers), including certain powers over the administration of civil and criminal discovery, *Natural Gas Pipeline Co. v. Energy Gathering, Inc.,* 2 F.3d 1397, 1406 (5th Cir.1993). In fact, FED.R.CRIM.P. 57(b) provides that where no law or rule is directly applicable, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." The existence of the federal rules does not preempt this power, if the rules do not exclude the exercise of the specific putative inherent power. *Id.* at 1407.[FN29] Before the enactment in 1974 of FED.R.CRIM.P. 12.2, which establishes the procedures governing psychiatric exams at trial, numerous courts had recognized the existence of inherent judicial authority to order a defendant to give the government notice of a psychiatric defense and to submit to examination by a government expert.[FN30] This court, too, in other circumstances, has found inherent power to compel a psychological examination of a criminal defendant.[FN31]

> FN29. *See also United States v. Nobles,* 422 U.S. 225, 236, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (finding that FED.R.CRIM.P. 16 did not preempt an inherent power of the judiciary in criminal trial).

> FN30. *See, e.g., United States v. Albright,* 388 F.2d 719, 722 (4th Cir.1968); *Pope v. United States,* 372 F.2d 710 (8th Cir.1967) (en banc), *rev'd on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Alexander v. United States,* 380 F.2d 33 (8th Cir.1967); *Winn v. United States,* 270 F.2d 326 (D.C.Cir.1959).

> FN31. *See United States v. Cohen,* 530 F.2d 43, 47 (5th Cir.1976) (holding that court possesses inherent authority to order exam and admit psychiatric testimony regarding sanity at time of offense in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

conjunction with exam for competency to stand trial performed pursuant to 18 U.S.C. § 4244); *United States v. Moudy,* 462 F.2d 694, 697 (5th Cir.1972) (same); *accord United States v. Malcolm,* 475 F.2d 420, 424–25 (9th Cir.1973) (same); *Gibson v. Zahradnick,* 581 F.2d 75, 78 (4th Cir.1978) (same); *United States v. Green,* 544 F.2d 138, 145 (3d Cir.1976) (holding that court possesses inherent power to compel exam by own psychiatrist under 18 U.S.C. § 4244); *United States v. Phelps,* 955 F.2d 1258, 1263 (9th Cir.1992) (inherent authority to compel psychiatric exam to determine whether release appropriate after verdict of not guilty by reason of insanity); *United States v. Lewis,* 53 F.3d 29, 35–36 n. 9 (4th Cir.1995) (holding that court did not err in ordering psychiatric examination in light of defendant's stated intent to rely on claim of sub-normal intelligence in support of entrapment defense despite the technical inapplicability of rule 12.2(b)).

Acknowledging that a district court has such inherent authority furthers the goals of the FDPA. If the federal courts have supervisory authority to "formulate procedural rules not specifically required by the Constitution or the Congress" to "preserve the integrity of the judiciary by ensuring that a conviction rests on appropriate considerations validly before the jury," *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), that authority must extend to the sentencing phase of a trial as well.

The FDPA provides, "[t]he government and the defendant shall be permitted to rebut any information received at the [sentencing] hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death." § 3593(c). Webster indicated his intention to present expert psychiatric testimony at the sentencing**\*340** hearing. The government would not have a "fair opportunity" to rebut that testimony if it could not conduct an examination of its own; and to ensure that the sentence rests on appropriate considerations, the government must have the opportunity to rebut the defense's claims.[FN32]

> FN32. *See Estelle v. Smith,* 451 U.S. 454, 465, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (noting that forbidding a government examination "may deprive the State of the only effective means it has of controverting [the defendant's] proof on an issue that he has injected into the case").

Allowing the court to require disclosure of the defendant's experts' reports and to compel the defendant to submit to a government psychiatric exam on the government's motion constitutes a fair procedure for achieving these goals in a timely manner. *Cf.* FED.R.CRIM.P. 12 (establishing similar procedure for guilt-innocence phase). The court had the inherent authority to order the exam, and, therefore, did not abuse its discretion.

### G.

Webster's first challenge relating to veniremen alleges that the court abused its discretion in granting the government's *Witt* challenge of Linda Vicar. A review of the record reveals that the court had sufficient grounds to grant the challenge.

### 1.

[54][55] A court may excuse a prospective juror for cause because of his views on capital punishment if those views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and oath. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Williams v. Collins,* 16 F.3d 626, 633 (5th Cir.1994). Determination that a juror would automatically vote against the death penalty in every case is not the only situation in which that standard would require dismissal. *Flores,* 63 F.3d at 1355. The court has

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

the discretion to excuse a juror when it "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* (quoting *Witt,* 469 U.S. at 426, 105 S.Ct. 844). We give considerable deference to the decision to excuse a juror on this basis, because such decisions are based on face-to-face credibility assessments.[FN33]

> FN33. *See Flores,* 63 F.3d at 1355; *see also Witt,* 469 U.S. at 426–29, 105 S.Ct. 844 (although in habeas context, discussing universal reasons for deference); *United States v. Bryant,* 991 F.2d 171, 174 (5th Cir.1993) (decision to excuse juror for actual bias reviewed for *manifest* abuse of discretion).

### 2.

[56] Webster's argument focuses on Vicar's statements that she believed capital punishment was a deterrent to crime and that "the possibility is there" that situations existed in which she could impose a death sentence. Based on this, Webster believes her ability to perform her duties as a juror was not impaired.

Other excerpts, however, support the government's concern and the court's decision. Vicar stated, "I mean from one day to the next, I don't have the same opinion of what I could do. I think there could be, depending on what the situations were, that I could say, yes, that's what it should be, that's what the penalty should be. I don't consistently, from day to day, think I could actually do that if there really is a life sentence."

Indeed, in answering several questions, Vicar wavered on whether she could sentence a defendant to death if a life sentence without parole option were a viable alternative.[FN34] **\*341** The government, in objecting to Vicar, pointed to her demeanor, her long pauses before answering questions, and her admission of equivocation. Although she stated she could envision circumstances in which she might be able to impose

a death sentence, the presence of the alternative of a life sentence without parole raised serious questions about her ability to follow the law. In addition, the whole of her testimony could have left the court with the impression that she favored the death penalty as a theoretical necessity, but would not be able to recommend it. The court did not abuse its discretion in granting the challenge for cause for Vicar's inability to apply the death sentence.

> FN34. During questioning by the government, Vicar gave the following answers:
>
> A. I guess it's not something that I have ever wanted to do. I guess I have debated since we filled out that questionnaire whether I could really do it or not, but that doesn't say I don't think it's necessary. I guess I asked the question this morning about whether we really had a life sentence that were truly without parole or any chance of getting out. I don't know if I could tell you at this time whether I could make a decision for the death penalty or—I mean, I don't know if I could sit here and tell you today whether I could really do that or not. That's why I had the questions I had this morning about whether if you're telling me there really is a life sentence without parole, if that is really true, if you tell me in the courtroom that there is that option.
>
> Q. ... knowing that a person you might convict of an offense like this is never going to be released, ever, period, and he's going to be in prison for the rest of his life, that realistically you could never vote for the death penalty, then you really need to let us know that now, okay?
>
> A. I guess I feel like—since there is that other option, I'm not sure. I thought

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

before that I could vote for the death penalty, but I don't really know, if it came right down to it, if I could do it or not. I'm not saying that I could not. I guess a lot of it would just have to do with the facts of the case. I don't know if I could do it or not. I couldn't tell you that I know I could or that I know I couldn't.

Q. ... Why do you feel that would be such a problem? Realistically, why do you feel that's a problem?

A. I guess I'm just torn between the fact of whether I thought there were cases that I have heard of that I thought that's exactly what they deserved, but whether I could—whether that decision—I guess whether it conflicts with my religious beliefs, whether that decision should really be up to me or not. I don't know if I could make that decision or if I could be guaranteed that person would be in prison for life. I guess it's probably primarily just—just something within myself that I don't know if I could do it or not, because I might think that person deserved exactly that, but whether I should be the one here on earth to make that decision.

### H.

Webster avers that the court abused its discretion in denying several of his challenges for cause. He challenged veniremen Deanna Hailey and Carolyn Coffelt on the ground that they stated that if they found Webster guilty of the primary offense of kidnaping resulting in death, they would have to answer "yes" to the statutory aggravating factor that the defendant caused the death of the victim during a kidnaping. Webster challenged Jimmy Chambless, Kristi Magouirk, and David Hoffman because all allegedly were biased in favor of finding him guilty during the guilt-innocence phase. The court denied these challenges, forcing Webster

to use peremptory challenges in all five cases. He now says the denial of his for-cause challenges was an abuse of discretion. We disagree.

### 1.

[57][58][59] The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois,* 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In a capital sentencing context, there is the right to challenge for a cause a juror whose views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The government has the right to challenge for cause those veniremen whose views in opposition to the death penalty will substantially impair their duty. *Id.* As a corollary, the capital murder defendant has a right to challenge for cause any juror who will automatically vote for the death penalty in every case, because that juror "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Hall,* 152 F.3d at 407 (quoting *Morgan,* 504 U.S. at 729, 112 S.Ct. 2222).

[60] Although Webster complains that the failure to grant his challenges for cause forced him to exhaust his peremptory challenges and, after running out, to take objectionable jurors, he does not allege that any of **\*342** the jurors who served was not impartial.[FN35] We do not face, therefore, a pure constitutional challenge. *Cf. id.* at 407–08.[FN36] Rather, we address Webster's statutory right to the free exercise of his peremptory challenges as a means of implementing the constitutional guarantees.

> FN35. Webster asserts, without substantiation or explanation, only that he was forced to take several "questionable" jurors.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN36. The failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only "if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury. Webster has made no claim of incompetent jurors.

"While peremptory challenges, or the number provided by FED.R.CRIM.P. 24(b) may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal." *United States v. Munoz,* 15 F.3d 395, 398 n. 1 (5th Cir.1994). FN37 " 'The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice.' " *Hall,* 152 F.3d at 408 (quoting *United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993)). Because the district court's predominant function is determining the credibility of the veniremen, however, "deference must be paid to the trial judge who sees and hears the prospective juror." *Id.* at 407 (quoting *Witt,* 469 U.S. at 426, 105 S.Ct. 844). "We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion." *Id.* (quoting *Flores,* 63 F.3d at 1357).

FN37. *See also United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976) ("[A]s a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges.").

2.

a.

[61] Webster contends that the court should have granted his challenge to Deanna Hailey because she automatically would answer "yes" to one of the statutory aggravating factors if she had found him guilty. Specifically, Hailey said that if she had found a defendant guilty of an intentional kidnaping that results in death, she always would find the statutory aggravating factor of § 3592(c)(1) to be true—that the defendant had caused the death during the commission of the offense. FN38

FN38. Hailey actually answered the question, "Yes, I guess so."

This, Webster argues, runs afoul of *Morgan,* because Hailey would fail to consider additional evidence before finding the statutory factor. In addition, Webster claims, Congress, when it provided the aggravating factor, must have contemplated a juror's consideration of something more than or different from the evidence at trial; otherwise, the aggravating factor would be superfluous. We disagree; the court did not abuse its discretion in finding Hailey unbiased and capable of serving.

First, *Morgan* does not apply here; it holds that a juror should be excused if a finding of guilt automatically would lead him to recommend a sentence of death. *See Morgan,* 504 U.S. at 729, 112 S.Ct. 2222. The instant alleged error is a far cry from that in *Morgan.* The problem of which Webster complains is that a finding of guilt automatically would lead to the finding of an aggravating factor-not to a recommendation of death. An automatic finding of an aggravating factor in no way runs afoul of *Morgan* 's requirement that a juror appears able to "consider the evidence of aggravating and mitigating circumstances as the instructions require him to do," *id.,* because the automatic finding of an aggravating factor is not the same as an inability to consider aggravating and mitigating circumstances. A juror could find the aggravator of kidnaping resulting in death and yet determine that the mitigating factors outweigh that and other aggravating **\*343** factors, sparing the defendant's life. FN39

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN39. *Cf. United States v. McVeigh,* 153 F.3d 1166, 1206–08 (10th Cir.1998) (giving *Morgan* a narrow reach by holding that court need not allow the defense to ask veniremen *Morgan*-type questions that include consideration of facts and circumstances beyond a mere finding of guilt automatically leading to a recommendation of death under the FDPA).

Second, as we held in *Jones* and *Hall,* allowing a juror, having already found the existence of a certain set of facts beyond a reasonable doubt during the guilt-innocence phase, to answer "yes" to an aggravating factor based on the same facts does not raise constitutional problems. *See Hall,* 152 F.3d at 416–17; *Jones,* 132 F.3d at 248–49. Indeed, it merely allows the jury to consider the facts or elements of the offense as an aggravating factor that, having already been found beyond a reasonable doubt, it then weighs—just once—in determining whether to return a death sentence. Allowing the factor to be weighed does not violate the narrow strictures of *Morgan,* even if a juror believes the finding of guilt automatically leads to a finding of the factor.

Finally, Hailey answered Webster's hypothetical questions in ignorance of the law the court would instruct her to apply. Contrary to Webster's assertion, she did not implicitly say she would not follow instructions; to the contrary, she stated that she would be able to follow the instructions and procedures. The court did not abuse its discretion in finding that she would obey those instructions when informed how to determine the existence of aggravating factors.[FN40]

FN40. *See Hall,* 152 F.3d at 410–11 (statements in ignorance of law combined with affirmation that venireman will follow instructions allows district court to find venireman competent).

b.

Webster finds error in the denial of his challenge for cause to venireman Carolyn "Kay" Coffelt. Webster believes Coffelt should have been excused for the same reason as for Hailey, although Coffelt more ambiguously answered that she would automatically find the first aggravating factor after finding guilt.[FN41] Coffelt also explicitly stated she would be able to follow the instructions and knew there was nothing automatic in assessing the death penalty. For the reasons given above, the district court did not abuse its discretion.

FN41. Coffelt answered, "Possibly."

c.

[62] Webster claims the court should have granted his challenge for cause of venireman Jimmy Chambless because he was predisposed to find Webster guilty. Chambless, on his own initiative, informed the court that he had been exposed to pre-trial publicity, "and what little I know about this, ... I'm already leaning towards the prosecution.... That's not saying I couldn't be swayed with the evidence and everything that could come up, but I have got to be honest at this point, the defense is not starting even with the prosecution."

He also stated he leaned toward the prosecution because Webster had been arrested, and "if someone was arrested for this, I feel like there was a reason for it.... I feel like there was probably a good reason they were arrested. I'm not saying that I couldn't, again, be swayed...." Based on these statements, Webster believes Chambless should have been excused for cause because he was predisposed to find an arrested defendant guilty and would shift the burden of proof onto the defense. We disagree; other statements Chambless made demonstrate the court did not abuse its discretion in denying the for-cause challenge.

When questioned by the court, Chambless agreed the verdict must be based on the evidence presented in the courtroom, and believed he could limit himself to such evidence. He affirmed that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049      Document: 8-2      Filed: 02/18/2014      Pages: 346

prosecution carries the burden of proving guilt beyond a reasonable doubt, and would require as much with respect to every element. He also believed he could give a fair trial to both the defense and the prosecution, putting his predisposition aside. The court found him credible in making these statements and denied the challenge for cause.

"A person is not automatically rendered unqualified to serve as a juror merely because**\*344** he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to the media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented." *Hall,* 152 F.3d at 411 (quoting *Bell v. Lynaugh,* 828 F.2d 1085, 1093 (5th Cir.1987)). We "decline to second-guess the district court's determination, made after face-to-face credibility assessment and thorough questioning, that [Chambless] could faithfully follow the court's instructions and reach a verdict based solely upon the evidence presented at trial." *Id.*[FN42]

> FN42. *See also Bell,* 828 F.2d at 1093 (holding that court properly declined to strike venireman for cause in similar circumstances, where pre-trial publicity predisposed venireman to find guilt).

#### d.

[63] Webster contends the court should have granted his challenge for cause of venireman Kristi Magouirk for a demonstrated bias against him, an inability to provide a presumption of innocence or to follow the instructions not to listen to news reports. During voir dire, Magouirk admitted, "I guess I'm more prone to look for evidence to convict rather than evidence not to convict, reasonable doubt." She later claimed not to be prone to convict, but "I feel like the government must a have good evidence to have this person on trial." She expressed her view that black men "have a grudge against me and my race" but asserted that that feeling would not affect her decision. She also

stated, "I am all for the death penalty. I would just as soon see them die for their crime than to live out their life on my taxes"; but she explained that she could recommend a life sentence without parole.

Furthermore, she later reiterated her preconceptions of evidence of guilt because "if the person is charged, they must have good evidence." She said, "I would like to give him a clean slate. It's just that, to be honest, yes, it's hard because he's here.... So there has got to be something against him." She also recounted news stories on the crime from as recently as the previous day. It "would be pretty hard" for her not to discuss the case with her husband and not to keep up with the press accounts. Despite Webster's claims that Magouirk showed bias and an inability to follow the instructions, the court deemed her capable of serving. We decline to second-guess that determination.

The decision is supported by ample evidence that, combined with the court's assessment of Magouirk's credibility, justifies its refusal to dismiss her for cause. As explained, knowledge of the case from news accounts does not preclude service, and Magouirk agreed she would follow the instructions to avoid the news, assume anything she heard outside the courtroom was false, and base her decision solely on the evidence. She recognized that the government carried the burden of proving guilt beyond a reasonable doubt. She stated, "I guess, since I haven't heard any evidence, I don't have anything against him. So to me he is innocent. Until I hear the facts, then he is innocent, yes." She affirmed that she would follow her oath as a juror and the court's instructions, including not discussing the case with her husband. The court acted within its discretion.

#### e.

[64] Webster claims error in the refusal to grant his challenge for cause to venireman David Hoffman. Webster believes Hoffman demonstrated bias resulting from Webster's being charged with the offense and an inability to separate the victim from thoughts of Hoffman's own daughter.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Hoffman testified that, based on news accounts, he believed a girl named Lisa Rene was kidnaped, taken to Arkansas, and murdered, even though those were the elements the government would have to prove. Recognizing the government had brought charges, he admitted, "I guess for that reason alone I would have to say that there's a certain bias there, or else he wouldn't be here." Hoffman also stated that he might find it difficult to "wall off" thoughts of his daughter during sentencing, and they might affect his vote "to a certain extent."

Hoffman said, however, "I believe that I would be able to force [thoughts of my kids from my mind] and weigh purely on the **\*345** evidence there." [FN43] He stated his view that much information coming from the media proved false. He believed he could keep an open mind, follow his oath as a juror, and base his verdict and sentence recommendation on the evidence and law.

> FN43. Hoffman demonstrated both the difficulty and, ultimately, his ability to make a decision based on the evidence and not on his feelings for his children:
>
>> Where I feel that I would have a harder time at that—walling that off—is if a guilty verdict is determined and sentencing begins. I would still, again, look at the individual evidence itself and weigh all the circumstances, but just being a human being, I have experiences and feelings, and that's what makes us all individuals, of course, and those feelings for my children would probably end up coming out in some form in the sentencing.

A juror need not, and indeed cannot, leave his experiences and circumstances outside the jury room. What he must do is base a decision solely on the evidence presented, as seen in a fair and unbiased manner through the lens of his experiences. The district court found Hoffman excruciatingly honest, but dedicated to and capable of overcoming any difficulties he might have as a juror. On this cold appellate record, we cannot find that determination an abuse of discretion.

### I.

Before the jury retired for deliberations at the penalty phase, the court excused one of the jurors and elevated an alternate to replace him. Webster alleges the court erred, but we disagree.

### 1.

[65][66] Webster styles the claim of error as an abuse of discretion in not granting a mistrial. We review a refusal to grant a mistrial for abuse of discretion. *United States v. Willis,* 6 F.3d 257, 263 (5th Cir.1993). But Webster moved for a mistrial because the court had substituted an alternate juror allegedly after the jury had retired to consider its verdict. Under FED.R.CRIM.P. 23(b) and 24(c), we review a decision to substitute jurors at that late stage for prejudice. *United States v. Huntress,* 956 F.2d 1309, 1316 (5th Cir.1992); *United States v. Helms,* 897 F.2d 1293 (5th Cir.1990).

### 2.

During the punishment phase, but before the jury had begun deliberations, the court excused juror Charles Fox after he came to court in severe pain from an automobile accident. After extensive discussion with counsel for the defense and prosecution, the court decided to substitute Fox with an alternate juror, Christopher Rawlinson. Rawlinson had sat through the guilt-innocence phase but had neither participated in nor observed those jury deliberations; he also sat through the penalty phase testimony. Webster moved for a mistrial and objected to using an alternate juror; the court ruled against him. In the sentencing phase charge, the court instructed the jurors, "As you will recall, a member of the jury which returned the verdict in the guilt phase of the trial was excused for health reasons. An alternate juror was substituted in his place. You are instructed that this substituted juror shall not be treated any differently than any other juror during your deliberations."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346    Page 54

3.

[67] Webster admits the propriety of dismissing Fox. In fact, that decision falls soundly within the court's discretion: "The district court has the discretion to remove a juror 'whenever the judge becomes convinced that the juror's abilities to perform his duties becomes impaired.' " *United States v. Leahy,* 82 F.3d 624, 629 (5th Cir.1996) (quoting *Huntress,* 956 F.2d at 1312). Webster complains only of the lack of authority to replace Fox with an alternate.

The court presented the parties with three alternatives: continue with eleven jurors, impanel an alternate, or declare a mistrial and impanel a new jury. The court observed that "the law isn't real clear" on how to proceed. The prospect of repeating the entire penalty phase hearing made the last alternative highly unattractive, although that is the alternative Webster urged; he would not stipulate to an eleven-member jury.

If this had taken place before the jury retired at the guilt-innocence phase of the **\*346** trial, the answer to the question would be simple, for rule 24(c) provides that "alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Rule 24(c) also states, however, that all alternate jurors who have not replaced a regular juror "shall be discharged after the jury retires to consider its verdict." *Id.*

[68] When a juror is disqualified after the jury retires, on the other hand, the court has the authority to require the jury to proceed to verdict with only eleven members, with or without stipulation by the parties, and this should be done particularly in lengthy and complicated trials.[FN44] We have explained our justification for proceeding with eleven jurors instead of substituting an alternate:

FN44. *See* FED.R.CRIM.P. 23(b); *Huntress,* 956 F.2d at 1317 ("We wish to emphasize that district judges in this circuit should follow Rule 23(b) rather than substitute alternate jurors when a juror is excused after deliberations begin.").

An alternate juror replacing a regular juror after the jury has commenced its deliberations may be unable to participate equally with the other jurors, because he will lack the benefit of prior deliberations. There is a danger that the other jurors will have already formulated positions or viewpoints or opinions in the absence of the alternate juror and then pressure the newcomer into possibly ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case by twelve jurors. *United States v. Quiroz–Cortez,* 960 F.2d 418, 420 (5th Cir.1992).

The complication in the instant case, of course, is the bifurcated trial. The FDPA provides that if the defendant is found guilty, the court

shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—

(1) before the jury that determined the defendant's guilt;

(2) before a jury impaneled for the purpose of the hearing if—

...

(C) the jury that determined the defendants guilt was discharged for good cause

....

A jury impaneled pursuant to paragraph (2) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate, with approval of the court, that it shall consist of a lesser number.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

§ 3593(b).[FN45] How should a court apply rules 23 and 24, if at all, when the jury has returned from deciding one verdict but has yet to retire to consider the second? This presents an issue of first impression.

> FN45. This language allowing for the parties to stipulate to a jury of less than 12 members is similar to former rule 23(b), which did not allow the court to order the case to proceed even absent stipulations. Before changes to rule 23(b) in 1983, caselaw allowed a court to substitute an alternate juror even when deliberations had begun, if the parties refused to stipulate to a jury of fewer than 12 members. *See United States v. Phillips,* 664 F.2d 971, 996 (Former 5th Cir. Dec. 1981); FED.R.CRIM.P. 23(b), advisory committee note. In such a case, the defendant had to show he was prejudiced by the use of the alternate juror. *See Huntress,* 956 F.2d at 1316.

The Federal Rules of Criminal Procedure apply to sentencing hearings; FED.R.CRIM.P. 1 provides, "These rules govern the procedure in all criminal proceedings in the courts of the United States...." Rule 54, FED.R.CRIM.P., excludes certain proceedings, but not sentencing hearings. Section 3593(c) waives rule 32(c)'s presentence report requirement, which suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA. The district court correctly looked at rules 23 and 24, therefore, in deciding what to do after excusing Fox. But how should a court apply these rules in light of the fact that they fail to contemplate a bifurcated proceeding?

If, hypothetically, the entire jury had been discharged for good cause after returning its guilty verdict, the court would have impaneled**\*347** an entirely new one pursuant to § 3593(b)(2). Presumably, that jury would have included alternates. If the court then had discharged a juror

for cause before the jury had retired to consider the sentence, would the court have been entitled to elevate an alternate? Rule 24(c) answers in the affirmative (alternate "shall replace" juror excused before jury retires).

The superficial conclusion, then, is that the court has the same authority to impanel an alternate when the same jury sits for both phases of the trial. And this conclusion answers Webster's primary contention: Because an alternate was available and the jury had not retired to deliberate on its sentence recommendation, the court had the authority, under rule 24(c), to elevate the alternate.

[69] The answer, unfortunately, is not so facile, for rule 24(c) also provides, "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." This mandatory language appears to compel the court to dismiss the alternate jurors once the jury retires at the end of the first phase—even the jury first retires to consider its verdict. If the court were to follow this mandatory language, no alternates would remain to be substituted for jurors whom the court might have to discharge before the end of the second phase.[FN46] In fact, the court dismissed three of the five alternate jurors; the remaining two were retained for the penalty phase of the hearings.

> FN46. Webster points out that when the jury was first impaneled, the court instructed that "once the deliberations begin, we will dismiss any alternate who has not been seated as a primary juror."

The court erred in not dismissing the juror at the end of the first phase. The mandatory language of rule 24(c) requires the court to dismiss the alternates when the jury retires to deliberate. This conclusion adheres faithfully to the language of the rules.

[70] Nevertheless, we affirm the sentence. Webster did not object to the failure to dismiss the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

alternates at the time; he complained only of elevating an alternate to the jury and not granting a mistrial.[FN47] Because the jury had not retired when the court dismissed Fox and substituted Rawlinson, any available alternate could be elevated consistent with the rule. Webster, therefore, waived the objection he should have made—the failure to dismiss the alternates. When the defendant has waived an objection for failure to follow the substitution rules, an error alone does not warrant reversal; we also review for prejudice from the resulting elevation of the substitute.[FN48]

> FN47. On appeal, Webster focuses on the same complaint. In some places, however, he mentions the failure to dismiss the alternates when deliberations began at the guilt-innocence phase.

> FN48. *See Huntress,* 956 F.2d at 1316–17 (holding that failure to make the proper objection to violation of juror rules leads to review for prejudice in the substitution).

[71] Webster did not suffer prejudice. The court provided the jury with an instruction to include the new juror equally in all deliberations. Furthermore, the jury had not started deliberating at the penalty phase. Those issues were distinct from those decided at the guilt-innocence phase; any overlap is irrelevant, because the jury specifically was instructed to consider everything as if for the first time. Interestingly, on the sole penalty phase issue as to which prejudice seems possible, which is in the first aggravating factor that overlapped with the offense decided in the first phase—kidnaping in which death results—the jury failed to find the aggravating factor. Webster's generic claims of prejudice fail, as there is nothing inherently prejudicial in a rule 24(c) violation. *See Huntress,* 956 F.2d at 1316 n. 7.

### J.

[72] Webster contends that the court erred in excusing juror Urbano Gomez on learning that, in response to the juror questionnaire, he had not disclosed past encounters with the judicial system. At the very least, Webster claims, the court erred by not recalling Gomez to ask him further questions. We conclude the court acted within its discretion by dismissing Gomez, even absent further questioning to determine whether he had lied.

### *348 1.

After the court qualified Gomez as a juror, the prosecutor notified the court that it had uncovered a criminal record for him. The government challenged Gomez for cause because he had not answered his questionnaire truthfully. The government presented evidence that Gomez had been charged with shoplifting and spent three days in county jail, had been convicted of aggravated assault on a police officer and received one month of confinement,[FN49] and had been convicted of aggravated assault with a deadly weapon for which he received five years' probation. None of these was mentioned in Gomez's answer to the questionnaire.[FN50] Over defense objections, the court dismissed Gomez for providing false information, without recalling him for questioning.

> FN49. The parties agree this must have been pled down to some lesser offense, given the punishment.

> FN50. The most evident problem is with the response to Question 73, "Have you or a relative been convicted of any offense other than a traffic ticket?" Gomez checked "Yes," and under "details" noted "brother-in-law, child abuse." Five other questions were answered inaccurately, given Gomez's record of arrests, convictions, and probation.

### 2.

[73][74] The court has discretion to excuse an untruthful juror.[FN51] The scope of the examination, if any, into juror misconduct rests within the court's sound discretion. *Fryar,* 867 F.2d at 854.[FN52] We will not disturb the court's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

findings on this issue except for want of factual support. *Coleman,* 997 F.2d at 1105. No evidentiary hearing is necessary. *Id.* (holding that court properly excused juror after government informed court that juror had failed to disclose he had been subjected to two ATF investigations). In light of the deferential standard, the court acted within its discretion in granting the challenge for cause.

> FN51. *United States v. Fryar,* 867 F.2d 850, 853 (5th Cir.1989); *United States v. Coleman,* 997 F.2d 1101, 1105 (5th Cir.1993) ("A trial judge may 'remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties have become impaired.' ") (quoting *United States v. Dominguez,* 615 F.2d 1093, 1095 (5th Cir.1980)). Webster argues that mere abuse of discretion review provides insufficient protection to a capital defendant and that the heightened need for reliability in capital cases should compel us to examine errors with greater scrutiny. He provides no authority for this claim, and we see no reason to depart from the ordinary standard of review.

> FN52. *See also Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (district court has broad discretion in determining how best to conduct voir dire).

### K.

Webster argues the court erred in denying his *Batson* motion, objecting to the government's use of peremptory challenges on black veniremen. We find no clear error in the court's acceptance of the government's non-racial justifications for the strikes.

### 1.

After voir dire, the court presented the parties with a list of sixty potential jurors, of whom five were black and one was Asian.FN53 Each side

exercised its twenty challenges. Webster objected to the government's strikes eliminating the Asian and the five blacks. To establish his *prima facie* case of racial discrimination, Webster relied solely on the fact that the government had stricken all black jurors. The court questioned whether this made out a *prima facie* case, but nonetheless called on the government to provide rationales for its strikes.

> FN53. There also were several hispanics whom the government did not strike.

The government provided race-neutral rationales. Webster filed a motion disputing those reasons for each of the black jurors.FN54 Webster argued the reasons were a pretext and that the prosecution did not strike other similarly-situated jurors who were not black. The government filed a response explaining why it found the jurors Webster claimed to be similarly situated were in fact different.

> FN54. Webster conceded a legitimate reason existed for the Asian juror—difficulty with the English language.

The court entered an order denying Webster's *Batson* motion, finding that (1) the **\*349** motion was untimely; (2) Webster had failed to make out a *prima facie* case; (3) the government's race-neutral reasons were believable; and (4) Webster had failed to prove purposeful discrimination. We affirm on the latter two grounds.

### 2.

[75][76] "The use of peremptory challenges to exclude veniremen 'solely on account' of race violates the equal protection component of the due process clause of the fifth amendment." *United States v. Terrazas–Carrasco,* 861 F.2d 93, 94 (5th Cir.1988). Courts address *Batson* claims under the familiar burden-shifting scheme. *See Batson v. Kentucky,* 476 U.S. 79, 96–97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *United States v. Fields,* 72 F.3d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1200, 1206 (5th Cir.1996). "The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner. First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race. Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination." *United States v. Bentley–Smith,* 2 F.3d 1368, 1373 (5th Cir.1993); *see also United States v. Huey,* 76 F.3d 638, 640–41 (5th Cir.1996). The party making the claim of purposeful discrimination bears the ultimate burden of persuasion. *Bentley–Smith,* 2 F.3d at 1373.

We assume, *arguendo,* that Webster timely made his *Batson* motion and that he made a *prima facie* case. The court called on the government to provide race-neutral justifications for the use of its peremptory strikes. Once a court has taken that step, we no longer examine whether a *prima facie* case exits. [FN55] Our decision, then, must rest on (1) whether the government articulated race-neutral explanations for the exercise of its challenges and (2) whether Webster has demonstrated that those justifications are pre-textual and that the government engaged in purposeful discrimination.

> FN55. *See United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993) ("appellate review should not become bogged down on the question of whether the defendant made a prima facie showing in cases where the district court has required an explanation") (citing *United States v. Forbes,* 816 F.2d 1006, 1010 (5th Cir.1987)); *see also Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges

and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

#### a.

[77][78] Unless a discriminatory intent is inherent in the explanation, the reason offered should be deemed race-neutral. *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859 (plurality). "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-biased." *Bentley–Smith,* 2 F.3d at 1375. The "race-neutral explanation tendered by the proponent need not be persuasive, or even plausible." *Huey,* 76 F.3d at 641; *see also Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It simply must be race-neutral and honest. Determining whether counsel speaks the truth in offering its reasons turns on in-person credibility assessments, so we review for clear error. *Huey,* 76 F.3d at 640–41; *Fields,* 72 F.3d at 1206.

[79][80][81][82] The government offered reasons for excusing each of the five jurors, with concerns ranging from a juror's establishing a rapport with defense counsel to a fear that none of the five would be able to recommend a death sentence when the time came, and from relatives with criminal records to relatives living in the city where the murder took place. The court accepted and believed these explanations. Having reviewed the record, we cannot say the court clearly erred.

#### b.

At the third stage of the inquiry, Webster bears the burden of establishing that the **\*350** government engaged in "purposeful discrimination" based on race. *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769; *Bentley–Smith,* 2 F.3d at 1373 ("The ultimate burden of persuasion always lies with the party making the claim of purposeful discrimination."). The "[p]roof of racially discriminatory intent or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

purpose ... 'implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected a particular course of action at least in part because of, not in spite of, its adverse effects upon an identifiable group.' " *United States v. Garcia,* 1 F.3d 330, 335 (5th Cir.1993) (quoting *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859). Webster fails to meet this burden.

Webster offers no direct evidence of purposeful discrimination, but rather argues that the government's proffered reasons are pretextual, and the government did not dismiss similar white jurors.[FN56] Because the determination turns on credibility assessments, we review for clear error at this stage as well. *Bentley–Smith,* 2 F.3d at 1373; *United States v. Seals,* 987 F.2d 1102, 1109 (5th Cir.1993).

> FN56. *See Bentley–Smith,* 2 F.3d at 1374 (noting difficulty of bringing forward such evidence, and frequent necessity of relying on rebuttal of proffered reasons and comparison to jurors not stricken).

The government offered distinguishing characteristics for each of the jurors Webster claims were similarly situated. They had different combinations of qualities, and some had more government-desired qualities than did the jurors the government preempted. *See United States v. Jimenez,* 77 F.3d 95, 100–01 (5th Cir.1996) (other redeeming qualities relevant). Although Webster asserts the proffered reasons for striking the black jurors are mere proxies for race, he provides no basis as to why; and the reasons resemble ones we have accepted in the past.[FN57] The court did not find the proffered reasons pretextual and found no other evidence of purposeful discrimination; we cannot say it clearly erred.

> FN57. *See, e.g., United States v. Fields,* 72 F.3d 1200, 1206 (5th Cir.1996) (juror trying to develop rapport with defense attorney); *United States v. Stedman,* 69 F.3d 737, 739 (5th Cir.1995) (potential

juror's brother convicted of a criminal offense, another potential juror appeared disinterested; another juror had lived in area of concern in the case; another juror's sister had been arrested for a narcotics charge); *United States v. Jackson,* 50 F.3d 1335, 1341 (5th Cir.1995) (prosecutor believed that potential juror gave hostile look to prosecutor); *United States v. Mixon,* 977 F.2d 921, 923 (5th Cir.1992) (potential juror appeared to prosecutor to express animosity toward prosecution).

## L.

The court forced Webster to choose one of two expert psychiatric witnesses to testify during surrebuttal. Webster claims this limitation violated his due process rights. We find no error.

[83] Webster styles his claim of error as a due process violation. Due process requires a fair opportunity to defend against the charges, including calling and cross-examining witnesses; keeping information, including witnesses, from the jury may violate due process. *See, e.g., Montana v. Egelhoff,* 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *United States v. Thompson,* 130 F.3d 676, 686 (5th Cir.1997), *cert. denied,* 524 U.S. 920, 118 S.Ct. 2307, 141 L.Ed.2d 166 (1998).

[84] We never have intimated, however, that this due process right extends to presenting witnesses at surrebuttal. Indeed, we know of only two published opinions that have addressed limitations on surrebuttal in a due process context.[FN58] Even assuming surrebuttal**351** implicates due process concerns, we cannot say that the court's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

limitation of Webster's surrebuttal to one of two expert witnesses whom the court considered cumulative was so arbitrary and fundamentally unfair as to deprive him of due process. [FN59]

> FN58. *See United States v. Clark,* 617 F.2d 180, 183, 187 (9th Cir.1980) (recognizing as due process claim, but treating under abuse of discretion standard); *United States v. One Single Family Residence Located at 15526 69th Drive N.,* 778 F.Supp. 1215, 1219 (S.D.Fla.1991) (finding due process violation for a complete denial of surrebuttal).

> FN59. Typically, we review the decision to permit or deny surrebuttal under the abuse of discretion standard. *See, e.g., United States v. Alford,* 999 F.2d 818, 821 (5th Cir.1993); *United States v. Moody,* 903 F.2d 321, 330 (5th Cir.1990). The Ninth Circuit has examined a due process claim under the same standard. *See Clark,* 617 F.2d at 187. Under this standard, too, limiting surrebuttal that the district court considers cumulative rests soundly within its discretion. *See, e.g., United States v. O'Brien,* 119 F.3d 523, 531 (7th Cir.1997) (no abuse of discretion where surrebuttal would be cumulative); *United States v. Blackstone,* 56 F.3d 1143, 1146 (9th Cir.1995) (same); *United States v. Wilford,* 710 F.2d 439, 452 (8th Cir.1983) (same); *United States v. Burgess,* 691 F.2d 1146, 1153 n. 19 (4th Cir.1982) (same); *United States v. Stirling,* 571 F.2d 708, 736 (2d Cir.1978) (same).

### M.

After entering a sentence of death on the verdict, the court filed a finding entitled Factual Finding Regarding Mental Retardation in which the court stated, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." [FN60] Webster objects to this finding on several grounds: (1) It was made in contravention of the FDPA; (2) it was made in derogation of Webster's rights to due process and effective assistance of counsel; (3) it was contrary to the greater weight of the credible evidence; and (4) it was inconsistent with the verdict on this issue. [FN61] We conclude that the court took proper action, and the finding was supported by the evidence.

> FN60. Section 3596(c) provides,

> > A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

> FN61. Webster intimates that imposing the death sentence on him, if he is mentally retarded, would violate the Eighth Amendment. The Supreme Court has rejected this argument. *See Penry v. Lynaugh,* 492 U.S. 302, 340, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("[W]e cannot hold today that the Eighth Amendment precludes the execution of any mentally retarded person ... simply by virtue of his or her mental retardation alone.").

[85] Webster failed to object to the factual finding. Our review, therefore, is limited to plain error. *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir.1994) (en banc). To find plain error, we must perceive (1) an error by district court, in that it deviated from a legal rule, (2) that was clear and, at a minimum, obvious under current law at the time of the trial, and (3) the error must affect substantial rights. *Id.* at 162–63.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

1.

[86] Webster alleges the factual finding was in contravention of the FDPA's statutory scheme, but the statute fails to address how to ensure that the mandate of § 3596(c) is carried out. Because the statute fails to provide guidance, and no case has addressed this issue, the law is not pellucid; the court did not plainly err in its *sua sponte* finding that Webster is not mentally retarded.

Webster argues that the statute provides sufficient guidance. We disagree. Webster points to § 3593(b)(3), which provides that the court will act as a fact-finder "upon the motion of the defendant and with the approval of the attorney for the government." Webster interprets this to preclude any fact-finding by the court absent the defendant's motion. The conclusion, however, does not flow from the statute.

Section 3593(b) provides that "the judge who presided at the trial ... shall conduct a separate sentencing hearing to determine the punishment imposed. The hearing shall be conducted ... (3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government." This provision refers only to the determination of the sentence; it is located in the section captioned "Special hearing to determine whether a sentence of death is justified." It in no way implies that all court **\*352** fact-finding must be on the defendant's motion.

Webster also asserts that, in the absence of a specific statutory scheme, the only logical conclusion is that the jury must be the fact-finder on the issue of mental retardation. This "logical" claim suffers from gaps in reasoning.

First, only §§ 3592 and 3593 address issues that a jury may be called on to consider. Section 3592 lays out all of the factors for the finder of fact to consider—the mitigating and aggravating factors. Section 3593 explains the procedure for the sentencing hearing, including laying out the options for who the fact-finder may be—jury, newly impaneled jury, or judge.

Section 3596 addresses "Implementation of a sentence of death." It is here that Congress chose to indicate its restriction on who could be executed. Placement of the consideration here, rather than in the earlier sections addressing the issues for the jury to consider in imposing the sentence, belies Webster's assertion that the issue obviously belongs to the jury.

In addition, although Webster did request and receive submission of the mitigating factor that he "is or may be mentally retarded," he did not request a jury instruction that placed in the jury's hands the job of factually finding whether Webster is mentally retarded. That the jury could consider whether Webster "is *or may be* retarded" falls woefully short of the factual finding required in § 3596 of mental retardation to prevent the implementation of the death sentence. The lack of a jury instruction request, along with failing to object to the factual finding, suggests that Webster's "logical assumption" placing this issue in the jury's hands was no more obvious to him at trial than it was to the district court.

The statutory scheme simply does not answer who decides this issue, so we cannot say the court's decision clearly contravened the FDPA. Given the lack of clarity, the court did not commit plain error in deciding the issue itself.

2.

Webster asserts that the procedure the court chose violated due process and deprived him of effective assistance of counsel. Neither is true. Webster rests these claims on the fact that the court acted without statutory authority and without notice to him. Bare assertions aside, Webster provides no analysis as to why the court's determination violates the Constitution.

[87] The alleged denial of effective assistance of counsel presumably rests on Webster's lack of opportunity to present his case. Even assuming this

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

rises to the level of constitutional error, it is harmless. Webster had just finished presenting voluminous evidence to the jury, in support of his claim of mental retardation.[FN62] The court had ample information before it to make its decision; indeed, just before the jury retired, Webster had asked the court to find him mentally retarded as a matter of law, taking the mitigating factor out of the jury's hands. Webster makes no showing of prejudice to his substantial rights by arguing there is something additional he would have presented to the court. The court did not plainly err in failing to provide Webster with notice, and did not deprive him of a fundamentally fair trial.

> FN62. *Cf. United States v. Bachynsky,* 949 F.2d 722, 732–33 (5th Cir.1991) (holding that sentencing court cannot base decision on matters outside of presentence report without notice to defendant to provide "ample opportunity to raise his factual contention.").

3.

[88] Webster contends that the finding that he is not mentally retarded is against the greater weight and credibility of the evidence. The standard of review for a finding that a defendant is not mentally retarded under § 3596 presents an issue of first impression. Because it is a factual finding, we adopt the clearly erroneous standard.[FN63]

> FN63. *Cf. United States v. Kimbrough,* 69 F.3d 723, 733 (5th Cir.1995) (noting that we review factual findings in examining a sentence imposed for clear error).

**\*353** [89] The government presented substantial evidence to support the finding. Furthermore, only four of the twelve jurors found that Webster is or may be mentally retarded and that he suffers from low intellectual functioning. We cannot say the court clearly erred in deciding that Webster is not mentally retarded.

4.

Webster contends that the court's determination conflicts with the verdict on this issue. Webster fails to indicate the import of this argument, aside from supporting his claim of a constitutional violation and his assertion that the finding contradicts the greater weight of the evidence.

Only four of twelve jurors concluded Webster "is or may be mentally retarded." Webster's failure to convince a majority of the jurors alone suggests the court's finding is not inconsistent with the verdict. Furthermore, those four jurors found only that he is or *may be* mentally retarded. Obviously, this mitigating factor requires less certainty than does the determination that he is not mentally retarded.

As a result of this lesser standard, we can conclude that eight jurors were not convinced that he even "may be" mentally retarded; they believed he was not. We cannot conclude that the court's agreement with a majority of the jurors constitutes a clear, obvious error.

N.

Webster argues that the evidence does not support the special findings of the existence of the aggravating factors and that the sentence of death was imposed under the influence of passion, prejudice, or some other arbitrary factor. This contention stems directly from the FDPA's requirement that a court of appeals "shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592." § 3595(c)(1).

Webster fails to distinguish between these two requirements as distinct responsibilities of an appellate court. Rather, he suggests that the only way we can fulfill our responsibility under the provision as a whole is to conduct "a *de novo* review and a balancing of the evidence." Any other method, Webster claims, will fail to ferret out

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

which verdicts were imposed under the impermissible factors.[FN64] An appellate court, however, is a court of review. We do not sit as a second jury. Instead, we will address the two aspects of our review in turn. *See Hall,* 152 F.3d at 426 (addressing each in turn, rather than engaging in one unified, *de novo* review).

> FN64. Webster also suggests this requires a proportionality review; we see no basis in the statute for such an assertion.

### 1.

[90] First, we must determine whether the evidence supports the jury's special findings of the aggravating factors. The statute does not clarify what standard of review we should use. Nothing in the FDPA, however, indicates that it alters our ordinary standards of review.[FN65] To protect the jury's domain, we apply the usual standard of sufficiency of the evidence.[FN66]

> FN65. *See United States v. Chandler,* 996 F.2d 1073, 1083 (11th Cir.1993) (holding similar provision of 21 U.S.C. § 848(q)(3) does not alter ordinary standards of review).

> FN66. *See Hall,* 152 F.3d at 426 (finding "the record contains ample evidence from which the jury could conclude beyond a reasonable doubt" that the aggravating factors existed).

[91] "Review for sufficiency of the evidence is decidedly narrow—a [finding of an aggravating factor] must be affirmed if a rational trier of fact could have found that the evidence established the essential elements of [its existence] beyond a reasonable doubt."[FN67] In view of this record, a rational *354 jury could find beyond a reasonable doubt that all four remaining aggravating factors exist.

> FN67. *United States v. Ramirez,* 145 F.3d 345, 350 (5th Cir.1998), *petition for cert.*

*filed* (Sept. 28, 1998) (No. 98–6687); *United States v. Cluck,* 143 F.3d 174, 180 (5th Cir.1998) (noting that "we review the evidence in the light most favorable to the jury verdict"), *petition for cert. filed* (Sept. 26, 1998).

### 2.

Our next responsibility is to ensure that the sentence was not handed down under the influence of passion, prejudice, or some other arbitrary factor. Again, Webster asserts this requires a *de novo* re-weighing of the evidence, for any other assessment will fail to negate the possibility that arbitrary factors were at work.

We question whether this is an accurate statement of our responsibility under the FDPA.[FN68] We need not decide this issue today, however, for we have already conducted a thorough reexamination of the aggravating and mitigating factors in part IV.A.1.c, *supra,* as part of our harmless error review. We also see nothing in the record indicating that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The death sentence is warranted by the jury's specific findings.

> FN68. *See Hall,* 152 F.3d at 426 (stating that "[w]e have found nothing in the record indicating that the jury's recommendation of a death sentence was motivated in any degree by passion, prejudice, or any other arbitrary factor").

### O.

Webster launches a variety of attacks on the constitutionality of the FDPA. We entertained and rejected most of these arguments in the past, *see Hall,* 152 F.3d at 413–19; *Jones,* 132 F.3d at 239–42, foreclosing our reconsideration of them today.[FN69] Those arguments that we have not heard in the past we consider *de novo. See United States v. Bailey,* 115 F.3d 1222, 1225 (5th Cir.1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 764 (1998).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

162 F.3d 308

**(Cite as: 162 F.3d 308)**

FN69. *See Garcia Abrego,* 141 F.3d at 151 n. 1 ("It has long been the rule of this court that no panel of this circuit can overrule a decision previously made by another." (internal quotation marks omitted)).

### 1.

[92][93][94][95][96][97] Webster's constitutional challenges that we have addressed in the past we deal with expeditiously. Contrary to Webster's arguments, (1) the FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty, *Jones,* 132 F.3d at 241; (2) the FDPA sufficiently circumscribes its delegated authority with "intelligible principles" to avoid violating the nondelegation doctrine, *id.* at 239; (3) the Constitution does not mandate "proportionality review," that is, a comparison of the penalties imposed in similar cases, *id.* at 240; (4) the FDPA's relaxed evidentiary standard at the sentencing hearing is not unconstitutional, *id.* at 241–42; (5) the "especially heinous, cruel or depraved manner" aggravating factor is not impermissibly vague, at least where the vagueness is cured by the statutory limitation that the offense involve torture or serious physical abuse and by further limitation in the jury instructions, *id.* at 249; *Hall,* 152 F.3d at 414–15;[FN70] and (6) the FDPA's inclusion of the "mere fact" that Webster was convicted of kidnaping and murdering Lisa Rene as an aggravating factor does not constitute constitutionally impermissible "stacking," or double-counting, *Jones,* 132 F.3d at 249; *Hall,* 152 F.3d at 416–17.[FN71]

FN70. Webster also asserts, without analysis, that the "substantial planning and premeditation" aggravator is impermissibly vague. His argument is foreclosed by our analysis of the same language in the analogous 21 U.S.C. § 848(e) death penalty scheme. *See Flores,* 63 F.3d at 1373–74.

FN71. Further, because the jury did not find the aggravator of which Webster complains, he cannot claim his sentence is impaired.

### 2.

Webster raises three constitutional arguments that we address as matters of first impression. We reject them *seriatim.*

#### a.

Webster argues that the FDPA is unconstitutional for failing significantly to narrow the class of offenses to which the death penalty applies. Under *Maynard v. Cartwright,* 486 U.S. 356, 363–64, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the government may not make every unjustified intentional killing **\*355** qualify for the death penalty. The FDPA does precisely that, Webster argues, by making the four mental states of murder aggravating factors that qualify the defendant for capital punishment under § 3591(a). Webster's argument stems from a misreading of the statute.

[98] As the government points out, § 3591(a) does not set forth a list of aggravating factors, but, on the contrary, serves a gatekeeping function. Section 3591(a) codifies the command in *Enmund,* 458 U.S. at 797, 102 S.Ct. 3368, and *Tison,* 481 U.S. at 157, 107 S.Ct. 1676, to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself. The limiting factors, which Webster claims are lacking, are, of course, the aggravating circumstances set forth in § 3592(b) and (c), which guide the jury in its capital decision after it finds at least one element of intent under § 3591(a) as a threshold matter.

#### b.

[99] Webster contends that the FDPA is unconstitutional because it permits the multiple weighing of aggravating factors (specifically, the § 3591(a)(2) *mens rea* factors). This argument stems

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

from the same fundamental misunderstanding of § 3591(a) discussed above. *See* part IV.N.2.a, *supra; see also* part IV.A.2, *supra* (discussing "double weighing"). As we have explained, § 3591(a) does not set forth aggravating factors, but rather serves as a preliminary qualification threshold. The fact that a defendant could satisfy more than one of these via the same course of action does not, therefore, constitute impermissible double counting. Thus, although Webster is correct in noting that many courts have held that "double counting" of aggravating factors is to be avoided, the FDPA does not present such a problem. FN72

> FN72. As we have said in part IV.A.2, *supra,* the instructions sufficiently informed the jury not to weigh the elements of intent.

c.

[100] Webster asserts that by precluding consideration of "race, color, religious beliefs, national origin, or sex of the defendant or of any victim" as a mitigating factor, the FDPA is unconstitutional. *See* § 3593(f). Webster correctly interprets the FDPA, but incorrectly interprets the Constitution; the FDPA can be constitutional only by precluding such factors.

[101][102][103] The Equal Protection Clause protects from purposeful state discrimination on the basis of race. *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). The Due Process Clause of the Fifth Amendment provides this same "equal protection" against the federal government. *Bolling v. Sharpe,* 347 U.S. 497, 498–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Court proceedings, especially criminal trials, implicate state action, therefore bringing them under equal protection scrutiny. *Georgia v. McCollum,* 505 U.S. 42, 49–55, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 621–29, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

[104][105] More specifically, the Equal Protection Clause prohibits the state from using race in its decision-making, unless it can meet the "most exacting scrutiny ... justified by a compelling government interest." FN73 In the realm of capital sentencing, this standard never can be met, because race is a "totally irrelevant factor." *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Therefore, the FDPA can pass constitutional muster only if it is interpreted absolutely to prohibit racial considerations in sentencing. Because we are obligated to interpret a statute in such a way as to preserve, if possible, its constitutionality, *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); **\*356** *United States v. Bird,* 124 F.3d 667, 678–79 (5th Cir.1997), *cert. denied,* 523 U.S. 1006, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998), we reason that race cannot be considered as either a mitigating or aggravating factor under the FDPA.

> FN73. *Palmore v. Sidoti,* 466 U.S. 429, 432–33, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *Hopwood v. Texas,* 78 F.3d 932, 939–40 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2580, 2581, 135 L.Ed.2d 1094, 1095 (1996).

Although the use of race in government decision-making is, as a general matter, "odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi,* 320 U.S. at 100, 63 S.Ct. 1375, the use of race in sentencing determinations is particularly invidious. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). And, in capital sentencing, the use of race becomes more offensive still:

Considering the race of a defendant or victim in deciding if the death penalty should be imposed is completely at odds with th[e] concern that an individual be evaluated as a unique human being. Decisions influenced by race rest in part on a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

categorical assessment of the worth of human beings according to color, insensitive to whatever qualities the individuals in question may possess.

*McCleskey,* 481 U.S. at 336, 107 S.Ct. 1756 (Brennan, J., dissenting).

Although divided in its decision, the Court in *McCleskey* was unanimous in its acknowledgment of "the illegitimacy of race as a consideration in capital sentencing." *Id.* at 341, 107 S.Ct. 1756 (Brennan, J., dissenting); *id.* at 292–93, 107 S.Ct. 1756 (majority opinion). Webster would have us go against this precedent, and rule that a defendant can be spared the death penalty because of his race. Such practices are precisely those forbidden by the Equal Protection Clause. *Id.* at 341, 107 S.Ct. 1756 (noting that "enhanced willingness to impose the death sentence" or "diminished willingness to render such a sentence" are impermissible when based on race).

In sum, a long line of Supreme Court precedent admonishes that the guillotine must be as color-blind as is the Constitution. *See McCleskey,* 481 U.S. at 292–93, 107 S.Ct. 1756; *Zant,* 462 U.S. at 885, 103 S.Ct. 2733; *Rose,* 443 U.S. at 555, 99 S.Ct. 2993. Today's decision recognizes this precedent in interpreting the FDPA in the only way constitutionally permissible: as prohibiting the consideration of race in sentencing.

Webster has constructed an artificial conflict, however, between the FDPA and Supreme Court precedent regarding mitigating evidence. He reads *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), as mandating the use of race in sentencing. Such a reading of *Penry* and *Lockett* is erroneous for at least two reasons: It ignores the concept of relevancy, and it would cause those cases to conflict with the Fourteenth Amendment for the reasons discussed above.

*Penry* and *Lockett* hold that in capital sentencing, a defendant must be permitted to introduce all "evidence *relevant* to the defendant's background or character ... that mitigate against imposing the death penalty." *Penry,* 492 U.S. at 318, 109 S.Ct. 2934 (emphasis added). [FN74] As a matter of law, race is "totally irrelevant to the sentencing process." *Zant,* 462 U.S. at 885, 103 S.Ct. 2733; *McCleskey,* 481 U.S. at 316, 107 S.Ct. 1756 (discussing the unconstitutionality of using the "irrelevant factor of race" in sentencing). Therefore, when the FDPA and the Supreme Court speak of "background or character" evidence, they obviously mean to permit, and can mean to permit only, the specific beliefs and life experiences of the defendant in question.

> FN74. *See also McKoy v. North Carolina,* 494 U.S. 433, 440, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (explaining that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" from its meaning during the case in chief; evidence is relevant if "it tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value") (quoting *North Carolina v. McKoy,* 323 N.C. 1, 372 S.E.2d 12, 45 (N.C.1988) (Exum, C.J., dissenting)).

[106][107] Thus, although race *per se* is an irrelevant and inadmissible factor, the *effects* and *experiences* of race may be admissible. If a defendant can show that his life has **\*357** been marked by discrimination or some other set of experiences, irrespective of whether the result, in part, of his race, then that properly might be admissable as relevant mitigating background or character evidence. But this is a far cry from using race in and of itself as a proxy for such a set of beliefs and experiences. Pigmentation does not define a person's character or background; the life that a person has led and the things that he has experienced do.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049     Document: 8-2     Filed: 02/18/2014     Pages: 346

P.

We permitted Webster to file a supplemental brief raising an additional issue on appeal, arguing that his conviction and sentence were based on testimony that was illegally induced from his co-defendants. Citing *United States v. Singleton,* 144 F.3d 1343 (10th Cir.), *vacated for reh'g en banc,* 144 F.3d 1361 (10th Cir.1998), Webster contends that the testimony of his co-defendants against him was induced by the government in violation of 18 U.S.C. § 201(c)(2).[FN75] Because we find no plain error in the failure *sua sponte* to suppress the co-defendants' testimony, we deny Webster's attempt to raise this issue for the first time on appeal.

FN75. Section 201(c)(2) reads,

Whoever—

directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

shall be fined under this title or imprisoned for not more than two years, or both.

1.

In *Singleton,* a panel held that the plain language of § 201(c)(2) prohibits prosecutors from making promises "of value" to witnesses in exchange for testimony. According to the panel, such prohibited promises include promises not to prosecute for certain offenses, promises to inform authorities of cooperation, and promises to inform the court of cooperation. *See Singleton,* 144 F.3d at

1348. Webster claims that the government's promises to his co-defendants—not seeking the death penalty, agreeing to guilty pleas for lesser crimes, not prosecuting other acts stemming from the same incident, dismissing remaining indictment counts, notifying the court of cooperation, and filing a motion for downward departure in sentencing—violate the plain language of § 201(c)(2) in the same manner as did the promises in *Singleton.*

2.

a.

Because Webster did not move to suppress the testimony of his co-defendants, the issue of their testimony's legality presents an entirely new issue. We may consider this question on appeal, therefore, only if it constitutes plain error.[FN76]

FN76. *See United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("No procedural principle is more familiar to this Court than that a [right] may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (internal citations omitted)); *see also United States v. Ravitch,* 128 F.3d 865, 869 (5th Cir.1997); *Calverley,* 37 F.3d at 162; *Helms v. United States,* 340 F.2d 15, 19 (5th Cir.1964).

[108] We find plain error "only when the appellant shows that (1) there is an error, (2) the error is plain, and (3) the error affects her substantial rights." *Ravitch,* 128 F.3d at 869 (citing *Olano,* 507 U.S. at 732, 113 S.Ct. 1770). Even if we find such an error, however, we will not "exercise [our] discretion to correct such errors unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[109] "Error is defined as a deviation from a legal rule in the absence of a valid waiver." *Calverley,* 37 F.3d at 162. "Plain is synonymous with 'clear' or 'obvious' and 'at a minimum' contemplates an error which was 'clear under current law' at the time of the trial." *Id.* Finally, "affecting substantial rights" is understood to mean that the error **\*358** "must affect the outcome of the proceeding." *Id.* at 164.

b.

Webster argues that the court erred by failing *sua sponte* to apply § 201(c)(2) and suppress the testimony of his co-defendants. Moreover, he argues that without the testimony of his co-defendants, there is great doubt that he would have been convicted.

[110] Although Webster's argument that the suppression of co-defendant testimony substantially would have affected his conviction is persuasive, Webster faces an insurmountable burden in showing that the court plainly erred. At the time of trial, *Singleton* had not yet been handed down. Thus, the court did not commit plain error when it did not follow a decision that had not yet been decided. Moreover, even if *Singleton* had been decided before trial, decisions of other circuits are not binding on the courts of this circuit, so according to the "current law" of this circuit, the testimony of co-defendants still would have been admissible.[FN77]

> FN77. We recently agreed to review a claim that was not raised until appeal when we found there had been an intervening change in the law. *See DSC Communications Corp. v. Next Level Communications,* 107 F.3d 322, 326 n. 2 (5th Cir.1997). Unlike Webster, however, the appealing party in *DSC Communications* relied on an intervening change in the law of this circuit, whereas Webster relies on a vacated opinion of another circuit.

The best Webster can argue is that, at the time of his trial, the applicability of § 201(c)(2) to government plea bargains in this circuit was uncertain.[FN78] "The uncertainty manifest in [an] area of the law illustrates that any error on the part of the trial court could not have been plain." *Calverley,* 37 F.3d at 165.

> FN78. The uncertainty of this circuit's law on this point is already anticipated in two recent district court decisions. In *United States v. Duncan,* 1998 U.S. Dist. LEXIS 11123, 1998 WL 419503 (E.D.La. July 15, 1998), the court refused to order a new trial based on § 201(c)(2). But in *United States v. Fraguela,* 1998 U.S. Dist. LEXIS 14347, 1998 WL 560352 (E.D.La. Aug. 27, 1998), the court granted a new trial and adopted the *Singleton* panel's reading of § 201(c)(2).

Webster challenges a district court decision on the basis of a new interpretation of an existing law even though no Fifth Circuit precedent directly supports his reading of § 201(c)(2).[FN79] At most, he can support the uncertainty of § 201(c)(2)'s applicability to government plea bargains. A court's failure to apply an uncertain interpretation of a statute is far from plain error. Rather than finding plain error by adopting a new interpretation of an existing statute based on the vacated decision of another circuit, we deny Webster's challenge to the court's failure to suppress the testimony of his co-defendants.

> FN79. Because we find no plain error in the failure to suppress the co-defendants' testimony, we do not reach the question of the proper reading of § 201(c)(2). A review of this circuit's precedents shows, however, that we consistently have upheld government efforts to provide benefits to witnesses in exchange for testimony when challenged on other grounds. The district court did not err by conforming to this precedent.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

In *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987) (en banc), we explained our views on the propriety of giving benefits in exchange for witness testimony when we held that contingent compensation for witnesses may occur as long as the nature of such compensation is fully disclosed to the jury. We noted that "[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *Id.* We went on to point out that "courts uniformly hold that such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility." *Id.* Thus, our general rule has been to allow the government to confer benefits upon witnesses in exchange for testimony (even contingent monetary compensation).

Along with our sister circuits, we also explicitly have upheld admitting the testimony of witnesses who were promised reduced sentences. *See United States v. Kimble,* 719 F.2d 1253 (5th Cir.1983); *see also United States v. Evans,* 697 F.2d 240 (8th Cir.1983); *United States v. Miceli,* 446 F.2d 256 (1st Cir.1971); *United States v. Vida,* 370 F.2d 759 (6th Cir.1966); *Lyda v. United States,* 321 F.2d 788 (9th Cir.1963) (discussed in *United States v. Dailey,* 759 F.2d 192, 198–200 (1st Cir.1985)).

   AFFIRMED.

C.A.5 (Tex.),1998.
U.S. v. Webster

162 F.3d 308

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Fort Worth Division.
Bruce Carneil WEBSTER, Petitioner,
v.
UNITED STATES OF AMERICA, Respondent.

No. Civ.A. 4:00–CV–1646–.
Sept. 30, 2003.

MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO VACATE
CONVICTION AND SENTENCE

MEANS, J.

*1 Petitioner Bruce Carneil Webster (Webster) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Webster replied. The Court denies Webster's motion.

I
*History of the Case*

On June 7, 1996, a jury convicted Webster of kidnaping in which a death occurred, conspiracy to commit kidnaping, and carrying a firearm during a crime of violence because of Webster's involvement in the kidnaping of Lisa Rene. After a subsequent punishment hearing the jury, after finding certain aggravating and mitigating factors to be present, recommended on June 20, 1996, that Webster receive the death penalty. This Court assessed the death penalty on September 30, 1996. The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Webster's conviction and sentence. *United States v. Webster,* 162 F.3d 308 (5th Cir.1998).

Webster filed an initial motion to vacate on September 29, 2000. On April 4, 2001, this Court

granted Webster's request to file a discovery motion, which he did on April 30, 2001. On June 18, 2002, this Court denied his motion for discovery, and Webster filed an amended motion to vacate on August 16, 2002. The government filed its response on November 14, 2002, and Webster filed a reply on March 13, 2003.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

Webster, [Orlando] Hall and Marvin Holloway ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D.Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas, from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949     Document: 8-2     Filed: 02/18/2014     Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

**\*2** On September 24, Hall contacted Holloway and had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they eventually returned to Ross's apartment. From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to

Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave, placed a sheet over her head, and hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with the gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

**\*3** Based on information from the victim's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B–Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B–Love. A security guard at the motel informed the agents and officers that Webster went by the name B–Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.

*Webster,* 162 F.3d at 318–20.

## II.
### *Standard of Review*

28 U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence on the grounds that it was imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid,* 937 F.2d 228, 231–32 (5th Cir.1991) (en banc), *citing United States v. Frady,* 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id.* A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier,* 477 U.S. 478, 493 (1986). Other types of error may not be raised for the first time under § 2255 unless the defendant establishes that the error could not have been raised on direct appeal *and,* if the error were condoned, it would result in a complete miscarriage of justice. *United States v..*

*Pierce,* 959 F.2d 1297, 1301 (5th Cir.1992).

Moreover, claims that were raised but rejected on direct appeal are also barred from federal habeas review. *United States v. Rocha,* 109 F.3d 225, 229 (5th Cir.1997). A federal habeas petitioner cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether the claims were previously raised on direct appeal. *United States v. Massaro,* 538 U.S. 500, 123 S.Ct. 1690, 1693–94, 155 L.Ed.2d 714 (2003).

## III
### *Issues Presented*

In his motion to vacate his conviction and sentence, Webster raises the following sixteen claims for relief:

**\*4** 1. Webster's rights to due process and equal protection and right to be free from cruel and unusual punishment were violated by the racially discriminatory effects of the federal capital sentencing scheme.

2. Webster's due-process rights were violated because the trial court made a factual finding on the issue of mental retardation that should have been made by the jury.

3. Trial counsel were ineffective in failing to investigate and present additional evidence regarding mental retardation.

4. Trial counsel were ineffective in failing to investigate and present evidence regarding racial bias in the school system in which Webster attended school as well as the potential biases of certain witnesses for the government.

5. Trial counsel were ineffective in failing to object to the trial court's decision to make the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

factual finding on the issue of mental retardation.

6. Trial counsel were ineffective in allowing a breakdown in communication with the mitigation specialist to affect the discovery, investigation, and presentation of evidence at trial.

7. Trial counsel were ineffective in failing to investigate and present to the jury an accurate portrait of the extreme abuse suffered by Webster as mitigating evidence.

8. Trial counsel were ineffective in failing to present evidence of Webster's special talents, musical abilities, and religious devotion as mitigating evidence.

9. Webster's due-process rights and right to be free from cruel and unusual punishment were violated because the government withheld information suggesting that Webster did not receive special education services in school because of racial discrimination.

10. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Steven Beckley.

11. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Marvin Holloway.

12. Webster is ineligible to be executed because he is mentally retarded.

13. The evidence presented at trial was insufficient to support the trial court's finding that Webster is not mentally retarded.

14. The trial court erred in dismissing a jury member and replacing him with an alternate juror after deliberations occurred at the guilt phase of the trial.

15. Webster's due-process rights have been violated because 18 U.S.C. § 3596 is unconstitutionally vague.

16. International law prohibits Webster's execution because he is mentally retarded.

Webster also requests an evidentiary hearing before this Court.

IV

*Procedural Bars*

In its response to Webster's petition, the government asserts several procedural bars to this Court's consideration of many of the claims that Webster raises in his petition. The government asserts that Webster is procedurally barred from raising his first, twelfth, thirteenth, and fourteenth claims because they were raised and rejected on direct appeal. The government also asserts that Webster is barred from raising his fifteenth claim for relief because it was not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

**\*5** In his reply, Webster asserts that he can overcome these procedural defaults, either because he raises claims based on new factual or legal bases or because his appellate counsel was ineffective on direct appeal. With respect to Webster's first, twelfth, and thirteenth grounds, this Court agrees that these previously raised and rejected grounds are based on new facts or law. Specifically, Webster's selective-prosecution claim is based on statistics from the Department of Justice that were not available at the time of his trial or appeal. Likewise, his mental retardation claims, including claims twelve and thirteen, are based, in essence, upon cases handed down by the Supreme Court since his appeal became final. Accordingly, these claims are not procedurally barred from habeas review. And, in the interest of justice, this Court will address Webster's fifteenth ground although it was not raised on direct appeal, as Webster has alleged, albeit in a perfunctory manner, that his appellate counsel was ineffective.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Webster's fourteenth ground for relief, however, concerning this Court's decision to excuse one juror and replace him with an alternate juror, was raised and rejected on appeal. Webster does not allege any new factual or legal basis for this claim that would render it necessary for this Court to revisit this issue. Accordingly, the Court agrees that this claim is barred from review.

V

*Discussion of Claims*

A. *Selective–Prosecution claim*

In his first claim for relief, Webster, in essence, makes a selective-prosecution claim. Specifically, Webster contends that the government violated his constitutional rights because it has used ethnicity as a basis for seeking the death penalty against African–Americans like himself. Webster bases his claim on statistics that purport to show that the government has sought the death penalty against African–American defendants with disproportionate frequency as compared to defendants of other races.

*Applicable Law*

In *United States v. Armstrong,* 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong,* the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464–65.

*Analysis*

At trial, Webster made a motion to dismiss the government's notice to seek the death penalty based on an affidavit presented to this Court indicating that 66% of federal death-penalty cases involved African–American defendants. This Court denied the motion and Webster's discovery request. Webster then appealed these decisions. On direct appeal, the Fifth Circuit denied this claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted because he had not shown that the government had failed or refused to seek the death penalty against other similarly situated individuals, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical evidence did not rebut the presumption of good faith on the part of the prosecution. *Webster,* 162 F.3d at 334–35.

**\*6** On habeas review, Webster now points to statistics compiled by the Department of Justice as support for his claim. (Webster's Ex. A). But contrary to his assertion that this statistical evidence is sufficient to establish a *prima-facie* selective prosecution case, the Fifth Circuit in *United States v. Jones,* 287 F.3d 325, 333–35 (5th Cir.), *cert. denied,* 537 U.S. 1018 (2002), ruled that these statistics were not sufficient to establish a *prima-facie* case after being presented with the same Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988–2000)." As Webster presents to this Court the same statistics that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution, this Court is not at liberty to rule otherwise, and Webster's first claim for relief is denied.[FN1]

> FN1. Webster further asserts that the fact that this Court denied him the right to conduct discovery on this issue is the reason he cannot establish both prongs of the *Armstrong* standard. But in both his motion for discovery and here, while Webster has arguably presented some statistical evidence to support his claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

that there has been a disparate effect on African–Americans, Webster has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Webster has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African–American individuals or when the Department of Justice has authorized the death penalty in cases against African–American defendants. Accordingly, following the reasoning in *Armstrong,* Webster's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery.

B. *Ineffective-assistance claims*

In grounds three through eighth, Webster asserts that his trial counsel were ineffective in several respects. Specifically, Webster contends that his trial counsel were ineffective for: failing to present additional evidence of his mental retardation, evidence of a racial bias in the school system for the area in Arkansas where Webster grew up as additional mitigating and impeachment evidence, accurate evidence regarding the abuse Webster suffered as a child, and evidence of Webster's musical abilities and religious devotion. Webster further asserts that his trial counsel were ineffective for allowing a breakdown in communication with their mitigation specialist to affect the investigation and presentation of evidence and for failing to object to this Court's decision to make the factual finding with regards to mental retardation.

### Standard of Review

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344–45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (holding habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel).

### Applicable Facts

At the punishment phase of the trial, defense counsel presented testimony from four experts regarding Webster's mental abilities, including Dr. Raymond Finn (R. 23:172–244), Dr. Denis Keyes (R. 24:2–119), Dr. Robert Fulbright (R. 24:120–172), and Dr. Mark Cunningham (R. 24:183–224). Furthermore, Dr. George Denkowski testified at surrebuttal in order to critique the methodology used by one of the government's experts in testing Webster's I.Q. (R. 26:200–219), and Dr. Cunningham also testified about abuse as a child and its effects on adults.

**\*7** Moreover, the defense put on testimony from Webster's mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified, with varying degrees of knowledge, about the severe physical and sexual abuse that Webster's father inflicted on his wife and children, including weekly beatings with hoses and extension cords that left scars; the encouragement of sexual activity between the siblings and, on one instance, between one of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Webster's brothers and his mother; and various forms of torture, including forcing the children to eat hog slop or to kiss the anus of a cat, burning one of his sons with an iron, placing hot sauce and pepper in the children's anuses, having the children beat each other, shooting guns at the children when they ran from the house, and killing Webster's dog. (R. 23:8–10, 13–14, 21, 37–40, 42, 55–7, 59, 105, 107–110, 112–13, 122–24, 126–27).

Webster's family members also testified that one of his brothers has been diagnosed as retarded and receives Social Security disability payments, one of his sisters receives disability payments due to a mental disorder, and another sister and his mother have received treatment for mental health problems. (R. 23:19,35–6, 71, 118–19, 136). The defense also presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's brothers from the home because of the abuse. (R. 24:171–182). Furthermore, Webster's mother testified about the murder of one of her sons and the serious effects that it had on Webster, such that she took him to a mental health clinic for evaluation. (R. 23:146–49). And, several of his family members testified that Webster went to church regularly and was active in church, knew the Bible well, and sang and played the drums in church. (R. 23:43, 48–9, 71–2, 78, 83, 140, 155).

Defense counsel also presented testimony from two defense investigators in an effort to impeach the testimony given by two government witnesses. Investigator Lawrence Connelley testified that he interviewed E.C. Turner, a school counselor who had earlier testified for the government, and Mr. Turner told him that Webster was more of a follower than a leader and was easily influenced. Connelley further testified that he interviewed Pat Drewett, who also told him that Webster was a follower who was easily influenced by others. (R. 26:192–94). Investigator John Strickland testified that he interviewed Greg Barber, Webster's parole officer who had earlier testified for the government. Strickland testified that Barber had told him that

Webster was a follower who was easily influenced by other people. (R. 26:196–98).

As support for his ineffective-assistance claims, Webster has submitted written exhibits, including: court documents that indicate that the Watson Chapel School District, the district in which Webster attended school, was under federal-court supervision from 1971 until 1991 because it was deemed a racially segregated district (Webster's Ex. B–E); documents indicating that a school teacher in that district successfully sued the district in the 1980's for racial discrimination in its failure to promote her to a position of assistant principal (Exhibits F & G); and affidavits from defense counsel Larry Moore and mitigation specialist Annette Lamoreaux outlining differences between the two regarding fees claimed by Lamoreaux and their respective theories about the case. (attachments H & I).

*Analysis*

**\*8** Webster faults his trial counsel primarily for not presenting additional mitigating evidence at the punishment phase of the trial, including additional evidence of mental retardation, additional evidence of abuse from his childhood, and additional evidence of his musical abilities and his religious devotion. Specifically, Webster asserts that his trial counsel should have developed and presented evidence of the racially discriminatory history of the school district in which he attended school, as well as testimony from certain other witnesses located by habeas counsel, as evidence that Webster was not in special education classes in school because the district was racially biased against African–Americans, not because he was not eligible for these classes. Webster further asserts that his trial counsel should have elicited further testimony from government witness E.C. Turner about his belief that Webster was a "follower;" that counsel should have presented other unspecified evidence about Webster's musical abilities and religious devotion; and that counsel was ineffective for allowing a breakdown in communication with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

the mitigation specialist, which resulted in counsel using their investigators to investigate possible mitigating evidence rather than Ms. Lamoreaux. Finally, Webster contends that his counsel were ineffective for failing to object to this Court's findings regarding mental retardation, which resulted in the issue's being reviewed only for plain error on direct appeal.

With regard to Webster's assertion that his trial counsel was ineffective for failing to present *additional* evidence of his mental retardation, the abuse in his family, and his religious devotion and musical abilities, as outlined earlier, defense counsel put substantial amounts of this evidence into trial. Thus, Webster is contending that his counsel were ineffective for failing to put *enough* of this type of information into evidence. The Fifth Circuit, however, has cautioned that a reviewing court should be wary of claims that an attorney did not investigate enough or failed to present enough evidence.  *Smith v. Cockrell,* 311 F.3d 661, 669 (5 [th] Cir.2002), *citing Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000). And although more of the same or similar evidence could have possibly been presented by defense counsel, defense counsel did place a great deal of this type of evidence about Webster's past before the jury, and counsel were not ineffective for failing to present more of the same. *Prejean v. State,* 889 F.2d 1391, 1898–9 (5th Cir.), *cert. denied,* 494 U.S. 1090 (1990).

Likewise, counsel were not ineffective for failing to discover and present evidence about the racial discriminatory past of the school district. Webster contends that it was vitally important that his trial counsel establish that he was prevented from attending special education classes because of his race, not because he did not qualify. Webster contends that, had defense counsel placed this type of information into evidence, it would have effectively countered the government's contention that Webster is not mentally retarded. This Court, however, disagrees with Webster about the importance of this information. The government

disputed Webster's allegations of mental retardation primarily through its own experts and the testimony of people other than his family who have known him both in and out of the prison system, not primarily by arguing that he is not mentally retarded because he was not in special education classes in school. Moreover, Webster's brother Mark testified that most of his brothers were in special education classes, and Tony Webster acknowledged that he was in "resource" classes in school. (R. 23:19, 31, 36). Therefore, any assertion that Webster was not placed in special education classes because the school district ignored the problems of its black students is countered by the fact that members of Webster's own family were in such classes. The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065. Given the fact that evidence was presented at trial that other members of Webster's family were in special education classes at school, counsel cannot be faulted for not pursuing evidence of the school district's troubled past. Webster has failed to establish either prong of the *Strickland* standard with respect to this claim.

**\*9** With respect to Webster's claim that his attorneys were ineffective for failing to question E.C. Turner directly about his previous statements about Webster and his claim that they were ineffective in their relationship with the mitigation specialist, Webster has failed to prove any prejudice. Defense counsel put an investigator on the stand to impeach Turner's testimony at trial that Webster was not, in his opinion, retarded with other statements made by him. And, regardless of the type of relationship defense counsel had with the mitigation specialist, the defense called numerous witnesses to the stand to testify regarding several different mitigation issues. In fact, all twelve of the jurors found as a mitigating factor the fact that Webster suffered from abuse and neglect at home, four found as a mitigating factor that he either is or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949      Document: 8-2      Filed: 02/18/2014      Pages: 346

may be mentally retarded, six found it mitigating that he grew up in an atmosphere of violence and fear which misshaped his perception of violence, four found as a mitigating factor that his participation in the crime was, at least in part, attributable to the influence of another, and eleven jurors found as a mitigating factor the fact that he has the love and support of other members of his family. *Webster,* 162 F.3d at 319, n. 2. These findings indicate that defense counsel were successful in presenting convincing mitigating evidence. Webster has not shown that cross-examining Mr. Turner, rather than having an investigator testify, or that a better relationship between the attorneys and the mitigation specialist would have resulted in any substantially different information being placed before the jury or, more importantly, that the result of the trial would have been different.

Finally, with regards to Webster's claim that his attorneys were ineffective for failing to object to the factual finding on mental retardation by this Court, as the Fifth Circuit noted on direct appeal, the law on this issue is far from settled or clear. *Webster,* 162 F.3d at 351.[FN2] Counsel cannot be deemed ineffective for failing to object when the law is not clear that a potential error has occurred. *See Clark v. Collins,* 19 F.3d 959 (5th Cir.1994) (holding that counsel was not deficient in failing to object to racially-motivated peremptory strikes before *Batson* was handed down by the Supreme Court). Webster has not established either prong of the *Strickland* standard with respect to this claim. Webster's ineffective-assistance claims are without merit and are denied.

> FN2. Indeed, as of the date of this opinion, a search on Westlaw reveals that only two published federal cases even mention 18 U.S.C. § 3596(c), the statute concerning the federal statutory prohibition on executing the mentally retarded. One was the instant case on direct appeal before the Fifth Circuit and the other is *Atkins v.*

*Virginia,* 536 U.S. 304 (2002), the recent Supreme Court case that held that executing the mentally retarded violates the Constitution. *Atkins* only mentions this statute in passing in a footnote. *Id .* At 314, n. 10.

C. *Mental–Retardation claims*

In his second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief, Webster asserts various claims that he is ineligible for the death penalty because he is mentally retarded. In his second claim, Webster asserts that this Court usurped the jury's role by making a factual finding that Webster is not mentally retarded. Instead, Webster asserts that he had a due process right to have the jury make that finding. In ground twelve, Webster asserts that he is ineligible for execution because he is mentally retarded. In ground thirteen, Webster contends that the evidence was insufficient to support this Court's finding that he was not mentally retarded. In ground fifteen, Webster argues that the federal statute that exempts mentally retarded defendants from execution is unconstitutionally vague, and in ground sixteen Webster argues that international law prohibits his execution because he is mentally retarded.

1. *Claims concerning 18 U.S.C. § 3596*

**\*10** In his second claim for relief, Webster asserts that he had a due-process right to have the jury make the factual determination under 18 U.S.C. § 3596(c) regarding whether he is ineligible for execution because is mentally retarded, and in his fifteenth ground, Webster contends that § 3596(c) is unconstitutionally vague.

18 U.S.C. § 3596 concerns the implementation of a sentence of death, and 18 U.S.C. § 3596 states, in relevant part, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." *See* 18 U.S.C. § 3596(c). This subsection does not, however, give any guidance as to who is to make this determination. At trial, this Court chose to make the factual determination that, based upon the evidence presented at trial, Webster is not,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

as a matter of law, mentally retarded. (R. 26:227–28).

On appeal, using the clear-error standard because Webster did not object at trial, the Fifth Circuit held that this Court had not erred in opting to make the factual finding itself. *Webster,* 162 F.3d at 351. In his habeas petition, however, Webster cites *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Ring v. Arizona,* 536 U.S. 584 (2002), handed down after the opinion in this case on direct appeal, as support for his assertion that he had a due-process right to have the jury make this determination. In *Apprendi,* the Supreme Court held that a jury, rather than a judge, must find beyond a reasonable doubt any fact that exposes a criminal defendant to a penalty greater than the statutory maximum. *Id.* at 482–83. In *Ring,* the Supreme Court extended the rule announced in *Apprendi,* holding that capital-murder defendants are entitled to a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring,* 536 U.S. at 588 .

The Fifth Circuit, however, has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane,* 489 U.S. 288 (1989). *United States v. Brown,* 305 F.3d 304, 309–10 (2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* While the Fifth Circuit has not ruled whether the rule in *Ring* should be applied retroactively, a case issued by the Fifth Circuit last year strongly suggests that it should not. *See In re Johnson,* 334 F.3d 403, 405 n. 1 (5th Cir.2003) (noting that, as *Ring* is essentially an application of *Apprendi,* logic would suggest that the rule announced in *Ring* is not retroactively available). Moreover, even if *Ring* is retroactively applicable, the Fifth Circuit has recently observed, albeit in the context of a state defendant seeking permission to file a second habeas petition, that neither *Ring* nor

*Apprendi* renders the absence of mental retardation an element of capital murder which must be proven beyond a reasonable doubt. *Johnson,* 334 F.3d at 405. That is, the status of *not* being mentally retarded does not raise the sentence for the capital crime for which Webster was convicted to one where the death penalty is available. Rather, the status of being mentally retarded prevents the death penalty from being carried out with regards to a federal defendant. Because neither *Ring* nor *Apprendi* is applicable to § 3596(c), Webster has not shown any reason for this Court to re-examine the Fifth Circuit's determination that it was not error for this Court to make the factual determination under § 3596(c).

**\*11** Webster further contends that § 3596(c) is unconstitutionally vague because it does not provide any guidance on who is to be the fact-finder, does not outline a burden of proof, and does not set forth any standards for defining mental retardation. He offers no case law as support for this claim. Moreover, as noted by the government in its response, even were this portion of the statute determined to be unconstitutionally vague, this would have no effect on Webster's conviction, as this statutory prohibition on execution has no bearing on his underlying conviction. Moreover, regardless of the failings of 18 U.S.C. § 3596(c), Webster's execution would be prohibited by Supreme Court case law were it determined that Webster is mentally retarded, *Atkins v. Virgina,* 536 U.S 304 (2002), and *Atkins* provides its own guidance for making this determination. Webster is therefore not entitled to relief on either of these claims.

*2. Sufficiency of evidence regarding mental retardation*

In his twelfth ground for relief, Webster asserts that he is ineligible for the death penalty because he is mentally retarded, and in his thirteenth ground he contends that the evidence is insufficient to support this Court's factual finding that Webster is not mentally retarded. As support for these grounds,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Webster relies on *Atkins v. Virginia,* 536 U.S. 304 (2002), and *Jackson v. Virginia,* 443 U.S. 307 (1979). In *Atkins,* the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibits the execution of a mentally retarded person, while in *Jackson v. Virginia,* the Supreme Court held that a state inmate is entitled to federal habeas relief if a review of the record in the light most favorable to the prosecution established that no rational trier of fact could have found the proof of guilt beyond a reasonable doubt. *Id.* at 324, 326.

On direct appeal, the Fifth Circuit, using the "clearly erroneous" standard for review of a factual finding, held that the evidence presented at trial was sufficient to support this Court's finding that Webster is not mentally retarded. *Webster,* 162 F.3d at 352–53. Specifically, the Fifth Circuit noted that, not only had the government presented "substantial" evidence to support the finding, but only four of the twelve jurors found that Webster either is or may be retarded. Accordingly, the Fifth Circuit held that it could not be said that this Court clearly erred in making this finding. *Id.*

Webster, however, contends that the Fifth Circuit erred in this decision. While recognizing that neither § 3596(c) nor *Atkins* delineates a particular standard of review that should be used when assessing whether a finding regarding mental retardation is supported by the evidence, Webster argues that the *Jackson v. Virginia* standard should be utilized in determining on collateral review whether or not he is mentally retarded (Motion at 58).

It is highly unlikely that the "beyond a reasonable doubt" standard would be applicable to a factual finding on mental retardation, as this standard would imply that the government bore the burden of doubt of establishing "beyond a reasonable doubt" that a federal defendant is *not* retarded, which the opinion in *Atkins* does not even suggest. However, even were *Atkins* to require some greater standard of review than the "clear

error" standard already used by the Fifth Circuit, such as the *Jackson* standard, viewed in the light most favorable to the prosecution, a rational fact-finder could have found that Webster is not mentally retarded based upon the evidence presented at trial.

**\*12** In that regard, this issue was a highly contested one at trial. Webster called four expert witnesses who testified about his mental capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright, and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of these experts, and he scored between a composite score of between a 51 and a 65. (R. 23:184–94; R. 24:20). Webster's experts agreed that an I.Q. score of around 70 or lower, along with a lack of adaptive skills and the onset of these deficits before the age of 18, are the criteria for a diagnosis of mental retardation. (R. 23:183, 229–30).[FN3] In order to assess Webster's adaptive skills, Dr. Keyes used the Vineland test, which involved asking numerous questions of people who knew Webster before he was eighteen, including family members, teachers, and friends, but dropping those answers that are inconsistent with the answers of most of the interviewees. (R. 24:36–42). From this, Keyes determined that Webster lived at home, did not have a bank account or a charge card, and was never observed setting the dinner table, assisting in the preparation of meals, or making his bed. He also determined that no one had known Webster to keep secrets or confidences or address envelopes on his own. (R. 24:44–5, 73–6). Dr. Keyes testified that he did not speak to Webster's fellow gang members or police officers who had dealt with him before he was eighteen-years-old in reaching his results on the Vineland test. (R. 24:82–4). Based on this test, Dr. Keyes opined that Webster did have a lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills test and evidence from family members that Webster had been "slow" as a child, all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47, 144, 189).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

FN3. This definition is the same as that outlined by the Supreme Court in *Atkins,* 536 U.S. at 308, n. 3, 318.

Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores (R 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60–2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51–3, 60–1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50–51).

**\*13** Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58–9, 136–39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143–44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65–6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26–8, 238, 239–40, 247–48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34–70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86–103, 111–18, 122–25, 128–30, 136–38, 141–46; R. 26:24–35).

**\*14** In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85–6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had

low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See Atkins,* 536 U.S. at 308, n. 3. The evidence at trial therefore supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* or 18 U.S.C. § 3596(c).

*3. International Law claim*

In his final claim on the issue of mental retardation, Webster asserts that binding international law prohibits his execution because he is mentally retarded. As support for this claim, Webster points to resolutions from the United Nations and the International Commission on Human Rights. (Motion at 65). Aside from whether these resolutions are, in fact, binding on the United States, as the government notes, because the Supreme Court has recently held that the United States Constitution prohibits the execution of the mentally retarded, international law provides no greater relief to him than domestic law. Webster's second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief are without merit and are denied.

D. *Brady claim*

In his ninth ground for relief, Webster contends that the government violated its duty under *Brady v. Maryland,* 373 U.S. 83 (1963), because the government was in possession of mitigating and impeachment evidence but did not provide it to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Webster. Specifically, Webster asserts that the government knew that the reason he was not placed in special education classes when he was in school was because of racial discrimination and knew that certain of the government's witnesses who testified at punishment about his educational background were biased against Webster.

**\*15** Under *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the State violates a defendant's due-process rights under the federal constitutional. And under *Brady,* the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley,* 473 U.S. 667, 682, 685 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley,* 473 U.S. at 678.

Webster asserts that the government was aware that the Watson Chapel School District in Arkansas, where Webster attended school, had had a history of discriminating against African–Americans. Webster further asserts that part of this discrimination was the failure to place African–American students in special education classes when needed. Therefore, Webster asserts, had this information been provided to the defense, the defense could have impeached certain government witnesses, such as E.C. Turner, Linda Monk, and Pat Drewett, who testified that they did not believe that Webster was retarded and noted that he was not in special education classes in school. (R. 25:34–56).

Putting aside the issue of whether knowledge of the history of the Watson Chapel school district can be imputed to the prosecutors who prosecuted Webster's case, Webster has not established that, even if the evidence was withheld and could have

been effectively used to impeach allegedly "biased" witnesses, it is material. In that regard, the Fifth Circuit has recognized that the materiality prong of the *Brady* standard is identical to the prejudice prong of the *Strickland* standard. *Martin v. Cain,* 246 F.3d 471 (5th Cir.), *cert. denied,* 534 U.S. 885 (2001); *Johnson v. Scott,* 68 F.3d 106, 109–10 (5th Cir.1995). That is, in both instances, a habeas petitioner must establish a reasonable probability of a different verdict had the alleged error not occurred. In the instant case, this Court has already determined that Webster has failed to establish any prejudice because his trial counsel did not discover and present this purported evidence of the school system's history of racial discrimination. Accordingly, Webster has failed to establish that this evidence was material to the punishment he received as he has not shown a reasonable probability that he would not have received the death penalty had defense counsel known about this information. These claims are denied.

E. *False-testimony claims*

In his tenth and eleventh grounds for relief, Webster argues that his due-process rights were violated when the government presented the "untrue and damaging" testimony of two of his co-defendants, Steve Beckley and Marvin Holloway. Specifically, Webster contends that, after his trial, Beckley told a correctional officer and a fellow inmate that he had lied at Webster's trial in order to improve his own situation. Webster further contends that, after Webster's trial, his co-defendant Orlando Hall received a letter from Holloway indicating that Holloway owed Webster an apology, a statement that Webster alleges indicates that Holloway lied at trial. Webster further argues that his due-process rights were violated even if the government did not know about any untruthful testimony.

**\*16** Beckley and Holloway were co-defendants who testified at Webster's trial regarding both their own and Webster's involvement in the crime. Both testified about their motives for testifying against

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949    Document: 8-2    Filed: 02/18/2014    Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

Webster, namely that both had pled guilty to various offenses and were hoping that the government would recommend to this Court that their sentences be lowered in recognition of their cooperation. (R. 19:4–7; R. 20:94–9). Nevertheless, Webster contends that he has evidence that both Beckley and Holloway lied when they testified about Webster's involvement in the crime.

It should be noted that Webster has not presented any actual evidence to this Court that either Beckley or Holloway have ever stated that they lied at Webster's trial. In that regard, the statements allegedly made by Beckley and Holloway could very easily be read to mean that both men were apologetic for testifying at Webster's trial in order to improve their own situations. But even if Webster's allegations are taken as true, and all of Beckley's and Holloway's testimony about Webster's involvement in the crime is suspect, Webster has shown no due-process violation. In that regard, the Supreme Court has held that the presentation and admission of false evidence at trial violates a criminal defendant's due-process rights if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1935). And this is true whether the presentation was intentional or through negligence. *Giglio v. United States,* 405 U.S. 150, 154 (1972). Predictably, then, none of the cases cited by Webster supports his contention that it is a due-process violation for false testimony to be presented at trial without the knowledge of the prosecution.FN4 In fact, contrary to this assertion, in order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, Webster must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois,* 360 U.S. at 271. Webster has failed even to allege that the government knew that any testimony given by Holloway or Beckley was false. Accordingly, this Court denies relief with respect to these claims.

FN4. Webster does not contend that the evidence is insufficient to support his conviction or sentence without the alleged false testimony. Indeed, after he was arrested, Webster gave a written confession that was admitted into evidence at trial in which he acknowledged that he participated in the kidnaping of Lisa Rene, although, not surprisingly, by his accounting his participation in the crime was less than his co-defendants. (R. 20:40–55). Furthermore, Holloway's and Beckley's testimony was corroborated by the testimony of Demetrius Hall, another co-defendant (R. 18:98–152); the testimony of a woman who saw Webster at a 7–Eleven near the victim's apartment (R. 18:280); testimony from a security guard at the motel where the victim was kept that the room was rented in Webster's name and he saw Webster on the premises (R. 19:176–92); testimony that Webster had the key to the motel room in his pocket when he was arrested (R. 19:247–54); testimony that Webster helped police officers locate the grave (R. 20:32–4); testimony that Webster had the victim's gold bracelet and necklace on him when he was arrested (R. 20:217, 219, 222); and testimony about Webster's own statements to the police that the killing was "strictly business." (R. 21A:72).

## VI
### *Request for Evidentiary Hearing*

Webster also requests that this Court conduct an evidentiary hearing on the claims he raised in his motion. Section 2255 does not require that a hearing be held to dispose of every motion made under its authority. *Coco v. United States,* 569 F.2d 367, 369 (5th Cir.1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir.1992). However, conclusive, rather than direct

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1949     Document: 8-2     Filed: 02/18/2014     Pages: 346

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
**(Cite as: 2003 WL 23109787 (N.D.Tex.))**

evidence, is required in order to deny relief without a hearing. *United States v. Drummond,* 910 F.2d 284, 285 (5th Cir.1990). Bona fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States,* 507 U.S. 243 (5th Cir.1975); *Reagor v. United States,* 488 F.2d 515 (5th Cir.1973).

**\*17** The record before this Court, including the exhibits submitted by Webster with his motion, do not create any contested fact issues that must be resolved in order to decide Webster's claims. To the contrary, most of Webster's claims are based on the record from the trial. And, with regard to the claims for which Webster has submitted additional evidence, the Court has decided these claims either by assuming that everything Webster alleges is true or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Webster is not entitled to relief, his request for an evidentiary hearing is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

N.D.Tex.,2003.
Webster v. U.S.
Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 F.3d 308
**(Cite as: 421 F.3d 308)**

H

United States Court of Appeals,
Fifth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bruce Carneil WEBSTER, Defendant-Appellant.

No. 03-11194.
Aug. 11, 2005.

**Background:** Following affirmance, 162 F.3d 308, of conviction and sentence of death in the United States District Court for the Northern District of Texas, Terry R. Means, J., on charges of kidnapping resulting in death, conspiring to kidnap, and using and carrying firearm during crime of violence, defendant moved to vacate or set aside sentence. The District Court denied defendant's motion, 2003 WL 23109787, and denied a certificate of appealability (COA) on most claims raised therein, affirmed, 392 F.3d 787. Defendant appealed claims for which COA was granted.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit Judge, held that:
(1) government is not required to prove, by any standard, that capital defendant is not mentally retarded, and
(2) sufficient evidence supported District Court's finding that defendant was not mentally retarded.

Affirmed.

West Headnotes

**[1] Sentencing and Punishment 350H ⟜1642**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(B) Persons Eligible
         350Hk1642 k. Mentally Retarded Persons.
Most Cited Cases
   Neither Federal Death Penalty Act, nor federal Constitution, requires government to prove, by any standard, that capital defendant is not mentally retarded; rather, it is up to states to determine how to enforce constitutional prohibition against executing mentally retarded persons. U.S.C.A. Const.Amend. 8; 18 U.S.C.A. § 3591 et seq.

**[2] Sentencing and Punishment 350H ⟜1642**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(B) Persons Eligible
         350Hk1642 k. Mentally Retarded Persons.
Most Cited Cases
   Sufficient evidence supported federal district court's finding that capital defendant was not mentally retarded, so as to permit jury to recommend death sentence; while all expert witnesses acknowledged defendant's low intelligence quotient, government's experts effectively countered defendant's claim of retardation with evidence that defendant possessed adaptive skills, i.e. had adapted into the criminal community. 18 U.S.C.A. § 3596(c).

**\*308** Delonia Anita Watson, Richard Bratton Roper, III, Asst. U.S. Atty., Fort Worth, TX, for Plaintiff-Appellee.

Philip Alan Wischkaemper, Snuggs & Wischkaemper, Lena G. Roberts, Boerner & Dennis, Lubbock, TX, for Defendant-Appellant.

Appeal from the United States District Court for the Northern District of Texas.

**\*309** Before SMITH, WIENER, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:
   Bruce Webster, a federal prisoner under a sentence of death, appeals the denial of his petition for post-conviction relief under 28 U.S.C. § 2255 on two related claims that the district court rejected

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 14-1049    Document: 8-2        Filed: 02/18/2014    Pages: 346

on the merits but on which it granted a certificate of appealability ("COA"). Concluding that Webster is not entitled to relief, we affirm.

I.

A.

In 1996, a federal jury convicted Webster of three offenses-kidnaping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence-for his role in the shocking and exceedingly brutal kidnaping, rape, and murder of sixteen-year-old Lisa Rene.[FN1] The government sought a death sentence pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-3598, and after a separate sentencing hearing the jury returned special findings that Webster satisfied the requisite elements of intent, *see* § 3591(a), and that three statutory and two non-statutory aggravating factors existed, *see* § 3592.[FN2] Varying numbers of jurors found nine mitigating factors.[FN3] By unanimous vote as required, the jury recommended that Webster be sentenced to death.

> FN1. The facts are set forth in chilling detail in *United States v. Webster,* 162 F.3d 308, 317-19 (5th Cir.1998).
>
> FN2. *See id.* at 319 n. 1 (identifying aggravating factors unanimously found by the jury).
>
> FN3. *See id.* at 319-20 n. 2 (identifying statutory and non-statutory mitigating factors presented by Webster and the number of jurors, if any, that found each factor).

After imposing a death sentence on the verdict, the district court entered a finding that Webster is not mentally retarded and is therefore not exempt from the death penalty under 18 U.S.C. § 3596(c),[FN4] which prohibits the imposition of a death sentence on a person who is mentally retarded or, because of a mental disability, lacks the mental capacity to understand the death penalty or why it

was imposed.

> FN4. The finding provides:
>
> After consideration of all the evidence and information presented in the guilt and punishment phases of trial, the Court hereby issues its factual finding that the defendant Webster is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty.

Webster maintained during the penalty phase that he is mentally retarded and, in support, presented testimony from four medical experts regarding his mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing his cognitive abilities.[FN5] Webster presented voluminous evidence of the abuse he suffered as a child, including testimony from his mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All these witnesses testified about the severe physical and sexual abuse Webster's father inflicted on his children and his wife (Webster's mother).

> FN5. *See United States v. Webster,* 392 F.3d 787, 793-94 & n. 10 (5th Cir.2004) (summarizing Webster's expert testimony and denying a COA, as discussed *infra*); *Webster v. United States,* No. 4:00-CV-1646-Y, 2003 WL 23109787, at **6-7, **12-14 (N.D.Tex. Sept. 30, 2003) (reviewing defense expert testimony on mental retardation).

**\*310** The government vigorously disputed Webster's claim of mental retardation. Beyond cross-examining defense experts, the government produced two medical experts who testified that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

they did not believe Webster was retarded and, moreover, that the methodology used by defense experts to gauge his mental capacity was critically flawed and misleading. The government presented numerous other witnesses, including correctional and probation officers, former teachers, and fellow inmates, whose testimony contradicted Webster's claim of retardation.

B.

We affirmed the conviction and sentence on direct appeal, *see United States v. Webster,* 162 F.3d 308 (5th Cir.1998), *cert. denied,* 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). Among the more than twenty claims Webster raised on direct appeal, we rejected his claim that the district court's finding that he is not mentally retarded, to which no objection was made at trial, was against the greater weight and credibility of the evidence. *See id.* at 352-53. Reviewing for clear error, we determined that "[t]he government presented substantial evidence to support the finding," *id.* at 353, and accordingly we rejected the claim.

Webster thereafter filed, in 2000, a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, and an amended § 2255 motion challenging his conviction and sentence on sixteen grounds in 2002. The district court rejected Webster's claims and dismissed his motion, *see Webster v. United States,* No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D.Tex. Sept. 30, 2003).

Webster applied for a COA on each of the sixteen grounds raised in his amended § 2255 motion.[FN6] The district court granted a COA limited to two of the sixteen claims: first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence.

> FN6. *See* 28 U.S.C. § 2253(C)(1)(B) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may

not be taken to the court of appeals from ... the final order in a proceeding under section 2255.").

Webster then applied to this court for a COA on the fourteen issues deemed unworthy of collateral appellate review by the district court; we denied a COA on each of the additional claims, *see United States v. Webster,* 392 F.3d 787 (5th Cir.2004). We now address, on the merits, Webster's appeal on the two issues rejected on the merits but on which the district court granted a COA.

II.

A.

Webster contends that the evidence presented at trial was insufficient to warrant the district court's finding that he is not mentally retarded. The government argued to the district court that this claim is procedurally barred because it was raised and rejected on direct appeal,[FN7] but the district court appears to have concluded that, though on direct appeal we rejected Webster's claim that the finding was against the greater weight and credibility of the evidence, the intervening decision in **\*311***Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the Eighth Amendment prohibits execution of the mentally retarded) saves this claim from a procedural bar. *See Webster,* 2003 WL 23109787, at \*5.

> FN7. *See United States v. Kalish,* 780 F.2d 506, 508 (5th Cir.1986) ("It is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions."); *United States v. Rocha,* 109 F.3d 225, 229-30 (5th Cir.1997).

Yet, even before *Atkins,* at the time of Webster's trial, 18 U.S.C. § 3596(c) prohibited the execution of mentally retarded offenders in federal prosecutions. The only substantive change (as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 F.3d 308

**(Cite as: 421 F.3d 308)**

explained further *infra*) ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (*i.e.,* constitutional) that bars their execution. In any event, we assume for present purposes that *Atkins* permits, whether by way of clarification of the meaning of mental retardation or some other reason, Webster to restate his sufficiency challenge, so we proceed to address the merits, but we do so without deciding that we must.

B.

In advancing his collateral challenge to the sufficiency of the evidence, Webster invokes *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which held that a state defendant is entitled to federal habeas corpus relief if the state's evidence was such that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Webster argues that *Jackson* provides the standard against which the evidence supporting the finding that he is not mentally retarded should be measured-the necessary implication being that the government had the burden of proving beyond a reasonable doubt that Webster is *not* mentally retarded.

But the *Jackson* standard is inapposite here, where the challenged finding is the *absence* of mental retardation, and not a substantive element of the offense to which *Jackson* applies by its own terms,[FN8] or an aggravating circumstance, sentencing factor, or special issue in the context of capital proceedings, to which *Jackson* has since been applied.[FN9]

> FN8. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found *the essential elements of the crime* beyond a reasonable doubt.") (second emphasis added).
>
> FN9. *See, e.g., Lewis v. Jeffers,* 497 U.S.

764, 781, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (holding that in reviewing whether a state court's finding of an aggravating factor is so erroneous as to constitute an Eighth Amendment or due process violation, a federal court considering a habeas corpus petition should apply the "rational factfinder" test established in *Jackson* ); *Martinez v. Johnson,* 255 F.3d 229, 244-45 (5th Cir.2001) (applying *Jackson* to sufficiency challenge to future dangerousness finding); *Fierro v. Lynaugh,* 879 F.2d 1276, 1280 (5th Cir.1989) (same); *Green v. Johnson,* 160 F.3d 1029, 1046-47 (5th Cir.1998) (applying *Jackson* to a challenge to the sufficiency of a finding of deliberateness); *Callins v. Collins,* 998 F.2d 269, 276 (5th Cir.1993) (same).

[1] Moreover, nothing in the Federal Death Penalty Act requires the government to prove-by any standard, much less beyond a reasonable doubt-that a capital defendant is not mentally retarded. Nor does anything in *Atkins* require, as a constitutional matter, the government to prove-again, by any standard, much less beyond a reasonable doubt-that a capital defendant is not mentally retarded. Instead, the Court in *Atkins* decided to "leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242 (quoting *Ford v. Wainwright,* 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (alterations in original)). And several states have since **\*312** placed the burden on capital defendants to prove by a preponderance of the evidence that they are mentally retarded.[FN10]

> FN10. *See, e.g., Ex Parte Briseno,* 135 S.W.3d 1, 12 (Tex.Crim.App.2004); *Russell v. State,* 849 So.2d 95, 148 (Miss.2003); *State v. Williams,* 831 So.2d 835, 860-61 (La.2002); *Murphy v. State,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

54 P.3d 556, 568 (Okla.Crim.App.2002).

In fact, even before the district court looked askance at Webster's suggestion on collateral review that the government had to prove his non-retardation beyond a reasonable doubt, we had already rejected the claim, albeit in the context of a state prisoner on federal habeas review, that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), when read together with *Atkins,* require the government to prove beyond a reasonable doubt that a capital defendant is not mentally retarded. In *In re Johnson,* 334 F.3d 403, 405 (5th Cir.2003), we squarely held that "neither *Apprendi* and *Ring* nor *Atkins* renders the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt."[FN11]

> FN11. *See also Ring,* 536 U.S. at 609, 122 S.Ct. 2428 (noting that jury finding beyond a reasonable doubt is constitutionally required for aggravating factors that operate as "the functional equivalent of an element of a greater offense"); *Walker v. True,* 399 F.3d 315, 326 (4th Cir.2005) (rejecting claim that *Ring* requires a jury determination of mental retardation, and reasoning that "an increase in a defendant's sentence is not predicated on the outcome of the mental retardation determination; only a decrease") (internal marks omitted); *Johnson,* 334 F.3d at 405 ("[T]he absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense."); *cf. Medina v. California,* 505 U.S. 437, 449, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (holding that a state may presume a defendant to be competent and require him to carry the burden of proving his incompetence by a preponderance of the evidence).

Indeed, it was on this basis that we denied Webster a COA on his claim that *Apprendi* and *Ring* alone require the government to prove his non-retardation beyond a reasonable doubt. *See Webster,* 392 F.3d at 791-92.[FN12] Accordingly, we reject Webster's claim to the extent it is based on an alleged constitutional error in the allocation of the burden of persuasion and standard of proof.

> FN12. Even if the rules announced in *Apprendi* and *Ring* were applicable to the absence of mental retardation, the bar of non-retroactivity would preclude their application to cases already final on direct review. *See Webster,* 392 F.3d at 792; *see also Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004) (holding that the procedural rule announced in *Ring* is not retroactive to cases already final on direct review); *United States v. Brown,* 305 F.3d 304, 310 (5th Cir.2002) (holding that the procedural rule announced in *Apprendi* is not retroactively applicable to initial post-conviction petitions under § 2255).

## C.

[2] In any event, the district court proceeded dutifully to re-examine the extensive record evidence bearing on Webster's mental capacity and concluded, once again, that a "rational fact-finder could have found that Webster is not mentally retarded based on the evidence presented at trial." *Webster,* 2003 WL 23109787, at *11. Once again, we cannot say the district court erred in reaching this conclusion and rejecting Webster's renewed sufficiency challenge. *See Webster,* 162 F.3d at 352-53.

To be sure, as the district court noted, "all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that **\*313** Webster has a low I.Q." *Id.* at *14.[FN13] But, under the definition of mental retardation cited in *Atkins, see* 536 U.S. at 308 n. 3, 122 S.Ct. 2242, a showing of borderline or below average intelligence does not alone constitute an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

421 F.3d 308
**(Cite as: 421 F.3d 308)**

adequate showing of retardation. Rather, an adequate showing of mental retardation also requires significant deficits in adaptive skills,[FN14] and it is here, as the district court concluded, that the government effectively countered Webster's claimed retardation:

> FN13. There was a dispute as to how low, and both government experts, Dr. George Parker and Dr. Richard Coons, testified that, in their opinion, Webster had an incentive not to perform well on cognitive tests administered after he was charged in this case; they pointed to earlier tests taken by Webster on which he scored higher. Parker also testified that lifestyle choices and cultural factors can account for low I.Q. scores (a point defense experts Dr. Keyes and Dr. Finn acknowledged), thus casting doubt on the reliability of the I.Q. tests administered by Keyes, which required Webster to define words (he was unable to define "inflation") and recognize faces (he could not identify Shakespeare, Mark Twain, or Albert Einstein from pictures) to which he was unlikely to have been previously exposed.

> FN14. Mental retardation has as its essential feature significantly subaverage general intellectual functioning accompanied by significant limitations in adaptive functioning, with onset before the age of eighteen. *Morris v. Dretke,* 413 F.3d 484, 487 (5th Cir.2005) (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (text rev. 4th ed.2000)).

[T]he issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has

adapted to his environment and does possess skills that his family stated he did not. Looking at all the evidence presented by both sides at trial, while it is undisputed that Webster has had low I.Q. scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.

*Webster,* 2003 WL 23109787, at *14.[FN15]

> FN15. In fact, not only were government experts able to refute many of the specific findings obtained from the "Vineland test" administered by Keyes, *see Webster,* 2003 WL 23109787, at *13, but they testified that the test was an inappropriate and deceptive measure of Webster's adaptive skills, given his lifestyle as a drug dealer. Moreover, government experts noted that Webster had shown cleverness and adaptability when he sneaked into the women's portion of the jail in which he was held, concocted cover stories and made excuses to police when he was arrested with a key in his pocket to the motel room in which Lisa Rene was held and raped repeatedly, and burned his clothes to destroy evidence after her murder.

> The government also presented the testimony of numerous other witnesses,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

including correctional officers and fellow inmates that, while incarcerated, Webster engaged in various activities potentially inconsistent with a finding of retardation. For example, he wrote letters to fellow inmates; received letters and newspapers; read aloud from newspapers; wrote request slips for various services; prepared written grievances; submitted names and addresses of people for his visitation list; and on one occasion complained because the change he received from the prison commissary was incorrect.

### III.

Webster claims he is mentally retarded and thus ineligible for his death sentence, but given our rejection of his claim regarding **\*314** the standard of proof and sufficiency of the evidence supporting the contrary finding at trial, this claim is reduced, in essence, to nothing more than an attempt to re-litigate the question. Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.[FN16]

> FN16. Webster's brief does refer to evidence marshaled in the district court on collateral review concerning racial discrimination in the district where Webster attended school, which Webster continues to assert would have, if presented at trial, demonstrated why he was not enrolled in special education courses and therefore would have effectively countered the government's assertion that he is not mentally retarded. But we previously denied Webster a COA on an ineffective assistance of counsel claim premised on the failure of defense counsel to investigate and present such evidence and on a vague yet related claim under *Brady v. Maryland,* 373 U.S. 83, 83

S.Ct. 1194, 10 L.Ed.2d 215 (1963), *see Webster,* 392 F.3d at 795, 797-99.

> Our analysis of those claims obtains equally here: "In the main, the prosecution presented substantial evidence countering Webster's claim of mental retardation, and the government's effort did not depend in any significant respect on Webster's non-enrollment in special education courses." *Id.* at 798-99. Thus, we held that even if Webster could otherwise sustain his claims, "the incremental impeachment value, if any, of such evidence does not raise a possibility that, had the evidence been presented, the outcome would have been different." *Id.* at 795; *see also id.* at 799.

Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," *Webster,* 2003 WL 23109787, at \*12, and Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded. And the record supports those findings.

The judgment denying Webster's petition for post-conviction relief is AFFIRMED.

C.A.5 (Tex.),2005.
U.S. v. Webster
421 F.3d 308

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# F I L E D
April 28, 2010

No. 09-11039

Lyle W. Cayce
Clerk

In re: BRUCE CARNEIL WEBSTER,

Movant.

On Motion for Authorization to File
Successive 28 U.S.C. § 2255 Motion
in the United States District Court
for the Northern District of Texas

Before SMITH, WIENER, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Bruce Webster moves for an order authorizing the district court to consider a successive motion to vacate his federal death sentence under 28 U.S.C. § 2255, as amended by section 105 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Because he does not meet the procedural requirements of § 2255(h), we deny the motion.

I.

In June 1996, Webster was sentenced to death for his role in the kidnaping

No. 09-11039

and brutal murder of a sixteen-year-old girl. He filed a direct appeal of his conviction, including among his nineteen assignments of error a challenge to the district court's finding that he was not mentally retarded. We affirmed in all respects. *United States v. Webster*, 162 F.3d 308, 358 (5th Cir. 1998), *cert. denied* 528 U.S. 829 (1999). He then filed for relief under § 2255, which motion the district court denied, concluding that, even in the wake of *Atkins v. Virginia*, 536 U.S. 304 (2002), the evidence supported a finding that Webster was not mentally retarded. *Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787, at *14 (N.D. Tex. Sept. 30, 2003). And, after the district court granted a certificate of appealability on two of the issues concerning mental retardation, we again affirmed the sentence. *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006).

Now Webster asks for another chance to argue that he is mentally retarded and therefore ineligible for the death penalty.[1] Specifically, he contends that in light of newly discovered evidence—in the form of government and school records and additional testimony—no reasonable factfinder could conclude that he is not mentally retarded.

## II.

Section 2255(h) governs the filing of second or successive motions:

A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—

(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

---

[1] Webster's execution is stayed for reasons not related to the instant motion.

2

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).

This court has not had occasion to consider whether a petitioner seeking only to challenge his eligibility for the death penalty can do so under § 2255-(h)(1).[2] We now conclude that a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder.

That result is compelled by the plain language of § 2255(h)(1), which does not encompass challenges to a sentence. Instead, it states that a petitioner wishing to rely on newly discovered evidence (as distinguished from being able to point to a qualifying new rule of constitutional law)[3] to support a second § 2255 motion must "establish by clear and convincing evidence that no reasonable factfinder would have found the movant *guilty of the offense*." § 2255(h)(1) (emphasis added).

Webster nevertheless urges us to read "offense" broadly so that § 2255-(h)(1) would cover not only a claim that a prisoner is not guilty of the offense of conviction but also a claim that he is merely "not guilty of the death penalty." Such an interpretation accords with prior habeas corpus law interpreting "actual innocence" to include "innocence of the death penalty." *Cf. Sawyer v. Whitley*, 505 U.S. 333, 340-41 (1992). But, as Judge Posner cogently explained,

---

[2] Nor have we had occasion to consider that question with regard to 28 U.S.C. § 2244(b)-(2)(B)(ii), which includes the same language. Section 2255 governs collateral attacks on federal convictions; § 2244, attacks on state court convictions. Nevertheless, "[b]ecause of the similarity of the actions under [these sections], they have traditionally been read *in pari materia* where the context does not indicate that would be improper." *United States v. Flores*, 135 F.3d 1000, 1002 n.7 (5th Cir. 1998).

[3] *See* § 2255(h)(2).

S.App.99

Courts that before the amendment had to decide whether an application for postconviction relief came within the "actual innocence" exception to the requirement of proving cause and prejudice in order to be permitted to revive a waived ground for relief extended the exception to sentencing issues . . . . But we do not think the exception survives the amendment. The "actual innocence" exception of the prior law was judge-made, and so its contours were appropriately judge-fashioned and permissibly judge-expanded. The exception in the new law is graven in statutory language that could not be any clearer. When we consider . . . the absence of any indication in the legislative history that 'offense' was being used in some special sense different from its ordinary meaning, we think it highly unlikely that Congress intended the word to bear a special meaning.

*Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (Posner, J.).[4]

That is to say, there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence."[5] Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255.[6] Or if Congress had intended

---

[4] *See also In re Dean*, 341 F.3d 1247, 1248-49 (11th Cir. 2003); *In re Jones*, 137 F.3d 1271, 1274 (11th Cir. 1998); *Burris v. Parke*, 130 F.3d 782, 785 (7th Cir. 1997); *Burris v. Parke*, 116 F.3d 256, 258 (7th Cir. 1997); *In re Medina*, 109 F.3d 1556, 1565-66 (11th Cir. 1997), *overruled on other grounds by Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998). Two other circuits addressed the issue but avoided deciding it. *See LaFevers v. Gibson*, 238 F.3d 1263, 1267 (10th Cir. 2001) ("[T]here is a split among the three circuits that have addressed the question . . . . This court need not resolve that difficult question . . . ."); *In re Vial*, 115 F.3d 1192, 1198 n.12 (4th Cir. 1997) (en banc) ("We need not address the question of whether, under the AEDPA, an individual subject to a sentence of death may assert the existence of new evidence establishing that the sentence was imposed improperly, *i.e.*, that he is "innocent" of the death penalty.").

[5] By this we do not mean to suggest that a prisoner is jurisdictionally barred from seeking successive review where he contests a factual predicate of his capital murder conviction, without which he would have been guilty only of non-capital murder. *Cf. Thompson v. Calderon*, 151 F.3d 918, 923-24 (9th Cir. 1998) (en banc).

[6] *Cf., e.g.*, 28 U.S.C. § 2255(b) ("If the court finds that the judgment was rendered without jurisdiction, or that *the sentence imposed* was not authorized by law or otherwise open to

(continued...)

4

to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence."[7]  Instead, it elected to couch § 2255(h)(1), as well as § 2244(b)(2)(B)(ii), in the markedly different, unmistakable terms of *guilt of the offense*.  Absent some indication that Congress meant for the language in § 2255(h)(1) not to be taken literally, we decline to interpret it any other way.

In summary, Webster's application does not satisfy § 2255(h)(1), and § 2255(h)(2) is inapplicable.  The motion for authorization to file a successive § 2255 motion is DENIED.[8]

---

[6] (...continued)
collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner *or resentence him* or grant a new trial *or correct the sentence* as may appear appropriate.  (Emphasis added.)).

[7] Or, indeed, "eligible for the death penalty," per *Sawyer*, 505 U.S. at 336.  *See Thompson*, 151 F.3d at 923 (noting that the difference between the language in *Sawyer* and the language in § 2244(b)(2)(B)(ii) could suggest that Congress chose to deviate from it).

[8] Our decision that the instant motion is beyond the reach of § 2255 is jurisdictional in nature, going to the ability of the district court and this court to entertain the § 2255 motion in the first instance.  The result makes it unnecessary for this court to address whether, as the government claims, the evidence that Webster seeks to introduce is neither newly discovered nor substantive.

5

No. 09-11039

WIENER, Circuit Judge, concurring:

I concur in the majority opinion, as I believe that it is a correct interpretation of 28 U.S.C. § 2255(h), but I write separately to emphasize the absurdity of its Kafkaesque result: Because Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty — and not that he is factually innocent of the crime — we must sanction his execution.

If the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded. In 1993 — more than a year before his indictment for the offense of conviction — Webster applied for Social Security benefits.[1] To determine his eligibility for those benefits, three separate government physicians performed medical and psychological examinations on him. Notably, all three physicians independently concluded that Webster is mentally retarded. First, Dr. Rittelmeyer diagnosed Webster as suffering from "[m]ental retardation." Then, Dr. Spellman described Webster as "a slow fellow who did not know much and did not know how to communicate well." Explaining that he had found no evidence of exaggeration or malingering during his examination, Dr. Spellman concluded that Webster's IQ was 69 or lower and that his significant cognitive difficulties were attributable not to mental illness but to "mental retardation." Finally, Dr. Hackett performed an IQ test and concluded that Webster's IQ was 59. Dr. Hackett described Webster as "mildly retarded," "antisocial," and unable to "function well in the work place."

These reports, the merits of which have never been considered by any

---

[1] Although Webster's counsel requested these Social Security records long before his trial, they were only recently produced. And, when Webster sought additional discovery in connection with his first habeas petition, the district court denied his motion — just two days before the Supreme Court's landmark decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) — and required that he file his petition within sixty days, i.e., less than two months after *Atkins* was decided and without the benefit of additional discovery.

6

No. 09-11039

judge or jury, refute much of the evidence introduced by the government at the penalty phase of Webster's trial. For example, the government's physicians — all of whom examined Webster while he was incarcerated for the offense of conviction — suggested that he was malingering and exaggerating his symptoms in the hopes of being found ineligible for the death penalty. In contrast, none of the Social Security physicians who diagnosed Webster's mental retardation many years earlier noted any such evidence. Moreover, at trial, the government introduced testimony that Webster had never been placed in special education classes, which weighed further still against a finding of mental retardation. Again, though, the Social Security records tell a different story. Specifically, a letter to the Social Security Administration from Lou Jackson, the Special Education Supervisor for the Watson Chapel Schools, indicates that Webster was indeed enrolled in special education classes but that the records of his enrollment there were destroyed in 1988 after his family did not respond to a letter "telling them they could have the records if they wanted them."[2]  Under § 2255(h), however, we must turn a blind eye to this evidence, as it speaks to Webster's constitutional eligibility for the death penalty and not his factual guilt or innocence of the crime.

The Supreme Court explained in *Atkins v. Virginia* that because mentally retarded persons suffer from "disabilities in areas of reasoning, judgment, and control of their impulses, they do not act with the level of *moral culpability* that

---

[2]  Of course, this is all in addition to the already substantial evidence of mental retardation that Webster introduced before the trial court, including, *inter alia*, testimony from Doctor Finn that Webster's IQ was 59; testimony from Dr. Keyes that Webster had an IQ of 51 with the adaptive functioning of a seven-year-old; testimony from Dr. Cunning that Webster suffered from mild mental retardation; and testimony from several witnesses familiar with Webster's adaptive deficits in communication, conceptual skills, home living, functional academics, and day-to-day life.

7

No. 09-11039

characterizes the most serious adult criminal conduct."[3]  Thus, "in the light of our evolving standards of decency," the Court held that the Eighth Amendment prohibits as excessive the execution of mentally retarded defendants.[4]  Although I concur in the majority's opinion as a correct statement of the law, I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment.

---

[3]  536 U.S. at 320 (emphasis added).

[4]  *Id.*

8

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

April 28, 2010

Ms. Karen S. Mitchell
Northern District of Texas, Fort Worth
United States District Court
501 W. 10th Street
Room 310
Fort Worth, TX 76102

      No. 09-11039,  In re: Bruce Webster
         USDC No.

Dear Ms. Mitchell:

Enclosed is a copy of an opinion-order entered on 4/28/2010.  We
have closed the case in this court.

We will forward the record on appeal at a later date.

                  Sincerely,

                  LYLE W. CAYCE, Clerk

                  By: _James R. Cheramie_____
                  James R. Cheramie, Deputy Clerk

Enclosures

cc:
    Mr. Steven Joseph Wells

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
-------------------------------------------------------
BRUCE CARNEIL WEBSTER,

           Petitioner,         :

                        :         CAUSE NO:

    vs.

                        :

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,  :
TERRE HAUTE (USP),

                        :

           Respondent.
-------------------------------------------------------

## DECLARATION OF STEVEN J. WELLS IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

## THIS IS A DEATH PENALTY CASE

DORSEY & WHITNEY LLP
Steven J. Wells
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402
(612) 340-2600

*Attorneys for Petitioner Bruce Webster*

I, STEVEN J. WELLS, declare as follows:

I am a partner at the law firm of Dorsey & Whitney LLP ("Dorsey"), attorneys for Petitioner Bruce Carneil Webster. I submit this Declaration in support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241.

1.    Attached hereto as **Exhibit A** is a true and correct copy of the Order entered in *Roane, et. al. v. Gonzales, et. al.*, Case No. 1:05-cv-2337 (D.D.C. Feb. 16, 2007) (Docket No. 27).

2.    Attached hereto as **Exhibit B** is a true and correct copy of excerpts from Volume 23 of the transcript of proceedings held in the criminal trial of Bruce Carniel Webster in the Northern District of Texas, *U.S. v. Webster*, Case No. 4:94-cr-00121-Y (N.D. Tex.) (hereinafter "trial transcript") on June 12, 1996.

3.    Attached hereto as **Exhibit C** is a true and correct copy of excerpts from Volume 24 of the trial transcript for proceedings held on June 13, 1996.

4.    Attached hereto as **Exhibit D** is a true and correct copy of excerpts from Volume 25 of the trial transcript for proceedings held on June 14, 1996.

5.    Attached hereto as **Exhibit E** is a true and correct copy of excerpts from Volume 26 of the trial transcript for proceedings held on June 18, 1996.

6.     Attached hereto as **Exhibit F** is a true and correct copy of excerpts from Volume 27 of the trial transcript for proceedings held on June 19, 1996.

7.     Attached hereto as **Exhibit G** is a true and correct copy of the Social Security Administration records of Bruce Webster received by Dorsey on February 9, 2009. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

8.     Attached hereto as **Exhibit H** is a true and correct copy of the Social Security Administration records of Willie Webster received on February 9, 2009. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

9.     Attached hereto as **Exhibit I** is a true and correct copy of the Department of Human Services Child Maltreatment Division Records received on October 31, 2008. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

10.     Attached hereto as **Exhibit J** is a true and correct copy of the December 9, 2008 Declaration of Leonda Daniels.

11.     Attached hereto as **Exhibit K** is a true and correct copy of the November 12, 2008 Declaration of Lanetra Evans.

12.     Attached hereto as **Exhibit L** is a true and correct copy of the November 11, 2008 Declaration of Luketha Frazier.

13.    Attached hereto as **Exhibit M** is a true and correct copy of the December 7, 2008 Declaration of Marvin Holloway.

14.    Attached hereto as **Exhibit N** is a true and correct copy of the December 9, 2008 Declaration of Angela Madison.

15.    Attached hereto as **Exhibit O** is a true and correct copy of the December 9, 2008 Declaration of Theressia Martin Moten.

16.    Attached hereto as **Exhibit P** is a true and correct copy of the December 8, 2008 Declaration of Michael Parks.

17.    Attached hereto as **Exhibit Q** is a true and correct copy of the November 11, 2008 Declaration of Jodin Smith.

18.    Attached hereto as **Exhibit R** is a true and correct copy of the November 11, 2008 Declaration of Dorothy Harris Wallace.

19.    Attached hereto as **Exhibit S** is a true and correct copy of the November 11, 2008 Declaration of Sharon Webster.

20.    Attached hereto as **Exhibit T** is a true and correct copy of the November 11, 2008 Declaration of Tony Webster.

21.    Attached hereto as **Exhibit U** is a true and correct copy of the September 29, 2011 Declaration of Dr. Marc J. Tassé, PhD.

22.    Attached hereto as **Exhibit V** is a true and correct copy of the March 23, 2012 Declaration of Kristen K. LeRoux.

23.    Attached hereto as **Exhibit W** is a true and correct copy of the October 20, 2009 Declaration of Larry M. Moore.

24.    Attached hereto as **Exhibit X** is a true and correct copy of the Motion of Bruce Carneil Webster for Leave to Conduct Discovery, Docket No. 1028, filed on April 30, 2001.

25.    Attached hereto as **Exhibit Y** is a true and correct copy of the Memorandum Opinion and Order Denying Petitioner's Motion for Discovery, Docket No. 1063, filed on June 18, 2002.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: 3|23|12

Steven J. Wells

# Wells Decl. Ex. B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA   . CRIMINAL ACTION NO.
                           .   4:94-CR-121-Y
V.                         .
                           . Fort Worth, Texas
BRUCE CARNEIL WEBSTER      . June 12, 1996
. . . . . . . . . . . . . . .

VOLUME 23
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:      MR. RICHARD B. ROPER
                        MR. PAUL D. MACALUSO
                        MR. CHRISTOPHER CURTIS
                        Assistant United States Attorney
                        801 Cherry Street, Suite 1700
                        Fort Worth, Texas  76102-6897
                        (817) 978-3291

For the Defendant:      MR. LARRY M. MOORE
                        Attorney at Law
                        1112-A East First Street
                        Fort Worth, Texas  76102
                        (817) 338-4800

                        MR. ALLAN K. BUTCHER
                        Hill, Beatty, Butcher
                        & Gallagher
                        201 Main Street, Suite 1300
                        Fort Worth, Texas  76102
                        (817) 336-3600

Court Reporter:         Ana P. Warren
                        U.S. District Court Reporter
                        501 W. 10th Street, Room 204B
                        Fort Worth, Texas  76102-3637
                        (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT B**

Redirect - Moore/Webster, Mark        33

Q. Who was he working with whenever he worked for those people?

A. Me and some more guys -- well, all my brothers. I had them all out there.

Q. In answer to one of the questions that Mr. Macaluso asked you about how was Bruce living, you said something about his girlfriends would take care of him. Tell me what you mean by that?

A. Well, they would buy him things and whatever, and he would stay with them.

Q. Did your brother ever get money from your mother?

A. Yes. He would get money from her.

Q. For how long?

A. As long as he was at the house or come down there.

Q. When you were a kid growing up and this was all going on, Mr. Macaluso asked you how come the teachers never saw the bruises or how come you never talked to the teachers about it. Why didn't you tell the teachers or the preacher or anybody else about what was going on?

A. Scared.

Q. Scared of what?

A. My father.

Q. When you would have bruises or marks on your body, would you wear clothes that allowed people to see those marks?

A. No.

U.S. DISTRICT COURT

Cross - Macaluso/Webster, Future        67

Q. He has not or you don't know?

A. No, because he was working on the C.E.T.A. program, and that was during school, and school was back in.

Q. Do you have any earthly idea how he would get all that money he was spending on himself and other people?

A. Bruce don't have no money because there have been times when Bruce sees me, Bruce asks me for money, and I give it to him.

Q. Okay. You wouldn't see him wearing jewelry?

A. Jewelry that my mother bought.

Q. Your mother bought him expensive jewelry?

A. Yes. She charged it on her card. She would do it for me, too.

Q. But if your mother didn't give him the money and he wasn't working, then you don't really know where he would have gotten his money, do you?

A. From me and his mother, $35 here, $2 here.

Q. Okay. Do you know why Bruce couldn't hold an honest job like your brother Tony and your brother Mark?

A. What did you say?

Q. Is there any reason that you know of why Bruce couldn't have gone out and gotten an honest job?

A. If somebody had hired him. Just like I used to put in for jobs and never could get hired because of education. I didn't get an education.

U.S. DISTRICT COURT

Direct - Butcher/Frazier       75

A. About seven or eight.

Q. So it was in your early years?

A. Yes.

Q. And how often would you see him?

A. I would see him every day.

Q. Were the two of you in the same grade?

A. Yes.

Q. Did you go to the same school?

A. Yes.

Q. Did you have classes together?

A. We had one class together.

Q. How did Bruce get along with the other children in school while you were there?

A. He got along with them well.

Q. Was he liked or not liked?

A. Very disliked -- excuse me.  Sorry.  He was very liked by the students.

Q. How well did he perform?  Was he able to do all of the assignments and do well in school?

A. With the help of other students.

Q. In what way would other students help him?

A. They would do his homework or try to show him how to do it.

Q. Did he ever get help on exams or tests?

A. On one particular test, I helped him.

Q. Do you know whether or not other students helped him on

U.S. DISTRICT COURT

Direct - Butcher/Frazier          76

other tests?

A. Not to my knowledge.

Q. Did you ever help him with assignments?

A. Yes.

Q. With regard to a driver's license, did you have memory --
do you remember an incident involving Bruce and the driver's
license?

A. Yes.

Q. What was that?

A. Well, I had the answers to the test, and I gave them to
him.

Q. So you provided the answers to the written portion of the
test to Bruce?

A. Yes.

Q. And this was for the driver's license?

A. Yes.

Q. Living across the street or down the street from the
Webster family, are you aware of the punishment that Willie
Webster, Bruce's father, would give out?

A. Yes.

Q. Have you seen that yourself?

A. I didn't see it, but I heard of it.

Q. Well, not with regard to any particular person, but have
you seen it in general?

A. Well, it happened to myself.

U.S. DISTRICT COURT

Recross - Macaluso/Daniels        102

A. Yes, sir.

MR. MOORE: I don't think I have anything further, Your Honor.

MR. MACALUSO: Just a question or two.

THE COURT: All right.

RECROSS EXAMINATION

BY MR. MACALUSO:

Q. Ms. Daniels, did I understand you to say that you didn't think Mr. Webster, Bruce over here, could fill out a job application?

A. He could fill out one, but at the time I guess he wanted me to fill out the application form.

Q. Then the question is, ma'am, so we're clear on this. Are you saying that he could but didn't?

A. He can fill out an application, yeah, but I filled it out that particular day.

Q. We don't want to confuse the jury by suggesting that he couldn't fill out a job application, would we?

A. Yeah. He can fill out one.

Q. You've read letters from him, haven't you?

A. Huh? Sir?

Q. Has he written letters to you?

A. Yes, sir.

Q. Does he have any difficulty writing you a letter?

A. I can hardly understand his handwriting. I don't know.

U.S. DISTRICT COURT

Direct - Moore/McKelvy          103

Q. Well, putting aside the handwriting, did you have any difficulty understanding what he had to say at all?

A. Huh-uh.

MR. MACALUSO: Thank you, ma'am.

MR. MOORE: No further questions.

THE COURT: You may step down. Thank you. And you're free to go as well.

MR. MOORE: Dorothy Harris McKelvy.

THE COURT: What was the last name again?

MR. MOORE: McKelvy, M-C-K-E-L-V-Y. I think she's on the witness list as Dorothy Harris, Your Honor, Number 64.

THE COURT: 64. Thank you.

Ms. McKelvy, would you please raise your hand and be sworn?

(Witness sworn by the Court)

DOROTHY HARRIS MCKELVY, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MOORE:

Q. State your full name for the jury, please? State your full name for the jury, Dorothy?

A. I can't hear you too well.

Q. Okay. Let me try this again. State your full name for the jury?

A. Dorothy Harris McKelvy.

Q. And how old are you?

A. Thirty-six.

U.S. DISTRICT COURT

Direct - Moore/Webster, Beatrice        138

A. Yes, sir.

Q. What grade did he have to repeat?

A. I believe he had to repeat the second grade twice and another grade when he got on up -- what you would call -- not high school but between that.

Q. During the time that Bruce was growing up in the house, were there things that occurred -- were there things that your husband did to Bruce that you knew he ought not be doing?

A. Yes, sir.

Q. Did those type things occur to the other children in the house as well?

A. Yes, sir.

Q. Did those type things happen to you?

A. Yes, sir.

Q. Did you ever make any efforts to try to stop your husband from doing those type things to your children?

A. No, sir.

Q. Why didn't you do that, Ms. Webster?

A. I was afraid.

Q. What were you afraid of?

A. The things that he told me.

Q. The things that your husband told you?

A. Yes, sir.

Q. What type things would he tell you that he would do?

A. He just told me that I don't go to no white folk, only him,

U.S. DISTRICT COURT

Direct - Moore/Webster, Beatrice        145

about him, what was he talking about?

A. Well, I assume if I say the wrong thing, testify to the truth or something, and he knows that it's the truth, that if he hear about it, you know, I don't know what he would do. But I assume that's what he's saying.

Q. Are you still scared of your husband?

A. Yes, sir.

Q. Are you scared about him finding out what you testified to here in court?

A. Yes, sir.

Q. Can your husband read and write?

A. No, sir.

Q. When you -- when did Bruce leave home for good? Has there ever been a time in Bruce's life when he left and moved out and never came back to live?

A. No, sir.

Q. How has Bruce, since he, you know, became a teenager and thereafter, how has Bruce lived? How has he supported himself?

A. Through the welfare office, F.D.C., and get food stamps and with a little money I give him. He would just live at home with me.

Q. Has he lived at home continuously pretty much all of his life?

A. Yes, sir.

Q. Has there been occasions when he has lived with somebody

U.S. DISTRICT COURT

Direct - Moore/Finn          176

course work in mental retardation, and have continued to perform some evaluations of mentally retarded individuals, some through the courts and some through just other sources.

I'm also a consultant to the Jefferson's Home for Children in Azle, Texas, which is a residential facility for severely and profoundly retarded children, and I do basically all the psychological assessments for them and their children.

Q. So you have had significant experience in assessing and evaluating individuals that are mentally retarded?

A. Yes, sir.

Q. As a matter of fact, have you been previously certified by the State Department of Mental Health and Mental Retardation? Did you obtain a certificate that qualified you to do those assessments for the granting of benefits, so to speak, through M.H.M.R.?

A. Yes, I did. When I worked here in Fort Worth, I received some kind of a certificate from the Texas Department of Mental Health and Mental Retardation that basically said I was qualified to conduct what they call diagnostic evaluations of individuals that are suspected of being mentally retarded.

Q. Now, in connection with your -- in line with your profession and your duties and interests, did you have an opportunity, at my request, to perform an evaluation of the defendant in this case, Bruce Webster?

A. Yes, I did.

U.S. DISTRICT COURT

Direct - Moore/Finn          177

Q. When was the first time that you recall that you had the opportunity to see Mr. Webster?

A. The first time I saw him was on January 28 of 1995.

Q. And what was your purpose in seeing Mr. Webster at that time?

A. Well, I saw him at your request, primarily to determine if there were any issues of mental illness or mental retardation that might be a factor in his defense that would figure in some way in these crimes that he was accused of, and would figure in some way in the disposition, should he be found guilty.

Q. Prior to your -- or in connection with your examination of him on that date, did I provide you with some information from the Southeast Arkansas Mental Health Clinic regarding Mr. Webster and a hospitalization or a session that he had with them back in 1992, I think?

A. Yes, you did.

Q. Did you have the opportunity to refer to that information?

A. Yes.

Q. And contained within that information, was there an indication at that time, at the time that he had gone to the Southeast Arkansas Mental Health Clinic, that he had received an I.Q. test and an evaluation regarding whether or not he was mentally retarded?

A. Yes. He was -- let me see. I'm trying to find the right reference. He was tested in 1992, given a test called the

U.S. DISTRICT COURT

Direct - Moore/Finn          178

Wechsler Adult Intelligence Scale, which is a very widely used measure of individual intelligence, and came out with an I.Q. score of 48, which is well within the range of what would be considered mentally retarded, the cut-off for mental retardation, being either below 70 or 62, depending on exactly which definition you're using.

Q. In connection with that same visit, was there an indication from the records that they had observed symptomology, or they had seen symptoms which suggested to them that he needed to be treated with some kind psychotropic medication?

A. Yes, there were.

Q. What, basically, had they seen, or did they do?

A. Primarily that he was reporting intense anxiety and what I would describe as paranoia, that is, unreasonable suspiciousness of others, fears that people are out to get him, that he was going to be harmed in some way. I think he reported an experience of feeling like something was following him, some kind of entity, or that he would even try to catch him from behind, things of that kind.

Q. Was there an indication in those records, also, as to whether or not he was suffering from any type of depression regarding the brother's death or something like that?

A. Yes. His brother had been killed in some sort of an argument, I believe, either one or two years previously, and that he had mentioned that in the intake interview and had

U.S. DISTRICT COURT

Direct - Moore/Finn          186

reliability of these tests. Five points either way means, to give you the complicated definition, that 95 percent of the variation of those scores will lie within that interval. It's what's called the confidence limit in technical terms.

Q. When you're looking at an I.Q. score of 70 or less, I think you indicated, you're talking about a statistical portion of the population that's very small?

A. Yes, about one-and-a-half to one percent of the general adult population.

Q. So if the mean -- if the normal mean for adults is 100 and we're talking about the people that are scoring 70 or less, we're talking less than one-and-a-half percent of all the adult population?

A. That's correct. If you were, let's say, to pick 100 people at random and line them up against the wall from the smartest to the least smart, that the retarded people would be the bottom one or maybe two people in line. Everybody else, the other 98 people, would be more intelligent and would score higher on these tests than them.

Q. In regard to the tests that you administered to Mr. Webster, the intelligence test, I believe you said it was the same test that he had received at the Southeast Arkansas Mental Health Clinic; is that correct?

A. Yes.

Q. Is it a test that is standardly used and recognized in the

U.S. DISTRICT COURT

Direct - Moore/Finn          187

mental health community as being reliable?

A. Yes. It's one of the two or three most widely used individual intelligence tests for adults.

Q. What was the result of the tests that you administered to Mr. Webster?

A. In January 30 of 1995, he obtained a verbal score, which is kind of a sub-score, an I.Q. of 59, a performance I.Q. which is based on some other -- it's another sub-score of 60, and a full scale or an overall I.Q. of 59.

Q. What does that, as a professional experienced and trained in the area of mental health and mental retardation, what does that tell you?

A. Well, it tells me, first of all, that in numerical terms this is an individual who is actually less -- who is at the 0.3 percentile. That is, if you take these same hundred people that I was talking about earlier, and line them up against the wall, you would have to cut one of them in two and fit him in the middle somewhere. He is actually below the first percentile in terms of intelligence compared to the rest of the population.

I might also add that this score of 59 is below both the score of 62 and the score of 70 that are used to define retardation in terms of test scores. So he is clearly mentally retarded by both definitions.

Q. Is the score that you obtained at the time you administered

U.S. DISTRICT COURT

Direct - Moore/Finn          192

A. Yes, there was.

Q. Why was that?

A. He has been extensively tested in the last year-and-a-half on either five or six different occasions, I believe, by psychologists for both the defense and the prosecution. So he has had a lot of opportunities to practice these skills and, in fact, took this particular test about three months before I gave it to him again.

Q. In regards to the test that you administered to him last Sunday, were you also able to observe the manner in which he took the test and things like that?

A. Yes, I was.

Q. Did it, once again, appear to you that he was making a forthright effort in terms of taking the examination and so forth?

A. That was my impression, yes.

Q. What were the results of the examination that he took last Sunday?

A. Well, he did do somewhat better, as I said, as I kind of expected. His verbal I.Q., which was 59 the first time I saw him, was now 72. So that's an increase of about 13 points. His performance I.Q. was about the same. In fact, it had actually gone down a point from 60 to 59, and his full scale I.Q., instead of being 59, was now 65.

Q. Is that still within the range set out in the D.S.M. 4 for

U.S. DISTRICT COURT

Direct - Moore/Finn          193

a person being mentally retarded?

A. Yes, it is.

Q. Dr. Finn, you have had the opportunity to talk to Mr. Webster on at least three different occasions; is that correct?

A. Yes.

Q. Was there any anecdotal information -- was there anything in particular that you noticed during the conversations that you had with Mr. Webster that tended to lend credibility to the results of the tests that you were getting from the I.Q. test?

A. Well, I think there were. I have already mentioned the fact that the kind of history that he gives and that, to some extent, has been confirmed by other people, is the kind of history that one gets from retarded individuals, that is, marginal school achievement. Basically, they kind of stop really learning at about somewhere around the third grade level. Marginal employment history, not being able to really hold a job or not having the skills to get a job and show up on time and follow directions of any complexity, not living independently, continuing to rely on other people for guidance and everyday affairs, things of that kind.

Additionally, his behavior during the interview was, to some extent, typical of retarded individuals in that his speech is very concrete. If you ask him to make an inference, he tends to give you all the specific things that happened, 1, 2,

U.S. DISTRICT COURT

Direct - Moore/Finn          194

3, 4, but really can't pull those together very well into a conclusion or a general statement. You have to sit and listen to all the details and kind of draw the conclusions yourself. So there is a certain concreteness, to use that term, in his thinking that, again, is typical of mildly retarded individuals.

Q. Does he have a large fund of knowledge? Were there words that you used that he didn't understand, things like that?

A. His word knowledge is one of his stronger points. Although he is better at speaking than he is at understanding. There were times that I had to rephrase and simplify things that I said to him in order for him to understand them.

Q. A person that has an I.Q. in the range of what you tested Mr. Webster to have, would it be possible for an individual like that to communicate, speak, read, write, things like that?

A. Yes. In fact, for mildly retarded individuals, the kind of rough rule of thumb is that they can often master academic skills up to about maybe a second or possibly low third grade level. The term educable mentally retarded is sometimes used, and it refers to the fact that these individuals can absorb at least the rudiments of what is taught in school. They can learn to read and write at a very low level, but they can do it. They can learn to dial a telephone, to communicate with people, in a minimally adequate way and so on.

U.S. DISTRICT COURT

Direct - Moore/Finn          196

and you wind up just not finding out very much. The other impression that I got was, again, this kind of concrete, very limited ability to respond to these tests, or to that particular test.

Q. Did you also re-administer that test last Sunday, or did you just re-administer the I.Q. test?

A. No. I did not administer the ink blot test. Just the I.Q. test.

Q. Dr. Finn, as a result of the testing, the examinations that you have done of Mr. Webster, the interviews you've done, your training, experience, your expertise in dealing with mental retardation assessments, do you have an opinion as to whether or not he is mentally retarded?

A. Yes, I do.

Q. What is that opinion?

A. I think he is. I think he is mildly retarded, or in the so-called educable mentally retarded range of abilities.

MR. MOORE: Thank you very much, Mr. Finn.

Your Honor, I think I'll pass the witness.

THE COURT: Let's take a break now, and we'll have cross examination when we return.

Let's attempt to keep this to ten minutes.

(Trial recess, 2:45 - 3:00 p.m.)

THE COURT: Are you ready for cross?

MR. MACALUSO: Yes, Your Honor.

U.S. DISTRICT COURT

# Wells Decl. Ex. C

Vol. 24: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA     .   CRIMINAL ACTION NO.
                                    .      4:94-CR-121-Y

V.                                      .
                                     .   Fort Worth, Texas

BRUCE CARNEIL WEBSTER     .   June 13, 1996
. . . . . . . . . . . . . . .

VOLUME 24
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:         MR. RICHARD B. ROPER
                               MR. PAUL D. MACALUSO
                               MR. CHRISTOPHER CURTIS
                               Assistant United States Attorney
                               801 Cherry Street, Suite 1700
                               Fort Worth, Texas   76102-6897
                               (817) 978-3291

For the Defendant:          MR. LARRY M. MOORE
                               Attorney at Law
                               1112-A East First Street
                               Fort Worth, Texas   76102
                               (817) 338-4800

                               MR. ALLAN K. BUTCHER
                               Hill, Beatty, Butcher
                                 & Gallagher
                               201 Main Street, Suite 1300
                               Fort Worth, Texas   76102
                               (817) 336-3600

Court Reporter:            Ana P. Warren
                               U.S. District Court Reporter
                               501 W. 10th Street, Room 204B
                               Fort Worth, Texas   76102-3637
                               (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.



U.S. DISTRICT COURT

**EXHIBIT C**

those.

Q. When you say there were several indications or neurological soft signs, what are you talking about? What does that mean?

A. People with neurological damage, brain damage, often times, when they are asked to draw something or asked to copy something, are not able to make an exact copy, an exact replica. Most people can't, in fact. But the kinds of signs that we see with people who have brain damage are called soft signs, and these soft signs are such things as turning dots into circles, turning squares into more rounded figures, et cetera.

Q. I believe you indicated that his abilities in regard to the Bender-Gestalt were only slightly below average; is that correct?

A. Yes.

Q. Is a person that has mental retardation necessarily going to score very badly in regard to the Bender-Gestalt?

A. Not necessarily. The Bender-Gestalt is only a soft sign organizational skill type of instrument.

Q. So, essentially, as a result of that test, there was some indication to you that there may be some kind of neurological damage in regard to Bruce Webster?

A. Yes. That is correct.

Q. After that, what, if anything, did you do?

A. That's when I started in on the intelligence test. The

Direct - Moore/Keyes                    Vol. 24: 20

first test I gave him was the Stanford Binet, Fourth Edition.

In the Stanford Binet he performed in the lowest .2 percent of

the population.

Q.  I'm sorry.  The lowest what?

A.  Point two percent of the population, a composite score of

51.

Q.  Earlier, when we were discussing the definition of I.Q.,

the definition of mental retardation and so forth, there was

some discussion of scores of 75 and below and so forth.  Is the

composite score of 51 that you achieved on the Stanford

Binet, are we talking the same numbers as they use in the

statistical definitions of mental retardation?

A.  Essentially, yes, we are.  There is a small difference

between the Stanford Binet and the W.A.I.S., Wechsler Adult

Intelligence Scale Revised, and the reason for that is because

of the distance between the standard deviation.  The standard

deviation on the W.A.I.S. is 15.  It's 16 on the Binet.

Q.  Was there a particular reason why you chose to administer

the Stanford Binet to Mr. Webster as opposed to the W.A.I.S.?

A.  Yes.  I chose to use the Stanford Binet because -- first of

all, Bruce, his age is within the limits of the Stanford Binet,

up to 23, 11.  And, also, I chose the Stanford Binet because he

had been given the W.A.I.S. on several other occasions, and I

felt that there was a very distinct possibility of a practice

effect.

U.S. DISTRICT COURT

Direct - Moore/Keyes                    Vol. 24: 26

fall in regard to the population as a whole as to his intellectual functioning as exhibited on the I.Q. test that you administered to him?

A.  Okay.  The first thing you need to know is that the second standard deviation is here.  The third standard deviation would be over about here, okay, because, theoretically, this just goes on infinitum, but it would be about here, and that would be an I.Q. of around 55.  Now, the problem with this is the composite score that Bruce received was a 51.  So it would be probably somewhere over here.

Q.  And when you say statistically he is in a .2 percentile ranking, can you explain that to me in a way that I can visualize?  If you line up a thousand people from the smartest on one end and the person that is the most limited in regard to his intellectual functioning on the other end, where is Bruce Webster going to stand in that line?

A.  He will be about the second person on the end, not the smart end.

Q.  Thank you very much, Dr. Keyes.

A.  You're very welcome.

Q.  You can take your seat.

As a result -- well, let me ask you one other question. The 51 I.Q. score that you got on the Stanford Binet, was that consistent with the scores that you saw that had been obtained by Dr. Finn in his W.A.I.S.-R. examination that had been done

Direct - Moore/Keyes                    Vol. 24: 27

and the scores that were found in the Southeast Arkansas Mental Health Records?

A.   Very consistent, yes.

Q.   Well, did you do anything else in regard to Mr. Webster in an effort to make an assessment of whether or not he was, in fact, retarded?

A.   I have to admit the first time I tested Bruce Webster, I felt very concerned, because this is not a person who comes off with an I.Q. of that area.  I didn't expect him to be functioning that low.  So I looked very carefully at the scores, and the individual scores in the verbal reasoning, for example, were higher, 61, which still puts him within the range of mental retardation, but that's where his strength area is, verbally.  He does talk a good game.  He talks the talk and walks the walk.  He is very capable of appearing to be a, quote, normal individual.

Q.   Is that the thing that surprised you?  You say that you were somewhat surprised by the score.  Based just simply on his ability to converse with you and the way that he presents and so forth, I take it it was somewhat lower than you expected?

A.   Yes, it was, very much so.  Then I looked at his quantitative reasoning.  It was also high.  Quantitative reasoning is not necessarily a good indicator, but it was also 66, which still puts him below retardation.  But if you look at his memory skills, his memory skills are very, very low.  And,

U.S. DISTRICT COURT

also, his abstract visual reasoning skills were low at 54.

Q.  You have done a number of assessments for determining whether or not a person is mentally retarded.  Have you ever done assessments of individuals to determine mental retardation in a forensic setting, in a situation where the individual is charged with a crime and things like that?

A.  Yes, I have.

Q.  Obviously, doing an assessment of an individual in that setting where he's charged with a crime is somewhat different than doing an assessment of an individual for purposes of providing services and support; is that correct?

A.  Yes.

Q.  I would take it that an individual that's charged with a crime, there could conceivably be some type of motivation for him to not do as well as he might otherwise do; is that correct?

A.  Yes.  You would expect that.

Q.  So that's not something that you were -- when you say that you were somewhat surprised regarding the I.Q. test score that you obtained of Bruce, I take it, then, you might have been somewhat suspicious as well?

A.  Yes, I was, very.

Q.  What, if anything, did you do next in regard to the evaluation?

A.  I gave him an achievement test, a standard achievement.  I

Direct - Moore/Keyes                    Vol. 24: 29

gave him the Woodcock-Johnson Psycho-Educational Battery, Part 2.

Q. What's the purpose -- or what was your purpose in giving him an achievement test?

A. I wanted to check out his level of literacy. Given the fact that his intellectual skills were lower, I wanted to see where his achievement skills were.

Q. What type of test -- you say it's a psycho-educational battery. What exactly is it? How do you do it?

A. It's an achievement test. It's a reading test, a writing test, a math test, and a general knowledge skills test. That's the second part. The first part is a cognitive test, very much like an I.Q. test, only it's not considered an I.Q. test.

Q. And as a result of the Woodcock-Johnson, what, if anything, did you learn?

A. That Bruce has certain skills that were not expected, that there were various writing skills that he had. There were various reading skills. But this also was something that surprised me. My first feeling was if Bruce was not giving his best effort on the I.Q. test, then he would not give his best effort on the achievement test. Oddly enough, he gave me his best effort on the achievement test, and the numbers that I got surprised me. Then I looked at the combination and said I need to do another intelligence test. That's why I came back.

Q. When did you make the determination that you wanted to do

U.S. DISTRICT COURT

another intelligence test?

A.   Actually, not -- certainly after finishing the scoring on these two tests.  I realized that there was something here that I needed to look at very carefully.

Q.   In essence, in regard to the Woodcock-Johnson Achievement Test, the scores that he had in regards to his ability to read and write and his verbal abilities appeared to be somewhat higher than you would except for a person with an I.Q. of 51?

A.   Yes.

Q.   You indicated you wanted to come back.  When is it that you came back and you interviewed him again?

A.   I came back, I believe it was in the beginning of March or middle of March, and gave him the Kaufman Adolescent and Adult Intelligence Test.

Q.   The Kaufman test that you gave, why at this point were you giving the Kaufman as opposed to the W.A.I.S. or the Stanford Binet?

A.   I had already given him the Binet.  So I didn't want a practice effect, and he had the W.A.I.S. so many times I knew there was a practice effect, probably.  Therefore, I gave him the Kaufman.

Q.   As a result of the Kaufman I.Q. test that you gave him, what, if anything, did you learn?

A.   The I.Q. that I achieved in the Kaufman was almost exactly what the I.Q. I achieved -- and, actually, almost exactly the

combination of numbers that I got on the Stanford Binet.  In other words, there was virtually no difference between them.

Q.  In essence, when you say the combination of numbers, are you talking about the specific sub-areas that the intelligence test looks at?

A.  Yes.

Q.  The verbal reasoning?

A.  Verbal reasoning, abstract visual reasoning, quantitative reasoning, and short-term memory, as well as looking at the crystallized and the fluid I.Q., which relate to those two areas -- to those four areas and, also, the corresponding composite, which is still placing him below the first percentile.

Q.  So not only was the overall -- the end result I.Q. was strikingly similar, but they were the same across the board in all of the sub-categories?

A.  Yes.

Q.  What does that tell you?

A.  That any question of his malingering was thrown out the window.

Q.  What does malingering mean?

A.  That he may not have been putting forth his best effort in order to receive some kind of benefit, in this case, to be deemed to be mentally retarded.

Q.  Okay.  Faking, basically, is that what malingering means?

Direct - Moore/Keyes                    Vol. 24: 34

Q.   And in regard to a particular battery of tests, something where you give more than just the I.Q. test, like you indicated you gave the Bender-Gestalt and other things, that gives an indication of the level of effort that is being given across the board; is that correct?

A.   That is correct.

Q.   So as a result of your testing in the case and your review of the testing that had been done up to that point, was it your opinion, at that point, that Bruce Webster was malingering or attempting not to do as well as he could do in regard to the I.Q. test and the other tests that you were administering to him?

A.   No.  In my opinion, he was giving his best effort.

Q.   When you ended up with an I.Q. -- let me just ask you one other question.  You have drawn on the bell curve there, and you have indicated to the jury that a person with a 51 Stanford Binet score is going to be in the .2 percentile ranking of the population as a whole, he's going to be the second guy in a line of a thousand, so to speak.  Was the result that you got in the Kaufman essentially the same?

A.   Almost exactly, yes.

Q.   Once again, he would be in essentially the same percentile ranking as a result from that test as he would otherwise?

A.   Yes.  It would be .2, possibly .3.  The difference between them is that, again, we're looking that the Stanford Binet has

a 16 standard deviation, and the Kaufman has a 15 standard deviation.  So that the numbers -- let's put it this way.  We're looking at the -- if we were to extend this down here, 51 would be about here on the W.A.I.S.  Fifty-five would be about hire on the Binet -- or excuse me, on the Kaufman.  Fifty-one on the Stanford Binet -- and what did you say was the score that Dr. Finn got?

Q.   I don't recall, but I think it was 58.

A.   Fifty-eight, 59?

Q.   Fifty-eight or 59.

A.   On the W.A.I.S. would be about here.  So you're looking at all those being just around there.

Q.   And I believe the Southeast Arkansas Mental Health records was a full scale 48.  Where would it be?

A.   Which would be right about there.

Q.   So they are all clustered there together?

A.   Yes.

Q.   Were they in approximately -- well, less than one percentile deviation of each other?

A.   Yes.  That's correct.

Q.   Within about one-tenth of a percent?

A.   No.  It would be a little more than that, maybe 2.5 tenths of a percent, a quarter of a percent.

Q.   As a result of your findings in regard to Bruce's intellectual functioning and the deficits of his intellectual

Direct - Moore/Keyes                    Vol. 24: 37

A. Mild moderate would be that area, yes, but before I was going to put him in a, quote-unquote, labeling category, I would want to know everything I could know first before I diagnose.

Q. But strictly on the basis of the intelligence test alone, that appeared to be correct?

A. Yes.

Q. That appeared to be the range in which he was functioning?

A. Yes, high moderate, low mild.

Q. How do you do an adaptive functioning assessment?

A. An adaptive functioning assessment can be -- depending on which instrument you use -- can be done in various ways. It is never done with a direct examination of the individual. It is almost always done by other respondents talking to me, and I -- depending on the instrument, I use the Vineland, which is a social maturity scale and adaptive behavior scale, whereby I sit down with people who know the individual and get as much information as I can from them.

I like to find out about the person's background, their childhood, their infancy, their developmental history. I get as much history as I can on the individual. Then I also like to find out about the social skills of the individual, what kind of people they were as far as their work attitude, their work ethic, et cetera, et cetera. I get as much information as I can. And it's typically not, I'm asking you questions,

U.S. DISTRICT COURT

Direct - Moore/Keyes                    Vol. 24: 38

you're giving me answers.  It is a discussion that is held in interview format.

Q.  And I take it that the interviews that you conduct, there is some structure to them, because you use a specific scale? You said you used the Vineland scale?

A.  Yes.  There is a reasonably high level of structure.

Q.  Part of the definition of mental retardation in conjunction with the requirement that there be significantly sub-average intellectual functioning and deficits in the adaptive behavior, is there also a requirement that the onset of the disability be before the age of 18?

A.  Yes, there is.

Q.  Why is that?  Why is that requirement part of the criteria?

A.  Well, because for various reasons.  The American Association on Mental Retardation looks -- as does the A.P.A., the American Psychiatric Association -- looks at people who become, quote-unquote, retarded after age 18 as being demented rather than being retarded.  A person who is retarded, it occurs in their youthful years because it is something that is pervasive to their life at a younger level.

If a person is mentally normal up until they are 18 years old, the day after their 18th birthday, if they have a motorcycle accident and they end up mentally disabled, then the proper terminology would not be mental retardation.  It would be dementia.

U.S. DISTRICT COURT

Direct - Moore/Keyes                    Vol. 24: 39

Q.   When you look for the respondents or the historians, I guess is another term -- to do the Vineland, is it important, in your opinion, to look to people that have had ongoing contact with him for a significant period of time?

A.   Absolutely.

Q.   When you make the assessment of adaptive functioning, I believe you indicated earlier, you're looking to see how they adapt and act in the real world; is that correct?

A.   Yes.

Q.   At the time that you were doing the assessments of Bruce, he was incarcerated; is that correct?

A.   That's correct.

Q.   He was incarcerated, I believe, out at the Mansfield holding facility?

A.   Correct.

Q.   Why couldn't you just talk to the jail guards, the jail administrators and so forth, and use them as the historians in regard to the Vineland scores that you attempted to obtain?

A.   Because they would not have had the background information necessary for diagnosis.  I could not have interviewed them for anything more than the last year of his life, which, of course, is past the time he's 18.  Therefore, it would not have made any difference.

Q.   Let me ask you another question.  I assume, then, that when you're talking about adaptive functioning, his ability to

U.S. DISTRICT COURT

Direct - Moore/Keyes                    Vol. 24: 40

function in the real world, you're looking at not only how did

he do today, but how did he do yesterday or the day before and

back to essentially the time prior to 18 when the disability

first began to manifest itself?

A.   Absolutely.  In fact, considerably further back than that.

Q.   Is the functioning of an individual in an institutional

setting different than the way they would function in a real

world?

A.   Certainly.

Q.   When you're doing the Vineland adaptive behavior scales,

are you trying to determine the ability of an individual to

function in an institutional setting, or are you looking at his

ability to function in the real world setting?

A.   In the real world.  That's the only one that counts.

Q.   What did you do?  How did you go about doing the actual

assessments, the interviews, so forth?

A.   During the first week of, I believe, it was April -- or was

it the first week of March?  I'm off.  I can't remember -- no,

it must have been March.  The first week of March, I flew to

Pine Bluff, Arkansas.

Q.   Why did you go to Pine Bluff, Arkansas?

A.   I went to Pine Bluff, Arkansas, the first week of March of

1996.

Q.   Why did you go there?

A.   To interview people who knew Bruce intimately well, family

U.S. DISTRICT COURT

members, friends, close family friends, et cetera.

Q.   Was it your understanding that that's where he grew up and was raised and went to school and so forth?

A.   That is correct.

Q.   Were there particular individuals -- let me back up once again.  Prior to doing your assessment of Bruce, prior to ever going out there and interviewing him the first time, did you have the opportunity to review certain materials in connection with this case?

A.   Some, yes.

Q.   So it was your understanding, was it not, Dr. Keyes, that that was where he grew up, where he went to school, things like that?

A.   Yes.

Q.   Were there particular individuals that you talked to and interviewed in Pine Bluff in order to arrive at some determination of his adaptive functioning, his adaptive behavior skills?

A.   Yes.  I talked with mostly his family, several family friends and teachers, as well as principals and administrators of schools.

Q.   Do you recall how many people you talked to in order to make that determination?

A.   Exactly how many?

Q.   Give me a ball park

Direct - Moore/Keyes                    Vol. 24: 42

A.  Seventeen or 20, between 17 and 20.  I think maybe 20.  It took me four days.

Q.  I'm sorry?

A.  It took me four days.

Q.  It ran the gamut from instructors in school, administrators in school, family friends --

A.  Counselors, girlfriends, ex-girlfriends, family friends, principals, teachers, et cetera.

Q.  Was it your purpose in doing these interviews for the purpose of attempting to determine how Bruce functions in the real world, his adaptive functioning?

A.  Yes.  That was the only purpose.

Q.  As a result of the interviewing that you did, were you able to compile a Vineland score, the Vineland scales, regarding his adaptive functioning?

A.  Yes, I was.

Q.  What, if anything, did the Vineland scales reflect that you determined from the results of your interviews?

A.  The way that you do an adaptive scale -- the way that I do an adaptive scale, I should say, is through what's called convergent validation.  You find the information that people give you that is the most consistent.  If the information is inconsistent, you drop those people.  They are not considered to be good indicators.

For example, several members of Bruce's family have an

Direct - Moore/Keyes                    Vol. 24: 43

inflated view of what he's capable of doing compared to what his teachers thought. Therefore, I dropped several members of the family and used the teacher's evaluations as better indicators. But the overall composite -- there were two composite scores that I used, and those areas considerably differed from his intellectual skills, which didn't surprise me terribly much.

Q. What does that mean? Explain that to me?

A. The people who knew him knew him when he was in a very unstructured environment. He was very free. He did not consider school to be a very good indicator of what he needed in the future, and as such, he was unstructured and misbehaved considerably while he was in school. Therefore, his school administrators found him to be probably functioning at a medium to lower level than he really does.

His family members, the ones who knew him best, I could tell were giving me honest responses. The ones who didn't know him quite as well gave inflated views, and the overall numbers that I came up with were significantly lower than his intellectual skills, which states that during his period of being in an unstructured lifestyle and living in an unstructured life, non-institutionalized, living in a home where there was abuse going on, and where he would come and go as he pleased, in those situations, adaptively, he functions somewhere in the range of a seven year old.

U.S. DISTRICT COURT

Direct - Moore/Keyes                           Vol. 24: 44

Q.   He functions in the range of what?

A.   Somewhere in the range of a seven year old, six to seven year old.

Q.   The information that you received in regard to the taking -- doing the Vineland scale, doing the history and so forth, was it consistent with an individual that essentially has never lived on his own, had never had a bank account, never had a charge card, never been able to function in the real world, essentially, on his own?

A.   Essentially, it was that of a six year old, six to seven year old.  Yes, that's exactly what it was.  He was never on his own.

Q.   You indicated something about abuse.  During the interviews that you were doing with the members of the family, as kind of a byproduct of the Vineland interviews, did you learn that there was, in fact, a history of abuse in that home?

A.   Yes, I did.

Q.   Is that something that you had had indications of prior to the time that you had been doing those interviews?

A.   There was some indication in the record, but the record, I don't think, really portrayed it very accurately.  It certainly didn't portray the heinous level.

Q.   Did Bruce -- is this something that you had learned from Bruce, or is it something that you had learned from other sources?

Direct - Moore/Keyes                    Vol. 24: 47

Q. When did you administer the incomplete sentences test?

A. In December.

Q. Was that one of the tests that had originally given you some indication that he seemed to read and write at a higher level than his I.Q. would otherwise indicate?

A. Right.

Q. As a result of all of the testing and interviews that you conducted -- well, as a result of your findings in regard to the intelligence testing that you did, and the other testing that you did of Bruce Webster regarding his intellectual functioning, as well as the interviewing that you did on the adaptive behavior, whether or not there were any deficits in his ability -- his adaptive behavior skills, were you able to arrive at a conclusion or diagnosis as to whether, in fact, Bruce Webster is mentally retarded?

A. Bruce Webster is mentally retarded, yes.

Q. When you say Bruce Webster is mentally retarded, we have talked a little bit about what mentally retarded means in general terms and so forth. Essentially, as regards to Bruce Webster, what does that mean that he, as an individual, is mentally retarded? How is he different from a normal person?

A. It means that he functions at a significantly lower level in almost all areas than the vast majority of the rest of the population. He is unable to see the consequences of his actions appropriately. He is unable to plan situations

Direct - Moore/Keyes                    Vol. 24: 48

appropriately.  He is unable to think in abstract methods, abstract ways.  He is unable to communicate appropriately under several circumstances.  He has a very poor short-term memory and an only reasonably okay long-term memory.

He has great difficulty concentrating on a task.  He is extremely distractible.  He has poor coping skills and is unable to learn from his mistakes in many situations.

Q.  You indicated that Bruce has -- his reading and writing abilities are higher, generally, than his other functioning abilities.  And I believe you indicated that when you administered the incomplete sentences test, that it took him some time to complete it.  I take it Bruce can read and write?  He can write a letter, or he can write -- he can read and write; is that correct?

A.  Bruce can write a letter, yes.  Bruce can write and has some skills in that area that would be considered to be unusual for a person with his level of retardation.  Bruce can also identify words orally, but you need to understand that to really read, you have to comprehend at a higher level.  His comprehension is a little lower.  It's in the third grade area.

Q.  When you say that Bruce can read and write, can he read and write with the same abilities that a normal person could?

A.  No.

Q.  If you were to sit down -- you or I were to sit down and write a letter that would take us five minutes, ten minutes, to

U.S. DISTRICT COURT

write, would Bruce Webster be able to write the same letter in the same period of time?

A. No, nor would his level of letter be as high as yours or mine.

Q. Did you -- at the time that you were originally contacted to do the assessment, when I originally contacted you, were you ever asked to do any kind of assessment regarding whether or not he was competent to stand trial, or whether or not he was sane at the time of the commission of the offense?

A. Not really, no. I was never asked that.

Q. Was it your understanding, at that point, there really wasn't much question about that on those issues?

A. The very first thing that I asked Mr. Butcher in our conversation was, are you looking for a competence evaluation, and he said no.

Q. So from your perspective, the issue which you were evaluating for and looking at was strictly related to whether or not he was mentally retarded?

A. That is correct.

Q. That is the area of your expertise; is that right?

A. That is correct.

Q. One other thing. There are certain other tests, psychological batteries and tests, that are used to determine illnesses or the presence of other types of mental problems; is that correct?

A.  Yes.

Q.  What are some of the things that you would expect a person of Bruce Webster's intelligence level not to be able to do on a day-to-day basis?

A.  Not to be able to do?

Q.  Yes.

A.  I would expect that he was not capable of carrying on a high level conversation to the point where an individual would think that he was talking with a normal person for very long. For awhile he can make you believe that he's just as normal as apple pie, and it's after awhile you can realize that he's really not able to carry on that level of conversation for a long period of time, particularly when you get into some abstract thoughts.

I would expect that he would not be able to sit down and read a text and understand everything that he reads. I would expect him to understand things around the third grade level of comprehension, third or fourth grade level of comprehension.

I would expect that he would be unable to do a job for extended periods of time without goofing off because his ability to concentrate would sway. I would expect that he would not be able to control certain impulses, various impulses, not the least of which among them is sexual.

Q.  I take it he could go to the movies and enjoy the movies?

A.  Yes.

Q.  Prior to giving the evaluation that you gave to Mr. Webster, I take it that you had performed similar evaluations on a number of prior occasions; is that correct?

A.  Yes.

Q.  Do you recall when it was that you did the neuropsychological evaluation on Mr. Webster?

A.  When it was?

Q.  Yes.

A.  It was on March 19, 1996.

Q.  Where was the battery of tests given?

A.  It was at the detention center in Mansfield.

Q.  Tell us briefly what comprises -- before we go into detail with each test, is there one test, two tests, or are there more than one test that compile or -- that are included within the battery of tests that you give?

A.  There are a variety of tests.  What you do is you group tests together by the function which they measure.  He had already had multiple intellectual evaluations, I.Q. tests, prior to the time that I saw him.  Since you can't readminister the same I.Q. test within theoretically a six-month period of time without getting a significant practice effect, it would have been improper for me to do I.Q. testing, which is a standard, kind of a starting place from a neuropsychological evaluation.  So I didn't do that.  I relied on testing that had already been done in like the last two months prior to my

Direct - Moore/Fulbright                    Vol. 24: 129

seeing Mr. Webster.

I evaluated his attention and concentration with a number of tests. I gave him a number of memory tests that looked at memory for verbal and visual information from various angles. I looked at his higher level reasoning problem solving, flexibility of thought. I looked at language functioning. I looked at his academic abilities and selected sensory and motor functioning, as well as some visual facial skills.

Q. You had -- prior to performing the battery of tests that you did, you had had access to the information from the I.Q. tests that had been performed by Dr. Raymond Finn and Dr. Denis Keyes; is that correct?

A. That's correct.

Q. You also had information from the records of the Southeast Arkansas Mental Health Clinic regarding an I.Q. test that was done back then in 1992?

A. That's correct.

Q. Let's just start with the beginning, so to speak. Tell me what would be the first test in the battery of tests that you administer?

A. Probably, we should go by the groups of functions that I evaluated. The first group would be attention information processing speed. I gave a test called the Stroop (phonetic) Neuropsychological Screening Test, which is a measure that looks at a person's distractibility. Basically, they have

U.S. DISTRICT COURT

Direct - Moore/Fulbright            Vol. 24: 130

names of colors like blue, red, green, yellow that are printed in conflicting colors of ink.  The person is told to say the color of the ink, not say the word, which really stands out at them.

Q.  So like you have the color red would be written in blue ink?

A.  And your goal was to say blue, and you have got a whole list of about -- of 120 words that you're trying to get through in a two-minute period.  It's a difficult test, and it really looks at a person's distractibility, their ability to filter out a competing distracter.

Q.  Were there other tests that you gave in connection with looking at this same area?

A.  Yes.  I gave him another test of auditory attention, where you have to listen to one thing at a time and make a decision. You have to listen to two sets of rhythms at a time, one after another, and determine if they are the same or different.  That requires concentration to a fairly rapidly paced stimulus for short periods of time.

Q.  You say he has to listen to a series of rhythms.  How do you listen to that?

A.  Well, it's on a tape recorder, and it plays out a pair of rhythmic patterns, one after the other, and you have to say if they are the same or different.  Then it goes on to another pair and then another pair.  There are 30 pairs you have to

Direct - Moore/Fulbright          Vol. 24: 131

judge, and it's been measured as a test of attention.

Q.   Were there other tests that you gave in this particular area?

A.   I would have given him the Pace (phonetic) Auditory Serial Addition Test, which is a measure of a person's information processing speed and their thinking speed, basically, and their ability to divide their attention between two things at once. He was not able to learn the basics of that test.  He couldn't perform -- when I was showing him what I wanted him to do, he couldn't demonstrate a capacity to do that, which is to add single digit numbers -- a single digit number to the previous number that was satisfied said in serial order, not in cumulative order.  It's a tough test.  A lot of people have difficulty with it, but he couldn't even master the basics with repeated instruction.  So I didn't give him that.

Q.   As a result of the testing that you did in this particular area, what did the results of those tests indicate to you?

A.   First of all, those results indicated significant impairment in his attention capacity.  His ability to pay attention to what he hears for a short periods of time does not appear to be too bad.  His ability to pay attention to more than one thing at a time and, at the same time on the flip side of the coin, filter out a distraction appears to be quite poor, and that would certainly not be unexpected in light of his intellectual functioning as measured on the previous tests.

Direct - Moore/Fulbright          Vol. 24: 132

Q. Was your finding in regard to that area of cognitive ability, was that consistent with the I.Q. scores that you had seen prior to beginning the testing?

A. Yes.

Q. The deficit in functioning that you found in that particular cognitive area, was that something that you would expect to see in a person that was mentally retarded?

A. Yes.

Q. Were there other areas in which you tested his cognitive abilities?

A. Yes. I looked at his memory functioning from a variety of angles. We looked at verbal and visual memory.

Q. How do you do that?

A. I gave him two tests of verbal memory, and I would have given him two tests of visual memory, but he did so poorly on the easier test of visual memory, memory for like geometric designs, he did so poorly on that that there wasn't any point in giving him the more complex measure.

On the verbal test, I gave him one test called the California Verbal Learning Test, which is a very well known standardized memory test where a person has to learn 16 shopping items with five practice trials. Basically, read them the list. They say it back. You read them the entire list again, they say it back, and you do that five times.

His performance on that indicated moderate impairment in

his memory storage capacity.  He actually did reasonably well on this test given his intellectual limitations.  He succeeded in learning 12 out of 16 words off the list, which may sound good, but for someone his age, that is moderately impaired.  Most people his age are going to be able to learn all 16 words fairly quickly.

Q.   In regards to the visual memory tests that you gave him, what were the results of that?

A.   He performed quite poorly.  Basically, we showed him four geometric designs.  I showed him the picture, took it away, and said, now draw it from memory.  His reproductions of the designs were pretty poor, and after a time delay, he was not able to remember much of the designs at all.  When I cued him and gave him some hints on the delayed recall saying, remember it looked kind of like this, or it had this or that feature, he was not able to recall that.  So he had a pretty significant drop off in his memory for visual information.  His memory for verbal information was pretty consistently in the low average with some indication of some drop off from the time he initially learned information until, you know, 30 minutes later.

Q.   You said it was in the low average range with some indication of one -- I didn't hear that?

A.   For his verbal memory, for stories, more organized information, he was able to learn them, two stories, at a low

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 134

average range, but after a time delay, that dropped pretty significantly, by a little less than 50 percent, what he could recall later.  That was an unusual finding.  His visual memory was severely impaired.

Q.  Were there other tests that you administered to him in other areas?

A.  Yes.  I gave him tests that looked at higher level thinking abilities.  This is your ability to mentally switch back and forth between two sets of ideas.  Your ability to figure out what's going on in a situation, come up with a hypothesis, try it out.  If that doesn't work, back up and try a different hypothesis out until you figure out a way to solve the problem.

He was also given some hands-on problem-solving tasks.  Those were the types of tasks that I gave him.  He did extremely poor on all of these tests.  They basically look at your ability to think abstractly, plan, and carry out a plan of action.  His performance was severely impaired in all those areas.

Q.  When you say that his abilities were severely impaired, are you indicating that compared to a normal person or what you would expect from a normal person, his ability to plan and then carry out a plan and so forth was somewhat diminished?

A.  Yes.

Q.  Was it greatly diminished below what a normal person would have?

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 135

A.   Yes.  It was greatly diminished below normal.  On one test I -- on the simplest test where, basically, on a page he's got letters and numbers.  It goes 1-A, 2-B, 3-C, and so on up to about 13, and he has to just simply connect the numbers and letters in alternating order on the page.  He could not do this.  He knew his alphabet.  He knew his numbers, but he could not switch back and forth, and he became very confused, needed maximal coaching from one point to the next.

Okay.  You just went to a number.  Where do you go next?  He would want to go to the next number.  I said, no, you go to the next letter.  What's the letter?

I don't know.

What's the next letter after A?

B.

Okay.  Go to B, and so forth.  That had to happen.  It took him, on a test that normally takes somebody his age under 50 seconds to perform, it took him 266 seconds, which is a long, long time with maximum coaching from me.  If I hadn't coached to see how much coaching it took, is basically what I was doing, he would not have been able to complete it.

Q.   Were there other areas or other tests that you administered or that you looked at?

A.   Yes.  I gave him another test, a more complex test, of reasoning abilities, abstract reasoning, logical analysis.  Basically, he has to figure out what's going on in the

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 136

situation, figure out what the stimuli in the situation are telling him, and figure out how to come up with the right idea to get the right answer through a series of stimuli.

For example, you have got a notebook with a bunch of pages in it, and you have got on one page three squares and a triangle, and you're supposed to answer one, two, three, or four. You go to the next page and the triangle moves to a different position. People start off going three. No, it's one. It's three squares and one triangle. No, that's not it. Okay. There's one triangle. No, that's not it. Then they go, oh, it's the position of the one that keeps moving around.

Absolutely, he could not get it. One of the better indicators on this test that he had significant intellectual limitations to begin with is that this test starts off with a warm-up test where you have got cards that have Roman Numerals I, II, III, or IV on them, and all you have to do is point to the Arabic numeral 1, 2, 3 or 4 as you're flipping through these cards. He didn't know what a Roman Numeral III or a Roman Numeral IV was, and this is something you find in people with significant intellectual limitations. When you see people who are severely socio-culturally deprived or people who are mentally retarded, it is a common finding, and you don't see it anywhere else.

So when we got to tests that were more complicated, it got beyond just counting but having to come up with a concept, he

U.S. DISTRICT COURT

Direct - Moore/Fulbright                 Vol. 24: 137

couldn't do it.  And he was basically missing nearly every item, even though I was coaching him, giving him hints, saying, look, try this.  Not giving him answers but say, look at this. What's in the picture?  Now, let's go to the next picture.  How did it change?  That didn't jog any kind of recognition of the concept.

What it suggested is that he's extremely concrete.  He's not able to think in an abstract manner, not able to consider different alternatives from one point to the next and, basically, has just severe impairment in his ability to think through, reason and plan, and kind of critically judge situations.

Q.  Were there other areas that you looked at in addition to the areas that you have testified?

A.  Yes.  I gave him another measure of what's called psychomotor problem solving abilities.  It's hands-on problem solving.  Basically, you're looking at a person's ability to figure out kind of a concrete solution to a fairly concrete problem.

The person has got ten blocks laid out in front of him. They are blindfolded.  There is a board in front of him that has the spaces for each block cut out of it, and the person is told, with your right hand, I want you to put as many of the blocks on the board as you can.  Go as fast as you can.  And you watch how the person goes about figuring out, okay, first,

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 138

they start off just kind of rubbing the block.  Then they go, okay, wait a second.  This isn't working.  Let me come up with a different strategy.  So, usually, they will feel around the board a little bit and go, oh, okay.  Wait a second.  Maybe if I take the block, hold it while I look around, and when I find the right one, I can stick it in.

He, basically, took the block and scrubbed around and just went back and forth, no systematic strategy whatsoever.  He didn't get any of them in at five minutes.  I discontinued with the right hand and went to the left hand.  He got six blocks in in nine minutes.  You expect some improvement over time after a person has already had some prior exposure to the test.  You figure they will get a little better the next time, and, in fact, he did.  Then when he was allowed to do it with both hands together, he got all ten of them in in about seven minutes, a little over seven minutes.

Q.  What is the significance of that?

A.  What that's saying is that when faced with a problem where he has to kind of analyze and organize a lot of information and then come up with a plan of action, he is unusually unsystematic, unorganized.  He can't come up with a strategy, even when it's a concrete problem, not a conceptual problem. This is not too much different than having to reach up under your car and feel around and do something, or having to reach up under your sink and try to do plumbing where you can't see.

U.S. DISTRICT COURT

Direct - Moore/Fulbright          Vol. 24: 139

It's the same sort of thing, and you have to kind of mentally image it and plan out what your plan of action is going to be.

Q.  Were there other areas that you administered tests in?

A.  Yes.  I looked at his language functioning.  He had already had academic testing.  So I take that back.  I didn't do academic testing, which I usually do, but I did look at his language functioning.

Basically, I'm looking just at his core communication skills.  Can he name objects to visual confrontation?  Is he able to speak fluently, generate words fluently, and is he able to understand adequately and process spoken communication.

He was clearly -- he scored in the second percentile on a measure of his visual naming.  Show him pictures and say, what do you call this?  What's this called?  Like a picture of an elephant, you point to different parts of an elephant, different shapes.  You have a piano and point to different parts of the piano like the keys and the pedals, things like that.

He used extremely concrete terms for things.  Sometimes he used the wrong terms for things, and, again, that would be something that would be highly expectable in the light of a person functioning in the first percentile of mental ability. He's functioning in the second percentile of language functioning, at least expressive language functioning.

His verbal fluency, on the other hand, was surprisingly

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 140

average.  This is consistent with his presentation when I met with him where he was certainly a very talkative person, although his speech was pretty imprecise and he wandered all over the place, and you couldn't stop him in midstream and say, hold it.  Explain that again.  Once he got going, he just kept going.  So his verbal fluency was not bad.

What was interesting, though, is that on this test where he had to generate words that begin with a certain letter within a certain time frame, 30 seconds, he was told, don't use people's names.  Don't use proper nouns of any kind, and I gave him examples of proper nouns.  And don't use the same words or different forms of the same word over and over again.  I counted six instances where he broke the rules of the test and one instance where he repeated himself.  He is not able to effectively monitor the quality of what comes out of his mouth.  He'll go and go and go and go and not really have -- be able to monitor what he's saying at the same time he's saying it.  That's clinically what the implication is from that finding.

Q.  When you say that his verbal fluency was better than expected or surprising, are you saying that for a person with the intellectual functioning abilities that were indicated by his prior I.Q. scores, you would have expected him not to be that fluent or not to be that verbal?

A.  That's certainly possible.  I mean, I would have expected him to be at least low overage, but even people with mental

Direct - Moore/Fulbright                Vol. 24: 141

retardation have peaks in their ability structure, and,

obviously, verbal skills are one area where he has got better

strengths.  That was consistent throughout my interaction with

him.

Q.  Did you examine any other areas?

A.  Yes.  I looked at his auditory language processing

abilities, again, within language.  Basically, I'm reading

sentences to him of increasing length and complexity.  He has

to say them back word for word.  He broke down at a level of

fairly short sentences, such as, where are you going to work

next summer?  Then he began to break down at, he sold his house

and they moved to the farm.  He couldn't repeat that.  Every

sentence, except for one after that, he got wrong, meaning, he

can't listen to long complex communications and understand

fully what is being said without breaking it down and

simplifying it for him.  He scored in the borderline range,

which was the seventh percentile, which is way down on the low

end of the curve.

Q.  Were there any other areas?

A.  Yes.  I looked at his sensory and motor abilities, meaning

his motor strength, left and right side.  I looked at his motor

dominance, if he's left-handed or right-handed.  I looked at

his motor speed, and I looked at what's called motor programing

and motor inhibition.  He showed some pretty significant

impairment with his left hand, first of all, on the motor

Direct - Moore/Fulbright                Vol. 24: 142

testing.  He was consistently weaker, slower, and less coordinated with his left hand.

When I looked at his motor programming abilities, basically, I'm asking him to put his hands out on the table, one flat and one with the fist and ask him just to alternate back and forth like this (indicating).  When he was letting one out, he pulls the other one in.  He couldn't do it.  It was like this over and over again (indicating).  He could do one, he could do the other, but he couldn't do both in alternating syncopation.  Again, that's very indicative of frontal lobe impairment or frontal lobe dysfunction in the brain.

The fact that his left-handed motor functioning was consistently lower than his right-handed functioning indicated some possibility of the right hemisphere impairment in the brain, which was certainly mirrored in some of the testing that's been done, both my testing and other people's testing.

Q.  Were there any other areas?

A.  I did do one test that looked -- excuse me.  I did one test that looked at his visual facial skills, basically, his ability to copy drawings of increasing complexity, and on that, he scored at the seventh percentile.

Q.  I'm sorry, the seventh --

A.  The seventh percentile, meaning he's, again, much lower for his age than he should have been.  So we have consistently, throughout the testing -- with a few exceptions that are in the

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 143

verbal area, you have consistently a pattern of a person who is functioning well below normal on just about every test there is, that I gave him, that looks at his thinking ability in much more detail than just an I.Q. test would.

Q.    The results of all of the neuropsychological tests that you gave him, were they consistent with the I.Q. findings that you had seen that had been previously provided to you?

A.    Yes, they were.

Q.    The neuropsychological tests that you described, they are not all tests involving written words and things like that, as I understand it; is that correct?

A.    No.    They are very interactive tests that really don't require a whole lot of pencil and paper-type activities, typically.

Q.    Would it be something -- would it be easy for somebody to know how to fake results in a test like that?

A.    Not convincingly, because when you look at cognitive functions across a wide range of abilities, you are going to see some coherence in the person's ability structure.    In other words, if they can do this, they ought to be able to do this. Like certain types of memory tests, if you see big discrepancies between different tests, you're going to be suspecting, hey, what's going on here?

It is not at all unusual for us to give tests that are somewhat redundant.    In other words, they overlap to some

U.S. DISTRICT COURT

Direct - Moore/Fulbright          Vol. 24: 144

degree, and you get a picture of, if a person can't do something easy but then they are able to do something hard quite well that's in the same ability area, you have got to look at that and say, hey, what's going on here?  How come, if a basic function is out, they are able to perform this complex function?  That would be one area of inconsistency that you would look for, and there is certainly no indication of that on any of the tests that I administered to him, and certainly not from test to test that he's had in the past on I.Q. testing across four different I.Q. tests.

Q.  The results of the test that you administered to him, you indicated, would be consistent with a person that had the I.Q. levels of -- that had been indicated, would those results be consistent with someone who was not mentally retarded?

A.  If they had had a severe brain injury, yes.  These findings you could look at that, and I think either a severe head injury or someone who had an across-the-board type of problem in their brain functioning, such as an encephalitis, a toxic exposure, things like that, you would see a similar kind of pattern of a brain that's kind of had a wet blanket thrown over it from a functional standpoint.

Q.  So, essentially -- and tell me if I'm wrong -- are you saying that a person that functions in the level that shows the deficits in cognitive functioning that you've found is either going to be mentally retarded or is going to be suffering from

Direct - Moore/Fulbright                    Vol. 24: 145

some type of organic brain injury?

A. That would be my conclusion based on the tests.

Q. In your professional experience and opinion, would there be any way for an individual to fake and obtain the type of I.Q. scores that Mr. Webster had obtained and that were presented to you and, also, then fake the neurological psychological evaluations that you did, and arrive at the type of consistency that you see in this particular case?

A. I think it would be highly, highly unlikely. For him to have faked convincingly an I.Q. test in 1992, reproduced the same scores in 1995, and then produced similar I.Q. scores on other tests whose score levels will correlate tightly with the tests that he had had twice before, that's unheard of. I have tested very intelligent people who had an incentive to fake, and they blew it, and it's very obvious. They could not fake convincingly, because when you test them over a several hour period, meaning five or so hours, you are going to eventually trip them up unless they have gone and studied neuropsychology and have become quite adept at understanding what the relationship is between the type of impairment they are claiming and the type of performance they would do on testing, or produce on testing, without that kind of study, it's hard to do convincingly.

Q. Have there been occasions in forensic settings where you have examined individuals where you have, in fact, found that

U.S. DISTRICT COURT

Direct - Moore/Fulbright          Vol. 24: 146

they were attempting to manipulate the data, attempting to fake

the results?

A.  Yes.

Q.  Is there any indication in your testing of Bruce Webster

that any of that was going on?

A.  None whatsoever.  His entire presentation, both on testing,

in my interview with him, and just in casual conversation was

nothing but consistent with the picture of a person who is

mildly to moderately retarded.

Q.  Would it be possible to have the type of results that you

have observed in the testing of Bruce Webster from an

individual that was not either mentally retarded or brain

injured?

A.  I'm sorry.  You lost me on that question.  Try me again?

Q.  That was a terrible question.

Essentially, would a person that did not suffer from either

an organic brain injury or was not mentally retarded, would he

have scored the types of scores on these tests that Bruce

Webster did?

A.  Under normal circumstances, no, no way.  If a person was

trying to fake, I think that they would not have scored with

the consistency.  The type of impairment would not have been

consistent from one unrelated test to the next, from one

related test to the next.  They would not have been able to

come out with the same level of impairment in their

performance.  A cross test that he was able to do, how do you

know?  How do you know what's normal versus not?  Obviously, we

know that he's not been someone who can go out and study this

stuff.

Q.  And when you reviewed the test instruments that were -- of

the tests that were given by Dr. Finn and Dr. Keyes in

reviewing the I.Q. scores, did you have the opportunity to look

at the sub-test scores on the tests that had been done?

A.  Yes, I did.

Q.  And did it appear to you that there was consistency in

sub-test scores across the board, basically?

A.  Yes, there was.  We found that there was a consistently

depressed or low, meaning very impaired, ability level in every

area that was measured.  That would be entirely consistent with

a person with a very limited intellectual endowment, meaning

their God-given intellectual abilities are limited from the

get-go.

Q.  In terms of the population as a whole, someone that

presents with the type results that Bruce presents, the results

that you obtained from him, where does he fit in terms of the

population as a whole, in terms of his cognitive function, his

brain ability?

A.  He's somewhat variable depending on which area you look

at.  From an intellectual standpoint, he fits in the first or

lower than first percentile.  I'm assuming that that's been

Direct - Moore/Fulbright          Vol. 24: 148

explained what a percentile is.  He's at the very bottom of the curve, which would include anybody from around the high 60's I.Q. all the way out to as low as they get, because the number of people who are 70 I.Q. or below really is only a minimal number of percentile points.  He's in the middle of the low end, that low end of the tail of the curve.

In terms of his attention and concentration, simple attention was not too bad.  Complex attention severely impaired.  In terms of his memory, his memory for what he hears was low average.  His memory for what he sees was quite impaired.  His reasoning abilities are undoubtedly in the -- lower than the first percentile.  He cannot reason, think, and plan, based on my test findings, and his abilities are severely impaired in that area.

From a language standpoint, his expressive abilities are imprecise at best.  He is not able to monitor the output of what he says, although he can generate a lot of words.  His ability to understand what people say to him is quite limited, although he is able to process it if you simplify it and make it short enough and concrete enough.

From a sensory motor standpoint, he is relatively normal except his left-handed performance is off, which would be certainly consistent with findings of some right side of brain impairment and other parts of the testing.

Q.  If you were attempting to fake some type of result in

U.S. DISTRICT COURT

S.App.174

Direct - Butcher/Cunningham          Vol. 24: 185

participate in continuous education and that sort of thing in this arena, also.

Q.  Does the training and experience, expertise that you have, allow you to make evaluations and diagnoses involving people and abuse?

A.  Yes, it does.

Q.  And have you testified in federal and state courts about the psychological dimensions of abuse?

A.  Yes, I have.

Q.  Have you specifically testified in death penalty cases regarding the psychological dimensions of abuse?

A.  Yes, I have.

Q.  Do you know Bruce Webster, the man seated at the defense table?

A.  Yes, I do.

Q.  How do you know him?

A.  I began an evaluation on Bruce Webster for the purposes of my appearing here today.

Q.  I contacted you, or you were contacted by the defense team and asked to participate in this?

A.  That's correct.

Q.  What did you do to prepare for this?

A.  I have an extensive set of activities that I went through in this evaluation, and let me detail those.

On May 7, I interviewed him for five hours and 55 minutes,

Direct - Butcher/Cunningham                Vol. 24: 186

almost six hours.

On May 27, I talked to his brother, Mark Webster, by telephone for 50 minutes.

On May 27, I talked to Mark Webster's wife, Jodine Webster, who had the opportunity to know Bruce over the past 10 or 12 years.  I talked to her for 35 minutes.

On May 27, I talked to Dorothy Webster, who is Bruce's older sister, for 42 minutes.

On May 27, I spoke to Lashana Goodlow (phonetic,) who is Bruce's niece, for 8 minutes.

On May 27, I spoke to April Johnson, who is also his niece, for five minutes.

On May 27, I spoke to Ruby Harris Binns, who is his aunt, for 43 minutes.

On May 28, I spoke by phone to Luketha Frazier, who is his niece, for 20 minutes.

On 5-28, I interviewed by telephone his sister, Dassy Frazier.  On 5-29, I spoke to Dassy Frazier again for 25 minutes.

On May 30, I interviewed his mother, Beatrice Webster, for 57 minutes.

On May 31, I returned and interviewed Bruce at the Fort Worth federal jail facility for two hours and five minutes. And on June 4, I interviewed Jodine Webster, his sister-in-law, again, for 25 minutes.

U.S. DISTRICT COURT

Direct - Butcher/Cunningham                Vol. 24: 187

Q.  In addition to that, did you visit in my office, and did I make available to you certain records?

A.  Yes, I did.

Q.  And how would you characterize those records?  Were they voluminous?

A.  Voluminous, yes, very extensive.

Q.  Do you recall about how many boxes of records were involved?

A.  I think approximately two file drawers or two file boxes full of records that I went through and reviewed.

Q.  And did these include various psychological reports done by various psychologists?

A.  Yes, they did.

Q.  Did these also include school records, medical records, prison records, also the medical records of other family members, such as Beatrice Webster?

A.  And also Future Webster.  That's correct.

Q.  And did you also have an opportunity to review all of the F.B.I. 302's, as they are known, memoranda, that were generated and there in my office?

A.  Yes, I did.

Q.  And based on all of that information, did you find that there was an abusive situation existing in the Webster family?

A.  Yes, I did.

Q.  What we're here for today, the thrust of your testimony

Direct - Butcher/Cunningham            Vol. 24: 188

here, is this abuse; is that correct?  That's why you're here?

That's what you concentrated on?  That's what you focused on?

A.   Yeah.   I concentrated on the abuse and his experiences

growing up, particularly, that might have some relationship to

his participation in this offense.

Q.   You also made a diagnosis of Bruce, didn't you?

A.   Yes, I did.

Q.   And did you find a psychological disorder there?

A.   Yes, I did.

Q.   And what psychological disorder was that?

A.   There are several psychological disorders that I think

Bruce suffers from or may suffer from.  The first diagnosis

that I made, I made as a rule-out diagnosis.  In other words,

it's a tentative diagnosis because I don't feel that I can be

as certain as I would like to be about it, and that was of a

psychotic disorder not otherwise specified.  Bruce described

hallucinations, auditory hallucinations of hearing voices, and

also visual hallucinations that he has had from time to time.

Those are also described in his medical record back in 1992,

before this offense, when he was evaluated at the Southeast

Arkansas Mental Health Center, and at that time a provisional

diagnosis of rule out psychotic disorder not otherwise

specified was also made.

     The reason that I made that one tentative is because I

can't be sure that that was what was happening at the time of

U.S. DISTRICT COURT

the offense, and that's what I was focusing on, in terms of diagnoses, was what was occurring at that time. He didn't spontaneously report any hallucinations at that time period, but there is, again, history of that occurring in his record before the offense, and he described it when I was interviewing him as something that happened to him periodically.

I made some other diagnoses as well. I diagnosed him as suffering from mental retardation of a mild variety. As you have perhaps heard testimony, mental retardation is staged as mild or moderate or severe profound, and this was of a mild sort, in terms of the I.Q. range that it falls within, by my best estimate.

I also diagnosed an antisocial personality disorder and, also, a personality disorder not otherwise specified, a combination, a mixture of personality disorders, involving features that I identified, both narcissistic and dependent.

Q. Do you find that there are psychological disorders that are associated with chronic violence?

A. Yes, there are.

Q. And are the ones that you found so associated?

A. That's a complicated -- yes, because I have made several diagnoses, it would relate in different ways to those, and, perhaps, I can take them in order in terms of the relationship they have.

Q. Okay. With regard to the antisocial personality. Is there

Direct - Roper/McLemore                    Vol. 24: 226

Q.   And what are your responsibilities, sir?

A.   Right now I'm in the criminal investigation division.   I have been in highway patrol and various other departments.

Q.   And how long have you worked for the Arkansas State Police?

A.   Twenty-five years.

        MR. ROPER:   May I approach the witness, Your Honor?

        THE COURT:   You may.

Q.   (By Mr. Roper)   As a part of your responsibility, sir, did you at one time administer a driver's license test?

A.   Yes, sir, I did.

Q.   I want to show you Government's Exhibit Number 95, which is a certified and exemplified record of the State of Arkansas file for a Bruce Carneil Webster.   Do you recognize that, sir?

A.   This top half?

Q.   Recognize the document?

A.   Yes, sir, I do.

Q.   In fact, there are some records with your signature on them; is that correct?

A.   Yes, sir, there is.

        MR. ROPER:   The government would move to admit Government's Exhibit Number 95.

        THE COURT:   95?   It's admitted unless there is objection?

        MR. MOORE:   No objection.

        THE COURT:   95 is admitted.

U.S. DISTRICT COURT

Direct - Roper/McLemore                    Vol. 24: 227

Q.   (By Mr. Roper)   Government's 95 is a copy of Bruce Carneil Webster's driver's license record; is that right?

A.   Okay.  This right here is an application for instruction permit with Arkansas State Police.  When you go in to take a driver's test, there is a card which is made of up two to three different -- it's carbon copied.  When someone comes in to take the test, you fill out this front card on him here on every new applicant, and if someone comes in for transfer from one state to another, that's going to take the test, you have to fill out a card on each one.

Q.   So from looking at that record, there was an application presented on June 15, 1992, by a Bruce C. Webster, date of birth 5-21-73, residing at 5219 Hepburn, 5 foot, 9 inch, brown-eyed African-American; is that right?

A.   That's correct.

Q.   And was there a driver's license test administered at that time?

A.   Yes, there was.

Q.   And did you administer it?

A.   Yes, sir, I did.

Q.   All right.  Now, can you very briefly tell the members of the jury how the administration of that test takes place?

A.   When an applicant comes in, we fill out this form.  After we fill out this form, the person who the -- the tester will issue that applicant one of three tests to take for his

U.S. DISTRICT COURT

Direct - Roper/McLemore                    Vol. 24: 228

driver's license.  He has to make -- on the written part, he has to make at least 80.  On the signs, he has to make at least 70 to pass.

Q.  Okay.  There are two parts of the test.  How many questions are on the first part?

A.  Okay.  On the written part itself, there are 25 questions.

Q.  And how many on the sign portion?

A.  There are ten.

Q.  And you mentioned there are three different tests?

A.  Yes, sir.

Q.  If someone wanted to cheat on that test, how many questions would they have to be prepared to answer or be given the answers to?

A.  Okay.  They would have to have answers for three different tests, which would be -- they would have to have at least 75 multiple choice answers, and at least 30 signs that they would have to know for that test.

Q.  Now, when do you decide which test that you're going to give?  In particular, when did you decide which particular test you were going to give this person, Bruce C. Webster, with this date of birth and address?

A.  When he's standing in front of me, I have the three tests. I decide at that time which test I give him.

Q.  Now, at that point, after the test is given to him, where do they go?

Direct - Roper/McLemore                    Vol. 24: 229

A.   We have a small room, and they go and sit out in front of us where we can watch them.

Q.   Based on your training and experience, and during the time you worked in that section, what would they do to ensure that the person that was taking the test, in this case, Bruce C. Webster, was not cheating?

A.   They sit in front of me -- we don't have that many people come in to take the test there at any one time.  It's a rather small room.  They sit in front of me, and I watch them to ensure that they aren't cheating.  I make them put the articles that they have on the floor.  If they have caps on, we make them take the caps off.  They are allowed to have a pencil and the test on the table.

Q.   After this Bruce C. Webster took the test, did there come a time when he turned the test back in?

A.   Yes, sir.

Q.   Did you grade the test?

A.   Yes, I did.

Q.   Tell the members of the jury what the result of that test was?

A.   The score on the written part was 96, and on the signs was 70.

Q.   Ninety-six, what does that mean?

A.   That means he missed one question out of 25.

Q.   And with regard to signs, how many did he miss?

Direct - Roper/McLemore                    Vol. 24: 230

A.   He missed three.

Q.   Did you help him along at all to be able to answer those questions?

A.   No, sir.

Q.   To your knowledge, did anybody else?

A.   No, sir.  We separate them in the room.  We don't let them sit beside each other.  There are tables, and we might put one on one end of the table and one on the other, but they are not sitting close enough that they can see the test.

Q.   Sir, do you ever have any persons fail that test?

A.   Yes, sir.

Q.   How often?

A.   I'm not for sure what the failure rate is.  We do have some fail it.

Q.   What are some of the examples of the questions that were given on the test, the particular test taken by Mr. Webster?

A.   One question is -- concerns a double yellow line in the center of the highway indicates what?  The answer of that would be, no passing.

     One question is, the proper signal must be given continuously before turning, slowing, or stopping of at least a distance of 100 feet, according to state law.

     A question, the speed limit within cities and towns, unless otherwise posted, is multiple choice 25, 30, 35 or 20.  The answer to that is 30.

U.S. DISTRICT COURT

Direct - Roper/McLemore                    Vol. 24: 231

A question, you are not permitted to overtake or pass another vehicle within how many feet of an intersection? There is a multiple choice answer there of 100, 200, 300, or 500 feet.  The answer is 100 feet.  These are basically the questions that they ask that are typical of that 25.

Q.  After that point, after Bruce C. Webster made a 96 and a 70, was there -- well, let me back up and ask you one question.

Do you do anything to ensure that the person that you're going to give the test to has proper identification?

A.  Okay.  We require that they have a birth certificate before they can take the test.  If they don't have a birth certificate, they are required to have two types of other identification, such as insurance policies, draft record cards, things like that.

Q.  Okay.   The person -- after you gave this test and after the identification was approved, did there come a time when a driver's license was issued to Bruce C. Webster?

A.  Okay.  Under Arkansas law, once you pass the written test, you're required to hold what is called an instruction permit. He was issued an instruction permit, and he had to hold that for a minimum of 30 days before he could come in and take the road test.

Q.  What happened at that point?

A.  It indicates here that on July 29, 1992, he was issued a --

Cross - Moore/McLemore                    Vol. 24: 232

he passed his road test and was eligible for a driver's license.

Q.  I guess probably all of us have taken that road test.  Just very briefly describe what it is?

A.  Okay.  Our office is on Princeton Pike in Pine Bluff.  The examiner will get into the car with the applicant.  We take a road test.  We ensure that they stop at stop signs.  They use turn signals when they are making turns, that they are able to maneuver the vehicle without driving in the wrong lane, sudden stops.  Basically, we assure ourselves that they are capable of handling that vehicle.

Q.  Some people flunk that test, don't they?

A.  Yes, sir.

Q.  Bruce Webster passed it?

A.  Yes, sir.  According to this instruction permit, he did.

MR. ROPER:  I pass the witness, Your Honor.

THE COURT:  Cross?

MR. MOORE:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. MOORE:

Q.  Mr. McLemore, is there a date on which the test was taken that's reflected from the record?

A.  You're talking about the written part?

Q.  The written part.

A.  Yes, sir, on June 15, 1992.

U.S. DISTRICT COURT

Direct - Curtis/Stewart                      Vol. 24: 238

have you had the opportunity on several occasions to have contact with either mentally retarded or mildly mentally retarded individuals?

A.   I have.

Q.   Now, did you have -- could you describe for the jury what sort of contact you had with Bruce Webster when you were a principal at Watson Chapel Junior High?

A.   My primary function in relation to Bruce was supervision, his grade placement, his scheduling of classes.

Q.   Did you have enough contact with him to form any opinion as to his intellectual ability?

A.   I did.

Q.   Do you have an opinion as to whether or not he was mentally retarded?

A.   In my opinion, I do not believe Bruce is mentally retarded.

Q.   Now, during your time of 25 years as a counselor and a principal, have you participated in making determinations whether someone was going to be assigned to special education classes, in fact, whether they were mentally retarded?

A.   In a number of instances, yes.

Q.   Was Bruce Webster ever, as far as you know, assigned to special education classes while you were a principal in the school which he attended?

A.   He was not.

Q.   Was there any reason to put him in special education

Direct - Curtis/Stewart                    Vol. 24: 239

classes?

A.   In my opinion, he was not -- or should not have been assigned to any special education classes.

Q.   As far as you know, in anybody's opinion at Watson Chapel Junior High, should he have been assigned to special education classes?

A.   I do not think he met the qualifications for special education placement.

Q.   Now, Mr. Stewart, before coming to court today, several months ago did a Dr. Keyes come to talk to you?

A.   Yes, sir, he did.

Q.   How long did he talk with you?

A.   Just a few minutes.

Q.   At the conclusion of your conversation, what did he say to you?

A.   The final statement before his farewell -- and he was quite cordial with that -- but after we had visited for a few minutes, he closed his book and said that I hadn't given any information which would have been beneficial or would have helped him.

Q.   And did he leave after that?

A.   We may have visited for a few moments thereafter, but, yes, sir, he did leave after that.

Q.   Are you aware whether Bruce Webster, while you were principal of the school he was attending, was ever tested for

Direct - Macaluso/McLaughlin        Vol. 24: 247

Q.   Did he give you the lingo and the language and the signs and things like that?

A.   Yes, sir, rankings, et cetera.

Q.   And on the occasions, including those times when you spoke to Bruce, did you have difficulty understanding him?

A.   No, sir.

Q.   Did he speak in a coherent fashion?

A.   Always.

Q.   I mean, did you ever, like, scratch your head when you got through talking to Bruce and try to figure out what he's trying to say or what he was trying to get across to you?

A.   No, sir.

Q.   Now, you have been in the school business for about how long?

A.   Twenty years.

Q.   Have you seen people that you believed, or have been diagnosed as being mentally retarded?

A.   Yes, sir.

Q.   On few or on many occasions?

A.   Well, we have our share in our schools.

Q.   Okay.  And people who have been placed in special education programs?

A.   After testing, yes.

Q.   With Bruce, was there any reason at any time during your tenure, your involvement with Bruce Webster, on the basis of

U.S. DISTRICT COURT

Direct - Macaluso/McLaughlin        Vol. 24: 248

anybody that you spoke to, like a teacher, that suggested that he was in any way mentally retarded?

A.   No, sir.

Q.   Did anything like that come from a teacher that he should be put in a special education class or something like that?

A.   No, sir, not to me.

Q.   Did he appear to be impaired mentally in any other way?

A.   No, sir.

Q.   Did you ever have occasion to go by his house?

A.   Yes, sir.  There was an occasion that the principal and I took him home one time.

Q.   Did you go in the house or just drop him off?

A.   No, sir.  We didn't go in the house.

Q.   Did anything ever come to your attention about any sort of physical abuse to Bruce?

A.   No, sir.

Q.   Did you ever notice anything about him, bruises on him, or he complained about being beat up or mistreated by his family in any way?

A.   Never.

Q.   Now, let me ask you.  Did you have occasion, within the last few months, at least, to talk to or be visited by a doctor by the name of Denis Keyes?

A.   Yes, sir.  I have visited with him.

Q.   Did he come to your office, to your home, or where do you

# Wells Decl. Ex. D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA   .  CRIMINAL ACTION NO.
                                         .   4:94-CR-121-Y
V.                                       .
                                         .  Fort Worth, Texas
BRUCE CARNEIL WEBSTER        .  June 14, 1996
. . . . . . . . . . . . . . . .

VOLUME 25
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        MR. RICHARD B. ROPER
                           MR. PAUL D. MACALUSO
                           MR. CHRISTOPHER CURTIS
                           Assistant United States Attorney
                           801 Cherry Street, Suite 1700
                           Fort Worth, Texas  76102-6897
                           (817) 978-3291

For the Defendant:         MR. LARRY M. MOORE
                           Attorney at Law
                           1112-A East First Street
                           Fort Worth, Texas  76102
                           (817) 338-4800

                           MR. ALLAN K. BUTCHER
                           Hill, Beatty, Butcher
                           & Gallagher
                           201 Main Street, Suite 1300
                           Fort Worth, Texas  76102
                           (817) 336-3600

Court Reporter:            Ana P. Warren
                           U.S. District Court Reporter
                           501 W. 10th Street, Room 204B
                           Fort Worth, Texas  76102-3637
                           (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT D**

Direct - Roper/Barber          22

They can't move from one house to another until I check it out and get permission.

Q. How long have you been a parole officer?

A. Six years.

Q. And what did you do before that?

A. Six years before that I was a correctional counselor at the diagnostic unit of the Department of Corrections in Arkansas.

Q. And what did that involve?

A. We took in -- I took in new commitments from the counties and processed them. You had an original orientation, and then we went through the testing, and then an in-depth orientation to prepare them for the prison.

Q. And did you interview and counsel with prisoners on a daily basis?

A. Oh, yes, probably, in depth, 5,000 or 6,000 inmates.

Q. Now, in regards to the probation -- or parole, rather, of Bruce Webster, based on your review of the records and the memory you have of Bruce Webster, did he follow the directions -- well, first off, did he appear to understand the directions that were given to him for what he should do when he's on parole?

A. Yes. He didn't have any trouble with it. I explained to him when he first got out that he had to report to the drug counseling, which he did. He had to report monthly, and they have to pay a supervision fee, which I forgot to mention

U.S. DISTRICT COURT

Direct - Roper/Barber          23

previously, of -- back then it was $15 a month.  He reported regularly, paid his fees.

Q.  And in that regard, did there come a time -- well, eventually, he ended up violating his parole and went back to the penitentiary; is that right?

A.  That's correct.

Q.  But other than that, did he appear to follow the conditions of parole that were set up?

A.  Oh, yes.

Q.  Now, I want to ask you in particular about a certain entry.  Now, had there been any discussion at all during the time you had Webster on parole about going to the Southeast Arkansas Mental Health Center?

A.  Yes.

Q.  And, in particular, on July 7, did you have a discussion with him at that time as reflected in the chrono entries?

A.  Yes.

Q.  All right.  And, specifically, as of the July 7 entry, could you please read that and elaborate on that entry, or, first, read that entry for the jury?

A.  The entire entry or just the part concerning Southeast Arkansas Mental Health?

Q.  Well, just for July 7?

A.  July 7, 1992?

Q.  Yes, sir.

U.S. DISTRICT COURT

Direct - Roper/Barber          24

A. Paid July fees and turned in his report. Said he had two other part-time jobs and wanted to go to Monticello, Arkansas, to work. I told him to have his supervisor call me about it. He said he was going to Southeast Arkansas Mental Health tomorrow. I told him to bring in documentation.

Q. During that interview that you had with him at that time, did he appear to have a difficulty in understanding what you were saying to him?

A. I don't think so, because had there been a problem, I would have noted it in my chronologicals.

Q. And is there a later entry in there about him ever going to Southeast Arkansas Mental Health Center?

A. Yeah. There are some other entries on Southeast Arkansas, because, like I said, that was one of his stipulations by the parole board.

Q. Let me go through quickly, if I can, Government's Exhibit 102-C. Now, what is this -- these are several different reports?

A. Those are what we refer to as monthly reports. They basically ask his address, who he's living with, phone numbers, where he's working, how much he makes a week.

Q. Now, who fills that out?

A. They do.

Q. Who signs it?

A. They do.

U.S. DISTRICT COURT

Direct - Roper/Barber          25

Q. And are there certain questions on there to be answered?

A. Oh, yes.

Q. Whose writing would be on these monthly reports?

A. His.

Q. Bruce Webster's?

A. Uh-huh.

Q. To your knowledge, did he ever have any problems filling out these forms?

A. No, huh-uh.

Q. And in regards to the requirement for drug counseling, briefly explain what that is for the jury?

A. When they go into the counseling, the instructor will have them come up one at a time and sign their name that they did attend. And then Southeast Arkansas Mental Health will send us a copy to put in our files so we have documentation that they have been going by the parole board's orders.

Q. And Webster brought these back so you could put these in the files verifying that he did attend these sessions?

A. No. They sent them to us.

Q. They were sent?

A. They were sent back.

THE COURT: Mr. Roper, your time on this witness is about up. How much longer do you think it will take?

MR. ROPER: Just about five -- less than five minutes.

THE COURT: Okay. I'll give you five more minutes.

U.S. DISTRICT COURT

Direct - Roper/Barber          26

Q. (By Mr. Roper)  Now, after this time that you had Webster on parole, I want to move forward, if I can, to this spring of 1996.  Did there come a time that you came in contact with a man by the name of Dr. Dennis Keyes?

A. Yes.

Q. And where did you meet with him?

A. In my office.

Q. Now, how was that meeting arranged?

A. They -- he called up and asked could he come over and see me.

Q. And did you go over there -- I mean, did he come over and visit you?

A. Yeah.  He came over and visited.  I can't remember if it was the same day he called or the following morning.

Q. And tell the members of the jury what happened in that conversation you had with Dr. Keyes?

A. He basically came and asked me about Bruce, and I got the file out.  Well, actually, I had already had the file out, because they had -- I had already received a subpoena.  So I was reviewing it earlier.  And he -- Keyes, basically -- I felt like he was just trying to convince me that because of Bruce's environment as he was growing up and so forth, that this is something he really shouldn't be executed for and that he was mildly retarded.

Q. And what did he tell you in that regard?

U.S. DISTRICT COURT

Direct - Roper/Barber          27

A. That he was mildly retarded.

Q. Did he ask you any questions?

A. Basically, he was lecturing me.

Q. Well, what did you tell him in response to that?

A. I told him that Bruce had never, in my opinion, reacted or acted retarded. He was very street smart, extremely street smart. He could converse with you well, writes his reports up, did everything I asked him to do. He knew how to keep me off of him because he did everything I asked him to do.

Q. Did you ever have occasion to go out and do any home visits?

A. Well, as I said, yeah, we try to do a home visit approximately once every six months or so, unless something comes up that would warrant us going out before that, a phone call or something of that nature, but I did a routine home visit. He wasn't there. I spoke with his mother. The house was neat and well kept.

Q. Now, at the end of your conversation with Dr. Keyes, did he tell you anything in departing?

A. Other than he did not feel that Bruce should be getting the death penalty because of his home environment and the environment that he grew up in. Having gone back in his file and, as I said, having reviewed it a week or so before that when I got the subpoena, Bruce did grow up in a two-parent family, and they lived in the same house. They did not live in

U.S. DISTRICT COURT

Cross - Butcher/Barber          28

the projects or government housing or anything.

Q. Let me stop and ask you there. Was there any discussion about whether Dr. Keyes thought you could help him?

A. Oh, he got up and left and said, no, I wouldn't be able to help him at all.

MR. ROPER: That's all the questions I have.

THE COURT: Is there cross?

CROSS EXAMINATION

BY MR. BUTCHER:

Q. Mr. Barber, you had been interviewed by investigators from the defense team prior to this, hadn't you?

A. Yes. A prior investigator came up.

Q. In January of 1996? Would that be about right?

A. I can't remember the date. He wasn't there ten minutes, got up and left.

Q. The investigator?

A. Yes.

Q. And at that time, the investigator did ask you a lot of questions, though, didn't he?

A. He asked some questions.

Q. And did he identify himself as a retired F.B.I. agent?

A. Yes, he did.

Q. Did you take him to be a man skilled at asking questions?

A. Well, are we going on reputation or the questions he actually asked?

U.S. DISTRICT COURT

Direct - Curtis/Drewett          35

A. Sixteen of the 21 years, but I've been in the district 21 years.

Q. Okay. Are you from the Pine Bluff area?

A. Yes, I am.

Q. Do you know an individual by the name of Bruce Webster?

A. Yes, I do.

Q. Do you see that person in the courtroom today?

A. Yes, sir.

Q. Would you describe where he's sitting from where I'm standing?

A. Well, beside you to your left.

Q. How many seats from my left?

A. He's the third.

MR. CURTIS: Thank you.

Your Honor, I would request the record to reflect that she has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Curtis) Ms. Drewett, did you ever have Bruce Webster as a student?

A. Yes, I did.

Q. And what grade was that?

A. Ninth grade.

Q. And what course was it?

A. Civics.

Q. And what level?

U.S. DISTRICT COURT

Direct - Curtis/Drewett        36

A. Just a basic civics class.

Q. Now, that's not a special education class, is it?

A. No, sir, it's not.

Q. The students that are in that class, do they need to be able to read and write?

A. Yes, sir, just a slower level.

Q. Could you describe for the jury, basically, what you noticed about Bruce Webster's intellectual abilities?

A. As far as reading, of course, I said they performed at a slower level. He did read slower. On the days that he did perform, which most of the days he did sleep. He didn't perform a lot. He could read. He could do. He chose not to do on a lot of days. He did sleep a lot.

Q. Did you have the opportunity to converse with him while he was one of your students?

A. Yes, sure.

Q. Did he have any problem communicating with you?

A. Not that I remember. I did have some, you know, run-ins with him, but I don't even remember that. I don't remember specifics, but I do remember -- you know, I did have some discipline problems, but I don't remember any specifics on that.

Q. How was he dressed, as you can recall?

A. Nicely, lots of jewelry.

Q. What kind of jewelry?

U.S. DISTRICT COURT

Direct - Curtis/Drewett          37

A. Gold jewelry.

Q. Bracelets, necklaces?

A. Necklaces.

Q. How was he groomed?

A. Nicely.

Q. Did he seem to be well kept?

A. Yes, sir.

Q. In your 21 years as a school teacher, have you had the opportunity on many occasions to have contact with mentally retarded and mildly mentally retarded students?

A. Yes, sir.

Q. Would you tell the jury whether or not Bruce seemed to be mentally retarded or mildly mentally retarded at all?

A. No, sir. I do not think he is, in my opinion.

Q. If you had noticed any intellectual inability or limitation, what would you have done as a teacher?

A. Recommended him to the special ed department.

Q. And you never recommended him for special ed?

A. No, sir.

Q. In your opinion, did he need to be recommended to special ed?

A. No, sir.

Q. In your opinion, was his sleeping the result of any medical problem?

A. I don't think so. I think it was more, maybe, his

U.S. DISTRICT COURT

Cross - Butcher/Drewett          38

activities at night, maybe staying up late, just sleeping during the day and not at night.

MR. CURTIS: Your Honor, I pass the witness.

THE COURT: Cross?

CROSS EXAMINATION

BY MR. BUTCHER:

Q. Ms. Drewett, you mentioned several times that Bruce slept a lot in class. Does that mean every day or every other day or what?

A. I don't remember any definite times, but I do remember him sleeping.

Q. And one can't sleep through class and do very well in it, can you?

A. No.

Q. In fact, do you recall his grades?

A. No, sir. I don't recall that so much. He dropped out during the ninth grade. So I'm not real sure what he ended up with.

MR. BUTCHER: Your Honor, may I approach the witness?

THE COURT: You may.

Q. (By Mr. Butcher) Ms. Drewett, I hand you a document and ask if you could take a look at that and see if it refreshes your memory? Does this refresh your memory?

A. I don't remember. Like I said, I remember having him in basic civics, but I don't remember, you know, what he ended up

U.S. DISTRICT COURT

Cross - Butcher/Drewett          39

with.

Q. Well, does that reflect his grades?

A. Yes, it does, uh-huh.

Q. So the first semester -- do you now recall the grade that you gave him the first semester?

A. After looking at the transcript, that's the only thing that helped me.

Q. And, now, what did he receive?

A. An "F."

Q. And in the second semester, you say he dropped out of the class?

A. I'm pretty sure. I don't remember the time.

Q. You say that you think -- do I recall correctly that you said that you think it was a lack of effort on his part that caused him to do so poorly; is that correct?

A. Yes, sir.

Q. Are you aware of his home environment?

A. No, sir, I'm not.

Q. Do you know whether he had active help and guidance from his parents?

A. No, sir.

Q. Do you recall talking to an investigator on July 31, 1995, by telephone?

A. Last summer, yes, sir.

Q. And do you recall at that time saying -- telling him that

U.S. DISTRICT COURT

Cross - Butcher/Drewett                40

you believed that Bruce was someone who tried to raise himself with little or no parental guidance?

A. I never -- I guess, maybe not remembering his parents, that's maybe my opinion. Since I didn't meet his parents, maybe that's, you know, part of that. Most kids do that nowadays it seems like.

Q. Do you think, based on your memory of Bruce, that he's more of a follower and not a leader?

A. Huh-uh. I think he's more of a leader.

Q. You think he's more of a leader? Do you remember on July 31, in that same telephone conversation with the investigator, saying that Bruce is a follower and not a leader?

A. No, I don't. I don't remember. I don't remember that.

Q. Do you think Bruce is a person who can be influenced or swayed easily?

A. Probably so.

Q. Were you ever fearful of Bruce?

A. No, sir.

Q. Did you like Bruce?

A. I don't remember that. It's been too long ago.

Q. Do you recall, when you talked to the investigator back in July, that you told him that you only had a faint recollection of him being a student of yours? Do you recall that?

A. I don't remember that either.

Q. Would that be a true statement, though, that in July you

U.S. DISTRICT COURT

Cross - Butcher/Drewett          41

had a faint recollection?

A. I don't remember that. I'm sorry. I don't.

Q. Well, would it be a true statement, though, that in July you only had a faint recollection of him?

A. I remember Bruce.

Q. You do remember him well?

A. Yes. I taught Bruce and his brothers. There were several of them. You know, I taught several of them.

Q. You taught -- which of the brothers did you teach?

A. Let's see. I had Mark. I had Tony, Willie. There's, I think, three or four.

Q. And were the boys more or less the same?

A. Some excelled at some things more than the others. One was musically inclined.

Q. But as far as academic achievement and so forth, they were all about in the same boat?

A. They were all about the same.

MR. BUTCHER: Pass the witness.

MR. CURTIS: No further questions.

THE COURT: You may step down, ma'am. Thank you. And you're free to go as well.

Please call your next witness?

MR. CURTIS: The United States calls Linda Monk.

THE COURT: Ms. Monk, would you are raise your right hand and be sworn?

U.S. DISTRICT COURT

Direct - Curtis/Monk          42

(Witness sworn by the Court)

LINDA MONK, testified under oath as follows:

DIRECT EXAMINATION

BY MR. CURTIS:

Q. Ms. Monk, would you state your name, please?

A. Yes. It's Linda Monk.

Q. And where are you from, Ms. Monk?

A. I'm from Pine Bluff, Arkansas.

Q. What do you do for a living?

A. I teach junior high English.

Q. And what school do you teach in?

A. At Watson Chapel Junior High.

Q. I just ended a sentence in a preposition to an English teacher.

A. I'll overlook it.

Q. Okay. Thank you.

How long have you -- you may have just answered this question. How long have you been a school teacher?

A. I have taught for 22 years.

Q. And how long have you been teaching at Watson Chapel Junior High?

A. Thirteen.

Q. Are you familiar with an individual by the name of Bruce Webster?

A. Yes, sir.

U.S. DISTRICT COURT

Direct - Curtis/Monk    43

Q. Do you see him here in the courtroom today?

A. Yes, sir, I do.

Q. Would you describe where he's sitting, please?

A. He's sitting to my right.

Q. To your right. And how many chairs from me?

A. He's on the end of the table. He's the fourth from you.

Q. The fourth from me counting me, right?

A. Yes.

MR. CURTIS: Your Honor, I would request that the record reflect that the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Curtis) Did you ever teach Bruce Webster?

A. Yes. He was in my basic English class.

Q. And was that in the ninth grade?

A. Yes, sir.

Q. That's not a special education class, is it?

A. No, it's not.

Q. During the time that you taught Bruce, were you able to observe his intellectual abilities and --

A. Yes, sir.

Q. -- his skills?

A. For a student in a basic class, he seemed like he was one of the brighter ones, although his grade did not reflect that.

Q. What did he do when he was in your class?

A. For many weeks, at the beginning of the year, he slept. He

U.S. DISTRICT COURT

Direct - Curtis/Monk                44

was in a morning class, and he slept a great deal of the time.

Q. And did there come a time when he stopped sleeping in class?

A. Yes. When we moved into the second nine weeks and we stopped doing so much grammar and spelling, he seemed to pay quite a bit more attention in class.

Q. During the period of time that you taught him -- I'm sorry. Let me stop a second.

Did he eventually drop out of school that year?

A. Yes, sir.

Q. So you didn't have him the whole year?

A. No, sir.

Q. During the time that he was your student in the ninth grade, did you have an opportunity to converse with him?

A. Yes, sir, off and on through the time he was there.

Q. Would you say that he spoke with you rarely or often?

A. Occasionally.

Q. He spoke with you occasionally?

A. Yes.

Q. During those conversations, would you describe for the jury, did he have any kind of problems communicating with you?

A. No, he didn't. He was very likable whenever he talked with me. He talked to me personally, not to the other students. When he wanted to talk, he talked just to me, and he seemed rather mature for his age.

U.S. DISTRICT COURT

Direct - Curtis/Monk          45

Q. During your 22 years as a teacher, have you, on several occasions, had the opportunity to have contact with special education students, mentally retarded students, mildly mentally retarded students?

A. Mildly mentally retarded or borderline retarded, yes.

Q. And on several occasions?

A. Yes, sir. Several of my students each year are rated as this.

Q. Would you describe -- based on that, would you describe Bruce Webster as mildly mentally retarded or borderline?

A. No, no. Whenever they are rated as borderline or mildly retarded, I read their records, and it tells me what their expressive age is and their receptive age. When I talk to them, I should talk to them as they are like a ten-year-old, and when they talk to me they talk to me like a ten-year-old. It's approximately that age level, and Bruce didn't appear to be that way to me at all.

Q. Based on that, can you give the jury an opinion as to whether Bruce was either borderline or mildly mentally retarded?

A. In my opinion, he was not.

Q. Now, he did not excel in your class?

A. No. He did not excel.

Q. Do you have an opinion as to why he didn't excel?

A. I think he did not apply himself. I think he certainly was

U.S. DISTRICT COURT

Direct - Curtis/Monk          46

capable of the work.

Q. Do you ever recall an incident where you thought to yourself -- a specific incident where you thought to yourself that he was not applying himself and he could have done better?

A. I can remember watching him take a test as the first semester went along and just having the thought to myself that he could be doing so much better if he would just try a little bit harder.

Q. Okay. When he conversed with you, was he nice to you?

A. Yes. He was always very polite.

Q. And were you fearful of him?

A. No.

Q. How about the other students? Were they fearful of him?

A. Yes, sir. They appeared to be.

Q. How would you describe his dress?

A. He often worn the set of clothing known as the Dickies. They are work clothes, the pants and the shirt. Usually, it's a short-sleeve shirt, and he wore dark brown ones a great deal of the time.

Q. How about any jewelry?

A. Yes, a great deal of jewelry. That was when the nugget rings were very popular, the heavy nugget rings. He wore those, or he wore one.

MR. CURTIS: I believe that's all the questions I have, Your Honor. Thank you.

U.S. DISTRICT COURT

Cross - Moore/Monk                47

THE COURT: Cross?

MR. MOORE: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. MOORE:

Q. Ms. Monk, you indicated that Bruce was in your basic English class. Were there different levels of English classes?

A. Yes, sir. On most years, I have an advanced class and general classes and basic classes.

Q. And what is the distinction between those three different types of classes?

A. In my basic class, I did have some students each year who are rated as borderline or mildly retarded, but it's also for students whose reading skills are not on grade level, but all of them who are in there certainly are not mentally retarded. They don't receive special education services.

Some of them will receive these services, but all of them don't. It's also a class where many of the students who just simply don't apply themselves end up.

Q. So it's the lowest level of class?

A. Yes, except for the special ed classes.

Q. Except for the special ed classes?

A. Yes, sir.

Q. But there are some students in there that are the students with special needs, that have some mentally retarded students and things like that in these basic classes?

U.S. DISTRICT COURT

Cross - Moore/Monk          48

A. Yes.  There are some in there who are like that, yes, sir.

Q. All right.  And I believe you indicated that in the -- that it appeared that in the second semester that Bruce appeared to have more interest or more motivation than he did in the first semester?

A. This is the second nine weeks of the first semester.

Q. What was the different subject matter?  I think you said there was a change?

A. Yes.  The first nine weeks, we concentrated more on grammar and spelling, and the second nine weeks we went more into reading stories.

Q. The subject matter, the spelling, the grammar, things like that, were those things that seemed to interest or motivate Bruce?

A. I'm sorry.  I can't hear you.

Q. The subject matter that you covered in the first nine weeks, the spelling, the grammar, those basic language skills, were those things that seemed to be motivating Bruce at all?

A. No, they did not seem to be.  Whenever we do the first nine weeks work, there is a great deal of just looking at the exercises in the book and doing what it tells you to do, finding your nouns and verbs, things like that.  There is a great deal of written work to be done.  The second nine weeks is whenever I read a lot to them, and we discuss the stories, and most of them find that more interesting.

U.S. DISTRICT COURT

Cross - Moore/Monk                49

Q. It held Bruce's interest more?

A. Yes, sir, it did.

Q. You indicated that he appeared to read at a low level; is that correct?

A. Yes, sir. I can't recall exactly what his level would be, but I do know that he was able to read the tests adequately, or I would have made the provisions to read it orally to him.

Q. You indicated that -- the special education classes, if someone was a special education student, would there be a separate class that he would attend, or would he be in one of these basic classes?

A. It depends on what his rating would be. Whenever he takes a battery of tests, the counselors, there would be a committee to determine if he should be in special ed classes all day. I often have a student who will be in special ed classes for most of the day and will come out just for my class.

Q. In interaction among the students in the school back there, is there any type of bias against the special education students? I mean, how do the other students treat them? Does the student population as a whole seem to be very compassionate and caring and nurturing to the special education students?

A. No, sir. I wouldn't say they are like that, but I also wouldn't be able to say that they seemed to make fun of them a great deal.

Q. Okay. Well, in your experience, being a special education

U.S. DISTRICT COURT

Cross - Moore/Monk                50

student, are the students -- is that something that they want to do? Do they want to be classified as a special education student?

A. No, they don't.

Q. Does it carry some stigmatization among their peer groups, so to speak?

A. To some extent, yes, sir.

Q. Did you ever have any of Bruce's siblings as students?

A. Yes, sir. I had, I believe it was his brother, or, perhaps, a cousin named Tony. He's the only other one that I had that I can recall.

Q. Did you have him about the same time that Bruce was a student?

A. Yes, sir, I believe maybe a year before.

Q. Was there a discernible difference in Tony's abilities as from Bruce's abilities, or did they appear to have similar abilities?

A. No. In my opinion, Bruce was quite a bit brighter than Tony was.

Q. You said that there was no -- that Bruce did not excel in your class. Do you recall how he did do, what kind of grade he got?

A. He ended up with a "D" for the first nine weeks -- for the first semester.

Q. A "D"?

U.S. DISTRICT COURT

Cross - Moore/Monk          51

A. A "D," yes.

Q. What about for the second semester?

A. He dropped sometime during the second semester.

Q. Let me ask you one other question.

You indicated that you thought Bruce was one of the brighter students for your basic class. Do you recall having had a conversation with an investigator for the defense in this case back on July 18, 1995?

A. Yes, sir.

Q. Do you recall having told the investigator, at that time, saying that Bruce was probably in the lower end of the average range and that the classes he took were low level classes?

A. Well, a basic class is a low level class, and where I think my students as a whole, students who are in the low level classes, would be considered on the lower end of the intelligence level. Bruce wouldn't have done well in an advanced class. He would have had to work extremely hard to do fairly well in a general class. That's what I meant when I talked to this man.

Q. All right. In relation to the student population as a whole, he was at the lowest end of the average range, is that correct? Would that be a fair characterization?

A. No, sir, I don't think so, because in a basic class the range is so varied, and he would be one of the top ones in a basic class. So there would be many, many what would be rated

U.S. DISTRICT COURT

Direct - Macaluso/Turner          52

below him.

Q. So you don't believe that he would be the lower end of the average range?

A. The lower end of the average range? Oh, yes, sir. Am I answering your question?

Q. Yes. I think it was a bad question.

A. Okay.

MR. MOORE: Thank you very much. I pass the witness.

THE COURT: Thank you very much. You may step down.

THE WITNESS: Thank you.

May I see counsel for the government at the bench?

(Off-the-record discussion at the bench at this time)

MR. MACALUSO: We call Mr. E. C. Turner, Your Honor.

THE COURT: Mr. Turner, would you please raise your right hand and be sworn?

(Witness sworn by the Court)

E. C. TURNER, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MACALUSO:

Q. Good morning, Mr. Turner.

A. Good morning.

Q. Would you tell us for the record your full name, please, sir?

A. My name is Ervin Charles Turner.

Q. And, sir, what's the nature of your profession or

U.S. DISTRICT COURT

Direct - Macaluso/Turner          53

occupation, please?

A. I'm a school counselor.

Q. And for how long, sir?

A. I have been a counselor, sir, for approximately 23 years.

Q. Where, sir?

A. I was at Grady High School for a period of time. I have been at Watson Chapel Junior High School for 13 years.

Q. Are those both located in Pine Bluff, Arkansas?

A. No. Grady High School is located in Grady, Arkansas.

Q. Okay. So you have been with Watson Chapel Junior High School in Pine Bluff for how long?

A. Thirteen years.

Q. As a counselor for 13 years?

A. I have.

Q. Can you, just in a nutshell, give us a little bit of a background of your education and your training, sir, in that regard?

A. Okay. I have been in education for 28 years in all. I started out as a teacher and a coach. I received a Master's Degree in Guidance and Counseling from Henderson State University, but I also did additional study at the University of Wisconsin Eau Claire and the University of Arkansas and University of Iowa.

Q. And, basically, what are your duties and responsibilities there as a counselor for the Watson Chapel Junior High School,

U.S. DISTRICT COURT

Direct - Macaluso/Turner          54

sir?

A. My basic duties are to counsel students, work with students, try to help them make decisions.

Q. Mr. Turner, do you have responsibility, also, for any of the testing that may be done on the students there at Watson Chapel?

A. Yes, I do.

Q. What sort of tests do you administer to your students on a regular basis?

A. On a regular basis, our kids -- perhaps, the only test we do is an achievement test. We do it once during seventh grade year when they come at that time.

Q. Seventh grade?

A. The seventh grade year.

Q. And you referred to that test as a --

A. Achievement test, a nationally known achievement test.

Q. Was that the M.A.T. 6 Survey?

A. It was the M.A.T. 6 at that time, yes.

Q. What sort of areas are those students tested in under the M.A.T. 6 testing program?

A. They are tested in all general academic areas. It's the core basics.

Q. Let me ask you, sir, depending upon a student's score on the M.A.T. 6 and other factors, a determination might be made as to whether or not a student was appropriate for a certain

U.S. DISTRICT COURT

Direct - Macaluso/Turner          55

level of classes or even for special education classes?

A. Yes.

Q. Are there other factors that could be considered?

A. Yes. We also consider teacher recommendation.

Q. Let me ask you, while you were at Watson Chapel Junior High School you came to know of an individual by the name of Bruce Webster?

A. Yes, I did.

Q. Do you see him here in the courtroom today, Mr. Turner?

A. Yes, I do.

Q. Would you point to him and tell us where he's seated and, if you can, describe what he's wearing?

A. That's Bruce sitting over there at the table there with the black suit, like a light gray with a speckled tie.

MR. MACALUSO: I would ask that the record reflect, Your Honor, that the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) Mr. Turner, when was it, as best you can recollect, that you came to know of Bruce or became acquainted with Bruce Webster?

A. Probably -- when he came in, in probably the seventh grade.

Q. And did you have occasion to meet with him on various occasions and to speak with him?

A. Bruce and I have had conversations several times.

Q. All right. Did you have opportunity, of course, to

U.S. DISTRICT COURT

Direct - Macaluso/Turner          56

converse with him during those occasions?

A. Yes, I did.

Q. Listen to him talk and he'd listen to you, and you would just have conversations; is that correct?

A. Uh-huh.

Q. Let me ask you, sir. Have you, in your career, either diagnosed or been in the presence of or had to deal with students that you felt were tested to be either mildly or moderately mentally retarded?

A. Yes, I have.

Q. Was there anything, sir, about your dealings, your conversations, your exposure to Bruce Webster, based on your training and your experience and just your dealing with him, that would lead you to believe that he was suffering from any sort of mild or moderate mental retardation of any type?

A. I had no indications of that whatsoever.

Q. You're trained to do that, aren't you?

A. Yes, I am.

Q. I mean, when he would speak to you, would he make sense?

A. Yes.

Q. Did you have any difficulty understanding him?

A. No, I didn't. We had several conversations, and I've never had a problem communicating with him.

Q. Did you get along with him all right?

A. Yes.

Direct - Macaluso/Turner          57

Q. Did you become acquainted, or have you become acquainted with the results of the test, the M.A.T. 6 Survey test that you referred to that's done in the seventh grade?

A. I'm sorry. I didn't understand your question?

Q. Have you familiarized yourself, or are you familiar with Bruce's M.A.T. 6 Survey test results?

A. Yes, I am.

MR. MACALUSO:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q. (By Mr. Macaluso)  Mr. Turner, let me show you what's been marked for identification purposes as Government's Exhibit 98-A, and let me ask you, if you would, sir, take a look at that. And I'll ask if you can recognize and identify it? Do you recognize that?

A. Yes, I do.

Q. Is that, in fact, a duplicate copy of the M.A.T. 6 Survey -- is that an achievement test?

A. This is an achievement test, a duplicate copy of the master file that we have in my office.

Q. Of Bruce Webster?

A. Of Bruce Webster.

MR. MACALUSO:  We would offer Government's Exhibit 98-A, Your Honor, at this time.

MR. MOORE:  No objection.

THE COURT:  98-A is admitted.

U.S. DISTRICT COURT

Direct - Macaluso/Turner          58

Q. (By Mr. Macaluso) Okay. Can you tell us, just in sum, what the results of the tests were on Bruce?

A. Okay. This is a nationally known exam in which, really, there is no pass or fail on this exam. We simply compare our students with other students across the United States in a norm group, and averages have been determined from that. If we look at the average, we look at the national percentile is what we're looking at here. Going across on a total complete battery, he scored in the 43rd percentile.

Q. And compared to other students at Watson Chapel Junior High School, where would that place him?

A. That would place him with the average student at Watson Chapel within a framework, give or take the standard of measurement.

Q. Okay. And what would be average there for Watson Chapel Junior High?

A. It varies from year to year. I'm not sure what the average was for this year, but our school usually stays around the 48th to 53rd percentile on the average as a whole.

Q. So on basis of Bruce's results on that test, I gather he would not -- he would fall within the average range; is that correct?

A. He would fall within the low average range.

Q. Low average range?

A. Yes.

U.S. DISTRICT COURT

Direct - Macaluso/Turner          59

Q. Would that in any way, on the basis -- well, on the basis of his test or any other indication, whether it be from teachers or family, would he have been a candidate for a special education program?

A. Definitely not.

Q. Is there any question about that at all, Mr. Turner?

A. No. Based on those scores, he would not.

Q. You know he didn't do well there in the eighth or ninth grades, don't you, sir?

A. No.

Q. Did you have an opportunity to look at some of his grades from earlier years?

A. Yes, I did.

Q. He did well, didn't he, sir?

A. Up until about the sixth grade.

Q. In your conversations and your just face-to-face dealings with Bruce, did you get a feel for Bruce as to whether or not he was a leader, sir, or he was a follower?

A. Bruce, to me, was an independent thinker. He would think on his own. I feel he was more of a leader than he would have been a follower.

Q. Did he have problems conforming there at the school?

A. He had problems with rules and regulations. Conforming, yes.

MR. MACALUSO: I believe that's all the questions I

U.S. DISTRICT COURT

Cross - Moore/Turner                60

have. Thank you very much, sir, for coming down.  We

appreciate it.

   I pass the witness.

        THE COURT:  Cross examination?

        MR. MOORE:  Thank you, Your Honor.

                CROSS EXAMINATION

BY MR. MOORE:

Q. Mr. Turner, the achievement test that was given, how is

that test administered?

A. This test is administered over a four-to-five day period.

Q. Is it administered in the classroom?

A. In some cases we administer it in the classroom, and in

some cases we administer it in a large group, and, sir, I don't

remember exactly which administration he had.

Q. You don't remember if Bruce took the test in the classroom

with his other classmates or if he was in a large group with

them all together; is that correct?

A. No, I don't.  We change that from year to year.

Q. But it wouldn't have ever been administered individually

with Bruce being the only student there?

A. No, definitely not.  It's a nationally known achievement

test.  All our students are required to take it.

Q. Does anybody ever cheat on these tests?

A. I couldn't sit here and say positively it hasn't occurred,

but the test is given over a five-day period, and it would be

U.S. DISTRICT COURT

Cross - Moore/Turner          61

very difficult for a person to bring their scores up a

significant amount.

Q. Do they ever copy from each other?

A. We have teachers that are monitoring.  I'm pretty sure it

might take place, but I would say the chances are very, very

slim that it occurred.

Q. Do you have any personal knowledge whether it occurred in

connection with Bruce's taking this achievement test?

A. I don't have any personal knowledge.

Q. You indicated that you had reviewed his grade report and

were familiar with his grades; is that correct?

A. I have seen his transcript.

Q. Let me show you what had been marked as Defendant's

Exhibit Number 9 and ask you if you recognize it?

A. This is copy of Bruce's transcript.

Q. Do you also know Mr. Rick McLaughlin?

A. Yes.  Presently, he's the junior high principal.

Q. Mr. McLaughlin appears on the certification attached to

that exhibit; is that correct?

A. Uh-huh.

       MR. MOORE:  Your Honor, we would offer at this point

Defendant's Exhibit Number 9.

       MR. MACALUSO:  No objection.

       THE COURT:  Defendant's 9 is admitted.

Q. (By Mr. Moore)  Now, you said that Bruce had not -- that he

U.S. DISTRICT COURT

Cross - Moore/Turner    62

had done well in the early years; is that right?

A. Yes.

Q. Was he retained in the first grade?

A. He was retained in the first grade.

Q. Then he started doing better?

A. He started doing better.

Q. Did his grades begin to fall off in the sixth grade?

A. I would say between the sixth and seventh grade.

Q. You have indicated that you have some familiarity in dealing with, and experience and dealing with mentally retarded students. Is there any particular pattern at which point mildly mentally retarded students begin to have problems doing their schoolwork?

A. There is no particular time you can point out. It's brought to our attention or when the teacher happens to notice something, or someone else comes in with a suggestion that maybe there is a problem.

Q. Is it unusual, in your experience, to see students do fairly well during the first years of school and then begin to sharply decline along about the fifth or sixth grade if they are mentally retarded?

A. I couldn't say a specific grade level or time.

Q. So you don't know if that's consistent or inconsistent?

A. I couldn't say it would be consistently that way with any two students.

U.S. DISTRICT COURT

Cross - Moore/Turner          63

Q. You indicated you thought Bruce was a leader. Do you recall having a telephone conversation with an investigator for the defense in this case -- I mean, having a conversation with an ex-F.B.I. agent that was working as an investigator in this case?

A. No, I don't remember having a conversation. I may have. Somebody called me or somebody came out and talked to me from the defense.

Q. Do you remember, during that conversation, discussing whether or not it was your opinion that Bruce was a leader or a follower in connection with his peer group?

A. Sir, I don't remember specifically.

Q. Well, let me just ask you. Do you remember telling the investigator that you talked to that you did not personally think that Bruce Webster was a leader among his peers, that you felt Webster was that type of individual that could be easily led, and you described him as more of a follower than a leader? Do you remember saying that to the investigator?

A. Sir, I don't remember.

Q. Is there any reason why you would have told the investigator that if it wasn't the truth?

A. No. It wouldn't have been if I told him that.

Q. Is it your opinion that he was a leader or that he was a follower, Mr. Turner?

A. I feel he was more of a leader. He was the type of person

U.S. DISTRICT COURT

Cross - Moore/Turner        64

that spoke for himself, that would speak for himself, in my conversations with him, but he did run around with a group of people.

Q. Did you feel like he was a person that was susceptible to being influenced by other people?

A. Possibly, in some cases, yes.

Q. Is that the reason why you would have told that to the investigator?

A. In any case, in any situation, some kids will follow other kids even though they are leaders. If a person comes in that's a little bit stronger, or a peer comes in and, perhaps, puts more influence on him, or that person wants to be more like that other person, he could possibly change his role.

Q. After talking to the investigator for the defense, did you ever later on have the occasion to talk to a psychologist by the name of Denis Keyes?

A. I did.

Q. Did you, in fact, discuss with Dr. Keyes your opinion as to Bruce's abilities and his achievements in school?

A. I might have. Perhaps, I did. I'm not sure. I know one came from my office.

Q. Had you talked to the investigator about that prior to the time that Dr. Keyes ever came and talked to you?

A. Someone came to my home, maybe a year ago, during the summer, and then later on, somebody came to my office.

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          65

MR. MOORE:  That's all.  Pass the witness.

MR. MACALUSO:  I have no additional questions.  May this witness be excused, Your Honor?

THE COURT:  You may step down.  Thank you, and you're free to go.

Please call your next witness.

MR. MACALUSO:  Yes.  Marcus Hollien, Your Honor.

THE COURT:  Please raise your right hand and be sworn?

(Witness sworn by the Court)

THE COURT:  You may be seated.

MARCUS HOLLIEN, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MACALUSO:

Q.  Would you tell us your name, please, and spell your last name for the court reporter, please?

A.  Marcus Edwin Hollien, H-O-L-L-I-E-N.

Q.  And, sir, how old a man are you?  How old are you, sir?

A.  Thirty.

Q.  Thirty?

A.  Yes.

Q.  And how are you employed?

A.  First lieutenant in the United States Army.

Q.  And how long have you been with the United States Army, sir?

A.  Three years, a little over three years.

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          66

Q. Lieutenant Hollien, let me ask you if you received your college education at the University of Arkansas at Pine Bluff?

A. I did.

Q. Approximately what years were you there, and what year did you graduate from the university?

A. From January '89 until June '93. I graduated in June of '93.

Q. June of 1993.

While you were in attendance at the university, were you an R.O.T.C. cadet?

A. Yes, I was.

Q. And you graduated, and then you went on into the service for the last three years?

A. Yes.

Q. What do you do in the United States Army as a first lieutenant, sir?

A. Right now, I'm the test control officer, slash, assistant operations officer.

Q. I want to direct your attention back to one of the summers, I believe, when you were there at the university, and I'll ask you if you had occasion to be involved -- is it a C.E.T.A. program?

A. Yes, C.E.T.A. program, if I remember correctly --

THE COURT: Could you pull the mike towards you a little bit? Thank you.

U.S. DISTRICT COURT

Direct - Macaluso/Hollien                67

Q. (By Mr. Macaluso) We both need to speak into the microphone, Lieutenant?

A. Okay. Not a problem.

Q. I refer to it as a C.E.T.A. program. That's an acronym. It's S-E-D-A (sic); is that correct?

A. Yes, if I'm not mistaken. I can't actually remember the name myself.

Q. How did you get involved in that?

A. Well, I just happen to -- my brother, they called him for a job, and he didn't want it, and I just happened to apply for it, and they did give to me.

Q. What were your responsibilities or involvement with the C.E.T.A. program?

A. I was the supervisor over some of the kids that they had hired during the summer.

Q. To do what?

A. To clean up the neighborhoods and stuff.

Q. Okay. And for how long were you involved in the program, sir?

A. Six weeks.

Q. Let me ask you, during your responsibilities and your involvement in that C.E.T.A. program that summer, did you come to know or meet an individual by the name of Bruce Webster?

A. Yes.

Q. Do you see Bruce Webster here in the courtroom today, sir?

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          68

A. Yes.

Q. Would you point to him and describe what he's wearing and where he's seated, if you would?

A. Sitting over here next to the guy here, with the tie on and the suit.

Q. What number would he be seated at the table from my left?

A. From your left?

Q. Yes, sir.

A. Three.

MR. MACALUSO: Thank you.

Your Honor, I would ask that the record reflect that the witness has identified the defendant in open court?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) Now, so you're involved in the program, and I gather from what you said that Bruce Webster was working in the program?

A. Yes.

Q. Were those high school students, college students, kids in the neighborhood, what?

A. Around 15 or 16, high school, I would say.

Q. How many kids were -- how many participants were in the program?

A. Oh, eight to ten.

Q. And what did you say you had them doing?

A. Cleaning up. They were cleaning up the neighborhoods and

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          69

stuff, going around picking up trash and stuff out of the ditches and along the highway and stuff like that.

Q. Did you have contact, then, with Bruce Webster on a daily basis for that six-week period?

A. During that period, yes.

Q. During the time, did you have a chance to observe him do the work that he was supposed to do?

A. Yes, I did.

Q. Did you have occasion, also, to talk to Bruce Webster?

A. Yes, on occasion.

Q. On few or on many occasions?

A. During that six weeks, every day.

Q. You had a chance to observe him?

A. Well, not every day. I'm not sure if he didn't show up a couple times here and there.

Q. Yes, sir, most every day, though?

A. Yes.

Q. When you had conversation and you talked to Bruce Webster back then, did you have any difficulty at all understanding him?

A. No.

Q. Did he have any communications problems whatsoever?

A. No, not that I could tell.

Q. Okay. Was there anything about his behavior, as you observed, that would give rise to any belief that he was

U.S. DISTRICT COURT

Direct - Macaluso/Hollien            70

retarded or impaired mentally in any way whatsoever?

A. No.

Q. In fact, let me ask you if one of your responsibilities, Lieutenant, when you were in charge of this program was to basically do an evaluation of the participants in the program?

A. Yes.

Q. Okay. And did you do one for Bruce?

A. Yes.

Q. All right. Did you also have an opportunity to see how he interacted with the other people in the program?

A. Yes.

Q. Like whether he appeared to be a leader or a follower?

A. Yes.

Q. How he compared to the other participants?

A. Yes.

Q. What observations do you recall about Bruce? Did you think he was a leader, or did you think he was a follower, based on your observations of him?

A. Well, based on my observation, what I see is that, you know, whenever there is a group, somebody tends to -- others follow an individual, and he was the individual that they followed more so.

MR. MACALUSO: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Macaluso) Let me show you what's been marked for

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          71

identification purposes as Government's Exhibit 99, Lieutenant. Let me ask you to look at that? I'll ask you if you recognize that exhibit, sir?

A. Yes, I do.

Q. You need to speak up.

A. Yes, I do.

Q. And for the record, what is that, Government's Exhibit Number 99?

A. What do you mean, the title?

Q. Yeah. Is that the participants evaluation form you filled out on behalf of Bruce Webster in the summer of '92?

A. Yes.

Q. Let me ask you if you indicated on there -- well, we would offer Government's Exhibit 99, Your Honor.

MR. MOORE: No objection.

THE COURT: Government's 99 is admitted.

Q. (By Mr. Macaluso) Let me ask you if you indicated on there, under supervisor's remarks -- if you would read what you wrote on there, based on your observations of Bruce and your rating of him that summer when he worked for you? Can you read that part, first page?

A. Bruce is a very intelligent individual with good characteristics but needs to get self discipline.

MR. MACALUSO: Thanks for coming down, Lieutenant. I'll pass the witness for cross examination.

U.S. DISTRICT COURT

Cross - Moore/Hollien          72

THE COURT: Cross?

MR. MOORE: Briefly, Your Honor.

THE COURT: You always say that.

MR. MOORE: Briefly is a relevant term.

CROSS EXAMINATION

BY MR. MOORE:

Q. May I see that, please?

A. Yes.

Q. Exhibit 99, the evaluation on the front page is an evaluation that you filled out; is that correct?

A. Yes.

Q. What is that attached to the rest of it?

A. I don't have -- I didn't fill any of that out.

Q. You don't recognize it?

A. No.

Q. You don't know how it was administered, how it got there, or anything like that?

A. Oh, yes I do. Yes, I do.

Q. What is that?

A. If I'm not mistaken, those are things that I filled out every day where -- no. This is not what I think -- no, I don't remember. I don't recall the ones behind it. No, I don't.

Q. You don't recognize anything after the first page of that exhibit?

A. No.

Cross - Moore/Hollien                73

Q. So you don't know who that would purport to -- whose work that would purport to be or where that would have come from or anything like that?

A. Do I know where the report would come from, this one?

Q. Yeah.

A. No, not if I have never seen it before.

Q. Okay. Thank you.

You indicated that during the time that Bruce was working in the C.E.T.A. program, it was in the summer of 1992; is that correct?

A. Right.

Q. And that most of the kids that were working -- how big a group of kids did you have that you were supervising?

A. If I remember correctly, a group of like eight to ten, something like that.

Q. And most of them were 15 and 16-year-old high school students?

A. Yes, I do believe.

Q. Do you recall at that time whether or not Bruce Webster was on parole having been in the penitentiary?

A. No, I didn't know. I didn't have any background on any of the kids.

Q. So you wouldn't know if there was anybody -- if Bruce or any of the other students were individuals that had been on parole or if they were high school students?

U.S. DISTRICT COURT

Direct - Macaluso/McHan        74

A.  If they were who?

Q.  You didn't know anything about the backgrounds of those students?

A.  No.

Q.  Do you know whether or not Bruce was in school at that time?

A.  No, I did not.

Q.  Did you know whether or not Bruce was attending the Southeast Arkansas Mental Health Clinic at that time?

A.  I do not.

MR. MOORE:  Thank you very much.

I pass the witness.

MR. MACALUSO:  No further questions.

THE COURT:  You may step down, and you're free to go.

Call your next witness.

THE COURT:  Mr. McHan, if you will stand here and raise your right hand and be sworn?

(Witness sworn by the Court)

THE COURT:  You may be seated.

TOM MCHAN, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MACALUSO:

Q.  Would you tell us your name, please, sir?

A.  Tom McHan.

Q.  Your last name is spelled?

U.S. DISTRICT COURT

Direct - Macaluso/McHan                 75

A. M-C-capital H-A-N.

Q. Your profession or occupation, Mr. McHan?

A. Build cabinets and general contractor.

Q. And where do you call home?

A. Pine Bluff.

Q. Are you native to that area or that town?

A. Yes, sir.

Q. And you're a married man with a family, are you not, sir?

A. Yes, sir.

Q. How long have you been in the cabinet business, Mr. McHan?

A. Approximately two years, in and out.

Q. And prior to that, sir?

A. General contracting since about 1977.

Q. And do you do business under a particular name now?

A. McHan Construction and Mack's Cabinets.

Q. Mr. McHan, let me ask you if you had occasion -- if you have ever met an individual by the name of Bruce Webster?

A. Yes, sir.

Q. Do you see him here in the courtroom today?

A. Yes, sir, I do.

Q. Would you point to him, describe what he's wearing, and tell us where he's seated?

A. He's sitting the third man from my left right here wearing a black coat and tie.

    MR. MACALUSO: Your Honor, I would ask that the record

U.S. DISTRICT COURT

Direct - Macaluso/McHan                76

reflect that the witness has pointed to and has identified the defendant in open court?

THE COURT: You don't mean he's the third man to your left, do you?

THE WITNESS: No, sir, I meant from my left sitting at that table over there.

Q. (By Mr. Macaluso) Oh, the third man from my left you mean?

A. Oh, I mean from my right. Excuse me, from his left.

Q. We give these tests out all the time, Mr. McHan.

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) All kidding aside, you do know Bruce, don't you?

A. Yes.

Q. In fact, you know his brothers, too, do you not?

A. Yes.

Q. Which brothers do you know and how do you know them, sir?

A. I knew Mark, Tacky, which is Dary, Tony, and Bruce because I worked on their parent's house.

Q. Okay. You actually did -- when you were solely and exclusively in the construction business, you worked on the Webster residence, didn't you?

A. Yes, sir.

Q. And at various times, have the brothers worked for you?

A. Yes, sir. Mark and Tacky worked for me for awhile.

Q. Tacky?

U.S. DISTRICT COURT

Direct - Macaluso/McHan 77

A. That's Dary Webster.

Q. Dary?

A. Yes, sir.

Q. He's the brother who was killed; is that correct?

A. Yes, sir.

Q. And Mark, does he work for you now?

A. No, sir. He works for Mr. Carl Davis.

Q. Mr. Carl Davis, he's in the construction business as well, isn't he, there in Pine Bluff?

A. Yes.

Q. Let me ask you when Mark -- when he was working for you, when Tacky was working for you, or Dary, did they talk to you about hiring their brother?

A. Yes, they did, you know, on some clean-up jobs.

Q. And did you, in fact, meet Bruce Webster and actually give him a job?

A. Yes, sir.

Q. When approximately? How long ago would that have been?

A. Around '88, approximately.

Q. And what sort of work was he supposed to do for you, sir?

A. Just clean up.

Q. About how long did he -- well, did you have a chance to see him work?

A. Yes, sir, for just a day or so, and then Mark was supposed to take care of it. Mark usually ran my crew.

U.S. DISTRICT COURT

Direct - Macaluso/McHan          78

Q. Mark is a real good worker, isn't he?

A. Yes, sir.

Q. Is there any question about that at all?

A. No.

Q. Is he trustworthy?

A. Yes.

Q. What about Bruce? How did he work out for you?

A. Not real well.

Q. In fact, how long did he actually work for you in that clean-up crew?

A. About a week.

Q. How was he terminated, or how did that job end?

A. Well, I had found out that he had been sleeping on the job.

Q. Let me ask you, Mr. McHan, just real simple. Were you aware of any physical disability or anything that would prevent Bruce Webster from performing his responsibilities for you on that job?

A. No.

Q. You were paying him a salary, weren't you, or an hourly wage?

A. Yes, sir.

Q. Did you have occasion during the time that he worked for you to talk to him, to listen to him talk?

A. Yes, sir. I had talked to him a couple of times and directed him to do certain items.

U.S. DISTRICT COURT

Direct - Macaluso/McHan                79

Q. Could he follow instructions, so far as you know?

A. Yes.

Q. Would he follow instructions?

A. Yes, sir.

Q. Would he do the work that you told him to do?

A. Well, you know, there were several people doing the items at the time. I don't know whether he basically did it himself or, you know --

Q. Did you have any reason to believe, during any of the time that you had associated with him and he worked for you, that there was anything wrong with him mentally?

A. No, sir.

Q. You said he was sleeping on the job?

A. Yes, sir.

Q. Did you let him go for that reason?

A. Pretty much.

Q. Tell us how that happened, if you recall?

A. Well, he used to stay out late and just come in. He just went to sleep out there in one of the buildings I had out at the house one day.

Q. Well, did you tell -- I mean, did you fire him, just let him go? How did that -- how was that resolved?

A. I just told Mark not to bring him back. That pretty much terminated him.

Q. After about a week?

U.S. DISTRICT COURT

Direct - Macaluso/McHan          80

A. Yes, sir.

Q. Let me ask you. Did he ever talk to you about, or did you learn anything about him being involved in any kind of gang activity?

A. Yes, sir. I knew that he was a member of -- it's The Folks gang is what it is in Pine Bluff.

Q. How did you come to learn about that, sir?

A. Through mostly his brothers, and I have had occasions to go by several parks, which is in the area, and they were gathered up out there.

Q. Mr. McHan, let me ask you. Have you talked to people there in the Pine Bluff area about Bruce Webster, just generally, to learn about his reputation?

MR. BUTCHER: Your Honor, I object to that question. It's outside the scope of rebuttal.

THE COURT: Response?

MR. MACALUSO: I believe, Your Honor, that there was testimony from witnesses brought by the defense, at least one I can think of in particular, who said his reputation was good, or it was not bad, at least, in the community.

THE COURT: Overruled.

Q. (By Mr. Macaluso) Do you have an opinion as to his general reputation for being a peaceful and law-abiding person?

A. No, sir.

Q. Do you know about his reputation?

U.S. DISTRICT COURT

Cross - Butcher/McHan        81

A. Yes, sir.

Q. Is it good, or is it bad?

A. It's pretty bad.

Q. Would that be the same if you forgot everything you know or you think you know about this case for which he is on trial?

A. Oh, no, sir. He was pretty much a person who thought it was easier to go ahead and not make a living but do it a different way.

MR. MACALUSO: Thank you very much, Mr. McHan. I pass the witness for cross examination.

THE COURT: Is there cross?

MR. BUTCHER: Yes, sir.

CROSS EXAMINATION

BY MR. BUTCHER:

Q. Mr. McHan, is your actual personal knowledge or contact with Bruce limited to that one week or so that he worked for you?

A. No, sir. I worked at their house for probably 45 days, a complete remodel.

Q. During that time, you got to see various members of the family, didn't you?

A. Yes, sir.

Q. And you saw the father, didn't you?

A. Willie?

Q. Yes, Willie, Sr.? .

U.S. DISTRICT COURT

Cross - Butcher/McHan            82

A. Yes.

Q. How would you describe Willie, Sr.?

A. It's kind of hard to describe him.

Q. Do you remember describing him to an investigator for the defense back in 1995 as an ornery S.O.B.?

A. Yes, sir.

Q. Does that refresh your memory?

A. Pretty much.

Q. Have you had occasions to have contact with Willie, Sr.?

A. Yes, sir.

Q. Did he ask you for money and that type of thing?

A. Yes, sir, pretty much.

Q. And did you give him the money?

A. No, sir.

Q. Did he say who was going to repay the money?

A. Yes, sir, Mark.

Q. The work that Bruce was supposed to do for you was just menial?

A. Yes, sir, just labor work.

Q. Just pick up trash and so forth?

A. Yes.

Q. This finding him sleeping on the job, did you find him sleeping?

A. No, sir, I didn't.  His brothers told me.

Q. His brothers actually told you?

U.S. DISTRICT COURT

Cross - Butcher/McHan            83

A. Yes. They pretty well kept up with me.

Q. When you talked to him during this time that he did work for you, this was merely to give him directions and tell him what to do and what you expected of him?

A. Yes.

Q. You didn't have any lengthy conversations with him about things that were not directly work related, did you?

A. No.

Q. Do you recall, in talking to that investigator back in 1995, saying that you didn't recall whether Bruce quit or was fired?

A. No, sir, I don't remember that. I'm definitely sure that I let him go.

Q. That you fired him?

A. Yes.

MR. BUTCHER: Thank you. Pass the witness.

MR. MACALUSO: We have no further questions.

THE COURT: You may step down, and you're free to go. Let me visit with you just a moment.

(Off-the-record discussion at the bench at this time)

THE COURT: We're going to take an early lunch break. There is no sense in taking a break and coming back in here for a few minutes before lunch.

We are going to have in this courtroom at 3 o'clock a magistrate's investiture. We have a new magistrate here in

U.S. DISTRICT COURT

Cross - Butcher/McHan            84

Fort Worth, and he's going to be formally sworn in and robes put on him and all that sort of thing. So we're going to have to vacate here and have our trial this afternoon in Judge Mahon's courtroom, which is on the 5th Floor. So we're going to have to quit about 2:45 because I have to be involved in the ceremony.

So I'll ask you to go to lunch, report back to the normal jury room, and then Mr. Bowen will come get you and bring you to the 5th Floor courtroom. It's prettier than this one. So you may enjoy seeing a different courtroom. It's a little more intimate, but it's a nice courtroom. And we'll go from 1:00 until about 2:45, and then we'll quit which will give me time to get back down here for the ceremony at 3:00. A bunch of the judges from Dallas are coming over here, and I feel some obligation to host them a little bit.

Then we'll quit at 2:45 and come back at 9:00 a.m. on Tuesday. I thought we would be ready for the charge then, and we may be ready for the charge, but the government still has a couple of witnesses it wants to put on Tuesday morning. So we're probably going to move back the charge until the afternoon.

That's the best road map I can give you. It's kind of like the weather. It changes as circumstances change, and the prediction may not be accurate. So I'll say there is 20 percent chance of charge by noon on Tuesday.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          85

Any questions?

All right.  Thank you.  Take all your stuff with you.

(Trial recess, 11:40 a.m. - 1:15 p.m.)

THE COURT:  The government may call its next witness.

MR. ROPER:  Your Honor, the government calls John Clay.

THE COURT:  Mr. Clay, would you please raise your right hand and be sworn?

(Witness sworn by the Court)

JOHN CLAY, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q.  Would you state your name for the judge and jury, please?

A.  John L. Clay, Jr.

Q.  And you're currently being held in the Mansfield Law Enforcement Detention Center; is that right?

A.  Yes, sir.

Q.  And you have charges pending against you, is that correct, for drug dealing and possession?

A.  Yes, sir.

Q.  And your trial is pending; is that right?

A.  Yes, sir.

Q.  At this point, you're cooperating with the government?

A.  Yes, sir.

Q.  You're in hopes of getting a lesser sentence; is that

U.S. DISTRICT COURT

Direct - Roper/Clay, John          86

right?

A. Yes, sir.

Q. A possible sentence you could look at is, in fact, life; is that correct?

A. Yes.

Q. Now, I want to go back, if I could, with you to April -- specifically, April 14, 1996. Were you here in the federal court building that day?

A. Yes, sir.

Q. That's the courthouse we're in today; is that right?

A. Yes.

Q. Did there come a time when you were in the holdover cell, down in the marshal's office, here on the second floor of this building?

A. Yes, I was.

Q. And at that time did you have occasion to come in contact with a man by the name of Bruce Webster?

A. Yes.

Q. Is he here in the courtroom?

A. Yes, he is.

Q. Would you point him out for the judge and jury?

A. (Indicating.)

Q. How far from my right is Mr. Webster?

A. He's three gentlemens over.

MR. ROPER: The government would ask that the record

U.S. DISTRICT COURT

Direct - Roper/Clay, John          87

reflect that the witness has identified the defendant, Bruce Webster?

THE COURT: The record will so reflect.

Q. (By Mr. Roper) Would you tell the members of the jury what Mr. -- were you in the cell first before Mr. Webster was there, or did you come in later? How did that happen?

A. When I first arrived, he was there but he left, and then he came back.

Q. And would you tell the members of the jury what happened when he came back?

A. Well, when he came back, he started jumping around, saying, there has got to be a God. There has got to be a God. Then he went into preaching a sermon that touched my heart, and after that, he started talking in pig latin.

Q. Now, did he say why he was -- there has got to be a God?

A. Yes, he did.

Q. Why did he say that?

A. Because they set his trial to a later date.

Q. You said he preached or gave a sermon. What kind of sermon -- or how long did he give a sermon?

A. He quoted scriptures out of the Bible that had to be photographic in his mind because it was so accurate, and then he preached 30 minutes.

Q. Now, you didn't have a bible there with you to see if he was right, but was he quoting scriptures?

U.S. DISTRICT COURT

Direct - Roper/Clay, John        88

A. Yes, he was.

Q. Now, at that time after he finished that, you said he talked pig latin with you?

A. Yes.

Q. What do you mean by that?

A. Well, it's the way we talk when -- he and I know, you know, how to talk, and we know other people don't understand. People around us can hear us, but they don't know what we're talking about.

Q. Now, before you started talking to him, did you tell him what you're being charged with?

A. He asked me about my case, and I just told him I was in a whole bunch of trouble.

Q. And you say this pig latin is the way you all talk. Is it normal English conversation like we're talking right now?

A. Yes, but it's speeded up so fast and dragged so slow at times that you wouldn't be able to understand it, but he would.

Q. Can you just give a tiny short example of that?

A. Yes, I would. (The witness complies.)

   And what I just said, I said, people in the courtroom don't understand what I'm talking about right now.

Q. And when you and Mr. Webster were talking like that, was there anybody else there in the holdover cells?

A. Yes, there was.

Q. Well, what did you all talk about at that time?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          89

A. Well, he was telling me about some incidents that happened over at the facilities where I'm at.

Q. And did there come a time when he told you about a plan he had regarding the visiting area of the jail?

A. Yes, he did.

Q. And what did he say?

A. He was telling me about how he had a master mind plan that he could put together, but he needed me to help him because he was confined to solitary confinement at that time, and he needed me to help him do that.

Q. Well, what did he tell you in that regard?

A. He wanted me to -- he knew I had a lot of lady friends that was next door, and he wanted me to get a lady friend of mine to put him on his visiting list, and when someone came to saw me, they could put him out and me out, and pull the other ladies out as well. We would all be in the visiting room at the same time. I could look out for him while he got with the lady, and then he could look out for me when I got with my lady.

Q. Now, did you know whether or not Mr. Webster had anybody in this part of the area readily available to be put on his visitor list?

A. He said -- that's the reason why he needed me because his family wasn't from around here, and he didn't have anybody to put on there, and he wanted me to put someone on his visiting list that was around here that could come kind of regular.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          90

Q. After you had that conversation, did there come a time when you left the holdover cell? Did you leave eventually and go back to jail?

A. Yes. We both went back to the facility together.

Q. And that's the Mansfield Law Enforcement Detention Center?

A. Yes.

Q. Before you left, did Webster say anything about further contact with you in regards to this plan?

A. He was telling me that -- I told him that I really didn't understand what he was talking about, and he was telling me that he would write me a letter in pig latin that only I would understand, that if anybody else read it, that they wouldn't understand it.

MR. ROPER: May I approach the witness, Your Honor?

THE COURT: You may.

MR. ROPER: Your Honor, with the permission of the Court, I have marked it 121-A here on the outside. The sticker fell off, but it's an envelope. I'll put one on in just a second -- well, here's one.

(Brief pause in proceedings)

Q. (By Mr. Roper) I want to show you a handwritten letter and an envelope with a stamp on it marked Government's Exhibit 121-A. I'll ask you if you recognize it?

A. Yes, I do.

Q. Now, have you ever seen this letter before?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          91

A. Yes, I have.

Q. What is this?

A. This is the letter that Webster wrote me.

Q. And how do you know that?

A. Because he put, guess who?  So they would know he was writing me in the same facility.

Q. Let's move forward for a second.  Did you have occasion at a later time to give this to your attorney?

A. Yes, I did.

Q. Is Government's Exhibit Number 121-A a true and accurate copy of the letter that you received from -- well, the letter you received in April of 1994?

A. Yes, it is.

Q. Not '94, '96.  I'm sorry.

        MR. ROPER:  The government would move to introduce Government's Exhibit 121-A.

        MR. BUTCHER:  May I see it?

        THE COURT:  Yes.

        MR. BUTCHER:  The government has no objection.

        THE COURT:  121-A is admitted.

Q. (By Mr. Roper)  Now, subsequently, have you looked at -- this is in handwriting, is it not?

A. Yes, it is.

Q. And at the end of the letter, it's signed B-Love, P.S. My real name is Bruce Webster.  Is that right?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          92

A. That's correct.

Q. Now, I want to show you what's been marked as Government's Exhibit 121-B. Now, what is that? Have you seen that before?

A. Yes, I have.

Q. Is that a typewritten version of this handwritten document?

A. Yes, it is.

Q. Okay. And the penmanship in this letter is not outstanding, is it?

A. No, it isn't.

Q. But were you able to read that and determine whether that is a typewritten version of what is -- what you could read in handwriting?

A. Yes. This letter is wrote in pig latin.

Q. Okay. And there are a couple of phrases in there that are blank, and you just couldn't read those; is that right?

A. The words don't mean anything.

Q. You said pig latin. A lot of this is in English; is that right?

A. Correct.

Q. And it's not exactly what you were saying earlier?

A. It means you write a sentence talking about nothing, and then you get back to what we're talking about, and then you write something else that says nothing.

        MR. ROPER: The government would move to introduce 121-B for the purpose of aiding the jury only.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          93

MR. BUTCHER: Your Honor, the defendant would object. First of all, it's not the best evidence. The best evidence is the letter itself.

Secondly, there has been no showing who transcribed this document or how she did it.

Thirdly, there is no reason to believe that the person who transcribed it had any better skills, knowledge, or ability to translate, quote-unquote, this document than would the jurors.

THE COURT: I sustain on your second point and hold the others for decision later.

Mr. Roper, do you want to try to meet the second objection?

MR. ROPER: Yes, Your Honor.

Q. (By Mr. Roper) Have you had occasion to look over this?

A. Yes, I have.

Q. From looking at it, were you able to figure out the words -- it takes you a little while to read it?

A. Yes.

Q. And were you familiar from reading it with the words that are on here?

A. Yes, that's correct.

Q. And the words that are on there, on this document, on the handwritten letter, are those words that you could read contained on this?

A. Yes.

Q. Is there any question about that?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          94

A. No question.

Q. You didn't prepare that, did you?

A. No, I didn't.

Q. Did you review a draft of that?

A. No -- I reviewed a draft of this, yes.

Q. And did you make corrections on that?

A. I made corrections. I made corrections. Yes, I did, and filled in the blanks that made sense.

Q. All right. Is there anything in here you're interpreting what's said, or is it a case where you're just -- you determine whether a word that's written is typed?

A. That's what I did. Yes, you're right.

MR. ROPER: Your Honor, we would offer --

THE COURT: Mr. Clay, did you tell the typist what to type?

THE WITNESS: No, I didn't.

THE COURT: How did the typist know what to put on the typewritten piece?

THE WITNESS: It's written in English, sir. It's written all in English, and she just typed it word for word.

THE COURT: Well, if nobody else but you could know what was on the handwritten page, how did this person know what to type?

MR. ROPER: I understand the Court.

THE COURT: Well, let him answer.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          95

THE WITNESS: Well, what he did, he talks about nothing. Then he comes back to our conversation. He talks about nothing in English. Then he comes back to our conversation, which means you can read everything that's there, but it doesn't make any sentence, but only there are certain sentences in there that do make sense about our whole conversations that we had prior to that.

THE COURT: All right. Let me see if I understand. There is no pig latin on the handwritten page; is that correct?

THE WITNESS: No. We just call it pig latin when I talk about something that makes sense, then talk about nothing, then talk about something that makes sense, then talk about nothing. It's pig latin. It throws you off because you don't know what its saying.

THE COURT: All right. Let me see it.

(Brief pause in proceedings)

MR. BUTCHER: Your Honor, may I make a further objection?

THE COURT: Yes, sir.

MR. BUTCHER: If this -- well, this evidence is being admitted for rebuttal purposes. The only purpose that could be derived is the actual letter itself, that is the writing, penmanship, the grammar, the spelling, et cetera, and that's the evidence that is appropriate, not the translation, transcription of some other unknown person.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          96

MR. ROPER: I don't see the relevancy whether they typed it or not --

THE COURT: I'm going to settle that. I'm going to disallow 121-B because you can read this sufficiently, but you don't need the typewritten transcript that someone else prepared. So I'm going to allow 121-A but not 121-B.

MR. ROPER: May I approach the witness again, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Roper) All right. I want to show you -- are you familiar with the layout there, in general, of the Mansfield Law Enforcement Detention Center?

A. Yes, I am.

Q. Now, you've mentioned when you were talking to Webster about the visitor area -- are you familiar with the control room right here?

A. Yes.

Q. And do you know where the visitor area is?

A. Yes. It would be right in here (indicating).

Q. Now, you go down a hall -- you're familiar with a large hall right there?

A. Yes, sir.

Q. And you go down -- is there a visitor area at the jail?

A. Yes, there is.

Q. Describe it for the jury?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          97

A. It's a long room shaped like this, and it has chairs set like that with a window in front of it where your guest visits you from the opposite side.

Q. Would there be a bar across it?  I mean, you can't go out and touch somebody, can you?

A. No, you can't.  You can't touch the people that's visiting you, but you can touch the person beside you.

Q. And is there a security camera or anything there in this room?

A. It's not directly faced this way.  It's facing the hallway, which means you can't see nothing in the visiting room.

Q. And did Webster talk to you about what could happen in that area there?

A. Yes, he did.

Q. What did he say?

A. He was telling me that the camera does not face directly in the visiting room but down the hallway, which it does, and he was telling me that once we got to the visiting room, I could look out for him, and he could look out for me while we went way to the back bench and took care of business.

Q. And that would be to have sex with a female inmate?

A. Yes, it would.

Q. And this is mentioned in the letter?

A. Yes.

        MR. ROPER:  With the permission of the Court, I would

U.S. DISTRICT COURT

Direct - Roper/Clay, John          98

ask permission to read?

THE COURT: All right.

Q. (By Mr. Roper) Say, what's up, Cold Blood. You probably don't know who it is right off. I'm that brother you met over at the federal building about two weeks ago. You remember me and you rode back together and we both dressed out in the dressing room together? And I was kicking the B.B.'s with the officer?

What does kicking the B.B.'s mean?

A. It's a slang word for B.S.

Q. I make you remember even more. I had on a black suit and a silver and black tie, low hair cut with waves. I go by the name of B-Love. You remember what we talked about over there at the federal building, and on the way back we talked in the slang?

What slang?

A. The pig latin version I discussed awhile back.

Q. Now, you know I hope I would have been done hit you up in the paint, but I didn't have your real name.

What's hit you up in the paint?

A. It means writing you a letter faster if I would have known your name.

Q. I just found that out when I went back over to the federal building Wednesday and Monday and seen your boy slim, and he told me to tell you what's up. He was trying to get a bond.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          99

The judge almost wanted to let him go, but he looked at his part and that was his reason for holding him.  But he's chill. He's in that worse, and that's all to the good.  God will bless him.

Say, big their blues -- big D's blues.  Shoot your nigger that name up so I can put it down on my visiting list and regulate them through your women that's up in there.  You have it set up.  I talks to my home officer and he says the best day to regulate it is Sundays in the evening around 3:00, and Thursday and Friday and Tuesdays is good, especially in the evening around 3:15.  You know visitation isn't over until 4:30.  He told me he would let us stay out there until 4:30, from 3:15 to 4:30, as we are getting 45 extra minutes.  Say, let's make it happen, player.  This is from one player to another.  Say, keep ours on the down low.

What does down low mean?

A.  Keep it quiet.

Q.  When he's talking about 4:30 to 3:15, around that time, what did he mean by that?

A.  You normally get 30 minutes.  He was saying if he did it at a certain time, that he had an officer that would allow us to go a long period of time.

Q.  You know how their buster cluster player hotter would give up the 411 because they ain't making it happen.

What does 411 mean?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          100

A. He was saying keep it on the down low because you know if the word got out, there are a lot of snitches that would give us up before we could even make it happen.

Q. 411, what does that mean?

A. 411 means 911. It means any snitch. Somebody that would tell if they got a hold what we was going to do.

Q. Make sure you tell your women to keep it on the down low and say it's this Mexican girl that's up there that cuts for me, but she can't speak too good of English. She barely can write it. They call her Chacha.

What do you mean when you say cuts for me?

A. Meaning he's already --

Q. I'm sorry. Go ahead.

A. It means -- when you say cuts for me, that means she likes him, you know.

Q. Say get one of your girls in there to have it translated to her like they have someone that wants to see her. Have one of your girls to give her a name put on her list. Don't let her know it's going to be me. That she will see because she will probably say something to this Mexican girl named Virginia, and Virginia likes me and that will create problems. I just want you to regulate it.

What does -- did you have some girlfriends down at the Mansfield Law Enforcement Detention Center?

A. Yes, I did.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          101

Q. Were the women kept -- in how many different areas, to your knowledge, were the women kept?

A. In one tank.

Q. I just want you to regulate it and have her call out by name, one you give her through your girl to put on her list. Your girl can give her lady to put on her list, and you will have two people calling us out and we will go out there or a couple -- as a couple. I will watch for you. You watch for me. So make sure you send me some lady that's -- some lady's name that is going to come up here with whoever comes to see you as we can make it happen. Make sure you have a spare for me just in case the Mexican girl, Chacha, don't come through. Say it's a lot I want to break you off on, but until then, you stay up my nigger.

Say make sure you keep it all on the down low. Don't even talk too loud when you're at the door with whatever woman this is. Keep it on the low tip and make sure you ain't got no spectator standing around trying to -- something. I can't read it -- and gang top on your -- you dig. I know you are a regulator. I can count you on to handle your business. So don't forget these three things I asked you to do.

What does regulate mean, being a regulator?

A. It means put it in motion.

Q. One, make sure you send me a name of somebody who comes up here with whoever that comes to see you so they can pull me

U.S. DISTRICT COURT

Direct - Roper/Clay, John          102

with you, and if your women got people that will come up here the same day and time, 3:15, to pull them out, it's all good, but if not, you have got to get two more people to pull the women out.

Two, get your girl to get Virginia, or whoever can speak Spanish, up in the female zone to translate it for Chacha to put someone's name down on her visiting. You can give your girl a name to give her to put down on hers for me, but don't tell her it's for me because Virginia might fuck it up for me because she cuts for me, but I'm not too crazy about her, or you can have your girl to give her someone's name that is coming up on the same day and time we go out.

And, three, have your girl to find a spare for making things happen. Make sure she's -- make sure she's fine. She don't got to be all that as long as she's down. Tell your girl to give her someone name that's coming up to see her or if, whoever this girl is, got people that comes to see her, you tell her -- tell your girl to have her to send me a name of her people so I can put it on my list. So I will be all to the good if when you don't make it happen --

THE COURT: Mr. Roper, do you think that's a good sampling of the letter?

MR. ROPER: Yes, Your Honor.

Q. (By Mr. Roper) He goes on in the letter and talks about what else happens about setting this thing up with the women;

U.S. DISTRICT COURT

Direct - Roper/Clay, John          103

is that right?

A. Yes.

Q. Now, the end of the letter, I would like to just read that portion.

But in the meantime, between time, hit me right back on this so I can know if it's all good. I'm out like last year something.

And he does sign it -- at the end it's signed, P.S. My name is Bruce Webster, B-Love. So when you write back, you know who to send it to.

Did he send you that letter?

A. Yes, he did.

Q. Mr. Clay, you have been convicted of crimes, haven't you?

A. Yes.

Q. You have been convicted of burglary, and you got a probated sentence; is that right?

A. Yes.

Q. Then you got -- that was revoked, and you went down for a substantial amount of time on a narcotics distribution charge; is that right?

A. Yes.

Q. And you got 40 years on that charge?

A. Yes.

MR. ROPER: I believe that's all the questions.

THE COURT: Cross?

U.S. DISTRICT COURT

Direct - Roper/Holloway          111

Q. Mr. Holloway, did there come a time when Bruce Webster, to your knowledge, was transferred from the Mansfield Law Enforcement Detention Center to the Federal Medical Center -- or Federal Medical Center Pretrial Detention Area in Fort Worth, at the Fort Worth Federal Medical Center?

A. Yes, sir.

Q. I mean, that's not -- this area is not a hospital -- there is a hospital there; is that right?

A. Yes, sir.

Q. But this isn't a hospital. This is where prisoners are held?

A. Yes, sir.

Q. Did there come a time when Bruce Webster wrote you a letter?

A. Yes, sir.

Q. And that was just a few weeks ago; is that right?

A. Yes, sir.

      MR. ROPER: May I approach the witness?

      THE COURT: Yes, sir.

Q. (By Mr. Roper) Let me show you Government's Exhibit Number 132-A. Do you recognize that?

A. Yes, sir.

Q. Is Government's Exhibit -- well, what is this?

A. The same letter that Bruce wrote me.

Q. Did you keep the letter, or did you eventually turn this

U.S. DISTRICT COURT

Direct - Roper/Holloway                112

over to law enforcement officials?

A. Yes, sir.

Q. And is this one and the same letter that was written to you, the original that was written to you by Webster?

A. Yes.

MR. ROPER: The government would move to introduce Government's Exhibit Number 132-A.

MR. MOORE: Just the letter?

MR. ROPER: Yes.

MR. MOORE: No objection.

THE COURT: 132-A is admitted.

Q. (By Mr. Roper) Now, you have had a chance to read that letter, haven't you?

A. Yes, sir.

MR. ROPER: With the permission of the Court, I would like to read a portion of it?

THE COURT: Okay.

Q. (By Mr. Roper) Here at the top in parenthesis, holler at me when you finish. And, also, in parenthesis, throw it away when you finish.

Say, Hollywood, this is one of what I have been wanting to break you off on. You know I couldn't put it in the air -- you know I couldn't put it in the air like that because of Frost and Steve down there might catch it.

Was Steve Beckley and Demetrius Hall, or Frost, Jack Frost,

U.S. DISTRICT COURT

Direct - Roper/Holloway          113

there at the Federal Medical Center?

A. Yes, they were.

Q. So you know I was hitting Tanya on the cool. I knew she cutted for me the first day she met me, but she had to keep it on the down low because she knew Lan would break her off. I think Lan gave her my beeper number to page me while he was in the show doing something. So he had her to call to tell me to come by, but she end up keeping my number on hitting me on the D.L. when Lan would make a move around.

You know she told me often I had hit it. She wanted to know why there was so much talk of B-Love, why they call me B-Love. Well, she find out there ain't no love like B-Love.

Now, he goes on in the letter and talks about how he had a sexual encounter with Tanya; is that right?

A. Correct.

Q. And is that Orlando Hall's girlfriend, or fiancee, at the time?

A. Yes, sir.

Q. So I commenced -- back to Tanya, when I went back there the first time, she had a short set outfit looking jazzy as hell. So as I commenced at dropping this low conversation off her and brainwashing her and penetrating her mind, and she fell for the okey-dokey.

What is the okey-dokey? Are you familiar with that term?

A. It sounds like she fell for the line he was throwing at

U.S. DISTRICT COURT

Direct - Roper/Holloway          114

her.

Q. What?

A. I said, I assume he was saying that she fell for the line that he was giving her.

Q. Continuing to the latter part of the letter:

And I stepped outside playing with Ta-Ta, and she come out there asking me how I like Texas, and I told her, I'm international. I have been to Texas. You should be asking how Texas like me, and she told me on the cool before Lan came out there that she would pay for my ticket back if I pay for it to come up there.

And does he go on and talk more about his encounter with Tanya in the letter?

A. Yes, sir.

Q. You have got to speak out?

A. Yes, sir.

Q. Going to Page --

THE COURT: Is there anything new, Mr. Roper, in what you have coming up?

MR. ROPER: Yes, sir.

Q. (By Mr. Roper) Continuing on. Did there come a time when he started talking about Orlando in the letter?

A. Yes, sir.

Q. And this is on Page 4:

But little did he know Big D introduced us and told him,

U.S. DISTRICT COURT

Direct - Roper/Holloway                115

I'm the man to chill with because I can move shit and every mother knew me, and mother fucker knew I'll put in work on a nigger's ass.

What does that mean, Mr. Holloway?

A. Putting in work on somebody? That he's not afraid of shooting them or --

Q. Whatever it takes?

A. Right.

Q. Who is Big D?

A. Dennis. I'm not sure of his last name.

Q. Is that the same or different Dennis that you saw with Bruce when you met him on Friday night?

A. It's the same Dennis.

Q. Them niggers was waiting on me to get the word, and they would have gotten him. Damian Allen, Bubu, Don Perrion, Clifton, all my niggers from west side was laying on creep tip for him, and that made me even madder when Steve told me that, but I played it off so I could get him, but my niggers went ahead and shot him.

Did Orlando have a car?

A. Yes, sir.

Q. Green 5.0 Mustang?

A. Yes, sir.

Q. Did you ever see that car at all?

A. Yes, sir.

U.S. DISTRICT COURT

Direct - Roper/Holloway          116

Q. How was it?

A. Like describe it?

Q. Yeah. Did you ever see it broken down?

A. Oh, yes, sir.

Q. And what happened? What did you see in that car?

A. One day me and Orlando was leaving my house, and when we drove back to his apartment, someone had pulled up in the driveway, and the car had been shotgun blasted and stuff, the windows and stuff busted all out.

Q. Do you know what he's talking about Don Perrion and Clifton and all my -- and he used the "N" word -- from the west side?

A. Right.

Q. Do you know who he's talking about?

A. Do I know the guys he's talking about?

Q. Yes.

A. Yes, sir.

Q. And who are they?

A. Who are they?

Q. Are they friends?

A. Yeah. They are friends of Bruce.

Q. And going on in the letter: And they wanted to break you off, but I told them you my nigger, and I don't believe you said that because, nigger, I had papered up.

What does he mean by that? Who was he talking to at that point?

U.S. DISTRICT COURT

Direct - Roper/Holloway          117

A. He was referring to me.

Q. And what did he mean by that?

A. I'm really trying to keep up with you on this letter, but --

Q. I'm sorry. I'm trying to skip around so I don't take too much time.

Well, let me go ahead. I was going to break -- I'm down on Page 5 --

A. Okay. I see where you're at now.

Q. Do you want me to read it again?

A. Right. Read it.

Q. And they wanted to break you off, but I told them you my -- and he used the "N" word -- and I don't believe you said that because I had papered up?

A. I guess he's trying to say prepared us or something.

Q. I was going to break myself off -- until this happened. You know, I had that hooptie to throw them popo's off because them chicken hops spotted me too quick when I had my blue '67 Chevy before I sold it to Clifton, and I had a burgundy and gray two-tone Fifth Avenue.

When he says popo, who is he talking about?

A. He's referring to the police.

Q. What about a hooptie? What's a hooptie?

A. Just an older car.

Q. And that's the purpose of that car?

U.S. DISTRICT COURT

Cross - Moore/Holloway          118

A. A hooptie?

Q. Yes.

A. I don't know. A lot of people just get hooapties.

Q. I got it when I was in Memphis in '93 and some parts of '94. One time seen me one night coming out of Linden Street apartment. And them police tried to rush me like hot man rushing -- and I broke out on them -- in the car and everything. They towed it off and told mother fuckers that I was standing around. They knew it was me, and I want the car back, come down to the station, you know. I wasn't falling for that --

THE COURT: Mr. Roper, I think I have heard about all this I can take. Can you move on?

MR. ROPER: I have one other sentence, Your Honor.

THE COURT: No. This isn't helping enough.

MR. ROPER: That's all the questions I have.

THE COURT: Is there cross?

MR. MOORE: Yes, Your Honor.

CROSS EXAMINATION

BY MR. ROPER:

Q. Mr. Holloway, you indicated that you kept the letter when you got it from Mr. Webster; is that correct?

A. Well, I actually passed it on to another inmate.

Q. Who did you pass it on to?

A. Demetrius Hall.

U.S. DISTRICT COURT

Cross - Moore/Holloway          119

Q. Why did you pass the letter on to Demetrius Hall?

A. Because the things he had said about his brother just indicated that he was talking a lot of noise on this letter. So I wanted him to read it.

Q. Did you pass it on to anybody after that?

A. No, sir.

Q. How did you get the letter back?

A. When I got back in that evening, I didn't actually get it back. The counselor had gotten it. The counselor had grabbed the letter from Demetrius.

Q. When you say the counselor, who are you referring to?

A. A counselor, Ms. Jordan, one of my counselors.

Q. Ms. Jordan? What kind of counselor is she?

A. She's just a counselor over at the jail unit where I'm being held at.

Q. That works in the jail?

A. Right.

Q. How did she get the letter?

A. Demetrius gave it to her.

Q. When you gave the letter to Demetrius for him to look at what Bruce had put in the letter, was there any discussion as to what you all would do with the letter or how you all would use the letter?

A. No, sir. I told him to flush it.

Q. You told him to flush it?

U.S. DISTRICT COURT

Cross - Moore/Holloway          120

A. Right.

Q. You just wanted him to know what was going on?

A. Right.

Q. At the time you got this letter, you had already testified against Orlando Hall at his trial; is that correct?

A. Right.

Q. The trial on Bruce Webster, the jury selection for his trial had already begun; is that right?

A. Had it begun already?

Q. Had it already begun in May when you received this letter, when we already started picking the jury in this case?

A. No. I just received this letter about two weeks ago.

Q. You got this letter two weeks ago?

A. About two weeks ago.

Q. So it was two weeks ago you got this. The jury had already been selected, and the trial was already going on at the time you got the letter?

A. No.

Q. The trial hadn't started?

A. No.

Q. But you got it about two weeks ago?

A. Yeah, about two weeks ago.

Q. How did it come to be that the government talked to you about the letter?

A. Because they had asked me had Webster been writing.

U.S. DISTRICT COURT

Cross - Moore/Holloway          121

Q. Was there any reason for them to think that Webster had been writing?

A. I don't know.

Q. Well, had you told them prior to that point that he had been writing?

A. Yeah. And then when they asked me, I told them he had wrote me a letter.

Q. Well, did you ever write him a letter?

A. No, I didn't.

Q. You never wrote Bruce Webster a letter?

A. (The witness nods.)

Q. You're sure of that?

A. Positive.

Q. Did you ever ask him to write you a letter?

A. No.

Q. You never asked him to write you this letter?

A. No. He just started writing.

Q. Did you have trouble reading this letter?

A. Yeah, some words I did.

Q. Why did you have trouble reading this letter?

A. Well, there were certain words I just didn't understand.

Q. Are you impressed with his grammatical ability?

A. I wouldn't say I am.

Q. Are you impressed with his handwriting ability?

A. No.

U.S. DISTRICT COURT

Direct - Roper/Valdez          122

MR. MOORE:  Judge, I think that's all.

MR. ROPER:  No further questions.

THE COURT:  You may step down.

Please call your next witness.

MR. ROPER:  B. J. Valdez, Your Honor.

THE COURT:  Step over here, please, sir?

He's already been sworn, right?

MR. ROPER:  Yes, Your Honor.

THE COURT:  Be seated.  Recall that you're still under oath?

THE WITNESS:  Yes, sir.

DIRECT EXAMINATION

BY MR. ROPER:

Q.  Would you state your name for the jury, please?

A.  B. J. Valdez.

Q.  You testified earlier in this cause; is that correct?

A.  Yes, sir.

Q.  I know you identified the defendant in this case.  I want to ask you some questions regarding your contact with the defendant.  Did you, during the course of working as a guard there in the jail, come into contact with and have conversations with the defendant, Bruce Webster?

A.  Yes, sir.

Q.  During the course of working there, Bruce was there for a substantial period of time, since October of '94?

U.S. DISTRICT COURT

Direct - Roper/Valdez            123

A. Yes, sir.

Q. During that time period, did you talk with him on few or many occasions?

A. Yes, sir, I did.

Q. Few or many?

A. Few conversations we have had.

Q. And when you dealt with him during the course of that time, how often would you deal with him?

A. Maybe 15, 20 minutes.

Q. Would you have any other contact with him as a jailer there at the jail?

A. Only on questions that he asked as far as property, different conversations that we've had.

Q. Have you ever had occasion to observe him there in the jail area?

A. Yes, sir.

Q. During the course of that, did you ever see him receive any type of reading material?

A. Yes, sir.

Q. What would he receive?

A. He would receive letters, post cards, newspapers.

Q. Did he ever send out any letters or post cards?

A. Letters he did.

Q. And would that be outside the jail or inside the jail or both?

U.S. DISTRICT COURT

Direct - Roper/Valdez          124

A. Both.

Q. Now, did you ever see him receiving reading materials?

A. Yes, sir.

Q. And what was that?

A. It would be like ministry packets that he would receive.

Q. Could you tell whether he ever read those?

A. Well, pretty soon because he received a lot them.

Q. No. Did you ever observe him reading them?

A. No, sir.

Q. How about any newspapers?

A. Newspapers, post cards.

Q. Did you ever see him read any of that?

A. Yes, sir.

Q. Now, you said you had discussions with him. What were the discussions you had with him about?

A. Some discussions, we would talk about issues that come out of the newspapers. When I was working in the control section, he would discuss an incident that happened here in Fort Worth, a vehicle accident. He would read it from the newspaper to me through the intercom.

Q. And when would that take place? How would you have contact with him?

A. It would be through the intercom in his cell to my V.I.A. intercom in the office.

Q. And did he talk to you about anything else besides

U.S. DISTRICT COURT

Direct - Roper/Valdez            125

newspaper articles?

A. Yes, sir. He would read from the scriptures, and we would talk about that.

Q. Did he ever talk in a face-to-face manner about the bible?

A. No, sir.

Q. Did you ever have any difficulty in understanding Bruce?

A. No, sir.

Q. Now, is there a commissary in that building?

A. Yes, sir.

Q. Briefly explain to the jury what that is?

A. Commissary is their -- in order for him to receive, or any inmate to receive commissary privileges, he would have to check out the items that he needed. It's like a canteen where you can order sodas, chips, candy, cigarettes, and he would have to check the items that he needed and turn it into the officers so they can deduct it from his account and fill the order and give it back to him, and he would have to describe the orders that he would check off and sign for.

Q. Was he able to do that?

A. Yes, sir.

Q. Did you ever have a conversation with him about a commissary problem?

A. Yes, sir. There was one incident that a commissary officer made a mistake, that he was overcharged for the item and never received the item.

Cross - Butcher/Valdez          126

Q. How did you know?

A. Because he stopped me -- when I was coming in the office one day, and he stopped me that there was a problem with his commissary, and he requested me for me to talk to the commissary officer, and he brought it to my attention.

Q. You said reading material from newspapers he received. Was there any other reading material he ever received?

A. Post cards. He would question me about post cards.

Q. And what did he say about that?

A. He would like to see them and read them even through they weren't entitled to have them in their cell.

Q. How long have you been working in the jail unit, in law enforcement?

A. Fourteen years, sir.

Q. During that course, have you ever come across folks that were mentally retarded, prisoners that were mentally retarded?

A. Yes, sir, several.

Q. Is there any indication from talking to Mr. Webster that he appeared to fit in that category?

A. No, sir.

        MR. ROPER:  Pass the witness.

        THE COURT:  Is there cross?

        MR. BUTCHER:  Yes, Your Honor.

                CROSS EXAMINATION

BY MR. BUTCHER:

U.S. DISTRICT COURT

Cross - Butcher/Valdez          127

Q. Officer Valdez, the people there at the detention center, some of them are in cells by themselves; isn't that correct?

A. Yes, sir.

Q. Even those that are in cells with other people, they get lonely, don't they?

A. I believe so, sir.

Q. They welcome conversations with other people, don't they? Isn't that a fair statement?

A. Yes, sir.

Q. And the fact that Bruce sought out conversations with you, talked about the scriptures and things that he had read. That's not uncommon, is it?

A. No, sir.

Q. It's not unusual at all. It's to be expected, isn't it? Somebody all by himself wants to talk to another human being?

A. Yes.

Q. Do you like Bruce? Do you like him as a person, another human being?

A. He's a human being, sir.

Q. What do you like about him?

A. He's God's child.

Q. Excuse me?

A. He's God's child.

Q. He's God's child.

MR. BUTCHER: We pass the witness.

U.S. DISTRICT COURT

Direct - Roper/Alexander            128

MR. ROPER: No further questions.

THE COURT: You may step down, sir.

MR. ROPER: We call Luther Alexander.

THE COURT: Please have a seat over here, sir?

THE WITNESS: Yes, sir.

THE COURT: You'll recall you're still under oath?

THE WITNESS: Yes, sir.

LUTHER ALEXANDER, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q. For the record, are you the same Luther Alexander who testified earlier in this cause?

A. Yes, sir, I am.

Q. During the course of being a jailer there at the Mansfield Law Enforcement Detention, did you come in contact with the defendant in this case, Bruce Webster?

A. Yes, sir.

Q. Is there, at that center, a law library for inmates to use?

A. Yes, sir, there is.

Q. And have you ever had occasion to be in that law library with Defendant Webster?

A. Yes, sir, on many occasions.

Q. Tell the members of the jury why that would happen?

A. Okay. First, when he was in general population, he attended law library almost each and every day that we had it.

U.S. DISTRICT COURT

Direct - Roper/Alexander          129

Most inmates attend law library just to get out of their zones, have a little freedom.  During that time, after he had his escape attempt, he was escorted to the law library to do his studying by himself with leg irons and handcuffs off.  I observed him during that period of time.

Q.  Tell the members of the jury what you observed when you were there in the law library with him?

A.  When he was escorted to the law library, he got down law library books.  He looked at them.  He took notes from them.

Q.  Now, during the time when you were with him, did you appear to -- did you understand what he was saying when he was talking to you?

A.  Yes, sir, at all times.

Q.  Did you ever give him directions?

A.  Yes, sir, I did.

Q.  Was he able to understand those directions?

A.  Yes, sir, he was.

Q.  Did you ever have occasion to see him -- about how he kept himself, his hygiene?

A.  At all times he was very neat.  When he had attorney visits, regular visits, he always took his time to groom himself properly before he left the cell.  In many cases, the officer will call and complain about him not getting ready fast enough to go to his visits.

Q.  Now, did there come a time that you talked to him about --

U.S. DISTRICT COURT

Cross - Moore/Alexander          130

or did he contact you about a complaint he had?

A. Yes, sir. He spoke to me concerning speaking with Mr. Cardinale. I told him he had to follow the same procedure everyone else had to. He had to fill out a request slip, and I would submit it to him and take care of it. When I told him that, he told me he couldn't fill out a request anymore because he was advised by his attorney not to.

Q. Now, did that happen recently before he moved out?

A. Approximately a month or two months before he left.

MR. ROPER: Pass the witness.

THE COURT: Cross?

MR. MOORE: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. MOORE:

Q. Mr. Alexander, when did this conversation take place, a month or two before he left?

A. Yes, sir.

Q. Did he tell you who it was, which attorney?

A. No, sir, he didn't.

Q. He said something to the effect that he couldn't fill out anymore request slips because his attorney advised him not to do that?

A. Yes, sir. That's what he said.

Q. Has Mr. Webster been an individual in the jail that has been prolific with his requests for services?

U.S. DISTRICT COURT

Direct - Roper/Harrison          138

A. No.

Q. Did you ever see Webster with any reading materials?

A. Yes.

Q. Tell the members of the jury what you have seen?

A. One day I was working the zone where he was, and he asked for a book, and I gave him a book.  He asked for a request for service form, and I gave it to him, and he filled it out.

Q. Now, during the course of being there, did you have occasion to talk with him in regards to the commissary?

A. Yes.

Q. Would that be once or more than once?

A. Once.

Q. What did he say in regards to the commissary?

A. That his commissary was messed up, that she had given his money out wrong.

Q. Did you check into that?

A. Yes.

Q. And what did you find out?

A. That it was wrong, and he refigured it, and I took it to the commissary lady.

Q. Did you ever hear him talking to other inmates?

A. Yes.

Q. In particular, is there an inmate there by the name of Bobby Collins?

A. Yes.

U.S. DISTRICT COURT

# Wells Decl. Ex. E

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA     . CRIMINAL ACTION NO.
                              .   4:94-CR-121-Y
V.                            .
                              . Fort Worth, Texas
BRUCE CARNEIL WEBSTER          . June 18, 1996
. . . . . . . . . . . . . . . .

VOLUME 26
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          MR. RICHARD B. ROPER
                             MR. PAUL D. MACALUSO
                             MR. CHRISTOPHER CURTIS
                             Assistant United States Attorney
                             801 Cherry Street, Suite 1700
                             Fort Worth, Texas 76102-6897
                             (817) 978-3291

For the Defendant:           MR. LARRY M. MOORE
                             Attorney at Law
                             1112-A East First Street
                             Fort Worth, Texas 76102
                             (817) 338-4800

                             MR. ALLAN K. BUTCHER
                             Hill, Beatty, Butcher
                             & Gallagher
                             201 Main Street, Suite 1300
                             Fort Worth, Texas 76102
                             (817) 336-3600

Court Reporter:              Ana P. Warren
                             U.S. District Court Reporter
                             501 W. 10th Street, Room 204B
                             Fort Worth, Texas 76102-3637
                             (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT E**

Direct - Roper/Cardinale          21

GARY CARDINALE, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q. Would you state your name for the judge and jury, please?

A. My name is Gary Cardinale.

Q. Can you tell the members of the jury what you do for a living?

A. I'm the operations manager at the Mansfield Law Enforcement Center.

Q. What are your responsibilities there?

A. I oversee all personnel and inmates within the center and report directly to my boss, the jail administrator.

Q. Now, in regard to that, what kind of prisoners are housed out there at the Mansfield Law Enforcement Detention Center?

A. Currently, we have a combination of state and federal prisoners at our facility. For a long time, we housed nothing but federal prisoners, U.S. Marshalls, pretrial detainees, and some bureau prisoners, also.

Q. All right. Mainly, the federal prisoners or folks that were waiting trial on cases; is that right?

A. That's correct.

Q. Now, during the course of the -- starting at the end of 1994, around October of that year, did you have occasion to receive an inmate there by the name of Bruce Webster?

A. That's correct.

U.S. DISTRICT COURT

Direct - Roper/Cardinale          22

Q. Is he here in the courtroom?

A. Yes, he is.

Q. Would you point him out for the judge and jury?

A. He's sitting right there, third from the right -- right, from your left, I guess.

MR. ROPER: The government would ask the record to reflect the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Roper) Now, as the operational manager, can you give the jury a little bit of a background on what your qualifications are for that?

A. I have been in the jail business approximately 13 or 14 years. I'm a certified peace officer. I'm also a certified T-Close instructor, hostage negotiator, just a varied background in law enforcement, I guess you'd say.

Q. Where did you work before you came down to Mansfield?

A. Tarrant County Sheriff's office.

Q. And what was your position there? What did you do?

A. I was a lieutenant when I left, but for four years, I was in charge of classification of inmates for the system.

Q. What do you mean by that?

A. Evaluate inmate records and determine where they can be housed, their behavior while in custody, their charges, just a variety of factors that are used to evaluate inmates and placing them in the general population in the jail.

U.S. DISTRICT COURT

Direct - Roper/Cardinale            23

Q. As operations manager, are the records of that jail under your custody and control, jail records?

A. Yes, sir.

Q. And, in particular, did you have occasion on an earlier date to produce records pursuant to a subpoena relating to the defendant, Bruce Webster?

A. Yes, sir.

MR. ROPER: May I approach the witness?

THE COURT: You may.

Q. (By Mr. Roper) Let me show you what's been marked as Government's Exhibit Number 7-B (sic). Actually, the records are a fairly large file; is that right?

A. That's correct.

Q. And are these certain excerpts that have been taken from that file?

A. Yes, sir.

Q. Let me show you Government's Exhibit Number 7-B (sic). Do you recognize what those documents are?

A. Yes.

Q. And what are those?

A. These are requests for services that we use for our inmates. They submit requests. They are either denied, or we permit them some type of service based on these requests.

Q. And do you recognize those particular -- now, those are actual copies; is that right?

U.S. DISTRICT COURT

Direct - Roper/Cardinale          24

A. That's correct.

Q. Is Government's Exhibit Number 17-B (sic) a true and accurate copy of certain records from the file of the defendant, Bruce Carneil Webster?

A. Yes. It appears to be.

Q. Look through them and make sure all of them are there?

A. Yes. That's typically what we use. I recognize that as his writing. Of course, I'm not expert as far as that goes.

Q. Now, you're not testifying those are Bruce Webster's writings?

A. No.

Q. Those are just records from the file?

A. Yes, records from the jail, our typical jail request for service form, that's correct.

Q. And those relate to the defendant, Bruce Carneil Webster?

A. Yes, sir.

MR. ROPER: The government would move to introduce Government's Exhibit 117-B.

MR. BUTCHER: Your Honor, may I see the records briefly?

THE COURT: Yes, sir.

(Brief pause in proceedings)

MR. BUTCHER: Defendant has no objection.

THE COURT: 117-B is admitted.

Q. (By Mr. Roper) Let me show you. Request for services --

U.S. DISTRICT COURT

Direct - Roper/Cardinale          25

now, we're not going into all of these.  Are these all relating to requests by the defendant, Webster, for law library visits?

A. They appear to be.  We use these also for medical services and recreation and a variety of things.

Q. There could be other requests in there, but --

A. Right.  These all appear to relate to attending the law library.

Q. Let me show you Government's Exhibit Number 17-C (sic), D -- well, let's just start with 17 (sic) first.  Can you look at that?

A. Yes.

Q. Do you recognize those records?

A. Yes.

Q. Is Government's Exhibit Number 17-C (sic) a part of the records relating to the defendant, Bruce Carneil Webster?

A. Yes.

MR. ROPER:  The government would move to introduce Government's Exhibit 17-C (sic).

MR. BUTCHER:  No objection.

THE COURT:  17-C (sic) admitted.

Q. (By Mr. Roper)  What is Government's Exhibit Number 17-C (sic).

A. These are requests for service forms or a form specifically filled out by an inmate requesting to make a call, a request for service that's typically used, and there are several of

U.S. DISTRICT COURT

Direct - Roper/Cardinale          26

those in there.  The files are quite bulky, and they are loaded with these request for service forms due to the fact when they ask for a particular service, they have to fill one of these out.

Q.  Okay.  For instance -- and these would have been prepared by the inmate, in this case, Bruce Webster; is that right?

A.  That's right.

Q.  For instance, the second page reads, in November my legal papers were taken from me on my way to court because they had addresses and phone numbers on the back.

And it goes through -- these are -- is that what one of them reads?

A.  Yes, that's correct.

Q.  Another one is, I would like to have a letter certified?

A.  That's correct.

Q.  And are there also ones relating to requests for medical services?

A.  That's correct.

Q.  Now, let me show you what's been marked as Government's Exhibit 17-D (sic).  Do you recognize what that is?

A.  Yes.

Q.  Where are those documents?

A.  This is a grievance form typically filled out by an inmate to either a jail supervisor or myself requesting a specific service or relating a specific problem within the institution,

U.S. DISTRICT COURT

Direct - Roper/Cardinale        27

and that appears to be what these are.  In fact, they are grievance forms.  Yes, I recognize them.

Q.  Is Government's Exhibit Number 117-D true and accurate copies of certain grievance forms contained in the file of Bruce Carneil Webster?

A.  Yes.

MR. ROPER:  The government would move to introduce Government's Exhibit 117-D.

MR. BUTCHER:  No objection.

THE COURT:  117-D is admitted.

Q.  (By Mr. Roper)  How would these documents come to be prepared?

A.  They would be prepared by the inmate in their living area.  They would fill it out and then submit it -- place it in an envelope that's marked grievance, and submit it to either the shift supervisor or myself.  We do not prepare those for the inmates.

Q.  Let me show you what's been marked as Government's Exhibit 117-E.  Do you recognize that?

A.  Yes.

Q.  What is that?

A.  That's a request for service from Mr. Webster addressed to the administrator, which normally I handle those.

Q.  Is that, in fact, the original that was obtained from Webster?

U.S. DISTRICT COURT

Direct - Roper/Cardinale          28

A. Yes.  That's the original.

Q. And that was kept by you?

A. Yes.  That's correct.

    MR. ROPER:  The government would move to introduce Government's Exhibit Number 117-E.

    MR. BUTCHER:  No objection.

    THE COURT:  117-E is admitted.

Q. (By Mr. Roper)  Let me show you Government's Exhibit 117-F.  Do you recognize that?

A. Yes.

Q. What is that?

A. This is a jail visitation card.  We require all our inmates to submit a visitation card in writing with names and addresses of individuals that wish to visit.  That's for security purposes, basically.

Q. And is Government's Exhibit 117-F a true and accurate copy of that record taken from its files?

A. Yes.

    MR. ROPER:  The government would move to introduce Government's Exhibit Number 117-F.

    MR. BUTCHER:  No objection.

    THE COURT:  117-F is admitted.

Q. (By Mr. Roper)  That visitation card is filled out with the names and addresses of certain people and their phone numbers?

A. Yes, that's correct.

U.S. DISTRICT COURT

Direct - Roper/Cardinale          29

Q. Let me show you what's been marked as Government's Exhibit Number 117-F -- I'm sorry, H. Do you recognize that?

A. Yes. This is another grievance form that was filled out.

Q. And is that also contained in the files of Bruce Carneil Webster?

A. Yes.

Q. Now, some of these grievance forms, would you have occasion to respond by talking to inmates in regards to that?

A. Yes. In some instances, I do.

Q. I believe that's all.

And, in particular, these forms are actually filled out by the inmate; is that correct?

A. That's correct.

Q. Now, in particular, as to the defendant, Webster, did there come a time when he was placed in confinement in a single -- a seg cell it's called?

A. Yes, separation cell. That's correct.

Q. Why is that?

A. He had attempted to -- we're not clear if he attempted to escape or if he tried to enter the female housing area to see an inmate, but he attempted some type of movement from his housing area into an unauthorized area, specifically, in with female inmates.

Q. Some of these letters that were written, you mentioned you had occasion to talk to some inmates about them. Would that be

U.S. DISTRICT COURT

Direct - Roper/Parker          48

A. Yes, I did.

Q. And did you, yourself, conduct certain tests and examinations of the defendant?

A. Yes, I did.

Q. Now, based on the data that you observed, were you able to formulate an opinion, your professional opinion, to a reasonable medical certainty as to whether or not the defendant in this case, Bruce Carneil Webster, is mentally retarded?

A. In my opinion, he is not.

Q. Well, let's go into some of that.

First, I want to deal with the area of I.Q. tests. Were you aware that certain I.Q. tests were administered to him, and did you, in fact, administer an I.Q. test?

A. Yes.

Q. Can you explain, briefly, to the jury what is an I.Q. test?

A. An I.Q. test is an instrument used basically to predict or forecast how well an individual is likely to function within an academic setting. In the development of the intelligence tests, the criteria against which the tests were validated was school grades and teachers' ratings of the functioning of students.

Most of the individually administered I.Q. tests consist of a number of sub-tests, which are then administered involving lots of different kinds of questions, for example, defining words and explaining how a coat and a suit are alike,

U.S. DISTRICT COURT

Direct - Roper/Parker          49

abstracting and so on. The procedure leads to what's called an I.Q. estimate, and that's basically what an I.Q. test is.

Q. And did you perform an I.Q. test on Webster, the defendant?

A. Yes.

Q. What type of test was that?

A. I administered the Wechsler Adult Intelligence Scale Revised, which is a test that has been available to psychologists for, I guess, close to 50 years now. I have been giving it for almost 40 years. And it's an individually administered test.

Q. Now, how well did Webster do on that particular exam -- or let me restate. What were the results?

A. Well, he didn't do real well. He would have received a verbal I.Q. estimate of 77 and a performance I.Q. estimate of 67, with an overall full scale I.Q. estimate of 72.

Q. Now, that would be above the criteria just for I.Q. tests?

A. Well, yes, in the sense that a number has to be specified somewhere when you're trying to define categories. The numbers are not, I don't believe, intended to be adhered to rigidly. There are errors of measurement in the administration of psychological tests. There are reliability issues and so on. But in the Diagnostic and Statistical Manual criteria regarding I.Q. scores, the number 70 is the one that is presented. Although, I think the phrasing says something like approximately 70.

U.S. DISTRICT COURT

Direct - Roper/Parker          50

Q. Now, are there certain factors that affect how well a person does on an I.Q. test, how they perform on an I.Q. test?

A. Certainly.

Q. Would you explain to the members of the jury what those are?

A. Well, as in any kind of assessment procedure where you're trying to evaluate someone else, there are a number of factors that have to be considered, not the least of which is the attitude and the motivation and level of involvement of the individual who is being evaluated, and what the person expects is going to be the outcome of the examination. Those are some of the factors that are important.

Q. Now, in regards to that, would motivation play a role in how well somebody can do on an I.Q. test?

A. Yes, sir.

Q. Why would that be important?

A. Well, if you get drafted into the army, and you don't want to go into the army, and you know that if you look real dumb or crazy, then you may well be able to stay out of the army. On the other hand, if the goal is something that is really interesting to you and really appealing and you desire it strongly, then you're going to put forth your very best effort. So, yes, motivation is important.

Q. What about cultural differences? Could those play a role?

A. Cultural differences, of course. No one is sure why --

U.S. DISTRICT COURT

Direct - Roper/Parker 52

Q. And how well did Webster perform on that job skill test?

A. What the Job Corps test was, it was not an intelligence test, per se. Although, certainly, it would be some conceptual overlap in relationship. It was a reading comprehension test, and what it consisted of was little stories with a word left out, and then the person reading the story would be expected to go through a list of four choices to pick out the best word to put in that hole, and it was used as a screening test in Job Corps assessment programs.

On that particular test, Mr. Webster obtained a score of 76 percent correct, which would be a respectable score.

Q. Did you have occasion -- when you went out and examined the defendant, did you have occasion, here in 1996, to perform that same test?

A. Yes. I was interested in comparing his performance today on that particular task, and that was the task that -- what I was able to do was have my wife, who manages my office, make me up a new copy of that instrument, and then I re-administered it to Mr. Webster.

Q. How did he perform at this point in 1996?

A. Well, he got 44 percent of the items correct during this administration. So he did considerably poorer.

Q. When you speak of motivation, does motivation come into play when you're examining defendants charged with crimes?

A. Does motivation come into play when what?

U.S. DISTRICT COURT

Direct - Roper/Parker          53

Q. Well, do you take any particular -- and you mentioned you had a private practice and you examine folks out in the real world. And then you mentioned you examine people that are charged with crimes. Do you take any special effort in dealing with folks that are charged with a crime as opposed to if you were going to go out and give an I.Q. test and make an evaluation on someone out in the real world for mental retardation?

A. Yes, absolutely. It's very important.

Q. Why is that important?

A. Well, if you're sitting in your office and the patient comes in because he or she is having problems and they want help with it, and they are soliciting your professional services on their own hook, their own motivation, then the likelihood of trying to manipulate you or lie to you or deceive you or not do very well, it would be a pretty silly person to go to a doctor and then sit there and tell the doctor a bunch of lies about why he or she is there.

But in forensic settings, of course, there is often serious motivation to mislead or deceive or get over on you or whatever, because the nature of the contract is different.

Q. Could it involve overt lies as well as just not doing well?

A. Sure.

Q. Now, in regards to I.Q., you mentioned that I.Q. tests are generated for teacher evaluation; is that correct?

U.S. DISTRICT COURT

Direct - Roper/Parker          58

A. Well, based on what I observed versus some of what is reported here, yes, I see some discrepancies.

Q. Specifically, as to Question 25 on the communication domain, there is a question, speak in full sentences, and there is a D.K. for don't know?

A. Yes, sir.

Q. Did you have occasion to interview Webster during that time?

A. Yes. I interviewed him for several hours.

Q. And was he able to -- well, was he able to communicate with you and speak in full sentences?

A. He communicates very effectively, and he speaks in full sentences.

Q. And if you could turn the page to the communication domain, on 47, reads simple stories aloud, and there is a "1" there for just sometimes or partial. Do you see that?

A. Yes, sir.

Q. Have you ever -- through the course of your evaluation, were you able to come up with information consistent with that?

A. He was able to read simple stories aloud for me.

Q. And Number 50, he got a zero, no, never, for reads on own initiative. What about that?

A. Well, who ever answered this said, no, he never reads on his own initiative, and I have seen him read on his own initiative, and that's been reported to me, also, by the

U.S. DISTRICT COURT

Direct - Roper/Parker        59

officers at Mansfield.

Q. Fifty-one, addresses envelopes completely, and there is a "don't know" there. Have you ever dealt with information consistent with that finding?

A. I know that he can address an envelope. I have a copy of one that he has addressed.

Q. All right. Let's turn over, just quickly, if we can go through this, the daily living skills domain?

A. I'm sorry. Where are you?

Q. Daily living skills domain, several pages over?

A. Okay.

Q. Specifically, Question Number 36, puts clean clothes away without assistance when asked. Do you see that?

A. Yes, sir.

Q. There is a zero there. He didn't get any points for that?

A. That's right. That would mean, no, he never puts his clothes away. Well, I was in his cell. I saw his cell. I mean, it was squared away. He puts clothes where they are supposed to be, and other things, too.

Q. If you could turn a couple pages over to Question Number 77, makes own bed and changes bedding routinely, and that was a zero. No points for that?

A. Whoever answered this indicated that, no, he never makes his own bed. He makes his own bed. I saw it.

Q. All right. If we could move forward then, based on your

U.S. DISTRICT COURT

Direct - Roper/Parker          67

Q. Based on your review of the data in this case, the tests that you reviewed and the tests that you performed and the evaluation that you had face-to-face with Webster, would that be -- would Fulbright's results be consistent with the evidence that you found as regards the intelligence and adaptive behavior of the defendant, Webster?

A. Well, I wouldn't expect -- I would not have expected Mr. Webster to do that poorly on that test.

Q. Could motivation have an effect on how well a person does on those tests performed by Fulbright?

A. Of course.  Motivation can have an effect on any assessment procedure.

Q. Did you have occasion, also, to review the written statement given by the defendant, Webster?

A. A written statement by a Lieutenant Webster?

Q. I'm sorry, Defendant Webster?

A. Yes, I did.

Q. Were you able to make any conclusions from that about how well -- or do you have any impressions of that test relative to the mental retardation question?

A. Well, it's a very lengthy, coherent statement filled with a lot of evidence of good functioning memory.  I mean, I, obviously, can't speak of the facts or anything like that, because I just don't know, but the statement itself -- I don't think anybody reading that statement -- let me put it this

U.S. DISTRICT COURT

Cross - Moore/Parker          75

Q. Well, did you see any errors in testing procedure that caused you to have some question about the reliability of the results that they obtained?

A. I saw no errors in the testing procedure, but, I mean, I can't really answer that. I wasn't there.

Q. You indicated that you administered an I.Q. test to Mr. Webster yourself; is that correct?

A. Yes.

Q. Did you give him the whole test?

A. I gave him major parts of it, yes.

Q. Why didn't you give him the whole test?

A. Well, there is no really compelling reason to give him the whole test. It's all together helpful, when appropriate, to use certain of the sub-scales and obtain estimates for those that aren't administered. It's a very common practice.

Q. Well, is it a common practice in a diagnostic setting not to give the whole test when the purpose of the administration of the test is to obtain an I.Q. and to make a diagnosis of whether or not somebody is mentally retarded? Are you saying that it's a common practice not to give the whole test in those circumstances, Doctor?

A. It is with individuals with whom I work. I don't know about the whole world.

Q. What is the manual? What does the W.A.I.S.-R. manual say about administering the whole test in a diagnostic setting?

U.S. DISTRICT COURT

Cross - Moore/Parker          76

A. You would have to tell me. It's been so long since I've read that manual.

Q. Well, would it surprise you that it says that 11 tests are ordinarily to be given to all subjects? There may be occasion when administration of a particular test is inadvisable or a test score is somehow rendered invalid during administration, and results of one or more tests cannot be used. If the scores from only five verbal tests or four performance tests are available, then the sum of the scores must be prorated to derive the verbal or performance score that will be used to obtain the full scale score in the I.Q.'s, and it is inadvisable to undertake prorating the verbal score if it is based on fewer than five verbal tests, or a performance score if it is based on fewer than four performance tests, and if either the verbal or performance score is based on too few tests, it is not prorated, and the full score should not be computed.

Would it surprise you if that's what the manual says?

A. No. If that's what it says, that's what it says.

Q. Well, what it says is, essentially, that you don't -- if you're going to prorate a score, you do it because you're not able to -- one of the sub-tests is not available to you. For one reason or another, you are not able to use that particular sub-test. And you never prorate scores when you administer fewer than five of the sub-tests in the verbal area or fewer

U.S. DISTRICT COURT

Cross - Moore/Parker          77

than four of the sub-tests in the performance area. Isn't that what it says?

A. It says its inadvisable, apparently, yes.

Q. It says it's inadvisable and it says then you don't compute an I.Q. if you do use fewer than five, isn't that right, in the verbal area?

A. That's what the manual says, apparently, yes.

Q. In the tests that you administered to him, you gave him four of the sub-tests in the verbal area; is that right?

A. Yes.

Q. And you gave him three of the sub-tests in the performance domain; is that correct?

A. Yes.

Q. So you left out two in the performance area and two in the verbal domain?

A. Yes.

Q. And that's exactly what the manual tells it's inadvisable to do. It's exactly what the manual tells you that you should not prorate when you do, and it is exactly what the manual tells you that you should not arrive at a full scale I.Q. on the basis of that type of testing; is that correct?

A. Evidently, that's correct, yes.

Q. Now, I want to talk to you about the configuration of the sub-test that you did give him. Is there any particular reason why you gave him the sub-tests that you gave him and deleted

U.S. DISTRICT COURT

Cross - Moore/Parker        86

of those scales in evaluating somebody's adaptive functioning is because it tends to make it more objective, or take it out of the range of just being a subjective opinion; is that correct?

A. That would be the general purpose, yes.

Q. But you chose not to use one of those scales?

A. For reasons I have explained to you.

Q. Now, when you indicated that your testing result of a 72 full scale I.Q. was the result of the test, that was the result of the seven sub-tests that you gave, plus, your estimates of the four -- as to what the results of the four sub-tests that you didn't give him would have been; is that correct?

A. That's correct.

Q. And 72 puts him squarely in the range of that area that we discussed where a diagnosis of mental retardation is proper if there are deficits in that adaptive functioning?

A. You went too fast on that one. I didn't get it.

Q. Can you diagnose somebody with a 72 I.Q. as being mentally retarded if they have deficits in their adaptive functioning?

A. You could, yes.

Q. Where does a full scale I.Q. of 72 place an individual amongst the general population? At what percentile does he rank?

A. It would be -- let me think about it for a minute. It would be at about, I guess, the third or fourth percentile,

U.S. DISTRICT COURT

Cross - Moore/Parker          88

Q. So you gave it for other purposes, other than the purpose
that it was intended to be used; is that correct?

A. Well, I mean, an instrument like that can be used for a
variety of purposes.

Q. Was the purpose for which the C.A.S.T.M.R. was designed was
to allow somebody to arrive at an indication or an opinion as
to whether or not an individual that's mentally retarded is, in
fact, competent to stand trial?

A. That was the primary intent of the authors, yes.

Q. Now, when you were administering these tests, didn't you
also administer to Mr. Webster a test to make a determination
as to whether or not he was malingering?

A. Yes.

Q. What does malingering mean, Doctor?

A. Well, malingering is when you fake bad for reasons that are
fairly clear, that there is a payoff involved, and other folks
and you know what with the payoff is.

Q. So, essentially, you're trying to do worse than you might
otherwise do; is that correct?

A. Yes.

Q. And you administered to him a particular scale called the
Shretland Malingering Scale?

A. Yes.

Q. How did he do on that?

A. The results of the Shretland did not substantiate that he

U.S. DISTRICT COURT

Direct - Macaluso/Coons          120

prosecution at times and sometimes you are called to offer

testimony on behalf of the defendant?

A. Yes.

Q. Doctor, let me ask you if you have occasion -- or if you

had occasion to be requested and then permitted by the Court to

examine an individual by the name of Bruce, initial C, or

Carneil Webster?

A. Yes.

Q. Do you see him here in the courtroom today?

A. The gentleman seated to the left of defense table.

Q. To the far left of the table?

A. He appears to have a gray tie on.

MR. MACALUSO: Your Honor, we would ask that the

record reflect that the witness has pointed to and described

the defendant in open court?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) And, doctor, do you recall when it was,

approximately, you were requested to perform an evaluation or

to visit Mr. Webster and when it was that you actually did

visit with him and perform that evaluation?

A. I was contacted in January of 1996, and the evaluation took

place on March 9, 1996.

Q. And let me ask you, Doctor, where did that evaluation take

place?

A. In the Mansfield Correctional Center.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          121

Q. And do you recall who it was, if anyone else, accompanied you for that evaluation?

A. Dr. George Parker.

Q. And Dr. George Parker was the doctor, the forensic psychologist that testified just before you; is that correct?

A. That's my understanding.

Q. How long have you known Dr. Parker?

A. I think I met Dr. Parker in about 1977. So nearly 20 years.

Q. At whose request was Dr. Parker brought in to assist you in the evaluation of Mr. Webster?

A. Mine.

Q. You say you have worked with him since, what, almost 20 years; is that correct?

A. Yes.

Q. What would be his function -- in a nutshell, what would be Dr. Parker's function, or what sort of assistance would you expect from Dr. Parker to perform the analysis of Mr. Webster?

A. Let me back up a minute. You say I've worked with him. He has an office across town from mine. He's in private practice and I am, too. So we're not associated in practice in any way.

The function that Dr. Parker would have in an evaluation like this is to perform certain psychological testing and interpret whatever psychological testing was available in the

U.S. DISTRICT COURT

Direct - Macaluso/Coons        131

the defendant was charged with here, as opposed to the

methodology or the procedure that you may employ in conducting

an interview with somebody involved in a civil problem, civil

dispute, or something of that nature?

A. Well, yes, it's sort of issue specific. If you're

interested in finding out whether somebody is competent to

stand trial, then you want to understand certain specific

things that would tell you they knew about how to defend

themselves and their cooperation with their lawyer. So it

would be somewhat issue specific.

Q. And are you concerned about getting false information, or

are you concerned about the person charged with a crime, for

example, such as the defendant, basically manipulating you?

A. Yes. You have to be mindful in forensic psychiatry that

you may not be told exactly the truth. Ordinarily, when

patients come in to see me, as a patient they want help, and

they are not going to waste their money and their time and my

time telling me things that aren't true. They are going to

tell me what their symptoms are. They are going to tell me

about things as they see them because they want help. If it's

in a forensic setting, a criminal forensic setting, you need to

be concerned about what the motives of the evaluee might be.

Are they telling you something for a reason, a hidden reason?

Q. Okay, in order to help him or herself?

A. Yes, sir.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          132

Q. Let me ask you in that regard. I believe you said you may have -- or you did -- review at some point in time a report of Dr. Finn, who is, as you know, a forensic psychologist --

A. Yes.

Q. -- in regard to his interview in approximately January of 1995?

A. Yes.

Q. Did you have occasion to read that particular report to Mr. Moore that Dr. Finn wrote?

A. Yes.

Q. In specific, let me ask you -- and I'll direct your attention to one portion of that particular report from Dr. Finn wherein he refers to the defendant apprising him, Dr. Finn, that he, the defendant, Mr. Webster, had been in special education courses throughout his career, basically. Do you remember that?

A. Yes, sir, I do.

Q. You know like Dr. Finn knows that that's not true, don't you?

A. Yeah. That's my understanding.

Q. Now, Doctor, based on your training and, Doctor, based on your experience, aside from it just being a lie, Doctor, does it have some particular meaning to you in the context of an examination of this type, that is, for mental retardation?

A. Yes, it does.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          133

Q. What is that, Doctor?

A. If a criminal defendant has a desire to be found mentally retarded, then telling someone, an evaluator, that he has been in special education classes would certainly be in keeping with the concept of possible mental retardation, and it would be an attempt to persuade that person that you had mental deficiencies that you didn't actually have.

Q. Does it indicate an awareness of the nature and importance of an interview by someone like you?

A. Yes.

Q. Let me ask you. We referred earlier -- there was mention made about the driver's license score. In your several-hour interview with the defendant, do you recall some mention being made of the driver's license score --

A. I do.

Q. -- in Arkansas. Tell us what you recollect about that and the significance in the way it was brought up to you, Doctor, during your interview?

A. As I was talking with Mr. Webster, he indicated -- he brought up, just out of the blue -- that his niece, his oldest sister's daughter, Luketha, had gotten the test or the driver's license and wrote it down real small for me and I passed. I had to cheat on it, he said. This is something that he offered out of the blue.

He also went on to say that the female trooper gave it to

U.S. DISTRICT COURT

Direct - Macaluso/Coons          134

me on the driving test, basically indicating -- my impression was that he was saying that she had passed him gratuitously without him being able to actually pass the test.

Q. This rendition of how he passed the test, was this in response to any kind of question you asked him?

A. No.

Q. This rendition of his response as to how he passed the driving portion of the test, was that in some response to any question asked by you?

A. No.

Q. Again, Doctor, what, if anything, is of significance to you as an evaluator and as a professional in a statement like the one about the scores, either on the written part of the test or on the driving part?

A. I would find it very unusual that someone would spontaneously bring up that they had cheated on -- had to cheat on their driver's license test. When you're evaluating a person to see if they are mentally retarded, that would be a very unusual occasion. In my opinion, it was more likely -- much more likely represents an attempt to manipulate about mental inabilities.

Q. Now, Doctor, did you have occasion, also, -- well, did you have occasion to -- after the conclusion of the interview -- we'll come back to the interview in just a second.

But at the conclusion of the interview you conducted back

U.S. DISTRICT COURT

Direct - Macaluso/Coons          135

in March with Mr. Webster, did you have occasion to interview other individuals over there at the Mansfield Law Enforcement Center?

A. I interviewed several people at the Mansfield Law Enforcement Center.

Q. For example, who did you interview and why did you interview them?

A. Well, I was interested -- back up a second. When I evaluate people in the Travis County Jail or other jails, I generally ask the corrections officers who deal with the inmate about how they function, just to get some more information about how that person is doing, and I did that in this case. I talked with people who would see the person on a day-to-day basis.

Q. Let me ask you. In that regard, in addition to talking to those people that you did over there at Mansfield -- well, did you talk to Gary Cardinale, for example?

A. I did.

Q. B. J. Valdez?

A. Yes.

Q. Debra Harrison?

A. Yes.

Q. Did they afford you an opportunity as well, Doctor, to go over and to look where Webster stayed?

A. Yes.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          137

don't have any pictures in them.  So there wouldn't be any reason for reading them just to look at the pictures.

Q.  Why do you look at these sorts of things, again, specifically, with regard to your diagnosis of whether or not somebody is mentally retarded or not?

A.  Well, you see how a person utilizes their time.  What do they do?  Do they sit and stare at the wall, or do they just hum to themselves, or do they read and so forth like other folks who are interested in learning or entertaining themselves.

Q.  The D.S.M. 4, the Diagnostic and Statistical Manual, Volume 4 --

A.  Yes.

Q.  -- sets out two criteria for mental retardation, does it not, Doctor?

A.  It does.

Q.  What is the first one?

A.  Well, basically, that a person has sub-average intelligence.

Q.  We'll come back to that in just a second.  What's the second criteria?

A.  It has to do with adaptive functioning, whether they have adaptive skills or not.

Q.  What does that mean, seat of the pants, just so we can understand it?

U.S. DISTRICT COURT

Direct - Macaluso/Coons          138

A. In your -- wherever you live, and you -- are you able to adapt to what's going on? Do you have skills that will deal with the people that are there, the tasks at hand? Are you able to handle yourself and live and thrive under those circumstances, whether it's a usual family setting or penitentiary or with a gang of folks or drug dealing or work and whoever it is.

Q. Let me ask you in that regard. With the focus here on what you have referred to as indications of, or at least evidence of adaptive behavior, how a person functions on a regular daily basis, if you became aware, for example, through your interviews and your research that the defendant is capable of filing complaints about various things that were going on over there, or at least he perceived that were going on over at the Mansfield Law Enforcement Center?

A. Was I aware of that?

Q. Yes, sir.

A. I have some in my file, yes.

Q. Have you read those and have you examined them?

A. I read a number of them, and, yes, I have.

Q. Do they appear to be in the defendant's handwriting?

A. Yes.

Q. Let me ask you. What's the significance, again, to you of that particular type of evidence, the complaints that are filled out by him?

U.S. DISTRICT COURT

Direct - Macaluso/Coons        139

A. Well, here is a person that perceives something that they want to complain about or want to discuss about, and they send in a complaint to have it dealt with, and if it's not dealt with, as in some cases with Mr. Webster, then he files a subsequent complaint, why hasn't this been dealt with? So they want to change their surroundings or their situation or have an exercise of their rights or their needs or desires.

Q. Okay. And I believe you said that you had a number of those complaints; is that right?

A. Yes.

Q. And are those some evidence to you or some indication to you of his ability to adapt his behavior to the circumstances that he's in?

A. Yes, sir.

Q. Did you become aware, for example, he was able to detect and then complain about errors in his commissary?

A. Yes, he was.

Q. What about that? Is that of any significance to you?

A. Yes. I mean, that's looking out for your rights and your change.

Q. How about visitations to the law library?

A. Yes. That is an adaptive function, given the situation that he's in.

Q. Let me ask you, Doctor, with regard to the complaints. Have you been made aware of the fact that he discontinued, or

U.S. DISTRICT COURT

Direct - Macaluso/Coons          142

A. Well, a low I.Q. is what you might actually have. A low score on an I.Q. test is simply whatever you did on that given test. Now, you could have a higher I.Q. and make a lower score. You can't have a lower I.Q. and make a higher score because you can't do any better than you can do, but through lower motivation or just simply not cooperating or being tired, as he was back in '92, being confused or whatever, you can make a lower score than your capabilities.

Q. Okay. In your opinion, Doctor, although both of those are set out as criteria, that is, the lower I.Q. score and the significant deficiencies in adaptive behavior, is either one more important to you in your diagnosis or in your determination, Doctor?

A. I would say the latter. You're really looking at a person's adaptive capabilities, and I.Q. is a part of that. Both of those things are required, but the more important thing, to my way of thinking, is not just a score on an I.Q. test. It's how well can you adapt to whatever situation you find yourself in.

Q. Doctor, I would ask you if, in your opinion, based on your experience, education and your training, and based on all the information that was provided to you, based on your interview of the defendant, based on your interviews with the other people out there at Mansfield, and any other source of information that you felt was valuable in making your decision,

U.S. DISTRICT COURT

Direct - Macaluso/Coons          143

if you have an opinion, that is, a professional opinion, as to whether or not the defendant is mentally retarded?

A. I have an opinion.

Q. What is your opinion in that regard, Doctor?

A. It is my opinion that he is not mentally retarded.

Q. Why is that? In sum, Doctor, why is it that you feel, based on your examination, that he is not mentally retarded?

A. He is way too functional when he wants to be mentally retarded, in my opinion. Mentally retarded people don't function -- who are actually mentally retarded -- don't function at the higher level as he does. I spent several hours with him, and he does not behave as a mentally retarded person behaves. He is just too smart for that.

Q. Okay. How do you square your evaluation of him, Doctor, that is, that he is not mentally retarded -- well, scratch that. Let me just ask you. Do you feel that he has any significant deficiencies in his adaptive behavior?

A. I don't really see them. He has been -- he has not been in ordinary society a lot for a number of years. He has been either in the penitentiary or incarcerated on this offense or out running around with his buddies, dealing drugs and so forth, not living an ordinary life. So he has adapted, in my judgement, to the life that he has chosen to live and has functioned within that setting reasonably well. He has not chosen to adapt to an ordinary lifestyle.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          144

Q. What about the information you learned about those intervals when he was not either in the penitentiary up in Arkansas or confined here at Mansfield? What about his adaptive skills in that regard?

A. Well, essentially, what he was doing is running around selling drugs, getting money from his mother, getting money from girlfriends, partying, hanging around with his chums, instead of having a regular job, any 8:00 to 5:00 type work or anything like that.

Q. Let me ask you if those are indications, also, of adaptive skills, like you said, getting money from his mom, living off his girlfriends, selling drugs?

A. Those are ways of adapting to a lifestyle that he has chosen.

Q. Now, Doctor, back to that question that I inartfully worded or started to word earlier. How do you square your opinion, Doctor, that he is not mentally retarded, that he is not significantly lacking in adaptive behavior or there aren't significant deficiencies in his adaptive behavior with the low I.Q. scores that he has generated over the last few years or some of the scores he has generated over the last few years?

A. Well, some of those tests -- I mean, the tests that he had, as I understand it, with one exception before he was in this current pickle, he did reasonably well on a number of them. The one that he didn't do very well on was that one in 1992

U.S. DISTRICT COURT

Direct - Macaluso/Coons          145

when he was described by the doctor as being confused and paranoid and so forth, poorly oriented, appeared even unable to give the correct date or year, which is an unusual circumstance for him.

So I would have to just leave out any numbers they got from that evaluation based on the clinical presentation that he gave, the way he was when he came in to see the doctor. The ones that he has given, with the exception of the one that Dr. Parker did, I think were in a lower range, but as I understand it, there are a variety of reasons why people would not score very well on a given I.Q. test.

Q. Is your basis or the basis of your opinion predicated on the I.Q. test alone?

A. No --

Q. Go ahead.

A. You can score lower than your mental abilities will allow you to score. You can't score higher.

Q. You can't fake being smart, can you, Doctor?

A. You can't fake being smart. You can not have good motivation, not pay particular attention, just not do very well, not the kind of thing where they say two plus two is three, but the kind of thing where you just don't know the answers or sort of give a wrong answer or don't do it very rapidly or --

THE COURT: Mr. Macaluso, hold on just one second.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          146

(Brief pause in proceedings)

THE COURT:  Thank you, sir.

MR. MACALUSO:  Thank you, Your Honor.

Q.  (By Mr. Macaluso)  Doctor, what's the significance to you -- if you haven't already covered this, what's the significance to you of the earlier scores, for example, the 76 on the Beta test at the Arkansas Department of Corrections, 96 on a driver's license test, the 43rd percentile score on the M.A.T., the Job Corps test where he had a, I believe, 76 -- and let me pause for just a second.  Another version -- or not even another version.  That Job Corps test was re-administered to him, was it not?

A.  Yes, it was.

Q.  I don't know if it's been pointed out to the jury or not, but there was a duplicate of the Job Corps test, screening test, I believe it's referred to, if I'm not mistaken, that was given to him back when you interviewed him in March by Dr. Parker; am I correct?

A.  Yes.  Dr. Parker and I discussed that and decided to try to re-administer a test.  So he gave him a clean copy of it, basically, without the answers in there, and he got just a little over half as many right as he did the first time.

Q.  Forty-four percent, is that correct, on the March version of it, and 76 on the version he was given when he was working on the project itself, or at least during that particular

U.S. DISTRICT COURT

Direct - Macaluso/Coons          147

period of time?

A. Yes.

Q. What's the significance of that when you view that in the context of the other scores, the low scores that he generated for the other doctors that have testified before this jury?

A. Well, there are two aspects of the significance. One is that you look at how well he has done in the past, and you say, he can do at least that well. And then you can look at the context in which he does more poorly, and it appears to be manipulative.

Q. Doctor, let me ask you if during your interview with the defendant, the subject of family abuse, that is, claimed abuse by his father, Willie Webster, came up?

A. Yes.

Q. Tell us what you recollect about that information that was provided to you.

A. Well, that his father was exceptionally abusive to the children, was physically rough with them and, apparently, emotionally rough. And then there were a number of bizarre kinds of things that occurred to some of the children.

Q. Sexual things?

A. Yes.

Q. Let me ask you -- and I will ask you to refer to your notes if necessary -- if you recall with regard to the subject of abuse reportedly from Mr. Webster, his father, if the defendant

U.S. DISTRICT COURT

Cross - Moore/Coons          177

penitentiary or they are out running the streets or at home or whatever they are doing.

Q. Are you not familiar with the manual, the mental retardation manual of the American Association on Mental Retardation?

A. That's correct.

Q. You're not familiar with that?

A. That's correct.

Q. Are you licensed, or are you certified by the Texas Department of Mental Health and Mental Retardation to do assessments of mentally retarded people, do mental retardation evaluations for the purposes of determining diagnosis of mental retardation?

A. No. As I told you, I don't do the psychological testing.

Q. And it's your belief that when we're talking about adaptive functioning, that the adaptive functioning that is being addressed in the D.S.M. 4 or elsewhere might involve or entail how well he functions in an institutional setting as opposed to how he does in the real world?

A. Wherever the person is would be his adaptive -- his adaptive functioning would be taken into consideration.

Q. Does it take the same degree of intellectual functioning to be able to adapt in an institutional setting as it does to be able to function in the real world?

A. I would say that the stresses and strains and the behaviors

U.S. DISTRICT COURT

Cross - Roper/Moore          224

with Mr. Webster the issue of mental retardation, whether or not he was mentally retarded or any effect that a finding of mental retardation might have on the ability to execute the defendant.

At that time, he had already been tested by Dr. Raymond Finn. I don't believe that Dr. Keyes had completed any of his testing at that point. But that was the first -- to my knowledge and recollection, that was the first time that it was ever discussed with him or in his presence throughout our testing and throughout all the testing that was done. We have always told him that prior to the time that I advised him of the mental retardation issue on those occasions when Dr. Finn had tested him, our advice was for him to do the best he could do, to take the test, do as good as he could do, and we would go from there.

That would be the sum of the testimony we would offer.

THE COURT: Thank you.

Does the government wish to cross?

CROSS EXAMINATION

BY MR. ROPER:

Q. Well, are you familiar with jailhouse lawyers and folks that are in jail?

A. Uh-huh.

Q. Some of them are pretty knowledgeable about the law?

A. That's true.

U.S. DISTRICT COURT

Cross - Roper/Moore          225

Q. And have you ever heard of jailhouse folks talking and suggesting defenses for other defendants, even including capital murder defendants?

A. Yes, I have.

MR. ROPER: That's all I have.

THE COURT: All right. Thank you.

MR. ROPER: Your Honor -- I'm sorry.

MR. MOORE: That would be all that we would have in regard to that issue. We just wanted to make sure that that was before the Court.

THE COURT: All right. Thank you.

MR. ROPER: The only thing that we would have in addition to what we presented at trial would be, we would move to introduce Government's Exhibit 94-B, which is actually two transcripts, and then I had an excerpt of the transcripts that relate to the defendant's testimony -- or, actually, the colloquy he had with Judge McGlinchey on several occasion in the magistrate's court regarding how he wanted to hire a lawyer and what efforts he was doing to make bond, and I think those are relevant to the determination whether the defendant was mentally retarded.

That would be 93-B and C and 94-B. And C is actually a composite that has all the relevant portions. I didn't know if the Court wanted the whole transcript or not.

THE COURT: Okay. You're offering 93-A and B and 94-B?

U.S. DISTRICT COURT

# Wells Decl. Ex. F

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA      .  CRIMINAL ACTION NO.
                 .   4:94-CR-121-Y
V.                  .
                 . Fort Worth, Texas
BRUCE CARNEIL WEBSTER        . June 19 & 20, 1996
. . . . . . . . . . . . . . .

              VOLUME 27
       TRANSCRIPT OF THE TRIAL
     BEFORE THE HONORABLE TERRY R. MEANS,
     UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:       MR. RICHARD B. ROPER
                MR. PAUL D. MACALUSO
                 MR. CHRISTOPHER CURTIS
                Assistant United States Attorney
                 801 Cherry Street, Suite 1700
                Fort Worth, Texas  76102-6897
                 (817) 978-3291

For the Defendant:        MR. LARRY M. MOORE
                Attorney at Law
                 1112-A East First Street
                Fort Worth, Texas  76102
                 (817) 338-4800

                 MR. ALLAN K. BUTCHER
                Hill, Beatty, Butcher
                 & Gallagher
                201 Main Street, Suite 1300
                 Fort Worth, Texas  76102
                (817) 336-3600

Court Reporter:       Ana P. Warren
                U.S. District Court Reporter
                501 W. 10th Street, Room 204B
                 Fort Worth, Texas  76102-3637
                (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT F**

20

mitigating factors that you, as jurors, must consider if you find one or more of them to be present by a preponderance of the evidence. These are called statutory mitigating factors. However, this list is not to be viewed as a complete list of the mitigating factors you may consider. Indeed, each of you may consider any factor you, as an individual find has been established by a preponderance that relates to any aspect of the defendant's character or background, any circumstance of the offense or any other fact or circumstance, which you, as an individual, conclude indicates or tends to indicate that the defendant should not be sentenced to death.

The statutory mitigating factors are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

2. The defendant was under unusual and substantial duress.

3. Another defendant or defendants, though equally culpable in the crime will not be punished by death.

4. The defendant does not have a significant or prior history of other criminal conduct.

5. The defendant committed the offense under severe mental or emotional disturbance.

The nonstatutory factors in the defendant's background, record, or character, or any other circumstance of the offense that mitigates against imposition of the death sentence, which

U.S. DISTRICT COURT

21

are alleged by the defendant, are:

1. The defendant is or may be mentally retarded.

2. The defendant has low intellectual functioning.

3. The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing.

4. The defendant, as a result of a mental disease or illness, personality disorder, and/or low intellectual functioning has a lesser capability to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law than that of a normal person.

5. The defendant was youthful at the time of the commission of the crime, although, not under the age of 18.

6. The defendant has talents, capabilities, or qualities which are of some value to society such as musical talent, religious devotion, et cetera.

7. The defendant is unduly susceptible to influence by others.

8. The defendant's level of participation in the commission of this offense was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime.

9. The defendant grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct.

U.S. DISTRICT COURT

63

things that you and I take for granted every day. The rest of his existence is going to be in a box, in a cage, until the day that he dies. You know that. This is no other choice. And for a person with his problems, the things that he's had to overcome in his life, isn't that enough? Are each of you convinced in your own heart that death is the only appropriate punishment? Thank you.

THE COURT: Mr. Roper, let's see here. You have 20 minutes remaining.

MR. ROPER: Ladies and gentlemen, listening to the defendant's attorneys arguments, they are very good attorneys, and they have done a very good job in representing their client. And I submit to you what they say on the surface makes sense, but when you probe it and when you consider and apply common sense to it, you know it just doesn't wash.

For instance, he says, oh, well, gee whiz, he had a motive to do well to get his G.E.D. when he was in prison, because, oh, well, gee whiz, he can get good time credit. There was no testimony about that. But even if there was, he sure wasn't motivated to do well to get good time credit with all the other law violations he had in prison, battery, assault, not obeying the officers. It's just the way Bruce Webster is. That doesn't mean he's mentally retarded.

And, you know, they have brought up -- what they have done is, this search for the truth, they say, I submit to you what

U.S. DISTRICT COURT

64

this is, it's an attempt -- and it's a very clever attempt --
to get your mind as far away from Bruce Webster's conduct, his
dangerousness and the way he is and what happened to that
little girl than you can ever imagine. Let's don't think about
that. Let's think about these I.Q. tests that are going to
somehow show us some great insight as to the way Bruce Webster
is. Do you think that those folks who developed those tests
ever thought that they would have any application in a capital
murder case? Do you really think that? He comes from a
different world. Because he doesn't score well in an I.Q. test
doesn't mean he's mentally retarded. The testimony is clear
about that.

Finn testified that just because he didn't do well in an
I.Q. test doesn't mean he's mentally retarded. That doesn't
establish that. You look at how well he did in school, how
well he's motivated, what his cultural background is. Now, is
that something you need a psychiatrist to tell you about?

Look at those letters. He doesn't write very well, but if
writing was a sign of mental retardation, we would have every
doctor locked up in a mental ward. Look at those letters and
you'll see the kind of culture he came from and how well you
think he did. He can communicate. Sure.

Dr. Keyes says, well, he can walk the walk and talk the
talk. But, you know, trust me, because I have got this special
insight on how people are. I have got this Ph.D. You know,

U.S. DISTRICT COURT

65

trust me because I know how he really is. But look how he really is.

Fulbright. Fulbright did these tapping tests, and he said, oh, gee whiz, he can't move his hands back and forth. Now, trust me. I'm getting paid by the defense. You know, trust me, because I know. I can tell these folks.

Now, what did you hear from the testimony in the case? He's a drummer. He's a musician. Do you think somebody who can play the drums, a good drummer, a good musician, could do some kind of rhythm test like that? Don't you know what the motivation is behind that?

I want to talk just for a second about Dr. Keyes, Doctor of Objectivity, Dr. Keyes, oh, who always works for the defense, who writes criminal defendant's briefs for them. Mr. Objectivity, what does he do? He goes out there and sees the vice principal of the school, and he says, man, I need some help. I need somebody to help me. I'm trying to save my man's life. Is that a sense of somebody that's doing an objective evaluation of his adaptive skills? Folks, it just doesn't wash. It's just an attempt to get you away from what really happened in this case and to consider something else.

You know, when he talked about the driver's license test, how he went down to do on the driver's license test. He couldn't be mentally retarded to memorize the answers. They were watching him there on the test where he couldn't cheat.

U.S. DISTRICT COURT

101

want to get out of the courtroom as quick as you can because we don't seem to have any air conditioning in here.

You may retire at this time.

(Trial recesses, June 20, 1996, 12:00 a.m. - 12:35 a.m.)

THE COURT: Ladies and gentlemen of the jury, have you you reached a verdict?

THE FOREMAN: Yes, Your Honor.

THE COURT: If you will hand the verdict form to Mr. Bell?

All right. As to the element of intent, the defendant, Bruce Carneil Webster, intentionally killed Lisa Rene?

No.

Intentionally inflicted serious bodily injury?

No.

Intentionally engaged in conduct intending that she would be killed or that lethal force be employed?

Yes.

Intentionally engaged in conduct he knew would create a grave risk of death?

Yes.

Aggravating factors: Caused the death or injury relating in death to Lisa Rene, which occurred during the commission of the offense of kidnapping?

No.

Aggravating factor of especially heinous, cruel, or

U.S. DISTRICT COURT

102

depraved?

Yes.

Substantial planning and premeditation?

Yes.

Particularly vulnerable due to her age?

Yes.

Nonstatutory aggravating factors:  Future danger to the lives and safety of other persons?

Yes.

Effect of the instant offense on Lisa Rene's family?

Yes.

Statutory mitigating factors:  Number 1 -- I will not read them off except as to number.

Number 1, zero.  Number 2, zero.  Number 3, four.  Number 4, zero.  Number 5, zero.

Nonstatutory mitigating factors:

Number 1, four.  Number 2, four.  Number 3, as to physical abuse, 12.  Personality disorder mental illness, et cetera, Number 4, zero.  Number 5 is zero.  Number 6 is zero.  Number 7 is zero.  Number 8 is four.  Number 9 is six.  In fact, 10 is two.  Number 11 is zero.  Number 12 is 11.  Number 13 is zero.  Number 14 is zero.  Number 15 is two.  Number 16 is zero.

Decision Form C is filled out.  Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to

U.S. DISTRICT COURT

103

justify a sentence of death, or in the absence of any mitigating factors whether the aggravating factor or factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death be imposed.

Signed by the presiding juror, June 20, 1996.

Certification, signed by all 12 jurors and dated the same date.

Ladies and gentlemen, you have done the job that we asked you to do some months ago. It's very late, but it is my practice to visit with jurors to help bring closure to their experience if they want to do so. I'll be glad to stay and do that if you want to do that for a few minutes. I know most of you want to go home as quickly as possible. If it will help you in some way to visit for a few minutes, I'll be glad to do that, and we'll be able to do that in a few minutes after I dismiss you.

If you want to go on home, you're certainly free to go on home now. We will have people to help you to your cars, if you need that.

All right. You're dismissed at this time.

Hold on just a moment. Please be seated.

It's customary that a polling sometimes be done upon request, and I asked Mr. Moore if he wanted a polling. And I'll ask you in turn if this is your verdict. If it is your

U.S. DISTRICT COURT