IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

## No. 14-1049

BRUCE CARNEIL WEBSTER,

Petitioner-Appellant,

v.

JOHN F. CARAWAY, Warden,

Respondent-Appellee.

On Appeal from the United States District Court
For the Southern District of Indiana
District Court No. 2:12-cv-00086-WTL-WGH

## PETITIONER-APPELLANT'S SEPARATE APPENDIX

## VOLUME III

## THIS IS A DEATH PENALTY CASE

## ORAL ARGUMENT REQUESTED

Dorsey & Whitney LLP
Steven J. Wells
Kirsten E. Schubert
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

*Attorneys for Petitioner-Appellant Bruce
Carneil Webster*

# TABLE OF CONTENTS

## VOLUME I

Judgment In A Criminal Case, Sept. 30, 1996, 4:94-CR-121-Y (1)
(N.D. Tex.) (N.D. Tex. Dkt.824)...................................................................S.App.1

*United States v. Webster*, No. 96-11224, 162 F.3d 308 (5th Cir.
1998), *cert. denied*, 528 U.S. 829 (1999)...............................................S.App.5

*Webster v. United States*, No. Civ.A. 4:00-CV-1646, 2003 WL 23109787
(N.D. Tex. Sept. 30, 2003) (N.D. Tex. Dkt.1110) ................................. S.App.74

*United States v. Webster*, No. 03-11194, 421 F.3d 308 (5th Cir.
2005), *cert. denied*, 549 U.S. 828 (2006) ........................................... S.App.90

*United States v. Webster*, No. 09-11039 (5th Cir. 2010), *cert. denied*,
131 S.Ct. 794 (2010)..................................................................... S.App.97

Declaration of Steven Wells ("Wells Decl.") in Support of Petition for
Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, Mar. 23, 2012
(Dkt.3) ..................................................................................S.App.106

Exhibit B to Wells Decl., excerpts from Vol. 23 of trial transcript,
June 12, 1996, 4:94-CR-121-Y (Dkt.3-2) ........................................S.App.111

Exhibit C to Wells Decl., excerpts from Vol. 24 of trial transcript,
June 13, 1996, 4:94-CR-121-Y (Dkt.3-3) ........................................S.App.130

Exhibit D to Wells Decl., excerpts from Vol. 25 of trial
transcript, June 14, 1996, 4:94-CR-121-Y (Dkt.3-4).........................S.App.191

Exhibit E to Wells Decl., excerpts from Vol. 26 of trial transcript,
June 18, 1996, 4:94-CR-121-Y (Dkt.3-4) ........................................S.App.290

Exhibit F to Wells Decl., excerpts from Vol. 27 of trial transcript,
June 19-20, 1996, 4:94-CR-121-Y (Dkt.3-5).....................................S.App.333

## VOLUME II

Exhibit G to Wells Decl., Social Security Administration Records of
Bruce Webster, rec'd by Dorsey & Whitney on Feb. 9, 2009 (Dkt.3-6).............S.App.343

## VOLUME III

Exhibit H to Wells Decl., Social Security Administration Records of
Willie Webster, rec'd by Dorsey & Whitney on Feb. 9, 2009 (Dkt.3-7)..............S.App.414

Exhibit I to Wells Decl., Department of Human Services Child
Maltreatment Division Records rec'd by Dorsey & Whitney on Oct. 31,
2008 (Dkt.3-8) ......................................................................................S.App.417

Exhibit J to Wells Decl., Declaration of Leonda Daniels, Dec. 9, 2008
(Dkt.3-9) ..............................................................................................S.App.421

Exhibit K to Wells Decl., Declaration of Lanetra Evans, Nov. 12, 2008
(Dkt.3-10)  ...........................................................................................S.App.425

Exhibit L to Wells Decl., Declaration of Luketha Fraizer, Dec. 11, 2008
(Dkt.3-11) .............................................................................................S.App.428

Exhibit M to Wells Decl., Declaration of Marvin Holloway, Dec. 7, 2008
(Dkt.3-12) .............................................................................................S.App.432

Exhibit N to Wells Decl., Declaration of Angela Madison, Dec. 9, 2008
(Dkt.3-13) .............................................................................................S.App.435

Exhibit O to Wells Decl., Declaration of Theressia Martin Moten,
Dec. 9, 2008 (Dkt.3-14) ......................................................................S.App.438

Exhibit P to Wells Decl., Declaration of Michael Parks, Dec. 8, 2008
(Dkt.3-15) .............................................................................................S.App.441

Exhibit Q to Wells Decl., Declaration of Jodin Smith, Nov. 11, 2008
(Dkt.3-16) .............................................................................................S.App.444

Exhibit R to Wells Decl., Declaration of Dorothy Harris Wallace,
Nov. 11, 2008 (Dkt.3-17)......................................................................S.App.449

Exhibit S to Wells Decl., Declaration of Sharon Webster, Nov. 11, 2008
(Dkt.3-18) .............................................................................................S.App.458

Exhibit T to Wells Decl., Declaration of Tony Webster, Nov. 11, 2008
(Dkt.3-19) .............................................................................................S.App.463

Exhibit U to Wells Decl., Declaration of Dr. Marc J. Tassé,
Ph.D., Sept. 29, 2011 (Dkt.3-20).........................................................S.App.469

Exhibit V to Wells Decl., Declaration of Kristen K. LeRoux,
Mar. 23, 2012 (Dkt.3-21) .....................................................................S.App.496

Exhibit W to Wells Decl., Declaration of Larry M. Moore,
Oct. 20, 2009 (Dkt.3-22)................................................................S.App.500

Exhibit X to Wells Decl. Motion of Bruce Carniel Webster for Leave to
Conduct Discovery, N.D. Tex. Docket No. 1028, filed on Apr. 30, 2001
(Dkt.3-23) ........................................................................................S.App.507

Exhibit Y to Wells Decl., Memorandum Opinion and Order Denying
Petitioner's Motion for Discovery, N.D. Tex. Docket No. 1063, filed on
June 18, 2002 (Dkt.3-24) ................................................................S.App.536

Entry and Order to Show Cause, Apr. 19, 2012, 2:12-cv-86
(Dkt.9) ..............................................................................................S.App.555

Supplemental Declaration of Kristen LeRoux ("LeRoux Decl.") in
Support of Petitioner's Reply to Respondent's Return to Order to Show
Cause, Oct. 10, 2012, 2:12-cv-86 (Dkt.25).......................................S.App.556

Exhibit A to LeRoux Decl., Facsimile Transmission to the SSA office
requesting records, Mar. 5, 1996 (Dkt.25-1).....................................S.App.561

Exhibit B to LeRoux Decl., Letter to SSA office requesting records,
Oct. 27, 2008 (Dkt.25-2)..................................................................S.App.566

Exhibit C to LeRoux Decl., Letter to SSA office requesting records,
Dec. 15, 2008 (Dkt.25-3) .................................................................S.App.569

Exhibit D to LeRoux Decl., Letter to SSA office requesting records,
Oct. 8, 2009 (Dkt.25-4)....................................................................S.App.573

Exhibit E to LeRoux Decl., SSA Letter to Dorsey & Whitney denying
request for additional records, Oct. 22, 2008 (Dkt.25-5)..................S.App.580

Exhibit F to LeRoux Decl., Letter to SSA requesting records,
Nov. 23, 2009 (Dkt.25-6)..................................................................S.App.584

Exhibit G to LeRoux Decl., SSA Letter to Dorsey & Whitney stating
that Webster's folder has been destroyed, Dec. 7, 2009 (Dkt.25-7) ..................S.App.591

# Wells Decl. Ex. H

Page 2 - Willie L. Webster

He was given some capsules to take but is irregular and sometimes refuses to take the medicine. When I asked if her husband had been involved in any difficulty in the community outside the home, she reluctantly reported that he had been charged with Second Degree Murder one month ago. When I turned to Mr. Webster for details he again wanted to leave the room, so no further information is available on the details of that event.

The past history revealed that Mr. Webster was born in Louisiana, had no formal education, but has learned to sign his own signature. Both parents are deceased and he said with some uncertainty, that he thought there were 24 children in his family. He has been married twice, seven years to his present wife and they have seven children.

The evaluation of his mental status reveals him to be functioning on a psychotic level. He was inappropriately suspicious of all the examining procedures and seemed to be preoccupied with the delusional belief that he was being prepared for some dire event, such as confinement in a hospital. With great patience he did allow testing of his cranial nerves, but he followed the moving finger quite erratically; he was unable to focus on an object for a funduscopic exam and he seemed not to understand the purpose of my asking him to go through various motions with the facial muscles and sticking out the tongue, swallowing, hunching the shoulders, etc. As near as I could tell however, from his spontaneous motions, there was no significant impairment of cranial nerve function.

With the wife in the room, I asked him to strip to his waist and again he was very suspicious, looked at his wife and asked her what I was going to do to him. On some of the occasions during the interview, I asked him to give the name of the examiner and he never did concentrate on that task sufficient to recall. He said that he did not know the names of the month but did slowly name the days of the week and stated that the current day was Saturday, which was correct. Throughout the exam he made remarks indicating a sense of fearfulness and mistrust regarding the purpose of the procedures. He would not answer any questions of a personal nature or regarding changes in his feelings. He seemed to become more tense and close to a point of behavior explosion. His apperception therefore, was markedly impaired and he had no insight or judgement into his present functioning. There was no modulation of affect and he maintained a quizzical, confused and suspicious attitude throughout the contact.

H.06

S.App.415

### DRS. PADBERG AND MOORE
NEUROLOGICAL SURGERY
SUITE 704 · DOCTORS BUILDING
800 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205

MOHAWK 6-5466

FRANK PADBERG, M.D.                                                        JIM J. MOORE II, M.D.

June 22, 1970

Robert E. Diles, Referee
Workmen's Compensation Commission
Justice Building, State Capitol Grounds
Little Rock, Arkansas   72201

Dear Mr. Diles:

Re Willie Lee Webster vs. Pulpwood Producers Co.
   WCC File ███████

This 47 year old colored male was in the office today accompanied by his wife.

HISTORY:  He states, with some urging, that his complaints are continued, migrating, pains in his head; a numbness of the left side of the body, head down; and periodic dizziness.  His wife, on questioning, adds that he has some problem with memory, he tends to lose his temper easily and is rough on both her and their children. The patient states that he does not do too much in the way of activities at present; though he has been doing some driving of his personal car; but that when it zig-zags, he stops.  He states that his past history is excellent and that he never knew what a doctor was until his injury.  We have copies of the discharge summary and admission note from the Arkansas Baptist Medical Center which indicate his injury; the injury occurring on or about June 11, 1969, when he sustained a blow to the top of his head and right shoulder area and with findings pointing to a compound, depressed, skull fracture in the right parietal region.  Dr. Jouett saw him and, apparently, carried out immediate repair and removal of the depressed fragments and apparently, according to the note, a plate was inserted at the same time.  The neurologic examination, according to those notes, indicates a fairly symmetrical pattern.  There is a history, apparently, of some momentary unconsciousness.  A review of the surgical note reveals that there was no dural laceration; that is, there was no involvement, apparently, of the soft tissues or brain underlying the bony fracture.

NEUROLOGICAL EXAMINATION:  Examination on this patient is somewhat difficult; it is difficult to get his attention; frequently he appears a bit hostile or, at least, surly.  He tends toward much deep sighing during both the interview and examination.  He moves around very fluidly; he walked into the examining room without difficulty nor

**REDACTED**

H.11

# Wells Decl. Ex. I

Arkansas Department of Human Services

## Maltreatment Summary Report

10/31/2008 09:30 am

| Referral Number | Referral Date | Family Name |
|---|---|---|
| 554482 | 11/28/1983 01:00 PM | WEBSTER |
| Staff Name | | Incident County |
| | | Jefferson (Pine Bluff) |

**CLIENT INFORMATION**

| Client Number 1: ▇▇▇▇ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137089 | Female | | 41 |

**CLIENT INFORMATION**

| Client Number 2: ▇▇ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137090 | Male | | 66 |

**CLIENT INFORMATION**

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137094 | Male | | 10 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

**CLIENT INFORMATION**

| Client Number 4: D▇▇ W ▇▇▇▇ | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID | Gender | Birth Date | Approx. Age |
| 1137092 | Male | | 13 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

**REDACTED**

I.02

S.App.418

## CLIENT INFORMATION

| Client Number 5: T⬛ W'⬛⬛ | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID 1137093 | Gender Male | Birth Date | Approx. Age 12 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

## CLIENT INFORMATION

| Client Number 6: D⬛ W⬛⬛ | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID 1137091 | Gender Male | Birth Date | Approx. Age 16 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

## COLLATERAL INFORMATION

| Collateral Name | | |
|---|---|---|
| Relation to Family | Start Date | End Date |

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D⬛ W⬛ | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| D. ⬛ W'⬛ | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| D⬛ W⬛ | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| D. ⬛ W. ⬛ | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| D⬛ W⬛ | Abuse | | | | |

REDACTED

I.03

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| T█ W█ | Abuse | | Cuts, Bruises, Welts | █ WEBSTER | True |
| T█ W█ | Sexual Abuse | | Unknown | █ WEBSTER | See Legacy File |
| T█ W█. | Abuse | | | | |
| BRUCE WEBSTER | Abuse | | | | |
| D█. W█ | Abuse | | Cuts, Bruises, Welts | █ WEBSTER | True |
| D█. W█ | Abuse | | Cuts, Bruises, Welts | █ WEBSTER | True |
| D. █ W█ | Sexual Abuse | | Unknown | █ WEBSTER | See Legacy File |
| D█ W█ | Sexual Abuse | | Unknown | █ WEBSTER | See Legacy File |
| D█ W█ | Abuse | | | | |
| T█ W█ | Abuse | | Cuts, Bruises, Welts | █ WEBSTER | True |
| T█ W█ | Sexual Abuse | | Unknown | █ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | █ WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | | County | |
|---|---|---|---|

| Current Status | True | | |
|---|---|---|---|

REDACTED

I.04

# Wells Decl. Ex. J

**PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**LEONDA DANIELS**

I, **Leonda Daniels**, declare as follows:

1.      I live in Pine Bluff, Arkansas. I have lived here since I was 12 years old. I am employed by Welspun, Inc., a gas pipeline company in Little Rock. I have worked there for 2 years.

2.      I met Bruce Webster through his sister, Future Mae, when I was roughly 16 years old and he was 17. We dated for a couple of years and lived together at his sister's house.

3.      Bruce was a fun-loving happy sort of guy and he was fun to be around but he had very obvious mental problems. Bruce was unable to be serious about anything. It was not a matter of being disrespectful because Bruce was always very respectful. It was just that he truly could not understand the seriousness of anything, no matter what it was.

4.      It was impossible for Bruce to focus on anything for long. He had the attention span of a small child. He could not sit through a television program or a movie without

1

**EXHIBIT J**

getting up every 5 minutes to do something. He could not follow the plot of anything and would always have to ask me what was going on and what the characters were talking about.

5.    We would play games like cards or dominoes with our friends, but Bruce was not able to keep up. He could not play a card game like "Spades" where the rules required you to "follow suit." He truly could not tell the difference between spades and clubs. Playing dominoes was out of the question for Bruce. He could not think fast enough and calculate fast enough to make a correct or proper move. He would just sit there and stare at his pieces and not know what to do. Finally, he would just give up. He would make some sort of comment about how he wanted to do something else and he would just drop out to save face.

6.    In all my time around Bruce, I never once saw him read a book, magazine or newspaper.

7.    Bruce could not do any kind of paper work. I had to fill out a job application for him. When I testified at his trial in 1996, the government lawyer got me all confused about this and got me to say that Bruce could fill out an application but that he just did not want to. The reality is that Bruce really could not do it himself.

8.    Bruce would go along with anything. He could not think for himself. Whatever anybody wanted to do, that was alright with Bruce.

9.    Bruce could not be counted on to do anything where he had to exercise judgment or common sense. If you sent him to the store for, say, a coke, a pack of cigarettes and a bag of chips, when he came back there would always be something

2

wrong. I would say, "You can't remember three things?" Even if you wrote him out a list, like "milk, Fruit Loops, etc.," he could not follow directions.

10.  Bruce did not have any money of his own. His mother would give him money.

11.  Bruce did not understand a lot of words. Like, he thought "double date" meant going out on two dates, one this week and one next week.

12.  Bruce and I split up about two years before he was arrested in the murder case. I heard about the case when my cousin called me on the phone. I was asleep when she called and said, "Hurry up! Turn on Channel 7. The guy you used to date is on TV." I turned on the television and saw Bruce's picture. I could not believe it. Bruce was always sweet to me and was never violent or abusive. I was in total shock.

Pursuant to 28 U.S.C. § 1746, I, **Leonda Daniels**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12-9-08

Leonda Daniels

3

# Wells Decl. Ex. K

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                                CRIMINAL ACTION NO. 4:94-CR-121-Y

                                              FROM

                            THE UNITED STATES DISTRICT COURT
                              NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

      Defendant.
                                      __DECLARATION OF__

                                      __LANETRA EVANS__

I, **Lanetra Evans**, declare as follows:

1.      I live in Pine Bluff, Arkansas. I am a Licensed Practical Nurse. I am presently employed in a supervisory position at a convalescent home in Pine Bluff.

2.      Prior to my current employment, I worked at a facility for children with developmental disabilities including mental retardation and Down Syndrome.

3.      I have known Bruce Webster since we were children. I went through school with Bruce and his brothers and sisters and I spent a lot of time as a child at the home of my friend who lived directly across the street from the Webster home.

4.      The Webster home was known in the neighborhood as a very strange place. Even though I would visit and play right across the street and I knew all the Webster kids I would never go over there. The father was someone you did not want to have anything to do with. He was known to abuse his children and they were all obviously affected by it.

Declaration of Lanetra Evans

**EXHIBIT K**

5. I always thought that two of the Webster children were especially slow mentally, Bruce and Tony. Bruce was always very needy and dependent as a child. He wanted a lot of attention and he would act silly to get attention. From the things he would do and say you could tell he was not normal.

6. When we got a little older, Bruce got romantically involved with my cousin, Gwen. Gwen stayed with us a lot when she was in high school and Bruce would often stay at our house with her when they were teenagers. He obviously did not want to be in his own home.

7. Gwen would have to do everything for Bruce. She would pick out his clothes for him and she would even tie his shoes for him which I thought was extremely odd.

8. He spent a lot of time in our home but I do not remember ever seeing him read or write.

9. Bruce was not a mean person at all. He was polite and respectful towards everyone in our home. He mostly wanted people to like him.

Pursuant to 28 U.S.C. § 1746, I, **Lanitra Evans**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __11/12/08__        _Lanitra Evans_

Lanitra Evans

Page 2

# Wells Decl. Ex. L

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                                 CRIMINAL ACTION NO. 4:94-CR-121-Y

                                          FROM

                        THE UNITED STATES DISTRICT COURT
                           NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

      Defendant.

                               **DECLARATION OF**

                               **LUKETHA FRAZIER**

I, **Luketha Frazier**, declare as follows:

1.     Bruce Webster is my uncle. I am the daughter of Bruce's older sister, Dassie Mae Frazier.

2.     I grew up with Bruce. I saw him almost every day, and when I was seven or eight years old I lived with Bruce's family for about a year.

3.     Bruce and I were in the same grade at school. We both had to repeat the first grade. Bruce was always a poor student.

4.     Most of the kids liked Bruce because he was funny and goofy. Since he was not good at school, he was sort of a class clown.

5.     Even though I repeated first grade and was never a very good student, I was a better student than Bruce and would help him with his school work.

6.     Bruce and I were in 8th grade science class together. Other students would do

Declaration of Luketha Frazier

Page 1

EXHIBIT L

Bruce's work for him or show him how to do it. Some of them would let Bruce look at their papers during tests. Other students liked Bruce and wanted to help him. They knew he could not pass tests on his own, so they would help him.

7. School was very hard for Bruce. I know he was embarrassed that he could not keep up and by eighth grade he was going to school less and less.

8. When Bruce got his driver's license I had gotten the answers to the written part of the test from a man who worked at the drivers license department, a relative of a classmate of ours. I gave the answers to Bruce so he could pass the test. Bruce could never have been able to pass it otherwise.

9. When I lived with Bruce's family, I often heard Willie beating Bruce and his brothers and sisters. The sounds were gruesome. He would beat Bruce and his siblings two or three times a week, often for the smallest things or for nothing at all. He would beat them with extension cords and a water hose that gave them big bruises and welts. We were all terrified of Willie. He kept us all in constant fear of his anger and cruelty.

10. Willie beat me with a belt when I was 7 or 8 years old. I wanted to go to church with my grandmother. He told me I could not go, but I went anyway. His brutal beating left a large bruise on my back.

11. Willie would make his own children do awful things. He would make one of his children pour a cup of warm water into another one of his children's ear. Tony used to wet the bed, so Willie put one end of a hose on Tony's penis with a clothespin and the other end in his mouth when he went to sleep. He did that so he

Declaration of Luketha Frazier

Page 2

would urinate into his mouth instead of on the bed. He beat the bottom of David's feet with a water hose. I would hear the kids yelling when they got beat.

12.    Willie would force his sons to call my grandmother's sister, my Great-aunt Ruby, to harass her and say nasty things and bad stuff over the phone.

13.    Bruce was a sweet, fun uncle. He was my favorite uncle. He always there for me and he was very protective of me and the girls in his family. I have never seen him be violent. The Bruce I knew was not a mean person at all. I will never understand how he could have been involved in what he was charged with and sentenced to death for.

Pursuant to 28 U.S.C. § 1746, I, **Luketha Frazier**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: ___11|11|08___                    _____
                                                    Luketha Frazier

Declaration of Luketha Frazier

Page 3

# Wells Decl. Ex. M

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

Defendant.

DECLARATION OF

MARVIN HOLLOWAY

I, **Marvin Holloway**, declare as follows:

1.     I live in Pine Bluff, Arkansas. I was Bruce Webster's co-defendant in the murder case that resulted in Bruce being sentenced to death. I testified for the United States government against Bruce and Orlando Hall.

2.     I served twelve years in prison as part of a plea agreement in return for my testimony against Bruce. I was released from prison one year ago, on December 5, 2007. Since my release from prison, I have been employed as a salesman at a major car dealership in Little Rock.

3.     Other than this offense, I have no other felony convictions.

4.     I knew Bruce for several years before the offense, but I did not know him well. I could tell that Bruce was not right mentally and that he was lacking in intelligence.

5.     In the first paragraph of its opinion affirming Bruce's death sentence, the U.S Court of Appeals for the Fifth Circuit stated: "Webster, Hall and Marvin Holloway ran a

EXHIBIT M

S.App.433

marihuana trafficking enterprise in Pine Bluff, Arkansas." The Court was totally incorrect about this. Bruce was definitely not a partner in the marihuana enterprise. As far as I know, Bruce did not run anything.

Pursuant to 28 U.S.C. § 1746, I, **Marvin Holloway**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _12/07/08_

_Marvin Holloway_
Marvin Holloway

# Wells Decl. Ex. N

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                    CRIMINAL ACTION NO. 4:94-CR-121-Y

                               FROM

                    THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

    Defendant.
                            **DECLARATION OF**

                            **ANGELA MADISON**

I, **Angela Madison**, declare as follows:

1. My name is Angela Madison and I live in Pine Bluff, Arkansas. I was born and grew up in a house a couple of blocks from where Bruce Webster grew up. I am 37 years old, roughly two years older than Bruce and the same age as his brother, Tony.

