# 14-1049

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

**BRUCE CARNEIL WEBSTER,**
Petitioner-Appellant

v.

**JOHN F. CARAWAY, Warden**
Respondent-Appellee

---

On Appeal from the United States District Court
For the Southern District of Indiana, Terre Haute Division
District Court No. 2:12-cv-086-WTL-WGH
The Honorable Judge William T. Lawrence

---

**BRIEF FOR THE RESPONDENT-APPELLEE
JOHN F. CARAWAY, Warden**

---

Joseph H. Hogsett
United States Attorney

Wes Hendrix
Special Assistant U.S. Attorney
Texas Bar No. 24041086
10 West Market Street, Suite 2100
Indianapolis, Indiana  46204-3048
Telephone:  214.659.8600
wes.hendrix@usdoj.gov

Attorneys for Appellee

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES.................................................................iv

I.      JURISDICTIONAL STATEMENT............................................. 1

II.     STATEMENT OF THE ISSUES............................................... 2

III.    STATEMENT OF THE CASE ................................................. 3

      A.      Webster kidnaps, rapes, and beats Lisa Rene, a sixteen-year-old girl, and then buries her, likely while she is still alive .................................................. 4

      B.      After a heavily contested sentencing hearing, the jury recommends a death sentence, and the district court concludes that Webster is not mentally retarded ...........................................8

      C.      Webster challenges the district court's finding that he is not mentally retarded on direct appeal, but the Fifth Circuit affirms.............................................. 14

      D.      In his section 2255 motion, Webster again argues that he is mentally retarded and ineligible for the death penalty, but the district court and Fifth Circuit disagree......................................................... 15

      E.      Webster unsuccessfully seeks permission for a successive 2255 motion based on allegedly new evidence of mental retardation................................................................ 18

      F.      Webster seeks a writ of habeas corpus based on "new" evidence, but the district court below concludes that he does not meet section 2241's prerequisites ...... 22

IV.   SUMMARY OF THE ARGUMENT ...................................... 27

V.    ARGUMENT ................................................................ 29

    A.   Webster cannot seek habeas corpus relief because he has failed to carry his burden of showing that section 2255 was "inadequate or ineffective." ............... 29

        1.   Standard of Review ............................................ 29

        2.   To qualify for habeas relief, Webster must satisfy this Court's *Davenport* standards .............. 29

        3.   Webster satisfies none of *Davenport's* requirements ...................................................... 35

            i.    Webster does not rely on a statutory-interpretation case or a retroactive decision, nor can he show a miscarriage of justice ................................................... 35

            ii.   A structural problem with 2255 does not result from reliance on evidence that is not newly discovered and is largely cumulative .............................................. 38

            iii.  Section 2255 is not inadequate simply because it limits certain successive petitions ............. 42

            iv.   Webster's claim is unlike the narrow band of cases that satisfies the savings clause ......... 44

        4.   Webster's argument is inconsistent with the purpose and function of the savings clause .......... 47

    B.   Even if Webster could present his "new" evidence in a section 2241 proceeding, it would be of no avail because it does not undermine the trial evidence . 50

ii

1.      Standard of Review ............................................ 50

2.      Webster fails to establish—by clear and convincing
        evidence and viewed in light
        of the evidence as a whole—that no
        reasonable factfinder could find him not mentally
        retarded ................................................................. 51

C.    Affirming the district court's judgment would
      not result in an unconstitutional suspension of
      the writ .................................................................... 60

1.      Standard of Review ............................................ 60

2.      This Court has held the Suspension Clause
        to be inapplicable in collateral review proceedings 60

VI.    CONCLUSION ................................................................ 62

VII.   CERTIFICATE OD COMPLIANCE IN ACCORDANCE WITH
       FED. R. APP. P. 32(a)(7)(C) .............................................. 63

VIII.  CERTIFICATE OF SERVICE ............................................ 64

iii

## TABLE OF AUTHORITIES

**Federal Cases**                                              **Page(s)**

*Atkins v. Virginia,* 536 U.S. 304 (2002) ........................... 15, 36, 52

*Benefiel v. Davis,* 403 F.3d 825 (7th Cir. 2005)......................... 61

*Brown v. Caraway,* 719 F.3d 583 (7th Cir. 2013) .............. 34-37, 46

*Burns v. Orthotek, Inc. Employees' Pension Plan & Trust,*
  657 F.3d 571 (7th Cir. 2011) .................................................. 51

*Davis v. United States,* 417 U.S. 333 (1974)................................. 31

*Ford v. Wainwright,* 477 U.S. 399 (1986) ...................................... 49

*Garza v. Lappin,* 253 F.3d 918 (7th Cir. 2001).................. 43, 45-46

*Harbison v. Bell,* 129 S. Ct. 1481 (2009) ...................................... 50

*Herrera v. Collins,* 506 U.S. 390 (1993)........................................ 50

*Hill v. Werlinger,* 695 F.3d 644 (7th Cir. 2012)............................ 29

*Hope v. United States,* 108 F.3d 119 (7th Cir. 1997) ................... 46

*In re Davenport,* 147 F.3d 605 (7th Cir. 1998).................. 33-34, 38

*In re Webster,* 605 F.3d 256 (5th Cir. 2010) ("*Webster V*")...... 18, 19

*Lindh v. Murphy,* 96 F.3d 856 (7th Cir. 1996) (en banc),
  *rev'd on other grounds,* 521 U.S. 320 (1997) ................. 29, 60, 61

*McQuiggin v. Perkins,* 133 S. Ct. 1924 (2013) ............................ 60

*Moore v. Olson,* 368 F.3d 757 (7th Cir. 2004)................................. 1

*Morales v. Bezy,* 499 F.3d 668 (5th Cir. 2007) ...................... 60-61

**Federal Cases, . . . con't** **Page(s)**

*Morris v. Dretke,* 413 F.3d 484 (5th Cir. 2005) ............................ 52

*Panetti v. Quarterman,* 551 U.S. 930 (2007) ................................ 49

*Peoples v. United States,* 403 F.3d 844 (7th Cir. 2005) ................. 32

*Roper v. Simmons,* 543 U.S. 551 (2005) ...................................... 48

*Rumsfeld v. Padilla,* 542 U.S. 426 (2004) ..................................... 30

*Sanders v. United States,* 373 U.S. 1 (1963) ......................... 32, 44

*Sawyer v. Whitley,* 505 U.S. 333 (1992) ................................ 23, 45

*Stewart v. United States,* 646 F.3d 856 (11th Cir. 2011) ............. 32

*Taylor v. Gilkey,* 314 F.3d 832 (7th Cir. 2002) ..................... *passim*

*Thompson v. Calderon,* 151 F.3d 918 (9th Cir. 1998) (en banc).... 21

*Tison v. Arizona,* 481 U.S. 137 (1987) ......................................... 48

*Tyler v. Cain,* 533 U.S. 656 (2001) .............................................. 32

*United States v. Addonizio,* 442 U.S. 178 (1979) ......................... 30

*United States v. Hayman,* 342 U.S. 205 (1952) ........................... 30

*United States v. Prevatte,* 300 F.3d 792 (7th Cir. 2002)............... 31

*United States v. Taylor,* 627 F.3d 674 (7th Cir. 2010) ................. 51

*United States v. Webster,* 392 F.3d 787 (5th Cir. 2004)............... 18

*United States v. Webster,* 421 F.3d 308 (5th Cir. 2005)
 ("*Webster III*").................................................................... *passim*

**Federal Cases, . . . con't**                                    **Page(s)**

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998)
("*Webster I*")............................................................ *passim*

*Unthank v. Jett*, 549 F.3d 534 (7th Cir. 2008)............................. 46

*Webster v. United States*, 131 S. Ct. 794 (2010)......................... 22

*Webster v. United States*, No. 00-CV-1646, 2003 WL 23109787,
(N.D. Tex. 2003) ("*Webster II*")........................................ *passim*

**Federal Statutes and Rules**

*Antiterrorism and Effective Death Penalty Act of 1996* (AEDPA),
Pub. L. No. 104-132, § 105, 110 Stat. 1220 ............................... 19

18 U.S.C. § 3591 ......................................................... 8

18 U.S.C. § 3591(a) ...................................................... 48

18 U.S.C. § 3591(a)(2) ................................................ 8, 48

18 U.S.C. § 3592(c) ...................................................... 8

18 U.S.C. § 3592(c)(6).................................................... 13

18 U.S.C. § 3592(c)(9).................................................... 13

18 U.S.C. § 3593(c) ...................................................... 8

18 U.S.C. § 3593(d) ...................................................... 8

18 U.S.C. § 3593(e) ...................................................... 8

18 U.S.C. § 3596(c) ........................................ 8, 13, 16, 19, 36

18 U.S.C. § 3599(e) ...................................................... 50

28 U.S.C. § 1291 ......................................................... 2

**Federal Statutes and Rules, . . . con't**                    **Page(s)**

28 U.S.C. § 1331 ................................................................ 1

28 U.S.C. § 2241 ......................................................... *passim*

28 U.S.C. § 2244(b) .......................................................... 44

28 U.S.C. § 2244(b)(3)(A) ................................................ 33

28 U.S.C. § 2244(b)(3)(C) ................................................ 33

28 U.S.C. § 2244(b)(3)(E) ................................................ 22

28 U.S.C. § 2254 ............................................................ 60

28 U.S.C. § 2255 ......................................................... *passim*

28 U.S.C. § 2255(a) ................................................... 30, 31

28 U.S.C. § 2255(e) ............................. 1, 31-32, 43-44

28 U.S.C. § 2255(h) ..................................................... *passim*

28 U.S.C. § 2255(h)(1) ................................................. *passim*

28 U.S.C. § 2255(h)(2) .................................................. 19

Fed. R. App. P. 4(a)(1)(B) ................................................ 1

# I.  JURISDICTIONAL STATEMENT

Petitioner-Appellant Bruce Webster's jurisdictional statement is not complete and correct.  Webster is appealing from the final judgment of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2241 and 28 U.S.C. § 2255(e), in which Webster challenged his sentence in a criminal case.  On November 13, 2013, the district court (Lawrence, J.) entered an order denying Webster's habeas corpus petition.  App.1-13.[1]  Final judgment was docketed on the same day, dismissing the petition with prejudice.  App.14.  On January 9, 2014, Webster filed a timely notice of appeal.  ROA.263-65; Fed. R. App. P. 4(a)(1)(B).

