IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

## No. 14-1049

BRUCE CARNEIL WEBSTER,

Petitioner-Appellant,

v.

JOHN F. CARAWAY, Warden,

Respondent-Appellee.

On Appeal from the United States District Court
For the Southern District of Indiana
Judge William T. Lawrence
District Court No. 2:12-cv-00086-WTL-WGH

## APPELLANT'S REPLY BRIEF

**THIS IS A DEATH PENALTY CASE**

**ORAL ARGUMENT REQUESTED**

Steven J. Wells
*Counsel of Record*
Kirsten E. Schubert
Timothy J. Droske
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Dated: June 4, 2014

*Attorneys for Petitioner-Appellant
Bruce Carneil Webster*

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 6

I.    Section 2241 Provides a Mechanism for Review of Information
      Discovered After Denial of a §2255 Petition that Establishes
      Categorical Ineligibility for the Death Penalty ................................................ 6

      A.    There Is No Basis to Conclude that Congress Intended to
            Exclude Such Evidence in Enacting AEDPA ......................................... 6

      B.    This Court Has Not Limited §2241 to Review of Claims Directed
            to Innocence of the Crime ................................................................... 11

II.   The Recently-Disclosed Evidence "Virtually Guarantees" that Webster
      will be Found to be Mentally Retarded ........................................................... 13

      A.    The SSA Records Establish Webster is Mentally Retarded and
            Directly Undermine the Government's Evidence and Arguments
            at Trial ................................................................................................. 13

            1.    The SSA Records Show, Contrary to the Government's
                  Arguments at Trial, that Webster was Not Faking Low IQ
                  Scores .......................................................................................... 13

            2.    The Presentation at Trial of One IQ Test Administered
                  Prior to the Commission of the Crime Does Not Make the
                  SSA Records "Merely Cumulative" ............................................. 15

            3.    The SSA Records Contain Significant Evidence of
                  Webster's Adaptive Deficits and Undercut the
                  Government's Weak and Discredited Trial Evidence ................. 15

      B.    The Government's Attempt to Attack the Findings of the SSA
            Doctors is Unsupported ......................................................................... 21

III.  The SSA Records were Not Available to Webster ........................................... 22

A.    The District Court did Not Make any Finding Regarding the Prior Availability of the SSA Records .................................................. 22

B.    The SSA Records were Not Made Available to Webster Despite Repeated Efforts to Obtain Them ......................................................... 23

C.    The Government Blocked all Attempts to Obtain Discovery ............... 25

IV.    This Court Should Reverse and Remand for Discovery and an Evidentiary Hearing on Any Issues of Fact ...................................................... 27

Conclusion ................................................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Attorney General United States,*
  495 F. App'x. 274 (3d Cir. 2012)..................................................................27

*Antonelli v. Lappin,*
  338 F. App'x. 379 (5th Cir. 2009) ................................................................27

*Atkins v. Virginia,*
  536 U.S. 304 (2002) .......................................................................... 7, 13, 27

*Bailey v. United States,*
  516 U.S. 137 (1995) ..................................................................................... 8

*Banks v. Dretke,*
  540 U.S. 668 (2004) ................................................................................... 26

*Brown v. Caraway,*
  719 F.3d 583 (7th Cir. 2013) ............................................................. 3, 8, 9, 12

*Burns v. Stone Forest Indus., Inc.,*
  147 F.3d 1182 (9th Cir. 1998) .................................................................... 10

*Cooke v. Bowersock,*
  122 F.2d 977 (8th Cir. 1941) ...................................................................... 23

*In re Davenport,*
  147 F.3d 605 (7th Cir. 1998) ...............................................................*passim*

*Davis v. United States,*
  417 U.S. 333 (1974) ..................................................................................... 8

*In re Dorsainvil,*
  119 F.3d 245 (3d Cir. 1997).................................................................... 3, 12

*Garza v. Lappin,*
  253 F.3d 918 (7th Cir. 2001) ................................................................. 3, 12

*Hall v. Florida,*
  572 U.S. ---, No. 12-10882, slip op. at 2 (May 27, 2014)...............................*passim*

*Heller v. Doe,*
   509 U.S. 312 (1993) ........................................................................ 17

*Herrera v. Collins,*
   506 U.S. 390 (1993) .................................................................. 2, 10

*INS v. St. Cyr,*
   533 U.S. 289 (2001) .......................................................................... 9

*In re Jones,*
   226 F.3d 328 (4th Cir. 2000) ...................................................... 3, 12

*Leighton v. Comm'r of Internal Revenue,*
   1945 WL 7514 ................................................................................ 23

*McDaniel v. Sanchez,*
   452 U.S. 130 (1981) ...................................................................... 23

*McQuiggin v. Perkins,*
   133 S.Ct. 1942 (2013) .................................................................. 10

*Milkovich v. Lorain Journal Co.,*
   497 U.S. 1 (1990) .......................................................................... 23

*Nixon v. Mo. Mun. League,*
   541 U.S. 125 (2004) ...................................................................... 10

*Poindexter v. Nash,*
   333 F.3d 372 (2d Cir. 2003) ........................................................ 3, 12

*Roper v. Simmons,*
   543 U.S. 551 (2005) ........................................................................ 7

*In re Smith,*
   285 F.3d 6 (D.C. Cir. 2002) ........................................................ 3, 12

*St. Pierre v. Cowan,*
   217 F.3d 939 (7th Cir. 2000) ........................................................ 27

*Strauss v. United States,*
   516 F.2d 980 (7th Cir. 1975) .......................................................... 8

*Taylor v. Gilkey,*
   314 F.3d 832 (7th Cir. 2002) ........................................................ 8, 9

*Thomas v. Allen,*
   614 F. Supp. 2d 1257 (N.D. Ala. 2009) ........................................ 19

v

*Torres v. United States,*
200 F.3d 179 (3d Cir. 1999) ...................................................... 23

*United States v. Am. Trucking Ass'ns, Inc.,*
310 U.S. 534 (1940) ................................................................ 10