2. As a child, I used to play with Bruce and his brothers and one of his sisters. The one thing I remember most about Bruce back then is that he would always do whatever anybody asked him to do, no matter what it was. I remember one time, we were all sitting around listening to the radio and we decided we wanted to listen to tapes. Bruce had to be no more than 10 or 11 years old at the time. We knew his brother David collected music but we also knew he did not like anybody messing with his stuff. We told Bruce to go sneak some of his brother's tapes out. We told him, "He won't know." Bruce, as always, did what we asked him to

1

**EXHIBIT N**

do without any questions or hesitation. David came over and heard us listening to his music and, of course, Bruce got beat up for it.

3. Bruce could never sit still so it was very hard for him to sit in church. Our house was right across the street from his family's church on 13th Street. Bruce would sneak out and come over. His mother was extremely strict and he would always get in trouble for this – time after time after time.

4. Truthfully, I thought all of Bruce's brothers were retarded. The ones I knew best were David, Tony and Bruce and they were all very slow mentally, but Bruce was the slowest. His mind would wander. You would be talking to him and he would just ramble from one subject to another. I'd tell him, "We weren't even talking about that." It seemed like he would change the subject to cover up the fact that he did not understand what we were talking about. As Bruce got a little older, maybe 11 or 12, it was hard or impossible to have a normal conversation with him. He would just talk in an ignorant sort of slang, saying nothing intelligent.

5. When I was 13 or 14 years old we moved to Milwaukee, Wisconsin, so I never saw Bruce again. When I was 22, I moved back to Pine Bluff, but I never did see Bruce again after we were children.

Pursuant to 28 U.S.C. § 1746, I, **Angela Madison**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12-09-08

Angela Madison

Angela Madison

# Wells Decl. Ex. O

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

**DECLARATION OF**

Defendant.

**THERESSIA MARTIN MOTEN**

I, **Theressia Martin Moten**, declare as follows:

1. I am Bruce Webster's cousin. I live in Pine Bluff, Arkansas. I am 50 years old which makes me about 15 years older than Bruce.

2. My mother and Bruce's mother were sisters. My mother passed away about two years ago.

3. There is a lot of mental retardation in my mother's and Bruce's mother's family. Bruce and I have a first cousin in Little Rock named Alpercy Cox, our Aunt Delores' son, who is severely retarded. He is around 50 years old and can barely speak. He went to special schools and rehabilitation his whole life just to learn how to speak at all. His sister, Denise, has to take care of him. We have another first cousin in Monticello, Arkansas, Varner Martin, who is around 40 years old who cannot take care of himself at all. He still goes to a special school for the retarded. I have a nephew named Johnny Foster who is 8 years old. He is severely mentally disabled

1

**EXHIBIT O**

and cannot talk at all.

4. There were a number of other people in our family who were very abnormal. Our Auntie Leola was very strange. She was afraid to stay by herself. She would pay you a week's pay just to stay the night with her. She would get confused and think her nephew was her own child. Meanwhile, she could not raise her own daughter at all and had to let other people raise her.

5. Bruce's sister Dassie Mae was the same way. She did not develop properly and was always very tiny. Her head hurt all the time and she had two brain operations. She is very hard to communicate with unless you are family or know her well.

6. I always thought Bruce was the same way. When Bruce was a youngster, the way he moved and carried himself was not normal. He didn't talk and he didn't play with the other children when he was small. Even his brother Tony, who was definitely "not all there" either, did a lot better than Bruce did.

Pursuant to 28 U.S.C. § 1746, I, **Theressia Martin Moten**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/9/08

_Theressia Moten_

Theressia Martin Moten

2

# Wells Decl. Ex. P

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**MICHAEL PARKS**

I, **Michael Parks**, declare as follows:

1. I live in Hensley, Arkansas. I have a barber shop in Pine Bluff and I am a supervisor for UPS. I have an associate degree in electronics from Arkansas College of Technology.

2. I have known Bruce Webster's family my entire life. I grew up in the same neighborhood and I went through school with Bruce's older brother, Mark.

3. My mother did not allow me to go to the Webster home when I was growing up. Their father was known to be very abusive and there was a lot of family violence in the home. The father was reputed to have killed a man and gotten away with it.

4. All the Webster children were mentally slow and most of them were in special education classes. They were also very lacking in social skills. Even so, some of Bruce's brothers overcame these obstacles and were able to acquire some job skills and to make

**EXHIBIT P**

decent lives for themselves.  For example, Bruce's brother, Mark, is a very good carpenter and Tony is a minister and has had a steady job with the sanitation department. This was not true of Bruce, however.  Bruce never developed any of these skills due, I am quite sure, to his mental limitations.  He never seemed to be able to develop skills like his brothers did despite their own limitations.

5.      Bruce was always a fun-loving person and pretty outgoing but I believe he used this to cover up for the fact that he was mentally impaired.  It was deceptive because it hid the fact that he was far below average in intelligence.

Pursuant to 28 U.S.C. § 1746, I, **Michael Parks**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _12/8/08_                    _____

Michael Parks

# Wells Decl. Ex. Q

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**JODIN SMITH**

I, **Jodin Smith**, declare as follows:

1.  I am the ex-wife of Bruce Webster's brother Mark. I live in Pine Bluff, Arkansas. I am employed as the Agency Manager for an insurance and tax preparation agency.

2.  I moved to Pine Bluff when I was 16 to live in a youth home. My family had abandoned me and I had nowhere to turn.

3.  I met Mark Webster in 1986 and we were married in 1987 shortly before I graduated from high school. We were both working at the book store at the University of Arkansas in Pine Bluff. He is one year older than I am.

4.  I married Mark and we have two children together, a daughter who is 20 and a son, 17. I left Mark in 1996 because I could no longer tolerate his violence and his physical and mental abuse. I was genuinely afraid that he might kill me.

Declaration of Jodin Smith

Page 1

EXHIBIT Q

5. During the time I was dating and married to Mark Webster, I became very close to all of his family. To this day, I think of them as my own family and I remain close to many of Mark's brothers and sisters, his Aunt Ruby and others in his family.

6. Bruce was around 13 years old when I met him. He was a very sweet kid who loved to have fun more than anything else. Bruce and I were very close and I was always crazy about him. I considered their brother Darrie to be my best friend. Darrie's nickname was "Tacky." That's what everybody called him. Darrie was stabbed to death in 1992 by their sister's husband.

7. The Webster kids had a terrible childhood. I heard many stories from all of them about the horrible things that were done to them by their father. Their father's nickname was "Bear" or "Mr. Bear." Mr. Bear was a ferocious mean man. I heard about a lot of what he did to them, but I saw some of it firsthand. I know for a fact he hit Darrie with a 2x4 and left welts all over his back and shoulder. He beat David and Darrie with a water hose and PVC pipe. David told me his father made him drink out of the slop jar they kept in the house to urinate and defecate in before they had a toilet. He also told me about his father forcing him to have sex with his own mother. Their sister, Future Mae, told me her father forced her to have sex with her sister Dassie Mae.

8. The Webster kids never really had a chance to be children. They were deprived of the opportunity children should have to be care free and to have fun. Instead, they lived in a constant state of fear and terror. Because of their home life they were all very sexual at a young age, before they even reached adulthood.

Declaration of Jodin Smith

Page 2

9.  When my daughter was a small baby, Mr. Bear would pick her up by her limbs. He almost broke her arm one time. He picked my son up by his foot when he was a baby and scared me half to death.

10.  Mark has serious problems with uncontrollable anger and violence. I know it is a result of what his father did to him and his brothers and sisters. It is as if he has multiple personalities. He has three sides to him. One is childlike and sweet, one is a fairly normal adult, and one is a violent terrifying demon. The demonic Mark was very physically abusive to me and our children. He hit me in the head with an iron skillet. He pounded me repeatedly in the chest and bruised three ribs and my breast bone. He also stomped on my face and left a shoe print on it. He would threaten to blow up the house with me and the kids in it. When he shot at me, that was the last straw. I was afraid he would eventually kill me and I knew I had to leave him. Once when he was in a violent rage, he even referred to himself by a different name which terrified me. He said, "You don't know who I am, bitch? I'm William." His father's name is Willie, so that struck me as very strange.

11.  When my daughter got a little older, I could see that she was developing violent tendencies that she was picking up from her father. One time after we had split up, they were having a fight and he picked her up by her leg and slammed her on the floor. He had a scratch on his face and neck and he claimed she attacked him, but really she was just trying to get away from him. I took him to court over it and the judge called his actions "reasonable discipline."

12.  Bruce was a wonderful kid. When I met him he was about 13, but he was still

Declaration of Jodin Smith

Page 3

very much a Mama's boy. His mother still called him her "Titty baby" because he was still very immature. To me he was always a childlike, even when he was full grown.

13.    Bruce had a hard time expressing himself with words. He would have trouble finding the right word for things and would even ask you in the middle of a sentence to help him find the word he was looking for. He did not understand some basic concepts that we take for granted. For example he did not understand that a quarter, the coin, was ¼ of a dollar or that a quarter of an hour was the same thing as 15 minutes. He could not do simple things like give directions and would have to ask me to do it. He would just hand me the phone and say, "Hold on, Jodin will tell you." You could never count on him to handle any type of responsibility like going to the store or dealing with any sort of emergency. He was just not mentally up to it. I never saw him read a book or newspaper or talk about anything serious.

Pursuant to 28 U.S.C. § 1746, I, **Jodin Smith**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11\11\2008

Jodin Smith

Declaration of Jodin Smith

Page 4

# Wells Decl. Ex. R

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**DOROTHY HARRIS
WALLACE**

I, **Dorothy Harris Wallace**, declare as follows:

1. My name is Dorothy Harris Wallace. I am Bruce Webster's sister. I live in Pine Bluff, Arkansas.

2. I am thirteen years older than Bruce. Bruce and I have different fathers. My mother brought my sister and me to live with Bruce's father, Willie Webster, when I was about two years old. I have a memory of hiding up under the house all night when I was about 2 or 3 years old because I was so afraid of my step-father. I have no other memories until I was about 9 years old. I thought he was my real father until I was about 14. My Aunt Ruby told me he was not my father. I was glad to know he was not really my father.

3. My step-father, Willie Webster, is a violent perverted man who tortured,

Declaration of Dorothy Harris Wallace

- Page 1

EXHIBIT R

brutalized and sexually abused everyone living under his roof. He did things to me and my brothers and sisters that most people could never imagine people doing to each other – especially a father to his own children. He beat us constantly, hit us with belts, cords, hoses, fire pokers, hoes – anything he could get his hands on. He made us all be sexual with each other and even made my brother do sexual things with our own mother. He beat my mother all the time.

4. My step-father even beat my mother when she was pregnant. I remember him jumping on her when she was pregnant with Bruce. He held her down and beat her. I always thought he might have damaged the fetus and that maybe that is why Bruce was not normal mentally.

5. Our childhood was pure hell. Not a one of us really survived life with Willie Webster without lasting and deep mental injuries. We are all very damaged people after those horrible experiences. Most of us have needed long years of therapy just to get from one day to the next without totally falling apart, without killing ourselves and without doing terrible things to our own children and spouses.

6. One time Willie tied my hands to the side of the house and beat me on the back with a water hose until my back split open. He often whipped me and the others with a water hose folded over. I still have the scars on my back. Another time, he hit me in the leg with a hoe so hard it knocked a big chunk out of my leg. I ran to my Aunt Ruby's house, but Willie followed me and shot at my auntie. I still have a big scar on my leg more than 40 years later. When I was around 13, he made me

Declaration of Dorothy Harris Wallace

- Page 2

carry jugs of water long distances in the snow barefoot. Then he tied me up and beat the bottoms of my feet. They were frozen so I couldn't feel anything. I could not walk for days.

7.    He called it punishing us but he got pleasure out of it and most times it did not have anything to do with something we had done that was so wrong. He made David drink urine out of a slop bucket we used instead of a bathroom before we had indoor plumbing. The girls were usually whipped with extension cords high up on their legs and backs so the wounds would be covered by our clothes. He would do all sorts of things to humiliate us and dominate us. He forced our mother to eat a spoonful of black pepper at gun point.

8.    Willie was jealous of Bruce's relationship with our mother. Bruce was the baby of the family and our mother always treated him like her baby. Bruce developed slowly compared to my daughter who is two years younger than Bruce. She learned to speak earlier and she could always explain herself better than Bruce even when they were small. When she was 4 years old and he was 6, you could understand her but you could not understand what he was trying to say.

9.    Bruce had a hard time learning to tell time. Our father would get mad and beat him for not being able to tell him what time it was.

10.    Bruce was very babyish for a long time. He always stayed up under Mama, hanging onto her. She would have to help him with everything, tying his shoes, dressing him, feeding him. He always needed more help than the others.

11.    Most of us had learning disabilities. Out of the nine children in our family, only

Declaration of Dorothy Harris Wallace
- Page 3

three graduated from high school. I always thought Bruce and Tony were the slowest of all. Tony got disability when he was a child for being mentally retarded but Bruce was just as slow as Tony.

12. I remember Willie beating Bruce for coming home after dark. He tied his hands behind his back and tied his feet. Then he took him underneath the car shed and beat him with a water hose. He would normally give twenty-five licks and if you'd move, he'd double it. He beat Bruce with a hose a lot.

13. David and Bruce got the most whooping. I think Bruce got it the worst because Willie was jealous of the extra attention my mother gave him.

14. Willie physically and verbally abused our mother constantly. He was always threatening to kill her or to burn the house down with her inside. He always made it known that he would kill her if she ever reported him to the police or child protection agencies. She wanted to run away and sometimes she would leave him when it got real bad, but she would always come right back.

15. He even abused my daughters when they were little. I heard screaming one morning and ran out of my house to find him beating my daughter because she didn't want to comb his hair. He was whipping her with an extension cord. He beat my other daughter with an extension cord when she was only one year old. She got welts all over her back from it. I called SCAN, the child protection service. Mama put peroxide and ointments on her so by the time SCAN came out to check on it, the bruises had healed up and they didn't do anything. He did the same thing to my sister Future Mae's son when he was about six. The boy's father

Declaration of Dorothy Harris Wallace

- Page 4

called SCAN. When they got there, Future Mae said she had done it to cover for our father.

16. Willie would beat you for any reason he could think of. If you didn't get him water fast enough or wash the dishes right or fast enough, he would beat you. He would beat my slower brothers because they could not tell time. You never knew when or why you might get beat. He didn't need a real reason.

17. He sexually abused the girls. He would make us get naked and touch and kiss each other's private parts. I wouldn't do it so he would beat me.

18. One time my brother David had taken all he could take and he tried to kill Willie, but Willie got a gun and put David back in his place.

19. I believe my little brother Darrie died because Willie kicked him out of the house. After Willie put him out, he was roaming the streets. He got into a knife fight with our brother-in-law, my sister Dassie Mae's husband, Boyd Lee Frazier. Boyd Lee stabbed him real bad and Darrie ended up bleeding to death in a ditch outside our house.

20. Willie beat my sister Dassie Mae in the head three weeks after she had brain surgery.

21. No one ever went to the doctor for injuries from the abuse. He would not let us get medical attention or treatment. All us kids were afraid to tell our teachers about the abuse and Willie was careful to beat us in places that would be covered by clothes.

22. One time, he came home early and my brother David was sleeping in bed with our

Declaration of Dorothy Harris Wallace

- Page 5

Mama. Willie got mad and told them to have sex with each other. He ordered David to take off Mama's clothes and lie on top of her. They were both crying and screaming so he told David to get out of the house and if he ever caught him in bed again he would make them do it.

23. I got pregnant when I was 15 years old. My step-father beat me and ran the boy off. He beat me across the head with a belt buckle.

24. I have had a tough life because of the abuse I experienced at the hands of Willie Webster. I left his house when I turned seventeen and went to California. I took a lot of drugs there and became suicidal. When I came back to Pine Bluff I went to the mental health clinic and got antidepressants. I still have headaches and my brain goes crazy and I get very angry. I have to spend long periods of time alone to work through my anger. I have been with my present husband, Robert Wallace, for thirteen years. We have been married for three years. I was on disability for many years but when we got married I lost some of my benefits. Sometimes I go into sort of a trance and I don't know what I'm doing. I walked clear across town one night and did not even know it.

25. I am in therapy now and I am on medications for depression.

26. Our mother was physically abusive also. I guess all that violence and meanness rubbed off on her. Being around it all the time, she got to be the same way. She would hit my brother David in the head with a jug of frozen water or a plate. She beat me with a broomstick.

27. We have all had mental and emotional problems as adults. All of my brothers

Declaration of Dorothy Harris Wallace

- Page 6

have had trouble with domestic violence. All of them have had to work very hard not to be like their father and not to abuse their wives the way he abused our mother. My sisters and I have all been in very abusive relationships.

27. Bruce has never been able to relate to other people normally. He did not even really know how to relate to us. He never made much sense verbally. Most of the time he could not relate to the world like normal people do. He has always been very easily influenced by others and because of his low intelligence he has always been a follower. You could tell him something and he would just do what you say. Whatever you tell him, he would always go along with it. I have never known Bruce to be a leader at all. There is no one he could lead.

28. I have known my baby brother Bruce his whole life. He was a good boy and a sweet child. Everybody liked him because he was easy-going and silly. He was not a violent person and I never knew him to start trouble. After he stopped going to school, he started to fall in with a bad crowd and one thing led to another. I really don't think Bruce ever would have meant to harm anyone and certainly he would not ever mean to kill someone, especially a young woman. In fact, he was always very protective of the girls in our family, his sisters, nieces and cousins. I know in my heart he had to have been forced into that. It is not something he would have done or thought of on his own. Bruce is just not that kind of person.

29. I could not have gotten to where I am today without the help of the Lord. At times, it was too much for me to bear, but He always got me through.

Declaration of Dorothy Harris Wallace
- Page 7

30.    I hope and pray the President will see fit to grant mercy to Bruce.

Pursuant to 28 U.S.C. § 1746, I, **Dorothy Harris Wallace,** declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  11/11/08

Dorothy Harris Wallace

Declaration of Dorothy Harris Wallace

- Page 8

# Wells Decl. Ex. S

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**SHARON WEBSTER**

I, **Sharon Webster**, declare as follows:

1.      I am married to Bruce Webster's brother, Tony Webster. Tony and I met when we were both seventeen years old. We married when we were both 21. We have three children, ages 16, 14 and 11.

2.      I am a substitute teacher in the Dollarway School District in Pine Bluff. I work in the Special Education department. My brother is a special education teacher. Between my work and my conversations with my brother, I have learned a great deal about special education and learning disabilities.

3.      My husband, Tony Webster, was raised in a home of unthinkable physical, sexual, mental and emotional abuse. His father, Willie, constantly beat and tormented his children and their mother and made them do terrible things to each other. They were all terrified of their father. Even to this day he holds a power over some of

Declaration of Sharon Webster

Page 1

EXHIBIT S

them, especially their mother, Beatrice. Very recently I heard Willie scream at her that he was going to beat her.

4. I always told Tony he did not have to be like his parents. Maybe they could not control themselves, but he could. Tony has always tried to be a good person, but because he was constantly subjected to abuse as a child, he has at times been abusive to me. In January of 1994, I was pregnant with our second child. One day Tony came home very angry. He held a gun to my head. Of course, this is something his father used to do to his mother and he was just imitating the behavior he learned in his home. Although I always knew that Tony wanted to be a good person and did not really want to hurt me, I had had enough and I left him. On Easter of that year I realized he had changed. He has not been abusive since that time, but I know he struggles constantly to manage the pain and rage caused by his horrible childhood.

5. Both Beatrice and Willie have intellectual impairments. I have always suspected they are both mentally retarded. When I first knew them, they wanted to get on welfare but could not figure out how to do it. My grandmother had to help them with their paperwork and the process. Willie can not read at all, and can not even sign his own name. The best he can do is to scratch out a shaky "WW." Beatrice can read, but she does not understand what she is reading. She needs someone to explain the meaning of what she reads. She can not understand insurance papers or medical information, so someone has to explain them to her.

6. Education was not valued in the Webster home. There was no effort to make sure

Declaration of Sharon Webster

Page 2

the children got to school or did their school work. On the contrary, their father often kept them home from school, whether it was because he wanted them to do chores or did not want anyone to see the bruises and injuries he regularly inflicted on them.

7.    Of the nine Webster children, Tony was one of only three to graduate from high school. He was 20 years old when he graduated. When Tony was 21 he was awarded disability payments for mental retardation, back-dated to the time he was 12 years old.

8.    I met Bruce Webster when he was 15 years old. He was a sweet, nice boy, but I could tell right off that there was something wrong with him intellectually. He could not do many of the normal tasks of every day life. He didn't take care of himself like other teenagers. Everyone, especially his mother, helped him with his clothes and getting himself together for a regular day.

9.    Bruce had a very short attention span, like that of a three-year old. He could never stay still. He had trouble focusing on a conversation. Bruce was not someone I could go to if I needed something done, even a small errand. He just didn't know how to do relatively simple things. He had difficulty listening and he had a limited vocabulary, so it was hard to explain things to him. He seemed to be stuck at about the 3rd or 4th grade level as far as his literacy skills. I have never seen him read anything. Even after all his time in prison, the letters we receive from him are still on about the same level as my son in 6th grade.

10.    As Bruce got older, he would pretend he was "too cool" to do things for himself,

Declaration of Sharon Webster

Page 3

like shop or find his way around town. It has always been very clear to me that he was covering up for some kind of deficiency in his ability to function like a normal person in every day life. He had a lot of defense mechanisms for hiding what he could not do for himself.

11. My husband, Tony, who received disability from the age of 12 for mental retardation, is far more functional than Bruce. Tony is a reliable hard worker who has held down a job for many years. He is quite handy when it comes to repairs and fixing things, and he relates to people normally. None of these things are true of Bruce. Bruce is definitely impaired mentally.

12. In light of Bruce's mental impairments, it is impossible to imagine that he was the leader of any type of criminal enterprise or that anyone would take orders from him.

13. Based on all of these factors, I would hope and pray that the federal authorities would see it in their hearts to spare his life.

Pursuant to 28 U.S.C. § 1746, I, **Sharon Webster**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11/11/08

Sharon Webster

Declaration of Sharon Webster

Page 4

# Wells Decl. Ex. T

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**TONY WEBSTER**

I, **TONY WEBSTER,** declare as follows:

1. I am Bruce Webster's brother. I am two years older than Bruce.

2. When I was in school, they said I was a slow learner. I received social security most of my life for what they called mental retardation. Of the nine children in our family, I am one of three to graduate high school. I was 20 years old when I graduated.

3. My brother Bruce is definitely no smarter than I am. In fact, there are many things I could always do better than Bruce could and there is really nothing I can think of that Bruce could do that I can't do. Bruce flat-out could not build or fix anything. He could not do any plumbing work or work on cars. Bruce could not even put up shelves. He would have to get me or someone else to do anything like that for him. It took Bruce too long to do everything, whether it was get dressed, iron a

Declaration of Tony Webster

- Page 1

EXHIBIT T

shirt or use the bathroom. It always took him twice as long as everybody else. Even playing checkers, he would take 5 or 10 minutes to make a move. We would get tired of waiting on him. He would do other stupid things like cut the grass or work in the yard in his good clothes. When we got older, I learned to do things for myself like cook and take care of myself. Bruce never did learn those things. So, if they can say I am mentally retarded, the same has to be true for Bruce. He must be retarded, too.