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because Webster's habeas petition presented a federal question.  *See Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004)

---

[1] "App." refers to the appendix attached to Webster's opening brief, and "S.App." refers to Webster's separate appendix.  For materials not included in these appendices, the government will cite to the record on appeal, "ROA."  Consistent with the conventions used in Webster's brief, the docket from the underlying federal criminal case (4:94-cr-121-Y) is cited as "N.D. Tex. Dkt.," while the docket from the current habeas corpus case (No. 2:12-cv-86-WTL-WGH) is cited as "Dkt."  Finally, references to the trial transcripts from the underlying criminal case are cited as "Tr.[Volume Number]:[Page Number]."

("Subject-matter jurisdiction . . . is supplied by 28 U.S.C. § 1331, as any claim under § 2241 entails a federal question."). This Court has jurisdiction under 28 U.S.C. § 1291.

## II.  STATEMENT OF THE ISSUES

A.    Webster seeks a writ of habeas corpus based on what he describes as new evidence supporting his repeatedly rejected claim of mental retardation.  But the parties thoroughly litigated the mental-retardation issue at trial, on direct appeal, during Webster's first section 2255 proceeding, and during Webster's attempt at a successive 2255 proceeding.  He could have, but did not, present the evidence he now claims to be so crucial at trial and in his first section 2255 motion.  Under these circumstances, has Webster failed to carry his burden of showing that section 2255 was "inadequate or ineffective," and, as a result, he is not entitled to seek habeas corpus relief?

B.    The evidence Webster wishes to present is largely cumulative of his trial evidence, and it does not rebut the government's substantial trial evidence undermining his mental-retardation claim.  Under these circumstances and assuming Webster could present this "new" evidence in a section 2241

2

proceeding, was his petition properly denied because he has not established by clear and convincing evidence that no reasonable fact-finder would have found that he was eligible for the death penalty.

     C.    This Court has held that the Suspension Clause does not apply in the section 2241 arena.  Does this binding precedent foreclose Webster's argument that affirming the district court's dismissal of his section 2241 petition would result in an unconstitutional suspension of the writ of habeas corpus?

## III.  STATEMENT OF THE CASE

Over the past seventeen years, Webster has contested his eligibility for the death penalty by claiming that he is mentally retarded.  As detailed below, he has seized every opportunity to assert this claim—at trial, on direct appeal, in a section 2255 motion, on appeal from the denial of that motion, and in a motion for authorization to file a successive 2255.  At every turn, the district court of conviction and the Fifth Circuit have rejected his claim, preserving the jury's recommendation of a death sentence and the district court's determination that Webster is not mentally retarded.

3

This appeal stems from Webster's latest attempt to prove his mental retardation.  This time, he claims that new evidence of mental retardation makes section 2255 inadequate and justifies a writ of habeas corpus under 28 U.S.C. § 2241.  The government, along with the district court below, disagrees.  The facts most pertinent to his argument are as follows.

### A.    Webster kidnaps, rapes, and beats Lisa Rene, a sixteen-year-old girl, and then buries her, likely while she is still alive.

The evidence at trial showed that, in 1994, Webster, Orlando Hall, and Marvin Holloway ran a marijuana trafficking operation in Pine Bluff, Arkansas.  *United States v. Webster*, 162 F.3d 308, 317 (5th Cir. 1998) ("*Webster I*").  They bought marijuana in the Dallas-Fort Worth area with the assistance of Steven Beckley, who transported it to Arkansas.  *Id.*  Hall and Beckley gave two Dallas drug dealers, Neil Rene and Stanfield Vitalis, $4,700 for marijuana to be delivered later.  *Id.* at 318.  Rene and Vitalis failed to appear with the marijuana and later claimed in a phone conversation that they had been robbed of the money and their car.  *Id.*  When Hall subsequently saw the two men enter the car that they claimed had

4

been stolen, he concluded that they had lied about being robbed. *Id.*

A few days later, on September 24, 1994, Webster, Beckley, Hall, and his brother Demetrius Hall, all dressed in camouflage clothing, drove to the apartment in Arlington, Texas, from which Rene and Vitalis had telephoned. *Id.*; ROA.113. Webster and Hall were armed with handguns, D. Hall carried a small baseball bat, and Beckley had duct tape and a jug of gasoline. *Webster I*, 162 F.3d at 318. Webster saw Rene's sixteen-year-old sister, Lisa, through a window and shouted to her that they were the FBI. *Id.*; ROA.114; Tr.18:110-12, 200, 257; Tr.19:116. After Lisa refused to let them inside and called the police, Webster forcibly entered the house, tackled her, and dragged her into the car. *Webster I*, 162 F.3d at 318. The group then changed cars; while they drove around looking for a secluded spot, with Webster in the front passenger seat and Beckley at the wheel, Hall raped Lisa in the back seat and forced her to perform oral sex on him. *Id.*

After dropping off Hall, the group drove to a motel in Pine Bluff. *Id.* En route, Webster and D. Hall took turns raping Lisa.

5

*Id.* At the motel, the group kept Lisa tied to a chair and continued to rape her. *Id.*

The next day, Hall and Holloway arrived at the motel, and Hall told Beckley, "She know too much." *Id.* Hall and Webster discussed methods of killing Lisa, and Webster said he knew plenty of places where they could kill her. ROA.115; Tr.20:125. Webster and Hall went to a park and dug a grave. *Webster I,* 162 F.3d at 318. They and Beckley took Lisa to the park that night, but returned when they could not find the gravesite in the dark. *Id.*

The next morning, Webster, Hall, and Beckley drove Lisa back to the park. *Id.* Webster and Hall led the way to the gravesite, while Beckley guided Lisa, masked, by the shoulders. *Id.* At the gravesite, Hall turned Lisa's back to the grave and placed a sheet over her head. *Id.* at 318-19. He then hit her in the head with a shovel. *Id.* at 319. She screamed and started running. *Id.* Beckley grabbed her and hit her twice more in the head with the shovel. *Id.* Webster and Hall then took turns with the shovel, beating Lisa into unconsciousness. *Id.* Webster proceeded to gag Lisa and drag her into the grave. *Id.* He stripped her, covered her naked body with gasoline, and shoveled dirt into the grave. *Id.* She was likely still

breathing at the time, and thus, she died after being buried alive.
*Id.*

When police arrested Webster, he was carrying a key to the motel room in which he and the others had held Lisa. *Id.* at 333; *Webster v. United States*, No. 00-CV-1646, 2003 WL 23109787, at *16 n.4 (N.D. Tex. 2003) ("*Webster II*"). He burned his clothes after the murder to destroy the evidence, but he later admitted his involvement in the crimes. *Webster II*, 2003 WL 23109787, at *13, *16 n.4; *Webster I*, 162 F.3d at 320-21 n.5; ROA.121. He led authorities to the gravesite and said that the murder was not personal, but "strictly business." *Webster I*, 162 F.3d at 320-21 n.5; *Webster II*, 2003 WL 23109787, at *16 n.4.

Before trial, the government provided notice of its intent to seek the death penalty on the kidnapping count. *Webster I*, 162 F.3d at 319. The jury found Webster guilty of kidnapping resulting in death, conspiring to commit kidnapping, and using and carrying a firearm during a crime of violence. *Id.*

**B.    After a heavily contested sentencing hearing, the jury recommends a death sentence, and the district court concludes that Webster is not mentally retarded.**

Under the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. § 3591 *et seq.*, before a jury may sentence a defendant to death, it must find (a) the existence of at least one of the "intent" factors enumerated in 18 U.S.C. § 3591(a)(2), to ensure that the defendant acted with a degree of culpability sufficient to justify the death penalty; and (b) at least one of the aggravating factors listed in 18 U.S.C. § 3592(c).  If the jury finds that those requirements are satisfied, it may also consider any non-statutory aggravating factors for which the government has provided notice.  18 U.S.C. § 3592(c).  The jury then weighs these statutory and non-statutory aggravating factors against any mitigating factors that any individual juror finds to exist by a preponderance of the evidence.  18 U.S.C. § 3593(c) & (d).  The jury is to return a death sentence if it finds that the aggravating factors "sufficiently outweigh" the mitigating factors. 18 U.S.C. § 3593(e).