*United States v. Tayman,*
885 F. Supp. 832 (E.D. Va. 1995) ............................................... 8

*In re Webster,*
No. 09-11039 (5th Cir.) ........................................................... 13

*Wiley v. Epps,*
668 F. Supp. 2d 848 (N.D. Miss. 2009) ...................................... 19

*York v. U.S. Parole Commission,*
330 F. App'x. 163 (10th Cir. 2009) ........................................... 28

**Statutes**

28 U.S.C. §1131........................................................................ 1

28 U.S.C. §1331........................................................................ 1

28 U.S.C. §2241.................................................................*passim*

28 U.S.C. §2255.................................................................*passim*

28 U.S.C. §2255(e)..................................................................... 6

**Other Authorities**

Eighth Amendment ............................................................... 6, 12

Circuit Rule 31(b)................................................................... 30

104th Cong. 61–62 (1995) ......................................................... 7

*Developments in the Law: The Law of Prisons: II,* The Prison Litigation
Reform Act and the Antiterrorism and Effective Death Penalty Act:
Implications for Federal District Judges,
115 HARV. L. REV. 1846, 1859-63 (2002)....................................... 7

E.A. Doll, *Current Thoughts on Mental Deficiency,*
Proc. Am. Ass'n on Mental Deficiency 33 (1936)............................. 16

E.A. Doll, *Historical Review of Mental Retardation 1800-1965: A Symposium*, 72 Am. J. Mental Deficiency 165 (1967)............................................. 16

ECF Procedure (h)(2) ......................................................................................... 30

Fed. R. App. P. 32(a)(5).......................................................................................... 29

Fed. R. App. P.32(a)(6)............................................................................................ 29

Fed. R. App. P. 32(a)(7)........................................................................................... 29

Fed. R. App. P. 32(a)(7)(B).................................................................................... 29

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................................................ 29

*Mental Retardation: Determining Eligibility for Social Security Benefits* (Daniel J. Reschly et al. eds., 2002)................................................. 16, 22

## **INTRODUCTION**

The Government misstates the questions presented by this appeal and mischaracterizes the evidence presented to the District Court[1] (upon Webster's 2241 Petition) and the trial court.[2] Despite the Government's arguments, the District Court did not address the quality or significance of the evidence Webster seeks to present in his 2241 Petition. No court has ever assessed that evidence on the question of Webster's mental retardation,[3] and the one judicial decision-maker to ever weigh its significance—Judge Wiener in his Fifth Circuit concurrence—concluded that the evidence "virtually guaranteed that [Webster] would be found to be mentally retarded." Nor did the District Court find that the evidence buried in the files of a federal agency for 15 years was "available" to Webster. Indeed, no court has ever made a factual finding that the Social Security Administration's ("SSA") records sought to be presented here were "available" to Webster.

The Government, moreover, spends most of its brief "spinning" the evidence of Webster's mental retardation and its purported "availability" in an attempt to convince this Court to take on the unusual role of initial fact-finder. It is clear why: Given that the District Court did not address the recently-discovered evidence's

---

[1] Webster incorporates herein the abbreviated references and citations in his opening brief. Webster capitalizes "Government" where referring to it as a party in this action.

[2] In stating the District Court's jurisdiction over the 2241 Petition, Webster inadvertently referenced, as a result of a scrivener's error, 28 U.S.C. §1131 instead of §1331. Webster requests that this Court treat his jurisdictional statement as referencing §1331. (Opening Br. 1.)

[3] Although the Supreme Court recently adopted the term "intellectual disability" in place of the term "mental retardation," *Hall v. Florida*, 572 U.S. ---, No. 12-10882, slip op. at 2 (May 27, 2014), Webster will continue to use "mental retardation" to maintain consistency with prior briefing.

1

significance or availability, the question squarely before this Court is whether 28 U.S.C. §2241 provides a mechanism for a mentally retarded prisoner to present evidence disclosed for the first time by a federal agency after the denial of a §2255 motion which *establishes* that he is mentally retarded and therefore categorically ineligible for the death penalty. The Government, acknowledging that there is no other mechanism under AEDPA, argues that it does not—even if that evidence establishes categorical ineligibility beyond a shadow of a doubt. According to the Government, Congress intended, and this Court should hold, that it is perfectly acceptable to execute a person who is mentally retarded (or, similarly, a juvenile) if proof establishing that condition or status is discovered only after his initial federal habeas petition has been denied.

That is not and cannot be the law. The Supreme Court has declared that the execution of the mentally retarded, as well as a juvenile, is absolutely prohibited. Indeed, although the Supreme Court has been equivocal in its statements about the constitutionality of executing an actually innocent person,[4] it has not equivocated when it comes to the mentally retarded or juvenile defendant: Execution is forbidden. There is no indication, however, that Congress gave any thought or concern to after-discovered evidence[5] of categorical ineligibility when it passed AEDPA. There is nothing in AEDPA or its legislative history suggesting that Congress specifically intended to cut off all avenues of review where after-

---

[4] *Herrera v. Collins*, 506 U.S. 390, 427 (1993).

[5] Throughout this brief, evidence discovered or disclosed after an initial federal habeas petition, that was not reasonably available to a defendant prior to the initial habeas, is referred to as "after-discovered" evidence.

2

discovered evidence establishes categorical ineligibility for the death penalty. And, despite the Government's argument that Congress was "aware" of the concept of categorical ineligibility at the time it enacted AEDPA, Congress was just as "aware" of the "statutory claims" of the type this Court has held *justify* §2241 review. That is why, given the Eighth Amendment's absolute prohibition against executing the mentally retarded, reaffirmed by the Supreme Court just days ago, *see Hall*, slip op. at 6, §2255 is "ineffective" and §2241 provides a mechanism for review here. Further, where a prisoner has demonstrated, post-AEDPA, the absence of a mechanism to vindicate substantive (rather than procedural) constitutional rights through §2255, this Court and other circuit courts have shown flexibility in affording an opportunity to review such claims through §2241. *See, e.g., Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013)*; Garza v. Lappin*, 253 F.3d 918 (7th Cir. 2001); *Poindexter v. Nash*, 333 F.3d 372, 378 (2d Cir. 2003); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002); *In re Jones*, 226 F.3d 328, 333–34 (4th Cir. 2000); *In re Dorsainvil*, 119 F.3d 245, 251–52 (3d Cir. 1997).