4.    We had a very hard childhood. I am the only boy in our family to never do a day in jail or prison, but I am quite sure our home was a lot worse than any prison. Our Daddy was a mean nasty man. Most people would not believe the things he did to us and made us do to each other. He beat all of us on a regular basis. He would beat me 2 or 3 times a week, but my brothers Bruce and David got it worse than me. He would make the boys beat and whip each other and if they didn't do it hard enough they would get a whooping instead. He would tell you to be still while he beat you and if you didn't be still he would whoop you double. He would hit you with anything he had in his hand – belt, water hose, extension cords, an opossum tail – anything he could use to hurt you. He would try to hit you where no one would see it, where the marks would be covered by your clothes.

5.    When I was about 19, he hit me in the back of the head with a cast-iron fire poker. It knocked me silly. Since then, I get dizzy spells and other problems. Years after that, I would sometimes pass out. In church, I was playing the organ and I passed out for 10 or 15 minutes. They took me to the hospital and did a CT scan and

Declaration of Tony Webster

- Page 2

found that I had a trauma to the brain in the same spot where my father had hit me with the fire poker. They said it was like I had a stroke.

6. He knocked one of my brothers out cold with an iron pipe.

7. He would make you sit down and eat human feces and you better eat it or you'll get a beating. He would make us lick the cat's anus or get a beating. I refused so he beat me.

8. He would make all of us -- both the boys and the girls -- take off our clothes and he would beat us in the house or out in the yard.

9. He would wake us up at 4:00 in the morning banging on a big metal pot with a spoon, yelling at us to do chores. I can still hear that loud clanking in my head from when he would beat on those metal pots.

10. We were not allowed to go in the ice box or take a drink of water without asking him first. If we didn't ask permission, we would get beaten.

11. Our daddy told us that he had killed people and that he did time in Angola penitentiary for it. He would tell us how mean he was so we would be afraid of him. He told us how mean his daddy was, too, that he would whip him with a razor strap.

12. Our father would make us call our Aunt Ruby, our Mama's sister, and talk nasty to her over the phone. He would make us ask her about her sex life and about her private parts. We loved our Aunt Ruby and hated to do it but he would beat us if we refused, so we had no choice. We would apologize to her later and she understood we had to do it or get beat.

Declaration of Tony Webster

- Page 3

13. It was a joyful time when our father was gone from the house. Friday night he would take off and we would not see him again until Monday. He would be out running around with other women and going to night clubs. We were so happy when he would leave --Friday night was a joyful time in our home.

14. When I was 17, I would run away and hide from my father. I would sleep in abandoned cars, abandoned houses and old schools.

15. I have been married for sixteen years to my wife Sharon. I used to beat Sharon like my father used to do to our mother but I spent many years praying and working on my anger and now I have control of it. With the Lord's help I have gotten better, but it was not easy after all we went through as children.

16. I love my brother Bruce and I will never believe he could have done what they say he did except if someone else told him to do it. Bruce always would do what he was told and he is not the type of person to tell other people what to do. It's just not the way he is. Never was.

17. I have always gone to church and been a very religious person. I play the organ in two churches and I am now an ordained minister myself. I pray that the Lord will guide the President's hand and let him see that my brother may have been

Declaration of Tony Webster

- Page 4

involved in a terrible thing but that he is deserving of mercy and the right to go on living.

Pursuant to 28 U.S.C. § 1746, I, **Tony Webster,** declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _11-11-08_                      _[signature]_

                                       Tony Webster

Declaration of Tony Webster

                        - Page 5

S.App.469

# Wells Decl. Ex. U

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

BRUCE CARNEIL WEBSTER

Petitioner,

v.

CHARLES LOCKETT, WARDEN,
United States Penitentiary, Terre
Haute (USP),

Respondent.

Civil File No. _____

**DECLARATION OF
MARC J. TASSÉ, PHD**

I, Marc J. Tassé, declare as follows:

I.      **BACKGROUND**

1.      My name is Marc J. Tassé, Ph.D. and I am a licensed psychologist in North Carolina (NC #2613). I completed my Ph.D. in research-clinical psychology at the Université du Québec à Montréal. My doctoral dissertation focused on the study of adaptive behavior assessment in individuals with mental retardation. Following my Ph.D., I completed a post-doctoral fellowship in mental retardation and developmental disabilities at The Ohio State University Nisonger Center, University Center for Excellence in Developmental Disabilities Education, Research, and Service. I am also a "Fellow" of the American Psychological Association and the American Association on Intellectual and Developmental Disabilities.

2.      I am a Professor in the Departments of Psychology and Psychiatry at The Ohio State University (OSU). I am also the Director of the OSU Nisonger Center. The OSU Nisonger Center is a federally funded University Center for Excellence in

**EXHIBIT U**

Developmental Disabilities. Our Mission is three-fold: (1) provide training to undergraduate, graduate and post-graduate students in the field of mental retardation and related developmental disabilities (MR/DD), (2) offer services and state-wide technical assistance to individuals with MR/DD across the age span and to agencies providing supports and services to these individuals, and (3) conduct research in the field of MR/DD.

3.     I've worked with individuals with mental retardation for more than 25 years. I have provided direct clinical services as well as supervised graduate and post-graduate psychology students in providing direct services to children and adults with MR/DD. I've been involved in hundreds of psychological assessments and eligibility/diagnostic evaluations of mental retardation involving children, adolescents, and adults. I have worked extensively over the past 20 years directly with individuals with mental retardation across the age span. I have provided consultative services and technical assistance to families, service providers, and state MR/DD agencies. I have also been involved in providing individual therapy to adolescents and adults with mental retardation and co-occurring psychiatric disorders or complex behavior problems.

4.     In the past (1985 to 1993), I also worked as a behavior specialist (Douglas Hospital; Montreal, Canada), providing behavior programming and developing intervention plans for children and adults with mental retardation and co-occurring behavior problems or psychiatric disorders.

5.     In addition to my clinical work, I actively conduct research in the field of mental retardation. I have published more than 75 peer-reviewed journal articles, book

2

chapters, and monographs in the area of mental retardation and developmental disabilities. I have given over 100 presentations, workshops, or seminars at local, state/provincial, national, and international scientific/professional meetings in the field of mental retardation.

6.   I am a co-author on the American Association on Intellectual and Developmental Disabilities (AAIDD; formerly known as the American Association on Mental Retardation) 2010[1] Manual (Schalock et al., 2010) that defines mental retardation, as well as the prior 2002[2] Manual and the 2007 AAIDD User's Guide (Schalock et al., 2007).[3] I have also worked on the development of standardized tests in the field of mental retardation. One such assessment instrument was the *Supports Intensity Scale* (SIS). The SIS is a standardized measure of individual support needs for adolescents and adults with mental retardation. I have also worked on the development and refinement of

---

[1] Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S., Bradley, V., Craig, E. M., Coulter, D. L., Gomez, S. C., Lachapelle, Y., Luckasson, R. A., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tassé, M. J., Thompson, J. R., Verdugo, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and system of supports (11e)*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

[2] Luckasson, R., Borthwick-Duffy, S., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Reeve, A., Schalock, R. L., Snell, M. E., Spitalnik, D. M., Spreat, S., & Tassé, M. J. (2002). *Mental retardation: Definition, classification, and system of supports*. Washington, DC: American Association on Mental Retardation.

[3] Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's Guide Mental Retardation: Definition, Classification, and Systems of Supports, 10th Edition. Applications for Clinicians, Educators, Disability Program Managers, and Policy Makers*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

the *Quebec Adaptive Behavior Scale*, as well as other standardized assessment instruments in the area of measuring problem behavior and psychopathology in individuals with mental retardation. I am currently the lead author on the American Association on Intellectual and Developmental Disabilities' Diagnostic Adaptive Behavior Scale (DABS). The DABS has been in development for more than three years and should result in a standardized test of adaptive behavior that focuses on diagnosing the presence of "significant adaptive behavior deficits" for the purpose of diagnosing mental retardation. I was recently awarded an "Exceptional Service" award by the American Association on Intellectual and Developmental Disabilities for my work in developing the *Supports Intensity Scale*, a standardized test that is used to assess support needs of persons with mental retardation.

7. I am an active member of the following professional organizations:

- American Association on Intellectual and Developmental Disabilities (Fellow)

- American Psychological Association (Fellow) [member of Divisions: 5 (Assessment), 33 (Intellectual and Developmental Disabilities), 41 (Psychology & Law Society)]

- International Association for Behavior Analysis

- International Association for the Scientific Study of Intellectual Disabilities

- National Association for the Dually Diagnosed (MR/MI)

- North Carolina Psychology Board of Psychologists (License #2613)

8. I am currently serving a one-year term as President-elect of the American Association on Intellectual and Developmental Disabilities.

4

9.      I have served, since January 2009, as an Associate Editor of the *American Journal on Intellectual and Developmental Disabilities*. I am also an *ad hoc* reviewer for the following professional journals:

- American Journal on Mental Retardation
- Intellectual and Developmental Disabilities
- International Clinical Psychopharmacology
- Journal of Autism and Developmental Disorders
- Journal of Intellectual Disability Research
- Research in Developmental Disabilities
- *Revue francophone de la déficience intellectuelle*

10.     I was asked by Attorney Sydney Crowder, on behalf of her client Mr. Bruce Webster, to review materials recently discovered from the Social Security Administration and provide an affidavit which addressed the following subjects:

- an overview of mental retardation diagnosis;
- a discussion of the professional and clinical tools that assist psychologists in navigating the complexity of such diagnoses;
- an opinion whether, based on the mental retardation information recently made available (e.g., records from the Social Security Administration as well as previous psychological evaluations recently made available), the evidence supports a diagnosis of mental retardation.

11.     In undertaking the tasks described above, I examined the following relevant case materials relating to Mr. Webster:

 a. Mr. Webster's Elementary Permanent Record from Watson Chapel School District No. 24 – with grades from grade 1 through grade 9.

 b. Mat6Survey – Metropolitan Achievement Tests completed in April 1987 – Master List of Test Results.

5

c.      Blank copy of a test protocol of the Ottis-Lennon School Ability Test.

d.      Declarations dated November and December 2008 from: Leondra Daniels, Lanetra Evans, Luketha Frazier, Marvin Holloway, Angela Madison, Theressia Martin Moten, Michael Parks, Jodin Smith, Dorothy Harris Wallace, and Sharon Webster.

e.      Select pages from the transcript of the trial held on June 12, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 23: pp. 1, 33, 67, 75-76, 102-103, 138, 145, 187, 194, 246).

f.      Select pages from the transcript of the trial held on June 13, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 24: pp. 1, 20, 43-44, 107, 131, 189, 238-239, 247-248, 260).

g.      Select pages from the transcript of the trial held on June 14, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol 25: pp. 1, 89, 125-126, 128-129, 138, 143, 151).

h.      Select pages from the transcript of the trial held on June 18, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 26: pp. 1, 25, 59, 86,120-121, 136-137, 139-141, 177, 224-225, 227, 229).

i.      Select pages from the transcript of the trial held on June 19 & 20, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 27: pp. 1, 19-21, 101-102, 106).

j.      Recently discovered records from the Social Security Administration.

k.      Recently discovered Psychological Evaluation by Dr. Spellman (dated: 12/22/1993).

l.      Recently discovered Psychological Evaluation by Dr. Hackett (dated: 10/22/1993).

6

## II.    AN OVERVIEW OF THE DIAGNOSIS OF MENTAL RETARDATION

DEFINING MENTAL RETARDATION

12.    The Diagnostic and Statistical Manual of Mental Disorders (**DSM-IV-TR**; American Psychiatric Association, 2000)[4] defines mental retardation as follows: (a) significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test;[5] (b) concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (c) onset is before age 18 years.

13.    The **American Association on Intellectual and Developmental Disabilities'** (AAIDD; formerly known as the American Association on Mental Retardation) defines mental retardation[6] as a disability: *"characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."* The AAIDD operationally defined "significant limitations" to be at least two

---

[4] American Psychiatric Association (2000). *Diagnostic and Statistical Manual of Mental Disorders (4th Edition, Text Revision; DSM-IV-TR)*. Washington, DC: Author.

[5] According to the DSM-IV-TR (American Psychiatric Association, 2000), the IQ prong of mental retardation is met if an individual's full-scale IQ score falls between 70 – 75 (roughly accounting for a 95% confidence interval resulting from standard error of measurement on most IQ tests) or lower (DSM-IV-TR; see pages 41 – 42).

[6] While the 2010 AAIDD Manual uses the terminology "intellectual disability" rather than "mental retardation," the two terms are equivalent, and I will use the latter for the sake of consistency.

7

standard deviations below the population mean (i.e., typically a standard score of 70 when the mean = 100 and the standard deviation = 15). The adaptive behavior prong of this definition is met if the individual has significant limitations in (1) conceptual, practical, or social skills or (2) the overall composite (e.g., full-scale) score of adaptive behavior.

*Intellectual Functioning*

14.    The assessment of intellectual functioning is a task that requires specialized professional training. For the purpose of diagnosing mental retardation, AAIDD stipulates that IQ assessment data should be obtained and interpreted by an examiner experienced with people who have mental retardation and who is qualified in terms of professional and state regulations as well as publisher's guidelines for conducting thorough and valid evaluations of intellectual functioning.

15.    The determination that an individual's intellectual functioning is "significantly" sub-average fulfills the first requirement for being diagnosed with mental retardation. "Significant subaverage intellectual functioning" is defined as a performance that is represented by a full-scale IQ score of approximately 70 or less, while considering all sources of test error. A standard score or intelligence quotient of "70" represents a population-referenced performance that is two standard deviations below the population mean (i.e., population average score = 100, standard deviation = 15). Significant deficits in intellectual functioning are best determined using an individually administered comprehensive standardized test of intelligence. The full scale or composite IQ is

8

generally regarded as the best estimate of an individual's general intellectual functioning (Schalock et al., 2010).

16.   Assessment of intellectual functioning must be done using an individually administered comprehensive standardized test of intelligence.  The results obtained from group administered tests of intelligence or abbreviated measures (i.e., short form) of intellectual functioning lack sufficient reliability and psychometric robustness to be used for the purpose of making a diagnosis of mental retardation.  These instruments serve a screening purpose but should not be relied upon when making or refuting a diagnosis of mental retardation.

17.   The Wechsler Adult Intelligence Scale – Fourth Edition, when used in accordance to best practice, is considered by many as the gold standard for measuring an adult individual's intellectual functioning.  Other well accepted individually administered comprehensive measures of intellectual functioning for adults include: Stanford-Binet Intelligence Scale-Fifth Edition, Woodcock-Johnson III Test of Cognitive Abilities, and Kaufman Adolescent and Adult Intelligence Test.

18.   Established practice in intellectual assessment informs us that there are several important factors to consider when interpreting the IQ score.  The IQ score obtained on any standardized IQ test is an *estimate* of the individual's "true" intelligence.  This estimate is not without error.  In addition to the standard error of measurement of the test used, it is important to consider the age of the test's normative data (i.e., Flynn effect) and possible practice effect when interpreting IQ results (see AAIDD's User's Guide).

9

19.    The AAIDD User's Guide proposed a number of guidelines to ensure proper assessment of intellectual functioning for the purpose of diagnosing mental retardation.  Chief among these elements are the following:

- *"intellectual functioning is best understood as being composed of a general factor ('g') [i.e., full-scale IQ score].*

- *appropriate standardized measures should reflect the individual's social, linguistic, and cultural background and that proper adaptations must be made for any motor or sensory limitations.*

- *psychometric instruments that assess intelligence perform best when used with people who score within two to three standard deviations of the mean and that extreme scores are more subject to measurement error.*

- *assessment of intellectual functioning through the reliance on intelligence tests is fraught with the potential for misuse if consideration is not given to possible errors in measurement."* (Schalock et al., 2007; page 12).

20.    The AAIDD and DSM-IV-TR agree on the importance of taking into consideration all factors contributing error to the obtained IQ test results when interpreting someone's intellectual functioning for the purpose of making a diagnosis of mental retardation.  The AAIDD (Luckasson et al., 2002) stipulated the following: *"Although far from perfect, intellectual functioning is still best represented by IQ scores when obtained from appropriate assessment instruments.  The criterion for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instrument's strengths and weaknesses."* (page 14).

21.    Furthermore, according to the DSM-IV-TR (American Psychiatric Association, 2000), *the IQ prong of mental retardation is met if an individual's full-scale IQ score falls between 70 – 75 (roughly accounting for a 95% confidence interval*

10

*resulting from standard error of measurement on most IQ tests) or lower* (DSM-IV-TR; see pages 41 – 42). In addition to the standard error of measurement, sources of error surrounding the obtained IQ score may include error that is attributable to the Flynn effect and/or practice effect, and thus the interpretation of the results should account for these factors (see Schalock et al., 2007).

## Adaptive Behavior

22.    The AAIDD 2010 manual recommended that significant limitations in adaptive behavior be established through the use of standardized measures that have been normed on the general population. In the AAIDD 2010 manual, adaptive behavior is defined as an individual's conceptual, social, and practical adaptive skills (see Schalock et al., 2010). This well accepted AAIDD conceptual definition of adaptive behavior is incorporated in the Louisiana statute La. C. Cr. P. art. 905.5.1(H)(1) defining mental retardation. These three adaptive skills domains are defined as follows:

> *Conceptual Skills:* defined by communication skills, functional academics, and self-direction.
>
> *Social Skills:* defined by such abilities as interpersonal skills, social responsibility, following rules, and self-esteem. Higher order social skills have also been identified to include such elements as gullibility, naiveté, and avoiding victimization.
>
> *Practical Skills:* consist of basic personal care skills such as hygiene, domestic skills, health and safety as well as work skills.

23.    The AAIDD specified: *"[T]he person's strengths and limitations in adaptive skills should be documented within the context of community and cultural environments typical of the person's age peers and tied to the person's needs for individualized supports."* (page 45). Hence, assessing an individual's adaptive behavior

11

in an institutional context is inappropriate for the purpose of determining if an individual has mental retardation. Assessing if someone is well adapted in an institutional setting (e.g., a prison) might be useful for determining if additional structure is needed or for planning interventions to facilitate integration, but has no relevance in determining how an individual's adaptive functioning compares to the general population for the purpose of establishing a diagnosis of mental retardation.

24.     Another important aspect of adaptive behavior assessment is the measure of the individual's "typical performance" and not best or assumed ability (Schalock et al., 2010). Thus, when assessing the individual's adaptive behavior, we assess what the person *typically does* and not what he/she can do or could do. This is a critical distinction with the assessment of intellectual functioning, where we assess best or maximal performance.

25.     The AAIDD 2010 Manual reminded us of an important understanding about mental retardation. Namely, that within an individual with mental retardation, significant impairments often co-exist with strengths. Individuals with mild mental retardation are capable of doing many things. Most of these individuals will have strengths and areas of competence that might surprise many laypersons or even professionals who have limited experience in working with individuals with mild mental retardation. In the process of diagnosing mental retardation, the finding of significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the presence of some ability on the individual's part. These discrete abilities are not

12

uncommon in individuals with mild mental retardation and should not be viewed as discounting a diagnosis of mental retardation.

### Age of Onset and Etiology

26.    With respect to the possible cause of mental retardation, more than 40% of all cases of mild mental retardation are of undetermined etiology.  The cause of mental retardation is often likely related to a combination of risk factors.  These might include, but are not limited to, pre-natal maternal malnutrition, in uterine insult or trauma, genetic disorders, fetal alcohol spectrum disorder, pre-natal and post-natal exposure to toxins, childhood malnutrition, neglect, abuse, and/or impoverished and under-stimulating home environment.

27.    Mental Retardation is a functional diagnosis, based on evidence regarding someone's functioning in academic and real-world settings.  As such, knowledge of the cause of someone's mental retardation is not necessary in order to make a diagnosis, and in the majority of cases (especially of mild MR) one cannot say for certain what caused the condition.  Nevertheless, knowledge of a possible or likely cause is a valuable thing to have, especially in establishing whether someone meets the developmental criterion.  In the case of mild MR, especially in individuals from impoverished and disadvantaged backgrounds, it is often the case that environmental deprivation and parental understimulation in infancy and early childhood are contributing risk factors.  However, one can be from such a background and additionally have contributing biological factors such as pre-maturity, low birth weight, prenatal infection or malnutrition, mother's alcohol consumption during pregnancy, birth trauma, chromosomal syndromes, etc.  The

13

key in diagnosing individuals from disadvantaged backgrounds is to see if an individual

is viewed within his own family and community as unusually impaired, even when

compared to other individuals from the same background. It also helps in making a

diagnosis if one can also point to biological risk factors, such as severe head injuries or

maternal alcohol consumption during pregnancy, even though evidence of a known cause

is not necessary to make a diagnosis of mental retardation.

### Retrospective Assessment

28.     A retrospective diagnosis is needed when an individual has not been

diagnosed before the age of 18 years. One important criterion in diagnosing mental

retardation is clearly establishing that the individual's significant adaptive and intellectual

deficits were present prior to age 18. A retrospective assessment/diagnosis may be

needed for different reasons. Criminal justice cases involving sentencing eligibility such

as claims seeking relief under *Atkins v. Virginia* are cited by the AAIDD User's Guide as

often needing a retrospective evaluation and diagnosis. A retrospective evaluation is

especially pertinent in death penalty cases where the individual has been in prison for a

number of years. The diagnosis of mental retardation explicitly requires two conditions:

(1) the assessment of the individual's ability in meeting society's expectations with

respect to conceptual, practical, and social adaptive skills and (2) the assessment of the

individual's present functioning. Assessment of present intellectual functioning does not

often pose a problem. However, these two conditions may be at odds with one another in

death penalty cases where the individual's "present" adaptive functioning can only be

assessed against life in a prison or on a death row. Prison life and prison expectations for

14

adaptive functioning cannot be substituted for society's expectations in making the determination of the individual's everyday functioning in the general community. Since the individual's "present" adaptive functioning is in a prison setting, one must rather seek a retrospective evaluation of the individual's adaptive functioning in the community (i.e., prior to incarceration).

29.    Conducting a retrospective assessment and diagnosis is not unusual but should be done with caution and under proper conditions to ensure the reliability of the conclusions (i.e., ruling-in or ruling-out of the diagnosis). The AAIDD User's Guide has provided some guidelines for conducting a retrospective assessment/diagnosis of mental retardation. Below are some key elements (see AAIDD User's Guide):

- Conduct a thorough social history.

- Conduct a thorough review of school records.

- Assess adaptive behavior:
  - use multiple informants and multiple contexts
  - recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture
  - be aware that many important social behavioral skills, such as gullibility and naiveté, are not measured on current adaptive behavior scales;
  - use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant;
  - understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; and
  - realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning.

15

- When assessing the individual's level of intellectual functioning - recognize the "Flynn effect."

- Recognize that self-ratings have a high risk of error in determining "significant limitations in adaptive behavior." However, consistent with the need for multiple informants or respondents, self-ratings can be used under the following cautions:

  o   people with MR/ID are more likely to attempt to look more competent and "normal" than they actually are — which is sometimes incorrectly interpreted as "faking";

  o   people with MR/ID typically have a strong acquiescence bias or inclination to say yes or agree with the authority figures; and

  o   MR/ID is a social status that is closely tied to how a person is perceived by peers, family members, and others in the community.

- Conduct a longitudinal evaluation of adaptive behavior that involves multiple raters, very specific observations across community environments (especially in regard to social competence), school records, and ratings by peers during the developmental process.

- Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having MR/ID.

### *Cloak of Competence or Masking*

30.    It is well established (see Schalock et al., 2007) that self-ratings of individuals with mental retardation have a certain degree of error and should be interpreted with caution when determining an individual's level of adaptive behavior.  If self-ratings are used in establishing a diagnosis of mental retardation, these should be used while considering the following cautions:  (a) persons with MR are more likely to mask their deficits and attempt to look more able and "typical" than they actually are

16

(Edgerton, 1967[7]); (b) mental retardation (MR) is a particularly stigmatizing and pejorative label that leads most individuals with mild forms of this condition to fight hard NOT to be identified as "mentally retarded"; (c) MR is a social status that is closely tied to how a person is perceived by peers, family members, and others in the community; and (d) persons with MR typically have a strong acquiescence bias (Finlay & Lyons, 2002[8]) or bias to please that might lead to erroneous patterns of responding.

### *Myths and Misconceptions Regarding Mental Retardation*

31.     For most people with mental retardation, there is not a "mentally retarded" look.  There are no distinctive features or personality types to mental retardation.  It is important to remember the sage words of Ruth Luckasson (1990): *"Ninety percent of persons with mental retardation don't drool, don't stumble, aren't mute.  They have significantly impaired intellectual ability, but often don't have any physical stigmata that indicate mental retardation.  They won't 'look' a certain way."*  It is dangerously naïve to think that one can "tell" if someone is mentally retarded, or not mentally retarded, by looking or talking to them.  Less than 10% of all cases of mental retardation are attributable to a condition such as Down syndrome.  The vast majority (approximately 80%) of individuals with mental retardation function in the mild range of intellectual and adaptive behavior deficits.

---

[7]  Edgerton, R. B. (1967). *Cloak of Competence: Stigma in the Lives of the Mentally Retarded.* Berkeley, CA: University of California Press.

[8]  Finlay, W. M. L., & Lyons, E. (2002). Acquiescence in interviews with people who have mental retardation. *Mental Retardation, 40*, 14 - 29.

17

32.     The DSM-IV-TR notes: *"No specific personality and behavioral features are uniquely associated with mental retardation.  Some individuals with mental retardation are passive, placid, and dependent, whereas others can be aggressive and impulsive"* (*see* pages 44 – 45).  Additionally, mental retardation can co-exist with any number of other psychiatric disorders or personality traits.  The DSM-IV-TR is quite explicit on page 47 when it states: *"The diagnostic criteria for mental retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder."*  Thus, for example, an individual may have both mental retardation and antisocial personality disorder or mental retardation and learning disability.  The presence of a co-existing mental disorder should not summarily be used to deny the individual's functioning if it meets criteria for a diagnosis of mental retardation.

## III.     THE ROLE OF CLINICAL JUDGMENT IN DIAGNOSING MENTAL RETARDATION

33.     The AAIDD (Schalock et al., 2010) has recognized the important role of the professional's experience and knowledge of mental retardation and individuals with this condition, in diagnosing mental retardation, and in fact devotes an entire chapter to the role of clinical judgment in diagnosis, classification, and development of systems of support.  The AAIDD has defined clinical judgment as it relates to diagnosing mental retardation as follows:

> *"Clinical judgment is a special type of judgment rooted in a high level of clinical expertise and experience; it emerges directly from extensive data.  It is based on the clinician's explicit training, direct experience with those with whom he*

18

*or she is working, and specific knowledge of the person and the person's environments."* (page 86).

34.   Making or ruling out a diagnosis of mild mental retardation requires the utmost clinical judgment and skills.  These pre-requisite skills to making a diagnosis of mental retardation are more than the technical ability to administer IQ tests or adaptive behavior scales.  It is relatively easier to make or rule out a diagnosis of severe or profound mental retardation than it is in the case of mild mental retardation.  The diagnosis of mental retardation at or near the cut-off range for IQ and adaptive functioning requires extensive clinical experience and/or training in the area of mental retardation.

35.   To be a qualified clinician in mental retardation, individuals must have relevant training, engage in clinical activities, and use professionally accepted best practices (*see*: Schalock et al., 2010).  An ordinary layman lacks the training, experience, and familiarity with the accepted professional standards and clinical strategies to properly diagnose mental retardation.

36.   The professional must use his or her clinical judgment throughout the diagnostic process.  Experience and clinical judgment in mental retardation informs the professional regarding how to take well-established phenomena such as Flynn effect, practice effect, and cloak of competence into consideration when evaluating the data used in making a diagnosis of mental retardation (see AAIDD User's Guide; Schalock et al., 2007).

19

37.     One of the major purposes of using clinical judgment strategies is "to avoid thinking errors that can lead to faulty reasoning and, thereby, impact negatively the clinician's decision or recommendation." Among these thinking errors are (Schalock *et al.*, 2010; p. 91):

**Affective error:** your feelings, such as incorrect stereotypes, misplaced empathy, or what you wish were true

**Anchoring error:** the first bit of information anchors your mind on an incorrect decision or recommendation

**Availability error:** what happened recently or most dramatically

**Blind obedience:** what the authority said

**Commission bias:** do something, anything

**Confirmation bias:** you find what you expect to find

**Diagnosis momentum:** piling on after an initial diagnosis

**Framing effects:** mistakenly influenced by the context

**Premature closure:** deciding too soon

**Representativeness error:** what is typically true

38.     All people are susceptible to thinking errors. Clinical judgment, rooted in expertise and experience in a specialized field, is a necessary tool to overcome these common errors.

39.     A key component of clinical judgment is the exercise of critical thinking. An evaluating psychologist must work closely with a client while maintaining a professional distance from which she can apply critical thinking to the diagnostic question posed. Critical thinking skills include analysis, evaluation, inference,

20

interpretation, and explanation (Schalock & Luckasson, 2005; pp. 27-30). A careful exercise of clinical judgment strategies, including critical thinking, is particularly important when complicating factors (e.g., presence of a co-occurring mental illness, forensic setting) make establishing a diagnosis of mental retardation even more difficult.

40.    For example, clinical judgment strategies are imperative where "**Complex medical or behavioral conditions require multiple analyses** . . . that must be balanced in the application of clinical judgment." (Schalock & Luckasson, 2005; p. 16[9]). In situations of dual diagnosis, a trained psychologist specializing in mental retardation will be able to draw from his or her experience and expertise, and the strategies of clinical judgment, to separate symptoms associated with a patient's behavioral and mental health diagnoses from indicators of mental retardation and to make an accurate diagnosis. Psychologists who specialize in mental retardation have a professional responsibility as well as the training and experience to apply their clinical judgment objectively, without overreliance on problem behaviors presented by the patients with whom they work. This objectivity is particularly important as "Individuals with Mental Retardation have a prevalence of co-morbid mental disorders that is estimated to be three to four times greater than in the general population." (American Psychiatric Association, 2000; p. 45). It is a routine part of psychologists' work to look beneath what might appear to a layperson to be obnoxious or offensive behaviors, to analyze whether the root of these

---

[9] Schalock, R.L. & Luckasson, R. (2005). *Clinical Judgment.* Washington, DC: American Association on Mental Retardation.

S.App.490

behaviors is a health or competence issue, and to make a clinical diagnosis without being prejudicially swayed by a difficult presentation.

41.   Clinical judgment is also critical where *"**Legal restrictions significantly impact opportunities to assess the person** consistent with the five assumptions of the definition of mental retardation."* (Schalock & Luckasson, 2005; p. 16). As mentioned above, diagnosing mental retardation in the context of a death penalty case is an involved process that requires a careful analysis by a trained professional experienced in the field. The patient, who is incarcerated, cannot be assessed contemporaneously in a community-based setting; frequently a retrospective analysis is necessary, which requires careful analysis and attention; and there is an increased concern about malingering, which again poses a special need for the careful exercise of clinical judgment.

## IV.   SUMMARY OBSERVATIONS OF RECORDS REVIEWED

42.   School records available are scant. A document made available indicates that school records have been destroyed. Examination of the Elementary Permanent Record indicates that Mr. Webster was retained in 1st grade. His number of absences was low through grade 6. The records available did not indicate attendance beyond 6th grade. His grades starting in 6th grade seemed to drop from As, Bs, and Cs, to Ds and Fs consistently throughout grades 6 – 9.

43.   It is unclear from the school records whether or not Mr. Webster received special education services.

44.   The MAT6 Survey document seems to be a school record containing a master list of test results for 4 students, including Bruce Webster. It is unclear from this

22

document who these other students are. It would appear that this list is an alphabetical list, all four students having surnames starting with the letter "W". The results for Mr. Webster's performance on this test indicate that some of his standard scores place him below, at grade level, and above grade level. For example, his performance in the following areas is below the 7.7 grade level: Reading – Comprehension, Math Concepts, Math Computation, Spelling, Science, Social Studies, Total Reading, Total Math, Total Basic Battery, and Total Comprehensive Battery. His performance in the following areas is above the 7.7 grade level: Math Problem Solving, Language, Research Skills, and Total Language.

45. It is unclear what can be deduced from the MAT6 Survey since it unclear how and by whom this test was administered. Mr. Webster's performance on this test while he was part way through grade 7 (norms used were 7.7) ranges from a grade equivalent of 5th grade to a grade equivalent of 10th grade.

46. A review of the declarations from siblings, family members, ex-classmates, friends, and co-defendant speak of a person whom they know growing up in an abusive home environment, and describe him as being outgoing and somewhat of a class clown but being slow, immature, gullible, and having limited intellectual abilities.

47. The recently released documents from the Social Security Administration (SSA) date as far back as July 1, 1993.

48. A psychological evaluation was conducted on October 22, 1993 by Dr. Edward V. Hackett, psychologist. Dr. Hackett administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) to Mr. Webster. Mr. Webster obtained a Full-

23

Scale IQ = 59, Performance IQ = 49, and Verbal IQ = 71.  Dr. Hackett diagnosed Mr. Webster with (1) mental retardation and (2) antisocial personality disorder.

49.     A request for release of school records from the SSA was met with a letter from the Watson Chapel Schools dated 11/8/1993 informing SSA that all of Mr. Webster's "special education" records had been destroyed in 1988.  The one salient element of this school district letter is an acknowledgement that Mr. Webster did receive special education services.

50.     A medical report containing additional information was dated 11/10/1993 and signed by Dr. Edward V. Hackett.  Despite mentioning in this note that he suspected that Mr. Webster might have been malingering some, Dr. Hackett reiterated his diagnosis of mild mental retardation for Mr. Webster.  Dr. Hackett's described Mr. Webster's behavior as bizarre and was of the opinion that Mr. Webster was not able to manage his own benefits, not function well in a work setting or the community.

51.     Dr. Hackett's psychological evaluation was conducted when Mr. Webster was 20 years old and approximately 11 months before the date of the crime for which Mr. Webster was convicted.

52.     On October 25, 1993 Dr. C. M. Rittelmeyer, physician, conducted a physical examination of Mr. Webster.  His report concluded he was physically healthy and negative for abnormal physical findings.

53.     A second psychological evaluation was conducted by Dr. Charles M. Spellman on 12/22/1993 at the request of SSA for disability determination.  Dr. Spellman conducted an informal evaluation of Mr. Webster's intellectual functioning.  No test was

24

mentioned in his report but he reported an estimated IQ score of "69 or lower" and diagnosed Mr. Webster with (1) mental retardation and (2) antisocial personality disorder. Dr. Spellman reported an absence of malingering on Mr. Webster's part and found him to be disabled.

54. Dr. Spellman's psychological evaluation was conducted when Mr. Webster was 20 years old and approximately 9 months before the date of the crime for which Mr. Webster was convicted.

55. SSA document dated 4/13/1994 signed by P. Hallowell acknowledges having received of written Social Security Insurance (SSI) Disability request for hearing from Mr. Webster.

56. Another SSA document dated 10/25/1994 and signed by Administrative Law Judge Jahn Heck Goree indicates that Mr. Webster had made an application for child's insurance benefits and supplemental security income. This document indicates that a SSA hearing was scheduled on 11/16/1994 but Mr. Webster failed to appear.

57. A Social Security Administration ruling dated 4/5/1994 addressed to Mr. Webster informed him that his request for reconsideration for Childhood Disability Benefits was rejected and that SSA found that he did not qualify for SSI/SSDI.

V.      PROFESSIONAL OPINION

58. The SSA information recently made available contains compelling psychological evaluation results showing that Mr. Webster has significant subaverage intellectual functioning. Two independent psychologists (Drs. Hackett and Spellman) diagnosed Mr. Webster with mental retardation.

25

59.     Importantly, Dr. Hackett's evaluation of Mr. Webster's intellectual functioning was done almost 1 year before the date of the murder for which Mr. Webster was convicted and sentenced to death.  This is significant because at the time of his performance on Dr. Hackett's WAIS-R, Mr. Webster was not accused of murder nor trying to escape the death penalty – a claim often raised as a possible motivation for malingering on a test of intelligence.

60.     Furthermore, there is an abundance of examples of adaptive behavior deficits in the declarations as well as delayed milestones and childhood deficits.  This information along with other previous psychological evaluations and these recently released SSA records are consistent with mental retardation.  In addition, this information has the added merit that it was not gathered in an institutional setting, such as a prison, which is unsuited for determining if an individual has mental retardation.

61.     The released SSA records and two psychological reports dated 1993 indicate that Mr. Webster had significant subaverage intellectual functioning.  The evidence available in these SSA records is consistent with a diagnosis of mental retardation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of September, 2011.

Marc J. Tassé, PhD
Licensed Psychologist (NC#2613)

26

S.App.496

# Wells Decl. Ex. V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

-----------------------------------------------------x

BRUCE CARNEIL WEBSTER,

           Petitioner,      :

                       :      CAUSE NO:

         vs.

                       :

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,  :
TERRE HAUTE (USP),

                       :

           Respondent.

------------------------------------------------   x

## DECLARATION OF KRISTEN K. LEROUX IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

I, **Kristen K. LeRoux,** declare as follows:

1.    I am an employee of Dorsey & Whitney LLP ("Dorsey") and a paralegal on the Bruce Webster case team.  I have worked at Dorsey since 1993.

2.    In September 2008, my colleagues and I reviewed and indexed Bruce Webster's trial and appellate case file sent by Mr. Webster's appellate attorneys to Dorsey.

3.    In October 2008, Dorsey attorneys asked me and my colleagues to collect Arkansas Department of Human Services, Division of Children and Family Services records for Bruce Webster and his immediate family members, including Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

**EXHIBIT V**

S.App.497

In late October 2008, Dorsey attorneys asked me and my colleagues to collect Social Security Administration records for Bruce Webster and his immediate family members, including Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

4.     On October 7, 2008, Dorsey sent a request to Arkansas Department of Human Services, Division of Children and Family Services, Central Registry Unit, P.O. Box 1437 (Slot S566), Little Rock, AR 72203-1437, to release records for Bruce Webster.  On October 23, 2008, Dorsey sent requests to release the same for Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace. On October 27, 2008, Dorsey called the Central Registry with the same request.

5.     On October 31, 2008 Dorsey received a fax from Central Registry attaching the Maltreatment Summary Report and Narrative for the Webster family, which included entries for Bruce Webster and Tony Webster.  The cover letter stated, however, that the Jefferson County office of the Division of Children and Family Services could not locate the investigative file, and therefore Central Registry was unable to provide the complete investigative file as requested.

6.     On the same date, one of my colleagues spoke with Vellor Williams, following up on the request for the investigative file.  Although Dorsey offered to send someone to Pine Bluff to collect the investigative file, Ms. Williams insisted that it had been either lost or destroyed.

2

Dorothy Harris McKelvey Wallace to Social Security Administration on January 15, 2009.

11.    Dorsey received Social Security Administration records for Dassie Mae Harris Frazier on February 2, 2009.

12.    Dorsey received Social Security Administration records for Bruce Webster and for Willie Webster on February 9, 2009.

13.    Dorsey did not receive Social Security Administration records for Tony Webster or Dorothy Harris McKelvey Wallace.

14.    On October 8, 2009, Dorsey sent a request for additional records to the Pine Bluff, Arkansas, Social Security office that were listed in the "List of Exhibits" of Bruce Webster's Social Security records but were not received on February 9, 2009, along with copies of the letter requesting the records dated December 15, 2008, and Mr. Webster's Consent for Release of Information dated December 12, 2008.

15.    On October 15, 2009, Dorsey had a telephone conversation with the Pine Bluff, Arkansas, Social Security office and was informed that normal procedures were not followed when the records received in February of 2009 were sent and that the person who copied and sent them had retired.

16.    On October 22, 2009, the Pine Bluff, Arkansas, Social Security office sent a letter to Dorsey denying the request for additional records citing it was a

4

# Wells Decl. Ex. W

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Bruce Carneil Webster

v.

United States of America

---

## DECLARATION OF LARRY M. MOORE IN SUPPORT OF MOTION FOR AUTHORIZATION TO FILE SUCCESSIVE MOTION TO VACATE SENTENCE

I, **Larry M. Moore**, declare under penalty of perjury, as follows:

1. I am an attorney duly licensed to practice law in the State of Texas, and have been so licensed since November of 1977. I am also licensed to practice before the United States District Court for the Northern District of Texas; the United States Court of Appeals for the Fifth Circuit; and the United States Supreme Court. I am Board Certified in Criminal Law by the Texas Board of Legal Specialization, and I have been so certified since 1982. I am a sole practitioner; however, I am associated and share offices with another sole practitioner, and we practice under the firm name of the Law Offices of Moore and Cummings (not a partnership).

2. I was appointed in the United States District Court for the Northern District of Texas as one of the attorneys representing Bruce Carneil Webster in his case, both at trial and upon his direct appeal to the United States Court of Appeals for the Fifth Circuit. I served as Mr. Webster's "lead counsel" at trial, and as "second chair counsel" on appeal. I

**EXHIBIT W**

was originally appointed to represent Mr. Webster at the end of October in 1994, and his case was ultimately tried during the summer of 1996. His direct appeal ended approximately October of 1999, and we subsequently obtained the appointment of alternative counsel to pursue Mr. Webster's Section 2255 Application.

3.     While representing Mr. Webster, I employed one paralegal/legal assistant, Ms. Kimberly J. Whitehead (Moore), but had no other full-time employees. For purposes of Mr. Webster's trial, I secured the appointment of co-counsel to participate in the case (Dr. Allan K. Butcher), as well as a defense investigator (L. Michael Connelly and Associates), and a Mitigation Specialist (Ms. Annette Lamoreaux). Additionally, we had a number of experts appointed to assist in Mr. Webster's defense, including three mental health experts. Dr. Butcher and I also retained additional experts to assist us with various aspects of Mr. Webster's defense (including an additional mental health expert), whom we paid with our own funds. We also consulted with a number of other experts who advised and/or assisted us without compensation; however, Dr. Butcher and I were also required to pay with our own funds for some additional expenses which were incurred by some of these individuals.

4.     During our representation of Mr. Webster, we came to believe that the issue regarding Mr. Webster's mental retardation was going to be a critical issue in Mr. Webster's defense. For that reason, we made every effort which we were able to make, in an attempt to secure any and all evidence which might relate to the issue of Mr. Webster's mental retardation. In that regard, we were apprised at some point by Mr. Webster's family that an application had been made for social security disability benefits on Mr.

Webster's behalf; and we were further advised that some testing may have been done of Mr. Webster attendant to that application. We contacted the Social Security Administration District Office in Pine Bluff, Arkansas, and requested that we be provided with copies of any and all records that might exist pertaining to Mr. Webster, pursuant to a written release which I had obtained from Mr. Webster for that purpose. We also arranged for our defense investigator to retrieve any records which the Social Security Administration might locate during a trip to Pine Bluff, Arkansas, during March of 1996. I have reviewed the copies of the Social Security Administration records pertaining to Mr. Webster's application for benefits that have been provided to me by Mr. Oliver McKinstry of the Dorsey Whitney Law Firm. I do not recall ever having seen these records before, and to the best of my recollection, they were never provided to us by the Social Security Administration pursuant to the request we made during our preparation for trial. I have not had access to my case file regarding Mr. Webster's case since I originally provided it several years ago to the attorneys representing Mr. Webster in his original Section 2255 application. For that reason, I have been unable to review any notes which I may have made, or which may have been provided to me by our investigator, regarding the result of our investigator's trip in Arkansas in March of 1996; particularly in regard to any response that might have been made to our request for the production of any Social Security Administration records that might exist regarding Mr. Webster. While I do not currently have any direct recollection of the response which we received, it is my good faith belief that we must have been told that no records regarding Mr. Webster existed, otherwise we would have continued to pursue them by every means available to us.

5.    In my opinion, the Social Security Administration records which I have reviewed could have been important during the trial on the issue of Mr. Webster's mental retardation, as the testing conducted attendant to Mr. Webster's claim for benefits predates the offense for which he was convicted.  Additionally, the anecdotal information provided in the records regarding Mr. Webster's adaptive functioning would have provided support for our experts' determinations of the deficits in those areas of adaptive functioning they found to exist relative to Mr. Webster.

6.    During my representation of Mr. Webster, I also attempted to obtain any and all records which might exist regarding Mr. Webster's abuse or mistreatment as a child. To that end, I requested that I be provided with copies of any and all such records that might be in the possession of the Arkansas Department of Human Services.  I was ultimately advised by the Arkansas Department of Human Services Division of Children and Family Services that they were unable to locate any such information pertaining to Mr. Webster within the Child Maltreatment Central Registry of the Department, and we never received any such records from them.

7.    Although I have heretofore neither been provided with, nor had the opportunity to review the <u>Motion for Authorization to File Successive Motion to Vacate Sentence</u> which I understand is to be filed on Mr. Webster's behalf, I have nonetheless provided this Declaration in support of such an application.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge

Dated: _10-20-09_

Larry M. Moore
Attorney at Law
Texas State Bar No. 14357800
Law Offices of Moore and Cummings
4210 West Vickery Blvd.
Fort Worth, Texas 76107
Telephone Number: 817-338-4800
Fax: 817-989-2442

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge

Dated: _10-20-09_

Larry M. Moore
Attorney at Law
Texas State Bar No. 14357800
Law Offices of Moore and Cummings
4210 West Vickery Blvd.
Fort Worth, Texas  76107
Telephone Number: 817-338-4800
Fax: 817-989-2442

# Wells Decl. Ex. X

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TX.
FILED
2001 APR 30   PM 3: 02

CLERK OF COURT

UNITED STATES OF AMERICA,

    *Plaintiff,*

vs.

BRUCE CARNEIL WEBSTER.

    *Defendant.*

CASE NO. 4:00-CV-1646-Y
(4:94-CR-121-Y)

---

**MOTION FOR LEAVE TO CONDUCT DISCOVERY
AND BRIEF IN SUPPORT**

---

## I. MOTION

Defendant BRUCE CARNEIL WEBSTER, through undersigned counsel, respectfully moves the Court to grant him leave to conduct discovery, as set forth in detail below. This request for discovery is authorized by Rule 6 of the Rules Governing Section 2255 Proceedings For the United States District Courts ("Habeas Rule 6"). Moreover. Mr. Webster would show this Court that the requested discovery is essential to guarantee him a full and fair opportunity to present the claims alleged in his September 2000, motion under 28 U.S.C. § 2255, to amend that motion. as well as to ensure that this Court reviews and resolves his claims for relief in light of a fully developed factual record.