18 U.S.C. § 3596(c) exempts from the death penalty defendants who are mentally retarded or who, because of a mental disability, lack the mental capacity to understand the death penalty

8

or why it was imposed.  Thus, during the penalty phase, "this issue was a highly contested one."  *Webster II*, 2003 WL 23109787, at *12.

Webster argued that he is mentally retarded and, in support, presented testimony from four medical experts regarding his mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by the government's experts in testing his cognitive abilities.  *United States v. Webster*, 421 F.3d 308, 309 (5th Cir. 2005) ("*Webster III*").[2]  He also submitted voluminous evidence of the abuse he suffered as a child.  *Id.*

To rebut the idea of malingering and bolster his claim of retardation, Webster presented evidence that years before the kidnapping and murder, Webster went to a mental health clinic and was given "an I.Q. test and an evaluation regarding whether or not he was mentally retarded."  Tr.23:177-78.  As explained by the district court below in this case, "Defense counsel also introduced evidence of an I.Q. test that was given to Webster by an Arkansas

---

[2] The details of the defense's and government's expert testimony are outlined in the convicting court's denial of Webster's motion to vacate his conviction and sentence.  *Webster II*, 2003 WL 23109787, at *12-*14.

9

state mental health center in 1992. The test demonstrated that Webster had an I.Q. of only 48 more than a year before Lisa's kidnapping and murder." App.4.

Specifically, Dr. Finn, one of Webster's experts, explained that this I.Q. score "is well within the range of what would be considered mentally retarded." Tr.23:178. When questioned on cross-examination about the fact that the evaluation does not mention mental retardation, Dr. Finn testified that, reading between the lines, the diagnosis is there: "There is a sentence that says, Mr. Webster is presently functioning within the mild-to-moderate range of intellectual and cognitive abilities. And I think what they meant by that is that he is mildly retarded." Tr.23:213. Similarly, another one of Webster's experts relied on the earlier I.Q. test to rule out malingering: "For him to have faked convincingly an I.Q. test in 1992, reproduced the same scores in 1995, and then produced similar I.Q. scores on other tests whose score levels will correlate tightly with the tests that he had twice before, that's unheard of." Tr.24:145.

The government presented two medical experts who concluded that Webster was not mentally retarded. *Webster III*, 421 F.3d at

10

310.  Although the government experts agreed that Webster has a low I.Q., they concluded that Webster's I.Q. was higher than his experts suggested and, more importantly, that he had sufficient adaptive skills to preclude classifying him as mentally retarded.  *Id.* at 310, 312-13; *Webster II*, 2003 WL 23109787, at *12-*14.  The government's experts noted that Webster scored higher on intelligence tests administered before this case began, and that he had an incentive not to perform well on the tests administered after his arrest.  *Id.*  Furthermore, the government's experts explained that Webster's experts' testing methodology "was critically flawed and misleading" because Webster's immersion in a criminal subculture and lack of formal education likely resulted in deceptively low scores on the I.Q. and adaptive-skills tests used by Webster's experts (which, for instance, asked Webster to define "inflation" and to recognize a picture of Mark Twain).  *Webster III*, 421 F.3d at 310, 313 nn.13 & 15; *see Webster II,* 2003 WL 23109787, at *12-*14.

Webster's experts based their conclusions in part on family members' statements that Webster lacked certain skills.  *Webster II,* 2003 WL 23109787, at *12-*14.  Thus, the government experts

11

"effectively [rebutted] some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not." *Id.* at *14. For instance, he had shown adaptability by working as a drug dealer; by burning his clothes to destroy evidence after the murder; by concocting cover stories and making excuses to the police when he was arrested in possession of a key to the motel room in which Lisa Rene had been held and repeatedly raped; and by sneaking into the women's section of the jail in which he was held (apparently for sexual gratification). *Id.* at *13-*14; *Webster III*, 421 F.3d at 313 & n.15. The government also presented other witnesses who testified that Webster was in basic classes while in school and was not mentally retarded and that, while in custody, he (1) wrote letters to other inmates; (2) received and read aloud from newspapers; (3) appeared to be reading and taking notes from books in the law library; (4) prepared written grievances and wrote request slips for various services; (5) submitted names and addresses of people for his visitation list; and (6) complained because he received the incorrect change from the prison commissary. *Webster II*, 2003 WL 23109787, at *12-*14; *Webster III*, 421 F.3d at 310, 313 n.15.

12

The jury found unanimously that the government had proved beyond a reasonable doubt the requisite intent factor to support the death penalty. *Webster I*, 162 F.3d at 319. The jury also found beyond a reasonable doubt three statutory and two non-statutory aggravating factors: that Webster committed the offense in an especially heinous, cruel, and depraved manner in that the offense involved torture or serious physical abuse; that the offense was committed with substantial planning and premeditation; that Lisa was a particularly vulnerable victim due to her age; that he constituted a future danger to the lives and safety of others; and that the offense had affected the victim's family. *Id.* at 319 n.1; 18 U.S.C. § 3592(c)(6), (9) & (11). The defense submitted numerous mitigating factors, and nine of them were found to exist by at least one juror. *Webster I*, 162 F.3d at 319 n.2. Four jurors found as one mitigating factor that Webster "is or may be mentally retarded." *Id.* The jury found unanimously that the aggravating factors sufficiently outweighed the mitigating factors to justify a death sentence. *See id.* at 319-20; *Webster III*, 421 F.3d at 309.

After imposing the death sentence, the district court entered a finding under section 3596(c) that Webster is not mentally retarded

13

and therefore not exempt on that basis from the death penalty. *Webster III*, 421 F.3d at 309.  Specifically, the court, "[a]fter consideration of all the evidence and information presented in the guilt and punishment phases of trial," issued a "factual finding that the defendant Webster is not mentally retarded."  *Id.* at 309 n.4.[3]

### C.    Webster challenges the district court's finding that he is not mentally retarded on direct appeal, but the Fifth Circuit affirms.

On direct appeal, Webster argued, among many other things, that the district court's finding that he is not mentally retarded was against the weight of the evidence.  *Webster I*, 162 F.3d at 321, 351. The Fifth Circuit disagreed, observing that "[t]he government presented substantial evidence to support the finding" on mental retardation.  *Id.* at 353.  The court added that "only four of the twelve jurors found that [Webster] is or may be mentally retarded and that he suffers from low intellectual functioning," and "Webster's failure to convince a majority of the jurors alone suggests the court's finding is not inconsistent with the verdict."  *Id.*

---

[3] Webster is incarcerated in the Special Confinement Unit in Terre Haute, Indiana, but his execution has been stayed pending the outcome of *Roane v. Gonzalez*, 1:05-cv-2337 (D.D.C.), which involves a challenge to the method of lethal injection used by the federal government.  App.1.

14

Additionally, the court stressed that "those four jurors found only that he is or *may be* mentally retarded." *Id.* (emphasis in original).

**D.   In his section 2255 motion, Webster again argues that he is mentally retarded and ineligible for the death penalty, but the district court and Fifth Circuit disagree.**

In 2000, Webster filed a motion to vacate his conviction and death sentence under 28 U.S.C. § 2255. *See Webster II*, 2003 WL 23109787, at *1. While that motion was pending in the district court, the Supreme Court held in *Atkins v. Virginia*, 536 U.S. 304 (2002), that the execution of a mentally retarded individual would violate the Eighth Amendment. Following *Atkins*, Webster filed an amended section 2255 motion. *Webster II*, 2003 WL 23109787, at *1. He contended, among other things, that he was ineligible to be executed because he is mentally retarded and that the district court's finding that he was not mentally retarded was unsupported by the evidence. *Id.* at *4.[4]

---

[4] The district court denied Webster's motion for discovery because the government already had an obligation to disclose evidence indicating that Webster is mentally retarded. N.D. Tex. Dkt. 1063. The court explained: "In the instant case, the government has the continuing duty to produce material mitigating evidence in its possession, unavailable to Webster, such as evidence it might possess that is mitigating, including evidence indicating that

15

After reexamining the trial record, the district court again rejected Webster's claim of mental retardation. *Id.* at *11-*14. The court stated that it is "undisputed" that he has a low I.Q. *Id.* at *14. Nevertheless, the court noted that the trial evidence showed that Webster "adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, [and] live within the confines of the 'home' he has been in since he was sixteen." *Id.* Additionally, the evidence established that Webster could "use community resources within this home, read, write, and perform some rudimentary math." *Id.* As a result, the court concluded that the "evidence therefore supports a finding that Webster does not have a deficit in adaptive skills" and that, as a result, he is not mentally retarded under either *Atkins* or 18 U.S.C. § 3596(c). *Id.*

Webster also argued that trial counsel was ineffective by not discovering and presenting evidence "that he was prevented from attending special education classes because of his race, not

---

Webster is mentally retarded." *Id.* at 10, 18 n.1. Additionally, the court explained that the government had no duty to produce "evidence or information that is already known to the defendant or that he could have obtained from other sources by exercising reasonable diligence." *Id.* at 10-11.