In an attempt to avoid the stark consequences of its position that even the most convincing after-discovered evidence of categorical ineligibility is not entitled to any review at all, the Government spends most of its brief rewriting the history of its own arguments at trial, attempting to undermine the quality of federal government medical professionals and offering rank speculation—but no evidence— that the information in a federal agency's own files, while not available to the government itself, was somehow available to defense counsel. Factually and

procedurally, these arguments are nothing short of outrageous. At trial, the government never "conceded" that Webster's low IQ scores were valid, but instead argued vehemently that they were the result of post-crime fakery to avoid the death penalty. Most of the government's limited evidence at trial addressed to "adaptive functioning" was directed to prison conduct—a discredited approach to mental retardation, as the unrebutted testimony of Dr. Tassé presented to the District Court here discusses.[6] (S.App.470-95.) Far from asserting that Webster's enrollment in special education classes was irrelevant, one government trial witness actually accused Webster of lying about being enrolled in special education classes and used that "lie" as evidence for his opinion that Webster was pretending to be mentally retarded. (S.App.318-19 (opining that this lie was consistent with "an attempt to persuade that person that you had mental deficiencies that you didn't actually have").) And the Government is now reduced to arguing that another federal agency's own medical professionals, who, in diagnosing Webster with mental retardation, were required by SSA policies to consider adaptive functioning, didn't know what they were doing.

The Government's position that the after-discovered SSA records were actually available to Webster's trial counsel is not supported by a shred of evidence. It is undisputed that trial counsel asked for but was never provided the records. The government blocked all attempts to obtain discovery in connection with Webster's initial §2255 petition. And by any account, the SSA records would *never* have been

---

[6] *See Hall*, slip op. at 19-20 (noting the importance of the medical community's diagnostic framework to legal determination of intellectual disability).

produced at all absent the actions of one SSA employee who produced the records outside the SSA's "normal procedures," and then promptly "retired." When Webster's counsel sent follow-up requests for additional records, the SSA gave Webster the run-around only to inform Webster's counsel two months later that his files had been destroyed. Indeed, the Government now admits that it had a duty to produce information that was "available" to it in connection with the §2255 proceeding, but that it did not produce the SSA records. The SSA and the Department of Justice are both federal agencies. If the information in government files was "unavailable" to the government, then it was clearly unavailable to Webster as well. The Government has presented no evidence—from its federal employees or others—that it ever made the records available to Webster. The Government's chant that Webster has "had his opportunity" to establish mental retardation completely ignores that the after-discovered SSA records were not actually or reasonably available to Webster, and that the government took active steps to block Webster from ever obtaining them through discovery.

The Government's unsupported arguments simply highlight the procedural impropriety of the position it advocates. These are factual issues that can only be decided after an opportunity for discovery and an evidentiary hearing. This Court should address the issue squarely presented here—does §2241 afford a mechanism for review of after-discovered evidence of categorical ineligibility?—hold that it does, and remand this matter for determination by the District Court.

5

## ARGUMENT

I.   **Section 2241 Provides a Mechanism for Review of Information Discovered After Denial of a §2255 Petition that Establishes Categorical Ineligibility for the Death Penalty**

A.   **There Is No Basis to Conclude that Congress Intended to Exclude Such Evidence in Enacting AEDPA**

The Government's first argument is that, under a rigid reading of *Davenport*, there is no "glitch" in AEDPA entitling Webster to review under §§2255(e) and 2241 because, in enacting AEDPA's changes to §2255, Congress limited the Savings Clause to the extremely narrow class of cases where a federal prisoner relies upon a change in statutory law to attack his conviction. (Government's Brief, Dkt.No.16 ("Gov't Br.") 32-35.) The Government contends that Congress specifically intended to preclude any court from *ever* reviewing any evidence establishing categorical ineligibility, no matter how conclusive, if it became available after a federal prisoner's initial §2255 petition. (*Id.* at 38-42.) There is no support for that argument.

First, there is no indication that Congress, in enacting AEDPA, considered categorical ineligibility at all. Nothing in AEDPA's legislative history suggests that evidence directed to categorical ineligibility was discussed or considered by Congress—let alone that Congress intentionally excluded federal prisoners, on a categorical and class-wide basis, from presenting previously-unavailable evidence to challenge their eligibility for the death penalty under the Eighth Amendment. Mental retardation and juvenile status are nowhere mentioned in either AEDPA or

its legislative history.[7] Indeed, it is clear that, in enacting AEDPA, Congress was focused on factual innocence and the balance between establishing protections for after-discovered evidence of factual innocence and seemingly endless procedural reviews. *See Developments in the Law: The Law of Prisons: II*, The Prison Litigation Reform Act and the Antiterrorism and Effective Death Penalty Act: Implications for Federal District Judges, 115 HARV. L. REV. 1846, 1859-63 (2002) ("AEDPA was intended in part to limit the ability of federal courts to use habeas review to delay executions"); Federal Habeas Corpus Reform: Eliminating Prisoners' Abuse of the Judicial Process: Hearing Before the S. Comm. on the Judiciary, 104th Cong. 61–62 (1995) (statement of Don Stenberg, Attorney General of Nebraska, emphasizing repeatedly that the problem Congress needed to address by passing AEDPA was the significant procedural delays in carrying out constitutional executions).