**EXHIBIT X**

I.     **BRIEF IN SUPPORT**

Under Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6"), this Court holds the specific and express authority to order discovery:

> A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Criminal Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Habeas Rule 6(a) (West 2000). Habeas Rule 6(a) incorporates the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); *see also Rules Governing Section 2254 Cases in the United States District Courts*, Advisory Committee Note to Rule 6 (West 2000) ("Subdivision (a) is consistent with *Harris v. Nelson*").

Thus, this Court may grant the petitioner leave to conduct discovery when "good cause" is shown. Good cause is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).[1]

---

[1] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous (*i.e.*, the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300; *see also* Advisory Committee Note to Habeas Rule 6 (West 2000) (same, quoting *Harris*).

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

2

Before discovery is warranted under Habeas Rule 6(a), the Fifth Circuit has required a petitioner to set forth specific allegations of fact supporting his or her claims for relief. *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994) (citing *Willie v. Maggio*, 737 F.2d 1372 (5th Cir.)).[2] Further, the petitioner must have a reasonable basis to believe that the requested information exists. *Kirkpatrick v. Whitley*, 992 F.2d 491, 496 (5th Cir. 1993).

A petitioner who (1) made specific allegations warranting relief, (2) demonstrated why the requested information is essential to the adequate factual development of his claims, and (3) demonstrated that the requested information is likely in the hands of the party from whom discovery is sought and cannot be obtained through other means, has established "good cause" under the Fifth Circuit's consistent reading of *Bracy* and Habeas Rule 6. *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added); *see also East v. Scott*, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).[3]

---

[2]    *See also, e.g., Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir.) ("good cause" under Rule 6(a) "cannot exist where the facts alleged do not provide a basis for relief"), *cert. denied*, 498 U.S. 878 (1990).

[3]    *See Coleman v. Zant*, 708 F.2d 541 (11th Cir. 1983) (quoting *Townsend v. Sain*, 372 U.S. 293, 322 (1963)) (same); *see. e.g., Smith v. United States*, 618 F.2d 507, 509 (8th Cir. 1980) (affirming district court's denial of discovery because petitioner merely listed the records he sought

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

3

Within this motion, Mr. Webster demonstrates that the information sought is "indispensable" to the "fair, rounded development of the material facts," which in turn is essential to the full consideration and accurate resolution of the claims for relief in Mr. Webster's § 2255 motion.

Mr. Webster would further show this Court that he has expended all investigative funds provided by the Court and has been denied additional investigative funds. Moreover, Mr. Webster would show the Court that he sought the issuance of Subpoenas duces tecum which was denied by the Court.

## GROUND FOR REVIEW NO. ONE

**PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE RACIALLY DISCRIMINATORY MANNER WHICH RESULTS FROM THE FEDERAL CAPITAL SENTENCING SCHEME.**

In his first ground for review, petitioner demonstrates that the federal capital sentencing scheme is administered in a racially discriminatory manner. In support of this claim, petitioner demonstrated that trial counsel first raised this objection, arguing that the raw statistics available to the public suggested a racially discriminatory practice. After petitioner's trial, the government released its own study, *Survey of the Federal Death Penalty System (1988-2000)*,

---

without stating how they would assist him in prosecuting his writ of habeas corpus); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) (noting that the courts should not hesitate to order discovery "where it will help illuminate the issues underlying the applicant's claim").

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

4

which is attached to petitioner Sec. 2255 motion as "Attachment A". This survey demonstrates that over eighty percent (80%) of cases in which the death penalty was considered involved a non-white, or minority, defendant. Moreover, only 28 percent (28%) of the cases approved by the Attorney General for prosecution as a death penalty case involved white defendants. When one considers that many of these death penalty cases are later plea bargained to a penalty less than the death penalty, one will find that over forty percent (40%) of those plea bargained cases involved a white defendant.

In today's society, African Americans comprise approximately 12 percent (12%). However, African Americans account for some sixty-five percent (65%) of the death penalty verdicts, and sixty-eight percent (68%) of the federal death row. Petitioner would show this Court that he has demonstrated to the Court all of the racial disparity evidence available to the public regarding the United States Government's prosecution of death penalty eligible offenses. However, petitioner would show this Court that additional evidence exists to demonstrate that the effect of the Government's prosecution of capital offenses is racially discriminatory.

Through discovery petitioner seeks to demonstrate the racially discriminatory effect of the Justice Department's procedures regarding the determination whether to pursue the death penalty, as well as the awareness of the Justice Department of the racially discriminatory effect of their procedures. Petitioner understands the voluminous nature of his requests relating to this claim, but would respectfully show the Court that such evidence is essential in establishing the claims of racial discrimination raised herein. In support of this claim, petitioner would respectfully request the following discovery:

1.      The Government be required to produce for petitioner's counsel, for inspection and photocopying, case information for every "death penalty eligible" case since

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

5

S.App.512

the inception of the federal death penalty statute. Petitioner specifically does not request "work product" but instead public information for all such cases, including names, locations, descriptions of the alleged offense, gender and race of the alleged offender, name, race, gender and age of all victims, and resolution.

2. The Government be required to produce for petitioner's counsel, for inspection and photocopying, the names and identifying information, including name, race, gender and age of all alleged offenders and the name, race, gender and age of all alleged victims, for all cases referred to the committee of Senior Attorneys in the Justice Department for prosecution as a death penalty offense.

3. The Government be required to produce for petitioner's counsel, for inspection and photocopying, all matters relied upon by the committee of Senior Attorneys in the Justice Department in its recommendation whether to prosecute the cases before it as a death penalty offense.

4. The Government be required to produce for petitioner's counsel, for inspection and photocopying, the names and identifying information of all cases, including name, race, gender and age of all alleged offenders and the name, race, gender and age of all alleged victims, referred to the Attorney General for prosecution as a death penalty offense.

5. The Government be required to produce for petitioner's counsel, for inspection and photocopying, all matters relied upon by the Attorney General in his or her decision whether to prosecute a case as a death penalty offense.

6. The Government be required to produce for petitioner's counsel, for inspection and photocopying, the resolution or disposition of every case for which the death penalty could have been sought since the inception of the federal death penalty statute.

7. The Government be required to produce for petitioner's counsel, for inspection and photocopying, any information in the possession of the Government relating to the investigation of racially discriminatory practices in: the decision to seek the death penalty, the evaluation of offenses eligible for death penalty, the prosecution of a death eligible offense, or plea bargaining practices relating to death eligible offenses.

## GROUND FOR REVIEW THREE

### TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT ADDITIONAL EVIDENCE DEMONSTRATING PETITIONER'S MENTAL RETARDATION AND HIS ADAPTIVE SKILLS.

## GROUND FOR REVIEW FOUR

### TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF RACIAL BIAS IN THE WATSON CHAPEL SCHOOL SYSTEM AND THE POTENTIAL BIAS OF THE GOVERNMENT'S WITNESSES

## GROUND FOR REVIEW NINE

### PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BECAUSE THE GOVERNMENT WAS IN POSSESSION OF THE INFORMATION WHICH SUGGESTS PETITIONER WAS NOT PROVIDED SPECIAL EDUCATION SERVICES DUE TO RACIAL DISCRIMINATION.

Because of the relationship between grounds for review three, four, and nine, and to conserve the Court's valuable time and resources, Mr. Webster will address these grounds together. As is argued in Petitioner's Sec. 2255 motion, the jury herein heard some evidence from the Watson Chapel School District officials concerning petitioner's performance in school. Petitioner contends there was significant evidence which was not presented to the jury concerning petitioner's mental retardation, his adaptive skills, and the probable racial bias which was inherent in this school district and with these witnesses. The Government counters with an affidavit from petitioner's trial counsel asserting that they interviewed every teacher of which they were aware. Thus, in order to resolve petitioner's grounds herein, the Court must consider any new evidence of mental retardation, adaptive skills, and/or racial bias which was not presented to the jury, and which was not developed by trial counsel. For example, the school

counseler. E.C. Turner, would indicate that petitioner was not always a "leader" as the Government led the jury to believe. Instead, whenever petitioner was in the company of older children, and children more advanced in their mental abilities, Turner would have testified petitioner was a "follower." And, in spite of his testimony at trial, Turner was never able to assess petitioner's academic functioning, partially because of the inability of school officials to "followup" with students, but particularly because of petitioner's family and home life. Finally, Turner could have explained to the jury that his suspicions that petitioner was on drugs because he "talked in circles" and his disposition was "not normal."

Loula Gray, an elementary school teacher with the Watson Chapel School District for thirty-six years, and petitioner's elementary school teacher, did not testify. Had she been called, Ms. Gray, could have discussed the racial discrimination which existed in the Watson Chapel School District at the time petitioner attended school, and the school's policies concerning social promotion. Ms. Gray previously indicated her belief petitioner was promoted to the next grade even though he had not mastered the skills and knowledge in his current grade and that petitioner should have received special education services.

Several potential witnesses either believe that race was a factor in petitioner's failure to receive special education services, or provide reasons for a failure to provide special education services to petitioner. For example Dr. Sally Church, documents that sometimes "problem students" will not be classified as mentally retarded, even if they are, because once classified as mentally retarded, such students may not be dismissed from school for their behavior.

Moreover, in petitioner's Sec. 2255 motion, he sets forth the extensive racial discrimination history suffered by minorities in the Watson Chapel School District. This

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

8

evidence is supported not only by witnesses such as Ms. Gray, but also by the Justice Department itself who actually forced the Watson Chapel School District to desegregate their schools—against their will. These problems continue as at least one African American teacher was denied an administrative position on the basis of her race.

Petitioner would respectfully show that trial counsels' failure to discover and present this type of evidence, which was available, is critical. The evidence concerning petitioner's mental retardation at trial was the focus of both parties. One of the most important considerations in determining mental retardation was petitioner's adaptive skills. While the Government seemed focused on presenting the jury a picture of petitioner as a normal person who was maladapted and a "leader," the evidence to this point demonstrates this was not necessarily true. Moreover, those Government witnesses who testified to petitioner's level of functioning had an incentive to portray petitioner in such a way as to explain the failure of the school district to meet petitioner's needs.

In an effort to develop these facts, petitioner's counsel attempted to obtain records from the Watson Chapel School District. The School District did not voluntarily provide counsel any records. Moreover, the School District did not honor an open records request indicating that the Arkansas state statute did not require compliance with "out of state" requests.

Through discovery, petitioner intends to fully develop the factual basis for the claims raised within these grounds for review in his Sec. 2255 motion. Moreover, appellant seeks to obtain information from the government relevant to these issues and which should be turned over pursuant to the dictates of Due Process and the Fifth and Fourteenth Amendments. Petitioner further seeks to demonstrate a bias on the part of the Government's witnesses from the

Watson Chapel School District, as well as a reasonable explanation for the failure of Watson Chapel School District to provide petitioner services relating to his mental retardation. In an effort to continue the full development of the facts relating to the claims before this Court, petitioner would propose the following discovery be conducted with regard to grounds for review Three, Four, and Nine:

8.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, any reports prepared by a mental health professional in the Government's possession which, in any manner, questions or rebuts the testimony by the government's witnesses at trial (i.e. Dr. Coons and Dr. Parker) on the issue of petitioner's mental retardation.

9.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, the names, addresses and telephone numbers of all witnesses interviewed by the Government, and its agents, concerning the lack of adaptive skills demonstrated by petitioner prior to his eighteenth birthday.

10.   The Government be required to produce for petitioner's counsel, for inspection and photocopying, any and all records maintained concerning racially discriminatory practices at the Watson Chapel School District.

11.   A deposition of E.C. Turner be taken relating to: the treatment of mentally retarded children by the Watson Chapel School District; the failure of the Watson Chapel School District to provide special education services to mentally retarded children; petitioner's lack of adaptive skills prior to his eighteenth birthday; and, any other matters relating to petitioner's mental retardation and/or its assessment by the Watson Chapel School District and its employees. If the Court denies this discovery request, petitioner respectfully requests that such process issue to E.C. Turner as is necessary to require him to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of E.C. Turner, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of E.C. Turner.

12.   A deposition of Loula Grey be taken relating to: the treatment of mentally retarded children by the Watson Chapel School District; the failure of the Watson Chapel School District to provide special education services to mentally retarded children; the role racial discrimination has played in the education of minorities within the Watson Chapel School District, petitioner's academic performance;

petitioner's lack of adaptive skills prior to his eighteenth birthday; and, any other matters relating to racial discrimination, petitioner's mental retardation, and/or its assessment by the Watson Chapel School District and its employees.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Loula Grey as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above.  Moreover, if the Court denies petitioner's request for a deposition of Loula Grey, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Loula Grey.

13. A deposition of Dr. Sally Church be taken relating to: the classification/diagnosis of mental retardation: the role of schools with regard to mental retardation; and, the various reasons why, in her experience and training, that a mentally retarded person may be denied services by a school district.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Dr. Sally Church as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above.  Moreover, if the Court denies petitioner's request for a deposition of Dr. Sally Church, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Dr. Sally Church.

14. A deposition of Lydell Willis be taken relating to: racial discrimination occurring within the Watson Chapel School District; the impact of the School District's racial attitudes on students, and the policies, written and unwritten, of the school district toward student's with special needs.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Lydell Willis as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above.  Moreover, if the Court denies petitioner's request for a deposition of Lydell Willis, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Lydell Willis.

15. Such process issue as is necessary to require the Watson Chapel School District to produce to petitioner's counsel, for inspection and copying, all records, memorandum, and/or papers in its possession concerning the policies of the School District relating to services for mentally retarded children from 1978 until present.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

*11*

S.App.518

16.   Such process issue as is necessary to require the Watson Chapel School District to produce to petitioner's counsel, for inspection and copying, all records, memorandum, and/or papers in its possession, including the minutes and/or recordings of School Board Meetings, concerning the investigation of complaints of racial discrimination involving the School District.

17.   Such process issue as is necessary to require the Watson Chapel School District to produce to petitioner's counsel, for inspection and copying, all records, memorandum, and/or papers in its possession, including the minutes and/or recordings of School Board Meetings, concerning the investigation and disposition of a child related to Principal Steward bringing a weapon onto school grounds, as well as the investigation and disposition of similar conduct by other students within two years of the incident.

## GROUND FOR REVIEW FIVE

### PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE TRIAL JUDGE'S DETERMINATION THAT HE WOULD MAKE THE REQUISITE FINDINGS CONCERNING MENTAL RETARDATION

## GROUND FOR REVIEW SIX

### PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ALLOWING A BREAKDOWN IN COMMUNICATION WITH THEIR MITIGATION SPECIALIST TO AFFECT THE DISCOVERY, INVESTIGATION AND PRESENTATION OF EVIDENCE AT TRIAL.

In their written statements before this Court, trial counsel have indicated that their failure to object to the trial judge's determination that petitioner was not mentally retarded, was inadvertent, a mistake, and not the part of any reasonable trial strategy. The trial judge's action came as a surprise to counsel and the failure to object ultimately acted as a procedural default of petitioner's right to complain of the trial judge's determination. Not only was this determination contrary to the evidence, but also unsupported by any rule of procedure.

The Sec. 2255 motion, and the Government's response, demonstrate that trial counsel retained the services of an attorney, Annette Lamoreaux, to assist in the investigation and

preparation of mitigating evidence for presentation at petitioner's trial.[4]  Lamoreaux is an attorney with specialized training in mitigation investigations in death penalty cases and was previously an attorney at the Texas Resource Center, a federally funded entity charged with representing capital defendants and providing resources to private attorneys who represented capital defendants.  No other attorney or investigator on the defense team had Lamoreaux's experience and training in mitigation investigation and preparation.

Trial Counsel Larry Moore provided petitioner and the Government written statements. These statements demonstrate a disagreement between trial counsel and Lamoreaux which carried forth into the representation.   Moreover, Lamoreaux's written statement demonstrates she had a basic disagreement with trial counsel over the manner in which a mitigation case should be investigated and presented.  As is apparent from all the written statements on this issue, trial counsel and Lamoreaux disagreed over many different issues, including her billings for services  This disagreement festered and grew to such an extent that, shortly before trial, trial counsel were unable to locate Lamoreax or her materials.  Trial counsel attempted to complete the mitigation investigation using factual investigators, former law enforcement officers who were untrained in conducting mitigation investigations.  Such circumstances denied petitioner and the jury relevant information concerning petitioner's moral culpability for the offense for which he was convicted.

---

[4]     The importance of a mitigation specialist to the defense of a capital offense is demonstrated in the Supreme Court's opinion in *Williams v. Taylor*, 529 U.S. 362 (2000).  In *Williams*, the Supreme Court specifically held that evidence of mitigation such as mental retardation, mistreatment, abuse and neglect, must be considered and that defense counsel are obligated to conduct a thorough investigation into such evidence, presenting that evidence favorable to the defendant. *Id.*, 529 U.S. at 396-397.

Through discovery, petitioner seeks to establish the volatile relationship between an attorney retained to investigate and prepare mitigating evidence and the trial attorneys and its effect on petitioner's trial. With relation to this claim, petitioner requests the following:

18.  A deposition of Annette Lamoreaux be taken to determine the information and evidence she developed during her investigations, her relationship with trial counsel, how and why that relationship degenerated and what additional investigations could have been completed had the relationship with trial counsel not degenerated. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Annette Lamoreaux as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Annette Lamoreaux, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Annette Lamoreaux.

19.  A deposition of Mr. Webster's trial attorneys, Larry Moore and Alan Butcher, to determine any reasons said attorneys failed to object to the trial judge's finding regarding mental retardation, said attorneys' relationship with Annette Lamoreaux, how and why that relationship degenerated, and the impact upon Mr. Webster's defense/mitigation case as a result of not having the retained mitigation specialist/attorney available prior to and during trial. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Larry Moore and Alan Butcher, as is necessary to require them to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Larry Moore and Alan Butcher, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Larry Moore and Alan Butcher.

20.  The Government be required to produce to petitioner's counsel, for inspection and photocopying, the following information relative to these claims: any mitigating evidence in its files which questions the jury's verdict in any manner and was not presented during petitioner's trial; any communications its representatives had with the Court and/or petitioner's trial counsel regarding the procedures for determining mental retardation.

## GROUND FOR REVIEW SEVEN

**PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT THE JURY AN ACCURATE ASSESSMENT OF THE EXTREME ABUSE SUFFERED BY PETITIONER AS MITIGATING EVIDENCE.**

In his seventh ground for review, petitioner contended there was extensive evidence of abuse which trial counsel either did not discover or did not produce for the jury. At least some of the evidence of abuse was available to counsel because Lamoreax's investigation documented a cycle of abuse within petitioner's family which existed for several generations, at least through petitioner's grandfather and great-grandfather. Petitioner's father was one of the worst abusers in this lineage. Various family members informed Lamoreaux that petitioner's father was easily provoked and very violent toward his children and his wife. These episodes involved beating, bleeding, drinking urine and bondage. Little of this evidence was documented or developed by trial counsel. The jury was denied full knowledge of its existence.

Through discovery petitioner seeks to establish the existence of strong and compelling mitigating evidence of abuse inflicted upon petitioner and his siblings. Petitioner seeks to demonstrate the environment in which he was raised and demonstrate that petitioner was entitled to hear evidence which was related to petitioner's moral blameworthiness for the crime for which he was convicted. Finally, petitioner seeks to establish the effect of the failure to present such evidence at trial. With relation to this claim, petitioner would request the following discovery:

21.  The government be required to produce for petitioner's counsel, for inspection and photocopying, all evidence within its files, or at its disposal, concerning any physical, mental or sexual abuse suffered by petitioner or other members of his family.

22.   Such process issue as is necessary to compel the State of Arkansas, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

23.   Such process issue as is necessary to compel the city of Pine Bluff, Arkansas, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

24.   Such process issue as is necessary to compel the Watson Chapel School District, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

25.   Such process issue as is necessary to any other governmental entity in or around Pine Bluff, Arkansas, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

26.   A deposition of Mr. Webster's trial attorneys, Larry Moore and Alan Butcher, to determine the extent of their investigation of the neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's family or involving a member of petitioner's family. Said deposition will further address why counsel did not present evidence of such abuse to the jury during petitioner's trial. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Larry Moore and Alan Butcher, as is necessary to require them to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Larry Moore and Alan Butcher, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Larry Moore and Alan Butcher.

27.   A deposition of petitioner's siblings and his parents be taken to determine the existence, extent and results of any neglect, physical abuse, mental abuse and/or sexual abuse involving any member of petitioner's family. If the Court denies this discovery request, petitioner respectfully requests that such process issue to each member of petitioner's immediate family, his siblings and his parents, to produce for petitioner's counsel, for inspection and photocopying, all evidence

relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of petitioner's siblings and parents, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of petitioner's siblings and parents.

## GROUND FOR REVIEW EIGHT

## PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT EVIDENCE OF PETITIONER'S SPECIAL TALENTS, MUSICAL ABILITIES, AND RELIGIOUS DEVOTION IN MITIGATION OF THE DEATH PENALTY.

In his eighth ground for review, petitioner contended his trial counsel erred in failing to inform the jury of petitioner's extensive musical talents, his devotion to Christianity and his religious training. Petitioner provided factual allegations concerning his musical performance background and his steadfast dedication to the study of Christianity. Through discovery, petitioner seeks to establish the existence of evidence which was: relevant to sentencing, mitigating, called for a sentence less than death; and was not presented to the jury. Moreover, appellant seeks to demonstrate harm. With respect to this claim, petitioner requests the following discovery:

28. The government be required to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to any special talent or religious devotion held by petitioner.

29. A deposition of Mr. Webster's trial attorneys, Larry Moore and Alan Butcher, to determine the extent of their investigation into petitioner's special talents and/or religious devotion. Said deposition will further address why counsel did not present evidence of such talents and religious devotion to the jury during petitioner's trial. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Larry Moore and Alan Butcher, as is necessary to require them to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Larry Moore and Alan

Butcher, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Larry Moore and Alan Butcher.

## GROUND FOR REVIEW TEN

**PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, STEVE BECKLEY.**

## GROUND FOR REVIEW ELEVEN:

**PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, MARVIN HOLLOWAY.**

In his Sec. 2255 motion, petitioner demonstrated that co-defendant Steven Beckley testified at petitioner's trial pursuant to an agreement with the government. Beckley's testimony was a cornerstone in the Government's case and was directly related to petitioner's alleged involvement in the kidnaping and subsequent murder of Lisa Rene. Beckley's testimony included: the identification of petitioner on the 911 tape yelling "this is the FBI"; testimony that petitioner actually abducted Lisa Rene and dragged her from the apartment; Petitioner raped Lisa Rene at least twice on the way to Pine Bluff Arkansas; Petitioner's statements that he knows a place where they can take Lisa Rene and burn her and "nobody will ever find her"; Petitioner statements that "the hole is dug"; Petitioner and Orlando Hall led Beckley and Lisa Rene to a burial site in Byrd Park where a grave had been dug; Petitioner striking Lisa Rene in the head with a shovel multiple times; Petitioner placing Lisa Rene in the grave; Petitioner

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

18

removing Lisa Rene's clothes; Petitioner pouring gasoline on Lisa Rene after she is placed in the grave; and. Petitioner and Orlando Hall are "talking and laughing" when Beckley returns to the grave site.