16

because he did not qualify." *Id.* at *8. He claimed that, "had defense counsel placed this type of information into evidence, it would have effectively countered the government's contention that Webster is not mentally retarded." *Id.* The court, however, disagreed because the evidence was not critical to the mental retardation determination: "The government disputed Webster's allegations of mental retardation primarily through its own experts and the testimony of people other than his family who have known him both in and out of the prison system, not primarily by arguing that he is not mentally retarded because he was not in special education classes in school." *Id.*

The district court granted Webster a certificate of appealability ("COA") on his claim that insufficient evidence supported the court's finding on mental retardation. *Webster III*, 421 F.3d at 309-10. The Fifth Circuit affirmed, concluding that the district court had "proceeded dutifully to reexamine the extensive evidence bearing on [Webster's] mental capacity" and correctly concluded again that Webster had not established retardation. *Id.* at 312. The court explained that, despite his concededly low I.Q., the government had "effectively countered [petitioner's] claimed

17

retardation" by refuting his evidence that he lacked adaptive skills. *Id.* at 313.[5]  Again, the court relied on evidence that Webster had adapted to the life he chose and could communicate with others, care for himself, have social interactions with others, live within the confines of his "home," use community resources, read, write, and perform some rudimentary math.  *Id.*  Thus, the court reasoned that "[t]he evidence therefore supports a finding that Webster does not have a deficit in adaptive skills."  *Id.*

### E.    Webster unsuccessfully seeks permission for a successive 2255 motion based on allegedly new evidence of mental retardation.

In 2009, Webster moved the Fifth Circuit for authorization to file a second or successive section 2255 motion to vacate his death sentence.  *See In re Webster*, 605 F.3d 256, 256-57 (5th Cir. 2010) ("*Webster V*").  A defendant may file a second or successive section 2255 motion only if the court of appeals authorizes it, and the

---

[5] Webster also contended that his trial counsel were constitutionally ineffective in failing adequately to investigate and present evidence of retardation.  The district court and the court of appeals denied a COA on that issue, however, because counsel were "far from constitutionally ineffective" and presented "a significant amount" of such evidence, including testimony from five medical experts, seven family members, and an ex-girlfriend. *United States v. Webster*, 392 F.3d 787, 790-91, 793 (5th Cir. 2004) ("*Webster IV*").

court may grant such authorization only in limited circumstances. *See* 28 U.S.C. § 2255(h)(1) & (2); *see also* Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1220 (adding this provision). Webster sought authorization pursuant to section 2255(h)(1), which allows a second or successive collateral attack based on "newly discovered evidence" only where "[that evidence] would establish by clear and convincing evidence that no reasonable factfinder would have found the prisoner guilty of the offense." 28 U.S.C. § 2255(h)(1).

The motion argued that Webster had discovered new evidence that he is mentally retarded and thus ineligible for the death penalty under section 3596(c) and *Atkins*. *Webster V*, 605 F.3d at 257. The evidence—the same at issue in the current appeal— included Social Security records created in connection with Webster's application, more than a year before the crime, for disability. *Id.* at 259 (Wiener, J., concurring). The records showed (1) that three medical professionals had separately found that Webster was mentally retarded and/or had an extremely low I.Q.; and (2) that records of Webster's past enrollment in special

19

education classes had been destroyed years before.  *Id.* at 259-60 (Wiener, J., concurring).

The Fifth Circuit denied the motion, explaining that the plain language of section 2255(h)(1) allows challenges based on newly discovered evidence that negates guilt of the offense, but it "does not encompass challenges to a sentence."[6]  *Id.* at 257.  The court rejected Webster's argument that section 2255(h)(1) should be read to permit a claim that the movant is "not guilty of the death penalty."  *Id.* at 258-59.  It reasoned that "[h]ad Congress wanted the provision to cover challenges to a sentence – even if only to a death sentence – it could easily have referenced sentences explicitly in the text, as it did numerous times throughout § 2255."  *Id.* at 258.  Or Congress could have used the term "actual innocence," which, before the enactment of section 2255(h), the courts had construed in connection with the "actual innocence" exception for excusing procedural default as extending to some capital

---

[6] The government argued that Webster failed to show by clear and convincing evidence that no reasonable factfinder would find him mentally retarded. The government did not address whether such a sentencing challenge may ever be brought in a second or successive motion.  *See* Government Opposition to Webster's Motion for Successive Petition, Fifth Circuit No. 09-11039.

20

sentencing challenges.  *Id.* at 258-29.  But instead, the Fifth Circuit observed, Congress "elected to couch § 2255(h) . . . in the markedly different, unmistakable terms of *guilt of the offense.*"  *Id.* at 259 (emphasis in original).

The court clarified that it "d[id] not mean to suggest that a prisoner is jurisdictionally barred from seeking successive review where he contests a factual predicate of his capital murder conviction, without which he would be guilty only of non-capital murder."  *Id.* at 258 n.5.  The court cited a Ninth Circuit case holding that a challenge to the "special circumstance" of rape, which had rendered the defendant death-eligible, was a challenge to the "offense" of capital murder.  *Id.* (citing *Thompson v. Calderon,* 151 F.3d 918, 923-24 (9th Cir. 1998) (en banc)).

Judge Wiener filed a concurring opinion.  *Id.* at 259-60. Although agreeing that Webster's successive collateral attack was barred under the plain terms of section 2255(h)(1), he wrote to express his concern that, if Webster's proffered evidence were presented to a factfinder, it would result in a finding that Webster is mentally retarded.  *Id.* at 259.  Thus, given Congress's limitations on successive, new-evidence petitions—and based on

21

his understanding of the record—he viewed the result as "Kafkaesque." *Id.*

The Supreme Court denied certiorari. *Webster v. United States,* 131 S. Ct. 794 (2010). Webster claims that the government, in opposing certiorari, relied "on the fact that Webster would be able to bring his claim under § 2241." Brief at 8. That is incorrect. There, the government argued that 28 U.S.C. § 2244(b)(3)(E) barred the Supreme Court from reviewing orders denying leave to file a second or successive section 2255 motion. For support, the government noted that despite section 2244(b)(3)(E), post-conviction litigants were not without recourse to the Supreme Court because the Supreme Court may review whether a motion is "second or successive," may review denials of section 2241 relief, and may at times consider direct habeas relief. *See* Brief for the United States in Opposition, 2010 WL 4278712, at *17 (No. 10-150, Oct. 29, 2010).

**F. Webster seeks a writ of habeas corpus based on "new" evidence, but the district court below concludes that he does not meet section 2241's prerequisites.**

Based on the same evidence presented in the Fifth Circuit when he sought permission for a successive section 2255 motion,

22

Webster petitioned in the Southern District of Indiana—the district of his detention—for a writ of habeas corpus under 28 U.S.C. § 2241. ROA.7. He conceded that he was not challenging his guilt or conviction, but he argued that section 2255 was inadequate because it did not allow him to present evidence of his mental retardation. ROA.8. He claimed that this evidence was "overwhelming but previously unavailable" and "establishes Mr. Webster's mental retardation and renders him categorically ineligible for the death penalty." *Id.* Specifically, he argued that section 2255 was inadequate because (1) as held by the Fifth Circuit, he could not present the evidence through section 2255(h)(1), ROA.33-35; (2) it was not possible for him to bring his claim in his first section 2255 motion "because most of the new evidence . . . was in government files that were neither produced to Petitioner nor made available to him, despite his request," ROA.37; and (3) he satisfied section 2241's "actual innocence" requirement "because, in the context of a capital case, 'innocence of the death penalty' *is* 'actual innocence.'" ROA.38-39 (citing *Sawyer v. Whitley,* 505 U.S. 333, 336 (1992)) (emphasis by Webster). Finally, he claimed that failure to consider his evidence through section

23

2241 would result in an unconstitutional suspension of the writ of habeas corpus. ROA.40-42.

The government responded that Webster had not satisfied the requirements for a section 2241 action, and, in any event, his evidence failed to call into doubt the district court's determination that he was not mentally retarded. ROA.89-107. Because Webster had the opportunity, and did in fact, present evidence and claim that he was mentally retarded on collateral review, there was no structural problem with section 2255 that made it inadequate or ineffective. ROA.89-96.

Moreover, the government disputed Webster's claim that his evidence was previously unavailable. ROA.92-94. He could have previously acquired the declarations from his family, friends, and acquaintances and presented them with his first section 2255 motion. ROA.92-93. Moreover, Webster was aware of the existence of the Social Security records—having himself made application for them in preparation for trial—and there is no assertion that defense counsel tried to locate the records to support his section 2255 motion. ROA.93. There is no record of the documents being requested again until October 2008, years

24

after Webster's initial and amended motions for relief under section 2255. *Id.* Following that request, Webster's current defense counsel received the records a little more than three months later. *Id.*

Further, the government disputed any suggestion that it withheld the evidence from him. ROA.93 n.8. To the contrary, the prosecution was not aware of the records' existence. *Id.* Webster clarified in his reply brief that he was not alleging that the government engaged in any deliberate or malicious actions. ROA.185.