The Government's only basis for arguing that Congress specifically intended to foreclose review of the previously-undiscovered evidence presented here is that, because some form of categorical ineligibility existed prior to AEDPA's passage and Congress failed to specifically provide for review of after-discovered evidence of categorical ineligibility, Congress endorsed the execution of mentally retarded persons when the evidence establishing ineligibility was not available to them until after the initial §2255 proceeding. (*See* Gov't Br. 32-33, 44-46.) But that same rationale applies equally to the numerous situations in which this Court has found that Congress's failure to account for important procedural protections in AEDPA

---

[7] *Roper v. Simmons*, 543 U.S. 551 (2005) (categorical ineligibility of people under 18) and *Atkins v. Virginia*, 536 U.S. 304 (2002) (categorical ineligibility of the mentally retarded) were, of course, decided years after AEDPA's passage.

*warrants* review under §2241. Under the Government's rationale, none of these cases would be cognizable for review under §2241.

For example, in *Davenport*, this Court granted relief to a prisoner who claimed that the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137 (1995) constituted a retroactive change in statutory law that could properly form the basis of a petition under §2241. *In re Davenport*, 147 F.3d 605, 607, 611-612 (7th Cir. 1998). According to the Government, "[s]ome statutory claims" are entitled to redress under §2241 despite the strict language of §2255 because "'Congress may have overlooked the possibility that new and retroactive statutory decisions could support collateral review.'" (Gov't Br. 44-45 (quoting *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002).) Of course, this category of cases—post-conviction challenges based upon a retroactive change in statutory law—was not new; in fact, it was a cognizable basis for review under §2255 prior to AEDPA's passage. *See, e.g., Davis v. United States*, 417 U.S. 333, 346-47 (1974) (intervening judicial decision negating the criminality of prisoner's conduct "'inherently results in a complete miscarriage of justice' and 'present(s) exceptional circumstances' that justify collateral relief under §2255."); *Strauss v. United States*, 516 F.2d 980, 986 (7th Cir. 1975) (finding retroactive changes to mail fraud statute warranted successive post-conviction review under §2255); *see also Brown*, 719 F.3d at 587-89 (permitting post-AEDPA §2241 challenge to sentence based on misapplication of sentencing guidelines under *Booker*) *compared with United States v. Tayman*, 885 F. Supp. 832, 846-49 (E.D. Va.

1995) (granting pre-AEDPA successive §2255 review for failure to properly apply sentencing guidelines).

Despite the fact that claims based on a retroactive change in statutory law were regularly redressed through successive §2255 petitions at the time it passed AEDPA, Congress included only claims based on retroactive constitutional changes in the class of cases afforded successive relief under AEDPA's §2255 amendments. But, recognizing that there is nonetheless a need to address such potential injustices, this Court has made room for them under §2241. The fact that this Court concluded that "Congress may have overlooked the possibility" of those bases for review, *Taylor*, 314 F.3d at 835, counsels against imputing Congressional intent regarding categorical ineligibility without any supporting factual or legal authority. *See INS v. St. Cyr*, 533 U.S. 289, 298 (2001) ("Implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal.") (internal citations omitted).

Moreover, the Government does not explain how new evidence can at once be an acceptable basis for presenting claims of factual innocence, but somehow unacceptable as a basis for considering categorical ineligibility for death. Nor does the Government cite a single case where this Court has sanctioned the rejection of new evidence as a basis for finding categorical ineligibility. *Davenport*, *Taylor, Unthank,* and *Brown* all involved claims based on new rules of law—there was no reason for this Court to consider, in those cases, whether after-discovered evidence

9

would be an acceptable form of proof on a §2241 claim. This Court, in other words, has fashioned its rules regarding the availability of §2241 review based on the claims presented in the cases before it; this Court has never been presented with the issue raised here.

Finally, the Government's argument is irrational because it contends that Congress acted irrationally. It is clear that, in passing AEDPA, Congress was focused on factual innocence and the balance between protecting the factually innocent from execution and limiting delaying tactics. Despite Congress's focus on factual innocence, however, the Supreme Court has equivocated on whether it is unconstitutional to execute an innocent person, *see Herrera v. Collins*, 506 U.S. 390, 427 (1993); *McQuiggin v. Perkins*, 133 S.Ct. 1942, 1932 (2013), while it has absolutely prohibited execution of the mentally retarded and juveniles. Thus, from a constitutional standpoint, there is nothing less abhorrent about executing a mentally retarded person than a prisoner who didn't commit the crime of which he was convicted. To suggest that Congress favored the "factually innocent" over the mentally retarded or juveniles in allowing for review of after-discovered evidence establishing those claims makes no sense, constitutionally. Statutes, of course, should not be construed so as to assume that Congress acted irrationally. *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004); *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) (Court will not construe a statute in a manner that leads to absurd results); *Burns v. Stone Forest Indus., Inc.*, 147 F.3d 1182, 1185 (9th Cir. 1998) ("We should not choose a construction of ambiguous statutory language

10

that would attribute irrationality to Congress, where the words also lend themselves to a sensible construction.").

In sum, there is no support for the argument that the failure of Congress to specifically allow for consideration of after-discovered evidence of categorical ineligibility was intentional. Review under §2241 is essential to vindicate the absolute constitutional right of the mentally retarded and juveniles not to be executed. Failure to provide such a mechanism would amount to a suspension of the writ—and there is no evidence that Congress intended such a dramatic and constitutionally untenable result.