Co-defendant Marvin Holloway testified at Petitioner's trial pursuant to an agreement with the government. Although Holloway was not present during the kidnapping or murder of Lisa Rene, his testimony was directly related to Petitioner's alleged involvement in the kidnapping and subsequent murder of Lisa Rene. Among other things, Holloway's testimony included: Orlando Hall's statement that he wanted petitioner to be involved because he believed petitioner could "kill someone if it came down to it"; petitioner's statements that "we can handle these punk motherfuckers"; Beckley's statements that petitioner was "messing with [Lisa Rene] all night"; petitioner's statements to Orlando Hall that he knew plenty of places to kill Lisa Rene; and, statements by petitioner and Orlando Hall about killing Lisa Rene by different methods ... "either beat her to death, choke her or shoot her."

Petitioner learned that, after his trial, Beckley was being held in the Federal Correctional Institute in Ft. Worth, Texas. In the presence of Correctional Officer Ward and inmate Albert Williams. Beckley made statements to the effect that he lied under oath in the trial of Petitioner in order to garner favor with the government, avoid the death penalty, and procure a favorable sentence. Petitioner further learned that co-defendant Orlando Hall received a letter from Marvin Holloway wherein Holloway indicates that he owed petitioner an apology.

Through discovery, petitioner seeks to establish that the testimony of Steven Beckley and Marvin Holloway was not true and that both co-defendant's minimized their roles in order to avoid the death penalty in their cases. Moreover, petitioner believes such discovery will

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

*19*

establish that the theory upon which petitioner was prosecuted was not true, and that the major participants in this crime included the testifying co-defendants. Petitioner seeks to establish that his role in this offense, if any, was much more limited than that argued by the Government. Finally, petitioner would show the Court that he does not have the resources necessary to complete his investigation of these issues absent the discovery process and the provision of resources by the Court. Relevant to the above claims, petitioner requests leave to conduct the following discovery:

30. The Government be required to produce to petitioner's counsel, for inspection and photocopying, records from FCI Ft. Worth reflecting the full name, address and phone numbers of all correctional officers with the last name "Ward" who were employed at FCI Ft. Worth during the time periods Steven Beckley was incarcerated in that facility.

31. The Government be required to produce to petitioner's counsel, for inspection and photocopying, information from the Bureau of Prisons or other governmental agency, all information relevant to the location of inmate Albert Williams. In the event that inmate Albert Williams may no longer be within the BOP system, the Government should be required to produce all relevant identification information within its possession (Social Security Number, date of birth, last place of incarceration, employment, address while under Mandatory Supervision) so as to allow petitioner to locate and interview Williams.

32. The Government be required to produce to petitioner's counsel, for inspection and photocopying, all information within its possession, or at its disposal, regarding exculpatory or mitigating statements made by co-defendant Beckley during his incarceration at the federal facility in Fort Worth. Said production shall include any evidence that petitioner's role in this offense was limited or differed from that argued by the Government at petitioner's trial.

33. The Government be required to produce to petitioner's counsel, for inspection and photocopying, all information within its possession, or at its disposal, regarding exculpatory or mitigating statements made by co-defendant Holloway concerning Holloway's and petitioner's roles in the offense for which they were charged. Said production shall include any evidence that petitioner's role in this offense was limited or differed from that argued by the Government at petitioner's trial.

34.    A deposition of Officer Ward be taken, once his whereabouts are determined, to determine the existence and extent of any statements he overheard co-defendant Beckley make regarding petitioner, or the crime for which they both were charged, while incarcerated at the federal facility in Fort Worth. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Officer Ward to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Officer Ward, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Officer Ward.

35.    A deposition of Albert Williams be taken, once his whereabouts are determined, to determine the existence and extent of any statements he overheard co-defendant Beckley make regarding petitioner, or the crime for which they both were charged, while incarcerated at the federal facility in Fort Worth. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Albert Williams to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Albert Williams, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Albert Williams.

36.    A deposition be of Steven Beckley be taken, once his whereabouts are determined, to determine the existence and extent of any exculpatory and/or mitigating statements he made regarding petitioner, or the crime for which they both were charged, while incarcerated at the federal facility in Fort Worth. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Steven Beckley to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Steven Beckley, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Steven Beckley.

37.    A deposition of Marvin Holloway be taken, once his whereabouts are determined, to determine the existence, meaning and extent of any statements he made in a letter to co-defendant Orlando Hall, regarding the need for an apology to petitioner. Said deposition will further explore the relative roles of all of the alleged participants in the instant offense. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Marvin

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

Holloway to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Marvin Holloway, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Marvin Holloway.

38.    A deposition of co-defendant Orlando Hall be taken, to establish that he received the letter from Marvin Holloway which is attached to petitioner's Sec. 2255 Motion. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Orlando Hall to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Orlando Hall. petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Orlando Hall.

39.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, all evidence in its possession regarding any letters received by co-defendant Orlando Hall from co-defendant Marvin Holloway.

## GROUND FOR REVIEW TWELVE:

## PETITIONER IS INELIGIBLE FOR EXECUTION BECAUSE HE IS MENTALLY RETARDED.

Petitioner's claim of mental retardation became a central focus of these proceedings even before trial, and continues to be so today. Petitioner's Sec. 2255 motion details evidence at trial as well as additional evidence which petitioner contends satisfies any reasonable definition of mental retardation. However, although 18 U.S.C. 3596(c) precludes the execution of a mentally retarded person. the statute does not define mental retardation. Moreover, the statute does not set forth the procedure for determining mental retardation. Petitioner presented expert testimony and evidence of his mental retardation. The Government sought to rebut evidence of mental retardation with the testimony of two experts who testified that. based upon their interviews,

testing, and observations, petitioner was not retarded. Additionally the Government presented testimony from employees of the Watson Chapel School District and Corrections officers concerning the "adaptive skills" of Petitioner, arguing such skills belied mental retardation. Evidence obtained since petitioner's conviction provided additional evidence of petitioner's low level of functioning and his adaptive skills, as well as the failure of the Watson Chapel School District to provide services to petitioner relating to his mental retardation. Moreover, petitioner has demonstrated a possible motive and/or explanation for the School District's failure to provide services.

Through discovery, petitioner seeks to establish that he is mentally retarded and is ineligible for execution. Petitioner has presented additional evidence from that presented at trial. Petitioner seeks to fully develop the factual basis for this claim through this discovery process. With relation to this ground for review petitioner requests the following:

40.     The Government be required to produce to petitioner's counsel, for inspection and photocopying, any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on what constitutes mental retardation or the appropriate definition for mental retardation. Petitioner asserts the above request is relevant in that any position concerning mental retardation held by the Justice Department prior to Petitioner's trial that is contrary to that promulgated at petitioner's trial should have been disclosed by the Government pursuant to the dictates of *Brady v. Maryland* and *Kyles v. Whitley*. Petitioner further asserts this request is not overbroad nor burdensome inasmuch as a request for such information could easily be placed on a Government e-mail system or "listserve" to determine the existence and availability of such documents.

41.     The Government be required to produce to petitioner's counsel, for inspection and photocopying, any evidence in its possession which suggests petitioner is mentally retarded. Petitioner contends that such evidence should be produced regardless of when the Government obtained such evidence, i.e. before, during or after trial.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

23

42.     The Government be required to produce to petitioner's counsel, for inspection and photocopying, the names of all persons it consulted or interviewed regarding the existence (or not) of petitioner's mental retardation. Petitioner contends that such evidence should be produced regardless when the Government consulted such persons, i.e. before, during or after trial.

## GROUND FOR REVIEW THIRTEEN:

## THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE TRIAL JUDGE'S DETERMINATION THAT PETITIONER IS NOT MENTALLY RETARDED.

Petitioner would respectfully show this Court that the only *expert* testimony presented by the government concerning Petitioner's mental retardation was the testimony of Dr. George Parker and Dr. Richard Coons.[5] Parker's estimation of petitioner's full scale IQ (72) was fully within the range for a diagnosis for mental retardation pursuant to the DSM IV and the American Association on Mental retardation Manuel. Further, Parker admitted on cross-examination that he was not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis of mental retardation.

Through discovery, petitioner seeks to establish the information available at the time of trial was sufficient to find appellant mentally retarded. Petitioner further seeks to develop facts which demonstrate the Government's experts were not able to accurately assess mental retardation. Finally, petitioner seeks to investigate the Government's experts ability, training, and experience in determining mental retardation. With regard to this claim, petitioner requests the following discovery:

---

[5]     Dr. Parker performed an incomplete series of psychological tests, estimating petitioner's performance in crucial areas, while Dr. Coons only interviewed petitioner and reviewed various reports and tests of other Doctors, (including Parker's) school records, as well as statements of co-defendants. Neither expert interviewed anyone who knew petitioner outside the correctional setting.

43. Such process issue as is necessary to the State of Texas, any state agency, the Texas Medical Association, the Texas Board of Medical Examiners, and any State Board regulating psychologists, requiring the production to petitioner's counsel, for inspection and photocopying, of any documents reflecting any disciplinary action or complaints against Dr. Richard Coons within the past 10 years.

44. Such process issue as is necessary to the State of Texas, any state agency, the Texas Medical Association, the Texas Board of Medical Examiners, and any State Board regulating psychologists, requiring the production to petitioner's counsel, for inspection and photocopying, of any documents reflecting any disciplinary action or complaints against Dr. George Parker within the past 10 years.

45. The Government should be required to produce to petitioner's counsel, for inspection and photocopying, any and all records, reports, memos, notes or other documents of any kind in possession of the government that in any way reflect the opinions of mental health professionals or lay witnesses which would in any way rebut the testimony of Drs. Coons and Parker concerning mental retardation (or lack thereof).

46. The Government be required to produce to petitioner's counsel, for inspection and photocopying, the names of all persons it consulted or interviewed regarding the existence (or not) of petitioner's mental retardation. Petitioner contends that such evidence should be produced regardless of when the Government consulted such persons, i.e. before, during or after trial.

47. Such process issue as is necessary to Dr. Richard Coons, requiring the production to petitioner's counsel, for inspection and photocopying, of all documentary support of Dr. Coons training, experience, certification and ability to diagnose mental retardation.

48. Such process issue as is necessary to Dr. George Parker, requiring the production to petitioner's counsel, for inspection and photocopying, of all documentary support of Dr. Parker's training, experience, certification and ability to diagnose mental retardation.

49. A deposition of Dr. Richard Coons be taken, to establish that his training, experience, certification and ability to diagnose mental retardation. Said deposition will also include Dr. Coons' understanding of the definition of mental retardation, his understanding of the requisite procedures involved in the determination of mental retardation, and the actions he performed in the instant case. If the Court denies this discovery request, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

25

motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Dr. Richard Coons.

50.    A deposition of Dr. George Parker be taken, to establish his training, experience, certification and ability to diagnose mental retardation. Said deposition will also include Dr. Parker's understanding of the definition of mental retardation, his understanding of the requisite procedures involved in the determination of mental retardation, and the actions he performed in the instant case. If the Court denies this discovery request, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Dr. George Parker.

## GROUND FOR REVIEW FIFTEEN

## 18 U.S.C. Sec. 3596 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

In his fifteenth ground for review. petitioner contended 18 U.S.C. Sec. 3596 was unconstitutionally vague because the statute does not set forth: who is to be the fact-finder regarding mental retardation; what burden of proof applies to mental retardation; and, what standards are to be utilized in defining mental retardation. The Government agrees: "There is no question but that section 3596(c) fails to set forth the procedure by which a determination of whether a defendant is mentally retarded is to be made." However, the Government argues this does not invalidate the statute. *Government's Response*, pg 46. With respect to this claim, petitioner requests the following discovery:

51.    The Government be required to produce to petitioner's counsel, for inspection and photocopying. any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on the procedures to be employed in establishing mental retardation, the lack of direction in 18 U.S.C. Sec. 3596. and the validity of 18 U.S.C. 3596. Petitioner asserts the above request is relevant in that any position proffered by the Justice Department that is contrary to that promulgated herein should be disclosed by the Government pursuant to the dictates of *Brady v. Maryland* and *Kyles v. Whitley*. Petitioner further asserts this request is not overbroad nor burdensome inasmuch as a

*Motion for Leave to Conduct Discovery*
*USA v. Webster*                                                                  26

request for such information could easily be placed on a Government e-mail system or "listserve" to determine the existence and availability of such documents.

## GROUND FOR REVIEW SIXTEEN:

## BINDING INTERNATIONAL LAW FORBIDS PETITIONER'S EXECUTION BECAUSE PETITIONER IS MENTALLY RETARDED.

In his Sec. 2255 motion, petitioner contends his execution would violate International Law.   The Government responds that petitioner has "failed to establish the existence of any international law which forbids the execution of mentally retarded persons." The Government further alleges that the authority provided are non-binding resolutions and requests.

As a result of the foregoing allegations and assertions by the Government, Petitioner requests the following discovery:

52.    Any and all documents, briefs, memos, papers or any other materials in the possession of the Government that reflects the position of the Department of Justice concerning the applicability and binding nature of International Law on the Courts of the United States in general and, specifically as it relates to the execution of the mentally retarded.  Petitioner asserts the above request is relevant in that any position held by the Justice Department concerning the applicability of International Law to the Courts of the United States in general and specifically as it relates to the execution of the mentally retarded that is contrary to the position it has taken within this litigation must be disclosed by the Government pursuant to the dictates of *Brady v. Maryland* and *Kyles v. Whitley*.  Petitioner further asserts this request is not overbroad nor burdensome inasmuch as a request for such information could easily be placed on a Government e-mail system or "listserve" to determine the existence and availability of such documents.

## III. CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Mr. Webster respectfully requests that the Court enter the attached proposed Order authorizing him to conduct discovery related to the claims contained in his § 2255 motion. If the Government alleges that any of the information Mr. Webster seeks via discovery is privileged and/or constitutes attorney work product, we further move the Court to

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

27

require the Government to produce that information for *in camera* inspection and review by the Court. If the Government submits any such material, we further move the Court to copy that material and maintain it in the record under seal for purposes of any subsequent appeal in this proceeding.

Respectfully Submitted,

PHILIP WISCHKAEMPER
SNUGGS & WISCHKAEMPER
State Bar No. 21802750
915 Texas Avenue
Lubbock, TX 79401
(806) 763-9900

GARY TAYLOR
State Bar No. 19691650
P.O. Box 90212
Austin, Texas 78709-0212
(512) 301-5100
(512) 301-5329 (fax)

# CERTIFICATE OF DELIVERY

I herein certify that a true and correct copy of the above and foregoing was delivered to the United States Attorney's Office in Fort Worth, Texas by United States Mail, Certified Mail, Return Receipt Requested.

_____
Date

_____
Gary Taylor

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

28

# Wells Decl. Ex. Y

ORIGINAL

DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 18 2002

CLERK, U.S. DISTRICT COURT
By_____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BRUCE CARNEIL WEBSTER,           §
                                 §
        Petitioner,              §
                                 §   CIVIL NO. 4:00-CV-1646-Y
VS.                              §
                                 §   (Criminal No. 4:94-CR-121-Y)
UNITED STATES OF AMERICA,        §
                                 §
        Respondent.              §

**MEMORANDUM OPINION AND ORDER
DENYING PETITIONER'S MOTION FOR DISCOVERY**

Petitioner Bruce Carneil Webster (Webster) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, is currently seeking habeas relief. In pursuing habeas relief through a motion to vacate his conviction and sentence under 28 U.S.C. § 2255, Webster filed a motion for discovery on April 30, 2001. The government filed a response opposing discovery on May 16, and Webster filed a reply on July 30.

In his motion for discovery, Webster makes fifty-two separate requests for discovery. These requests can be grouped into three different categories. In order to support claims that he was selectively prosecuted, that his trial counsel were ineffective, that the State presented false testimony at trial, and that his constitutional rights have been violated because he is mentally retarded, Webster seeks various information from the government, asks this Court to subpoena information from various Arkansas state and local entities, and asks this Court's permission to depose a number of witnesses. Having determined that these requests are

**EXHIBIT Y**

either without merit or are premature, this Court denies Webster's motion for discovery.

**Applicable Law**

Under Rule 6(a) of the "Rules Governing Section 2255 Cases in the United States District Courts," a federal habeas petitioner may invoke the discovery process "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." *See* Fed. R. 6(a) Governing § 2255 Cases. Thus, a federal habeas petitioner, "unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In order to determine whether a habeas petitioner is entitled to discovery, a federal court must first identify the "essential elements" of his claims for habeas relief for which he seeks discovery. *Id.* Then, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 908-9, *citing Harris v. Nelson*, 394 U.S. 286, 300 (1969). Nevertheless, the Fifth Circuit has repeatedly stated that Rule 6 does not authorize fishing expeditions and that conclusory allegations are not enough to warrant discovery. *Rector v. Johnson*, 120 F.3d 551,

2

558 (5th Cir. 1997); *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir 1996); *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).

### *Analysis*

### 1. Selective-Prosecution Claim

In the first ground for relief in his § 2255 motion, Webster contends that the government violated his constitutional rights because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. In an effort to support a claim that he was selectively prosecuted for the death penalty, Webster seeks case information from the United States government regarding every "death-penalty eligible" case since the inception of the federal death penalty; the identities and personal information of all persons recommended by U.S. Attorneys for a death penalty prosecution; all information relied on by the Justice Department in reaching its decisions to seek the death penalty; the resolution and disposition of every case for which the death penalty could have been sought; and any information in the government's possession relating to the investigation of racially discriminatory practices in the government's evaluation of possible death-penalty prosecutions, deciding to seek the death penalty, and prosecuting death-penalty cases. Webster states that he needs all of this information in order to help prove his claim that the government sought the death penalty against him whereas the death penalty was

3

not sought against similarly situated non-African-American defendants.

As initial support for this claim, Webster points to a survey released by the United States Department of Justice in September of 2000, entitled "Survey of the Federal Death Penalty System (1988-2000)," a copy of which Webster has submitted as an exhibit with his initial § 2255 motion. (§ 2255 motion, ex. A) Webster argues that statistics included in this survey strongly imply that the federal government's decisions regarding who will face the death penalty are impermissibly influenced by the race of the defendants.

Webster raised this claim on direct appeal, and the Fifth Circuit, citing *United States v. Armstrong*, 517 U.S. 456 (1996), ruled that it was without merit. *United States v. Webster*, 162 F.3d 308, 334-35 (5th Cir.), *cert. denied*, 528 U.S. 829 (1999). In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed both the appropriate standard for establishing a selective-prosecution case and the appropriate standard for granting discovery when a selective-prosecution claim is made. In *Armstrong*, the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to

4

establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65. Applying this standard to the case at hand, the Fifth Circuit held that the statistics presented to that court on direct appeal showed neither a discriminatory purpose on the part of the government, nor a discriminatory effect. *Webster*, 162 F.3d at 334-35.

Webster nevertheless asserts that the justice department's survey, issued after the Fifth Circuit handed down its opinion on direct appeal, supplies evidence of selective prosecution warranting the discovery he seeks. This Court disagrees. As evidence that he is entitled to discovery, Webster points to the fact that, according to the federal survey, over eighty percent of cases considered for the death penalty in the relevant period involved a non-white defendant, only twenty-eight percent of cases approved for the death penalty involved white defendants, while over forty percent of cases where there was a plea bargain to a lesser sentence are cases in which the defendant was white. Finally, Webster points out that, as of September of 2000, African-Americans accounted for about two-thirds of the group of people under federal death sentences. But in *Armstrong* the Supreme Court stated that, because ordering discovery in a case in which a selective-prosecution claim is made imposes many costs on the government, in order to be entitled to discovery on such a claim, "some evidence" of the essential elements of the claim must be presented, including some evidence

5

that similarly situated individuals of another race have not been prosecuted. The Court then concluded that Armstrong's evidence that twenty-four black individuals had been prosecuted for dealing crack cocaine was not "some evidence" of a discriminatory impact because Armstrong identified no individuals who were not black and could have been prosecuted for dealing crack cocaine, but were not. *Id.* at 468-69.

While the Court in *Armstrong* was confronted with a pre-trial request for discovery, rather than a request made during the federal habeas process, this Court concludes that the analysis performed by the Supreme Court in that case, requiring "some evidence" of the elements of the claim before discovery is authorized, is sufficiently analogous to the "good cause" standard applicable in this case to be instructive to the Court in reaching a decision here. Webster has not presented the type of evidence that constitutes good cause for discovery. In *Armstrong*, the Supreme Court contrasted the evidence presented in that case with the evidence presented in *Underwood v. Hunter,* 471 U.S. 222 (1985). In *Hunter*, the Supreme Court invalidated an Alabama state law that provided for the disfranchisement of voters convicted of crimes against moral turpitude on the basis that the law violated the Equal Protection clause. In *Hunter*, however, there was direct evidence presented that the state law was originally intended to discriminate against blacks when it was enacted in 1901 *and* that blacks were 1.7 times more likely to suffer disfranchisement. *Id.* at 227, 229-233.

6

While Webster has arguably presented some statistical evidence that there has been a disparate effect on African-Americans, Webster has presented no evidence that there were *similarly situated* non-African-American defendants against whom the death penalty was not sought. Furthermore, Webster has failed to present any evidence, implied or otherwise, that there has been any discriminatory intent when prosecutors have asked for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants. Accordingly, following the reasoning in *Armstrong*, Webster's statistical presentation is not sufficient to constitute "some evidence" of both elements of his claim of selective prosecution.

This Court also notes that recently the Fifth Circuit held that the statistics contained in the Department of Justice report were insufficient to support a claim of selective prosecution under the test set forth in *Armstrong*. *See United States v. Jones*, 287 F.3d 325 (5th Cir. 2000). While this Court recognizes that in *Jones* the Fifth Circuit was ruling on a constitutional claim rather than a request for discovery, the Fifth Circuit's decisions in both *Jones* and *Webster* are strong indicators that, based upon the evidence presented to this Court, Webster has failed to show reason to believe that, were discovery granted on this issue, he would be able to demonstrate that he is entitled to relief.

7

In reaching this decision, this Court is aware that the Sixth Circuit has recently issued an opinion in which it held that a district court did not abuse its discretion in granting pre-trial discovery on an identical claim supported by similar evidence because the evidence was "some evidence" not only of discriminatory effect but of discriminatory intent. *See United States v. Bass*, 266 F.3d 532 (6th Cir. 2001). As the Sixth Circuit noted, however, "the relevant inquiry [for its review] is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether any reasonable person could agree with the district court." *Bass* at 536. The Sixth Circuit's 2-1 opinion held that a reasonable person could agree with the district court, not that every reasonable person would. This Court respectfully disagrees with that Court's analysis of the statistics presented to it and finds Judge Nelson's dissent persuasive. Moreover, while not commenting on its evidentiary value, this Court notes that the Court in *Bass* was also provided additional evidence not provided to this Court regarding the ethnic make-up of non-capital federal offenders that it used as support for its finding that there was some evidence of discriminatory intent. *Id.* at 539. Because this Court concludes that Webster has not met the standard set forth in *Armstrong* for discovery on this issue, this Court concludes that Webster has failed to establish good cause for habeas discovery on this issue, as well.