The government presented three additional arguments against Webster's section 2241 motion. First, it explained the well-settled proposition that a section 2241 petition does not qualify for relief simply because a defendant cannot meet the requirements for a successive section 2255 motion. ROA.94-95. Second, Webster was not presenting a claim of actual innocence of the offense. ROA.95. Finally, even assuming that Webster could satisfy 2241's prerequisites, his "new" evidence failed to show that the court of

25

conviction and the Fifth Circuit were wrong in concluding that he was not mentally retarded.  ROA.96-107.[7]

The district court denied Webster's petition.  ROA.249-62.  It recognized this Court's case law providing that "§ 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective review—and then only when as in *Davenport* the claim being foreclosed is one of actual innocence."  ROA.257 (quoting *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002)).  Because Webster's argument—that he is mentally retarded and thus ineligible for the death penalty—"is by no means new," the court noted that he was able to make the argument prior to his 2241 petition.  ROA.259.  In fact, the court found (as other courts had found before) that "Webster's mental ability was a highly contested issue at every stage of the proceedings."  *Id.*

Additionally, the court rejected Webster's contention that it was impossible for him to have previously raised his current claim. It noted that, "[b]ased on affidavits provided by Webster, trial counsel requested the information prior to Webster's trial, but the

---

[7] The government's response also included a summary of the evidence presented at trial in support of the conviction and death sentence.  ROA.109-36.

documents were never produced.  Apparently, trial counsel did not follow-up on his request.  The information was not requested again until October 2008, more than twelve years after his trial and several years after his direct appeals and his initial § 2255 motion were unsuccessful."  ROA.259 n.10.  As a result, the court concluded that "it is now too late to present this evidence."  *Id.*

Finally, the court rejected the petition because Webster did not argue that he is actually innocent of his crimes.  ROA.259-61.  Webster claimed, and continues to claim, only that he is "actually innocent" of the death penalty.  *Id.*  Thus, based on this Court's and other circuits' case law, the district court concluded that "Webster is unable to show that § 2255 is an inadequate or ineffective remedy such that he may bring a petition for writ of habeas corpus under § 2241."  ROA.261.  The court did not address or resolve whether Webster's "new" evidence establishes that he is mentally retarded.

## IV.  SUMMARY OF THE ARGUMENT

This Court should affirm the district court's judgment.  Webster cannot seek habeas corpus relief because he has failed to carry his burden of showing that section 2255 was "inadequate or ineffective."  Webster must show that he relies on a statutory-

27

interpretation case that is retroactive and that he could not have invoked in his first section 2255 motion. Additionally, there must be a grave enough error to be deemed a miscarriage of justice. He satisfies none of these standards because no change in the law, nor anything in section 2255, prevented him from making his current argument. To the contrary, the parties have litigated the issue thoroughly. At trial and during his first section 2255 proceeding, he could have, but did not, present the evidence he now claims to be so crucial. Moreover, the evidence is not newly discovered and is largely cumulative, and case law makes clear that section 2255 is not inadequate simply because it limits certain successive petitions.

But even if Webster could present his "new" evidence in a section 2241 proceeding, it would be of no avail because he cannot establish by clear and convincing evidence that no reasonable factfinder, viewing the evidence as a whole, would have found him eligible for the death penalty. That is an exceptionally demanding standard: it requires that Webster's prima facie showing be not just persuasive, but beyond reasonable factual dispute. Webster has not met that standard.

28

Finally, case law forecloses Webster's argument that the district court's denial of his section 2241 petition results in an unconstitutional suspension of the writ of habeas corpus. This Court has repeatedly explained that "[h]abeas corpus as a postconviction remedy is not the type of habeas corpus to which Article I, § 9, of the Constitution was referring."

## V. ARGUMENT

### A. Webster cannot seek habeas corpus relief because he has failed to carry his burden of showing that section 2255 was "inadequate or ineffective."

#### 1. Standard of Review

This Court reviews the denial of a section 2241 petition de novo. *Hill v. Werlinger*, 695 F.3d 644, 648 (7th Cir. 2012).

#### 2. To qualify for habeas relief, Webster must satisfy this Court's *Davenport* standards.

The evolution of habeas corpus litigation is critical to understanding modern statutory rights and limitations. At common law, the writ of habeas corpus was used to challenge the validity of executive detention without trial. *See Lindh v. Murphy*, 96 F.3d 856, 867 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521 U.S. 320 (1997). In the early part of the twentieth century, the Supreme

29

Court broadly interpreted later-enacted statutes authorizing habeas corpus relief in a manner that transformed the writ into a device for "[c]ollateral review of judgments entered after full opportunity for litigation." *Id.* at 868.  These decisions led to a large increase in the number of federal prisoner habeas corpus petitions.  *See United States v. Hayman,* 342 U.S. 205, 211-13 (1952).  And prisoner petitions disproportionately burdened those district courts whose territorial jurisdiction encompassed a major penal institution, because a writ of habeas corpus acts on the prisoner's jailer and must therefore be filed in the district of his confinement.  *See Rumsfeld v. Padilla,* 542 U.S. 426, 447 (2004).

In 1948, Congress responded favorably to a proposal by the Judicial Conference "to alleviate the burden of habeas corpus petitions filed by federal prisoners in the district of confinement" by creating a substitute postconviction remedy for federal prisoners. *United States v. Addonizio,* 442 U.S. 178, 185 (1979).  Codified at 28 U.S.C. § 2255(a), this new statutory "motion" procedure diverted federal prisoner collateral attacks from the district of confinement into "the more convenient jurisdiction of the sentencing court," *Hayman,* 342 U.S. at 219, while still "afford[ing] federal prisoners a

30

remedy identical in scope to federal habeas corpus." *Davis v. United States*, 417 U.S. 333, 343 (1974). To that end, section 2255 provides that "[a] prisoner in custody . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a).

The 1948 legislation also contained an exclusivity provision reflecting Congress's intent that this new motion be used instead of, and not in addition to, the traditional habeas corpus remedy. This provision states that district courts "shall not . . . entertain[]" a federal prisoner's application for a writ of habeas corpus "unless it appears that the remedy by motion [under section 2255] is inadequate or ineffective to test the legality of [the prisoner's] detention." 28 U.S.C. § 2255(e). As a result, "in the overwhelming majority of cases, § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions or sentences through a habeas petition under § 2241." *United States v. Prevatte*, 300 F.3d 792, 799 (7th Cir. 2002).

31

Although section 2255(e) allows habeas corpus petitions when section 2255 is inadequate, that clause—known as the savings clause—was dormant for its first half-century on the books.  During that time, section 2255's adequacy was never seriously called into question because there were no categorical restrictions on the filing of repetitive section 2255 motions.  Rather, prisoners could file such motions, and, while those motions were subject to dismissal under modified *res judicata* principles like "abuse of the writ," courts could entertain them on the merits when the "ends of justice" so required.  *See Sanders v. United States*, 373 U.S. 1, 12 (1963); *see also Peoples v. United States*, 403 F.3d 844, 847 (7th Cir. 2005).

The enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) altered this landscape and indirectly caused the savings clause to take on new-found importance. Among other things, AEDPA sought to enhance the finality of criminal judgments by "dramatically limit[ing] successive attempts at [postconviction] relief."  *Stewart v. United States*, 646 F.3d 856, 859 (11th Cir. 2011); *see also Tyler v. Cain*, 533 U.S. 656, 661 (2001).  To that end, AEDPA prohibits a defendant from filing a

32

"second or successive" collateral attack unless he first applies to the court of appeals "for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). The court of appeals "may authorize the filing of a second or successive application only if" the prisoner makes a "prima facie showing" that his claim relies on (1) persuasive new evidence of his innocence of the crime, or (2) a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. *See* 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(C).

*Davenport* is this Court's first, and most comprehensive, interpretation of the savings clause. *In re Davenport*, 147 F.3d 605 (7th Cir. 1998). It makes clear that to qualify for section 2241 relief, there must be a structural problem with section 2255 that prevents an opportunity to address the alleged problem on collateral review. *Id.* at 609-11. Because "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence," "a procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification

of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *Id.* at 609, 611.

*Davenport* requires three conditions to secure section 2241 relief: (1) "the prisoner must show that he relies on a 'statutory-interpretation case,' rather than a 'constitutional case'"; (2) "the prisoner must show that he relies on a retroactive decision that he could not have invoked in his first § 2255 motion"; and (3) there must be "a grave enough error to be deemed a miscarriage of justice corrigible therefore in a habeas corpus proceeding." *Brown v. Caraway*, 719 F.3d 583, 586 (7th Cir. 2013).[8]  The *Davenport* court concluded that Davenport, one of two consolidated petitioners, did not meet these standards.  147 F.3d at 609.  He claimed that he was wrongly categorized as an armed career criminal, but he had a chance to raise that claim on direct appeal and in his section 2255 motion.  *Id.*  Thus, this Court held that he could not raise the issue in a section 2241 proceeding because doing so was "not needed to give him a reasonable opportunity to obtain a reliable judicial

---

[8] *Brown* makes clear that section 2241 does not categorically bar challenges to a sentence.  *Id.* at 585.  But relief through section 2241 is nonetheless limited to those cases that satisfy *Davenport*'s strict requirements.

34

determination of that legality." *Id.* Because he had "an unobstructed procedural shot at getting his sentence vacated," he could not satisfy the savings clause. *Id.*

### 3. Webster satisfies none of *Davenport*'s requirements.

Webster claims that a "glitch" in section 2255 renders it inadequate and ineffective. His argument, however, ignores *Davenport*'s threshold requirements and fails to account for the fact that he presented the same fundamental challenge at trial and on collateral review—at which time he could have gathered and presented the evidence now at issue. Moreover, he underestimates the trial evidence that rebuts his claim of mental retardation, and he overestimates the impact of his "new" evidence. Thus, Webster's case does not fit into one of the narrow exceptions permitting section 2241 relief.

### i. Webster does not rely on a statutory-interpretation case or a retroactive decision, nor can he show a miscarriage of justice.