### B.    This Court Has Not Limited §2241 to Review of Claims Directed to Innocence of the Crime

The Government argues that *Davenport* establishes a rigid three-element test to determine whether AEDPA is "ineffective" in a way that entitles a prisoner to §2241 review. (Gov't Br. 33-34.) That is not correct. *Davenport* laid out a number of conditions to §2241 review that this Court has since modified where it appeared that a lack of review would result in a fundamental miscarriage of justice. For example, as discussed above, although Congress limited successive review under §2255(h)(2) to cases based on a retroactive, new rule of constitutional law, this Court has broadly permitted prisoners to move for relief under §2241 based on a retroactive, new rule of statutory law. Further, although *Davenport* limited §2241 review to claims of innocence and specifically denied §2241 relief to a petitioner who attacked the enhancement of his sentence, *id.* at 609-10, this Court subsequently found that §2241 was an appropriate mechanism to challenge the constitutionality

11

of the prisoner's sentence. *Brown*, 719 F.3d at 588 (§2241 petition "raising a guidelines error 'tests the legality of his detention' within the meaning of the savings clause"). The *Brown* decision explained that the text of the savings clause "does not limit its scope to testing the legality of the underlying criminal conviction." *Id.* Similarly, in *Garza*, this Court found that the prisoner was entitled to §2241 review of the legality of his death sentence where he had not had a reasonable opportunity to raise a treaty-based defense earlier. 253 F.3d at 922-23. Garza could not adequately test the legality of his sentence under §2255 because his treaty-based arguments did not qualify as a basis for a successive petition under §2255 and could not have been raised earlier. *Id.* This Court, along with its sister circuits, thus has shown flexibility when it appears that consideration of fundamental constitutional rights has been precluded by AEDPA. *See also, e.g., Poindexter*, 333 F.3d at 378; *Smith*, 285 F.3d at 8; *Jones*, 226 F.3d at 333–34; *Dorsainvil*, 119 F.3d at 251–52.

In short, where this Court has been confronted with a claim of fundamental injustice unreviewable under §2255, it has adopted a flexible approach to §2241 review, notwithstanding the *Davenport* factors. To deny Webster an opportunity to present this evidence under §2241 would constitute a grave injustice, a violation of the Eighth Amendment, and a suspension of the writ of habeas corpus.[8]

---

[8] While this Court has previously held that the Suspension Clause does not apply to post-conviction proceedings, this Court has never been confronted with such a severe constitutional deprivation.

II.   **The Recently-Disclosed Evidence "Virtually Guarantees" that Webster will be Found to be Mentally Retarded**

The SSA records are compelling evidence of Webster's mental retardation. No court, including the District Court, has assessed their importance. In arguing that this Court should become a fact-finder of first review, the Government makes virtually the same arguments it made to the Fifth Circuit regarding the quality and availability of the evidence Webster seeks to present.[9] However, in holding that §2255 did not confer jurisdiction, the Fifth Circuit did not consider the evidence and made no factual findings—and, indeed, the only judge to opine on the quality of the records, Judge Wiener in concurrence, found that they are "virtually guaranteed" to establish that Webster is mentally retarded.[10]

A.   **The SSA Records Establish Webster is Mentally Retarded and Directly Undermine the Government's Evidence and Arguments at Trial**

1.   **The SSA Records Show, Contrary to the Government's Arguments at Trial, that Webster was Not Faking Low IQ Scores**

In an attempt to shrug off the importance of the SSA records disclosed after Webster's initial federal habeas proceeding, the Government argues at length that

---

[9]  *In re Webster*, No. 09-11039 (5th Cir.), Gov't Opp'n to Req. to File Successive 2255 Mot. at 11, Nov. 28, 2009, ECF Doc. No. 0051946905.

[10]  The Government argues that the standard for reviewing after-discovered evidence of categorical ineligibility "should be as demanding as the new-evidence standard set out in section 2255(h)(1)" pertaining to factual innocence. (Gov't Br. 50.) Although Webster clearly meets that standard, the Government offers no support for its argument. Where the Supreme Court has made clear in *Atkins* and now *Hall* that, unlike a claim of factual innocence, it is absolutely prohibited to execute the mentally retarded and "the law requires that [a defendant] have the opportunity to present evidence of his intellectual disability," *Hall*, slip. op. at 22,  it is clear that a standard of evidentiary review less strict than that set forth in §2255(h)(1) must be applied to after-discovered evidence of categorical ineligibility.

13

the real issue at trial was not low IQ scores, but whether Webster exhibited adaptive deficits that supported his claim of mental retardation.[11] (Gov't Br. 52-60.) The reality, however, is that the government went to great lengths to attack the validity of Webster's IQ scores at trial, arguing through the testimony of its expert witnesses that Webster was "motivated" to do poorly on tests performed after his arrest, that Webster had a "serious motivation to mislead or deceive," and that Webster was manipulating his performance on the IQ exams. In his closing argument, the prosecutor asked the jury to consider Webster's "motivations" when adjudging the validity of his IQ tests, and suggested that Webster's IQ scores were irrelevant because he had faked them (or, in the Government's words, that Webster was "motivated" to fake low scores on the IQ and behavioral skills tests in order to avoid a death sentence). (S.App.301-05, 308, 313, 337-39.) This position was adopted by the habeas court in its denial of Webster's initial §2255 petition. (S.App.85-86.)

The Government ignores its well-documented trial strategy directed to Webster's IQ scores because the SSA records devastate the government's position at trial. The prosecution's own expert, Parker, conceded that a patient who seeks professional services in the non-forensic or "real world" setting—which would include Webster's evaluation by SSA doctors for a sinus condition—does not have any "motivation to mislead or deceive" concerning mental retardation, and that it would be "pretty silly" for a person seeking professional services on his own to "go to

---

[11] The government's arguments addressed to "adaptive functioning" also fail; *see* Section II.A.2, *infra.*

14

a doctor and then sit there and tell the doctor a bunch of lies about why he [] is there." (S.App.305.)

### 2. The Presentation at Trial of One IQ Test Administered Prior to the Commission of the Crime Does Not Make the SSA Records "Merely Cumulative"

The Government also focuses, for the first time, on an IQ test administered before the commission of the crime that established Webster's IQ as in the range for mental retardation, suggesting that the after-discovered SSA records are "merely cumulative." (Gov't Br. 58-59.) But that was just one test, and it was not performed by SSA doctors—employed by the same federal government as the prosecutors—who were required to adhere to standards set out by the SSA. Had the SSA records been made available to the defense at trial, the government would have been forced to argue that three additional pre-crime diagnoses of mental retardation by doctors employed by the federal government—one of which specifically found that Webster was not "malingering"—were of less value than its two hired experts at trial, neither of whom conducted a full test for intellectual capacity as part of their paid testimony on behalf of the prosecution. (S.App.344-413.) The SSA records are not, in any sense, "merely cumulative." They clearly and effectively corroborate the evidence presented by defense experts at trial and strongly undercut the testimony of the government's own expert witnesses.