8

## 2.    Ineffective-Assistance Claims

In his § 2255 petition, Webster also asserts that his trial counsel were ineffective in several respects. Specifically, Webster contends that his trial counsel were ineffective for: failing to present, as additional mitigating evidence, more testimony regarding his mental retardation, accurate evidence regarding the abuse Webster suffered as a child, evidence of Webster's musical abilities and religious devotion, evidence of a racial bias in the school system for the area in Arkansas where Webster grew up, and evidence that this racial bias resulted in Webster's not being placed in special education classes as additional mitigating evidence; failing to object to the trial court's determination that the court would make the required factual findings regarding Webster's mental retardation or lack thereof; and allowing a breakdown in communication with their mitigation specialist to affect the investigation and presentation of evidence. In an effort to support these claims of ineffective assistance of counsel, Webster requests that the government be required to produce any mitigating evidence in its possession, including evidence that suggests that Webster might be mentally retarded, evidence that the Watson Chapel School District used racially discriminatory practices, evidence of any physical, mental, or sexual abuse of Webster, and evidence of any special talents or religious devotion Webster might have. Webster also requests that this Court subpoena the Watson Chapel School District for all of its records regarding mental retardation, complaints of racial

9

discrimination, incidents of students bringing guns to school, and information about any abuse or neglect within Webster's family; and subpoena the State of Arkansas, the City of Pine Bluff, Arkansas, and any other relevant Arkansas government entity for any records of neglect or abuse in Webster's family. Finally, Webster asks that this Court permit him to depose numerous witnesses, including employees of the Watson Chapel School District, Webster's trial attorneys, the defense mitigation specialist, and members of Webster's family. In lieu of these depositions, Webster requests that this Court conduct an evidentiary hearing at which these people would testify.

With regard to Webster's request that the government produce any mitigating evidence in its possession, under *Brady v. Maryland*, 373 U.S. 83 (1963), it is a violation of a criminal defendant's due-process rights for the prosecution to suppress evidence that is material to either guilt or punishment. Accordingly, the government's duty to disclose *Brady* material includes mitigating evidence. In the instant case, the government has the continuing duty to produce material mitigating evidence in its possession, unavailable to Webster, such as evidence it might possess that is mitigating, including evidence indicating that Webster is mentally retarded. Because the government has the duty to disclose such evidence, there is no need for this Court to order the discovery of exculpatory or mitigating evidence. The Court does note, however, that the government has no duty to produce evidence or information

10

that is already known to the defendant or that he could have obtained from other sources by exercising reasonable diligence. *Brown v. Cain*, 104 F.3d 744, 750 (5th Cir. 1997). Thus, the government has no duty to produce evidence of any abuse in Webster's past, his special talents, or his religious devotion, as this is evidence about which Webster himself would be aware.

With regard to Webster's request that this Court subpoena numerous Arkansas state agencies in an attempt to obtain numerous documents about possible abuse in Webster's family, this extremely broad discovery request, with no evidence presented by Webster that any such records exist, is the very type of fishing expedition that is prohibited. Moreover, Webster's claim is that his counsel were ineffective for failing to present certain evidence. Webster has failed even to allege, much less present evidence, that, should such subpoenas issue, he might be able to prevail on a claim that his trial counsel were ineffective for failing to uncover documents that are evidently unknown even to Webster. Accordingly, Webster has failed to show good cause for subpoenaing these records, and this request is therefore denied.

Webster further requests that this Court permit him to subpoena the Watson Chapel School District, the district in which Webster was educated, for numerous documents regarding its history of racial discrimination in an effort to support his claim that his attorneys were ineffective for failing to present evidence that the school district operated under racially discriminatory practices. With

11

his initial § 2255 petitioner, however, Webster submitted an opinion and an order from a federal district court in the Eastern District of Arkansas, dated November 16, 1970, and February 6, 1971, respectively. Pursuant to a suit by the federal government against, among others, the Watson Chapel School District, the federal district court ruled that that school district operated a segregated school system and ordered that a plan submitted by the Department of Health, Education, and Welfare be adopted by the school district in order to desegregate the school system. (Petition, attachments B & C) Webster also submitted as an exhibit a report from the Watson Chapel School District to the federal district court filed on October 27, 1989, pursuant to the previous order, and an order from the district court in 1991 suspending its previous requirement that the Watson Chapel School District submit yearly reports regarding its desegregation plan. (attachments D & E). The Court concludes that this information already submitted by Webster is sufficiently developed to support his claim that trial counsel were ineffective for failing to present evidence of the racial bias of the school system. Furthermore, Webster's request to subpoena voluminous records from the school district is overly broad and that Webster has failed to present the Court with any evidence that school district documents, to the extent that they exist, would have been available to trial counsel. Accordingly, the Court concludes that Webster has failed to show that, if these documents were produced, he may be entitled to relief as a result.

12

Finally, Webster requests that he be allowed to depose several individuals in order to further develop his ineffective assistance of counsel claim in furtherance of filing an amended § 2255 motion or, in the alternative, that he be permitted to question these individuals in an evidentiary hearing. With respect to Webster's request that he be allowed to depose the defense mitigation specialist and Webster's trial attorneys, this Court notes that Webster had submitted an affidavit from the mitigation specialist with his initial § 2255 motion and the government has submitted an affidavit from his two trial attorneys with their response to Webster's § 2255 motion. The Court concludes therefore that there is no need to depose these three individuals in order to further develop the ineffective assistance of counsel claims for purposes of filing an amended petition. Webster also requests that he be permitted to depose his siblings and parents regarding abuse in the household. At Webster's trial, however, his siblings, his mother, and his aunt testified about the extreme abuse suffered by the children at the hands of their father. Because trial counsel presented this testimony at trial, Webster has not shown why it is necessary to depose these same individuals in an effort to support his ineffective assistance of counsel claim. With respect to Petitioner's request to depose several former or current employees of the Watson Chapel School District in order to support his claim that trial counsel were deficient for not presenting evidence that the school system had a racial bias, such as the school counselor

13

who testified at his trial, and two teachers from the district, this Court concludes that there is no need to depose these individuals in order to further support an amended petition as an affidavit from an investigator outlining the information they could provide has been submitted by Webster and the government has submitted an affidavit from his trial attorneys responding in detail to each of Webster's ineffective assistance of counsel claims. Accordingly, Webster's requests for discovery with respect to his claims of ineffective assistance of counsel are denied.

### 3.    **False-Testimony Claims**

In his tenth and eleventh ground for relief, Webster argues that his due-process rights were violated when the government presented the "untrue and damaging" testimony of two of his co-defendants, Steve Beckley and Marvin Holloway. To support these grounds, Webster asks that the government be required to produce any exculpatory or mitigating statements made by Beckley or Holloway, all information regarding any letters received by co-defendant Orlando Hall from Holloway, and certain information about persons employed by and incarcerated by the Federal Correctional Institute in Fort Worth. Moreover, Webster seeks permission to depose Beckley, Holloway, and Hall, among others, or in the alternative that these people be called as witnesses in an evidentiary hearing. Webster asserts that this discovery will enable him to prove that the testimony that Beckley and Holloway gave at trial was untrue because

14

they minimized their roles in order to avoid the death penalty and that therefore the theory under which Webster was prosecuted was not true because Beckley and Holloway were, contrary to their testimony, actually major participants in the crime.

With regard to Webster's request that the government turn over any exculpatory or mitigating statements made by Beckley or Holloway, as noted earlier, the government is under a continuing duty to produce such statements if they are known to the government, and this Court need not order any additional discovery regarding them.

With regard to Webster's request for permission to depose certain people and Webster's request that the government produce information about certain unknown persons who either work for or are incarcerated by the federal government, this Court concludes that Webster has failed to establish good cause for this requested discovery.    In his § 2255 motion, Webster states that, "[i]rrespective of whether the government had knowledge of the untruthful testimony of Holloway or Beckley, [Webster's] right to due process under the Fifth and Fourteenth Amendments to the United States Constitution was violated by Holloway and Beckley's untruthful testimony." (§ 2255 motion at 49.)  Contrary to this assertion, in order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, Webster must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *See Napue v. Illinois*, 360 U.S. 264, 271 (1959).  Thus, while

15

conclusory allegations are not enough to warrant discovery, Webster has failed even to allege that the government knew that any testimony given by Holloway or Beckley was false, much less present specific allegations before this Court that would show any reason to believe that, if the facts were fully developed, Webster may be able to demonstrate that he is entitled to relief. Accordingly, Webster has failed to show good cause for his request for depositions or his request that the government produce information about certain inmates and employees of the federal prison system. The Court denies Webster's discovery requests with respect to these claims.

### 4.    Claims Regarding Mental Retardation

In his twelfth, thirteenth, fifteenth, and sixteenth grounds for relief in his motion to vacate his conviction and sentence, Webster asserts that: he is ineligible for execution under 18 U.S.C. § 3596(c) because he is mentally retarded; the evidence presented at trial was insufficient to support this Court's determination that Webster is not mentally retarded; 18 U.S.C. § 3596(c) is unconstitutionally vague; and binding international law prohibits Webster's execution because he is mentally retarded. In an effort to support these claims, Webster seeks to have the government produce the following information: all records in its possession regarding its position on what constitutes mental retardation; any evidence in its possession that suggests that Webster is not mentally retarded; the names of people the government consulted in this case on the

16

issue of mental retardation; all records that would rebut the expert witnesses on mental retardation who testified for the government at trial; all records regarding the government's position on the proper procedures to be taken under 18 U.S.C. § 3596, as well as the validity of the statute; and all records reflecting the government's position on the applicability of international law on the issue of the execution of the mentally retarded. Webster also seeks to subpoena the State of Texas and any relevant state agency for any records reflecting any disciplinary actions or complaints about the government's mental health experts and seeks to subpoena the experts for records documenting their training and experience. And, Webster seeks permission to either depose both of the mental health experts who testified for the government at trial or have them testify at an evidentiary hearing.

The Court initially notes that, on direct appeal, the Fifth Circuit held that the finding made by this Court that Webster is not mentally retarded and is therefore not exempt from execution under 18 U.S.C. § 3596(c) was properly made and was supported by the evidence. *See Webster*, 162 F.3d at 352-353. Given that Webster did not prevail on direct appeal with regard to two of the four claims he raises here, Webster has not presented to this Court any evidence that, if the discovery he seeks was granted, he may prevail either on a claim that he is ineligible to be executed because he is mentally retarded or that the evidence presented at trial was insufficient to support the finding that he is not mentally retarded.

17

Moreover, Webster has not shown why any discovery is necessary for him to fully explore his claim that 18 U.S.C. § 3596 is unconstitutionally vague or his claim that his execution would violate international law. Accordingly, Webster has failed to establish good cause for discovery on these claims, and it is therefore denied.[1]

Webster has also requested that he be granted an evidentiary hearing during which he be allowed to call several people as witnesses. This Court in an order dated April 4, 2001, granted Webster leave to file an amended § 2255 petition sixty days after the Court ruled on his motion for discovery. Therefore, any decision regarding the need an evidentiary hearing before any amended petition and response are filed would be premature.

As Webster has failed to establish good cause for discovery, his motion for discovery seeking records and permission to take depositions is **DENIED**.

SIGNED June __18__, 2002.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

---

[1] As noted earlier, the government is under a continuing duty under _Brady v. Maryland_ to produce any evidence that is material to either guilt or punishment. Evidence in the government's possession that Webster is mentally retarded would, as noted earlier, be _Brady_ material, and it is therefore unnecessary for this Court to order discovery of such evidence, if it exists.

18

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | 2:12-cv-86-WTL-WGH |
| | ) | |
| CHARLES LOCKETT, | ) | |
| | ) | |
| Respondent. | ) | |

### Entry and Order to Show Cause

The court, having considered the above action and the matters which are pending, makes the following rulings:

1.     The United States is **notified** of the filing of the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and of the supporting memorandum. This material has been scanned into the court's electronic docket. A copy of this Entry and Order to Show Cause shall be **distributed to** the United States Attorney.

2.     The respondent shall have **through May 30, 2012,** in which to answer the allegations of the habeas petition, and in doing so shall **show cause** why the relief sought by the petitioner should not be granted. The petitioner shall have **thirty (30) days after service of the answer** in which to reply.

**IT IS SO ORDERED.**

Date: ___04/19/2012_____

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
--------------------------------------------------------
BRUCE CARNEIL WEBSTER,

                   : 

          Petitioner,

                   :      CAUSE NO: 2:12-CV-0086-WTL-WGH

      vs.

                   : 

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,   :
TERRE HAUTE (USP),

                   :

          Respondent.
--------------------------------------------------------

**SUPPLEMENTAL DECLARATION OF KRISTEN K. LEROUX IN SUPPORT
OF PETITIONER'S REPLY TO RESPONDENT'S RETURN TO ORDER TO
SHOW CAUSE**

I, **Kristen K. LeRoux,** declare as follows:

1.      I am a former employee of Dorsey & Whitney LLP ("Dorsey").  I worked

at Dorsey for nineteen (19) years from 1993 to 2012.  From 1993 to 1996, I worked in an

administrative department.  From 1996 to 2006, I worked as a paralegal.  From 2006 to

2012, I served as a paralegal manager and worked as a paralegal on the Bruce Webster

case team.

2.      During the course of my work as a paralegal on the Bruce Webster case

team, I reviewed  Bruce Webster's trial and appellate case file sent by Mr. Webster's

appellate attorneys to Dorsey.  The records in Mr. Webster's case file, specifically a

facsimile transmission to the Social Security Administration ("SSA") dated March 4,

1996, indicate that Mr. Webster's trial counsel requested his SSA records over sixteen

(16) years ago.  A true and correct copy of the 1996 facsimile transmission to the SSA

office is attached hereto as Exhibit A.  The case file does not show that any records were

produced nor does it show that any response or follow-up correspondence was ever

received.

6.     In late October 2008, Dorsey attorneys asked me and my colleagues to

collect SSA records for Bruce Webster.

4.     On October 27, 2008, Dorsey sent a letter to the SSA at 3511 Market

Street, Pine Bluff, Arkansas 71601, requesting the release of all records pertaining to

Bruce Webster.  Dorsey enclosed an "Authorization For Release of Confidential

Information and Records" signed by Mr. Webster with this request.  True and correct

copies of this request and the signed authorization form are attached hereto as Exhibit B.

5.     On December 4, 2008, one of my colleagues followed up with the SSA

regarding Dorsey's written request by calling Logan Hamilton, Assistant District

Manager of the Social Security Administration at Pine Bluff, who stated that a completed

and signed Social Security Administration Form 3288 Consent for Release of

Information would be necessary to release a copy of the requested records.  Accordingly,

Dorsey obtained Bruce Webster's signature on a Form 3288 Consent for Release of

Information and sent the signed consent form to the SSA on December 15, 2008.  True

and correct copies of request for records and the enclosed consent form are attached

hereto as Exhibit C.

6.     Dorsey received certain SSA records for Bruce Webster on February 9,

2009.

2

7.      Upon examining the SSA records provided for Bruce Webster, Dorsey determined that certain documents, including certain records enumerated in a "List of Exhibits," were missing from the records and that the file appeared to be incomplete.

8.      On October 8, 2009, Dorsey sent a request for additional records to the Pine Bluff, Arkansas, SSA office, along with copies of the December 15, 2008 letter requesting, and Mr. Webster's Consent for Release of Information dated December 12, 2008.  A true and correct copy of this correspondence is attached hereto as Exhibit D. Specifically, Dorsey requested the documents that were listed on the "List of Exhibits" of Mr. Webster's Social Security records but which were not received on February 9, 2009.

9.      On October 15, 2009, I had a telephone conversation with a representative from the Pine Bluff, Arkansas, SSA office and was informed that normal procedures were not followed when the records received in February of 2009 were sent and that the person who copied and sent them had retired.  The representative from the Pine Bluff SSA office stated that the SSA could not provide any more records in response to the request that was submitted.  Reiterating that normal procedures were not followed when the records were sent in February 2009, the representative said that Mr. Webster should have been charged for the copies and that the request should have been sent to the SSA office in the state where Mr. Webster resides, regardless of his incarceration.  The SSA representative explained that the person who had copied and sent Dorsey the records on February 9, 2009 had since retired, and the SSA representative noted that the SSA normally will not honor any request for "any and all" records.

3

10.     On October 22, 2009, the Pine Bluff, Arkansas, SSA office sent a letter to Dorsey denying the request for additional records, citing the following reasons:  (1) it was a "blanket request;"(2) the claimant was not living in the service area; and, (3) the consent was outdated.  A true and correct copy of this correspondence is attached hereto as Exhibit E.

11.     On November 23, 2009, Dorsey sent a request for additional records to the Terre Haute, Indiana, SSA office requesting those records that appeared to be missing from Mr. Webster's SSA file, including documents enumerated on the "List of Exhibits" of Bruce Webster's SSA records but which were not received on February 9, 2009. Dorsey also enclosed a newly-signed Consent for Release of Information, dated November 17, 2009.  True and correct copies of this correspondence  are attached hereto as Exhibit F.

12.     On December 4, 2009, I telephoned the Terre Haute, Indiana, SSA office and spoke to the representative assigned to Mr. Webster's request.    The representative informed me that they had mailed a formal written response to our request stating that there were no other records in Bruce Webster's file.  The representative also told me that the records that Dorsey specifically requested had been destroyed.  When I asked the representative whether the SSA kept any list of other people who had requested Bruce Webster's file, like a chain of custody, he explained that while the Social Security Administration had begun to track records requests electronically, any previous request for Mr. Webster's records would have predated that practice.

4

13.     On December 7, 2009, Dorsey received a letter from the Terre Haute, Indiana, SSA office stating Mr. Webster's folder had been destroyed.  A true and correct copy of this letter is attached as Exhibit G.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.


Dated:  October 10, 2012

s/Kristen K. LeRoux_____
Kristen K. LeRoux

5

# LeRoux Declaration Ex. A

03/04/1996  23:50    8173353500              LARRY MOORE ATTORNEY                PAGE  01

LAW OFFICE OF

# LARRY M. MOORE
1112-A EAST FIRST STREET
FORT WORTH, TEXAS 76102

BOARD CERTIFIED-CRIMINAL LAW                     OFFICE:  (817) 338-4800
TEXAS BOARD OF LEGAL SPECIALIZATION              FAX NO: (817) 335-3500

# FAX TRANSMITTAL SHEET



DATE: __3-5-96__    FAX NO. ( 501 ) __535-5381__

TO: __Mr. Hal West, SS Admin. Office__

FROM: __Kim Whitehead, Paralegal__

RE: __Bruce Webster__

PAGES (INCLUDING COVER SHEET): __4__

comments: _____

_____

_____

_____

THE INFORMATION CONTAINED IN AND TRANSMITTED IN THIS FACSIMILE IS ATTORNEY/CLIENT
PRIVILEGE AND IT IS INTENDED FOR THE INDIVIDUAL OR ENTITY DESIGNATED ABOVE.  YOU ARE HEREBY
NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, COPYING OR USE OF OR RELIANCE UPON THE
INFORMATION CONTAINED IN AND TRANSMITTED WITH THIS FACSIMILE BY OR TO ANYONE OTHER THAN
THE RECIPIENT DESIGNATED IS UNAUTHORIZED AND STRICTLY PROHIBITED.  IF YOU RECEIVE THIS FACSIMILE
IN ERROR, PLEASE NOTIFY LARRY M. MOORE BY TELEPHONE (817) 338-4800 IMMEDIATELY.   ANY FACSIMILE
ERRONEOUSLY TRANSMITTED TO YOU SHOULD BE IMMEDIATELY RETURNED TO THE SENDER BY US MAIL, OR
IF AUTHORIZATION IS GRANTED BY THE SENDER, DESTROYED.

PAGE ONE

**EXHIBIT A**

03/04/1996  23:50    8173353500              LARRY MOORE ATTORNEY                    PAGE  02

LAW OFFICE OF

## LARRY M. MOORE
1112-A EAST FIRST STREET
FORT WORTH, TEXAS 76102

BOARD CERTIFIED · CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION                February 29, 1996                          TELEPHONE
STATE BAR OF TEXAS                                                                            (817) 338-4800
                                                                                             FAX (817) 335-3500

Mr. Hal West
Social Security Administration Office
Pine Bluff District Office

                    RE:    BRUCE WEBSTER
                           DOB     -73
                           SS#     -9579        **REDACTED**

Dear Mr. West:

        Thank you for visiting with me regarding the above Defendant. As you requested I
have enclosed a copy of a Business Records Authorization and Release and a Business
Records Affidavit.   It is my understanding that Mr. Webster applied for disability in 1992 and
some testing was done.  He did not receive any disability payments.   For purposes of trial,
we will need to obtain any information relating to his disability claim.

        Mr. J.W. Strickland, of L. Michael Connelley and Associates, will be in Pine Bluff  on
March 1st through 5th, 1996.   He will have in his possession the original authorization signed
by Mr. Webster for your files.   The Business Records Affidavit will need to be filed out when
Mr. Strickland picks up the records.  This Affidavit will keep someone from your office from
having to come to Fort Worth to testify that these records are true and correct copies of the
records in your files.

        Please contact me if you have any questions, or if you require anything further in this
regard.

                                                Sincerely,

                                                *Kimberly Whitehead*

                                                KIMBERLY J. WHITEHEAD,
                                                Legal Assistant to Larry M. Moore

kw/
Faxed
Enclosures

03/04/1996 23:50 8173353500 LARRY MOORE ATTORNEY PAGE 03

## BUSINESS RECORDS AUTHORIZATION & RELEASE

TO: Mr. Hal West
U.S. Social Security Administration
Pine Bluff District Office

DATE: 8/3/96

**REDACTED**

I, BRUCE C. WEBSTER, (SSN: -9579, DOB -73 B/M) hereby request and authorize you to furnish to LARRY M. MOORE, Attorney at Law, or any representative thereof, any and all information and records that you may have in your possession concerning BRUCE C. WEBSTER, with respect to any applications for benefits made for, or on behalf, of BRUCE C. WEBSTER; any testing or examinations of any kind or character done in connection with such applications for benefits; any review eligibility for benefits that may have been done; any benefits approved or disapproved in regard to such applications; and any and all other records of any kind and character that may have been obtained in connection with any application for benefits made by, or on behalf of, this individual; or any other records in your possession pertaining to this individual. I further hereby authorize and request that you discuss any and all such matters with LARRY M. MOORE, my attorney, or any of his representatives.

A photostat copy of this authorization shall be considered as effective and valid as the original.

_____
Bruce C. Webster, Affiant

_____
Address

_____
Witness

S.App.564

03/04/1996 23:50 8173353500 LARRY MOORE ATTORNEY PAGE 04

NO._____

STATE OF TEXAS                                    *

    V.                                              *

BRUCE C. WEBSTER                               *

## BUSINESS RECORDS AFFIDAVIT

Before me, the undersigned authority, on this day personally appeared _____, who, being by me duly sown, deposed and said as follows:

My name is _____; I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am currently employed in the position of _____ for the U.S. Social Security administration Office in Pine Bluff, Ark. Among my duties in regard to my employment, I am the custodian of the records for the U.S. Social Security Administration Office In Pine Bluff, Ark. Attached to this affidavit are _____ pages of records from U.S. Social security Administration Office in Pine Bluff, Ark. These records are kept by the U.S. Social Security Administration Office in Pine Bluff, Ark. In the regular course of business; and it was the regular course of business of the U.S. Social Security administration Office in Pine Bluff, Ark., for an employee or representative of the U.S .Social Security administration Office in Pine Bluff, Ark., with knowledge of the act, event, condition, opinion or diagnosis recorded, to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The attached records hereto are the original records or exact duplicates of the original records as they appear in the files of the U.S. Social Security Administration Office in Pine Bluff, Ark.

_____
Affiant

SWORN and SUBSCRIBED TO BEFORE ME, on this the _____ day of March, 1996.