First, Webster has not shown that he "relies on a 'statutory-interpretation case,' rather than a 'constitutional case.'" *Brown,* 719 F.3d at 586. To the contrary, he claims that new evidence

35

establishes that if his sentence were carried out, it would violate the Eighth Amendment. Brief at 21. But he provides no case law support for the idea that section 2241 relief is available for new-evidence claims—let alone for a new evidence claim that relates to a previously made sentencing challenge—and the government is unaware of any such precedent.

Second, Webster fails to show that he "relies on a retroactive decision that he could not have invoked in his first § 2255 motion." *Brown*, 719 F.3d at 586. After his trial and sentencing, the Supreme Court held that the execution of a mentally retarded criminal is "cruel and unusual punishment" prohibited by the Eighth Amendment. *See Atkins*, 536 U.S. at 321. But that did not change the law in a way that opened the door to a section 2241 proceeding. Prior to *Atkins* and at the time of Webster's conviction and sentence, federal law prohibited the federal government's execution of the mentally retarded, and the law remains the same today. *See* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded[.]"). The district court was aware of the statutory prohibition and made a specific

36

factual finding that Webster was not mentally retarded. *Webster III*, 421 F.3d at 309 n.4.

Third, despite Webster's hyperbolic claims, this case does not present "a grave enough error to be deemed a miscarriage of justice corrigible therefore in a habeas corpus proceeding." *Brown*, 719 F.3d at 586. Because of the statutory bar against executing the mentally retarded, the issue of his alleged mental retardation was front and center at trial, with both the defense and the government marshaling considerable efforts toward it. Unlike many cases, where the issue is raised late in the process, whether Webster is mentally retarded has been thoroughly litigated with substantial fact finding from the very beginning, under the standard that Webster acknowledges is the proper one. Moreover, the court of conviction, although agreeing with the government that several of Webster's mental retardation claims had been raised and rejected on direct appeal, considered those claims anew because of the Supreme Court's intervening decision in *Atkins*. *Webster II*, 2003 WL 23109787, at *5.

Like Davenport, Webster has had repeated opportunities to raise the question of his alleged mental retardation, and he seized

37

those opportunities—twice in the district court (at trial and in a section 2255 proceeding) and thrice in the Fifth Circuit (on direct appeal, in an appeal from the denial of the section 2255 motion, and in an appeal from the denial of COA).  "Nothing in section 2255, including limitations on successive motions," prevented Webster from obtaining relief on his claim that his alleged mental retardation barred his execution.  *Davenport*, 147 F.3d at 609.  He simply failed to convince the trial court or the appellate court.  As the Seventh Circuit noted in *Taylor*, "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review."  *Taylor*, 314 F.3d at 835-36 (collecting cases).

### ii.   A structural problem with 2255 does not result from reliance on evidence that is not newly discovered and is largely cumulative.

Webster's argument relies on the premise that his evidence— the same evidence presented in support of his application for leave to file a successive 2255—is newly discovered and establishes without question that the court of conviction and the Fifth Circuit erred in rejecting his retardation claim.  But the record undermines

38

his premise.  He should not be permitted to attempt to prove yet again that he is mentally retarded, especially given that his evidence is not newly discovered, and it is largely cumulative of the trial evidence.

There is no reason, for instance, that Webster could not have obtained the declarations from his family, friends, and acquaintances to present contemporaneously with his motion for relief under section 2255.  In fact, much of what he proffers is cumulative of evidence produced at trial, and the government rebutted that evidence.  For example, Webster's trial experts based their conclusions, in part, on family members' statements that he lacked certain skills.  The government experts "effectively [rebutted] some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not."  *Webster II*, 2003 WL 23109787, at *14.

Similarly, the Social Security records contain a letter from Webster's school district suggesting, but not verifying, that he was enrolled in special education classes while in school.  S.App.360 (stating in full: "The above student's Special Education records were destroyed in 1988.  A letter was mailed to parents at the last known

address, telling them they could have the records if they wanted them. There was no response to the letter."). This letter, read in the light most favorable to Webster, could be contrary to the testimony of Webster's teachers at trial that he had not been in special education and contrary to his previous argument that he was not placed in special education classes because of racial discrimination. *Webster II*, 2003 WL 23109787, at *8, *13; ROA.128-31. On appeal, he claims that the records show that he "was, in fact, enrolled in special education classes," Brief at 9, but even the declaration of his own, newly acquired expert admits that "[i]t is unclear from the school records whether or not Mr. Webster received special education services." S.App.491.

In any event, that he might have been in special education classes—and any further proof of his limited intelligence—is cumulative of already-presented evidence and has little bearing on the question whether he suffers from sufficient adaptive deficits to qualify as mentally retarded. In rejecting his previous argument that he should have been in special education but was not, both the Fifth Circuit and the district court observed that "the government's effort [in the mental-retardation proceedings] did not depend in any

40

significant respect on Webster's non-enrollment in special education courses." *Webster III*, 421 F.3d at 314 n.16; *see Webster II*, 2003 WL 23109787, at *8.

As for the Social Security records, Webster was aware of their existence—having himself made application for Social Security benefits. Webster's trial attorneys were also aware of the existence of these records and requested them from the Social Security Administration in preparation for trial. S.App.502-03. Defense counsel avers that he could not recall having seen the Social Security records that are the subject of Webster's current petition, and to the best of his recollection, the Social Security Administration did not provide the documents. *Id.* There is no assertion, however, that Webster attempted to locate the records to support his section 2255 motion. Webster raised the issue of his alleged mental retardation in both his initial and amended section 2255 motion—with almost two years between the two filings. Thus, he had ample time to request the records again.[9]

---

[9] On appeal, Webster continues to insinuate that the prosecution team withheld the documents from him. *See* Brief at 9. But he made clear in the district court that he was not alleging any deliberate or malicious actions by the government. ROA.185.

41

There is no record of the documents being requested again until late October of 2008—years after Webster filed his initial and amended motions for relief under section 2255.  S.App.497. According to Webster's exhibits, his current counsel received the Social Security records a little more than three months later, on February 9, 2009.  S.App.499.  Given these circumstances, the district court rightfully rejected Webster's contention that "it was simply not possible for [him] to bring his claim in connection with his original petition."  ROA.259 n.10.

### iii.  Section 2255 is not inadequate simply because it limits certain successive petitions.

In essence, Webster is asserting that because section 2255(h)'s limits on successive petitions prevent him from presenting his evidence in the 2255 arena, he must be allowed to present the evidence here.  He claims that "[w]here, as here, § 2255 is not available, § 2241 is the only avenue for review."  Brief at 47.  But this Court soundly rejected Webster's claim that this amounts to an impermissible and unintended "glitch": "The mere fact that [a] petition would be barred as a successive petition under § 2255, however, is not enough to bring the petition under § 2255's savings

42

clause; otherwise, the careful structure Congress has created to avoid repetitive filings would mean little or nothing." *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001). Thus, section 2241's remedy does not become available to Webster simply because he cannot meet the requirements for filing a successive section 2255 motion.

*Taylor* makes this point abundantly clear. There, the petitioner wanted to argue, based on a new Supreme Court decision, that the district court erred in denying his first section 2255 motion. *Taylor*, 314 F.3d at 833-34, 836. The intervening decision, however, did not create a new and retroactive rule of constitutional law. *Id.* at 836. At most, it showed that the district court had erred in applying an old rule to his situation, for which section 2255(h) would not allow a second collateral attack. *Id.* The petitioner argued that whenever section 2255(h) closes the door to a renewed challenge under section 2255, then section 2255(e) must open the door to a challenge under section 2241. *Id.* This Court disagreed, concluding that this would make section 2255(h) self-defeating: "To say that [the] limitations [adopted in 1996] authorize further collateral proceedings would be to use [§ 2255(e)] to return

43

the courts to the world of *Sanders v. United States*, 373 U.S. 1 (1963), in which prisoners may file as many collateral attacks as they please, provided that they don't abuse the writ." *Id.* (parallel citations omitted). Allowing that result would be contrary to congressional intent: "One goal of [AEDPA], which added § 2244(b) and [§ 2255(h)] to the Judicial Code, was to replace *Sanders* with an approach under which only defined circumstances permit successive collateral attacks. The escape hatch in [§ 2255(e)] must be applied in light of that history." *Id.* (internal citation omitted).

### iv.    Webster's claim is unlike the narrow band of cases that satisfies the savings clause.

To be sure, there are occasions where section 2255 is inadequate or ineffective. Some statutory claims, for instance, qualify because, in creating the successive-petition provision of 2255(h), "Congress may have overlooked the possibility that new and retroactive statutory decisions could support collateral review." *Taylor*, 314 F.3d at 835. Thus, this Court "held in *Davenport* that for this small class of situations § 2255 is 'inadequate or ineffective to test the legality of [the] detention.'" *Id.* Similarly, there is no successive-petition provision for newly created treaty-based rights

44

in the death penalty realm, so this Court allowed a section 2241 case presenting those facts to proceed, although it recognized that the question was close and case-specific: "The question of the district court's jurisdiction and the availability of § 2241 is a very close one, but in the end we conclude that on these very unusual facts Garza's petition is properly cognizable under § 2241." *Garza*, 253 F.3d at 921.

But unlike *Garza*'s "very unusual facts," presenting a treaty claim, and the successful petitioner in *Davenport*, presenting a previously foreclosed statutory claim, Webster had the opportunity to make his evidentiary claim—and did—at trial and on collateral review. He is not relying on an intervening change in the law, nor can he show that his claim was previously foreclosed.