### 3. The SSA Records Contain Significant Evidence of Webster's Adaptive Deficits and Undercut the Government's Weak and Discredited Trial Evidence

Further, the Government mischaracterizes the extent and quality of the "adaptive functioning" evidence presented here, in the SSA records, and at trial.

15

First, the Government has failed to offer any meaningful evidence to contradict the adaptive functioning findings of the SSA medical professionals. Contrary to the Government's assertion (Gov't Br. 55), the SSA records reflect a wealth of information concerning Webster's adaptive functioning and demonstrate that his adaptive skills were considered as part of the SSA doctors' diagnoses of mental retardation, as explicitly required by the SSA's own standards. *See Mental Retardation: Determining Eligibility for Social Security Benefits* 189 (Daniel J. Reschly et al. eds., 2002) (noting that "adaptive behavior is an essential component of the mental retardation diagnostic construct, and all agencies contemplating mental retardation diagnoses should give consideration to adaptive behavior" because "[a]daptive behavior has been fundamental to conceptions of mental retardation at least since the early 19th century") (citing E.A. Doll, *Historical Review of Mental Retardation 1800-1965: A Symposium*, 72 Am. J. Mental Deficiency 165 (1967), and E.A. Doll, *Current Thoughts on Mental Deficiency*, 41 Proc. Am. Ass'n on Mental Deficiency 33 (1936)).

In the "Current Level of Functioning" section of his report, Dr. Spellmann noted many factors indicating adaptive deficits, including an inability to engage in day-to-day tasks and manage a home and work life. (S.App.356.) Spellmann then diagnosed Webster with mental retardation, stating, "Client will not get any better. He is not competent to manage funds, if awarded. There was no evidence of exaggeration or malingering." (*Id.*) Dr. Hackett, who performed a WAIS-R IQ test and diagnosed Webster as mentally retarded, evaluated Webster's functioning

16

similarly, stating that Webster could not be functional in a community setting, would not function well in the work place, and could not manage his own benefits. (S.App.357-59.) These are all hallmark examples of adaptive deficits. *See Heller v. Doe*, 509 U.S. 312, 329 (1993) (mental retardation "results in 'deficits or impairments in adaptive functioning,'" including "'how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group'").

Moreover, Webster's poor reading, writing, comprehension, and language skills are apparent simply by looking at his Social Security benefits application, which is riddled with errors in spelling, grammar, syntax, and comprehension. (*See* S.App.367, 369, 371-78, 393-400, 408-11.) For example, in response to the prompt "Describe what you do on an average day. Tell what you usually do in the mornings, what takes most of your time during the day, etc.," Webster wrote "I sleeps look at cartoon."

> 1.A. Describe what you do on an average day. Tell what you usually do in the mornings, what takes most of your time during the day, etc..
> I sleeps look at cartoon

(S.App.373.) Similarly, in response to the question "How many hours do you usually sleep each night," Webster wrote "don't sleep to good at night wakes up sneesing, couhing."

> 2.A. How many hours do you usually sleep each night?
> don't sleep to good at night wakes up sneesing, couhing.

(S.App.373.) Webster answered the prompt "Describe any changes in social activities since your condition began," with "I don't social much."



(S.App.377.) In response to questions regarding what household maintenance tasks Webster engaged in, Webster wrote "make my room;" in response to the follow up question regarding whether he needs help, Webster wrote "Nope I just make my room;" and, apparently growing frustrated with the question "Describe any changes in household maintenance since your condition began," Webster states, "I told you I make my room".

(S.App.375.) Finally, in response to the inquiry "Do you do any shopping," Webster checked "Yes," and wrote that he shops for "potato ships, pops, kookies;" when

asked how often he shops, he responded "Not much"; when asked how long it takes, he responded "hours"; and when asked whether he needs help shopping, Webster responded "every once a while it taks hours".

(*Id.*) These excerpts offer just a few examples of the deficiencies in handwriting, comprehension, and language skills that are clear from Webster's application.

The Government's trial evidence regarding adaptive deficits was quantitatively sparse and qualitatively weak. The prosecution's experts, Parker and Coons, focused their forensic analysis on Webster's behavior in prison and their mistaken belief that he had not been enrolled in special education classes in school. (*See, e.g.*, S.App.325 (Dr. Coons testifying that Webster has adapted to life in prison).) Yet, the Government does nothing to dispute that evidence of an individual's capacity to function in an institutionalized environment or prison setting is not credible evidence of adaptive functioning. *See Thomas v. Allen*, 614 F. Supp. 2d 1257, 1282 (N.D. Ala. 2009) ("adaptive behavior is performance in one's community, not in restricted settings, such as prison"); *Wiley v. Epps*, 668 F. Supp.

19

2d 848, 900 (N.D. Miss. 2009) ("[s]tandardized [adaptive] measures are not normed for a prison population, and what a person can do in a structured environment is not indicative of how the individual will perform in the open community"); *see also* S.App.483-84 ¶28 (noting prison life and prison expectations for adaptive functioning cannot be substituted for society's expectations in determining the individual's functioning in the general community). Without evidence of adaptive functioning outside the prison context, the Government lacks almost any evidence related to Webster's adaptive functioning.

Furthermore, the Watson Chapel School District letter Webster seeks to present here, which acknowledges that Webster's special education records were destroyed in the 1980s, directly contradicts the prosecution's trial evidence that Webster was never in, did not qualify for, and lied about being placed in special education classes—all of which, according to the prosecution, demonstrated that Webster was not mentally retarded. (*See* S.App.187-90, 360, 493 ¶49.) Coons went so far as to tell the jury that Webster lied about being in special education classes in an attempt to manipulate a diagnosis of mental retardation. (S.App.317-18.) Yet, the Government continues to insist that this letter has little or no evidentiary value. (Gov't Br. 40-41.) The fact that Webster now has possession of a letter from his school stating that his special education records were destroyed is highly probative of whether Webster was qualified for special education, whether he was placed in special education, and, importantly, whether he lied about being in special education.