_____
Notary Public, State of Arkansas
Notary's Printed Name: _____

# LeRoux Declaration Ex. B



**DORSEY**
DORSEY & WHITNEY LLP

KATHERINE E. SLAIKEU
Paralegal
(612) 492-6615
FAX (612) 340-2868
slaikeu.katherine@dorsey.com

October 27, 2008

Social Security Administration
3511 Market Street
Pine Bluff, AR 71601

        Re:    Bruce Webster
              DOB      1973
              SSN:     9579    **REDACTED**

Dear Records Administrator:

    Dorsey & Whitney LLP is representing Bruce Webster in a criminal proceeding. I am writing to request any and all records pertaining to Mr. Webster. I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

    Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of these records would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

    Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

                    Sincerely,

                    Katherine E. Slaikeu

KES:kjs
Enclosure

cc:    Gretchen Agee, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 612.340.2600 • **F** 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA   CANADA   EUROPE   ASIA

4827-0056-8579\1

**EXHIBIT B**

S.App.567

## AUTHORIZATION FOR RELEASE OF
## CONFIDENTIAL INFORMATION AND RECORDS

To:   Social Security Administration, 3511 Market Street, Pine Bluff, AR 71601

Date:   10/27/08

I,   BRUCE CARNEIL WEBSTER                              , by this release or a copy
and/or facsimile thereof, authorize and request you to release to:

Steven J. Wells, Esq.
Dorsey & Whitney LLP.
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(Phone) 612-340-7809
(Fax)    612-340-2807

or his designated agent(s), any and all information and/or records relating to me and/or my
deceased family members, including (but not limited to) birth, death and marriage, law
enforcement, jail and prison (including classification and custody, psychological/medical,
disciplinary, parole and probation, counseling, correspondence, etc.), academic, adoption,
social service, juvenile, employment including Social Security Administration, judicial,
psychological, psychiatric, medical, including nurse notes, physician notes, progress
reports, ward notes, films, reports, charts, HIV status and information, invoices for
services, discharge summaries and emergency room records, raw data, test scores and
notes, drug treatment, drug and alcohol rehabilitation programs, employment, child
custody and marriage records, files prepared in connection with prior civil or criminal
litigation, as well as any other records whatsoever, including those normally deemed
confidential. I specifically request that you release all records pertaining to _____
_____. You are specifically authorized to photocopy and certify these records
and to release copies to the above mentioned investigators and attorney.

In consideration of this disclosure of otherwise confidential information, I hereby
release you (in your individual and/or institutional capacity) from any and all liability
arising from such disclosure to these designated parties.

These records and this information will be used as background social history
information in pending court proceedings. It will not be re-disclosed. I understand that at
any time, I have the right to revoke this authorization in writing. I have received a copy of
this signed authorization for my records. I have been informed that the disclosure of this
information will not result in the direct or indirect remuneration of any health care
provider.    This authorization expires on    NEVER            .

Signed: _Bruce Webster_

Date of Birth: _____, 1973

Social Security No. _____ 9579

**REDACTED**

# LeRoux Declaration Ex. C


**DORSEY**
DORSEY & WHITNEY LLP

GRETCHEN A. AGEE
(612) 492-6741
FAX (612) 395-5460
AGEE.GRETCHEN@DORSEY.COM

December 15, 2008

Social Security Administration
3511 Market Street
Pine Bluff, AR 71601

　　　Re:　Bruce Webster
　　　　　DOB:　　73
　　　　　SS#:　　　　9579　　**REDACTED**

Dear Records Administrator:

　　　I am writing to request any and all records pertaining to Bruce Webster. I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

　　　Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of these records would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

　　　Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　*Gretchen A. Agee*

　　　　　　　　　　　　Gretchen A. Agee

GAA:kjs
Enclosure

cc:　　Steve Wells, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 612.340.2600 • **F** 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA   CANADA   EUROPE   ASIA

4851-4041-4979\1

**EXHIBIT C**

December 15, 2008
Page 2


bcc:    Kristen LeRoux

12/09/2008 14:28 FAX 6123408800          DORSEY & WHITNEY LLP                    ☐004/004

**Social Security Administration**                                  Form Approved
**Consent for Release of Information**                              OMB No. 0960-0566

## TO: Social Security Administration

**REDACTED**

BRUCE WEBSTER _____     ___73____     __-9579____
          Name                        Date of Birth        Social Security Number

I authorize the Social Security Administration to release information or records about
me to:

          NAME                                         ADDRESS
GRETCHEN AGEE _____

DORSEY & WHITNEY LLP _____      50 SOUTH SIXTH STREET #1500 _____

_____          MINNEAPOLIS, MN 55402 _____

_____          _____

I want this information released because:
I need it for a clemency proceeding
_____

_____

(There may be a charge for releasing information.)

Please release the following information:

__XX__   Social Security Number
__XX__   Identifying information (includes date and place of birth, parents' names)
__XX__   Monthly Social Security benefit amount
__XX__   Monthly Supplemental Security Income payment amount
__XX__   Information about benefits/payments I received from_ANY TIME_ to _____
__XX__   Information about my Medicare claim/coverage from_ANY TIME_ to _____
         (specify) _____
__xx__   Medical records
__XX__   Record(s) from my file (specify) _ANY AND ALL_____

_____

_____   Other (specify) _____

I am the individual to whom the information/record applies or that person's
parent (if a minor) or legal guardian. I know that if I make any representation
which I know is false to obtain information from Social Security records, I could
be punished by a fine or imprisonment or both.

Signature: _Bruce Webster_____
(Show signatures, names, and addresses of two people if signed by mark.)
Date: _12-10-08_____     Relationship: _____

Form SSA-3288 (5-2007) EF (5-2007)

# LeRoux Declaration Ex. D

\



**KRISTEN K. LEROUX**
Paralegal and Case Assistant Manager
(612) 340-2790
FAX (612) 340-8800
leroux.kristen@dorsey.com

October 8, 2009

**VIA FACSIMILE**

Lisa Ruth
Social Security Administration
3511 Market Street
Pine Bluff, AR 71601
*Facsimile: 870-535-5381*

      Re:    Bruce Webster
            DOB      73          **REDACTED**
            SS#:      -9579

Dear Ms. Ruth:

      We are writing to request documents pertaining to Bruce Webster. We requested records on December 15, 2008 (copy attached) and received documents on February 9, 2009 but upon reviewing those documents, we note that we did not receive some of the records referenced in the file:

      The "List of Exhibits" (copy attached) lists the following documents by exhibit number that we did not receive:

      1.      Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93)
      3.      Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93)
      4.      Disability Determination by State Agency, Title II, dated 2/3/94, with attachment
      5.      Disability Determination by State Agency, Title XVI, dated 2/3/94
      7.      Supplemental Security Income Notice, dated 2/8/94
      9.      Disability Determination by State Agency, Title II, dated 3/29/94, with attachments
      10.      Disability Determination by State Agency, Title XVI, dated 3/29/94, with attachments
      14.      Earnings Record and DEQY, dated 9/13/94

We received exhibit 12, the Social Security Notice of Reconsideration, dated April 5, 1994 but we note that the second to last sentence in the first paragraph states, "Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it," (copy attached). We did not receive this attachment and request it now.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • T 612.340.2600 • F 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA   CANADA   EUROPE   ASIA-PACIFIC

**EXHIBIT D**

( )) DORSEY

October 8, 2009
Page 2

Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of this record would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

Sincerely,

Kristen K. LeRoux

KKL:kjm

cc: Steven Wells, Esq. (w/enc.)

4830-7888-9220\1 10/8/2009 2:44 PM

DORSEY & WHITNEY LLP

12/09/2008  14:28 FAX  6123408817          DORSEY & WHITNEY LLP                    @004/004

**Social Security Administration**
**Consent for Release of Information**

Form Approved
OMB No. 0960-0566

TO:  Social Security Administration                              **REDACTED**

BRUCE WEBSTER _____   _____   ___73___   _____   ___-9579___
             Name                        Date of Birth       Social Security Number

I authorize the Social Security Administration to release information or records about me to:

NAME                                        ADDRESS

GRETCHEN AGEE _____          _____

DORSEY & WHITNEY LLP _____          _50 SOUTH SIXTH STREET #1500_____

_____          _MINNEAPOLIS, MN 55402_____

I want this information released because:
I need it for a clemency proceeding

(There may be a charge for releasing information.)

Please release the following information:

XX___  Social Security Number
XX___  Identifying information (includes date and place of birth, parents' names)
XX___  Monthly Social Security benefit amount
XX___  Monthly Supplemental Security Income payment amount
XX___  Information about benefits/payments I received from_ANY TIME_ to_____
XX___  Information about my Medicare claim/coverage from_ANY TIME_ to_____
       (specify)_____
XX___  Medical records
XX___  Record(s) from my file (specify)  ANY AND ALL._____

_____  Other (specify)_____

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian. I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: _Bruce Webster_____
(Show signatures, names, and addresses of two people if signed by mark.)
Date: _12-10-08_____  Relationship:_____

Form SSA-3288  (5-2007) EF (5-2007)

## LIST OF EXHIBITS

| Bruce C. Webster | -9579 |
|---|---|
| (Claimant) | (Social Security Number) |

| Willie L. Webster     -5523 | **REDACTED** |
|---|---|

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94,with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration - Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

## LIST OF EXHIBITS

Page 2

Bruce C. Webster                                                                  ·9579
      (Claimant)                                    (Social Security Number)

Willie L. Webster          5523                                        **REDACTED**

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

# Social Security
# Notice of Reconsideration

From:   Department of Health and Human Services
        Social Security Administration

Bruce C. Webster                           Date:              APR   5 1994
5219 Hepburn
Pine Bluff, AR   71603                      Claim Number        -5523     **REDACTED**

                                           Claim for
                                           ☐   Disability Insurance Benefits
                                           ☐   Disabled Widow, Widower Benefits
                                           ☒ˣ  Childhood Disability Benefits
                                           ☐   Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759
**Important: See other side for additional information.** ▶          EXHIBIT NO. __11__ (2 )PAGES

                                                              Form SSA-L928-U2 (2-90)

# LeRoux Declaration Ex. E

RECEIVED OCT 2 6 2009



SOCIAL SECURITY
3511 Market St
Pine Bluff, AR 71601
866-563-9693

October 22, 2009

Dorsey & Whitney LLP
Gretchen Agee
50 South 6th St. #1500
Minneapolis, MN  55402

Dear Sir/Madam:

We are returning your request for a copy of our records because the consent you provided does not meet our requirements. It is a blanket request and our office does not service the area that the claimant lives in.

The Social Security field office is staffed to assist the local population base. Each office services a certain number of zip codes and is to assist individuals and third party requesters in that office's designated service area.

Please visit our website at www.socialsecurity.gov and click on Find a Social Security Office. Enter the zip code of your client. This is the office you request should be sent.

The Privacy Act and the Social Security Administration's privacy rules and regulations require that in order for us to release information from a record, we must have a completed, signed and dated, proper consent by the claimant.

Federal statutes and regulations prohibit the Social Security Administration (SSA) from disclosing the contents of its records in the absence of proper written consent from the individual whose records are being requested. See 5 U.S.C. §552 (b)(6); 5 U.S.C. §552a(b); 42 U.S.C. §1306; 20 C.F.R. §401.100 et. seq. A proper consent must:

- Be directed **specifically** to the **Social Security Administration**;
- **Specify** the records that may be disclosed;
- **Specify** to whom the disclosure may be made, and the **length of time** the consent is effective; and
- Be **signed** and **dated** by the individual.

**EXHIBIT E**

S.App.581

In addition, the consent must be received by SSA within 60 days of signing for tax return information, 90 days for medical information, and 1 year for all other information. **We do not honor requests for all records, all information, or similar blanket requests**. The consent must describe the specific records or information to be disclosed.

If you wish, you can also obtain a copy of our consent form (Form SSA-3288) by visiting our website at http://www.ssa.gov. Click the icon entitled "Forms," then click the icon on the next page entitled "Other Forms." From there, you can scroll down to "Form SSA-3288 Consent to Release Information." Once an appropriate consent and request for records are received, we will request the folder, make the copies of the requested items and notify you when the file is ready to be picked up.

12/09/2008  14:28 FAX  6123408800       DORSEY & WHITNEY LLP                                    ⌀ 004/004

Form Approved
OMB No. 0960-0566

**Social Security Administration**
**Consent for Release of Information**

TO:  Social Security Administration                                         **REDACTED**

BRUCE WEBSTER                          73                    -9579
_____        _____        _____
        Name                      Date of Birth        Social Security Number

I authorize the Social Security Administration to release information or records about me to:

| NAME | ADDRESS |
|---|---|
| GRETCHEN AGEE | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
| | MINNEAPOLIS, MN 55402 |

I want this information released because:
I need it for a clemency proceeding

(There may be a charge for releasing information.)

Please release the following information:

XX__ Social Security Number
XX__ Identifying information (includes date and place of birth, parents' names)
XX__ Monthly Social Security benefit amount
XX__ Monthly Supplemental Security Income payment amount
XX__ Information about benefits/payments I received from ANY TIME to _____
XX__ Information about my Medicare claim/coverage from ANY TIME to _____
        (specify) _____
XX__ Medical records
XX__ Record(s) from my file (specify) ANY AND ALL_____

____ Other (specify) _____

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian. I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: Bruce Webster _____
(Show signatures, names, and addresses of two people if signed by mark.)
Date: 12-10-08 _____ Relationship: _____

Form SSA-3288  (5-2007) EF (5-2007)

# LeRoux Declaration Ex. F



**DORSEY™**
DORSEY & WHITNEY LLP

OLIVER MCKINSTRY
(612) 492-6785
FAX (612) 340-8800
MCKINSTRY.OLIVER@DORSEY.COM

November 23, 2009

***VIA US MAIL***
Social Security Administration
222 Cherry Street
Terre Haute, IN 47808

      Re:   Bruce Webster
            DOB    73     **REDACTED**
            SS#:    9579

Dear Records Administrator:

      I am writing to request records pertaining to Bruce Webster. I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

      Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of these records would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

      Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

                        Sincerely,

                        Oliver McKinstry

Enclosure

cc:   Steve Wells, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 612.340.2600 • **F** 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA  CANADA  EUROPE  ASIA-PACIFIC

**EXHIBIT F**

Form Approved
OMB No. 0960-0566

**Social Security Administration**
Consent for Release of Information

**TO:**  Social Security Administration

**REDACTED**

| BRUCE WEBSTER | 73 | -9579 |
|---|---|---|
| Name | Date of Birth | Social Security Number |

I authorize the Social Security Administration to release information or records about me to:

| NAME | ADDRESS |
|---|---|
| OLIVER MC KINSTRY | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET  #1500 |
| | MINNEAPOLIS, MN  55402 |

I want this information released because:
I need it for my legal proceedings.   This consent is good for

one year.
(There may be a charge for releasing information.)

Please release the following information:

__XX__  Social Security Number
__XX__  Identifying information (includes date and place of birth, parents' names)
__XX__  Monthly Social Security benefit amount
__XX__  Monthly Supplemental Security Income payment amount
__XX__  Information about benefits/payments I received from__1993__ to__1996__
__XX__  Information about my Medicare claim/coverage from__1993__ to__1996__
        (specify)_____
__XX__  Medical records
__XX__  Record(s) from my file (specify) SEE ATTACHED LIST

_____  Other (specify) _____

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian. I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: *Bruce Webster*
(Show signatures, names, and addresses of two people if signed by mark.)
Date:__11-17-09__      Relationship:_____

Form SSA-3288  (5-2007) EF (5-2007)

List of Requested Documents on Consent for Release of Information for

    Bruce Webster
    DOB    73
    SS#:    9579    **REDACTED**

I.    I request release of the following documents from the attached "List of Exhibits," contained in my records:

    1.    Leads/Protective Filing Worksheet
        (showing Protective Filing Dale of 9/9/93)
    3.    Application for Supplemental Security Income, filed 10/4/93
        (with Protective Filing Date of 9/9/93)
    4.    Disability Determination by State Agency, Title II, dated 2/3/94,
        with attachment
    5.    Disability Determination by State Agency, Title XVI, dated 2/3/94
    7.    Supplemental Security Income Notice, dated 2/8/94
    9.    Disability Determination by State Agency, Title II, dated 3/29/94,
        with attachments
    10.    Disability Determination by State Agency, Title XVI, dated 3/29/94,
        with attachments
    14.    Earnings Record and DEQY, dated 9/13/94.

II.    I also request release of the explanation of the April 5, 1994 decision made regarding my claim and described in the attached Social Security Notice of Reconsideration. (*See* first paragraph, second to last sentence: "Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it.")

## LIST OF EXHIBITS

Bruce C. Webster                                              -9579
_____              _____
              (Claimant)                                  (Social Security Number)

Willie L. Webster          -5523                      **REDACTED**
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94, with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration – Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

**LIST OF EXHIBITS**                                                    Page 2

Bruce C. Webster                                              -9579
_____                    _____
            (Claimant)                                    (Social Security Number)

Willie L. Webster          -5523                          **REDACTED**
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

# Social Security
# Notice of Reconsideration

From:   Department of Health and Human Services
        Social Security Administration

Bruce C. Webster
5219 Hepburn
Pine Bluff, AR   71603

Date:                    APR   5 1994

Claim Number:            -5523
                                        **REDACTED**

Claim for
☐   Disability Insurance Benefits
☐   Disabled Widow, Widower Benefits
☒ᵡ Childhood Disability Benefits
☐   Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759

**Important: See other side for additional information. ▶**

EXHIBIT NO. _11_ (_2_) PAGES

Form SSA-L928-U2 (2-90)

# LeRoux Declaration Ex. G

Social Security Administration
Important Information

SOCIAL SECURITY
222 CHERRY STREET
TERRE HAUTE, IN 47807-2932
Claim Number:          9579
December 04, 2009
SR2                               **REDACTED**

DORSEY & WHITNEY LLP
ATTN:OLIVER MCKINSTRY
50 SOUTH SIXTH STREET
SUITE 1500
MINNEAPOLIS, MN 55402-1498

DEC 0 7 2009

Dear OLIVER MCKINSTRY

Please call if any questions our office before December 18, 2009 and ask for any service representatives. The telephone number is 812-232-4909,EXT.205. We need to talk to you about:

You requested information about Bruce Webster. Our record showed that his folder has been destroyed and the last benefit stop in May of 1991. We can tell you that his name, date of birth and his social security number does match our records. If you have any questions feel free to call us.

When you call our office, please have this letter with you. It will help us to serve you more quickly.

*Brian Hewitt*
Brian Hewitt
Field Office Manager

**EXHIBIT G**



DORSEY & WHITNEY LLP

2009 NOV 25  AM 10: 27

TERRE HAUTE, IN.
51458 SSA OFFICE

OLIVER MCKINSTRY
(612) 492-6785
FAX (612) 340-8800
MCKINSTRY.OLIVER@DORSEY.COM

November 23, 2009

**VIA US MAIL**
Social Security Administration
222 Cherry Street
Terre Haute, IN  47808

Re:   Bruce Webster
      DOB:        73
      SS#:          9579        **REDACTED**

Dear Records Administrator:

I am writing to request records pertaining to Bruce Webster.  I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

Mr. Webster is currently on death row and faces an execution date.  Any efforts your office could make to expedite the return of these records would be greatly appreciated.  All costs incurred will be paid promptly upon billing or notice of billing.

Thank you very much for your time and attention.  Please feel free to contact me at the number and email address listed above if you have any questions.

Sincerely,

Oliver McKinstry

Enclosure

cc:   Steve Wells, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • T  612.340.2600 • F  612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA   CANADA   EUROPE   ASIA-PACIFIC

Form Approved
OMB No. 0960-0566

**Social Security Administration**
Consent for Release of Information

**TO:** Social Security Administration

**REDACTED**

| BRUCE WEBSTER | 73 | -9579 |
|---|---|---|
| Name | Date of Birth | Social Security Number |

I authorize the Social Security Administration to release information or records about me to:

| NAME | ADDRESS |
|---|---|
| OLIVER MC KINSTRY | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
| | MINNEAPOLIS, MN 55402 |

I want this information released because:
I need it for my legal proceedings. This consent is good for

one year.
(There may be a charge for releasing information.)

Please release the following information:

XX   Social Security Number
XX   Identifying information (includes date and place of birth, parents' names)
XX   Monthly Social Security benefit amount
XX   Monthly Supplemental Security Income payment amount
XX   Information about benefits/payments I received from__1993__ to 1996
XX   Information about my Medicare claim/coverage from__1993__ to 1996
     (specify)_____
XX   Medical records
XX   Record(s) from my file (specify) SEE ATTACHED LIST

_____   Other (specify) _____

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian. I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: Bruce Webster
(Show signatures, names, and addresses of two people if signed by mark.)
Date: 11-17-09        Relationship: _____

Form SSA-3288 (5-2007) EF (5-2007)

List of Requested Documents on Consent for Release of Information for

Bruce Webster
DOB:        73
SS#:              9579        **REDACTED**

I.      I request release of the following documents from the attached "List of Exhibits," contained in my records:

    1.      Leads/Protective Filing Worksheet
(showing Protective Filing Dale of 9/9/93)

    3.      Application for Supplemental Security Income, filed 10/4/93
(with Protective Filing Date of 9/9/93)

    4.      Disability Determination by State Agency, Title II, dated 2/3/94, with attachment

    5.      Disability Determination by State Agency, Title XVI, dated 2/3/94

    7.      Supplemental Security Income Notice, dated 2/8/94

    9.      Disability Determination by State Agency, Title II, dated 3/29/94, with attachments

    10.     Disability Determination by State Agency, Title XVI, dated 3/29/94, with attachments

    14.     Earnings Record and DEQY, dated 9/13/94.

II.     I also request release of the explanation of the April 5, 1994 decision made regarding my claim and described in the attached Social Security Notice of Reconsideration. (*See* first paragraph, second to last sentence: "Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it.")

## LIST OF EXHIBITS

| Bruce C. Webster | -9579 |
|---|---|
| (Claimant) | (Social Security Number) |

Willie L. Webster    5523          **REDACTED**

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94, with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration – Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

**LIST OF EXHIBITS**                                           Page 2

Bruce C. Webster                                      -9579
_____      _____
            (Claimant)                              (Social Security Number)

Willie L. Webster          -5523                     **REDACTED**
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form **HA-540-U6** (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

# Social Security
# Notice of Reconsideration

From:   Department of Health and Human Services
        Social Security Administration

Bruce C. Webster
5219 Hepburn
Pine Bluff, AR  71603

Date:                    APR   5 1994

Claim Number:        5523  **REDACTED**

Claim for
☐  Disability Insurance Benefits
☐  Disabled Widow, Widower Benefits
☒ᵡ Childhood Disability Benefits
☐  Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759
**Important: See other side for additional information. ▶**

EXHIBIT NO. _____11_____ (2—)PAGES

Form SSA-L928-U2 (2-90)

# CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2014, I electronically filed the foregoing Separate Appendix (Volumes I, II and III) with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> James Wesley Hendrix, Esq.
> Office of the U.S. Attorney
> Northern District of Texas
> 1100 Commerce Street, Suite 300
> Dallas, TX 75242-1699
> 214-659-8684
> Email: wes.hendrix@usdoj.gov

Pursuant to ECF Procedure (h)(2) and Fed. R. App. P. 30(a)(3), and upon notice of this Court's acceptance of the electronic appendix for filing, I certify that I will cause 10 copies of the foregoing to be transmitted to the Court within 7 days of that notice date.

Dated: February 18, 2014

DORSEY & WHITNEY LLP

By  s/ Kirsten E. Schubert
Kirsten E. Schubert
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorney for Petitioner-Appellant Bruce Carneil Webster*