Moreover, section 2255(h) envisions and permits the type of claim Webster makes—claims based on new evidence. Prior to AEDPA, the Supreme Court recognized that ineligibility for the statutory aggravating factors exposing a defendant to the death penalty was the equivalent of actual innocence that could overcome the bar to successive collateral attacks. *See Sawyer v. Whitley*, 505 U.S. 333 (1992). But AEDPA curtailed that by restricting actual-

45

innocence claims to claims that the defendant was innocent "of the offense." 28 U.S.C. § 2255(h)(1). In *Hope v. United States*, this Court made clear that AEDPA abrogated this aspect of *Sawyer* and limited successive 2255s to challenges to the conviction. 108 F.3d 119, 120 (7th Cir. 1997)). Thus, unlike statutory or treaty claims, which Congress apparently never considered, Congress thought about new evidence claims and limited them to evidence relating to innocence of the offense. The fact that Webster cannot satisfy section 2255(h)(1)'s statutory standard to raise his claim does not mean that section 2255 is inadequate. Rather, it means only that he cannot satisfy the existing standards.[10]

---

[10] Additionally, the district court concluded that Webster's petition failed because his evidence did not establish innocence of the offense. App.8-13. Some of this Court's cases have permitted section 2241 relief when the new claim did not establish innocence of the offense. *Brown*, 719 F.3d at 586 (allowing a 2241 sentencing challenge because prior to a later-issued Supreme Court decision, precedent foreclosed the petitioner's claim); *Garza*, 253 F.3d at 921 (allowing a 2241 petitioner to challenge his death sentence based on later-arising international treaty claims). Other cases, however, indicate that the petitioner must demonstrate actual innocence. *See, e.g., Unthank v. Jett*, 549 F.3d 534, 535 (7th Cir. 2008) (providing that section 2255 is inadequate only when a prisoner is unable to present a claim of actual innocence, and a challenge to a sentence does not amount to such a claim) (citing *Hope*, 108 F.3d at 120). This Court need not determine where Webster's case falls on the spectrum, however, because Webster cannot meet other

46

### 4.    Webster's argument is inconsistent with the purpose and function of the savings clause.

The savings clause's purpose is procedural fairness, not substantive results.  It is designed to allow a federal prisoner whom precedent forbade from raising a claim that he has suffered a grievous wrong (a fundamental defect) to raise the claim if, after his first section 2255 proceeding, he learns from intervening Supreme Court precedent that error existed.  The clause, as *Taylor* explains, focuses on whether section 2255 was adequate to "test" the legality of detention.  314 F.3d at 835.  In other words, *Taylor* demonstrates that the clause's focus is on procedure, not outcome.

Applying this instruction here, it is clear that Webster's claim must fail.  His claim was not "foreclosed" in any way at the time of trial, and he had a fair, meaningful procedural chance to raise it earlier.  Even before *Atkins*, Webster had an adequate opportunity to present his mental-retardation theory, both to the jury, which considered the mitigating factor whether he is or may be retarded, and to the court.  And he had an incentive to do so in light of the

---

*Davenport* requirements and, in any event, Webster's evidence does not clearly and convincingly establish mental retardation in light of the record as a whole.

47

statutory bar against executing the mentally retarded.  The fact that he lost and now wants to use some pieces of allegedly new evidence to reopen the issue is insufficient to meet the "escape hatch" nature of section 2241 relief.

Webster appears to contend that he is entitled to unlimited opportunities to persuade the courts that he is mentally retarded, and he implies that any statute precluding the possibility of relief on a future meritorious *Atkins* claim is unconstitutional.  That theory, for which petitioner offers no support, would stretch the Eighth Amendment too far, requiring endless opportunities to relitigate any constitutional fact that, if proven, would exempt the defendant from the death penalty.[11]  If he is correct that he must be permitted a second chance to prove his mental retardation because of "new evidence," then will he be permitted a third or fourth chance if he produces still more evidence?  If Webster takes another I.Q. test or has another expert evaluate his adaptive skills, what

---

[11] For instance, a felony-murder defendant's lack of culpable intent, *see Tison v. Arizona,* 481 U.S. 137, 155-58 (1987); 18 U.S.C. § 3591(a)(2), or the defendant's age at the time of the offense, *see Roper v. Simmons,* 543 U.S. 551 (2005); 18 U.S.C. § 3591(a)).

prevents him from claiming that he must be allowed to proceed under section 2241 once again?

Moreover, Webster's claim that a section 2241 petition is the only vehicle for presenting his claim and preventing an unconstitutional execution is unavailing.  First, for reasons explained in Part B, below, his argument attempts to paint the Court into an imaginary corner, as his "new" evidence does not call the district court's determination into doubt.  Second, the claim ignores that, if he believes mental retardation renders him incompetent to be executed, he can raise that claim once an execution date is set and execution is imminent.  *See Panetti v. Quarterman*, 551 U.S. 930, 946 (2007) (recognizing that federal courts may resolve Ford claims once execution is imminent); *Ford v. Wainwright*, 477 U.S. 399, 424-25 (1986) (Powell, J., concurring in part and concurring in the judgment) (explaining that determination of competency to be executed must involve an "opportunity [for defendant] to be heard," but need not be a "full-scale 'sanity trial'").

Finally, Webster's claim ignores that there are remedies available outside the judicial process.  Once the "judicial process has been exhausted," Webster may pursue clemency as a further

"fail safe." *Harbison v. Bell*, 129 S. Ct. 1481, 1490 (2009); *see* 18 U.S.C. § 3599(e). In *Herrera v. Collins*, for example, a state prisoner sentenced to death brought a second federal habeas petition based on new evidence that he believed established actual innocence. 506 U.S. 390, 393 (1993). The Court held that the petitioner was not entitled to pursue habeas relief, but "[t]his is not to say, however, that petitioner is left without a forum to raise his actual innocence claim." *Id.* at 411. "History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." *Id.* at 417.

### B. Even if Webster could present his "new" evidence in a section 2241 proceeding, it would be of no avail because it does not undermine the trial evidence.

#### 1. Standard of Review

Webster does not identify the standard by which new evidence may provide a section 2241 petitioner relief—likely because no court has ever considered or provided 2241 relief for a new-evidence claim like Webster's. At the very least, however, any standard should be as demanding as the new-evidence standard set out in section 2255(h)(1). That provision requires a petitioner to show that

50

the new evidence, "if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense."  28 U.S.C. § 2255(h)(1).

The district court did not reach the parties' alternative arguments regarding the allegedly newly discovered evidence.  This Court, however, may affirm on any ground supported by the record. *See Burns v. Orthotek, Inc. Employees' Pension Plan & Trust*, 657 F.3d 571, 575 (7th Cir. 2011) (holding that the reviewing court may affirm on any ground that the record fairly supports and has not been waived); *United States v. Taylor*, 627 F.3d 674, 676 (7th Cir. 2010) (affirming the district court's erroneous dismissal of a motion to reduce sentence on alternative grounds supported by the record).

>    **2.    Webster fails to establish—by clear and convincing evidence and viewed in light of the evidence as a whole—that no reasonable factfinder could find him not mentally retarded.**

Even assuming that Webster could satisfy section 2241's standards and properly raise a new-evidence claim, he cannot show that he is categorically ineligible for the death penalty by virtue of being mentally retarded.  Overestimating the value of his "new

51

evidence" and underestimating the evidence presented during the sentencing phase, he claims that the status quo would result in an unquestionably mentally retarded prisoner being executed. The record and the proper standard of proof, however, prove him wrong. Despite Judge Wiener's concurrence, Webster's evidence does not show that both the court of conviction and the Fifth Circuit were wrong in holding that he failed to establish mental retardation, and he certainly cannot show by clear and convincing evidence viewed in light of the record as a whole that no reasonable factfinder could find him eligible for his sentence. Much of the evidence, in fact, is cumulative of information these courts already considered.

As Webster recognized in the district court, to establish mental retardation, he must do more than show that he has a low I.Q. He must also establish that he has "significant limitations in adaptive functioning." *Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir. 2005); *see also Atkins*, 536 U.S. at 308 n.3. In considering Webster's first post-conviction challenge to the district court's finding that he is not mentally retarded, the Fifth Circuit acknowledged that "all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low

52

I.Q." *Webster III*, 421 F.3d at 312-13.  But a showing of mental retardation also requires significant deficits in adaptive skills, "and it is here, as the district court concluded, that the government effectively countered Webster's claimed retardation."  *Id.* at 313.

The evidence at trial showed that Webster demonstrated adaptability in various ways, including:

- working as a drug dealer;

- concocting cover stories after he was arrested;

- making excuses to police when they found him carrying the key to the motel room in which Lisa was held and raped; and

- burning his clothes after her murder.

*Id.*; *Webster II*, 2003 WL 23109787, at *13.  Notably, this evidence pertains to Webster's documented behavior outside the prison environment, which he argues is more controlled and hence less probative.

The government also presented evidence that, while incarcerated, Webster engaged in various activities inconsistent with mental retardation, including:

- writing letters to fellow inmates;

53

- complaining when he received incorrect change from the prison commissary;

- receiving letters and newspapers;

- reading aloud from newspapers;

- writing request slips for various services;

- preparing written grievances;

- submitting names and addresses of people for his visitation list; and

- concocting an elaborate scheme "to arrange for [Webster and another inmate] to have sexual contact with a female inmate by manipulating the visiting process" and sneaking into the women's section of the jail.