Thus, the recently-disclosed SSA records—including three diagnoses of mental retardation rendered by independent practitioners working on behalf of the SSA, prior to the commission of the crime—are directly relevant to the highly-litigated issue of whether Webster's IQ scores were credible and whether he shows the requisite adaptive deficits. The SSA records directly undercut the government's position at trial and corroborate the post-crime tests for mental retardation presented by the defense experts at trial.

**B.     The Government's Attempt to Attack the Findings of the SSA Doctors is Unsupported**

Faced with unambiguous diagnoses and other findings that contradict its trial evidence, the Government attacks the methodology and expertise of the very SSA doctors tasked by the government with weeding out fakers. (Gov't Br. 55-57.) That attack has no foundation. The Government offers no evidence that any of the medical professionals in the employ of the government were unqualified or that their testing was incomplete or flawed. Nor did the Government offer to the District Court below any evidence to rebut the testimony of Dr. Tassé that the SSA records "indicate that Mr. Webster had significant subaverage intellectual functioning … consistent with a diagnosis of mental retardation." (S.App.495.)

The Government makes the unsubstantiated claim that the SSA doctors did not adequately take into account Webster's adaptive functioning. (Gov't Br. 55.) As set forth in Part II.A.3, *supra*, that claim is belied both by the records themselves, and by the standards that SSA doctors were required to follow in evaluating a

21

patient for mental retardation. *See Mental Retardation: Determining Eligibility for Social Security Benefits* at 189.

Thus, the Government's claims that federal government doctors were incompetent or careless in their diagnoses is completely without support. Further, by opposing all discovery in connection with the initial habeas proceeding, the Government not only ensured, wittingly or not,[12] the suppression of the SSA records themselves, but also any follow up that would have provided the additional information about the qualifications and methodologies of the SSA doctors.

### III.    The SSA Records were Not Available to Webster

#### A.    The District Court did Not Make any Finding Regarding the Prior Availability of the SSA Records

As an initial matter, while the Government does not even attempt to argue that the District Court in this action made any factual findings as to the significance and quality of the new evidence presented by Webster here, the Government misleadingly suggests that the District Court *did* make a finding as to the prior availability of Webster's newly discovered evidence. (Gov't Br. 26-27.) That is wrong. First, the only comment by the District Court on the subject of availability appears in a footnote: "*Apparently*, trial counsel did not follow-up" on his pre-trial request for information. (App.11 n.10.) That footnote is dictum, unnecessary to the District Court's decision. *See, e.g., McDaniel v. Sanchez*, 452 U.S. 130, 141 (1981)

---

[12]  Far from conceding that the Government did not engage in any "deliberate or malicious actions" in failing to produce the records earlier, (*see* Gov't Br. 25), Webster has consistently maintained that he does not *know* whether the prosecution's failure to disclose the SSA records was malicious or deliberate, because he has only now gained access to these vital records that were in control of a federal agency and because the Government has failed to set forth any explanation for its failings. (Dkt.23 at 15.)

(discussion in the footnote of an opinion, unnecessary to the decision, is dictum). More importantly, the District Court's qualification of its statement with the word "apparently" means that it was speculation, not a finding of fact. *See, e.g. Cooke v. Bowersock*, 122 F.2d 977, 984-85 (8th Cir. 1941) ("[T]he [district] court's qualification of its finding by the word 'apparently' deprives it of the weight which we must accord to a positive finding of a fact."); *Leighton v. Comm'r of Internal Revenue*, 1945 WL 7514, T.C.M. (P-H) P 42,332 (Tax Ct. Nov. 5, 1945) (using the word "apparently" because the evidence "is so vague that no satisfactory findings of fact can be made from it"); *see also Torres v. United States*, 200 F.3d 179, 183 (3d Cir. 1999); *cf. Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 31 (1990).

## B. The SSA Records were Not Made Available to Webster Despite Repeated Efforts to Obtain Them

The Government's mantra that Webster "had repeated opportunities" to establish mental retardation simply assumes away the existence and unavailability of the recently-disclosed SSA records. Webster has not had a reasonable opportunity to present those records because they were buried in federal government files and not produced either at the time of trial or upon Webster's initial habeas, despite the attempts of Webster's counsel to obtain them.

Several requests to obtain Webster's records from the SSA received partial responses, stonewalling, or no response at all. In March 1996, Webster's trial counsel contacted the SSA and attempted to retrieve records regarding Webster's application for benefits. (S.App.502 ¶4.) Webster's trial counsel also arranged for a private investigator to travel to the Pine Bluff, Arkansas, SSA Office to retrieve

23

Webster's records before his trial. (*Id.*) Webster's trial counsel's recollection—not contested by the Government in its Brief—is that he was informed that no records regarding Webster's application were available at that time. (*Id.*) There is not a shred of evidence that the SSA ever produced the records requested by Webster's trial counsel.

Counsel for Webster in his initial habeas proceeding sought discovery to obtain all government records that related to a diagnosis of mental retardation. The government, however, actively opposed that request and the court denied all of Webster's requests for discovery. (*See* Opening Br. 5.)