*Webster III*, 421 F.3d at 313-14 n.15; *Webster I*, 162 at 336-37.

The court of conviction, in rejecting Webster's mental retardation claim, found that this and other evidence reflected that he "has adapted to the criminal life that he chose" and that he has "the ability to communicate with others, [to] care for himself, [to] have social interaction with others, [to] live within the confines of the 'home' he has been in since he was sixteen, [to] use community resources within this home, [and to] read, write, and perform some rudimentary math." *Webster III*, 421 F.3d at 313. Thus, the Fifth

54

Circuit found that the evidence supporting the district court's ruling was "substantial."  *Webster I*, 162 F.3d at 353.

Webster's "new" evidence does not detract in any significant way from the strength of the above evidence, especially on the key issue of adaptive skills.  The evidence consists primarily of the findings of three medical professionals in connection with his application to the Social Security Administration for disability benefits based on a sinus condition one year before the murder.  But that evidence is weak and cumulative.  As detailed below, one of his three reports suspected malingering, one did not reflect any I.Q. test, and one was merely a physical examination.  The government's evidence, in contrast, showed that Webster has demonstrated adaptive skills in a number of ways—ways particularly tailored to the criminal and correctional environments in which he has spent his adolescence and adulthood.  *See Webster III*, 421 F.3d at 313 n.15; *Webster II*, 2003 WL 23109787, at *12-*14.

First, C.M. Rittlemeyer conducted a general physical examination of petitioner and included the following in his diagnosis "by history": "Mental retardation.  Flat feet.  Chronic

sinus problems and allergies." S.App.364. But the record does not reflect that Dr. Rittlemeyer did any I.Q. or adaptive skills testing. S.App.361-68. In fact, the records do not demonstrate that Dr. Rittlemeyer even knew the criteria for a finding of mental retardation or that he was qualified to make such an assessment. Given that he was conducting a physical examination, his diagnosis of mental retardation may well have rested on Webster's self-reporting.

Second, Dr. Edward Hackett, a psychologist, diagnosed Webster with mild mental retardation based on a Full Scale I.Q. of 59, but he noted that Webster "manifested many inconsistencies regarding his street behavior and current attempts to seek employment." S.App.359. Critically, in supplemental information provided to the Social Security Administration, he noted that "[t]here may have been some malingering" because "[t]he IQ scores are not normal considering history." S.App.357. He notes that Webster was "quite verbal" and that the I.Q. scores were lower on the performance test than on the verbal test, whereas "[a] person that displays antisocial personality," as Webster does, "usually scores higher on performance." *Id.* Moreover, there is no indication

56

that Dr. Hackett conducted any formal testing of Webster's adaptive skills. He concluded that petitioner "was . . . a somewhat mild[ly] retarded con man, but very street wise." *Id.*

Third, Dr. Charles Spellman, another psychologist, conducted another psychological examination "in order to better ascertain eligibility for [disability] benefits." S.App.354. He diagnosed petitioner as being mentally retarded based on his I.Q. "estimation" ("69 or lower"), Webster's self-reporting regarding his level of functioning, and his observations of Webster, who had an incentive to exaggerate his mental deficiency to obtain disability benefits. S.App.356. Dr. Spellman saw no evidence of malingering, *id.*, but unlike Dr. Hackett, who performed a Wechsler I.Q. test and suspected malingering, Dr. Spellman did not report performing any such testing or analysis of his adaptive skills. *See* S.App.354-56. In fact, there is no indication in these records that Dr. Spellman was even aware of the criteria for a mental retardation diagnosis. *Id.*

Moreover, while much of the new evidence focuses on Webster's I.Q., the government has never argued that his I.Q. would not meet the definition for mental retardation. The government

57

experts agreed that Webster has a low I.Q. but concluded that it was higher than his experts had suggested. The government experts noted that Webster had an incentive not to perform well on the cognitive tests administered after he was charged in this case, and they pointed to prior cognitive tests he took where he had scored higher, such as tests when he was in junior high, when he was in prison previously, and when he was in the Job Corps. Tr.26:51-54, 60-61, 63, 67, 126, 142-43. Of the three doctors who examined Webster for Social Security purposes, the only doctor to actually give Webster an I.Q. test—Dr. Hackett—also questioned whether he was malingering. S.App.357-58.

Additionally, Webster's reliance on the fact that his evidence was created pre-offense is undermined by the fact that defense counsel admitted other pre-offense evidence, including an I.Q. test resulting in a low score. Webster claims that "[b]ecause these newly available diagnoses were made before his incarceration, when Webster was a 'real world' patient, and expressly conclude that there is no evidence of malingering, they directly undermine the government's evidence and argument that Webster consistently was faking later tests in order to secure a mental retardation defense."

58

Brief at 25.  But, as the district court noted, defense counsel introduced evidence that Webster had a low score on an I.Q. test taken years before the kidnapping and murder.  *See supra* Statement of Facts, at 9-10; Tr.23:177-78, 213; Tr.24:145.  One of Webster's experts testified that the person giving the exam effectively concluded that he was mildly retarded, and another expert relied on the evidence to rule out malingering.  *Id.*  This trial evidence blunts his claim that the pre-offense Social Security records would overwhelmingly refute the government's case.

Finally, Webster could have presented the declarations from his family, friends, and acquaintances in his section 2255 motion, and they are cumulative of other evidence he offered at trial and in conjunction with that motion.  Moreover, since each of them has an incentive to exaggerate because of their desire to prevent Webster's execution, these declarations have little probative value.  Thus, they likewise would not have impacted the district court's fact finding.[12]

In sum, Webster's evidence, viewed in light of the expert testimony and other evidence that the government presented at the

---

[12] For the reasons discussed earlier, the same is true of the records regarding special education classes.  *See supra* Part V(A)(3), pp. 39-41.

59

penalty phase, would not compel any reasonable factfinder to conclude by clear and convincing evidence that Webster is mentally retarded.  Thus, Webster could not obtain a writ of habeas corpus even if his renewed claim of mental retardation were cognizable under section 2241.[13]

### C.  Affirming the district court's judgment would not result in an unconstitutional suspension of the writ.

#### 1.  Standard of Review

Whether the denial of a section 2241 petition results in an unconstitutional suspension of the writ of habeas corpus is a legal issue reviewed de novo.  *See Morales v. Bezy*, 499 F.3d 668, 670 (5th Cir. 2007); *see also Lindh*, 96 F.3d at 867.

#### 2.  This Court has held the Suspension Clause to be inapplicable in collateral review proceedings.

Webster argues that if his section 2241 petition is not

---

[13] This reality likewise forecloses Webster's third argument on appeal—that the "miscarriage of justice exception" should apply and excuse any procedural or statutory bars preventing his section 2241 petition.  As explained above, the new evidence does not establish a miscarriage of justice because the evidence does not unquestionably establish his mental retardation.  Moreover, Webster relies on *McQuiggin v. Perkins* for support, but that case involved evidence that, if true, would establish actual innocence of the crime committed.  133 S. Ct. 1924 (2013).  Additionally, the case addresses procedural bars to review under section 2254, not section 2241 via the savings clause.

permitted, "then the writ of habeas corpus is unconstitutionally suspended." Brief at 49. His argument, however, fails to distinguish, explain, or even cite this Court's binding precedent rejecting the Suspension Clause's applicability in the section 2241 arena. When that authority is considered, it is clear that his argument is foreclosed and should be rejected.

Although the Supreme Court has not yet decided whether the Suspension Clause applies to modern section 2241, this Court has repeatedly held that it does not: "Habeas corpus as a postconviction remedy is not the type of habeas corpus to which Article I, § 9, of the Constitution was referring when it provided that Congress can suspend the writ only in times of invasion or rebellion." *Morales*, 499 F.3d at 670 (citing *Lindh*, 96 F.3d at 867; *Benefiel v. Davis*, 403 F.3d 825, 827 (7th Cir. 2005); *Taylor*, 314 F.3d at 834-35). "What is protected from suspension is the writ that limits a person's detention by the executive branch without trial. There is no constitutional entitlement to post-judgment collateral review by the inferior federal courts, let alone to unending rounds of such review." *Benefiel*, 403 F.3d at 827.

61

In light of this case law, Webster's argument that the district court's dismissal of his petition amounts to an unconstitutional suspension of the writ is without merit. In any event, even if the Suspension Clause applied to modern section 2241 petitions, Webster's case does not present a suspension of the writ because he had numerous opportunities to pursue his claim earlier. His inability to satisfy the strict standards for obtaining section 2241 relief does not mean that the writ has been suspended.

## VI. CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

Joseph H. Hogsett
United States Attorney

By:    *s/ Wes Hendrix*
Wes Hendrix
Special Assistant U.S. Attorney

## VII.  CERTIFICATE OF COMPLIANCE IN ACCORDANCE WITH FED. R. APP. P. 32(a)(7)(C)

The foregoing BRIEF OF RESPONDENT-APPELLEE complies with the type volume limitations required under Fed. R. App. P. 32(a)(7)(B)(i) in that there are not more than 14,000 words or 1,300 lines of text using monospaced type in the brief.  There are 11,455 words typed in Microsoft Word this 30th day of April, 2014.

*s/Wes Hendrix*
Wes Hendrix
Special Assistant U.S. Attorney

## VIII.  CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*s/Wes Hendrix*
Wes Hendrix
Special Assistant U.S. Attorney

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333