After being retained to represent Webster, undersigned counsel sent a routine request to the SSA and other agencies on October 27, 2008, for all records relating to Webster, and received, in February 2009, the SSA records that Webster sought to present to the District Court. (S.App.557 ¶6.) However, upon examining these records, the file appeared incomplete. (S.App.558 ¶7.) When counsel submitted a request for the records that appeared to be missing, the SSA informed counsel that, despite the fact that Webster's request was supported by a valid authorization, "normal procedures were not followed when the [SSA] records received in February of 2009 were sent," and that "the person who copied and sent them had retired," and the SSA refused to produce any additional records or even confirm whether any additional records existed. (S.App.558.) After giving Webster the run-around for another two months, requiring him to submit new authorizations and make requests through a different SSA office, the SSA sent a

final letter to Webster's counsel on December 7, 2009, stating that Webster's folder had been destroyed. (S.App.559-60 ¶¶12-13.) The SSA's position that the records were produced as the result of an error and their subsequent destruction in the face of direct requests by undersigned counsel confirms their unavailability in previous proceedings and raises obvious suspicions that the Government here makes no attempt to dispel. Thus, Webster has shown that the records were not available to him either at trial or in the initial habeas proceeding. Despite the fact that the SSA is, like the Department of Justice, an agency of the federal government, the Government here has produced no evidence that the records were ever produced or made available to Webster. If, in fact, the records had been made available to Webster, certainly the Government could easily establish that fact by presenting the testimony or records of the government employees who made them available. Yet the Government has produced no such evidence, and is reduced to speculating about why trial counsel did not receive these records. That speculation is not warranted in light of the extraordinary efforts undersigned habeas counsel undertook, only to be told that the records it had obtained had been sent in contravention of SSA procedures and then promptly destroyed.

## C.     The Government Blocked all Attempts to Obtain Discovery

The Government strongly suggests that Webster's §2255 counsel should have obtained the records, but completely ignores the fact that the government affirmatively blocked all attempts to obtain discovery in the §2255 proceeding. (Gov't Br. 41.) Indeed, the Government claims it opposed the sought-after discovery

that would have required the SSA to produce its records (*see* S.App.512-34) because the government already had a duty to provide the Webster with any available evidence relating to his mental retardation defense.  (Gov't Br. 15 n. 4.) Acknowledging that it did not produce the SSA records, the Government implicitly concedes that the SSA records were not available to the government. If the records in the files of a government agency were *not* available to another agency of the same government, there can be no claim that the records *were* available to a mentally retarded person sitting on death row who had no connection at all to the government. And given trial counsel's futile efforts and the SSA's later-stated position that the records obtained by undersigned counsel were produced in error, there is no reasonable basis to conclude that any means of obtaining information short of court-ordered discovery would have dislodged the records from the SSA at the time of the §2255 proceeding.

Remarkably, the Government suggests that it was Webster's duty both to know about and obtain records in the hands of the federal government.  First, a defendant does not have the burden to search for undisclosed materials when the government represents that all such material has been disclosed. *Banks v. Dretke*, 540 U.S. 668, 695 (2004). Second, Webster affirmatively tried to obtain discovery that would have required disclosure of the SSA records, and was denied that opportunity as a result of the government's active opposition to discovery.  (*See* S.App.561-65; S.App.500-06; S.App.507-35.) Finally, the Government's claim that Webster himself should have known about and appreciated the significance of the

26

SSA records (and thus, apparently, "tried harder" to force their disclosure) flies in the face of *Atkins.* As the Supreme Court held, one of the very reasons for the categorical ineligibility of the mentally retarded is their inability to assist trial counsel in their own defense. *Atkins v. Virginia*, 536 U.S. 304, 320-21 (2002).

As demonstrated above, the importance of these records is undeniable. And as the Supreme Court's recent opinion in *Hall* makes clear, "[p]ersons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution." *Hall,* slip op. at 16. Webster has been denied that fair opportunity.

## IV. This Court Should Reverse and Remand for Discovery and an Evidentiary Hearing on Any Issues of Fact

Because there were no factual findings by the District Court, this Court should address the legal question presented here, find that §2241 provides a pathway for federal habeas review of the newly-released evidence of categorical ineligibility presented by Webster, and remand to the District Court for factual findings on any disputed issues regarding the quality or availability of the previously-undisclosed evidence. *See St. Pierre v. Cowan*, 217 F.3d 939, 951 (7th Cir. 2000) (reversing denial of habeas petition and remanding for further fact-finding because "it would be inappropriate for us to make such a factual finding in these proceedings"); *see also Alexander v. Attorney General United States*, 495 F. App'x. 274, 277 (3d Cir. 2012) (vacating and remanding denial of §2241 petition and encouraging additional fact-finding); *Antonelli v. Lappin*, 338 F. App'x. 379, 382

27

(5th Cir. 2009) (same); *York v. U.S. Parole Commission*, 330 F. App'x. 163, 165 n.2 (10th Cir. 2009) (same).

## **CONCLUSION**

Webster respectfully requests that this Court: (1) reverse the District Court's order; (2) find that Webster is entitled to review of the previously unavailable evidence under 28 U.S.C. §2241; and (3) remand to the District Court for discovery and an evidentiary hearing.

Dated: June 4, 2014

DORSEY & WHITNEY LLP


By   /s/Steven J. Wells_____
      Steven J. Wells
         *Counsel of Record*
      Kirsten E. Schubert
      Timothy J. Droske
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile: (952) 516-5526

*Attorneys for Petitioner-Appellant Bruce Carneil Webster*

28

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,994 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point Century Schoolbook font for the main text and 11-point Century Schoolbook font for footnotes.

Dated: June 4, 2014                          By:  /s/Timothy J. Droske
                                                        Timothy J. Droske

                                                    DORSEY & WHITNEY LLP
                                                    Suite 1500, 50 South Sixth Street
                                                    Minneapolis, MN 55402-1498
                                                    Telephone: (612) 340-2600
                                                    Facsimile: (612) 340-2868

                                                    *Attorneys for Petitioner-Appellant Bruce*
                                                    *Carneil Webster*

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2014, I electronically filed the foregoing Appellant's Reply Brief with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> James Wesley Hendrix, Esq.
> Office of the U.S. Attorney
> Northern District of Texas
> 1100 Commerce Street, Suite 300
> Dallas, TX 75242-1699
> 214-659-8684
> Email: wes.hendrix@usdoj.gov

Pursuant to ECF Procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the foregoing to be transmitted to the Court within 7 days of that notice date.

Dated: June 4, 2014

By: /s/Timothy J. Droske
    Timothy J. Droske

DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Petitioner-Appellant Bruce Carneil Webster*

30