UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

-------------------------------------------------------

BRUCE CARNEIL WEBSTER,

              Petitioner,

       vs.

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

              Respondent.

-------------------------------------------------------

:

:

CAUSE NO:

:

:

:

**2 : 1 2 -cv- 0 0 8 6 WTL -WGH**

FILED
U.S. DISTRICT COURT
_____ DIVISION

2012 APR -6 PM 1: 46

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

## DECLARATION OF STEVEN J. WELLS IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

### THIS IS A DEATH PENALTY CASE

DORSEY & WHITNEY LLP
Steven J. Wells
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

*Attorneys for Petitioner Bruce Webster*

I, STEVEN J. WELLS, declare as follows:

I am a partner at the law firm of Dorsey & Whitney LLP ("Dorsey"), attorneys for Petitioner Bruce Carneil Webster. I submit this Declaration in support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241.

1. Attached hereto as **Exhibit A** is a true and correct copy of the Order entered in *Roane, et. al. v. Gonzales, et. al.*, Case No. 1:05-cv-2337 (D.D.C. Feb. 16, 2007) (Docket No. 27).

2. Attached hereto as **Exhibit B** is a true and correct copy of excerpts from Volume 23 of the transcript of proceedings held in the criminal trial of Bruce Carniel Webster in the Northern District of Texas, *U.S. v. Webster*, Case No. 4:94-cr-00121-Y (N.D. Tex.) (hereinafter "trial transcript") on June 12, 1996.

3. Attached hereto as **Exhibit C** is a true and correct copy of excerpts from Volume 24 of the trial transcript for proceedings held on June 13, 1996.

4. Attached hereto as **Exhibit D** is a true and correct copy of excerpts from Volume 25 of the trial transcript for proceedings held on June 14, 1996.

5. Attached hereto as **Exhibit E** is a true and correct copy of excerpts from Volume 26 of the trial transcript for proceedings held on June 18, 1996.

6.     Attached hereto as **Exhibit F** is a true and correct copy of excerpts from Volume 27 of the trial transcript for proceedings held on June 19, 1996.

7.     Attached hereto as **Exhibit G** is a true and correct copy of the Social Security Administration records of Bruce Webster received by Dorsey on February 9, 2009. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

8.     Attached hereto as **Exhibit H** is a true and correct copy of the Social Security Administration records of Willie Webster received on February 9, 2009. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

9.     Attached hereto as **Exhibit I** is a true and correct copy of the Department of Human Services Child Maltreatment Division Records received on October 31, 2008. Dorsey has paginated this exhibit for ease of reading. Dorsey has redacted pursuant to Fed. R. Crim. P. 49 for privacy protection.

10.     Attached hereto as **Exhibit J** is a true and correct copy of the December 9, 2008 Declaration of Leonda Daniels.

11.     Attached hereto as **Exhibit K** is a true and correct copy of the November 12, 2008 Declaration of Lanetra Evans.

12.     Attached hereto as **Exhibit L** is a true and correct copy of the November 11, 2008 Declaration of Luketha Frazier.

13.    Attached hereto as **Exhibit M** is a true and correct copy of the December 7, 2008 Declaration of Marvin Holloway.

14.    Attached hereto as **Exhibit N** is a true and correct copy of the December 9, 2008 Declaration of Angela Madison.

15.    Attached hereto as **Exhibit O** is a true and correct copy of the December 9, 2008 Declaration of Theressia Martin Moten.

16.    Attached hereto as **Exhibit P** is a true and correct copy of the December 8, 2008 Declaration of Michael Parks.

17.    Attached hereto as **Exhibit Q** is a true and correct copy of the November 11, 2008 Declaration of Jodin Smith.

18.    Attached hereto as **Exhibit R** is a true and correct copy of the November 11, 2008 Declaration of Dorothy Harris Wallace.

19.    Attached hereto as **Exhibit S** is a true and correct copy of the November 11, 2008 Declaration of Sharon Webster.

20.    Attached hereto as **Exhibit T** is a true and correct copy of the November 11, 2008 Declaration of Tony Webster.

21.    Attached hereto as **Exhibit U** is a true and correct copy of the September 29, 2011 Declaration of Dr. Marc J. Tassé, PhD.

22.    Attached hereto as **Exhibit V** is a true and correct copy of the March 23, 2012 Declaration of Kristen K. LeRoux.

23.     Attached hereto as **Exhibit W** is a true and correct copy of the October 20, 2009 Declaration of Larry M. Moore.

24.     Attached hereto as **Exhibit X** is a true and correct copy of the Motion of Bruce Carneil Webster for Leave to Conduct Discovery, Docket No. 1028, filed on April 30, 2001.

25.     Attached hereto as **Exhibit Y** is a true and correct copy of the Memorandum Opinion and Order Denying Petitioner's Motion for Discovery, Docket No. 1063, filed on June 18, 2002.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: 3/23/12

_____
Steven J. Wells

Case 2:12-cv-00086-JTW-WGMG Document 41-3-1 Filed 01/30/06/12 Page 6 of 275 Page ID #: 4165
Case: 14-1049     Document: 26-6     Filed: 07/08/2014     Pages: 275

# Wells Decl. Ex. A

Case 2:12-cv-00086-JTW-WGMG Document 41-3-1 Filed 01/30/06/12 Page 6 of 275 Page ID #: 4165

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES H. ROANE, JR., et al.,                )
                                            )
       **Plaintiffs,**                 )
                                            )
   v.                                      )        **Case No. 1:05-CV-2337 (RWR)**
                                            )
ALBERTO GONZALES, et al.,                   )
       **Defendants.**                )
                                            )
                                            )

## ORDER

IT IS ORDERED that Plaintiff Bruce Webster's Unopposed Motion for a Preliminary Injunction Barring His Execution it is hereby GRANTED. The Defendants herein are enjoined from executing Plaintiff Bruce Webster, pending further order of this Court.

Dated: 2/16/07

_Richard W. Roberts_
Richard W. Roberts
United States District Judge

**EXHIBIT A**

# Wells Decl. Ex. B

Case 1:12-cv-00086-TWP-DML Document 41-22 Filed 00/06/42 Page 9 of 279 PageID #: 5068

Case: 14-1049     Document: 26-6     Filed: 07/08/2014     Pages: 275

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA     .  CRIMINAL ACTION NO.
                             .   4:94-CR-121-Y
V.                           .
                             .  Fort Worth, Texas
BRUCE CARNEIL WEBSTER        .  June 12, 1996
. . . . . . . . . . . . . . . .


                    VOLUME 23
              TRANSCRIPT OF THE TRIAL
        BEFORE THE HONORABLE TERRY R. MEANS,
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:       MR. RICHARD B. ROPER
                          MR. PAUL D. MACALUSO
                           MR. CHRISTOPHER CURTIS
                          Assistant United States Attorney
                           801 Cherry Street, Suite 1700
                          Fort Worth, Texas  76102-6897
                           (817) 978-3291

For the Defendant:        MR. LARRY M. MOORE
                          Attorney at Law
                           1112-A East First Street
                          Fort Worth, Texas  76102
                           (817) 338-4800

                           MR. ALLAN K. BUTCHER
                          Hill, Beatty, Butcher
                           & Gallagher
                          201 Main Street, Suite 1300
                           Fort Worth, Texas  76102
                          (817) 336-3600

Court Reporter:           Ana P. Warren
                          U.S. District Court Reporter
                          501 W. 10th Street, Room 204B
                           Fort Worth, Texas  76102-3637
                          (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.


U.S. DISTRICT COURT


**EXHIBIT B**

Case 2:12-cv-00086-WTL-WGH   Document 122   Filed 04/06/14   Page 10 of 275 PageID #: 1

Redirect - Moore/Webster, Mark          33

Q. Who was he working with whenever he worked for those people?

A. Me and some more guys -- well, all my brothers. I had them all out there.

Q. In answer to one of the questions that Mr. Macaluso asked you about how was Bruce living, you said something about his girlfriends would take care of him. Tell me what you mean by that?

A. Well, they would buy him things and whatever, and he would stay with them.

Q. Did your brother ever get money from your mother?

A. Yes. He would get money from her.

Q. For how long?

A. As long as he was at the house or come down there.

Q. When you were a kid growing up and this was all going on, Mr. Macaluso asked you how come the teachers never saw the bruises or how come you never talked to the teachers about it. Why didn't you tell the teachers or the preacher or anybody else about what was going on?

A. Scared.

Q. Scared of what?

A. My father.

Q. When you would have bruises or marks on your body, would you wear clothes that allowed people to see those marks?

A. No.

U.S. DISTRICT COURT

Cross - Macaluso/Webster, Future        67

Q. He has not or you don't know?

A. No, because he was working on the C.E.T.A. program, and that was during school, and school was back in.

Q. Do you have any earthly idea how he would get all that money he was spending on himself and other people?

A. Bruce don't have no money because there have been times when Bruce sees me, Bruce asks me for money, and I give it to him.

Q. Okay. You wouldn't see him wearing jewelry?

A. Jewelry that my mother bought.

Q. Your mother bought him expensive jewelry?

A. Yes. She charged it on her card. She would do it for me, too.

Q. But if your mother didn't give him the money and he wasn't working, then you don't really know where he would have gotten his money, do you?

A. From me and his mother, $35 here, $2 here.

Q. Okay. Do you know why Bruce couldn't hold an honest job like your brother Tony and your brother Mark?

A. What did you say?

Q. Is there any reason that you know of why Bruce couldn't have gone out and gotten an honest job?

A. If somebody had hired him. Just like I used to put in for jobs and never could get hired because of education. I didn't get an education.

U.S. DISTRICT COURT

Direct - Butcher/Frazier          75

A. About seven or eight.

Q. So it was in your early years?

A. Yes.

Q. And how often would you see him?

A. I would see him every day.

Q. Were the two of you in the same grade?

A. Yes.

Q. Did you go to the same school?

A. Yes.

Q. Did you have classes together?

A. We had one class together.

Q. How did Bruce get along with the other children in school while you were there?

A. He got along with them well.

Q. Was he liked or not liked?

A. Very disliked -- excuse me. Sorry. He was very liked by the students.

Q. How well did he perform? Was he able to do all of the assignments and do well in school?

A. With the help of other students.

Q. In what way would other students help him?

A. They would do his homework or try to show him how to do it.

Q. Did he ever get help on exams or tests?

A. On one particular test, I helped him.

Q. Do you know whether or not other students helped him on

U.S. DISTRICT COURT

Direct - Butcher/Frazier        76

other tests?

A. Not to my knowledge.

Q. Did you ever help him with assignments?

A. Yes.

Q. With regard to a driver's license, did you have memory -- do you remember an incident involving Bruce and the driver's license?

A. Yes.

Q. What was that?

A. Well, I had the answers to the test, and I gave them to him.

Q. So you provided the answers to the written portion of the test to Bruce?

A. Yes.

Q. And this was for the driver's license?

A. Yes.

Q. Living across the street or down the street from the Webster family, are you aware of the punishment that Willie Webster, Bruce's father, would give out?

A. Yes.

Q. Have you seen that yourself?

A. I didn't see it, but I heard of it.

Q. Well, not with regard to any particular person, but have you seen it in general?

A. Well, it happened to myself.

U.S. DISTRICT COURT

Recross - Macaluso/Daniels          102

A. Yes, sir.

MR. MOORE: I don't think I have anything further, Your Honor.

MR. MACALUSO: Just a question or two.

THE COURT: All right.

RECROSS EXAMINATION

BY MR. MACALUSO:

Q. Ms. Daniels, did I understand you to say that you didn't think Mr. Webster, Bruce over here, could fill out a job application?

A. He could fill out one, but at the time I guess he wanted me to fill out the application form.

Q. Then the question is, ma'am, so we're clear on this. Are you saying that he could but didn't?

A. He can fill out an application, yeah, but I filled it out that particular day.

Q. We don't want to confuse the jury by suggesting that he couldn't fill out a job application, would we?

A. Yeah. He can fill out one.

Q. You've read letters from him, haven't you?

A. Huh? Sir?

Q. Has he written letters to you?

A. Yes, sir.

Q. Does he have any difficulty writing you a letter?

A. I can hardly understand his handwriting. I don't know.

U.S. DISTRICT COURT

Direct - Moore/McKelvy          103

Q. Well, putting aside the handwriting, did you have any difficulty understanding what he had to say at all?

A. Huh-uh.

MR. MACALUSO: Thank you, ma'am.

MR. MOORE: No further questions.

THE COURT: You may step down. Thank you. And you're free to go as well.

MR. MOORE: Dorothy Harris McKelvy.

THE COURT: What was the last name again?

MR. MOORE: McKelvy, M-C-K-E-L-V-Y. I think she's on the witness list as Dorothy Harris, Your Honor, Number 64.

THE COURT: 64. Thank you.

Ms. McKelvy, would you please raise your hand and be sworn?

(Witness sworn by the Court)

DOROTHY HARRIS MCKELVY, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MOORE:

Q. State your full name for the jury, please? State your full name for the jury, Dorothy?

A. I can't hear you too well.

Q. Okay. Let me try this again. State your full name for the jury?

A. Dorothy Harris McKelvy.

Q. And how old are you?

A. Thirty-six.

U.S. DISTRICT COURT

Direct - Moore/Webster, Beatrice        138

A. Yes, sir.

Q. What grade did he have to repeat?

A. I believe he had to repeat the second grade twice and another grade when he got on up -- what you would call -- not high school but between that.

Q. During the time that Bruce was growing up in the house, were there things that occurred -- were there things that your husband did to Bruce that you knew he ought not be doing?

A. Yes, sir.

Q. Did those type things occur to the other children in the house as well?

A. Yes, sir.

Q. Did those type things happen to you?

A. Yes, sir.

Q. Did you ever make any efforts to try to stop your husband from doing those type things to your children?

A. No, sir.

Q. Why didn't you do that, Ms. Webster?

A. I was afraid.

Q. What were you afraid of?

A. The things that he told me.

Q. The things that your husband told you?

A. Yes, sir.

Q. What type things would he tell you that he would do?

A. He just told me that I don't go to no white folk, only him,

U.S. DISTRICT COURT

Direct - Moore/Webster, Beatrice          145

about him, what was he talking about?

A. Well, I assume if I say the wrong thing, testify to the truth or something, and he knows that it's the truth, that if he hear about it, you know, I don't know what he would do. But I assume that's what he's saying.

Q. Are you still scared of your husband?

A. Yes, sir.

Q. Are you scared about him finding out what you testified to here in court?

A. Yes, sir.

Q. Can your husband read and write?

A. No, sir.

Q. When you -- when did Bruce leave home for good? Has there ever been a time in Bruce's life when he left and moved out and never came back to live?

A. No, sir.

Q. How has Bruce, since he, you know, became a teenager and thereafter, how has Bruce lived? How has he supported himself?

A. Through the welfare office, F.D.C., and get food stamps and with a little money I give him. He would just live at home with me.

Q. Has he lived at home continuously pretty much all of his life?

A. Yes, sir.

Q. Has there been occasions when he has lived with somebody

U.S. DISTRICT COURT

Direct - Moore/Finn                176

course work in mental retardation, and have continued to perform some evaluations of mentally retarded individuals, some through the courts and some through just other sources.

I'm also a consultant to the Jefferson's Home for Children in Azle, Texas, which is a residential facility for severely and profoundly retarded children, and I do basically all the psychological assessments for them and their children.

Q. So you have had significant experience in assessing and evaluating individuals that are mentally retarded?

A. Yes, sir.

Q. As a matter of fact, have you been previously certified by the State Department of Mental Health and Mental Retardation? Did you obtain a certificate that qualified you to do those assessments for the granting of benefits, so to speak, through M.H.M.R.?

A. Yes, I did. When I worked here in Fort Worth, I received some kind of a certificate from the Texas Department of Mental Health and Mental Retardation that basically said I was qualified to conduct what they call diagnostic evaluations of individuals that are suspected of being mentally retarded.

Q. Now, in connection with your -- in line with your profession and your duties and interests, did you have an opportunity, at my request, to perform an evaluation of the defendant in this case, Bruce Webster?

A. Yes, I did.

U.S. DISTRICT COURT

Direct - Moore/Finn          177

Q. When was the first time that you recall that you had the opportunity to see Mr. Webster?

A. The first time I saw him was on January 28 of 1995.

Q. And what was your purpose in seeing Mr. Webster at that time?

A. Well, I saw him at your request, primarily to determine if there were any issues of mental illness or mental retardation that might be a factor in his defense that would figure in some way in these crimes that he was accused of, and would figure in some way in the disposition, should he be found guilty.

Q. Prior to your -- or in connection with your examination of him on that date, did I provide you with some information from the Southeast Arkansas Mental Health Clinic regarding Mr. Webster and a hospitalization or a session that he had with them back in 1992, I think?

A. Yes, you did.

Q. Did you have the opportunity to refer to that information?

A. Yes.

Q. And contained within that information, was there an indication at that time, at the time that he had gone to the Southeast Arkansas Mental Health Clinic, that he had received an I.Q. test and an evaluation regarding whether or not he was mentally retarded?

A. Yes. He was -- let me see. I'm trying to find the right reference. He was tested in 1992, given a test called the

U.S. DISTRICT COURT

Direct - Moore/Finn          178

Wechsler Adult Intelligence Scale, which is a very widely used measure of individual intelligence, and came out with an I.Q. score of 48, which is well within the range of what would be considered mentally retarded, the cut-off for mental retardation, being either below 70 or 62, depending on exactly which definition you're using.

Q. In connection with that same visit, was there an indication from the records that they had observed symptomology, or they had seen symptoms which suggested to them that he needed to be treated with some kind psychotropic medication?

A. Yes, there were.

Q. What, basically, had they seen, or did they do?

A. Primarily that he was reporting intense anxiety and what I would describe as paranoia, that is, unreasonable suspiciousness of others, fears that people are out to get him, that he was going to be harmed in some way. I think he reported an experience of feeling like something was following him, some kind of entity, or that he would even try to catch him from behind, things of that kind.

Q. Was there an indication in those records, also, as to whether or not he was suffering from any type of depression regarding the brother's death or something like that?

A. Yes. His brother had been killed in some sort of an argument, I believe, either one or two years previously, and that he had mentioned that in the intake interview and had

U.S. DISTRICT COURT

Direct - Moore/Finn                186

reliability of these tests. Five points either way means, to give you the complicated definition, that 95 percent of the variation of those scores will lie within that interval. It's what's called the confidence limit in technical terms.

Q. When you're looking at an I.Q. score of 70 or less, I think you indicated, you're talking about a statistical portion of the population that's very small?

A. Yes, about one-and-a-half to one percent of the general adult population.

Q. So if the mean -- if the normal mean for adults is 100 and we're talking about the people that are scoring 70 or less, we're talking less than one-and-a-half percent of all the adult population?

A. That's correct. If you were, let's say, to pick 100 people at random and line them up against the wall from the smartest to the least smart, that the retarded people would be the bottom one or maybe two people in line. Everybody else, the other 98 people, would be more intelligent and would score higher on these tests than them.

Q. In regard to the tests that you administered to Mr. Webster, the intelligence test, I believe you said it was the same test that he had received at the Southeast Arkansas Mental Health Clinic; is that correct?

A. Yes.

Q. Is it a test that is standardly used and recognized in the

U.S. DISTRICT COURT

Direct - Moore/Finn                187

mental health community as being reliable?

A. Yes. It's one of the two or three most widely used individual intelligence tests for adults.

Q. What was the result of the tests that you administered to Mr. Webster?

A. In January 30 of 1995, he obtained a verbal score, which is kind of a sub-score, an I.Q. of 59, a performance I.Q. which is based on some other -- it's another sub-score of 60, and a full scale or an overall I.Q. of 59.

Q. What does that, as a professional experienced and trained in the area of mental health and mental retardation, what does that tell you?

A. Well, it tells me, first of all, that in numerical terms this is an individual who is actually less -- who is at the 0.3 percentile. That is, if you take these same hundred people that I was talking about earlier, and line them up against the wall, you would have to cut one of them in two and fit him in the middle somewhere. He is actually below the first percentile in terms of intelligence compared to the rest of the population.

I might also add that this score of 59 is below both the score of 62 and the score of 70 that are used to define retardation in terms of test scores. So he is clearly mentally retarded by both definitions.

Q. Is the score that you obtained at the time you administered

U.S. DISTRICT COURT

Direct - Moore/Finn          192

A. Yes, there was.

Q. Why was that?

A. He has been extensively tested in the last year-and-a-half on either five or six different occasions, I believe, by psychologists for both the defense and the prosecution. So he has had a lot of opportunities to practice these skills and, in fact, took this particular test about three months before I gave it to him again.

Q. In regards to the test that you administered to him last Sunday, were you also able to observe the manner in which he took the test and things like that?

A. Yes, I was.

Q. Did it, once again, appear to you that he was making a forthright effort in terms of taking the examination and so forth?

A. That was my impression, yes.

Q. What were the results of the examination that he took last Sunday?

A. Well, he did do somewhat better, as I said, as I kind of expected. His verbal I.Q., which was 59 the first time I saw him, was now 72. So that's an increase of about 13 points. His performance I.Q. was about the same. In fact, it had actually gone down a point from 60 to 59, and his full scale I.Q., instead of being 59, was now 65.

Q. Is that still within the range set out in the D.S.M. 4 for

U.S. DISTRICT COURT

Direct - Moore/Finn          193

a person being mentally retarded?

A. Yes, it is.

Q. Dr. Finn, you have had the opportunity to talk to Mr. Webster on at least three different occasions; is that correct?

A. Yes.

Q. Was there any anecdotal information -- was there anything in particular that you noticed during the conversations that you had with Mr. Webster that tended to lend credibility to the results of the tests that you were getting from the I.Q. test?

A. Well, I think there were. I have already mentioned the fact that the kind of history that he gives and that, to some extent, has been confirmed by other people, is the kind of history that one gets from retarded individuals, that is, marginal school achievement. Basically, they kind of stop really learning at about somewhere around the third grade level. Marginal employment history, not being able to really hold a job or not having the skills to get a job and show up on time and follow directions of any complexity, not living independently, continuing to rely on other people for guidance and everyday affairs, things of that kind.

Additionally, his behavior during the interview was, to some extent, typical of retarded individuals in that his speech is very concrete. If you ask him to make an inference, he tends to give you all the specific things that happened, 1, 2,

U.S. DISTRICT COURT

Direct - Moore/Finn                 194

3, 4, but really can't pull those together very well into a conclusion or a general statement. You have to sit and listen to all the details and kind of draw the conclusions yourself. So there is a certain concreteness, to use that term, in his thinking that, again, is typical of mildly retarded individuals.

Q. Does he have a large fund of knowledge? Were there words that you used that he didn't understand, things like that?

A. His word knowledge is one of his stronger points. Although he is better at speaking than he is at understanding. There were times that I had to rephrase and simplify things that I said to him in order for him to understand them.

Q. A person that has an I.Q. in the range of what you tested Mr. Webster to have, would it be possible for an individual like that to communicate, speak, read, write, things like that?

A. Yes. In fact, for mildly retarded individuals, the kind of rough rule of thumb is that they can often master academic skills up to about maybe a second or possibly low third grade level. The term educable mentally retarded is sometimes used, and it refers to the fact that these individuals can absorb at least the rudiments of what is taught in school. They can learn to read and write at a very low level, but they can do it. They can learn to dial a telephone, to communicate with people, in a minimally adequate way and so on.

U.S. DISTRICT COURT

Direct - Moore/Finn          196

and you wind up just not finding out very much.  The other impression that I got was, again, this kind of concrete, very limited ability to respond to these tests, or to that particular test.

Q.  Did you also re-administer that test last Sunday, or did you just re-administer the I.Q. test?

A.  No.  I did not administer the ink blot test.  Just the I.Q. test.

Q.  Dr. Finn, as a result of the testing, the examinations that you have done of Mr. Webster, the interviews you've done, your training, experience, your expertise in dealing with mental retardation assessments, do you have an opinion as to whether or not he is mentally retarded?

A.  Yes, I do.

Q.  What is that opinion?

A.  I think he is.  I think he is mildly retarded, or in the so-called educable mentally retarded range of abilities.

MR. MOORE:  Thank you very much, Mr. Finn.

Your Honor, I think I'll pass the witness.

THE COURT:  Let's take a break now, and we'll have cross examination when we return.

Let's attempt to keep this to ten minutes.

(Trial recess, 2:45 - 3:00 p.m.)

THE COURT:  Are you ready for cross?

MR. MACALUSO:  Yes, Your Honor.

U.S. DISTRICT COURT

Case: 14-1049      Document: 26-6 1186   Filed: 07/08/2014      Pages: 275

# Wells Decl. Ex. C

Vol. 24: 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA   .   CRIMINAL ACTION NO.
                           .      4:94-CR-121-Y
v.                         .
                           .   Fort Worth, Texas
BRUCE CARNEIL WEBSTER      .   June 13, 1996
. . . . . . . . . . . . . . . .


VOLUME 24
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Government:          MR. RICHARD B. ROPER
                             MR. PAUL D. MACALUSO
                             MR. CHRISTOPHER CURTIS
                             Assistant United States Attorney
                             801 Cherry Street, Suite 1700
                             Fort Worth, Texas   76102-6897
                             (817) 978-3291

For the Defendant:           MR. LARRY M. MOORE
                             Attorney at Law
                             1112-A East First Street
                             Fort Worth, Texas   76102
                             (817) 338-4800

                             MR. ALLAN K. BUTCHER
                             Hill, Beatty, Butcher
                               & Gallagher
                             201 Main Street, Suite 1300
                             Fort Worth, Texas   76102
                             (817) 336-3600

Court Reporter:              Ana P. Warren
                             U.S. District Court Reporter
                             501 W. 10th Street, Room 204B
                             Fort Worth, Texas   76102-3637
                             (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

COPY

EXHIBIT C

Case 2:12-cv-00086-WTL-WGH Document 4132 Filed 04/06/14 Page 29 of 275 PageID 70
Case: 14-1049 Document: 26-6 1188 Filed: 07/08/2014 Pages: 275

those.

Q. When you say there were several indications or neurological soft signs, what are you talking about? What does that mean?

A. People with neurological damage, brain damage, often times, when they are asked to draw something or asked to copy something, are not able to make an exact copy, an exact replica. Most people can't, in fact. But the kinds of signs that we see with people who have brain damage are called soft signs, and these soft signs are such things as turning dots into circles, turning squares into more rounded figures, et cetera.

Q. I believe you indicated that his abilities in regard to the Bender-Gestalt were only slightly below average; is that correct?

A. Yes.

Q. Is a person that has mental retardation necessarily going to score very badly in regard to the Bender-Gestalt?

A. Not necessarily. The Bender-Gestalt is only a soft sign organizational skill type of instrument.

Q. So, essentially, as a result of that test, there was some indication to you that there may be some kind of neurological damage in regard to Bruce Webster?

A. Yes. That is correct.

Q. After that, what, if anything, did you do?

A. That's when I started in on the intelligence test. The

Direct - Moore/Keyes                         Vol. 24: 20

first test I gave him was the Stanford Binet, Fourth Edition.

In the Stanford Binet he performed in the lowest .2 percent of

the population.

Q.   I'm sorry.   The lowest what?

A.   Point two percent of the population, a composite score of

51.

Q.   Earlier, when we were discussing the definition of I.Q.,

the definition of mental retardation and so forth, there was

some discussion of scores of 75 and below and so forth.   Is the

composite score of 51 that you achieved on the Stanford

Binet, are we talking the same numbers as they use in the

statistical definitions of mental retardation?

A.   Essentially, yes, we are.   There is a small difference

between the Stanford Binet and the W.A.I.S., Wechsler Adult

Intelligence Scale Revised, and the reason for that is because

of the distance between the standard deviation.   The standard

deviation on the W.A.I.S. is 15.   It's 16 on the Binet.

Q.   Was there a particular reason why you chose to administer

the Stanford Binet to Mr. Webster as opposed to the W.A.I.S.?

A.   Yes.   I chose to use the Stanford Binet because -- first of

all, Bruce, his age is within the limits of the Stanford Binet,

up to 23, 11.   And, also, I chose the Stanford Binet because he

had been given the W.A.I.S. on several other occasions, and I

felt that there was a very distinct possibility of a practice

effect.

fall in regard to the population as a whole as to his intellectual functioning as exhibited on the I.Q. test that you administered to him?

A. Okay. The first thing you need to know is that the second standard deviation is here. The third standard deviation would be over about here, okay, because, theoretically, this just goes on infinitum, but it would be about here, and that would be an I.Q. of around 55. Now, the problem with this is the composite score that Bruce received was a 51. So it would be probably somewhere over here.

Q. And when you say statistically he is in a .2 percentile ranking, can you explain that to me in a way that I can visualize? If you line up a thousand people from the smartest on one end and the person that is the most limited in regard to his intellectual functioning on the other end, where is Bruce Webster going to stand in that line?

A. He will be about the second person on the end, not the smart end.

Q. Thank you very much, Dr. Keyes.

A. You're very welcome.

Q. You can take your seat.

As a result -- well, let me ask you one other question. The 51 I.Q. score that you got on the Stanford Binet, was that consistent with the scores that you saw that had been obtained by Dr. Finn in his W.A.I.S.-R. examination that had been done

Direct - Moore/Keyes                                    Vol. 24: 27

and the scores that were found in the Southeast Arkansas Mental Health Records?

A.  Very consistent, yes.

Q.  Well, did you do anything else in regard to Mr. Webster in an effort to make an assessment of whether or not he was, in fact, retarded?

A.  I have to admit the first time I tested Bruce Webster, I felt very concerned, because this is not a person who comes off with an I.Q. of that area.  I didn't expect him to be functioning that low.  So I looked very carefully at the scores, and the individual scores in the verbal reasoning, for example, were higher, 61, which still puts him within the range of mental retardation, but that's where his strength area is, verbally.  He does talk a good game.  He talks the talk and walks the walk.  He is very capable of appearing to be a, quote, normal individual.

Q.  Is that the thing that surprised you?  You say that you were somewhat surprised by the score.  Based just simply on his ability to converse with you and the way that he presents and so forth, I take it it was somewhat lower than you expected?

A.  Yes, it was, very much so.  Then I looked at his quantitative reasoning.  It was also high.  Quantitative reasoning is not necessarily a good indicator, but it was also 66, which still puts him below retardation.  But if you look at his memory skills, his memory skills are very, very low.  And,

Case 2:12-cv-00086-WTL-WGH   Document 41-32   Filed 04/06/14   Page 33 of 275 PageID #: 74
Case: 14-1049   Document: 26-6 1192   Filed: 07/08/2014   Pages: 275

also, his abstract visual reasoning skills were low at 54.

Q. You have done a number of assessments for determining whether or not a person is mentally retarded. Have you ever done assessments of individuals to determine mental retardation in a forensic setting, in a situation where the individual is charged with a crime and things like that?

A. Yes, I have.

Q. Obviously, doing an assessment of an individual in that setting where he's charged with a crime is somewhat different than doing an assessment of an individual for purposes of providing services and support; is that correct?

A. Yes.

Q. I would take it that an individual that's charged with a crime, there could conceivably be some type of motivation for him to not do as well as he might otherwise do; is that correct?

A. Yes. You would expect that.

Q. So that's not something that you were -- when you say that you were somewhat surprised regarding the I.Q. test score that you obtained of Bruce, I take it, then, you might have been somewhat suspicious as well?

A. Yes, I was, very.

Q. What, if anything, did you do next in regard to the evaluation?

A. I gave him an achievement test, a standard achievement. I

Direct - Moore/Keyes                    Vol. 24: 29

gave him the Woodcock-Johnson Psycho-Educational Battery, Part 2.

Q.   What's the purpose -- or what was your purpose in giving him an achievement test?

A.   I wanted to check out his level of literacy.  Given the fact that his intellectual skills were lower, I wanted to see where his achievement skills were.

Q.   What type of test -- you say it's a psycho-educational battery.  What exactly is it?  How do you do it?

A.   It's an achievement test.  It's a reading test, a writing test, a math test, and a general knowledge skills test.  That's the second part.  The first part is a cognitive test, very much like an I.Q. test, only it's not considered an I.Q. test.

Q.   And as a result of the Woodcock-Johnson, what, if anything, did you learn?

A.   That Bruce has certain skills that were not expected, that there were various writing skills that he had.  There were various reading skills.  But this also was something that surprised me.  My first feeling was if Bruce was not giving his best effort on the I.Q. test, then he would not give his best effort on the achievement test.  Oddly enough, he gave me his best effort on the achievement test, and the numbers that I got surprised me.  Then I looked at the combination and said I need to do another intelligence test.  That's why I came back.

Q.   When did you make the determination that you wanted to do

U.S. DISTRICT COURT

Direct - Moore/Keyes                        Vol. 24: 30

another intelligence test?

A.  Actually, not -- certainly after finishing the scoring on these two tests.  I realized that there was something here that I needed to look at very carefully.

Q.  In essence, in regard to the Woodcock-Johnson Achievement Test, the scores that he had in regards to his ability to read and write and his verbal abilities appeared to be somewhat higher than you would except for a person with an I.Q. of 51?

A.  Yes.

Q.  You indicated you wanted to come back.  When is it that you came back and you interviewed him again?

A.  I came back, I believe it was in the beginning of March or middle of March, and gave him the Kaufman Adolescent and Adult Intelligence Test.

Q.  The Kaufman test that you gave, why at this point were you giving the Kaufman as opposed to the W.A.I.S. or the Stanford Binet?

A.  I had already given him the Binet.  So I didn't want a practice effect, and he had the W.A.I.S. so many times I knew there was a practice effect, probably.  Therefore, I gave him the Kaufman.

Q.  As a result of the Kaufman I.Q. test that you gave him, what, if anything, did you learn?

A.  The I.Q. that I achieved in the Kaufman was almost exactly what the I.Q. I achieved -- and, actually, almost exactly the

Direct - Moore/Keyes                    Vol. 24: 31

combination of numbers that I got on the Stanford Binet.  In other words, there was virtually no difference between them.

Q.   In essence, when you say the combination of numbers, are you talking about the specific sub-areas that the intelligence test looks at?

A.   Yes.

Q.   The verbal reasoning?

A.   Verbal reasoning, abstract visual reasoning, quantitative reasoning, and short-term memory, as well as looking at the crystallized and the fluid I.Q., which relate to those two areas -- to those four areas and, also, the corresponding composite, which is still placing him below the first percentile.

Q.   So not only was the overall -- the end result I.Q. was strikingly similar, but they were the same across the board in all of the sub-categories?

A.   Yes.

Q.   What does that tell you?

A.   That any question of his malingering was thrown out the window.

Q.   What does malingering mean?

A.   That he may not have been putting forth his best effort in order to receive some kind of benefit, in this case, to be deemed to be mentally retarded.

Q.   Okay.  Faking, basically, is that what malingering means?

U.S. DISTRICT COURT

Direct - Moore/Keyes                      Vol. 24: 34

Q.   And in regard to a particular battery of tests, something where you give more than just the I.Q. test, like you indicated you gave the Bender-Gestalt and other things, that gives an indication of the level of effort that is being given across the board; is that correct?

A.   That is correct.

Q.   So as a result of your testing in the case and your review of the testing that had been done up to that point, was it your opinion, at that point, that Bruce Webster was malingering or attempting not to do as well as he could do in regard to the I.Q. test and the other tests that you were administering to him?

A.   No.   In my opinion, he was giving his best effort.

Q.   When you ended up with an I.Q. -- let me just ask you one other question.   You have drawn on the bell curve there, and you have indicated to the jury that a person with a 51 Stanford Binet score is going to be in the .2 percentile ranking of the population as a whole, he's going to be the second guy in a line of a thousand, so to speak.   Was the result that you got in the Kaufman essentially the same?

A.   Almost exactly, yes.

Q.   Once again, he would be in essentially the same percentile ranking as a result from that test as he would otherwise?

A.   Yes.   It would be .2, possibly .3.   The difference between them is that, again, we're looking that the Stanford Binet has

U.S. DISTRICT COURT

Direct - Moore/Keyes                              Vol. 24: 35

a 16 standard deviation, and the Kaufman has a 15 standard deviation. So that the numbers -- let's put it this way. We're looking at the -- if we were to extend this down here, 51 would be about here on the W.A.I.S. Fifty-five would be about hire on the Binet -- or excuse me, on the Kaufman. Fifty-one on the Stanford Binet -- and what did you say was the score that Dr. Finn got?

Q. I don't recall, but I think it was 58.

A. Fifty-eight, 59?

Q. Fifty-eight or 59.

A. On the W.A.I.S. would be about here. So you're looking at all those being just around there.

Q. And I believe the Southeast Arkansas Mental Health records was a full scale 48. Where would it be?

A. Which would be right about there.

Q. So they are all clustered there together?

A. Yes.

Q. Were they in approximately -- well, less than one percentile deviation of each other?

A. Yes. That's correct.

Q. Within about one-tenth of a percent?

A. No. It would be a little more than that, maybe 2.5 tenths of a percent, a quarter of a percent.

Q. As a result of your findings in regard to Bruce's intellectual functioning and the deficits of his intellectual

U.S. DISTRICT COURT

Direct - Moore/Keyes                          Vol. 24: 37

A.  Mild moderate would be that area, yes, but before I was going to put him in a, quote-unquote, labeling category, I would want to know everything I could know first before I diagnose.

Q.  But strictly on the basis of the intelligence test alone, that appeared to be correct?

A.  Yes.

Q.  That appeared to be the range in which he was functioning?

A.  Yes, high moderate, low mild.

Q.  How do you do an adaptive functioning assessment?

A.  An adaptive functioning assessment can be -- depending on which instrument you use -- can be done in various ways.  It is never done with a direct examination of the individual.  It is almost always done by other respondents talking to me, and I -- depending on the instrument, I use the Vineland, which is a social maturity scale and adaptive behavior scale, whereby I sit down with people who know the individual and get as much information as I can from them.

I like to find out about the person's background, their childhood, their infancy, their developmental history.  I get as much history as I can on the individual.  Then I also like to find out about the social skills of the individual, what kind of people they were as far as their work attitude, their work ethic, et cetera, et cetera.  I get as much information as I can.  And it's typically not, I'm asking you questions,

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH   Document 43-2   Filed 04/06/14   Page 40 of 62 PageID #1
Case: 14-1049   Document: 26-6 1199   Filed: 07/08/2014   Pages: 275

you're giving me answers.  It is a discussion that is held in interview format.

Q.  And I take it that the interviews that you conduct, there is some structure to them, because you use a specific scale? You said you used the Vineland scale?

A.  Yes.  There is a reasonably high level of structure.

Q.  Part of the definition of mental retardation in conjunction with the requirement that there be significantly sub-average intellectual functioning and deficits in the adaptive behavior, is there also a requirement that the onset of the disability be before the age of 18?

A.  Yes, there is.

Q.  Why is that?  Why is that requirement part of the criteria?

A.  Well, because for various reasons.  The American Association on Mental Retardation looks -- as does the A.P.A., the American Psychiatric Association -- looks at people who become, quote-unquote, retarded after age 18 as being demented rather than being retarded.  A person who is retarded, it occurs in their youthful years because it is something that is pervasive to their life at a younger level.

If a person is mentally normal up until they are 18 years old, the day after their 18th birthday, if they have a motorcycle accident and they end up mentally disabled, then the proper terminology would not be mental retardation.  It would be dementia.

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH Document 43-2 Filed 04/06/14 Page 41 of 62 PageID #2
Case: 14-1049 Document: 26-6 1200 Filed: 07/08/2014 Pages: 275

Q.  When you look for the respondents or the historians, I guess is another term -- to do the Vineland, is it important, in your opinion, to look to people that have had ongoing contact with him for a significant period of time?

A.  Absolutely.

Q.  When you make the assessment of adaptive functioning, I believe you indicated earlier, you're looking to see how they adapt and act in the real world; is that correct?

A.  Yes.

Q.  At the time that you were doing the assessments of Bruce, he was incarcerated; is that correct?

A.  That's correct.

Q.  He was incarcerated, I believe, out at the Mansfield holding facility?

A.  Correct.

Q.  Why couldn't you just talk to the jail guards, the jail administrators and so forth, and use them as the historians in regard to the Vineland scores that you attempted to obtain?

A.  Because they would not have had the background information necessary for diagnosis.  I could not have interviewed them for anything more than the last year of his life, which, of course, is past the time he's 18.  Therefore, it would not have made any difference.

Q.  Let me ask you another question.  I assume, then, that when you're talking about adaptive functioning, his ability to

Direct - Moore/Keyes                    Vol. 24: 40

function in the real world, you're looking at not only how did he do today, but how did he do yesterday or the day before and back to essentially the time prior to 18 when the disability first began to manifest itself?

A.   Absolutely.  In fact, considerably further back than that.

Q.   Is the functioning of an individual in an institutional setting different than the way they would function in a real world?

A.   Certainly.

Q.   When you're doing the Vineland adaptive behavior scales, are you trying to determine the ability of an individual to function in an institutional setting, or are you looking at his ability to function in the real world setting?

A.   In the real world.  That's the only one that counts.

Q.   What did you do?  How did you go about doing the actual assessments, the interviews, so forth?

A.   During the first week of, I believe, it was April -- or was it the first week of March?  I'm off.  I can't remember -- no, it must have been March.  The first week of March, I flew to Pine Bluff, Arkansas.

Q.   Why did you go to Pine Bluff, Arkansas?

A.   I went to Pine Bluff, Arkansas, the first week of March of 1996.

Q.   Why did you go there?

A.   To interview people who knew Bruce intimately well, family

U.S. DISTRICT COURT

Direct - Moore/Keyes                    Vol. 24: 41

members, friends, close family friends, et cetera.

Q.   Was it your understanding that that's where he grew up and was raised and went to school and so forth?

A.   That is correct.

Q.   Were there particular individuals -- let me back up once again.   Prior to doing your assessment of Bruce, prior to ever going out there and interviewing him the first time, did you have the opportunity to review certain materials in connection with this case?

A.   Some, yes.

Q.   So it was your understanding, was it not, Dr. Keyes, that that was where he grew up, where he went to school, things like that?

A.   Yes.

Q.   Were there particular individuals that you talked to and interviewed in Pine Bluff in order to arrive at some determination of his adaptive functioning, his adaptive behavior skills?

A.   Yes.   I talked with mostly his family, several family friends and teachers, as well as principals and administrators of schools.

Q.   Do you recall how many people you talked to in order to make that determination?

A.   Exactly how many?

Q.   Give me a ball park

Direct - Moore/Keyes                    Vol. 24: 42

A.   Seventeen or 20, between 17 and 20.   I think maybe 20.   It took me four days.

Q.   I'm sorry?

A.   It took me four days.

Q.   It ran the gamut from instructors in school, administrators in school, family friends --

A.   Counselors, girlfriends, ex-girlfriends, family friends, principals, teachers, et cetera.

Q.   Was it your purpose in doing these interviews for the purpose of attempting to determine how Bruce functions in the real world, his adaptive functioning?

A.   Yes.   That was the only purpose.

Q.   As a result of the interviewing that you did, were you able to compile a Vineland score, the Vineland scales, regarding his adaptive functioning?

A.   Yes, I was.

Q.   What, if anything, did the Vineland scales reflect that you determined from the results of your interviews?

A.   The way that you do an adaptive scale -- the way that I do an adaptive scale, I should say, is through what's called convergent validation.   You find the information that people give you that is the most consistent.   If the information is inconsistent, you drop those people.   They are not considered to be good indicators.

For example, several members of Bruce's family have an

U.S. DISTRICT COURT

Direct - Moore/Keyes                              Vol. 24: 43

inflated view of what he's capable of doing compared to what his teachers thought.  Therefore, I dropped several members of the family and used the teacher's evaluations as better indicators.  But the overall composite -- there were two composite scores that I used, and those areas considerably differed from his intellectual skills, which didn't surprise me terribly much.

Q.   What does that mean?  Explain that to me?

A.   The people who knew him knew him when he was in a very unstructured environment.  He was very free.  He did not consider school to be a very good indicator of what he needed in the future, and as such, he was unstructured and misbehaved considerably while he was in school.  Therefore, his school administrators found him to be probably functioning at a medium to lower level than he really does.

His family members, the ones who knew him best, I could tell were giving me honest responses.  The ones who didn't know him quite as well gave inflated views, and the overall numbers that I came up with were significantly lower than his intellectual skills, which states that during his period of being in an unstructured lifestyle and living in an unstructured life, non-institutionalized, living in a home where there was abuse going on, and where he would come and go as he pleased, in those situations, adaptively, he functions somewhere in the range of a seven year old.

U.S. DISTRICT COURT

Direct - Moore/Keyes                    Vol. 24: 44

Q.   He functions in the range of what?

A.   Somewhere in the range of a seven year old, six to seven year old.

Q.   The information that you received in regard to the taking -- doing the Vineland scale, doing the history and so forth, was it consistent with an individual that essentially has never lived on his own, had never had a bank account, never had a charge card, never been able to function in the real world, essentially, on his own?

A.   Essentially, it was that of a six year old, six to seven year old.  Yes, that's exactly what it was.  He was never on his own.

Q.   You indicated something about abuse.  During the interviews that you were doing with the members of the family, as kind of a byproduct of the Vineland interviews, did you learn that there was, in fact, a history of abuse in that home?

A.   Yes, I did.

Q.   Is that something that you had had indications of prior to the time that you had been doing those interviews?

A.   There was some indication in the record, but the record, I don't think, really portrayed it very accurately.  It certainly didn't portray the heinous level.

Q.   Did Bruce -- is this something that you had learned from Bruce, or is it something that you had learned from other sources?

U.S. DISTRICT COURT

Q.   When did you administer the incomplete sentences test?

A.   In December.

Q.   Was that one of the tests that had originally given you some indication that he seemed to read and write at a higher level than his I.Q. would otherwise indicate?

A.   Right.

Q.   As a result of all of the testing and interviews that you conducted -- well, as a result of your findings in regard to the intelligence testing that you did, and the other testing that you did of Bruce Webster regarding his intellectual functioning, as well as the interviewing that you did on the adaptive behavior, whether or not there were any deficits in his ability -- his adaptive behavior skills, were you able to arrive at a conclusion or diagnosis as to whether, in fact, Bruce Webster is mentally retarded?

A.   Bruce Webster is mentally retarded, yes.

Q.   When you say Bruce Webster is mentally retarded, we have talked a little bit about what mentally retarded means in general terms and so forth.  Essentially, as regards to Bruce Webster, what does that mean that he, as an individual, is mentally retarded?  How is he different from a normal person?

A.   It means that he functions at a significantly lower level in almost all areas than the vast majority of the rest of the population.  He is unable to see the consequences of his actions appropriately.  He is unable to plan situations

Direct - Moore/Keyes                    Vol. 24: 48

appropriately.  He is unable to think in abstract methods, abstract ways.  He is unable to communicate appropriately under several circumstances.  He has a very poor short-term memory and an only reasonably okay long-term memory.

He has great difficulty concentrating on a task.  He is extremely distractible.  He has poor coping skills and is unable to learn from his mistakes in many situations.

Q.  You indicated that Bruce has -- his reading and writing abilities are higher, generally, than his other functioning abilities.  And I believe you indicated that when you administered the incomplete sentences test, that it took him some time to complete it.  I take it Bruce can read and write?  He can write a letter, or he can write -- he can read and write; is that correct?

A.  Bruce can write a letter, yes.  Bruce can write and has some skills in that area that would be considered to be unusual for a person with his level of retardation.  Bruce can also identify words orally, but you need to understand that to really read, you have to comprehend at a higher level.  His comprehension is a little lower.  It's in the third grade area.

Q.  When you say that Bruce can read and write, can he read and write with the same abilities that a normal person could?

A.  No.

Q.  If you were to sit down -- you or I were to sit down and write a letter that would take us five minutes, ten minutes, to

Case 2:12-cv-00086-WTL-WGH   Document 43-2   Filed 04/06/14   Page 39 of 62 PageID 90
Case: 14-1049   Document: 26-6 1208   Filed: 07/08/2014   Pages: 275

write, would Bruce Webster be able to write the same letter in the same period of time?

A.   No, nor would his level of letter be as high as yours or mine.

Q.   Did you -- at the time that you were originally contacted to do the assessment, when I originally contacted you, were you ever asked to do any kind of assessment regarding whether or not he was competent to stand trial, or whether or not he was sane at the time of the commission of the offense?

A.   Not really, no.  I was never asked that.

Q.   Was it your understanding, at that point, there really wasn't much question about that on those issues?

A.   The very first thing that I asked Mr. Butcher in our conversation was, are you looking for a competence evaluation, and he said no.

Q.   So from your perspective, the issue which you were evaluating for and looking at was strictly related to whether or not he was mentally retarded?

A.   That is correct.

Q.   That is the area of your expertise; is that right?

A.   That is correct.

Q.   One other thing.  There are certain other tests, psychological batteries and tests, that are used to determine illnesses or the presence of other types of mental problems; is that correct?

A.   Yes.

Q.   What are some of the things that you would expect a person of Bruce Webster's intelligence level not to be able to do on a day-to-day basis?

A.   Not to be able to do?

Q.   Yes.

A.   I would expect that he was not capable of carrying on a high level conversation to the point where an individual would think that he was talking with a normal person for very long. For awhile he can make you believe that he's just as normal as apple pie, and it's after awhile you can realize that he's really not able to carry on that level of conversation for a long period of time, particularly when you get into some abstract thoughts.

I would expect that he would not be able to sit down and read a text and understand everything that he reads.  I would expect him to understand things around the third grade level of comprehension, third or fourth grade level of comprehension.

I would expect that he would be unable to do a job for extended periods of time without goofing off because his ability to concentrate would sway.  I would expect that he would not be able to control certain impulses, various impulses, not the least of which among them is sexual.

Q.   I take it he could go to the movies and enjoy the movies?

A.   Yes.

Case 2:12-cv-00086-WTL-WGH   Document 31-2   Filed 04/06/14   Page 51 of 62 PageID 92
Case: 14-1049   Document: 26-6 1210   Filed: 07/08/2014   Pages: 275

Direct - Moore/Fulbright                 Vol. 24: 128

Q.   Prior to giving the evaluation that you gave to Mr. Webster, I take it that you had performed similar evaluations on a number of prior occasions; is that correct?

A.   Yes.

Q.   Do you recall when it was that you did the neuropsychological evaluation on Mr. Webster?

A.   When it was?

Q.   Yes.

A.   It was on March 19, 1996.

Q.   Where was the battery of tests given?

A.   It was at the detention center in Mansfield.

Q.   Tell us briefly what comprises -- before we go into detail with each test, is there one test, two tests, or are there more than one test that compile or -- that are included within the battery of tests that you give?

A.   There are a variety of tests.  What you do is you group tests together by the function which they measure.  He had already had multiple intellectual evaluations, I.Q. tests, prior to the time that I saw him.  Since you can't readminister the same I.Q. test within theoretically a six-month period of time without getting a significant practice effect, it would have been improper for me to do I.Q. testing, which is a standard, kind of a starting place from a neuropsychological evaluation.  So I didn't do that.  I relied on testing that had already been done in like the last two months prior to my

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH   Document 43-2   Filed 04/03/14   Page 52 of 61 PageID 93
Case: 14-1049   Document: 26-6 1211   Filed: 07/08/2014   Pages: 275

seeing Mr. Webster.

I evaluated his attention and concentration with a number of tests. I gave him a number of memory tests that looked at memory for verbal and visual information from various angles. I looked at his higher level reasoning problem solving, flexibility of thought. I looked at language functioning. I looked at his academic abilities and selected sensory and motor functioning, as well as some visual facial skills.

Q. You had -- prior to performing the battery of tests that you did, you had had access to the information from the I.Q. tests that had been performed by Dr. Raymond Finn and Dr. Denis Keyes; is that correct?

A. That's correct.

Q. You also had information from the records of the Southeast Arkansas Mental Health Clinic regarding an I.Q. test that was done back then in 1992?

A. That's correct.

Q. Let's just start with the beginning, so to speak. Tell me what would be the first test in the battery of tests that you administer?

A. Probably, we should go by the groups of functions that I evaluated. The first group would be attention information processing speed. I gave a test called the Stroop (phonetic) Neuropsychological Screening Test, which is a measure that looks at a person's distractibility. Basically, they have

names of colors like blue, red, green, yellow that are printed in conflicting colors of ink.  The person is told to say the color of the ink, not say the word, which really stands out at them.

Q.  So like you have the color red would be written in blue ink?

A.  And your goal was to say blue, and you have got a whole list of about -- of 120 words that you're trying to get through in a two-minute period.  It's a difficult test, and it really looks at a person's distractibility, their ability to filter out a competing distracter.

Q.  Were there other tests that you gave in connection with looking at this same area?

A.  Yes.  I gave him another test of auditory attention, where you have to listen to one thing at a time and make a decision.  You have to listen to two sets of rhythms at a time, one after another, and determine if they are the same or different.  That requires concentration to a fairly rapidly paced stimulus for short periods of time.

Q.  You say he has to listen to a series of rhythms.  How do you listen to that?

A.  Well, it's on a tape recorder, and it plays out a pair of rhythmic patterns, one after the other, and you have to say if they are the same or different.  Then it goes on to another pair and then another pair.  There are 30 pairs you have to

Direct - Moore/Fulbright                    Vol. 24: 131

judge, and it's been measured as a test of attention.

Q.   Were there other tests that you gave in this particular area?

A.   I would have given him the Pace (phonetic) Auditory Serial Addition Test, which is a measure of a person's information processing speed and their thinking speed, basically, and their ability to divide their attention between two things at once. He was not able to learn the basics of that test. He couldn't perform -- when I was showing him what I wanted him to do, he couldn't demonstrate a capacity to do that, which is to add single digit numbers -- a single digit number to the previous number that was satisfied said in serial order, not in cumulative order. It's a tough test. A lot of people have difficulty with it, but he couldn't even master the basics with repeated instruction. So I didn't give him that.

Q.   As a result of the testing that you did in this particular area, what did the results of those tests indicate to you?

A.   First of all, those results indicated significant impairment in his attention capacity. His ability to pay attention to what he hears for a short periods of time does not appear to be too bad. His ability to pay attention to more than one thing at a time and, at the same time on the flip side of the coin, filter out a distraction appears to be quite poor, and that would certainly not be unexpected in light of his intellectual functioning as measured on the previous tests.

Direct - Moore/Fulbright                    Vol. 24: 132

Q.  Was your finding in regard to that area of cognitive ability, was that consistent with the I.Q. scores that you had seen prior to beginning the testing?

A.  Yes.

Q.  The deficit in functioning that you found in that particular cognitive area, was that something that you would expect to see in a person that was mentally retarded?

A.  Yes.

Q.  Were there other areas in which you tested his cognitive abilities?

A.  Yes.  I looked at his memory functioning from a variety of angles.  We looked at verbal and visual memory.

Q.  How do you do that?

A.  I gave him two tests of verbal memory, and I would have given him two tests of visual memory, but he did so poorly on the easier test of visual memory, memory for like geometric designs, he did so poorly on that that there wasn't any point in giving him the more complex measure.

On the verbal test, I gave him one test called the California Verbal Learning Test, which is a very well known standardized memory test where a person has to learn 16 shopping items with five practice trials.  Basically, read them the list.  They say it back.  You read them the entire list again, they say it back, and you do that five times.

His performance on that indicated moderate impairment in

U.S. DISTRICT COURT

Direct - Moore/Fulbright                    Vol. 24: 133

his memory storage capacity.  He actually did reasonably well on this test given his intellectual limitations.  He succeeded in learning 12 out of 16 words off the list, which may sound good, but for someone his age, that is moderately impaired. Most people his age are going to be able to learn all 16 words fairly quickly.

Q.   In regards to the visual memory tests that you gave him, what were the results of that?

A.   He performed quite poorly.  Basically, we showed him four geometric designs.  I showed him the picture, took it away, and said, now draw it from memory.  His reproductions of the designs were pretty poor, and after a time delay, he was not able to remember much of the designs at all.  When I cued him and gave him some hints on the delayed recall saying, remember it looked kind of like this, or it had this or that feature, he was not able to recall that.  So he had a pretty significant drop off in his memory for visual information.  His memory for verbal information was pretty consistently in the low average with some indication of some drop off from the time he initially learned information until, you know, 30 minutes later.

Q.   You said it was in the low average range with some indication of one -- I didn't hear that?

A.   For his verbal memory, for stories, more organized information, he was able to learn them, two stories, at a low

Case 2:12-cv-00086-WTL-WGH   Document 43-2   Filed 04/06/14   Page 57 of 62 PageID 98

average range, but after a time delay, that dropped pretty significantly, by a little less than 50 percent, what he could recall later. That was an unusual finding. His visual memory was severely impaired.

Q. Were there other tests that you administered to him in other areas?

A. Yes. I gave him tests that looked at higher level thinking abilities. This is your ability to mentally switch back and forth between two sets of ideas. Your ability to figure out what's going on in a situation, come up with a hypothesis, try it out. If that doesn't work, back up and try a different hypothesis out until you figure out a way to solve the problem.

He was also given some hands-on problem-solving tasks. Those were the types of tasks that I gave him. He did extremely poor on all of these tests. They basically look at your ability to think abstractly, plan, and carry out a plan of action. His performance was severely impaired in all those areas.

Q. When you say that his abilities were severely impaired, are you indicating that compared to a normal person or what you would expect from a normal person, his ability to plan and then carry out a plan and so forth was somewhat diminished?

A. Yes.

Q. Was it greatly diminished below what a normal person would have?

Direct - Moore/Fulbright                    Vol. 24: 135

A.  Yes.  It was greatly diminished below normal.  On one test I -- on the simplest test where, basically, on a page he's got letters and numbers.  It goes 1-A, 2-B, 3-C, and so on up to about 13, and he has to just simply connect the numbers and letters in alternating order on the page.  He could not do this.  He knew his alphabet.  He knew his numbers, but he could not switch back and forth, and he became very confused, needed maximal coaching from one point to the next.

Okay.  You just went to a number.  Where do you go next?

He would want to go to the next number.  I said, no, you go to the next letter.  What's the letter?

I don't know.

What's the next letter after A?

B.

Okay.  Go to B, and so forth.  That had to happen.  It took him, on a test that normally takes somebody his age under 50 seconds to perform, it took him 266 seconds, which is a long, long time with maximum coaching from me.  If I hadn't coached to see how much coaching it took, is basically what I was doing, he would not have been able to complete it.

Q.  Were there other areas or other tests that you administered or that you looked at?

A.  Yes.  I gave him another test, a more complex test, of reasoning abilities, abstract reasoning, logical analysis. Basically, he has to figure out what's going on in the

Direct - Moore/Fulbright                    Vol. 24: 136

situation, figure out what the stimuli in the situation are telling him, and figure out how to come up with the right idea to get the right answer through a series of stimuli.

For example, you have got a notebook with a bunch of pages in it, and you have got on one page three squares and a triangle, and you're supposed to answer one, two, three, or four. You go to the next page and the triangle moves to a different position. People start off going three. No, it's one. It's three squares and one triangle. No, that's not it. Okay. There's one triangle. No, that's not it. Then they go, oh, it's the position of the one that keeps moving around.

Absolutely, he could not get it. One of the better indicators on this test that he had significant intellectual limitations to begin with is that this test starts off with a warm-up test where you have got cards that have Roman Numerals I, II, III, or IV on them, and all you have to do is point to the Arabic numeral 1, 2, 3 or 4 as you're flipping through these cards. He didn't know what a Roman Numeral III or a Roman Numeral IV was, and this is something you find in people with significant intellectual limitations. When you see people who are severely socio-culturally deprived or people who are mentally retarded, it is a common finding, and you don't see it anywhere else.

So when we got to tests that were more complicated, it got beyond just counting but having to come up with a concept, he

Case 2:12-cv-00866-WTL-WGH Document 343-2 Filed 04/16/2014 Page 60 of 127 PageID 101

couldn't do it. And he was basically missing nearly every item, even though I was coaching him, giving him hints, saying, look, try this. Not giving him answers but say, look at this. What's in the picture? Now, let's go to the next picture. How did it change? That didn't jog any kind of recognition of the concept.

What it suggested is that he's extremely concrete. He's not able to think in an abstract manner, not able to consider different alternatives from one point to the next and, basically, has just severe impairment in his ability to think through, reason and plan, and kind of critically judge situations.

Q. Were there other areas that you looked at in addition to the areas that you have testified?

A. Yes. I gave him another measure of what's called psychomotor problem solving abilities. It's hands-on problem solving. Basically, you're looking at a person's ability to figure out kind of a concrete solution to a fairly concrete problem.

The person has got ten blocks laid out in front of him. They are blindfolded. There is a board in front of him that has the spaces for each block cut out of it, and the person is told, with your right hand, I want you to put as many of the blocks on the board as you can. Go as fast as you can. And you watch how the person goes about figuring out, okay, first,

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/06/2014 Page 61 of 127 Page ID #102
Case: 14-1049    Document: 26-6 1220    Filed: 07/08/2014    Pages: 275

they start off just kind of rubbing the block. Then they go, okay, wait a second. This isn't working. Let me come up with a different strategy. So, usually, they will feel around the board a little bit and go, oh, okay. Wait a second. Maybe if I take the block, hold it while I look around, and when I find the right one, I can stick it in.

He, basically, took the block and scrubbed around and just went back and forth, no systematic strategy whatsoever. He didn't get any of them in at five minutes. I discontinued with the right hand and went to the left hand. He got six blocks in in nine minutes. You expect some improvement over time after a person has already had some prior exposure to the test. You figure they will get a little better the next time, and, in fact, he did. Then when he was allowed to do it with both hands together, he got all ten of them in in about seven minutes, a little over seven minutes.

Q.   What is the significance of that?

A.   What that's saying is that when faced with a problem where he has to kind of analyze and organize a lot of information and then come up with a plan of action, he is unusually unsystematic, unorganized. He can't come up with a strategy, even when it's a concrete problem, not a conceptual problem. This is not too much different than having to reach up under your car and feel around and do something, or having to reach up under your sink and try to do plumbing where you can't see.

U.S. DISTRICT COURT

Case 2:12-cv-00866-WTL-WGH   Document 343-2   Filed 04/16/2014   Page 62 of 275 PageID #103
Case: 14-1049   Document: 26-6 1221   Filed: 07/08/2014   Pages: 275

It's the same sort of thing, and you have to kind of mentally image it and plan out what your plan of action is going to be.

Q.   Were there other areas that you administered tests in?

A.   Yes.   I looked at his language functioning.  He had already had academic testing.  So I take that back.  I didn't do academic testing, which I usually do, but I did look at his language functioning.

Basically, I'm looking just at his core communication skills.  Can he name objects to visual confrontation?  Is he able to speak fluently, generate words fluently, and is he able to understand adequately and process spoken communication.

He was clearly -- he scored in the second percentile on a measure of his visual naming.  Show him pictures and say, what do you call this?  What's this called?  Like a picture of an elephant, you point to different parts of an elephant, different shapes.  You have a piano and point to different parts of the piano like the keys and the pedals, things like that.

He used extremely concrete terms for things.  Sometimes he used the wrong terms for things, and, again, that would be something that would be highly expectable in the light of a person functioning in the first percentile of mental ability.  He's functioning in the second percentile of language functioning, at least expressive language functioning.

His verbal fluency, on the other hand, was surprisingly

Case 2:12-cv-00866-WTL-WGH Document 43-2 Filed 04/06/2014 Page 63 of 275 PageID #104
Case: 14-1049   Document: 26-6 1222   Filed: 07/08/2014   Pages: 275

average.  This is consistent with his presentation when I met with him where he was certainly a very talkative person, although his speech was pretty imprecise and he wandered all over the place, and you couldn't stop him in midstream and say, hold it.  Explain that again.  Once he got going, he just kept going.  So his verbal fluency was not bad.

What was interesting, though, is that on this test where he had to generate words that begin with a certain letter within a certain time frame, 30 seconds, he was told, don't use people's names.  Don't use proper nouns of any kind, and I gave him examples of proper nouns.  And don't use the same words or different forms of the same word over and over again.  I counted six instances where he broke the rules of the test and one instance where he repeated himself.  He is not able to effectively monitor the quality of what comes out of his mouth.  He'll go and go and go and go and not really have -- be able to monitor what he's saying at the same time he's saying it.  That's clinically what the implication is from that finding.

Q.  When you say that his verbal fluency was better than expected or surprising, are you saying that for a person with the intellectual functioning abilities that were indicated by his prior I.Q. scores, you would have expected him not to be that fluent or not to be that verbal?

A.  That's certainly possible.  I mean, I would have expected him to be at least low overage, but even people with mental

retardation have peaks in their ability structure, and, obviously, verbal skills are one area where he has got better strengths. That was consistent throughout my interaction with him.

Q. Did you examine any other areas?

A. Yes. I looked at his auditory language processing abilities, again, within language. Basically, I'm reading sentences to him of increasing length and complexity. He has to say them back word for word. He broke down at a level of fairly short sentences, such as, where are you going to work next summer? Then he began to break down at, he sold his house and they moved to the farm. He couldn't repeat that. Every sentence, except for one after that, he got wrong, meaning, he can't listen to long complex communications and understand fully what is being said without breaking it down and simplifying it for him. He scored in the borderline range, which was the seventh percentile, which is way down on the low end of the curve.

Q. Were there any other areas?

A. Yes. I looked at his sensory and motor abilities, meaning his motor strength, left and right side. I looked at his motor dominance, if he's left-handed or right-handed. I looked at his motor speed, and I looked at what's called motor programing and motor inhibition. He showed some pretty significant impairment with his left hand, first of all, on the motor

Direct - Moore/Fulbright                    Vol. 24: 142

testing.  He was consistently weaker, slower, and less coordinated with his left hand.

When I looked at his motor programming abilities, basically, I'm asking him to put his hands out on the table, one flat and one with the fist and ask him just to alternate back and forth like this (indicating).  When he was letting one out, he pulls the other one in.  He couldn't do it.  It was like this over and over again (indicating).  He could do one, he could do the other, but he couldn't do both in alternating syncopation.  Again, that's very indicative of frontal lobe impairment or frontal lobe dysfunction in the brain.

The fact that his left-handed motor functioning was consistently lower than his right-handed functioning indicated some possibility of the right hemisphere impairment in the brain, which was certainly mirrored in some of the testing that's been done, both my testing and other people's testing.

Q.  Were there any other areas?

A.  I did do one test that looked -- excuse me.  I did one test that looked at his visual facial skills, basically, his ability to copy drawings of increasing complexity, and on that, he scored at the seventh percentile.

Q.  I'm sorry, the seventh --

A.  The seventh percentile, meaning he's, again, much lower for his age than he should have been.  So we have consistently, throughout the testing -- with a few exceptions that are in the

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH Document 343-2 Filed 04/03/2014 Page 66 of 275 PageID 107

verbal area, you have consistently a pattern of a person who is functioning well below normal on just about every test there is, that I gave him, that looks at his thinking ability in much more detail than just an I.Q. test would.

Q.   The results of all of the neuropsychological tests that you gave him, were they consistent with the I.Q. findings that you had seen that had been previously provided to you?

A.   Yes, they were.

Q.   The neuropsychological tests that you described, they are not all tests involving written words and things like that, as I understand it; is that correct?

A.   No.   They are very interactive tests that really don't require a whole lot of pencil and paper-type activities, typically.

Q.   Would it be something -- would it be easy for somebody to know how to fake results in a test like that?

A.   Not convincingly, because when you look at cognitive functions across a wide range of abilities, you are going to see some coherence in the person's ability structure.   In other words, if they can do this, they ought to be able to do this. Like certain types of memory tests, if you see big discrepancies between different tests, you're going to be suspecting, hey, what's going on here?

It is not at all unusual for us to give tests that are somewhat redundant.   In other words, they overlap to some

degree, and you get a picture of, if a person can't do something easy but then they are able to do something hard quite well that's in the same ability area, you have got to look at that and say, hey, what's going on here?  How come, if a basic function is out, they are able to perform this complex function?  That would be one area of inconsistency that you would look for, and there is certainly no indication of that on any of the tests that I administered to him, and certainly not from test to test that he's had in the past on I.Q. testing across four different I.Q. tests.

Q.  The results of the test that you administered to him, you indicated, would be consistent with a person that had the I.Q. levels of -- that had been indicated, would those results be consistent with someone who was not mentally retarded?

A.  If they had had a severe brain injury, yes.  These findings you could look at that, and I think either a severe head injury or someone who had an across-the-board type of problem in their brain functioning, such as an encephalitis, a toxic exposure, things like that, you would see a similar kind of pattern of a brain that's kind of had a wet blanket thrown over it from a functional standpoint.

Q.  So, essentially -- and tell me if I'm wrong -- are you saying that a person that functions in the level that shows the deficits in cognitive functioning that you've found is either going to be mentally retarded or is going to be suffering from

Case 2:12-cv-00866-WTL-WGH Document 343-2 Filed 04/06/2014 Page 68 of 275 PageID 109
Case: 14-1049     Document: 26-6 1227     Filed: 07/08/2014     Pages: 275

some type of organic brain injury?

A.   That would be my conclusion based on the tests.

Q.   In your professional experience and opinion, would there be any way for an individual to fake and obtain the type of I.Q. scores that Mr. Webster had obtained and that were presented to you and, also, then fake the neurological psychological evaluations that you did, and arrive at the type of consistency that you see in this particular case?

A.   I think it would be highly, highly unlikely.  For him to have faked convincingly an I.Q. test in 1992, reproduced the same scores in 1995, and then produced similar I.Q. scores on other tests whose score levels will correlate tightly with the tests that he had had twice before, that's unheard of.  I have tested very intelligent people who had an incentive to fake, and they blew it, and it's very obvious.  They could not fake convincingly, because when you test them over a several hour period, meaning five or so hours, you are going to eventually trip them up unless they have gone and studied neuropsychology and have become quite adept at understanding what the relationship is between the type of impairment they are claiming and the type of performance they would do on testing, or produce on testing, without that kind of study, it's hard to do convincingly.

Q.   Have there been occasions in forensic settings where you have examined individuals where you have, in fact, found that

Case 2:12-cv-00086-WTL-WGH Document 43-2 Filed 04/16/2014 Page 69 of 275 PageID #140

they were attempting to manipulate the data, attempting to fake the results?

A.   Yes.

Q.   Is there any indication in your testing of Bruce Webster that any of that was going on?

A.   None whatsoever.  His entire presentation, both on testing, in my interview with him, and just in casual conversation was nothing but consistent with the picture of a person who is mildly to moderately retarded.

Q.   Would it be possible to have the type of results that you have observed in the testing of Bruce Webster from an individual that was not either mentally retarded or brain injured?

A.   I'm sorry.  You lost me on that question.  Try me again?

Q.   That was a terrible question.

     Essentially, would a person that did not suffer from either an organic brain injury or was not mentally retarded, would he have scored the types of scores on these tests that Bruce Webster did?

A.   Under normal circumstances, no, no way.  If a person was trying to fake, I think that they would not have scored with the consistency.  The type of impairment would not have been consistent from one unrelated test to the next, from one related test to the next.  They would not have been able to come out with the same level of impairment in their

Direct - Moore/Fulbright                    Vol. 24: 147

performance.  A cross test that he was able to do, how do you know?  How do you know what's normal versus not?  Obviously, we know that he's not been someone who can go out and study this stuff.

Q.  And when you reviewed the test instruments that were -- of the tests that were given by Dr. Finn and Dr. Keyes in reviewing the I.Q. scores, did you have the opportunity to look at the sub-test scores on the tests that had been done?

A.  Yes, I did.

Q.  And did it appear to you that there was consistency in sub-test scores across the board, basically?

A.  Yes, there was.  We found that there was a consistently depressed or low, meaning very impaired, ability level in every area that was measured.  That would be entirely consistent with a person with a very limited intellectual endowment, meaning their God-given intellectual abilities are limited from the get-go.

Q.  In terms of the population as a whole, someone that presents with the type results that Bruce presents, the results that you obtained from him, where does he fit in terms of the population as a whole, in terms of his cognitive function, his brain ability?

A.  He's somewhat variable depending on which area you look at.  From an intellectual standpoint, he fits in the first or lower than first percentile.  I'm assuming that that's been

Direct - Moore/Fulbright                    Vol. 24: 148

explained what a percentile is. He's at the very bottom of the curve, which would include anybody from around the high 60's I.Q. all the way out to as low as they get, because the number of people who are 70 I.Q. or below really is only a minimal number of percentile points. He's in the middle of the low end, that low end of the tail of the curve.

In terms of his attention and concentration, simple attention was not too bad. Complex attention severely impaired. In terms of his memory, his memory for what he hears was low average. His memory for what he sees was quite impaired. His reasoning abilities are undoubtedly in the -- lower than the first percentile. He cannot reason, think, and plan, based on my test findings, and his abilities are severely impaired in that area.

From a language standpoint, his expressive abilities are imprecise at best. He is not able to monitor the output of what he says, although he can generate a lot of words. His ability to understand what people say to him is quite limited, although he is able to process it if you simplify it and make it short enough and concrete enough.

From a sensory motor standpoint, he is relatively normal except his left-handed performance is off, which would be certainly consistent with findings of some right side of brain impairment and other parts of the testing.

Q.  If you were attempting to fake some type of result in

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/16/2014 Page 467 of 1275 PageID#13

Direct - Butcher/Cunningham                    Vol. 24: 185

participate in continuous education and that sort of thing in this arena, also.

Q.   Does the training and experience, expertise that you have, allow you to make evaluations and diagnoses involving people and abuse?

A.   Yes, it does.

Q.   And have you testified in federal and state courts about the psychological dimensions of abuse?

A.   Yes, I have.

Q.   Have you specifically testified in death penalty cases regarding the psychological dimensions of abuse?

A.   Yes, I have.

Q.   Do you know Bruce Webster, the man seated at the defense table?

A.   Yes, I do.

Q.   How do you know him?

A.   I began an evaluation on Bruce Webster for the purposes of my appearing here today.

Q.   I contacted you, or you were contacted by the defense team and asked to participate in this?

A.   That's correct.

Q.   What did you do to prepare for this?

A.   I have an extensive set of activities that I went through in this evaluation, and let me detail those.

      On May 7, I interviewed him for five hours and 55 minutes,

U.S. DISTRICT COURT

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/06/21 Page 473 of 1275 PageID #14
Case: 14-1049    Document: 26-6 1232    Filed: 07/08/2014    Pages: 275

almost six hours.

On May 27, I talked to his brother, Mark Webster, by telephone for 50 minutes.

On May 27, I talked to Mark Webster's wife, Jodine Webster, who had the opportunity to know Bruce over the past 10 or 12 years. I talked to her for 35 minutes.

On May 27, I talked to Dorothy Webster, who is Bruce's older sister, for 42 minutes.

On May 27, I spoke to Lashana Goodlow (phonetic,) who is Bruce's niece, for 8 minutes.

On May 27, I spoke to April Johnson, who is also his niece, for five minutes.

On May 27, I spoke to Ruby Harris Binns, who is his aunt, for 43 minutes.

On May 28, I spoke by phone to Luketha Frazier, who is his niece, for 20 minutes.

On 5-28, I interviewed by telephone his sister, Dassy Frazier. On 5-29, I spoke to Dassy Frazier again for 25 minutes.

On May 30, I interviewed his mother, Beatrice Webster, for 57 minutes.

On May 31, I returned and interviewed Bruce at the Fort Worth federal jail facility for two hours and five minutes. And on June 4, I interviewed Jodine Webster, his sister-in-law, again, for 25 minutes.

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/06/2014 Page 487 of 1275 PageID#15

Q.  In addition to that, did you visit in my office, and did I make available to you certain records?

A.  Yes, I did.

Q.  And how would you characterize those records?  Were they voluminous?

A.  Voluminous, yes, very extensive.

Q.  Do you recall about how many boxes of records were involved?

A.  I think approximately two file drawers or two file boxes full of records that I went through and reviewed.

Q.  And did these include various psychological reports done by various psychologists?

A.  Yes, they did.

Q.  Did these also include school records, medical records, prison records, also the medical records of other family members, such as Beatrice Webster?

A.  And also Future Webster.  That's correct.

Q.  And did you also have an opportunity to review all of the F.B.I. 302's, as they are known, memoranda, that were generated and there in my office?

A.  Yes, I did.

Q.  And based on all of that information, did you find that there was an abusive situation existing in the Webster family?

A.  Yes, I did.

Q.  What we're here for today, the thrust of your testimony

Direct - Butcher/Cunningham                    Vol. 24: 188

here, is this abuse; is that correct?  That's why you're here?  That's what you concentrated on?  That's what you focused on?

A.   Yeah.   I concentrated on the abuse and his experiences growing up, particularly, that might have some relationship to his participation in this offense.

Q.   You also made a diagnosis of Bruce, didn't you?

A.   Yes, I did.

Q.   And did you find a psychological disorder there?

A.   Yes, I did.

Q.   And what psychological disorder was that?

A.   There are several psychological disorders that I think Bruce suffers from or may suffer from.  The first diagnosis that I made, I made as a rule-out diagnosis.  In other words, it's a tentative diagnosis because I don't feel that I can be as certain as I would like to be about it, and that was of a psychotic disorder not otherwise specified.  Bruce described hallucinations, auditory hallucinations of hearing voices, and also visual hallucinations that he has had from time to time.  Those are also described in his medical record back in 1992, before this offense, when he was evaluated at the Southeast Arkansas Mental Health Center, and at that time a provisional diagnosis of rule out psychotic disorder not otherwise specified was also made.

The reason that I made that one tentative is because I can't be sure that that was what was happening at the time of

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/06/2014 Page 76 of 275 PageID 147
Case: 14-1049   Document: 26-6 1235   Filed: 07/08/2014   Pages: 275

the offense, and that's what I was focusing on, in terms of diagnoses, was what was occurring at that time. He didn't spontaneously report any hallucinations at that time period, but there is, again, history of that occurring in his record before the offense, and he described it when I was interviewing him as something that happened to him periodically.

I made some other diagnoses as well. I diagnosed him as suffering from mental retardation of a mild variety. As you have perhaps heard testimony, mental retardation is staged as mild or moderate or severe profound, and this was of a mild sort, in terms of the I.Q. range that it falls within, by my best estimate.

I also diagnosed an antisocial personality disorder and, also, a personality disorder not otherwise specified, a combination, a mixture of personality disorders, involving features that I identified, both narcissistic and dependent.

Q.   Do you find that there are psychological disorders that are associated with chronic violence?

A.   Yes, there are.

Q.   And are the ones that you found so associated?

A.   That's a complicated -- yes, because I have made several diagnoses, it would relate in different ways to those, and, perhaps, I can take them in order in terms of the relationship they have.

Q.   Okay. With regard to the antisocial personality. Is there

Q.   And what are your responsibilities, sir?

A.   Right now I'm in the criminal investigation division.  I have been in highway patrol and various other departments.

Q.   And how long have you worked for the Arkansas State Police?

A.   Twenty-five years.

     MR. ROPER:  May I approach the witness, Your Honor?

     THE COURT:  You may.

Q.   (By Mr. Roper)  As a part of your responsibility, sir, did you at one time administer a driver's license test?

A.   Yes, sir, I did.

Q.   I want to show you Government's Exhibit Number 95, which is a certified and exemplified record of the State of Arkansas file for a Bruce Carneil Webster.  Do you recognize that, sir?

A.   This top half?

Q.   Recognize the document?

A.   Yes, sir, I do.

Q.   In fact, there are some records with your signature on them; is that correct?

A.   Yes, sir, there is.

     MR. ROPER:  The government would move to admit Government's Exhibit Number 95.

     THE COURT:  95?  It's admitted unless there is objection?

     MR. MOORE:  No objection.

     THE COURT:  95 is admitted.

Q. (By Mr. Roper) Government's 95 is a copy of Bruce Carneil Webster's driver's license record; is that right?

A. Okay. This right here is an application for instruction permit with Arkansas State Police. When you go in to take a driver's test, there is a card which is made of up two to three different -- it's carbon copied. When someone comes in to take the test, you fill out this front card on him here on every new applicant, and if someone comes in for transfer from one state to another, that's going to take the test, you have to fill out a card on each one.

Q. So from looking at that record, there was an application presented on June 15, 1992, by a Bruce C. Webster, date of birth 5-21-73, residing at 5219 Hepburn, 5 foot, 9 inch, brown-eyed African-American; is that right?

A. That's correct.

Q. And was there a driver's license test administered at that time?

A. Yes, there was.

Q. And did you administer it?

A. Yes, sir, I did.

Q. All right. Now, can you very briefly tell the members of the jury how the administration of that test takes place?

A. When an applicant comes in, we fill out this form. After we fill out this form, the person who the -- the tester will issue that applicant one of three tests to take for his

Case 2:12-cv-00866-WTL-WGH Document 343-2 Filed 04/03/2014 Page 37 of 61 PageID 20
Case: 14-1049   Document: 26-6 1238   Filed: 07/08/2014   Pages: 275

Direct - Roper/McLemore                    Vol. 24: 228

driver's license.  He has to make -- on the written part, he has to make at least 80.  On the signs, he has to make at least 70 to pass.

Q.  Okay.  There are two parts of the test.  How many questions are on the first part?

A.  Okay.  On the written part itself, there are 25 questions.

Q.  And how many on the sign portion?

A.  There are ten.

Q.  And you mentioned there are three different tests?

A.  Yes, sir.

Q.  If someone wanted to cheat on that test, how many questions would they have to be prepared to answer or be given the answers to?

A.  Okay.  They would have to have answers for three different tests, which would be -- they would have to have at least 75 multiple choice answers, and at least 30 signs that they would have to know for that test.

Q.  Now, when do you decide which test that you're going to give?  In particular, when did you decide which particular test you were going to give this person, Bruce C. Webster, with this date of birth and address?

A.  When he's standing in front of me, I have the three tests. I decide at that time which test I give him.

Q.  Now, at that point, after the test is given to him, where do they go?

A.   We have a small room, and they go and sit out in front of us where we can watch them.

Q.   Based on your training and experience, and during the time you worked in that section, what would they do to ensure that the person that was taking the test, in this case, Bruce C. Webster, was not cheating?

A.   They sit in front of me -- we don't have that many people come in to take the test there at any one time.  It's a rather small room.  They sit in front of me, and I watch them to ensure that they aren't cheating.  I make them put the articles that they have on the floor.  If they have caps on, we make them take the caps off.  They are allowed to have a pencil and the test on the table.

Q.   After this Bruce C. Webster took the test, did there come a time when he turned the test back in?

A.   Yes, sir.

Q.   Did you grade the test?

A.   Yes, I did.

Q.   Tell the members of the jury what the result of that test was?

A.   The score on the written part was 96, and on the signs was 70.

Q.   Ninety-six, what does that mean?

A.   That means he missed one question out of 25.

Q.   And with regard to signs, how many did he miss?

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/03/2014 Page 581 of 1275 PageID #122

Case: 14-1049   Document: 26-6 1240   Filed: 07/08/2014   Pages: 275

A. He missed three.

Q. Did you help him along at all to be able to answer those questions?

A. No, sir.

Q. To your knowledge, did anybody else?

A. No, sir. We separate them in the room. We don't let them sit beside each other. There are tables, and we might put one on one end of the table and one on the other, but they are not sitting close enough that they can see the test.

Q. Sir, do you ever have any persons fail that test?

A. Yes, sir.

Q. How often?

A. I'm not for sure what the failure rate is. We do have some fail it.

Q. What are some of the examples of the questions that were given on the test, the particular test taken by Mr. Webster?

A. One question is -- concerns a double yellow line in the center of the highway indicates what? The answer of that would be, no passing.

One question is, the proper signal must be given continuously before turning, slowing, or stopping of at least a distance of 100 feet, according to state law.

A question, the speed limit within cities and towns, unless otherwise posted, is multiple choice 25, 30, 35 or 20. The answer to that is 30.

Case 2:12-cv-00866-WTL-WGH Document 343-2 Filed 04/06/2014 Page 82 of 275 PageID #123
Case: 14-1049   Document: 26-6 1241   Filed: 07/08/2014   Pages: 275

A question, you are not permitted to overtake or pass another vehicle within how many feet of an intersection? There is a multiple choice answer there of 100, 200, 300, or 500 feet.  The answer is 100 feet.  These are basically the questions that they ask that are typical of that 25.

Q.  After that point, after Bruce C. Webster made a 96 and a 70, was there -- well, let me back up and ask you one question.

Do you do anything to ensure that the person that you're going to give the test to has proper identification?

A.  Okay.  We require that they have a birth certificate before they can take the test.  If they don't have a birth certificate, they are required to have two types of other identification, such as insurance policies, draft record cards, things like that.

Q.  Okay.  The person -- after you gave this test and after the identification was approved, did there come a time when a driver's license was issued to Bruce C. Webster?

A.  Okay.  Under Arkansas law, once you pass the written test, you're required to hold what is called an instruction permit. He was issued an instruction permit, and he had to hold that for a minimum of 30 days before he could come in and take the road test.

Q.  What happened at that point?

A.  It indicates here that on July 29, 1992, he was issued a --

Case 2:12-cv-00866-WTL-WGH Document 343-2 Filed 04/06/2014 Page 783 of 1275 PageID #124
Case: 14-1049   Document: 26-6 1242   Filed: 07/08/2014   Pages: 275

he passed his road test and was eligible for a driver's license.

Q.   I guess probably all of us have taken that road test.  Just very briefly describe what it is?

A.   Okay.  Our office is on Princeton Pike in Pine Bluff.  The examiner will get into the car with the applicant.  We take a road test.  We ensure that they stop at stop signs.  They use turn signals when they are making turns, that they are able to maneuver the vehicle without driving in the wrong lane, sudden stops.  Basically, we assure ourselves that they are capable of handling that vehicle.

Q.   Some people flunk that test, don't they?

A.   Yes, sir.

Q.   Bruce Webster passed it?

A.   Yes, sir.  According to this instruction permit, he did.

            MR. ROPER:  I pass the witness, Your Honor.

            THE COURT:  Cross?

            MR. MOORE:  Thank you, Your Honor.

                      CROSS EXAMINATION

BY MR. MOORE:

Q.   Mr. McLemore, is there a date on which the test was taken that's reflected from the record?

A.   You're talking about the written part?

Q.   The written part.

A.   Yes, sir, on June 15, 1992.

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/06/14 Page 68 of 127 PageID #125
Case: 14-1049    Document: 26-6 1243    Filed: 07/08/2014    Pages: 275

have you had the opportunity on several occasions to have contact with either mentally retarded or mildly mentally retarded individuals?

A.   I have.

Q.   Now, did you have -- could you describe for the jury what sort of contact you had with Bruce Webster when you were a principal at Watson Chapel Junior High?

A.   My primary function in relation to Bruce was supervision, his grade placement, his scheduling of classes.

Q.   Did you have enough contact with him to form any opinion as to his intellectual ability?

A.   I did.

Q.   Do you have an opinion as to whether or not he was mentally retarded?

A.   In my opinion, I do not believe Bruce is mentally retarded.

Q.   Now, during your time of 25 years as a counselor and a principal, have you participated in making determinations whether someone was going to be assigned to special education classes, in fact, whether they were mentally retarded?

A.   In a number of instances, yes.

Q.   Was Bruce Webster ever, as far as you know, assigned to special education classes while you were a principal in the school which he attended?

A.   He was not.

Q.   Was there any reason to put him in special education

Case 2:12-cv-00066-WTL-WGH Document 343-2 Filed 04/03/2014 Page 85 of 127 PageID #126

Direct - Curtis/Stewart                    Vol. 24: 239

classes?

A.   In my opinion, he was not -- or should not have been assigned to any special education classes.

Q.   As far as you know, in anybody's opinion at Watson Chapel Junior High, should he have been assigned to special education classes?

A.   I do not think he met the qualifications for special education placement.

Q.   Now, Mr. Stewart, before coming to court today, several months ago did a Dr. Keyes come to talk to you?

A.   Yes, sir, he did.

Q.   How long did he talk with you?

A.   Just a few minutes.

Q.   At the conclusion of your conversation, what did he say to you?

A.   The final statement before his farewell -- and he was quite cordial with that -- but after we had visited for a few minutes, he closed his book and said that I hadn't given any information which would have been beneficial or would have helped him.

Q.   And did he leave after that?

A.   We may have visited for a few moments thereafter, but, yes, sir, he did leave after that.

Q.   Are you aware whether Bruce Webster, while you were principal of the school he was attending, was ever tested for

U.S. DISTRICT COURT

Case 2:12-cv-00886-WTL-WGH Document 343-2 Filed 04/06/2014 Page 86 of 127 PageID 127
Case: 14-1049    Document: 26-6 1245    Filed: 07/08/2014    Pages: 275

Q.   Did he give you the lingo and the language and the signs and things like that?

A.   Yes, sir, rankings, et cetera.

Q.   And on the occasions, including those times when you spoke to Bruce, did you have difficulty understanding him?

A.   No, sir.

Q.   Did he speak in a coherent fashion?

A.   Always.

Q.   I mean, did you ever, like, scratch your head when you got through talking to Bruce and try to figure out what he's trying to say or what he was trying to get across to you?

A.   No, sir.

Q.   Now, you have been in the school business for about how long?

A.   Twenty years.

Q.   Have you seen people that you believed, or have been diagnosed as being mentally retarded?

A.   Yes, sir.

Q.   On few or on many occasions?

A.   Well, we have our share in our schools.

Q.   Okay.  And people who have been placed in special education programs?

A.   After testing, yes.

Q.   With Bruce, was there any reason at any time during your tenure, your involvement with Bruce Webster, on the basis of

Direct - Macaluso/McLaughlin                    Vol. 24: 248

anybody that you spoke to, like a teacher, that suggested that he was in any way mentally retarded?

A.  No, sir.

Q.  Did anything like that come from a teacher that he should be put in a special education class or something like that?

A.  No, sir, not to me.

Q.  Did he appear to be impaired mentally in any other way?

A.  No, sir.

Q.  Did you ever have occasion to go by his house?

A.  Yes, sir.  There was an occasion that the principal and I took him home one time.

Q.  Did you go in the house or just drop him off?

A.  No, sir.  We didn't go in the house.

Q.  Did anything ever come to your attention about any sort of physical abuse to Bruce?

A.  No, sir.

Q.  Did you ever notice anything about him, bruises on him, or he complained about being beat up or mistreated by his family in any way?

A.  Never.

Q.  Now, let me ask you.  Did you have occasion, within the last few months, at least, to talk to or be visited by a doctor by the name of Denis Keyes?

A.  Yes, sir.  I have visited with him.

Q.  Did he come to your office, to your home, or where do you

U.S. DISTRICT COURT

# Wells Decl. Ex. D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA       .  CRIMINAL ACTION NO.
                               .  4:94-CR-121-Y
V.                             .
                               .  Fort Worth, Texas
BRUCE CARNEIL WEBSTER          .  June 14, 1996
. . . . . . . . . . . . . . .

VOLUME 25
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        MR. RICHARD B. ROPER
                           MR. PAUL D. MACALUSO
                           MR. CHRISTOPHER CURTIS
                           Assistant United States Attorney
                           801 Cherry Street, Suite 1700
                           Fort Worth, Texas  76102-6897
                           (817) 978-3291

For the Defendant:         MR. LARRY M. MOORE
                           Attorney at Law
                           1112-A East First Street
                           Fort Worth, Texas  76102
                           (817) 338-4800

                           MR. ALLAN K. BUTCHER
                           Hill, Beatty, Butcher
                             & Gallagher
                           201 Main Street, Suite 1300
                           Fort Worth, Texas  76102
                           (817) 336-3600

Court Reporter:            Ana P. Warren
                           U.S. District Court Reporter
                           501 W. 10th Street, Room 204B
                           Fort Worth, Texas  76102-3637
                           (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT D**

Direct - Roper/Barber          22

They can't move from one house to another until I check it out and get permission.

Q. How long have you been a parole officer?

A. Six years.

Q. And what did you do before that?

A. Six years before that I was a correctional counselor at the diagnostic unit of the Department of Corrections in Arkansas.

Q. And what did that involve?

A. We took in -- I took in new commitments from the counties and processed them. You had an original orientation, and then we went through the testing, and then an in-depth orientation to prepare them for the prison.

Q. And did you interview and counsel with prisoners on a daily basis?

A. Oh, yes, probably, in depth, 5,000 or 6,000 inmates.

Q. Now, in regards to the probation -- or parole, rather, of Bruce Webster, based on your review of the records and the memory you have of Bruce Webster, did he follow the directions -- well, first off, did he appear to understand the directions that were given to him for what he should do when he's on parole?

A. Yes. He didn't have any trouble with it. I explained to him when he first got out that he had to report to the drug counseling, which he did. He had to report monthly, and they have to pay a supervision fee, which I forgot to mention

U.S. DISTRICT COURT

Direct - Roper/Barber          23

previously, of -- back then it was $15 a month.  He reported

regularly, paid his fees.

Q. And in that regard, did there come a time -- well,

eventually, he ended up violating his parole and went back to

the penitentiary; is that right?

A. That's correct.

Q. But other than that, did he appear to follow the conditions

of parole that were set up?

A. Oh, yes.

Q. Now, I want to ask you in particular about a certain

entry.  Now, had there been any discussion at all during the

time you had Webster on parole about going to the Southeast

Arkansas Mental Health Center?

A. Yes.

Q. And, in particular, on July 7, did you have a discussion

with him at that time as reflected in the chrono entries?

A. Yes.

Q. All right.  And, specifically, as of the July 7 entry,

could you please read that and elaborate on that entry, or,

first, read that entry for the jury?

A. The entire entry or just the part concerning Southeast

Arkansas Mental Health?

Q. Well, just for July 7?

A. July 7, 1992?

Q. Yes, sir.

U.S. DISTRICT COURT

Direct - Roper/Barber          24

A. Paid July fees and turned in his report. Said he had two other part-time jobs and wanted to go to Monticello, Arkansas, to work. I told him to have his supervisor call me about it. He said he was going to Southeast Arkansas Mental Health tomorrow. I told him to bring in documentation.

Q. During that interview that you had with him at that time, did he appear to have a difficulty in understanding what you were saying to him?

A. I don't think so, because had there been a problem, I would have noted it in my chronologicals.

Q. And is there a later entry in there about him ever going to Southeast Arkansas Mental Health Center?

A. Yeah. There are some other entries on Southeast Arkansas, because, like I said, that was one of his stipulations by the parole board.

Q. Let me go through quickly, if I can, Government's Exhibit 102-C. Now, what is this -- these are several different reports?

A. Those are what we refer to as monthly reports. They basically ask his address, who he's living with, phone numbers, where he's working, how much he makes a week.

Q. Now, who fills that out?

A. They do.

Q. Who signs it?

A. They do.

U.S. DISTRICT COURT

Direct - Roper/Barber                25

Q. And are there certain questions on there to be answered?

A. Oh, yes.

Q. Whose writing would be on these monthly reports?

A. His.

Q. Bruce Webster's?

A. Uh-huh.

Q. To your knowledge, did he ever have any problems filling out these forms?

A. No, huh-uh.

Q. And in regards to the requirement for drug counseling, briefly explain what that is for the jury?

A. When they go into the counseling, the instructor will have them come up one at a time and sign their name that they did attend. And then Southeast Arkansas Mental Health will send us a copy to put in our files so we have documentation that they have been going by the parole board's orders.

Q. And Webster brought these back so you could put these in the files verifying that he did attend these sessions?

A. No. They sent them to us.

Q. They were sent?

A. They were sent back.

THE COURT: Mr. Roper, your time on this witness is about up. How much longer do you think it will take?

MR. ROPER: Just about five -- less than five minutes.

THE COURT: Okay. I'll give you five more minutes.

U.S. DISTRICT COURT

Direct - Roper/Barber          26

Q. (By Mr. Roper) Now, after this time that you had Webster on parole, I want to move forward, if I can, to this spring of 1996. Did there come a time that you came in contact with a man by the name of Dr. Dennis Keyes?

A. Yes.

Q. And where did you meet with him?

A. In my office.

Q. Now, how was that meeting arranged?

A. They -- he called up and asked could he come over and see me.

Q. And did you go over there -- I mean, did he come over and visit you?

A. Yeah. He came over and visited. I can't remember if it was the same day he called or the following morning.

Q. And tell the members of the jury what happened in that conversation you had with Dr. Keyes?

A. He basically came and asked me about Bruce, and I got the file out. Well, actually, I had already had the file out, because they had -- I had already received a subpoena. So I was reviewing it earlier. And he -- Keyes, basically -- I felt like he was just trying to convince me that because of Bruce's environment as he was growing up and so forth, that this is something he really shouldn't be executed for and that he was mildly retarded.

Q. And what did he tell you in that regard?

U.S. DISTRICT COURT

Direct - Roper/Barber                27

A. That he was mildly retarded.

Q. Did he ask you any questions?

A. Basically, he was lecturing me.

Q. Well, what did you tell him in response to that?

A. I told him that Bruce had never, in my opinion, reacted or acted retarded. He was very street smart, extremely street smart. He could converse with you well, writes his reports up, did everything I asked him to do. He knew how to keep me off of him because he did everything I asked him to do.

Q. Did you ever have occasion to go out and do any home visits?

A. Well, as I said, yeah, we try to do a home visit approximately once every six months or so, unless something comes up that would warrant us going out before that, a phone call or something of that nature, but I did a routine home visit. He wasn't there. I spoke with his mother. The house was neat and well kept.

Q. Now, at the end of your conversation with Dr. Keyes, did he tell you anything in departing?

A. Other than he did not feel that Bruce should be getting the death penalty because of his home environment and the environment that he grew up in. Having gone back in his file and, as I said, having reviewed it a week or so before that when I got the subpoena, Bruce did grow up in a two-parent family, and they lived in the same house. They did not live in

U.S. DISTRICT COURT

Cross - Butcher/Barber            28

the projects or government housing or anything.

Q. Let me stop and ask you there. Was there any discussion about whether Dr. Keyes thought you could help him?

A. Oh, he got up and left and said, no, I wouldn't be able to help him at all.

MR. ROPER: That's all the questions I have.

THE COURT: Is there cross?

CROSS EXAMINATION

BY MR. BUTCHER:

Q. Mr. Barber, you had been interviewed by investigators from the defense team prior to this, hadn't you?

A. Yes. A prior investigator came up.

Q. In January of 1996? Would that be about right?

A. I can't remember the date. He wasn't there ten minutes, got up and left.

Q. The investigator?

A. Yes.

Q. And at that time, the investigator did ask you a lot of questions, though, didn't he?

A. He asked some questions.

Q. And did he identify himself as a retired F.B.I. agent?

A. Yes, he did.

Q. Did you take him to be a man skilled at asking questions?

A. Well, are we going on reputation or the questions he actually asked?

U.S. DISTRICT COURT

Direct - Curtis/Drewett                35

A. Sixteen of the 21 years, but I've been in the district 21 years.

Q. Okay. Are you from the Pine Bluff area?

A. Yes, I am.

Q. Do you know an individual by the name of Bruce Webster?

A. Yes, I do.

Q. Do you see that person in the courtroom today?

A. Yes, sir.

Q. Would you describe where he's sitting from where I'm standing?

A. Well, beside you to your left.

Q. How many seats from my left?

A. He's the third.

MR. CURTIS: Thank you.

Your Honor, I would request the record to reflect that she has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Curtis) Ms. Drewett, did you ever have Bruce Webster as a student?

A. Yes, I did.

Q. And what grade was that?

A. Ninth grade.

Q. And what course was it?

A. Civics.

Q. And what level?

U.S. DISTRICT COURT

Direct - Curtis/Drewett          36

A. Just a basic civics class.

Q. Now, that's not a special education class, is it?

A. No, sir, it's not.

Q. The students that are in that class, do they need to be able to read and write?

A. Yes, sir, just a slower level.

Q. Could you describe for the jury, basically, what you noticed about Bruce Webster's intellectual abilities?

A. As far as reading, of course, I said they performed at a slower level. He did read slower. On the days that he did perform, which most of the days he did sleep. He didn't perform a lot. He could read. He could do. He chose not to do on a lot of days. He did sleep a lot.

Q. Did you have the opportunity to converse with him while he was one of your students?

A. Yes, sure.

Q. Did he have any problem communicating with you?

A. Not that I remember. I did have some, you know, run-ins with him, but I don't even remember that. I don't remember specifics, but I do remember -- you know, I did have some discipline problems, but I don't remember any specifics on that.

Q. How was he dressed, as you can recall?

A. Nicely, lots of jewelry.

Q. What kind of jewelry?

U.S. DISTRICT COURT

Direct - Curtis/Drewett          37

A. Gold jewelry.

Q. Bracelets, necklaces?

A. Necklaces.

Q. How was he groomed?

A. Nicely.

Q. Did he seem to be well kept?

A. Yes, sir.

Q. In your 21 years as a school teacher, have you had the opportunity on many occasions to have contact with mentally retarded and mildly mentally retarded students?

A. Yes, sir.

Q. Would you tell the jury whether or not Bruce seemed to be mentally retarded or mildly mentally retarded at all?

A. No, sir. I do not think he is, in my opinion.

Q. If you had noticed any intellectual inability or limitation, what would you have done as a teacher?

A. Recommended him to the special ed department.

Q. And you never recommended him for special ed?

A. No, sir.

Q. In your opinion, did he need to be recommended to special ed?

A. No, sir.

Q. In your opinion, was his sleeping the result of any medical problem?

A. I don't think so. I think it was more, maybe, his

U.S. DISTRICT COURT

Cross - Butcher/Drewett        38

activities at night, maybe staying up late, just sleeping during the day and not at night.

MR. CURTIS: Your Honor, I pass the witness.

THE COURT: Cross?

CROSS EXAMINATION

BY MR. BUTCHER:

Q. Ms. Drewett, you mentioned several times that Bruce slept a lot in class. Does that mean every day or every other day or what?

A. I don't remember any definite times, but I do remember him sleeping.

Q. And one can't sleep through class and do very well in it, can you?

A. No.

Q. In fact, do you recall his grades?

A. No, sir. I don't recall that so much. He dropped out during the ninth grade. So I'm not real sure what he ended up with.

MR. BUTCHER: Your Honor, may I approach the witness?

THE COURT: You may.

Q. (By Mr. Butcher) Ms. Drewett, I hand you a document and ask if you could take a look at that and see if it refreshes your memory? Does this refresh your memory?

A. I don't remember. Like I said, I remember having him in basic civics, but I don't remember, you know, what he ended up

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH   Document 3-12 Filed 04/06/14 Page 4 of 99 PageID #42
Case: 14-1049   Document: 26-6 1260   Filed: 07/08/2014   Pages: 275

Cross - Butcher/Drewett          39

with.

Q. Well, does that reflect his grades?

A. Yes, it does, uh-huh.

Q. So the first semester -- do you now recall the grade that you gave him the first semester?

A. After looking at the transcript, that's the only thing that helped me.

Q. And, now, what did he receive?

A. An "F."

Q. And in the second semester, you say he dropped out of the class?

A. I'm pretty sure. I don't remember the time.

Q. You say that you think -- do I recall correctly that you said that you think it was a lack of effort on his part that caused him to do so poorly; is that correct?

A. Yes, sir.

Q. Are you aware of his home environment?

A. No, sir, I'm not.

Q. Do you know whether he had active help and guidance from his parents?

A. No, sir.

Q. Do you recall talking to an investigator on July 31, 1995, by telephone?

A. Last summer, yes, sir.

Q. And do you recall at that time saying -- telling him that

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH Document 34-2 Filed 04/06/14 Page 5 of 99 PageID #43
Case: 14-1049   Document: 26-6 1261   Filed: 07/08/2014   Pages: 275

Cross - Butcher/Drewett          40

you believed that Bruce was someone who tried to raise himself with little or no parental guidance?

A. I never -- I guess, maybe not remembering his parents, that's maybe my opinion. Since I didn't meet his parents, maybe that's, you know, part of that. Most kids do that nowadays it seems like.

Q. Do you think, based on your memory of Bruce, that he's more of a follower and not a leader?

A. Huh-uh. I think he's more of a leader.

Q. You think he's more of a leader? Do you remember on July 31, in that same telephone conversation with the investigator, saying that Bruce is a follower and not a leader?

A. No, I don't. I don't remember. I don't remember that.

Q. Do you think Bruce is a person who can be influenced or swayed easily?

A. Probably so.

Q. Were you ever fearful of Bruce?

A. No, sir.

Q. Did you like Bruce?

A. I don't remember that. It's been too long ago.

Q. Do you recall, when you talked to the investigator back in July, that you told him that you only had a faint recollection of him being a student of yours? Do you recall that?

A. I don't remember that either.

Q. Would that be a true statement, though, that in July you

U.S. DISTRICT COURT

Cross - Butcher/Drewett          41

had a faint recollection?

A. I don't remember that. I'm sorry. I don't.

Q. Well, would it be a true statement, though, that in July you only had a faint recollection of him?

A. I remember Bruce.

Q. You do remember him well?

A. Yes. I taught Bruce and his brothers. There were several of them. You know, I taught several of them.

Q. You taught -- which of the brothers did you teach?

A. Let's see. I had Mark. I had Tony, Willie. There's, I think, three or four.

Q. And were the boys more or less the same?

A. Some excelled at some things more than the others. One was musically inclined.

Q. But as far as academic achievement and so forth, they were all about in the same boat?

A. They were all about the same.

        MR. BUTCHER: Pass the witness.

        MR. CURTIS: No further questions.

        THE COURT: You may step down, ma'am. Thank you. And you're free to go as well.

    Please call your next witness?

        MR. CURTIS: The United States calls Linda Monk.

        THE COURT: Ms. Monk, would you are raise your right hand and be sworn?

U.S. DISTRICT COURT

Direct - Curtis/Monk                42

(Witness sworn by the Court)

LINDA MONK, testified under oath as follows:

DIRECT EXAMINATION

BY MR. CURTIS:

Q. Ms. Monk, would you state your name, please?

A. Yes.  It's Linda Monk.

Q. And where are you from, Ms. Monk?

A. I'm from Pine Bluff, Arkansas.

Q. What do you do for a living?

A. I teach junior high English.

Q. And what school do you teach in?

A. At Watson Chapel Junior High.

Q. I just ended a sentence in a preposition to an English teacher.

A. I'll overlook it.

Q. Okay.  Thank you.

How long have you -- you may have just answered this question.  How long have you been a school teacher?

A. I have taught for 22 years.

Q. And how long have you been teaching at Watson Chapel Junior High?

A. Thirteen.

Q. Are you familiar with an individual by the name of Bruce Webster?

A. Yes, sir.

U.S. DISTRICT COURT

Direct - Curtis/Monk                43

Q. Do you see him here in the courtroom today?

A. Yes, sir, I do.

Q. Would you describe where he's sitting, please?

A. He's sitting to my right.

Q. To your right. And how many chairs from me?

A. He's on the end of the table. He's the fourth from you.

Q. The fourth from me counting me, right?

A. Yes.

MR. CURTIS: Your Honor, I would request that the record reflect that the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Curtis) Did you ever teach Bruce Webster?

A. Yes. He was in my basic English class.

Q. And was that in the ninth grade?

A. Yes, sir.

Q. That's not a special education class, is it?

A. No, it's not.

Q. During the time that you taught Bruce, were you able to observe his intellectual abilities and --

A. Yes, sir.

Q. -- his skills?

A. For a student in a basic class, he seemed like he was one of the brighter ones, although his grade did not reflect that.

Q. What did he do when he was in your class?

A. For many weeks, at the beginning of the year, he slept. He

U.S. DISTRICT COURT

Direct - Curtis/Monk                44

was in a morning class, and he slept a great deal of the time.

Q. And did there come a time when he stopped sleeping in class?

A. Yes. When we moved into the second nine weeks and we stopped doing so much grammar and spelling, he seemed to pay quite a bit more attention in class.

Q. During the period of time that you taught him -- I'm sorry. Let me stop a second.

Did he eventually drop out of school that year?

A. Yes, sir.

Q. So you didn't have him the whole year?

A. No, sir.

Q. During the time that he was your student in the ninth grade, did you have an opportunity to converse with him?

A. Yes, sir, off and on through the time he was there.

Q. Would you say that he spoke with you rarely or often?

A. Occasionally.

Q. He spoke with you occasionally?

A. Yes.

Q. During those conversations, would you describe for the jury, did he have any kind of problems communicating with you?

A. No, he didn't. He was very likable whenever he talked with me. He talked to me personally, not to the other students. When he wanted to talk, he talked just to me, and he seemed rather mature for his age.

U.S. DISTRICT COURT

Direct - Curtis/Monk                45

Q. During your 22 years as a teacher, have you, on several occasions, had the opportunity to have contact with special education students, mentally retarded students, mildly mentally retarded students?

A. Mildly mentally retarded or borderline retarded, yes.

Q. And on several occasions?

A. Yes, sir. Several of my students each year are rated as this.

Q. Would you describe -- based on that, would you describe Bruce Webster as mildly mentally retarded or borderline?

A. No, no. Whenever they are rated as borderline or mildly retarded, I read their records, and it tells me what their expressive age is and their receptive age. When I talk to them, I should talk to them as they are like a ten-year-old, and when they talk to me they talk to me like a ten-year-old. It's approximately that age level, and Bruce didn't appear to be that way to me at all.

Q. Based on that, can you give the jury an opinion as to whether Bruce was either borderline or mildly mentally retarded?

A. In my opinion, he was not.

Q. Now, he did not excel in your class?

A. No. He did not excel.

Q. Do you have an opinion as to why he didn't excel?

A. I think he did not apply himself. I think he certainly was

U.S. DISTRICT COURT

Direct - Curtis/Monk                46

capable of the work.

Q. Do you ever recall an incident where you thought to yourself -- a specific incident where you thought to yourself that he was not applying himself and he could have done better?

A. I can remember watching him take a test as the first semester went along and just having the thought to myself that he could be doing so much better if he would just try a little bit harder.

Q. Okay. When he conversed with you, was he nice to you?

A. Yes. He was always very polite.

Q. And were you fearful of him?

A. No.

Q. How about the other students? Were they fearful of him?

A. Yes, sir. They appeared to be.

Q. How would you describe his dress?

A. He often worn the set of clothing known as the Dickies. They are work clothes, the pants and the shirt. Usually, it's a short-sleeve shirt, and he wore dark brown ones a great deal of the time.

Q. How about any jewelry?

A. Yes, a great deal of jewelry. That was when the nugget rings were very popular, the heavy nugget rings. He wore those, or he wore one.

     MR. CURTIS:  I believe that's all the questions I have, Your Honor. Thank you.

U.S. DISTRICT COURT

Cross - Moore/Monk                47

THE COURT:  Cross?

MR. MOORE:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. MOORE:

Q.  Ms. Monk, you indicated that Bruce was in your basic English class.  Were there different levels of English classes?

A.  Yes, sir.  On most years, I have an advanced class and general classes and basic classes.

Q.  And what is the distinction between those three different types of classes?

A.  In my basic class, I did have some students each year who are rated as borderline or mildly retarded, but it's also for students whose reading skills are not on grade level, but all of them who are in there certainly are not mentally retarded.  They don't receive special education services.

Some of them will receive these services, but all of them don't.  It's also a class where many of the students who just simply don't apply themselves end up.

Q.  So it's the lowest level of class?

A.  Yes, except for the special ed classes.

Q.  Except for the special ed classes?

A.  Yes, sir.

Q.  But there are some students in there that are the students with special needs, that have some mentally retarded students and things like that in these basic classes?

U.S. DISTRICT COURT

Cross - Moore/Monk          48

A. Yes. There are some in there who are like that, yes, sir.

Q. All right. And I believe you indicated that in the -- that it appeared that in the second semester that Bruce appeared to have more interest or more motivation than he did in the first semester?

A. This is the second nine weeks of the first semester.

Q. What was the different subject matter? I think you said there was a change?

A. Yes. The first nine weeks, we concentrated more on grammar and spelling, and the second nine weeks we went more into reading stories.

Q. The subject matter, the spelling, the grammar, things like that, were those things that seemed to interest or motivate Bruce?

A. I'm sorry. I can't hear you.

Q. The subject matter that you covered in the first nine weeks, the spelling, the grammar, those basic language skills, were those things that seemed to be motivating Bruce at all?

A. No, they did not seem to be. Whenever we do the first nine weeks work, there is a great deal of just looking at the exercises in the book and doing what it tells you to do, finding your nouns and verbs, things like that. There is a great deal of written work to be done. The second nine weeks is whenever I read a lot to them, and we discuss the stories, and most of them find that more interesting.

U.S. DISTRICT COURT

Cross - Moore/Monk            49

Q. It held Bruce's interest more?

A. Yes, sir, it did.

Q. You indicated that he appeared to read at a low level; is that correct?

A. Yes, sir. I can't recall exactly what his level would be, but I do know that he was able to read the tests adequately, or I would have made the provisions to read it orally to him.

Q. You indicated that -- the special education classes, if someone was a special education student, would there be a separate class that he would attend, or would he be in one of these basic classes?

A. It depends on what his rating would be. Whenever he takes a battery of tests, the counselors, there would be a committee to determine if he should be in special ed classes all day. I often have a student who will be in special ed classes for most of the day and will come out just for my class.

Q. In interaction among the students in the school back there, is there any type of bias against the special education students? I mean, how do the other students treat them? Does the student population as a whole seem to be very compassionate and caring and nurturing to the special education students?

A. No, sir. I wouldn't say they are like that, but I also wouldn't be able to say that they seemed to make fun of them a great deal.

Q. Okay. Well, in your experience, being a special education

U.S. DISTRICT COURT

Cross - Moore/Monk                50

student, are the students -- is that something that they want to do?  Do they want to be classified as a special education student?

A.  No, they don't.

Q.  Does it carry some stigmatization among their peer groups, so to speak?

A.  To some extent, yes, sir.

Q.  Did you ever have any of Bruce's siblings as students?

A.  Yes, sir.  I had, I believe it was his brother, or, perhaps, a cousin named Tony.  He's the only other one that I had that I can recall.

Q.  Did you have him about the same time that Bruce was a student?

A.  Yes, sir, I believe maybe a year before.

Q.  Was there a discernible difference in Tony's abilities as from Bruce's abilities, or did they appear to have similar abilities?

A.  No.  In my opinion, Bruce was quite a bit brighter than Tony was.

Q.  You said that there was no -- that Bruce did not excel in your class.  Do you recall how he did do, what kind of grade he got?

A.  He ended up with a "D" for the first nine weeks -- for the first semester.

Q.  A "D"?

U.S. DISTRICT COURT

Cross - Moore/Monk          51

A. A "D," yes.

Q. What about for the second semester?

A. He dropped sometime during the second semester.

Q. Let me ask you one other question.

You indicated that you thought Bruce was one of the brighter students for your basic class. Do you recall having had a conversation with an investigator for the defense in this case back on July 18, 1995?

A. Yes, sir.

Q. Do you recall having told the investigator, at that time, saying that Bruce was probably in the lower end of the average range and that the classes he took were low level classes?

A. Well, a basic class is a low level class, and where I think my students as a whole, students who are in the low level classes, would be considered on the lower end of the intelligence level. Bruce wouldn't have done well in an advanced class. He would have had to work extremely hard to do fairly well in a general class. That's what I meant when I talked to this man.

Q. All right. In relation to the student population as a whole, he was at the lowest end of the average range, is that correct? Would that be a fair characterization?

A. No, sir, I don't think so, because in a basic class the range is so varied, and he would be one of the top ones in a basic class. So there would be many, many what would be rated

U.S. DISTRICT COURT

Direct - Macaluso/Turner          52

below him.

Q. So you don't believe that he would be the lower end of the average range?

A. The lower end of the average range?  Oh, yes, sir.  Am I answering your question?

Q. Yes.  I think it was a bad question.

A. Okay.

MR. MOORE:  Thank you very much.  I pass the witness.

THE COURT:  Thank you very much.  You may step down.

THE WITNESS:  Thank you.

May I see counsel for the government at the bench?

(Off-the-record discussion at the bench at this time)

MR. MACALUSO:  We call Mr. E. C. Turner, Your Honor.

THE COURT:  Mr. Turner, would you please raise your right hand and be sworn?

(Witness sworn by the Court)

E. C. TURNER, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MACALUSO:

Q. Good morning, Mr. Turner.

A. Good morning.

Q. Would you tell us for the record your full name, please, sir?

A. My name is Ervin Charles Turner.

Q. And, sir, what's the nature of your profession or

U.S. DISTRICT COURT

Direct - Macaluso/Turner                53

occupation, please?

A. I'm a school counselor.

Q. And for how long, sir?

A. I have been a counselor, sir, for approximately 23 years.

Q. Where, sir?

A. I was at Grady High School for a period of time. I have been at Watson Chapel Junior High School for 13 years.

Q. Are those both located in Pine Bluff, Arkansas?

A. No. Grady High School is located in Grady, Arkansas.

Q. Okay. So you have been with Watson Chapel Junior High School in Pine Bluff for how long?

A. Thirteen years.

Q. As a counselor for 13 years?

A. I have.

Q. Can you, just in a nutshell, give us a little bit of a background of your education and your training, sir, in that regard?

A. Okay. I have been in education for 28 years in all. I started out as a teacher and a coach. I received a Master's Degree in Guidance and Counseling from Henderson State University, but I also did additional study at the University of Wisconsin Eau Claire and the University of Arkansas and University of Iowa.

Q. And, basically, what are your duties and responsibilities there as a counselor for the Watson Chapel Junior High School,

U.S. DISTRICT COURT

Direct - Macaluso/Turner          54

sir?

A. My basic duties are to counsel students, work with students, try to help them make decisions.

Q. Mr. Turner, do you have responsibility, also, for any of the testing that may be done on the students there at Watson Chapel?

A. Yes, I do.

Q. What sort of tests do you administer to your students on a regular basis?

A. On a regular basis, our kids -- perhaps, the only test we do is an achievement test. We do it once during seventh grade year when they come at that time.

Q. Seventh grade?

A. The seventh grade year.

Q. And you referred to that test as a --

A. Achievement test, a nationally known achievement test.

Q. Was that the M.A.T. 6 Survey?

A. It was the M.A.T. 6 at that time, yes.

Q. What sort of areas are those students tested in under the M.A.T. 6 testing program?

A. They are tested in all general academic areas. It's the core basics.

Q. Let me ask you, sir, depending upon a student's score on the M.A.T. 6 and other factors, a determination might be made as to whether or not a student was appropriate for a certain

U.S. DISTRICT COURT

Direct - Macaluso/Turner          55

level of classes or even for special education classes?

A. Yes.

Q. Are there other factors that could be considered?

A. Yes. We also consider teacher recommendation.

Q. Let me ask you, while you were at Watson Chapel Junior High School you came to know of an individual by the name of Bruce Webster?

A. Yes, I did.

Q. Do you see him here in the courtroom today, Mr. Turner?

A. Yes, I do.

Q. Would you point to him and tell us where he's seated and, if you can, describe what he's wearing?

A. That's Bruce sitting over there at the table there with the black suit, like a light gray with a speckled tie.

MR. MACALUSO: I would ask that the record reflect, Your Honor, that the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) Mr. Turner, when was it, as best you can recollect, that you came to know of Bruce or became acquainted with Bruce Webster?

A. Probably -- when he came in, in probably the seventh grade.

Q. And did you have occasion to meet with him on various occasions and to speak with him?

A. Bruce and I have had conversations several times.

Q. All right. Did you have opportunity, of course, to

U.S. DISTRICT COURT

Direct - Macaluso/Turner            56

converse with him during those occasions?

A. Yes, I did.

Q. Listen to him talk and he'd listen to you, and you would just have conversations; is that correct?

A. Uh-huh.

Q. Let me ask you, sir. Have you, in your career, either diagnosed or been in the presence of or had to deal with students that you felt were tested to be either mildly or moderately mentally retarded?

A. Yes, I have.

Q. Was there anything, sir, about your dealings, your conversations, your exposure to Bruce Webster, based on your training and your experience and just your dealing with him, that would lead you to believe that he was suffering from any sort of mild or moderate mental retardation of any type?

A. I had no indications of that whatsoever.

Q. You're trained to do that, aren't you?

A. Yes, I am.

Q. I mean, when he would speak to you, would he make sense?

A. Yes.

Q. Did you have any difficulty understanding him?

A. No, I didn't. We had several conversations, and I've never had a problem communicating with him.

Q. Did you get along with him all right?

A. Yes.

U.S. DISTRICT COURT

Direct - Macaluso/Turner          57

Q. Did you become acquainted, or have you become acquainted with the results of the test, the M.A.T. 6 Survey test that you referred to that's done in the seventh grade?

A. I'm sorry. I didn't understand your question?

Q. Have you familiarized yourself, or are you familiar with Bruce's M.A.T. 6 Survey test results?

A. Yes, I am.

MR. MACALUSO: May I approach the witness, Your Honor?

THE COURT: You may.

Q. (By Mr. Macaluso) Mr. Turner, let me show you what's been marked for identification purposes as Government's Exhibit 98-A, and let me ask you, if you would, sir, take a look at that. And I'll ask if you can recognize and identify it? Do you recognize that?

A. Yes, I do.

Q. Is that, in fact, a duplicate copy of the M.A.T. 6 Survey -- is that an achievement test?

A. This is an achievement test, a duplicate copy of the master file that we have in my office.

Q. Of Bruce Webster?

A. Of Bruce Webster.

MR. MACALUSO: We would offer Government's Exhibit 98-A, Your Honor, at this time.

MR. MOORE: No objection.

THE COURT: 98-A is admitted.

U.S. DISTRICT COURT

Direct - Macaluso/Turner          58

Q. (By Mr. Macaluso) Okay. Can you tell us, just in sum, what the results of the tests were on Bruce?

A. Okay. This is a nationally known exam in which, really, there is no pass or fail on this exam. We simply compare our students with other students across the United States in a norm group, and averages have been determined from that. If we look at the average, we look at the national percentile is what we're looking at here. Going across on a total complete battery, he scored in the 43rd percentile.

Q. And compared to other students at Watson Chapel Junior High School, where would that place him?

A. That would place him with the average student at Watson Chapel within a framework, give or take the standard of measurement.

Q. Okay. And what would be average there for Watson Chapel Junior High?

A. It varies from year to year. I'm not sure what the average was for this year, but our school usually stays around the 48th to 53rd percentile on the average as a whole.

Q. So on basis of Bruce's results on that test, I gather he would not -- he would fall within the average range; is that correct?

A. He would fall within the low average range.

Q. Low average range?

A. Yes.

U.S. DISTRICT COURT

Direct - Macaluso/Turner              59

Q. Would that in any way, on the basis -- well, on the basis of his test or any other indication, whether it be from teachers or family, would he have been a candidate for a special education program?

A. Definitely not.

Q. Is there any question about that at all, Mr. Turner?

A. No. Based on those scores, he would not.

Q. You know he didn't do well there in the eighth or ninth grades, don't you, sir?

A. No.

Q. Did you have an opportunity to look at some of his grades from earlier years?

A. Yes, I did.

Q. He did well, didn't he, sir?

A. Up until about the sixth grade.

Q. In your conversations and your just face-to-face dealings with Bruce, did you get a feel for Bruce as to whether or not he was a leader, sir, or he was a follower?

A. Bruce, to me, was an independent thinker. He would think on his own. I feel he was more of a leader than he would have been a follower.

Q. Did he have problems conforming there at the school?

A. He had problems with rules and regulations. Conforming, yes.

MR. MACALUSO: I believe that's all the questions I

U.S. DISTRICT COURT

Cross - Moore/Turner          60

have. Thank you very much, sir, for coming down.  We

appreciate it.

   I pass the witness.

      THE COURT:  Cross examination?

      MR. MOORE:  Thank you, Your Honor.

                  CROSS EXAMINATION

BY MR. MOORE:

Q.  Mr. Turner, the achievement test that was given, how is
that test administered?

A.  This test is administered over a four-to-five day period.

Q.  Is it administered in the classroom?

A.  In some cases we administer it in the classroom, and in
some cases we administer it in a large group, and, sir, I don't
remember exactly which administration he had.

Q.  You don't remember if Bruce took the test in the classroom
with his other classmates or if he was in a large group with
them all together; is that correct?

A.  No, I don't.  We change that from year to year.

Q.  But it wouldn't have ever been administered individually
with Bruce being the only student there?

A.  No, definitely not.  It's a nationally known achievement
test.  All our students are required to take it.

Q.  Does anybody ever cheat on these tests?

A.  I couldn't sit here and say positively it hasn't occurred,
but the test is given over a five-day period, and it would be

U.S. DISTRICT COURT

Cross - Moore/Turner          61

very difficult for a person to bring their scores up a

significant amount.

Q. Do they ever copy from each other?

A. We have teachers that are monitoring. I'm pretty sure it might take place, but I would say the chances are very, very slim that it occurred.

Q. Do you have any personal knowledge whether it occurred in connection with Bruce's taking this achievement test?

A. I don't have any personal knowledge.

Q. You indicated that you had reviewed his grade report and were familiar with his grades; is that correct?

A. I have seen his transcript.

Q. Let me show you what had been marked as Defendant's Exhibit Number 9 and ask you if you recognize it?

A. This is copy of Bruce's transcript.

Q. Do you also know Mr. Rick McLaughlin?

A. Yes. Presently, he's the junior high principal.

Q. Mr. McLaughlin appears on the certification attached to that exhibit; is that correct?

A. Uh-huh.

   MR. MOORE: Your Honor, we would offer at this point Defendant's Exhibit Number 9.

   MR. MACALUSO: No objection.

   THE COURT: Defendant's 9 is admitted.

Q. (By Mr. Moore) Now, you said that Bruce had not -- that he

U.S. DISTRICT COURT

Cross - Moore/Turner          62

had done well in the early years; is that right?

A. Yes.

Q. Was he retained in the first grade?

A. He was retained in the first grade.

Q. Then he started doing better?

A. He started doing better.

Q. Did his grades begin to fall off in the sixth grade?

A. I would say between the sixth and seventh grade.

Q. You have indicated that you have some familiarity in dealing with, and experience and dealing with mentally retarded students. Is there any particular pattern at which point mildly mentally retarded students begin to have problems doing their schoolwork?

A. There is no particular time you can point out. It's brought to our attention or when the teacher happens to notice something, or someone else comes in with a suggestion that maybe there is a problem.

Q. Is it unusual, in your experience, to see students do fairly well during the first years of school and then begin to sharply decline along about the fifth or sixth grade if they are mentally retarded?

A. I couldn't say a specific grade level or time.

Q. So you don't know if that's consistent or inconsistent?

A. I couldn't say it would be consistently that way with any two students.

U.S. DISTRICT COURT

Cross - Moore/Turner          63

Q. You indicated you thought Bruce was a leader. Do you recall having a telephone conversation with an investigator for the defense in this case -- I mean, having a conversation with an ex-F.B.I. agent that was working as an investigator in this case?

A. No, I don't remember having a conversation. I may have. Somebody called me or somebody came out and talked to me from the defense.

Q. Do you remember, during that conversation, discussing whether or not it was your opinion that Bruce was a leader or a follower in connection with his peer group?

A. Sir, I don't remember specifically.

Q. Well, let me just ask you. Do you remember telling the investigator that you talked to that you did not personally think that Bruce Webster was a leader among his peers, that you felt Webster was that type of individual that could be easily led, and you described him as more of a follower than a leader? Do you remember saying that to the investigator?

A. Sir, I don't remember.

Q. Is there any reason why you would have told the investigator that if it wasn't the truth?

A. No. It wouldn't have been if I told him that.

Q. Is it your opinion that he was a leader or that he was a follower, Mr. Turner?

A. I feel he was more of a leader. He was the type of person

U.S. DISTRICT COURT

Cross - Moore/Turner          64

that spoke for himself, that would speak for himself, in my conversations with him, but he did run around with a group of people.

Q. Did you feel like he was a person that was susceptible to being influenced by other people?

A. Possibly, in some cases, yes.

Q. Is that the reason why you would have told that to the investigator?

A. In any case, in any situation, some kids will follow other kids even though they are leaders. If a person comes in that's a little bit stronger, or a peer comes in and, perhaps, puts more influence on him, or that person wants to be more like that other person, he could possibly change his role.

Q. After talking to the investigator for the defense, did you ever later on have the occasion to talk to a psychologist by the name of Denis Keyes?

A. I did.

Q. Did you, in fact, discuss with Dr. Keyes your opinion as to Bruce's abilities and his achievements in school?

A. I might have. Perhaps, I did. I'm not sure. I know one came from my office.

Q. Had you talked to the investigator about that prior to the time that Dr. Keyes ever came and talked to you?

A. Someone came to my home, maybe a year ago, during the summer, and then later on, somebody came to my office.

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          65

MR. MOORE:  That's all.  Pass the witness.

MR. MACALUSO:  I have no additional questions.  May this witness be excused, Your Honor?

THE COURT:  You may step down.  Thank you, and you're free to go.

Please call your next witness.

MR. MACALUSO:  Yes.  Marcus Hollien, Your Honor.

THE COURT:  Please raise your right hand and be sworn?

(Witness sworn by the Court)

THE COURT:  You may be seated.

MARCUS HOLLIEN, testified under oath as follows:

DIRECT EXAMINATION

BY MR. MACALUSO:

Q.  Would you tell us your name, please, and spell your last name for the court reporter, please?

A.  Marcus Edwin Hollien, H-O-L-L-I-E-N.

Q.  And, sir, how old a man are you?  How old are you, sir?

A.  Thirty.

Q.  Thirty?

A.  Yes.

Q.  And how are you employed?

A.  First lieutenant in the United States Army.

Q.  And how long have you been with the United States Army, sir?

A.  Three years, a little over three years.

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          66

Q. Lieutenant Hollien, let me ask you if you received your college education at the University of Arkansas at Pine Bluff?

A. I did.

Q. Approximately what years were you there, and what year did you graduate from the university?

A. From January '89 until June '93. I graduated in June of '93.

Q. June of 1993.

While you were in attendance at the university, were you an R.O.T.C. cadet?

A. Yes, I was.

Q. And you graduated, and then you went on into the service for the last three years?

A. Yes.

Q. What do you do in the United States Army as a first lieutenant, sir?

A. Right now, I'm the test control officer, slash, assistant operations officer.

Q. I want to direct your attention back to one of the summers, I believe, when you were there at the university, and I'll ask you if you had occasion to be involved -- is it a C.E.T.A. program?

A. Yes, C.E.T.A. program, if I remember correctly --

THE COURT: Could you pull the mike towards you a little bit? Thank you.

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          67

Q. (By Mr. Macaluso)  We both need to speak into the microphone, Lieutenant?

A. Okay.  Not a problem.

Q. I refer to it as a C.E.T.A. program.  That's an acronym. It's S-E-D-A (sic); is that correct?

A. Yes, if I'm not mistaken.  I can't actually remember the name myself.

Q. How did you get involved in that?

A. Well, I just happen to -- my brother, they called him for a job, and he didn't want it, and I just happened to apply for it, and they did give to me.

Q. What were your responsibilities or involvement with the C.E.T.A. program?

A. I was the supervisor over some of the kids that they had hired during the summer.

Q. To do what?

A. To clean up the neighborhoods and stuff.

Q. Okay.  And for how long were you involved in the program, sir?

A. Six weeks.

Q. Let me ask you, during your responsibilities and your involvement in that C.E.T.A. program that summer, did you come to know or meet an individual by the name of Bruce Webster?

A. Yes.

Q. Do you see Bruce Webster here in the courtroom today, sir?

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          68

A. Yes.

Q. Would you point to him and describe what he's wearing and where he's seated, if you would?

A. Sitting over here next to the guy here, with the tie on and the suit.

Q. What number would he be seated at the table from my left?

A. From your left?

Q. Yes, sir.

A. Three.

MR. MACALUSO: Thank you.

Your Honor, I would ask that the record reflect that the witness has identified the defendant in open court?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) Now, so you're involved in the program, and I gather from what you said that Bruce Webster was working in the program?

A. Yes.

Q. Were those high school students, college students, kids in the neighborhood, what?

A. Around 15 or 16, high school, I would say.

Q. How many kids were -- how many participants were in the program?

A. Oh, eight to ten.

Q. And what did you say you had them doing?

A. Cleaning up. They were cleaning up the neighborhoods and

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          69

stuff, going around picking up trash and stuff out of the
ditches and along the highway and stuff like that.

Q. Did you have contact, then, with Bruce Webster on a daily
basis for that six-week period?

A. During that period, yes.

Q. During the time, did you have a chance to observe him do
the work that he was supposed to do?

A. Yes, I did.

Q. Did you have occasion, also, to talk to Bruce Webster?

A. Yes, on occasion.

Q. On few or on many occasions?

A. During that six weeks, every day.

Q. You had a chance to observe him?

A. Well, not every day. I'm not sure if he didn't show up a
couple times here and there.

Q. Yes, sir, most every day, though?

A. Yes.

Q. When you had conversation and you talked to Bruce Webster
back then, did you have any difficulty at all understanding
him?

A. No.

Q. Did he have any communications problems whatsoever?

A. No, not that I could tell.

Q. Okay. Was there anything about his behavior, as you
observed, that would give rise to any belief that he was

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          70

retarded or impaired mentally in any way whatsoever?

A. No.

Q. In fact, let me ask you if one of your responsibilities, Lieutenant, when you were in charge of this program was to basically do an evaluation of the participants in the program?

A. Yes.

Q. Okay. And did you do one for Bruce?

A. Yes.

Q. All right. Did you also have an opportunity to see how he interacted with the other people in the program?

A. Yes.

Q. Like whether he appeared to be a leader or a follower?

A. Yes.

Q. How he compared to the other participants?

A. Yes.

Q. What observations do you recall about Bruce? Did you think he was a leader, or did you think he was a follower, based on your observations of him?

A. Well, based on my observation, what I see is that, you know, whenever there is a group, somebody tends to -- others follow an individual, and he was the individual that they followed more so.

MR. MACALUSO: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (By Mr. Macaluso) Let me show you what's been marked for

U.S. DISTRICT COURT

Direct - Macaluso/Hollien          71

identification purposes as Government's Exhibit 99,

Lieutenant. Let me ask you to look at that? I'll ask you if

you recognize that exhibit, sir?

A. Yes, I do.

Q. You need to speak up.

A. Yes, I do.

Q. And for the record, what is that, Government's Exhibit

Number 99?

A. What do you mean, the title?

Q. Yeah. Is that the participants evaluation form you filled

out on behalf of Bruce Webster in the summer of '92?

A. Yes.

Q. Let me ask you if you indicated on there -- well, we would

offer Government's Exhibit 99, Your Honor.

MR. MOORE: No objection.

THE COURT: Government's 99 is admitted.

Q. (By Mr. Macaluso) Let me ask you if you indicated on

there, under supervisor's remarks -- if you would read what you

wrote on there, based on your observations of Bruce and your

rating of him that summer when he worked for you? Can you read

that part, first page?

A. Bruce is a very intelligent individual with good

characteristics but needs to get self discipline.

MR. MACALUSO: Thanks for coming down, Lieutenant.

I'll pass the witness for cross examination.

U.S. DISTRICT COURT

Cross - Moore/Hollien          72

THE COURT:  Cross?

MR. MOORE:  Briefly, Your Honor.

THE COURT:  You always say that.

MR. MOORE:  Briefly is a relevant term.

CROSS EXAMINATION

BY MR. MOORE:

Q.  May I see that, please?

A.  Yes.

Q.  Exhibit 99, the evaluation on the front page is an evaluation that you filled out; is that correct?

A.  Yes.

Q.  What is that attached to the rest of it?

A.  I don't have -- I didn't fill any of that out.

Q.  You don't recognize it?

A.  No.

Q.  You don't know how it was administered, how it got there, or anything like that?

A.  Oh, yes I do.  Yes, I do.

Q.  What is that?

A.  If I'm not mistaken, those are things that I filled out every day where -- no.  This is not what I think -- no, I don't remember.  I don't recall the ones behind it.  No, I don't.

Q.  You don't recognize anything after the first page of that exhibit?

A.  No.

U.S. DISTRICT COURT

Cross - Moore/Hollien                73

Q. So you don't know who that would purport to -- whose work that would purport to be or where that would have come from or anything like that?

A. Do I know where the report would come from, this one?

Q. Yeah.

A. No, not if I have never seen it before.

Q. Okay. Thank you.

You indicated that during the time that Bruce was working in the C.E.T.A. program, it was in the summer of 1992; is that correct?

A. Right.

Q. And that most of the kids that were working -- how big a group of kids did you have that you were supervising?

A. If I remember correctly, a group of like eight to ten, something like that.

Q. And most of them were 15 and 16-year-old high school students?

A. Yes, I do believe.

Q. Do you recall at that time whether or not Bruce Webster was on parole having been in the penitentiary?

A. No, I didn't know. I didn't have any background on any of the kids.

Q. So you wouldn't know if there was anybody -- if Bruce or any of the other students were individuals that had been on parole or if they were high school students?

U.S. DISTRICT COURT

Direct - Macaluso/McHan                74

A. If they were who?

Q. You didn't know anything about the backgrounds of those students?

A. No.

Q. Do you know whether or not Bruce was in school at that time?

A. No, I did not.

Q. Did you know whether or not Bruce was attending the Southeast Arkansas Mental Health Clinic at that time?

A. I do not.

    MR. MOORE:  Thank you very much.

    I pass the witness.

    MR. MACALUSO:  No further questions.

    THE COURT:  You may step down, and you're free to go.

    Call your next witness.

    THE COURT:  Mr. McHan, if you will stand here and raise your right hand and be sworn?

    (Witness sworn by the Court)

    THE COURT:  You may be seated.

    TOM MCHAN, testified under oath as follows:

        DIRECT EXAMINATION

BY MR. MACALUSO:

Q. Would you tell us your name, please, sir?

A. Tom McHan.

Q. Your last name is spelled?

Direct - Macaluso/McHan                    75

A. M-C-capital H-A-N.

Q. Your profession or occupation, Mr. McHan?

A. Build cabinets and general contractor.

Q. And where do you call home?

A. Pine Bluff.

Q. Are you native to that area or that town?

A. Yes, sir.

Q. And you're a married man with a family, are you not, sir?

A. Yes, sir.

Q. How long have you been in the cabinet business, Mr. McHan?

A. Approximately two years, in and out.

Q. And prior to that, sir?

A. General contracting since about 1977.

Q. And do you do business under a particular name now?

A. McHan Construction and Mack's Cabinets.

Q. Mr. McHan, let me ask you if you had occasion -- if you
have ever met an individual by the name of Bruce Webster?

A. Yes, sir.

Q. Do you see him here in the courtroom today?

A. Yes, sir, I do.

Q. Would you point to him, describe what he's wearing, and
tell us where he's seated?

A. He's sitting the third man from my left right here wearing
a black coat and tie.

MR. MACALUSO: Your Honor, I would ask that the record

U.S. DISTRICT COURT

Direct - Macaluso/McHan            76

reflect that the witness has pointed to and has identified the defendant in open court?

THE COURT: You don't mean he's the third man to your left, do you?

THE WITNESS: No, sir, I meant from my left sitting at that table over there.

Q. (By Mr. Macaluso) Oh, the third man from my left you mean?

A. Oh, I mean from my right. Excuse me, from his left.

Q. We give these tests out all the time, Mr. McHan.

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) All kidding aside, you do know Bruce, don't you?

A. Yes.

Q. In fact, you know his brothers, too, do you not?

A. Yes.

Q. Which brothers do you know and how do you know them, sir?

A. I knew Mark, Tacky, which is Dary, Tony, and Bruce because I worked on their parent's house.

Q. Okay. You actually did -- when you were solely and exclusively in the construction business, you worked on the Webster residence, didn't you?

A. Yes, sir.

Q. And at various times, have the brothers worked for you?

A. Yes, sir. Mark and Tacky worked for me for awhile.

Q. Tacky?

U.S. DISTRICT COURT

Direct - Macaluso/McHan          77

A. That's Dary Webster.

Q. Dary?

A. Yes, sir.

Q. He's the brother who was killed; is that correct?

A. Yes, sir.

Q. And Mark, does he work for you now?

A. No, sir.  He works for Mr. Carl Davis.

Q. Mr. Carl Davis, he's in the construction business as well, isn't he, there in Pine Bluff?

A. Yes.

Q. Let me ask you when Mark -- when he was working for you, when Tacky was working for you, or Dary, did they talk to you about hiring their brother?

A. Yes, they did, you know, on some clean-up jobs.

Q. And did you, in fact, meet Bruce Webster and actually give him a job?

A. Yes, sir.

Q. When approximately?  How long ago would that have been?

A. Around '88, approximately.

Q. And what sort of work was he supposed to do for you, sir?

A. Just clean up.

Q. About how long did he -- well, did you have a chance to see him work?

A. Yes, sir, for just a day or so, and then Mark was supposed to take care of it.  Mark usually ran my crew.

U.S. DISTRICT COURT

Direct - Macaluso/McHan          78

Q. Mark is a real good worker, isn't he?

A. Yes, sir.

Q. Is there any question about that at all?

A. No.

Q. Is he trustworthy?

A. Yes.

Q. What about Bruce? How did he work out for you?

A. Not real well.

Q. In fact, how long did he actually work for you in that clean-up crew?

A. About a week.

Q. How was he terminated, or how did that job end?

A. Well, I had found out that he had been sleeping on the job.

Q. Let me ask you, Mr. McHan, just real simple. Were you aware of any physical disability or anything that would prevent Bruce Webster from performing his responsibilities for you on that job?

A. No.

Q. You were paying him a salary, weren't you, or an hourly wage?

A. Yes, sir.

Q. Did you have occasion during the time that he worked for you to talk to him, to listen to him talk?

A. Yes, sir. I had talked to him a couple of times and directed him to do certain items.

U.S. DISTRICT COURT

Direct - Macaluso/McHan                79

Q. Could he follow instructions, so far as you know?

A. Yes.

Q. Would he follow instructions?

A. Yes, sir.

Q. Would he do the work that you told him to do?

A. Well, you know, there were several people doing the items at the time. I don't know whether he basically did it himself or, you know --

Q. Did you have any reason to believe, during any of the time that you had associated with him and he worked for you, that there was anything wrong with him mentally?

A. No, sir.

Q. You said he was sleeping on the job?

A. Yes, sir.

Q. Did you let him go for that reason?

A. Pretty much.

Q. Tell us how that happened, if you recall?

A. Well, he used to stay out late and just come in. He just went to sleep out there in one of the buildings I had out at the house one day.

Q. Well, did you tell -- I mean, did you fire him, just let him go? How did that -- how was that resolved?

A. I just told Mark not to bring him back. That pretty much terminated him.

Q. After about a week?

U.S. DISTRICT COURT

Direct - Macaluso/McHan                80

A. Yes, sir.

Q. Let me ask you. Did he ever talk to you about, or did you learn anything about him being involved in any kind of gang activity?

A. Yes, sir. I knew that he was a member of -- it's The Folks gang is what it is in Pine Bluff.

Q. How did you come to learn about that, sir?

A. Through mostly his brothers, and I have had occasions to go by several parks, which is in the area, and they were gathered up out there.

Q. Mr. McHan, let me ask you. Have you talked to people there in the Pine Bluff area about Bruce Webster, just generally, to learn about his reputation?

MR. BUTCHER: Your Honor, I object to that question. It's outside the scope of rebuttal.

THE COURT: Response?

MR. MACALUSO: I believe, Your Honor, that there was testimony from witnesses brought by the defense, at least one I can think of in particular, who said his reputation was good, or it was not bad, at least, in the community.

THE COURT: Overruled.

Q. (By Mr. Macaluso) Do you have an opinion as to his general reputation for being a peaceful and law-abiding person?

A. No, sir.

Q. Do you know about his reputation?

U.S. DISTRICT COURT

Cross - Butcher/McHan                81

A. Yes, sir.

Q. Is it good, or is it bad?

A. It's pretty bad.

Q. Would that be the same if you forgot everything you know or you think you know about this case for which he is on trial?

A. Oh, no, sir. He was pretty much a person who thought it was easier to go ahead and not make a living but do it a different way.

MR. MACALUSO: Thank you very much, Mr. McHan. I pass the witness for cross examination.

THE COURT: Is there cross?

MR. BUTCHER: Yes, sir.

CROSS EXAMINATION

BY MR. BUTCHER:

Q. Mr. McHan, is your actual personal knowledge or contact with Bruce limited to that one week or so that he worked for you?

A. No, sir. I worked at their house for probably 45 days, a complete remodel.

Q. During that time, you got to see various members of the family, didn't you?

A. Yes, sir.

Q. And you saw the father, didn't you?

A. Willie?

Q. Yes, Willie, Sr.?

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH   Document 31-2   Filed 04/06/14   Page 144 of 275 PageID #5
Case: 14-1049   Document: 26-6 1303   Filed: 07/08/2014   Pages: 275

Cross - Butcher/McHan          82

A. Yes.

Q. How would you describe Willie, Sr.?

A. It's kind of hard to describe him.

Q. Do you remember describing him to an investigator for the defense back in 1995 as an ornery S.O.B.?

A. Yes, sir.

Q. Does that refresh your memory?

A. Pretty much.

Q. Have you had occasions to have contact with Willie, Sr.?

A. Yes, sir.

Q. Did he ask you for money and that type of thing?

A. Yes, sir, pretty much.

Q. And did you give him the money?

A. No, sir.

Q. Did he say who was going to repay the money?

A. Yes, sir, Mark.

Q. The work that Bruce was supposed to do for you was just menial?

A. Yes, sir, just labor work.

Q. Just pick up trash and so forth?

A. Yes.

Q. This finding him sleeping on the job, did you find him sleeping?

A. No, sir, I didn't.  His brothers told me.

Q. His brothers actually told you?

U.S. DISTRICT COURT

Cross - Butcher/McHan               83

A. Yes. They pretty well kept up with me.

Q. When you talked to him during this time that he did work for you, this was merely to give him directions and tell him what to do and what you expected of him?

A. Yes.

Q. You didn't have any lengthy conversations with him about things that were not directly work related, did you?

A. No.

Q. Do you recall, in talking to that investigator back in 1995, saying that you didn't recall whether Bruce quit or was fired?

A. No, sir, I don't remember that. I'm definitely sure that I let him go.

Q. That you fired him?

A. Yes.

MR. BUTCHER:  Thank you.  Pass the witness.

MR. MACALUSO:  We have no further questions.

THE COURT:  You may step down, and you're free to go. Let me visit with you just a moment.

(Off-the-record discussion at the bench at this time)

THE COURT:  We're going to take an early lunch break. There is no sense in taking a break and coming back in here for a few minutes before lunch.

We are going to have in this courtroom at 3 o'clock a magistrate's investiture.  We have a new magistrate here in

U.S. DISTRICT COURT

Cross - Butcher/McHan          84

Fort Worth, and he's going to be formally sworn in and robes put on him and all that sort of thing. So we're going to have to vacate here and have our trial this afternoon in Judge Mahon's courtroom, which is on the 5th Floor. So we're going to have to quit about 2:45 because I have to be involved in the ceremony.

So I'll ask you to go to lunch, report back to the normal jury room, and then Mr. Bowen will come get you and bring you to the 5th Floor courtroom. It's prettier than this one. So you may enjoy seeing a different courtroom. It's a little more intimate, but it's a nice courtroom. And we'll go from 1:00 until about 2:45, and then we'll quit which will give me time to get back down here for the ceremony at 3:00. A bunch of the judges from Dallas are coming over here, and I feel some obligation to host them a little bit.

Then we'll quit at 2:45 and come back at 9:00 a.m. on Tuesday. I thought we would be ready for the charge then, and we may be ready for the charge, but the government still has a couple of witnesses it wants to put on Tuesday morning. So we're probably going to move back the charge until the afternoon.

That's the best road map I can give you. It's kind of like the weather. It changes as circumstances change, and the prediction may not be accurate. So I'll say there is 20 percent chance of charge by noon on Tuesday.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          85

Any questions?

All right.  Thank you.  Take all your stuff with you.

(Trial recess, 11:40 a.m. - 1:15 p.m.)

THE COURT:  The government may call its next witness.

MR. ROPER:  Your Honor, the government calls John Clay.

THE COURT:  Mr. Clay, would you please raise your right hand and be sworn?

(Witness sworn by the Court)

JOHN CLAY, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q.  Would you state your name for the judge and jury, please?

A.  John L. Clay, Jr.

Q.  And you're currently being held in the Mansfield Law Enforcement Detention Center; is that right?

A.  Yes, sir.

Q.  And you have charges pending against you, is that correct, for drug dealing and possession?

A.  Yes, sir.

Q.  And your trial is pending; is that right?

A.  Yes, sir.

Q.  At this point, you're cooperating with the government?

A.  Yes, sir.

Q.  You're in hopes of getting a lesser sentence; is that

U.S. DISTRICT COURT

Direct - Roper/Clay, John          86

right?

A. Yes, sir.

Q. A possible sentence you could look at is, in fact, life; is that correct?

A. Yes.

Q. Now, I want to go back, if I could, with you to April -- specifically, April 14, 1996. Were you here in the federal court building that day?

A. Yes, sir.

Q. That's the courthouse we're in today; is that right?

A. Yes.

Q. Did there come a time when you were in the holdover cell, down in the marshal's office, here on the second floor of this building?

A. Yes, I was.

Q. And at that time did you have occasion to come in contact with a man by the name of Bruce Webster?

A. Yes.

Q. Is he here in the courtroom?

A. Yes, he is.

Q. Would you point him out for the judge and jury?

A. (Indicating.)

Q. How far from my right is Mr. Webster?

A. He's three gentlemens over.

     MR. ROPER: The government would ask that the record

U.S. DISTRICT COURT

Direct - Roper/Clay, John          87

reflect that the witness has identified the defendant, Bruce Webster?

THE COURT:  The record will so reflect.

Q.  (By Mr. Roper)  Would you tell the members of the jury what Mr. -- were you in the cell first before Mr. Webster was there, or did you come in later?  How did that happen?

A.  When I first arrived, he was there but he left, and then he came back.

Q.  And would you tell the members of the jury what happened when he came back?

A.  Well, when he came back, he started jumping around, saying, there has got to be a God.  There has got to be a God.  Then he went into preaching a sermon that touched my heart, and after that, he started talking in pig latin.

Q.  Now, did he say why he was -- there has got to be a God?

A.  Yes, he did.

Q.  Why did he say that?

A.  Because they set his trial to a later date.

Q.  You said he preached or gave a sermon.  What kind of sermon -- or how long did he give a sermon?

A.  He quoted scriptures out of the Bible that had to be photographic in his mind because it was so accurate, and then he preached 30 minutes.

Q.  Now, you didn't have a bible there with you to see if he was right, but was he quoting scriptures?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          88

A. Yes, he was.

Q. Now, at that time after he finished that, you said he talked pig latin with you?

A. Yes.

Q. What do you mean by that?

A. Well, it's the way we talk when -- he and I know, you know, how to talk, and we know other people don't understand. People around us can hear us, but they don't know what we're talking about.

Q. Now, before you started talking to him, did you tell him what you're being charged with?

A. He asked me about my case, and I just told him I was in a whole bunch of trouble.

Q. And you say this pig latin is the way you all talk. Is it normal English conversation like we're talking right now?

A. Yes, but it's speeded up so fast and dragged so slow at times that you wouldn't be able to understand it, but he would.

Q. Can you just give a tiny short example of that?

A. Yes, I would. (The witness complies.)

   And what I just said, I said, people in the courtroom don't understand what I'm talking about right now.

Q. And when you and Mr. Webster were talking like that, was there anybody else there in the holdover cells?

A. Yes, there was.

Q. Well, what did you all talk about at that time?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          89

A. Well, he was telling me about some incidents that happened over at the facilities where I'm at.

Q. And did there come a time when he told you about a plan he had regarding the visiting area of the jail?

A. Yes, he did.

Q. And what did he say?

A. He was telling me about how he had a master mind plan that he could put together, but he needed me to help him because he was confined to solitary confinement at that time, and he needed me to help him do that.

Q. Well, what did he tell you in that regard?

A. He wanted me to -- he knew I had a lot of lady friends that was next door, and he wanted me to get a lady friend of mine to put him on his visiting list, and when someone came to saw me, they could put him out and me out, and pull the other ladies out as well. We would all be in the visiting room at the same time. I could look out for him while he got with the lady, and then he could look out for me when I got with my lady.

Q. Now, did you know whether or not Mr. Webster had anybody in this part of the area readily available to be put on his visitor list?

A. He said -- that's the reason why he needed me because his family wasn't from around here, and he didn't have anybody to put on there, and he wanted me to put someone on his visiting list that was around here that could come kind of regular.

U.S. DISTRICT COURT

Direct - Roper/Clay, John                90

Q. After you had that conversation, did there come a time when you left the holdover cell?  Did you leave eventually and go back to jail?

A. Yes.  We both went back to the facility together.

Q. And that's the Mansfield Law Enforcement Detention Center?

A. Yes.

Q. Before you left, did Webster say anything about further contact with you in regards to this plan?

A. He was telling me that -- I told him that I really didn't understand what he was talking about, and he was telling me that he would write me a letter in pig latin that only I would understand, that if anybody else read it, that they wouldn't understand it.

MR. ROPER:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. ROPER:  Your Honor, with the permission of the Court, I have marked it 121-A here on the outside.  The sticker fell off, but it's an envelope.  I'll put one on in just a second -- well, here's one.

(Brief pause in proceedings)

Q. (By Mr. Roper)  I want to show you a handwritten letter and an envelope with a stamp on it marked Government's Exhibit 121-A.  I'll ask you if you recognize it?

A. Yes, I do.

Q. Now, have you ever seen this letter before?

U.S. DISTRICT COURT

Direct - Roper/Clay, John        91

A.  Yes, I have.

Q.  What is this?

A.  This is the letter that Webster wrote me.

Q.  And how do you know that?

A.  Because he put, guess who?  So they would know he was writing me in the same facility.

Q.  Let's move forward for a second.  Did you have occasion at a later time to give this to your attorney?

A.  Yes, I did.

Q.  Is Government's Exhibit Number 121-A a true and accurate copy of the letter that you received from -- well, the letter you received in April of 1994?

A.  Yes, it is.

Q.  Not '94, '96.  I'm sorry.

     MR. ROPER:  The government would move to introduce Government's Exhibit 121-A.

     MR. BUTCHER:  May I see it?

     THE COURT:  Yes.

     MR. BUTCHER:  The government has no objection.

     THE COURT:  121-A is admitted.

Q.  (By Mr. Roper)  Now, subsequently, have you looked at -- this is in handwriting, is it not?

A.  Yes, it is.

Q.  And at the end of the letter, it's signed B-Love, P.S. My real name is Bruce Webster.  Is that right?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          92

A. That's correct.

Q. Now, I want to show you what's been marked as Government's Exhibit 121-B. Now, what is that? Have you seen that before?

A. Yes, I have.

Q. Is that a typewritten version of this handwritten document?

A. Yes, it is.

Q. Okay. And the penmanship in this letter is not outstanding, is it?

A. No, it isn't.

Q. But were you able to read that and determine whether that is a typewritten version of what is -- what you could read in handwriting?

A. Yes. This letter is wrote in pig latin.

Q. Okay. And there are a couple of phrases in there that are blank, and you just couldn't read those; is that right?

A. The words don't mean anything.

Q. You said pig latin. A lot of this is in English; is that right?

A. Correct.

Q. And it's not exactly what you were saying earlier?

A. It means you write a sentence talking about nothing, and then you get back to what we're talking about, and then you write something else that says nothing.

    MR. ROPER: The government would move to introduce 121-B for the purpose of aiding the jury only.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          93

MR. BUTCHER: Your Honor, the defendant would object. First of all, it's not the best evidence. The best evidence is the letter itself.

Secondly, there has been no showing who transcribed this document or how she did it.

Thirdly, there is no reason to believe that the person who transcribed it had any better skills, knowledge, or ability to translate, quote-unquote, this document than would the jurors.

THE COURT: I sustain on your second point and hold the others for decision later.

Mr. Roper, do you want to try to meet the second objection?

MR. ROPER: Yes, Your Honor.

Q. (By Mr. Roper) Have you had occasion to look over this?

A. Yes, I have.

Q. From looking at it, were you able to figure out the words -- it takes you a little while to read it?

A. Yes.

Q. And were you familiar from reading it with the words that are on here?

A. Yes, that's correct.

Q. And the words that are on there, on this document, on the handwritten letter, are those words that you could read contained on this?

A. Yes.

Q. Is there any question about that?

U.S. DISTRICT COURT

Direct - Roper/Clay, John            94

A. No question.

Q. You didn't prepare that, did you?

A. No, I didn't.

Q. Did you review a draft of that?

A. No -- I reviewed a draft of this, yes.

Q. And did you make corrections on that?

A. I made corrections. I made corrections. Yes, I did, and filled in the blanks that made sense.

Q. All right. Is there anything in here you're interpreting what's said, or is it a case where you're just -- you determine whether a word that's written is typed?

A. That's what I did. Yes, you're right.

MR. ROPER: Your Honor, we would offer --

THE COURT: Mr. Clay, did you tell the typist what to type?

THE WITNESS: No, I didn't.

THE COURT: How did the typist know what to put on the typewritten piece?

THE WITNESS: It's written in English, sir. It's written all in English, and she just typed it word for word.

THE COURT: Well, if nobody else but you could know what was on the handwritten page, how did this person know what to type?

MR. ROPER: I understand the Court.

THE COURT: Well, let him answer.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          95

THE WITNESS: Well, what he did, he talks about nothing. Then he comes back to our conversation. He talks about nothing in English. Then he comes back to our conversation, which means you can read everything that's there, but it doesn't make any sentence, but only there are certain sentences in there that do make sense about our whole conversations that we had prior to that.

THE COURT: All right. Let me see if I understand. There is no pig latin on the handwritten page; is that correct?

THE WITNESS: No. We just call it pig latin when I talk about something that makes sense, then talk about nothing, then talk about something that makes sense, then talk about nothing. It's pig latin. It throws you off because you don't know what its saying.

THE COURT: All right. Let me see it.

(Brief pause in proceedings)

MR. BUTCHER: Your Honor, may I make a further objection?

THE COURT: Yes, sir.

MR. BUTCHER: If this -- well, this evidence is being admitted for rebuttal purposes. The only purpose that could be derived is the actual letter itself, that is the writing, penmanship, the grammar, the spelling, et cetera, and that's the evidence that is appropriate, not the translation, transcription of some other unknown person.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          96

MR. ROPER:  I don't see the relevancy whether they typed it or not --

THE COURT:  I'm going to settle that.  I'm going to disallow 121-B because you can read this sufficiently, but you don't need the typewritten transcript that someone else prepared.  So I'm going to allow 121-A but not 121-B.

MR. ROPER:  May I approach the witness again, Your Honor?

THE COURT:  Yes, sir.

Q.  (By Mr. Roper)  All right.  I want to show you -- are you familiar with the layout there, in general, of the Mansfield Law Enforcement Detention Center?

A.  Yes, I am.

Q.  Now, you've mentioned when you were talking to Webster about the visitor area -- are you familiar with the control room right here?

A.  Yes.

Q.  And do you know where the visitor area is?

A.  Yes.  It would be right in here (indicating).

Q.  Now, you go down a hall -- you're familiar with a large hall right there?

A.  Yes, sir.

Q.  And you go down -- is there a visitor area at the jail?

A.  Yes, there is.

Q.  Describe it for the jury?

U.S. DISTRICT COURT

Direct - Roper/Clay, John          97

A. It's a long room shaped like this, and it has chairs set like that with a window in front of it where your guest visits you from the opposite side.

Q. Would there be a bar across it? I mean, you can't go out and touch somebody, can you?

A. No, you can't. You can't touch the people that's visiting you, but you can touch the person beside you.

Q. And is there a security camera or anything there in this room?

A. It's not directly faced this way. It's facing the hallway, which means you can't see nothing in the visiting room.

Q. And did Webster talk to you about what could happen in that area there?

A. Yes, he did.

Q. What did he say?

A. He was telling me that the camera does not face directly in the visiting room but down the hallway, which it does, and he was telling me that once we got to the visiting room, I could look out for him, and he could look out for me while we went way to the back bench and took care of business.

Q. And that would be to have sex with a female inmate?

A. Yes, it would.

Q. And this is mentioned in the letter?

A. Yes.

MR. ROPER: With the permission of the Court, I would

U.S. DISTRICT COURT

Direct - Roper/Clay, John          98

ask permission to read?

THE COURT:  All right.

Q.  (By Mr. Roper)  Say, what's up, Cold Blood.  You probably don't know who it is right off.  I'm that brother you met over at the federal building about two weeks ago.  You remember me and you rode back together and we both dressed out in the dressing room together?  And I was kicking the B.B.'s with the officer?

What does kicking the B.B.'s mean?

A.  It's a slang word for B.S.

Q.  I make you remember even more.  I had on a black suit and a silver and black tie, low hair cut with waves.  I go by the name of B-Love.  You remember what we talked about over there at the federal building, and on the way back we talked in the slang?

What slang?

A.  The pig latin version I discussed awhile back.

Q.  Now, you know I hope I would have been done hit you up in the paint, but I didn't have your real name.

What's hit you up in the paint?

A.  It means writing you a letter faster if I would have known your name.

Q.  I just found that out when I went back over to the federal building Wednesday and Monday and seen your boy slim, and he told me to tell you what's up.  He was trying to get a bond.

U.S. DISTRICT COURT

Direct - Roper/Clay, John          99

The judge almost wanted to let him go, but he looked at his part and that was his reason for holding him.  But he's chill. He's in that worse, and that's all to the good.  God will bless him.

Say, big their blues -- big D's blues.  Shoot your nigger that name up so I can put it down on my visiting list and regulate them through your women that's up in there.  You have it set up.  I talks to my home officer and he says the best day to regulate it is Sundays in the evening around 3:00, and Thursday and Friday and Tuesdays is good, especially in the evening around 3:15.  You know visitation isn't over until 4:30.  He told me he would let us stay out there until 4:30, from 3:15 to 4:30, as we are getting 45 extra minutes.  Say, let's make it happen, player.  This is from one player to another.  Say, keep ours on the down low.

What does down low mean?

A.  Keep it quiet.

Q.  When he's talking about 4:30 to 3:15, around that time, what did he mean by that?

A.  You normally get 30 minutes.  He was saying if he did it at a certain time, that he had an officer that would allow us to go a long period of time.

Q.  You know how their buster cluster player hotter would give up the 411 because they ain't making it happen.

What does 411 mean?

U.S. DISTRICT COURT

Direct - Roper/Clay, John              100

A. He was saying keep it on the down low because you know if the word got out, there are a lot of snitches that would give us up before we could even make it happen.

Q. 411, what does that mean?

A. 411 means 911. It means any snitch. Somebody that would tell if they got a hold what we was going to do.

Q. Make sure you tell your women to keep it on the down low and say it's this Mexican girl that's up there that cuts for me, but she can't speak too good of English. She barely can write it. They call her Chacha.

What do you mean when you say cuts for me?

A. Meaning he's already --

Q. I'm sorry. Go ahead.

A. It means -- when you say cuts for me, that means she likes him, you know.

Q. Say get one of your girls in there to have it translated to her like they have someone that wants to see her. Have one of your girls to give her a name put on her list. Don't let her know it's going to be me. That she will see because she will probably say something to this Mexican girl named Virginia, and Virginia likes me and that will create problems. I just want you to regulate it.

What does -- did you have some girlfriends down at the Mansfield Law Enforcement Detention Center?

A. Yes, I did.

U.S. DISTRICT COURT

Direct - Roper/Clay, John                101

Q. Were the women kept -- in how many different areas, to your knowledge, were the women kept?

A. In one tank.

Q. I just want you to regulate it and have her call out by name, one you give her through your girl to put on her list. Your girl can give her lady to put on her list, and you will have two people calling us out and we will go out there or a couple -- as a couple. I will watch for you. You watch for me. So make sure you send me some lady that's -- some lady's name that is going to come up here with whoever comes to see you as we can make it happen. Make sure you have a spare for me just in case the Mexican girl, Chacha, don't come through. Say it's a lot I want to break you off on, but until then, you stay up my nigger.

Say make sure you keep it all on the down low. Don't even talk too loud when you're at the door with whatever woman this is. Keep it on the low tip and make sure you ain't got no spectator standing around trying to -- something. I can't read it -- and gang top on your -- you dig. I know you are a regulator. I can count you on to handle your business. So don't forget these three things I asked you to do.

What does regulate mean, being a regulator?

A. It means put it in motion.

Q. One, make sure you send me a name of somebody who comes up here with whoever that comes to see you so they can pull me

U.S. DISTRICT COURT

Direct - Roper/Clay, John          102

with you, and if your women got people that will come up here the same day and time, 3:15, to pull them out, it's all good, but if not, you have got to get two more people to pull the women out.

Two, get your girl to get Virginia, or whoever can speak Spanish, up in the female zone to translate it for Chacha to put someone's name down on her visiting.  You can give your girl a name to give her to put down on hers for me, but don't tell her it's for me because Virginia might fuck it up for me because she cuts for me, but I'm not too crazy about her, or you can have your girl to give her someone's name that is coming up on the same day and time we go out.

And, three, have your girl to find a spare for making things happen.  Make sure she's -- make sure she's fine.  She don't got to be all that as long as she's down.  Tell your girl to give her someone name that's coming up to see her or if, whoever this girl is, got people that comes to see her, you tell her -- tell your girl to have her to send me a name of her people so I can put it on my list.  So I will be all to the good if when you don't make it happen --

THE COURT:  Mr. Roper, do you think that's a good sampling of the letter?

MR. ROPER:  Yes, Your Honor.

Q.  (By Mr. Roper)  He goes on in the letter and talks about what else happens about setting this thing up with the women;

U.S. DISTRICT COURT

Direct - Roper/Clay, John          103

is that right?

A. Yes.

Q. Now, the end of the letter, I would like to just read that portion.

But in the meantime, between time, hit me right back on this so I can know if it's all good. I'm out like last year something.

And he does sign it -- at the end it's signed, P.S. My name is Bruce Webster, B-Love. So when you write back, you know who to send it to.

Did he send you that letter?

A. Yes, he did.

Q. Mr. Clay, you have been convicted of crimes, haven't you?

A. Yes.

Q. You have been convicted of burglary, and you got a probated sentence; is that right?

A. Yes.

Q. Then you got -- that was revoked, and you went down for a substantial amount of time on a narcotics distribution charge; is that right?

A. Yes.

Q. And you got 40 years on that charge?

A. Yes.

     MR. ROPER: I believe that's all the questions.

     THE COURT: Cross?

U.S. DISTRICT COURT

Direct - Roper/Holloway          111

Q. Mr. Holloway, did there come a time when Bruce Webster, to your knowledge, was transferred from the Mansfield Law Enforcement Detention Center to the Federal Medical Center -- or Federal Medical Center Pretrial Detention Area in Fort Worth, at the Fort Worth Federal Medical Center?

A. Yes, sir.

Q. I mean, that's not -- this area is not a hospital -- there is a hospital there; is that right?

A. Yes, sir.

Q. But this isn't a hospital. This is where prisoners are held?

A. Yes, sir.

Q. Did there come a time when Bruce Webster wrote you a letter?

A. Yes, sir.

Q. And that was just a few weeks ago; is that right?

A. Yes, sir.

MR. ROPER: May I approach the witness?

THE COURT: Yes, sir.

Q. (By Mr. Roper) Let me show you Government's Exhibit Number 132-A. Do you recognize that?

A. Yes, sir.

Q. Is Government's Exhibit -- well, what is this?

A. The same letter that Bruce wrote me.

Q. Did you keep the letter, or did you eventually turn this

U.S. DISTRICT COURT

Direct - Roper/Holloway          112

over to law enforcement officials?

A. Yes, sir.

Q. And is this one and the same letter that was written to you, the original that was written to you by Webster?

A. Yes.

MR. ROPER:  The government would move to introduce Government's Exhibit Number 132-A.

MR. MOORE:  Just the letter?

MR. ROPER:  Yes.

MR. MOORE:  No objection.

THE COURT:  132-A is admitted.

Q. (By Mr. Roper)  Now, you have had a chance to read that letter, haven't you?

A. Yes, sir.

MR. ROPER:  With the permission of the Court, I would like to read a portion of it?

THE COURT:  Okay.

Q. (By Mr. Roper)  Here at the top in parenthesis, holler at me when you finish.  And, also, in parenthesis, throw it away when you finish.

Say, Hollywood, this is one of what I have been wanting to break you off on.  You know I couldn't put it in the air -- you know I couldn't put it in the air like that because of Frost and Steve down there might catch it.

Was Steve Beckley and Demetrius Hall, or Frost, Jack Frost,

U.S. DISTRICT COURT

Direct - Roper/Holloway            113

there at the Federal Medical Center?

A. Yes, they were.

Q. So you know I was hitting Tanya on the cool. I knew she cutted for me the first day she met me, but she had to keep it on the down low because she knew Lan would break her off. I think Lan gave her my beeper number to page me while he was in the show doing something. So he had her to call to tell me to come by, but she end up keeping my number on hitting me on the D.L. when Lan would make a move around.

You know she told me often I had hit it. She wanted to know why there was so much talk of B-Love, why they call me B-Love. Well, she find out there ain't no love like B-Love.

Now, he goes on in the letter and talks about how he had a sexual encounter with Tanya; is that right?

A. Correct.

Q. And is that Orlando Hall's girlfriend, or fiancee, at the time?

A. Yes, sir.

Q. So I commenced -- back to Tanya, when I went back there the first time, she had a short set outfit looking jazzy as hell. So as I commenced at dropping this low conversation off her and brainwashing her and penetrating her mind, and she fell for the okey-dokey.

What is the okey-dokey? Are you familiar with that term?

A. It sounds like she fell for the line he was throwing at

U.S. DISTRICT COURT

Direct - Roper/Holloway          114

her.

Q. What?

A. I said, I assume he was saying that she fell for the line that he was giving her.

Q. Continuing to the latter part of the letter:

And I stepped outside playing with Ta-Ta, and she come out there asking me how I like Texas, and I told her, I'm international. I have been to Texas. You should be asking how Texas like me, and she told me on the cool before Lan came out there that she would pay for my ticket back if I pay for it to come up there.

And does he go on and talk more about his encounter with Tanya in the letter?

A. Yes, sir.

Q. You have got to speak out?

A. Yes, sir.

Q. Going to Page --

THE COURT: Is there anything new, Mr. Roper, in what you have coming up?

MR. ROPER: Yes, sir.

Q. (By Mr. Roper) Continuing on. Did there come a time when he started talking about Orlando in the letter?

A. Yes, sir.

Q. And this is on Page 4:

But little did he know Big D introduced us and told him,

U.S. DISTRICT COURT

Direct - Roper/Holloway          115

I'm the man to chill with because I can move shit and every mother knew me, and mother fucker knew I'll put in work on a nigger's ass.

What does that mean, Mr. Holloway?

A. Putting in work on somebody?  That he's not afraid of shooting them or --

Q. Whatever it takes?

A. Right.

Q. Who is Big D?

A. Dennis.  I'm not sure of his last name.

Q. Is that the same or different Dennis that you saw with Bruce when you met him on Friday night?

A. It's the same Dennis.

Q. Them niggers was waiting on me to get the word, and they would have gotten him.  Damian Allen, Bubu, Don Perrion, Clifton, all my niggers from west side was laying on creep tip for him, and that made me even madder when Steve told me that, but I played it off so I could get him, but my niggers went ahead and shot him.

Did Orlando have a car?

A. Yes, sir.

Q. Green 5.0 Mustang?

A. Yes, sir.

Q. Did you ever see that car at all?

A. Yes, sir.

U.S. DISTRICT COURT

Direct - Roper/Holloway          116

Q. How was it?

A. Like describe it?

Q. Yeah. Did you ever see it broken down?

A. Oh, yes, sir.

Q. And what happened? What did you see in that car?

A. One day me and Orlando was leaving my house, and when we drove back to his apartment, someone had pulled up in the driveway, and the car had been shotgun blasted and stuff, the windows and stuff busted all out.

Q. Do you know what he's talking about Don Perrion and Clifton and all my -- and he used the "N" word -- from the west side?

A. Right.

Q. Do you know who he's talking about?

A. Do I know the guys he's talking about?

Q. Yes.

A. Yes, sir.

Q. And who are they?

A. Who are they?

Q. Are they friends?

A. Yeah. They are friends of Bruce.

Q. And going on in the letter: And they wanted to break you off, but I told them you my nigger, and I don't believe you said that because, nigger, I had papered up.

    What does he mean by that? Who was he talking to at that point?

U.S. DISTRICT COURT

Direct - Roper/Holloway                    117

A. He was referring to me.

Q. And what did he mean by that?

A. I'm really trying to keep up with you on this letter, but --

Q. I'm sorry. I'm trying to skip around so I don't take too much time.

Well, let me go ahead. I was going to break -- I'm down on Page 5 --

A. Okay. I see where you're at now.

Q. Do you want me to read it again?

A. Right. Read it.

Q. And they wanted to break you off, but I told them you my -- and he used the "N" word -- and I don't believe you said that because I had papered up?

A. I guess he's trying to say prepared us or something.

Q. I was going to break myself off -- until this happened. You know, I had that hooptie to throw them popo's off because them chicken hops spotted me too quick when I had my blue '67 Chevy before I sold it to Clifton, and I had a burgundy and gray two-tone Fifth Avenue.

When he says popo, who is he talking about?

A. He's referring to the police.

Q. What about a hooptie? What's a hooptie?

A. Just an older car.

Q. And that's the purpose of that car?

U.S. DISTRICT COURT

Cross - Moore/Holloway          118

A.  A hooptie?

Q.  Yes.

A.  I don't know.  A lot of people just get hoopties.

Q.  I got it when I was in Memphis in '93 and some parts of '94.  One time seen me one night coming out of Linden Street apartment.  And them police tried to rush me like hot man rushing -- and I broke out on them -- in the car and everything.  They towed it off and told mother fuckers that I was standing around.  They knew it was me, and I want the car back, come down to the station, you know.  I wasn't falling for that --

THE COURT:  Mr. Roper, I think I have heard about all this I can take.  Can you move on?

MR. ROPER:  I have one other sentence, Your Honor.

THE COURT:  No.  This isn't helping enough.

MR. ROPER:  That's all the questions I have.

THE COURT:  Is there cross?

MR. MOORE:  Yes, Your Honor.

            CROSS EXAMINATION

BY MR. ROPER:

Q.  Mr. Holloway, you indicated that you kept the letter when you got it from Mr. Webster; is that correct?

A.  Well, I actually passed it on to another inmate.

Q.  Who did you pass it on to?

A.  Demetrius Hall.

U.S. DISTRICT COURT

Cross - Moore/Holloway          119

Q.  Why did you pass the letter on to Demetrius Hall?

A.  Because the things he had said about his brother just indicated that he was talking a lot of noise on this letter. So I wanted him to read it.

Q.  Did you pass it on to anybody after that?

A.  No, sir.

Q.  How did you get the letter back?

A.  When I got back in that evening, I didn't actually get it back. The counselor had gotten it. The counselor had grabbed the letter from Demetrius.

Q.  When you say the counselor, who are you referring to?

A.  A counselor, Ms. Jordan, one of my counselors.

Q.  Ms. Jordan?  What kind of counselor is she?

A.  She's just a counselor over at the jail unit where I'm being held at.

Q.  That works in the jail?

A.  Right.

Q.  How did she get the letter?

A.  Demetrius gave it to her.

Q.  When you gave the letter to Demetrius for him to look at what Bruce had put in the letter, was there any discussion as to what you all would do with the letter or how you all would use the letter?

A.  No, sir.  I told him to flush it.

Q.  You told him to flush it?

U.S. DISTRICT COURT

Cross - Moore/Holloway          120

A. Right.

Q. You just wanted him to know what was going on?

A. Right.

Q. At the time you got this letter, you had already testified against Orlando Hall at his trial; is that correct?

A. Right.

Q. The trial on Bruce Webster, the jury selection for his trial had already begun; is that right?

A. Had it begun already?

Q. Had it already begun in May when you received this letter, when we already started picking the jury in this case?

A. No. I just received this letter about two weeks ago.

Q. You got this letter two weeks ago?

A. About two weeks ago.

Q. So it was two weeks ago you got this. The jury had already been selected, and the trial was already going on at the time you got the letter?

A. No.

Q. The trial hadn't started?

A. No.

Q. But you got it about two weeks ago?

A. Yeah, about two weeks ago.

Q. How did it come to be that the government talked to you about the letter?

A. Because they had asked me had Webster been writing.

U.S. DISTRICT COURT

Cross - Moore/Holloway          121

Q. Was there any reason for them to think that Webster had been writing?

A. I don't know.

Q. Well, had you told them prior to that point that he had been writing?

A. Yeah. And then when they asked me, I told them he had wrote me a letter.

Q. Well, did you ever write him a letter?

A. No, I didn't.

Q. You never wrote Bruce Webster a letter?

A. (The witness nods.)

Q. You're sure of that?

A. Positive.

Q. Did you ever ask him to write you a letter?

A. No.

Q. You never asked him to write you this letter?

A. No. He just started writing.

Q. Did you have trouble reading this letter?

A. Yeah, some words I did.

Q. Why did you have trouble reading this letter?

A. Well, there were certain words I just didn't understand.

Q. Are you impressed with his grammatical ability?

A. I wouldn't say I am.

Q. Are you impressed with his handwriting ability?

A. No.

U.S. DISTRICT COURT

Direct - Roper/Valdez          122

MR. MOORE:  Judge, I think that's all.

MR. ROPER:  No further questions.

THE COURT:  You may step down.

Please call your next witness.

MR. ROPER:  B. J. Valdez, Your Honor.

THE COURT:  Step over here, please, sir?

He's already been sworn, right?

MR. ROPER:  Yes, Your Honor.

THE COURT:  Be seated.  Recall that you're still under oath?

THE WITNESS:  Yes, sir.

DIRECT EXAMINATION

BY MR. ROPER:

Q.  Would you state your name for the jury, please?

A.  B. J. Valdez.

Q.  You testified earlier in this cause; is that correct?

A.  Yes, sir.

Q.  I know you identified the defendant in this case.  I want to ask you some questions regarding your contact with the defendant.  Did you, during the course of working as a guard there in the jail, come into contact with and have conversations with the defendant, Bruce Webster?

A.  Yes, sir.

Q.  During the course of working there, Bruce was there for a substantial period of time, since October of '94?

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH   Document 34-2 Filed 04/06/14 Page 178 of 275 PageID 219

Case: 14-1049   Document: 26-6 1337   Filed: 07/08/2014   Pages: 275

Direct - Roper/Valdez          123

A. Yes, sir.

Q. During that time period, did you talk with him on few or many occasions?

A. Yes, sir, I did.

Q. Few or many?

A. Few conversations we have had.

Q. And when you dealt with him during the course of that time, how often would you deal with him?

A. Maybe 15, 20 minutes.

Q. Would you have any other contact with him as a jailer there at the jail?

A. Only on questions that he asked as far as property, different conversations that we've had.

Q. Have you ever had occasion to observe him there in the jail area?

A. Yes, sir.

Q. During the course of that, did you ever see him receive any type of reading material?

A. Yes, sir.

Q. What would he receive?

A. He would receive letters, post cards, newspapers.

Q. Did he ever send out any letters or post cards?

A. Letters he did.

Q. And would that be outside the jail or inside the jail or both?

U.S. DISTRICT COURT

Direct - Roper/Valdez          124

A. Both.

Q. Now, did you ever see him receiving reading materials?

A. Yes, sir.

Q. And what was that?

A. It would be like ministry packets that he would receive.

Q. Could you tell whether he ever read those?

A. Well, pretty soon because he received a lot them.

Q. No. Did you ever observe him reading them?

A. No, sir.

Q. How about any newspapers?

A. Newspapers, post cards.

Q. Did you ever see him read any of that?

A. Yes, sir.

Q. Now, you said you had discussions with him. What were the discussions you had with him about?

A. Some discussions, we would talk about issues that come out of the newspapers. When I was working in the control section, he would discuss an incident that happened here in Fort Worth, a vehicle accident. He would read it from the newspaper to me through the intercom.

Q. And when would that take place? How would you have contact with him?

A. It would be through the intercom in his cell to my V.I.A. intercom in the office.

Q. And did he talk to you about anything else besides

U.S. DISTRICT COURT

Direct - Roper/Valdez              125

newspaper articles?

A. Yes, sir. He would read from the scriptures, and we would talk about that.

Q. Did he ever talk in a face-to-face manner about the bible?

A. No, sir.

Q. Did you ever have any difficulty in understanding Bruce?

A. No, sir.

Q. Now, is there a commissary in that building?

A. Yes, sir.

Q. Briefly explain to the jury what that is?

A. Commissary is their -- in order for him to receive, or any inmate to receive commissary privileges, he would have to check out the items that he needed. It's like a canteen where you can order sodas, chips, candy, cigarettes, and he would have to check the items that he needed and turn it into the officers so they can deduct it from his account and fill the order and give it back to him, and he would have to describe the orders that he would check off and sign for.

Q. Was he able to do that?

A. Yes, sir.

Q. Did you ever have a conversation with him about a commissary problem?

A. Yes, sir. There was one incident that a commissary officer made a mistake, that he was overcharged for the item and never received the item.

U.S. DISTRICT COURT

Cross - Butcher/Valdez        126

Q. How did you know?

A. Because he stopped me -- when I was coming in the office one day, and he stopped me that there was a problem with his commissary, and he requested me for me to talk to the commissary officer, and he brought it to my attention.

Q. You said reading material from newspapers he received. Was there any other reading material he ever received?

A. Post cards. He would question me about post cards.

Q. And what did he say about that?

A. He would like to see them and read them even through they weren't entitled to have them in their cell.

Q. How long have you been working in the jail unit, in law enforcement?

A. Fourteen years, sir.

Q. During that course, have you ever come across folks that were mentally retarded, prisoners that were mentally retarded?

A. Yes, sir, several.

Q. Is there any indication from talking to Mr. Webster that he appeared to fit in that category?

A. No, sir.

        MR. ROPER: Pass the witness.

        THE COURT: Is there cross?

        MR. BUTCHER: Yes, Your Honor.

                CROSS EXAMINATION

BY MR. BUTCHER:

U.S. DISTRICT COURT

Cross - Butcher/Valdez        127

Q. Officer Valdez, the people there at the detention center, some of them are in cells by themselves; isn't that correct?

A. Yes, sir.

Q. Even those that are in cells with other people, they get lonely, don't they?

A. I believe so, sir.

Q. They welcome conversations with other people, don't they? Isn't that a fair statement?

A. Yes, sir.

Q. And the fact that Bruce sought out conversations with you, talked about the scriptures and things that he had read. That's not uncommon, is it?

A. No, sir.

Q. It's not unusual at all. It's to be expected, isn't it? Somebody all by himself wants to talk to another human being?

A. Yes.

Q. Do you like Bruce? Do you like him as a person, another human being?

A. He's a human being, sir.

Q. What do you like about him?

A. He's God's child.

Q. Excuse me?

A. He's God's child.

Q. He's God's child.

MR. BUTCHER: We pass the witness.

U.S. DISTRICT COURT

Direct - Roper/Alexander          128

MR. ROPER:  No further questions.

THE COURT:  You may step down, sir.

MR. ROPER:  We call Luther Alexander.

THE COURT:  Please have a seat over here, sir?

THE WITNESS:  Yes, sir.

THE COURT:  You'll recall you're still under oath?

THE WITNESS:  Yes, sir.

LUTHER ALEXANDER, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q.  For the record, are you the same Luther Alexander who testified earlier in this cause?

A.  Yes, sir, I am.

Q.  During the course of being a jailer there at the Mansfield Law Enforcement Detention, did you come in contact with the defendant in this case, Bruce Webster?

A.  Yes, sir.

Q.  Is there, at that center, a law library for inmates to use?

A.  Yes, sir, there is.

Q.  And have you ever had occasion to be in that law library with Defendant Webster?

A.  Yes, sir, on many occasions.

Q.  Tell the members of the jury why that would happen?

A.  Okay.  First, when he was in general population, he attended law library almost each and every day that we had it.

U.S. DISTRICT COURT

Direct - Roper/Alexander          129

Most inmates attend law library just to get out of their zones, have a little freedom. During that time, after he had his escape attempt, he was escorted to the law library to do his studying by himself with leg irons and handcuffs off. I observed him during that period of time.

Q. Tell the members of the jury what you observed when you were there in the law library with him?

A. When he was escorted to the law library, he got down law library books. He looked at them. He took notes from them.

Q. Now, during the time when you were with him, did you appear to -- did you understand what he was saying when he was talking to you?

A. Yes, sir, at all times.

Q. Did you ever give him directions?

A. Yes, sir, I did.

Q. Was he able to understand those directions?

A. Yes, sir, he was.

Q. Did you ever have occasion to see him -- about how he kept himself, his hygiene?

A. At all times he was very neat. When he had attorney visits, regular visits, he always took his time to groom himself properly before he left the cell. In many cases, the officer will call and complain about him not getting ready fast enough to go to his visits.

Q. Now, did there come a time that you talked to him about --

U.S. DISTRICT COURT

Cross - Moore/Alexander                130

or did he contact you about a complaint he had?

A. Yes, sir. He spoke to me concerning speaking with Mr. Cardinale. I told him he had to follow the same procedure everyone else had to. He had to fill out a request slip, and I would submit it to him and take care of it. When I told him that, he told me he couldn't fill out a request anymore because he was advised by his attorney not to.

Q. Now, did that happen recently before he moved out?

A. Approximately a month or two months before he left.

MR. ROPER: Pass the witness.

THE COURT: Cross?

MR. MOORE: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. MOORE:

Q. Mr. Alexander, when did this conversation take place, a month or two before he left?

A. Yes, sir.

Q. Did he tell you who it was, which attorney?

A. No, sir, he didn't.

Q. He said something to the effect that he couldn't fill out anymore request slips because his attorney advised him not to do that?

A. Yes, sir. That's what he said.

Q. Has Mr. Webster been an individual in the jail that has been prolific with his requests for services?

U.S. DISTRICT COURT

Direct - Roper/Harrison          138

A. No.

Q. Did you ever see Webster with any reading materials?

A. Yes.

Q. Tell the members of the jury what you have seen?

A. One day I was working the zone where he was, and he asked for a book, and I gave him a book. He asked for a request for service form, and I gave it to him, and he filled it out.

Q. Now, during the course of being there, did you have occasion to talk with him in regards to the commissary?

A. Yes.

Q. Would that be once or more than once?

A. Once.

Q. What did he say in regards to the commissary?

A. That his commissary was messed up, that she had given his money out wrong.

Q. Did you check into that?

A. Yes.

Q. And what did you find out?

A. That it was wrong, and he refigured it, and I took it to the commissary lady.

Q. Did you ever hear him talking to other inmates?

A. Yes.

Q. In particular, is there an inmate there by the name of Bobby Collins?

A. Yes.

U.S. DISTRICT COURT

Case: 14-1049     Document: 26-6   1346   Filed: 07/08/2014     Pages: 275

# Wells Decl. Ex. E

Case 2:12-cv-00086-WTL-WGH   Document 152   Filed 04/06/14   Page 188 of 275 PageID 29.

Case: 14-1049     Document: 26-6 1347   Filed: 07/08/2014     Pages: 275

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    . CRIMINAL ACTION NO.
      . 4:94-CR-121-Y
V.    .
    . Fort Worth, Texas
BRUCE CARNEIL WEBSTER    . June 18, 1996
. . . . . . . . . . . . . . .

VOLUME 26
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:    MR. RICHARD B. ROPER
    MR. PAUL D. MACALUSO
    MR. CHRISTOPHER CURTIS
    Assistant United States Attorney
    801 Cherry Street, Suite 1700
    Fort Worth, Texas 76102-6897
    (817) 978-3291

For the Defendant:    MR. LARRY M. MOORE
    Attorney at Law
    1112-A East First Street
    Fort Worth, Texas 76102
    (817) 338-4800

    MR. ALLAN K. BUTCHER
    Hill, Beatty, Butcher
    &amp; Gallagher
    201 Main Street, Suite 1300
    Fort Worth, Texas 76102
    (817) 336-3600

Court Reporter:    Ana P. Warren
    U.S. District Court Reporter
    501 W. 10th Street, Room 204B
    Fort Worth, Texas 76102-3637
    (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT E**

Direct - Roper/Cardinale          21

GARY CARDINALE, testified under oath as follows:

DIRECT EXAMINATION

BY MR. ROPER:

Q. Would you state your name for the judge and jury, please?

A. My name is Gary Cardinale.

Q. Can you tell the members of the jury what you do for a living?

A. I'm the operations manager at the Mansfield Law Enforcement Center.

Q. What are your responsibilities there?

A. I oversee all personnel and inmates within the center and report directly to my boss, the jail administrator.

Q. Now, in regard to that, what kind of prisoners are housed out there at the Mansfield Law Enforcement Detention Center?

A. Currently, we have a combination of state and federal prisoners at our facility. For a long time, we housed nothing but federal prisoners, U.S. Marshalls, pretrial detainees, and some bureau prisoners, also.

Q. All right. Mainly, the federal prisoners or folks that were waiting trial on cases; is that right?

A. That's correct.

Q. Now, during the course of the -- starting at the end of 1994, around October of that year, did you have occasion to receive an inmate there by the name of Bruce Webster?

A. That's correct.

U.S. DISTRICT COURT

Direct - Roper/Cardinale          22

Q. Is he here in the courtroom?

A. Yes, he is.

Q. Would you point him out for the judge and jury?

A. He's sitting right there, third from the right -- right, from your left, I guess.

MR. ROPER: The government would ask the record to reflect the witness has identified the defendant?

THE COURT: The record will so reflect.

Q. (By Mr. Roper) Now, as the operational manager, can you give the jury a little bit of a background on what your qualifications are for that?

A. I have been in the jail business approximately 13 or 14 years. I'm a certified peace officer. I'm also a certified T-Close instructor, hostage negotiator, just a varied background in law enforcement, I guess you'd say.

Q. Where did you work before you came down to Mansfield?

A. Tarrant County Sheriff's office.

Q. And what was your position there? What did you do?

A. I was a lieutenant when I left, but for four years, I was in charge of classification of inmates for the system.

Q. What do you mean by that?

A. Evaluate inmate records and determine where they can be housed, their behavior while in custody, their charges, just a variety of factors that are used to evaluate inmates and placing them in the general population in the jail.

U.S. DISTRICT COURT

Direct - Roper/Cardinale          23

Q. As operations manager, are the records of that jail under your custody and control, jail records?

A. Yes, sir.

Q. And, in particular, did you have occasion on an earlier date to produce records pursuant to a subpoena relating to the defendant, Bruce Webster?

A. Yes, sir.

MR. ROPER: May I approach the witness?

THE COURT: You may.

Q. (By Mr. Roper) Let me show you what's been marked as Government's Exhibit Number 7-B (sic). Actually, the records are a fairly large file; is that right?

A. That's correct.

Q. And are these certain excerpts that have been taken from that file?

A. Yes, sir.

Q. Let me show you Government's Exhibit Number 7-B (sic). Do you recognize what those documents are?

A. Yes.

Q. And what are those?

A. These are requests for services that we use for our inmates. They submit requests. They are either denied, or we permit them some type of service based on these requests.

Q. And do you recognize those particular -- now, those are actual copies; is that right?

U.S. DISTRICT COURT

Direct - Roper/Cardinale          24

A. That's correct.

Q. Is Government's Exhibit Number 17-B (sic) a true and accurate copy of certain records from the file of the defendant, Bruce Carneil Webster?

A. Yes. It appears to be.

Q. Look through them and make sure all of them are there?

A. Yes. That's typically what we use. I recognize that as his writing. Of course, I'm not expert as far as that goes.

Q. Now, you're not testifying those are Bruce Webster's writings?

A. No.

Q. Those are just records from the file?

A. Yes, records from the jail, our typical jail request for service form, that's correct.

Q. And those relate to the defendant, Bruce Carneil Webster?

A. Yes, sir.

MR. ROPER: The government would move to introduce Government's Exhibit 117-B.

MR. BUTCHER: Your Honor, may I see the records briefly?

THE COURT: Yes, sir.

(Brief pause in proceedings)

MR. BUTCHER: Defendant has no objection.

THE COURT: 117-B is admitted.

Q. (By Mr. Roper) Let me show you. Request for services --

U.S. DISTRICT COURT

Direct - Roper/Cardinale          25

now, we're not going into all of these. Are these all relating to requests by the defendant, Webster, for law library visits?

A. They appear to be. We use these also for medical services and recreation and a variety of things.

Q. There could be other requests in there, but --

A. Right. These all appear to relate to attending the law library.

Q. Let me show you Government's Exhibit Number 17-C (sic), D -- well, let's just start with 17 (sic) first. Can you look at that?

A. Yes.

Q. Do you recognize those records?

A. Yes.

Q. Is Government's Exhibit Number 17-C (sic) a part of the records relating to the defendant, Bruce Carneil Webster?

A. Yes.

MR. ROPER: The government would move to introduce Government's Exhibit 17-C (sic).

MR. BUTCHER: No objection.

THE COURT: 17-C (sic) admitted.

Q. (By Mr. Roper)  What is Government's Exhibit Number 17-C (sic).

A. These are requests for service forms or a form specifically filled out by an inmate requesting to make a call, a request for service that's typically used, and there are several of

U.S. DISTRICT COURT

Direct - Roper/Cardinale          26

those in there. The files are quite bulky, and they are loaded with these request for service forms due to the fact when they ask for a particular service, they have to fill one of these out.

Q. Okay. For instance -- and these would have been prepared by the inmate, in this case, Bruce Webster; is that right?

A. That's right.

Q. For instance, the second page reads, in November my legal papers were taken from me on my way to court because they had addresses and phone numbers on the back.

And it goes through -- these are -- is that what one of them reads?

A. Yes, that's correct.

Q. Another one is, I would like to have a letter certified?

A. That's correct.

Q. And are there also ones relating to requests for medical services?

A. That's correct.

Q. Now, let me show you what's been marked as Government's Exhibit 17-D (sic). Do you recognize what that is?

A. Yes.

Q. Where are those documents?

A. This is a grievance form typically filled out by an inmate to either a jail supervisor or myself requesting a specific service or relating a specific problem within the institution,

U.S. DISTRICT COURT

Direct - Roper/Cardinale          27

and that appears to be what these are.  In fact, they are grievance forms.  Yes, I recognize them.

Q. Is Government's Exhibit Number 117-D true and accurate copies of certain grievance forms contained in the file of Bruce Carneil Webster?

A. Yes.

MR. ROPER:  The government would move to introduce Government's Exhibit 117-D.

MR. BUTCHER:  No objection.

THE COURT:  117-D is admitted.

Q. (By Mr. Roper)  How would these documents come to be prepared?

A. They would be prepared by the inmate in their living area. They would fill it out and then submit it -- place it in an envelope that's marked grievance, and submit it to either the shift supervisor or myself.  We do not prepare those for the inmates.

Q. Let me show you what's been marked as Government's Exhibit 117-E.  Do you recognize that?

A. Yes.

Q. What is that?

A. That's a request for service from Mr. Webster addressed to the administrator, which normally I handle those.

Q. Is that, in fact, the original that was obtained from Webster?

U.S. DISTRICT COURT

Direct - Roper/Cardinale          28

A. Yes. That's the original.

Q. And that was kept by you?

A. Yes. That's correct.

MR. ROPER:  The government would move to introduce Government's Exhibit Number 117-E.

MR. BUTCHER:  No objection.

THE COURT:  117-E is admitted.

Q. (By Mr. Roper)  Let me show you Government's Exhibit 117-F.  Do you recognize that?

A. Yes.

Q. What is that?

A. This is a jail visitation card.  We require all our inmates to submit a visitation card in writing with names and addresses of individuals that wish to visit.  That's for security purposes, basically.

Q. And is Government's Exhibit 117-F a true and accurate copy of that record taken from its files?

A. Yes.

MR. ROPER:  The government would move to introduce Government's Exhibit Number 117-F.

MR. BUTCHER:  No objection.

THE COURT:  117-F is admitted.

Q. (By Mr. Roper)  That visitation card is filled out with the names and addresses of certain people and their phone numbers?

A. Yes, that's correct.

U.S. DISTRICT COURT

Direct - Roper/Cardinale          29

Q. Let me show you what's been marked as Government's Exhibit Number 117-F -- I'm sorry, H. Do you recognize that?

A. Yes. This is another grievance form that was filled out.

Q. And is that also contained in the files of Bruce Carneil Webster?

A. Yes.

Q. Now, some of these grievance forms, would you have occasion to respond by talking to inmates in regards to that?

A. Yes. In some instances, I do.

Q. I believe that's all.

And, in particular, these forms are actually filled out by the inmate; is that correct?

A. That's correct.

Q. Now, in particular, as to the defendant, Webster, did there come a time when he was placed in confinement in a single -- a seg cell it's called?

A. Yes, separation cell. That's correct.

Q. Why is that?

A. He had attempted to -- we're not clear if he attempted to escape or if he tried to enter the female housing area to see an inmate, but he attempted some type of movement from his housing area into an unauthorized area, specifically, in with female inmates.

Q. Some of these letters that were written, you mentioned you had occasion to talk to some inmates about them. Would that be

U.S. DISTRICT COURT

Direct - Roper/Parker          48

A. Yes, I did.

Q. And did you, yourself, conduct certain tests and examinations of the defendant?

A. Yes, I did.

Q. Now, based on the data that you observed, were you able to formulate an opinion, your professional opinion, to a reasonable medical certainty as to whether or not the defendant in this case, Bruce Carneil Webster, is mentally retarded?

A. In my opinion, he is not.

Q. Well, let's go into some of that.

First, I want to deal with the area of I.Q. tests. Were you aware that certain I.Q. tests were administered to him, and did you, in fact, administer an I.Q. test?

A. Yes.

Q. Can you explain, briefly, to the jury what is an I.Q. test?

A. An I.Q. test is an instrument used basically to predict or forecast how well an individual is likely to function within an academic setting. In the development of the intelligence tests, the criteria against which the tests were validated was school grades and teachers' ratings of the functioning of students.

Most of the individually administered I.Q. tests consist of a number of sub-tests, which are then administered involving lots of different kinds of questions, for example, defining words and explaining how a coat and a suit are alike,

U.S. DISTRICT COURT

Direct - Roper/Parker          49

abstracting and so on.  The procedure leads to what's called an I.Q. estimate, and that's basically what an I.Q. test is.

Q.  And did you perform an I.Q. test on Webster, the defendant?

A.  Yes.

Q.  What type of test was that?

A.  I administered the Wechsler Adult Intelligence Scale Revised, which is a test that has been available to psychologists for, I guess, close to 50 years now.  I have been giving it for almost 40 years.  And it's an individually administered test.

Q.  Now, how well did Webster do on that particular exam -- or let me restate.  What were the results?

A.  Well, he didn't do real well.  He would have received a verbal I.Q. estimate of 77 and a performance I.Q. estimate of 67, with an overall full scale I.Q. estimate of 72.

Q.  Now, that would be above the criteria just for I.Q. tests?

A.  Well, yes, in the sense that a number has to be specified somewhere when you're trying to define categories.  The numbers are not, I don't believe, intended to be adhered to rigidly. There are errors of measurement in the administration of psychological tests.  There are reliability issues and so on. But in the Diagnostic and Statistical Manual criteria regarding I.Q. scores, the number 70 is the one that is presented. Although, I think the phrasing says something like approximately 70.

U.S. DISTRICT COURT

Direct - Roper/Parker          50

Q. Now, are there certain factors that affect how well a person does on an I.Q. test, how they perform on an I.Q. test?

A. Certainly.

Q. Would you explain to the members of the jury what those are?

A. Well, as in any kind of assessment procedure where you're trying to evaluate someone else, there are a number of factors that have to be considered, not the least of which is the attitude and the motivation and level of involvement of the individual who is being evaluated, and what the person expects is going to be the outcome of the examination. Those are some of the factors that are important.

Q. Now, in regards to that, would motivation play a role in how well somebody can do on an I.Q. test?

A. Yes, sir.

Q. Why would that be important?

A. Well, if you get drafted into the army, and you don't want to go into the army, and you know that if you look real dumb or crazy, then you may well be able to stay out of the army. On the other hand, if the goal is something that is really interesting to you and really appealing and you desire it strongly, then you're going to put forth your very best effort. So, yes, motivation is important.

Q. What about cultural differences? Could those play a role?

A. Cultural differences, of course. No one is sure why --

U.S. DISTRICT COURT

Direct - Roper/Parker            52

Q. And how well did Webster perform on that job skill test?

A. What the Job Corps test was, it was not an intelligence test, per se. Although, certainly, it would be some conceptual overlap in relationship. It was a reading comprehension test, and what it consisted of was little stories with a word left out, and then the person reading the story would be expected to go through a list of four choices to pick out the best word to put in that hole, and it was used as a screening test in Job Corps assessment programs.

On that particular test, Mr. Webster obtained a score of 76 percent correct, which would be a respectable score.

Q. Did you have occasion -- when you went out and examined the defendant, did you have occasion, here in 1996, to perform that same test?

A. Yes. I was interested in comparing his performance today on that particular task, and that was the task that -- what I was able to do was have my wife, who manages my office, make me up a new copy of that instrument, and then I re-administered it to Mr. Webster.

Q. How did he perform at this point in 1996?

A. Well, he got 44 percent of the items correct during this administration. So he did considerably poorer.

Q. When you speak of motivation, does motivation come into play when you're examining defendants charged with crimes?

A. Does motivation come into play when what?

U.S. DISTRICT COURT

Direct - Roper/Parker          53

Q. Well, do you take any particular -- and you mentioned you had a private practice and you examine folks out in the real world. And then you mentioned you examine people that are charged with crimes. Do you take any special effort in dealing with folks that are charged with a crime as opposed to if you were going to go out and give an I.Q. test and make an evaluation on someone out in the real world for mental retardation?

A. Yes, absolutely. It's very important.

Q. Why is that important?

A. Well, if you're sitting in your office and the patient comes in because he or she is having problems and they want help with it, and they are soliciting your professional services on their own hook, their own motivation, then the likelihood of trying to manipulate you or lie to you or deceive you or not do very well, it would be a pretty silly person to go to a doctor and then sit there and tell the doctor a bunch of lies about why he or she is there.

But in forensic settings, of course, there is often serious motivation to mislead or deceive or get over on you or whatever, because the nature of the contract is different.

Q. Could it involve overt lies as well as just not doing well?

A. Sure.

Q. Now, in regards to I.Q., you mentioned that I.Q. tests are generated for teacher evaluation; is that correct?

U.S. DISTRICT COURT

Direct - Roper/Parker            58

A. Well, based on what I observed versus some of what is reported here, yes, I see some discrepancies.

Q. Specifically, as to Question 25 on the communication domain, there is a question, speak in full sentences, and there is a D.K. for don't know?

A. Yes, sir.

Q. Did you have occasion to interview Webster during that time?

A. Yes. I interviewed him for several hours.

Q. And was he able to -- well, was he able to communicate with you and speak in full sentences?

A. He communicates very effectively, and he speaks in full sentences.

Q. And if you could turn the page to the communication domain, on 47, reads simple stories aloud, and there is a "1" there for just sometimes or partial. Do you see that?

A. Yes, sir.

Q. Have you ever -- through the course of your evaluation, were you able to come up with information consistent with that?

A. He was able to read simple stories aloud for me.

Q. And Number 50, he got a zero, no, never, for reads on own initiative. What about that?

A. Well, who ever answered this said, no, he never reads on his own initiative, and I have seen him read on his own initiative, and that's been reported to me, also, by the

U.S. DISTRICT COURT

Direct - Roper/Parker          59

officers at Mansfield.

Q. Fifty-one, addresses envelopes completely, and there is a "don't know" there. Have you ever dealt with information consistent with that finding?

A. I know that he can address an envelope. I have a copy of one that he has addressed.

Q. All right. Let's turn over, just quickly, if we can go through this, the daily living skills domain?

A. I'm sorry. Where are you?

Q. Daily living skills domain, several pages over?

A. Okay.

Q. Specifically, Question Number 36, puts clean clothes away without assistance when asked. Do you see that?

A. Yes, sir.

Q. There is a zero there. He didn't get any points for that?

A. That's right. That would mean, no, he never puts his clothes away. Well, I was in his cell. I saw his cell. I mean, it was squared away. He puts clothes where they are supposed to be, and other things, too.

Q. If you could turn a couple pages over to Question Number 77, makes own bed and changes bedding routinely, and that was a zero. No points for that?

A. Whoever answered this indicated that, no, he never makes his own bed. He makes his own bed. I saw it.

Q. All right. If we could move forward then, based on your

U.S. DISTRICT COURT

Direct - Roper/Parker          67

Q.  Based on your review of the data in this case, the tests that you reviewed and the tests that you performed and the evaluation that you had face-to-face with Webster, would that be -- would Fulbright's results be consistent with the evidence that you found as regards the intelligence and adaptive behavior of the defendant, Webster?

A.  Well, I wouldn't expect -- I would not have expected Mr. Webster to do that poorly on that test.

Q.  Could motivation have an effect on how well a person does on those tests performed by Fulbright?

A.  Of course.  Motivation can have an effect on any assessment procedure.

Q.  Did you have occasion, also, to review the written statement given by the defendant, Webster?

A.  A written statement by a Lieutenant Webster?

Q.  I'm sorry, Defendant Webster?

A.  Yes, I did.

Q.  Were you able to make any conclusions from that about how well -- or do you have any impressions of that test relative to the mental retardation question?

A.  Well, it's a very lengthy, coherent statement filled with a lot of evidence of good functioning memory.  I mean, I, obviously, can't speak of the facts or anything like that, because I just don't know, but the statement itself -- I don't think anybody reading that statement -- let me put it this

U.S. DISTRICT COURT

Cross - Moore/Parker          75

Q. Well, did you see any errors in testing procedure that caused you to have some question about the reliability of the results that they obtained?

A. I saw no errors in the testing procedure, but, I mean, I can't really answer that. I wasn't there.

Q. You indicated that you administered an I.Q. test to Mr. Webster yourself; is that correct?

A. Yes.

Q. Did you give him the whole test?

A. I gave him major parts of it, yes.

Q. Why didn't you give him the whole test?

A. Well, there is no really compelling reason to give him the whole test. It's all together helpful, when appropriate, to use certain of the sub-scales and obtain estimates for those that aren't administered. It's a very common practice.

Q. Well, is it a common practice in a diagnostic setting not to give the whole test when the purpose of the administration of the test is to obtain an I.Q. and to make a diagnosis of whether or not somebody is mentally retarded? Are you saying that it's a common practice not to give the whole test in those circumstances, Doctor?

A. It is with individuals with whom I work. I don't know about the whole world.

Q. What is the manual? What does the W.A.I.S.-R. manual say about administering the whole test in a diagnostic setting?

U.S. DISTRICT COURT

Case 2:12-cv-00086-WTL-WGH   Document 35-2   Filed 04/30/14   Page 207 of 43 PageID#248
Case: 14-1049   Document: 26-6 1366   Filed: 07/08/2014   Pages: 275

Cross - Moore/Parker          76

A. You would have to tell me.  It's been so long since I've read that manual.

Q. Well, would it surprise you that it says that 11 tests are ordinarily to be given to all subjects?  There may be occasion when administration of a particular test is inadvisable or a test score is somehow rendered invalid during administration, and results of one or more tests cannot be used.  If the scores from only five verbal tests or four performance tests are available, then the sum of the scores must be prorated to derive the verbal or performance score that will be used to obtain the full scale score in the I.Q.'s, and it is inadvisable to undertake prorating the verbal score if it is based on fewer than five verbal tests, or a performance score if it is based on fewer than four performance tests, and if either the verbal or performance score is based on too few tests, it is not prorated, and the full score should not be computed.

Would it surprise you if that's what the manual says?

A. No.  If that's what it says, that's what it says.

Q. Well, what it says is, essentially, that you don't -- if you're going to prorate a score, you do it because you're not able to -- one of the sub-tests is not available to you.  For one reason or another, you are not able to use that particular sub-test.  And you never prorate scores when you administer fewer than five of the sub-tests in the verbal area or fewer

U.S. DISTRICT COURT

Cross - Moore/Parker               77

than four of the sub-tests in the performance area. Isn't that what it says?

A. It says its inadvisable, apparently, yes.

Q. It says it's inadvisable and it says then you don't compute an I.Q. if you do use fewer than five, isn't that right, in the verbal area?

A. That's what the manual says, apparently, yes.

Q. In the tests that you administered to him, you gave him four of the sub-tests in the verbal area; is that right?

A. Yes.

Q. And you gave him three of the sub-tests in the performance domain; is that correct?

A. Yes.

Q. So you left out two in the performance area and two in the verbal domain?

A. Yes.

Q. And that's exactly what the manual tells it's inadvisable to do. It's exactly what the manual tells you that you should not prorate when you do, and it is exactly what the manual tells you that you should not arrive at a full scale I.Q. on the basis of that type of testing; is that correct?

A. Evidently, that's correct, yes.

Q. Now, I want to talk to you about the configuration of the sub-test that you did give him. Is there any particular reason why you gave him the sub-tests that you gave him and deleted

U.S. DISTRICT COURT

Cross - Moore/Parker          86

of those scales in evaluating somebody's adaptive functioning

is because it tends to make it more objective, or take it out

of the range of just being a subjective opinion; is that

correct?

A.  That would be the general purpose, yes.

Q.  But you chose not to use one of those scales?

A.  For reasons I have explained to you.

Q.  Now, when you indicated that your testing result of a 72

full scale I.Q. was the result of the test, that was the result

of the seven sub-tests that you gave, plus, your estimates of

the four -- as to what the results of the four sub-tests that

you didn't give him would have been; is that correct?

A.  That's correct.

Q.  And 72 puts him squarely in the range of that area that we

discussed where a diagnosis of mental retardation is proper if

there are deficits in that adaptive functioning?

A.  You went too fast on that one.  I didn't get it.

Q.  Can you diagnose somebody with a 72 I.Q. as being mentally

retarded if they have deficits in their adaptive functioning?

A.  You could, yes.

Q.  Where does a full scale I.Q. of 72 place an individual

amongst the general population?  At what percentile does he

rank?

A.  It would be -- let me think about it for a minute.  It

would be at about, I guess, the third or fourth percentile,

U.S. DISTRICT COURT

Cross - Moore/Parker        88

Q. So you gave it for other purposes, other than the purpose that it was intended to be used; is that correct?

A. Well, I mean, an instrument like that can be used for a variety of purposes.

Q. Was the purpose for which the C.A.S.T.M.R. was designed was to allow somebody to arrive at an indication or an opinion as to whether or not an individual that's mentally retarded is, in fact, competent to stand trial?

A. That was the primary intent of the authors, yes.

Q. Now, when you were administering these tests, didn't you also administer to Mr. Webster a test to make a determination as to whether or not he was malingering?

A. Yes.

Q. What does malingering mean, Doctor?

A. Well, malingering is when you fake bad for reasons that are fairly clear, that there is a payoff involved, and other folks and you know what with the payoff is.

Q. So, essentially, you're trying to do worse than you might otherwise do; is that correct?

A. Yes.

Q. And you administered to him a particular scale called the Shretland Malingering Scale?

A. Yes.

Q. How did he do on that?

A. The results of the Shretland did not substantiate that he

U.S. DISTRICT COURT

Direct - Macaluso/Coons          120

prosecution at times and sometimes you are called to offer

testimony on behalf of the defendant?

A. Yes.

Q. Doctor, let me ask you if you have occasion -- or if you

had occasion to be requested and then permitted by the Court to

examine an individual by the name of Bruce, initial C, or

Carneil Webster?

A. Yes.

Q. Do you see him here in the courtroom today?

A. The gentleman seated to the left of defense table.

Q. To the far left of the table?

A. He appears to have a gray tie on.

MR. MACALUSO: Your Honor, we would ask that the

record reflect that the witness has pointed to and described

the defendant in open court?

THE COURT: The record will so reflect.

Q. (By Mr. Macaluso) And, doctor, do you recall when it was,

approximately, you were requested to perform an evaluation or

to visit Mr. Webster and when it was that you actually did

visit with him and perform that evaluation?

A. I was contacted in January of 1996, and the evaluation took

place on March 9, 1996.

Q. And let me ask you, Doctor, where did that evaluation take

place?

A. In the Mansfield Correctional Center.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          121

Q. And do you recall who it was, if anyone else, accompanied you for that evaluation?

A. Dr. George Parker.

Q. And Dr. George Parker was the doctor, the forensic psychologist that testified just before you; is that correct?

A. That's my understanding.

Q. How long have you known Dr. Parker?

A. I think I met Dr. Parker in about 1977. So nearly 20 years.

Q. At whose request was Dr. Parker brought in to assist you in the evaluation of Mr. Webster?

A. Mine.

Q. You say you have worked with him since, what, almost 20 years; is that correct?

A. Yes.

Q. What would be his function -- in a nutshell, what would be Dr. Parker's function, or what sort of assistance would you expect from Dr. Parker to perform the analysis of Mr. Webster?

A. Let me back up a minute. You say I've worked with him. He has an office across town from mine. He's in private practice and I am, too. So we're not associated in practice in any way.

The function that Dr. Parker would have in an evaluation like this is to perform certain psychological testing and interpret whatever psychological testing was available in the

U.S. DISTRICT COURT

Direct - Macaluso/Coons          131

the defendant was charged with here, as opposed to the methodology or the procedure that you may employ in conducting an interview with somebody involved in a civil problem, civil dispute, or something of that nature?

A. Well, yes, it's sort of issue specific. If you're interested in finding out whether somebody is competent to stand trial, then you want to understand certain specific things that would tell you they knew about how to defend themselves and their cooperation with their lawyer. So it would be somewhat issue specific.

Q. And are you concerned about getting false information, or are you concerned about the person charged with a crime, for example, such as the defendant, basically manipulating you?

A. Yes. You have to be mindful in forensic psychiatry that you may not be told exactly the truth. Ordinarily, when patients come in to see me, as a patient they want help, and they are not going to waste their money and their time and my time telling me things that aren't true. They are going to tell me what their symptoms are. They are going to tell me about things as they see them because they want help. If it's in a forensic setting, a criminal forensic setting, you need to be concerned about what the motives of the evaluee might be. Are they telling you something for a reason, a hidden reason?

Q. Okay, in order to help him or herself?

A. Yes, sir.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          132

Q. Let me ask you in that regard. I believe you said you may have -- or you did -- review at some point in time a report of Dr. Finn, who is, as you know, a forensic psychologist --

A. Yes.

Q. -- in regard to his interview in approximately January of 1995?

A. Yes.

Q. Did you have occasion to read that particular report to Mr. Moore that Dr. Finn wrote?

A. Yes.

Q. In specific, let me ask you -- and I'll direct your attention to one portion of that particular report from Dr. Finn wherein he refers to the defendant apprising him, Dr. Finn, that he, the defendant, Mr. Webster, had been in special education courses throughout his career, basically. Do you remember that?

A. Yes, sir, I do.

Q. You know like Dr. Finn knows that that's not true, don't you?

A. Yeah. That's my understanding.

Q. Now, Doctor, based on your training and, Doctor, based on your experience, aside from it just being a lie, Doctor, does it have some particular meaning to you in the context of an examination of this type, that is, for mental retardation?

A. Yes, it does.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          133

Q. What is that, Doctor?

A. If a criminal defendant has a desire to be found mentally retarded, then telling someone, an evaluator, that he has been in special education classes would certainly be in keeping with the concept of possible mental retardation, and it would be an attempt to persuade that person that you had mental deficiencies that you didn't actually have.

Q. Does it indicate an awareness of the nature and importance of an interview by someone like you?

A. Yes.

Q. Let me ask you. We referred earlier -- there was mention made about the driver's license score. In your several-hour interview with the defendant, do you recall some mention being made of the driver's license score --

A. I do.

Q. -- in Arkansas. Tell us what you recollect about that and the significance in the way it was brought up to you, Doctor, during your interview?

A. As I was talking with Mr. Webster, he indicated -- he brought up, just out of the blue -- that his niece, his oldest sister's daughter, Luketha, had gotten the test or the driver's license and wrote it down real small for me and I passed. I had to cheat on it, he said. This is something that he offered out of the blue.

    He also went on to say that the female trooper gave it to

U.S. DISTRICT COURT

Direct - Macaluso/Coons          134

me on the driving test, basically indicating -- my impression was that he was saying that she had passed him gratuitously without him being able to actually pass the test.

Q. This rendition of how he passed the test, was this in response to any kind of question you asked him?

A. No.

Q. This rendition of his response as to how he passed the driving portion of the test, was that in some response to any question asked by you?

A. No.

Q. Again, Doctor, what, if anything, is of significance to you as an evaluator and as a professional in a statement like the one about the scores, either on the written part of the test or on the driving part?

A. I would find it very unusual that someone would spontaneously bring up that they had cheated on -- had to cheat on their driver's license test. When you're evaluating a person to see if they are mentally retarded, that would be a very unusual occasion. In my opinion, it was more likely -- much more likely represents an attempt to manipulate about mental inabilities.

Q. Now, Doctor, did you have occasion, also, -- well, did you have occasion to -- after the conclusion of the interview -- we'll come back to the interview in just a second.

But at the conclusion of the interview you conducted back

U.S. DISTRICT COURT

Direct - Macaluso/Coons                   135

in March with Mr. Webster, did you have occasion to interview other individuals over there at the Mansfield Law Enforcement Center?

A. I interviewed several people at the Mansfield Law Enforcement Center.

Q. For example, who did you interview and why did you interview them?

A. Well, I was interested -- back up a second. When I evaluate people in the Travis County Jail or other jails, I generally ask the corrections officers who deal with the inmate about how they function, just to get some more information about how that person is doing, and I did that in this case. I talked with people who would see the person on a day-to-day basis.

Q. Let me ask you. In that regard, in addition to talking to those people that you did over there at Mansfield -- well, did you talk to Gary Cardinale, for example?

A. I did.

Q. B. J. Valdez?

A. Yes.

Q. Debra Harrison?

A. Yes.

Q. Did they afford you an opportunity as well, Doctor, to go over and to look where Webster stayed?

A. Yes.

U.S. DISTRICT COURT

Direct - Macaluso/Coons          137

don't have any pictures in them.  So there wouldn't be any reason for reading them just to look at the pictures.

Q.  Why do you look at these sorts of things, again, specifically, with regard to your diagnosis of whether or not somebody is mentally retarded or not?

A.  Well, you see how a person utilizes their time.  What do they do?  Do they sit and stare at the wall, or do they just hum to themselves, or do they read and so forth like other folks who are interested in learning or entertaining themselves.

Q.  The D.S.M. 4, the Diagnostic and Statistical Manual, Volume 4 --

A.  Yes.

Q.  -- sets out two criteria for mental retardation, does it not, Doctor?

A.  It does.

Q.  What is the first one?

A.  Well, basically, that a person has sub-average intelligence.

Q.  We'll come back to that in just a second.  What's the second criteria?

A.  It has to do with adaptive functioning, whether they have adaptive skills or not.

Q.  What does that mean, seat of the pants, just so we can understand it?

U.S. DISTRICT COURT

Direct - Macaluso/Coons          138

A. In your -- wherever you live, and you -- are you able to adapt to what's going on? Do you have skills that will deal with the people that are there, the tasks at hand? Are you able to handle yourself and live and thrive under those circumstances, whether it's a usual family setting or penitentiary or with a gang of folks or drug dealing or work and whoever it is.

Q. Let me ask you in that regard. With the focus here on what you have referred to as indications of, or at least evidence of adaptive behavior, how a person functions on a regular daily basis, if you became aware, for example, through your interviews and your research that the defendant is capable of filing complaints about various things that were going on over there, or at least he perceived that were going on over at the Mansfield Law Enforcement Center?

A. Was I aware of that?

Q. Yes, sir.

A. I have some in my file, yes.

Q. Have you read those and have you examined them?

A. I read a number of them, and, yes, I have.

Q. Do they appear to be in the defendant's handwriting?

A. Yes.

Q. Let me ask you. What's the significance, again, to you of that particular type of evidence, the complaints that are filled out by him?

U.S. DISTRICT COURT

Direct - Macaluso/Coons          139

A. Well, here is a person that perceives something that they want to complain about or want to discuss about, and they send in a complaint to have it dealt with, and if it's not dealt with, as in some cases with Mr. Webster, then he files a subsequent complaint, why hasn't this been dealt with? So they want to change their surroundings or their situation or have an exercise of their rights or their needs or desires.

Q. Okay. And I believe you said that you had a number of those complaints; is that right?

A. Yes.

Q. And are those some evidence to you or some indication to you of his ability to adapt his behavior to the circumstances that he's in?

A. Yes, sir.

Q. Did you become aware, for example, he was able to detect and then complain about errors in his commissary?

A. Yes, he was.

Q. What about that? Is that of any significance to you?

A. Yes. I mean, that's looking out for your rights and your change.

Q. How about visitations to the law library?

A. Yes. That is an adaptive function, given the situation that he's in.

Q. Let me ask you, Doctor, with regard to the complaints. Have you been made aware of the fact that he discontinued, or

U.S. DISTRICT COURT

Direct - Macaluso/Coons          142

A. Well, a low I.Q. is what you might actually have. A low score on an I.Q. test is simply whatever you did on that given test. Now, you could have a higher I.Q. and make a lower score. You can't have a lower I.Q. and make a higher score because you can't do any better than you can do, but through lower motivation or just simply not cooperating or being tired, as he was back in '92, being confused or whatever, you can make a lower score than your capabilities.

Q. Okay. In your opinion, Doctor, although both of those are set out as criteria, that is, the lower I.Q. score and the significant deficiencies in adaptive behavior, is either one more important to you in your diagnosis or in your determination, Doctor?

A. I would say the latter. You're really looking at a person's adaptive capabilities, and I.Q. is a part of that. Both of those things are required, but the more important thing, to my way of thinking, is not just a score on an I.Q. test. It's how well can you adapt to whatever situation you find yourself in.

Q. Doctor, I would ask you if, in your opinion, based on your experience, education and your training, and based on all the information that was provided to you, based on your interview of the defendant, based on your interviews with the other people out there at Mansfield, and any other source of information that you felt was valuable in making your decision,

U.S. DISTRICT COURT

Direct - Macaluso/Coons          143

if you have an opinion, that is, a professional opinion, as to whether or not the defendant is mentally retarded?

A. I have an opinion.

Q. What is your opinion in that regard, Doctor?

A. It is my opinion that he is not mentally retarded.

Q. Why is that? In sum, Doctor, why is it that you feel, based on your examination, that he is not mentally retarded?

A. He is way too functional when he wants to be mentally retarded, in my opinion. Mentally retarded people don't function -- who are actually mentally retarded -- don't function at the higher level as he does. I spent several hours with him, and he does not behave as a mentally retarded person behaves. He is just too smart for that.

Q. Okay. How do you square your evaluation of him, Doctor, that is, that he is not mentally retarded -- well, scratch that. Let me just ask you. Do you feel that he has any significant deficiencies in his adaptive behavior?

A. I don't really see them. He has been -- he has not been in ordinary society a lot for a number of years. He has been either in the penitentiary or incarcerated on this offense or out running around with his buddies, dealing drugs and so forth, not living an ordinary life. So he has adapted, in my judgement, to the life that he has chosen to live and has functioned within that setting reasonably well. He has not chosen to adapt to an ordinary lifestyle.

U.S. DISTRICT COURT

Direct - Macaluso/Coons               144

Q. What about the information you learned about those intervals when he was not either in the penitentiary up in Arkansas or confined here at Mansfield? What about his adaptive skills in that regard?

A. Well, essentially, what he was doing is running around selling drugs, getting money from his mother, getting money from girlfriends, partying, hanging around with his chums, instead of having a regular job, any 8:00 to 5:00 type work or anything like that.

Q. Let me ask you if those are indications, also, of adaptive skills, like you said, getting money from his mom, living off his girlfriends, selling drugs?

A. Those are ways of adapting to a lifestyle that he has chosen.

Q. Now, Doctor, back to that question that I inartfully worded or started to word earlier. How do you square your opinion, Doctor, that he is not mentally retarded, that he is not significantly lacking in adaptive behavior or there aren't significant deficiencies in his adaptive behavior with the low I.Q. scores that he has generated over the last few years or some of the scores he has generated over the last few years?

A. Well, some of those tests -- I mean, the tests that he had, as I understand it, with one exception before he was in this current pickle, he did reasonably well on a number of them. The one that he didn't do very well on was that one in 1992

U.S. DISTRICT COURT

Direct - Macaluso/Coons          145

when he was described by the doctor as being confused and paranoid and so forth, poorly oriented, appeared even unable to give the correct date or year, which is an unusual circumstance for him.

So I would have to just leave out any numbers they got from that evaluation based on the clinical presentation that he gave, the way he was when he came in to see the doctor. The ones that he has given, with the exception of the one that Dr. Parker did, I think were in a lower range, but as I understand it, there are a variety of reasons why people would not score very well on a given I.Q. test.

Q. Is your basis or the basis of your opinion predicated on the I.Q. test alone?

A. No --

Q. Go ahead.

A. You can score lower than your mental abilities will allow you to score. You can't score higher.

Q. You can't fake being smart, can you, Doctor?

A. You can't fake being smart. You can not have good motivation, not pay particular attention, just not do very well, not the kind of thing where they say two plus two is three, but the kind of thing where you just don't know the answers or sort of give a wrong answer or don't do it very rapidly or --

THE COURT: Mr. Macaluso, hold on just one second.

U.S. DISTRICT COURT

Direct - Macaluso/Coons         146

(Brief pause in proceedings)

THE COURT:  Thank you, sir.

MR. MACALUSO:  Thank you, Your Honor.

Q.  (By Mr. Macaluso)  Doctor, what's the significance to you -- if you haven't already covered this, what's the significance to you of the earlier scores, for example, the 76 on the Beta test at the Arkansas Department of Corrections, 96 on a driver's license test, the 43rd percentile score on the M.A.T., the Job Corps test where he had a, I believe, 76 -- and let me pause for just a second.  Another version -- or not even another version.  That Job Corps test was re-administered to him, was it not?

A.  Yes, it was.

Q.  I don't know if it's been pointed out to the jury or not, but there was a duplicate of the Job Corps test, screening test, I believe it's referred to, if I'm not mistaken, that was given to him back when you interviewed him in March by Dr. Parker; am I correct?

A.  Yes.  Dr. Parker and I discussed that and decided to try to re-administer a test.  So he gave him a clean copy of it, basically, without the answers in there, and he got just a little over half as many right as he did the first time.

Q.  Forty-four percent, is that correct, on the March version of it, and 76 on the version he was given when he was working on the project itself, or at least during that particular

U.S. DISTRICT COURT

Direct - Macaluso/Coons            147

period of time?

A. Yes.

Q. What's the significance of that when you view that in the context of the other scores, the low scores that he generated for the other doctors that have testified before this jury?

A. Well, there are two aspects of the significance. One is that you look at how well he has done in the past, and you say, he can do at least that well. And then you can look at the context in which he does more poorly, and it appears to be manipulative.

Q. Doctor, let me ask you if during your interview with the defendant, the subject of family abuse, that is, claimed abuse by his father, Willie Webster, came up?

A. Yes.

Q. Tell us what you recollect about that information that was provided to you.

A. Well, that his father was exceptionally abusive to the children, was physically rough with them and, apparently, emotionally rough. And then there were a number of bizarre kinds of things that occurred to some of the children.

Q. Sexual things?

A. Yes.

Q. Let me ask you -- and I will ask you to refer to your notes if necessary -- if you recall with regard to the subject of abuse reportedly from Mr. Webster, his father, if the defendant

U.S. DISTRICT COURT

Cross - Moore/Coons                177

penitentiary or they are out running the streets or at home or whatever they are doing.

Q. Are you not familiar with the manual, the mental retardation manual of the American Association on Mental Retardation?

A. That's correct.

Q. You're not familiar with that?

A. That's correct.

Q. Are you licensed, or are you certified by the Texas Department of Mental Health and Mental Retardation to do assessments of mentally retarded people, do mental retardation evaluations for the purposes of determining diagnosis of mental retardation?

A. No. As I told you, I don't do the psychological testing.

Q. And it's your belief that when we're talking about adaptive functioning, that the adaptive functioning that is being addressed in the D.S.M. 4 or elsewhere might involve or entail how well he functions in an institutional setting as opposed to how he does in the real world?

A. Wherever the person is would be his adaptive -- his adaptive functioning would be taken into consideration.

Q. Does it take the same degree of intellectual functioning to be able to adapt in an institutional setting as it does to be able to function in the real world?

A. I would say that the stresses and strains and the behaviors

U.S. DISTRICT COURT

Cross - Roper/Moore                224

with Mr. Webster the issue of mental retardation, whether or not he was mentally retarded or any effect that a finding of mental retardation might have on the ability to execute the defendant.

At that time, he had already been tested by Dr. Raymond Finn. I don't believe that Dr. Keyes had completed any of his testing at that point. But that was the first -- to my knowledge and recollection, that was the first time that it was ever discussed with him or in his presence throughout our testing and throughout all the testing that was done. We have always told him that prior to the time that I advised him of the mental retardation issue on those occasions when Dr. Finn had tested him, our advice was for him to do the best he could do, to take the test, do as good as he could do, and we would go from there.

That would be the sum of the testimony we would offer.

THE COURT: Thank you.

Does the government wish to cross?

CROSS EXAMINATION

BY MR. ROPER:

Q.  Well, are you familiar with jailhouse lawyers and folks that are in jail?

A.  Uh-huh.

Q.  Some of them are pretty knowledgeable about the law?

A.  That's true.

U.S. DISTRICT COURT

Cross - Roper/Moore                    225

Q. And have you ever heard of jailhouse folks talking and suggesting defenses for other defendants, even including capital murder defendants?

A. Yes, I have.

MR. ROPER: That's all I have.

THE COURT: All right. Thank you.

MR. ROPER: Your Honor -- I'm sorry.

MR. MOORE: That would be all that we would have in regard to that issue. We just wanted to make sure that that was before the Court.

THE COURT: All right. Thank you.

MR. ROPER: The only thing that we would have in addition to what we presented at trial would be, we would move to introduce Government's Exhibit 94-B, which is actually two transcripts, and then I had an excerpt of the transcripts that relate to the defendant's testimony -- or, actually, the colloquy he had with Judge McGlinchey on several occasion in the magistrate's court regarding how he wanted to hire a lawyer and what efforts he was doing to make bond, and I think those are relevant to the determination whether the defendant was mentally retarded.

That would be 93-B and C and 94-B. And C is actually a composite that has all the relevant portions. I didn't know if the Court wanted the whole transcript or not.

THE COURT: Okay. You're offering 93-A and B and 94-B?

U.S. DISTRICT COURT

Case: 14-1049      Document: 26-6 1389   Filed: 07/08/2014      Pages: 275

# Wells Decl. Ex. F

Case 2:12-cv-00086-WTL-WGH   Document 41-62   Filed 04/06/12   Page 230 of 275 PageID #:

Case: 14-1049      Document: 26-6 1389   Filed: 07/08/2014      Pages: 275

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA    . CRIMINAL ACTION NO.
                          . 4:94-CR-121-Y
V.                        .
                          . Fort Worth, Texas
BRUCE CARNEIL WEBSTER          . June 19 & 20, 1996
. . . . . . . . . . . . . . . .


VOLUME 27
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        MR. RICHARD B. ROPER
                          MR. PAUL D. MACALUSO
                           MR. CHRISTOPHER CURTIS
                          Assistant United States Attorney
                           801 Cherry Street, Suite 1700
                          Fort Worth, Texas  76102-6897
                           (817) 978-3291

For the Defendant:        MR. LARRY M. MOORE
                          Attorney at Law
                           1112-A East First Street
                          Fort Worth, Texas  76102
                           (817) 338-4800

                           MR. ALLAN K. BUTCHER
                          Hill, Beatty, Butcher
                           & Gallagher
                          201 Main Street, Suite 1300
                           Fort Worth, Texas  76102
                          (817) 336-3600

Court Reporter:            Ana P. Warren
                          U.S. District Court Reporter
                          501 W. 10th Street, Room 204B
                           Fort Worth, Texas  76102-3637
                          (817) 335-3050

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

U.S. DISTRICT COURT

**EXHIBIT F**

20

mitigating factors that you, as jurors, must consider if you find one or more of them to be present by a preponderance of the evidence. These are called statutory mitigating factors. However, this list is not to be viewed as a complete list of the mitigating factors you may consider. Indeed, each of you may consider any factor you, as an individual find has been established by a preponderance that relates to any aspect of the defendant's character or background, any circumstance of the offense or any other fact or circumstance, which you, as an individual, conclude indicates or tends to indicate that the defendant should not be sentenced to death.

The statutory mitigating factors are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

2. The defendant was under unusual and substantial duress.

3. Another defendant or defendants, though equally culpable in the crime will not be punished by death.

4. The defendant does not have a significant or prior history of other criminal conduct.

5. The defendant committed the offense under severe mental or emotional disturbance.

The nonstatutory factors in the defendant's background, record, or character, or any other circumstance of the offense that mitigates against imposition of the death sentence, which

U.S. DISTRICT COURT

21

are alleged by the defendant, are:

1. The defendant is or may be mentally retarded.

2. The defendant has low intellectual functioning.

3. The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing.

4. The defendant, as a result of a mental disease or illness, personality disorder, and/or low intellectual functioning has a lesser capability to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law than that of a normal person.

5. The defendant was youthful at the time of the commission of the crime, although, not under the age of 18.

6. The defendant has talents, capabilities, or qualities which are of some value to society such as musical talent, religious devotion, et cetera.

7. The defendant is unduly susceptible to influence by others.

8. The defendant's level of participation in the commission of this offense was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime.

9. The defendant grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct.

U.S. DISTRICT COURT

63

things that you and I take for granted every day. The rest of his existence is going to be in a box, in a cage, until the day that he dies. You know that. This is no other choice. And for a person with his problems, the things that he's had to overcome in his life, isn't that enough? Are each of you convinced in your own heart that death is the only appropriate punishment? Thank you.

THE COURT: Mr. Roper, let's see here. You have 20 minutes remaining.

MR. ROPER: Ladies and gentlemen, listening to the defendant's attorneys arguments, they are very good attorneys, and they have done a very good job in representing their client. And I submit to you what they say on the surface makes sense, but when you probe it and when you consider and apply common sense to it, you know it just doesn't wash.

For instance, he says, oh, well, gee whiz, he had a motive to do well to get his G.E.D. when he was in prison, because, oh, well, gee whiz, he can get good time credit. There was no testimony about that. But even if there was, he sure wasn't motivated to do well to get good time credit with all the other law violations he had in prison, battery, assault, not obeying the officers. It's just the way Bruce Webster is. That doesn't mean he's mentally retarded.

And, you know, they have brought up -- what they have done is, this search for the truth, they say, I submit to you what

U.S. DISTRICT COURT

64

this is, it's an attempt -- and it's a very clever attempt --
to get your mind as far away from Bruce Webster's conduct, his
dangerousness and the way he is and what happened to that
little girl than you can ever imagine. Let's don't think about
that. Let's think about these I.Q. tests that are going to
somehow show us some great insight as to the way Bruce Webster
is. Do you think that those folks who developed those tests
ever thought that they would have any application in a capital
murder case? Do you really think that? He comes from a
different world. Because he doesn't score well in an I.Q. test
doesn't mean he's mentally retarded. The testimony is clear
about that.

Finn testified that just because he didn't do well in an
I.Q. test doesn't mean he's mentally retarded. That doesn't
establish that. You look at how well he did in school, how
well he's motivated, what his cultural background is. Now, is
that something you need a psychiatrist to tell you about?

Look at those letters. He doesn't write very well, but if
writing was a sign of mental retardation, we would have every
doctor locked up in a mental ward. Look at those letters and
you'll see the kind of culture he came from and how well you
think he did. He can communicate. Sure.

Dr. Keyes says, well, he can walk the walk and talk the
talk. But, you know, trust me, because I have got this special
insight on how people are. I have got this Ph.D. You know,

U.S. DISTRICT COURT

65

trust me because I know how he really is.  But look how he really is.

Fulbright.  Fulbright did these tapping tests, and he said, oh, gee whiz, he can't move his hands back and forth.  Now, trust me.  I'm getting paid by the defense.  You know, trust me, because I know.  I can tell these folks.

Now, what did you hear from the testimony in the case? He's a drummer.  He's a musician.  Do you think somebody who can play the drums, a good drummer, a good musician, could do some kind of rhythm test like that?  Don't you know what the motivation is behind that?

I want to talk just for a second about Dr. Keyes, Doctor of Objectivity, Dr. Keyes, oh, who always works for the defense, who writes criminal defendant's briefs for them. Mr. Objectivity, what does he do?  He goes out there and sees the vice principal of the school, and he says, man, I need some help.  I need somebody to help me.  I'm trying to save my man's life.  Is that a sense of somebody that's doing an objective evaluation of his adaptive skills?  Folks, it just doesn't wash.  It's just an attempt to get you away from what really happened in this case and to consider something else.

You know, when he talked about the driver's license test, how he went down to do on the driver's license test.  He couldn't be mentally retarded to memorize the answers.  They were watching him there on the test where he couldn't cheat.

U.S. DISTRICT COURT

101

want to get out of the courtroom as quick as you can because we
don't seem to have any air conditioning in here.

You may retire at this time.

(Trial recesses, June 20, 1996, 12:00 a.m. - 12:35 a.m.)

THE COURT:  Ladies and gentlemen of the jury, have you
you reached a verdict?

THE FOREMAN:  Yes, Your Honor.

THE COURT:  If you will hand the verdict form to
Mr. Bell?

All right.  As to the element of intent, the defendant,
Bruce Carneil Webster, intentionally killed Lisa Rene?

No.

Intentionally inflicted serious bodily injury?

No.

Intentionally engaged in conduct intending that she would
be killed or that lethal force be employed?

Yes.

Intentionally engaged in conduct he knew would create a
grave risk of death?

Yes.

Aggravating factors:  Caused the death or injury relating
in death to Lisa Rene, which occurred during the commission of
the offense of kidnapping?

No.

Aggravating factor of especially heinous, cruel, or

U.S. DISTRICT COURT

102

depraved?

Yes.

Substantial planning and premeditation?

Yes.

Particularly vulnerable due to her age?

Yes.

Nonstatutory aggravating factors:  Future danger to the lives and safety of other persons?

Yes.

Effect of the instant offense on Lisa Rene's family?

Yes.

Statutory mitigating factors:  Number 1 -- I will not read them off except as to number.

Number 1, zero.  Number 2, zero.  Number 3, four.  Number 4, zero.  Number 5, zero.

Nonstatutory mitigating factors:

Number 1, four.  Number 2, four.  Number 3, as to physical abuse, 12.  Personality disorder mental illness, et cetera, Number 4, zero.  Number 5 is zero.  Number 6 is zero.  Number 7 is zero.  Number 8 is four.  Number 9 is six.  In fact, 10 is two.  Number 11 is zero.  Number 12 is 11.  Number 13 is zero.  Number 14 is zero.  Number 15 is two.  Number 16 is zero.

Decision Form C is filled out.  Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to

U.S. DISTRICT COURT

103

justify a sentence of death, or in the absence of any

mitigating factors whether the aggravating factor or factors

are themselves sufficient to justify a sentence of death, we

recommend by unanimous vote that a sentence of death be

imposed.

Signed by the presiding juror, June 20, 1996.

Certification, signed by all 12 jurors and dated the same date.

Ladies and gentlemen, you have done the job that we asked you to do some months ago. It's very late, but it is my practice to visit with jurors to help bring closure to their experience if they want to do so. I'll be glad to stay and do that if you want to do that for a few minutes. I know most of you want to go home as quickly as possible. If it will help you in some way to visit for a few minutes, I'll be glad to do that, and we'll be able to do that in a few minutes after I dismiss you.

If you want to go on home, you're certainly free to go on home now. We will have people to help you to your cars, if you need that.

All right. You're dismissed at this time.

Hold on just a moment. Please be seated.

It's customary that a polling sometimes be done upon request, and I asked Mr. Moore if he wanted a polling. And I'll ask you in turn if this is your verdict. If it is your

U.S. DISTRICT COURT

Case: 14-1049     Document: 26-6 1399   Filed: 07/08/2014     Pages: 275

# Wells Decl. Ex. G



**DEPARTMENT OF HEALTH & HUMAN SERVICES**   Social Security Administration

Refer to: ▮▮▮▮▮▮▮

Office of Hearings and Appeals
Room 2418, 700 West Capitol
Little Rock, Arkansas  72201
Telephone: 501-324-6381
Date:
        JAN 2 5 1995

## NOTICE OF DISMISSAL

Bruce C. Webster
▮▮▮▮▮▮▮▮▮▮▮▮
Pine Bluff, AR 71603

I have issued the enclosed order dismissing your request for hearing.  Please read this notice and the order carefully.

**If You Disagree With The Order of Dismissal**

If you do not agree with my order, you may file an appeal requesting the Appeals Council to review and vacate the order.

**How To File An Appeal**

To file an appeal you or, if you appoint one, your representative must request the Appeals Council to review the order of dismissal.  You must make the request in writing.  You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office.  You may also mail your request right to the Appeals Council, Office of Hearings and Appeals, 5107 Leesburg Pike, Falls Church, VA  22041-3255.  Please put the Social Security number shown above on any appeal you file.

**Time To File An Appeal**

To file an appeal, you must file your request for review within 60 days from the date you get this notice.

The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period.  The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

See Next Page

REDACTED

EXHIBIT G

G.01



Page 2 of 3

### Do You Want To Submit Evidence?

You may submit evidence to show why you think I should not have dismissed your request for hearing. You should submit any evidence you wish the Appeals Council to consider with your request for review.

### Rules About An Appeal

Our regulations state the rules the Appeals Council applies to decide whether to review a case and in reviewing a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N). The Council will review an order of dismissal for the reasons listed in sections 404.970 and 416.1470 of our regulations.

### If You Do Not File an Appeal With The Appeals Council

If you do not appeal my order and the Appeals Council does not review the order on its own motion, the action or determination upon which you requested a hearing cannot be changed except under special rules.

### Your Right To Representation

You may have a lawyer or other person help you in any request for review you file with the Appeals Council. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your case. Your local Social Security office has a list of groups that can help you with a request for review.

If you get someone to help you, you or that person should let the Appeals Council know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due insurance benefits to pay towards the fee.

**REDACTED**

G.02

███████████                                                Page 3 of 3

**Do You Have Any Questions?**

If you have any questions, you may call, write or visit any Social Security office. If you visit an office, please bring this notice and decision with you. The telephone number of the local office that serves your area is 501-534-0183. Its address is P. O. Box 8309, Pine Bluff, AR. 71601.

JOHN HECK GOREE
Administrative Law Judge

Enclosure:

**REDACTED**

G.03

DEPARTMENT OF
HEALTH AND HUMAN SERVICES
Social Security Administration
OFFICE OF HEARINGS AND APPEALS

ORDER OF DISMISSAL

IN THE CASE OF                          CLAIM FOR

                                        Period of Disability,
                                        Disability Insurance Benefits, and
Bruce C. Webster                        Supplemental Security Income
(Claimant)

                                        ████████████████████████
Willie C. Webster
(Wage Earner)                           (Social Security Number)

This case is before the Administrative Law Judge on the request
for hearing filed by the claimant on April 13, 94.

On October 24, 1994, a Notice of Hearing was mailed to the
claimant to advise him of the time and place set for the hearing.

Social Security Administration Regulations No. 4 and No. 16
provide that the Administrative Law Judge may dismiss a
claimant's request for hearing when neither the claimant nor his
representative appears at the time and place set for the hearing
and the claimant does not give a good reason for the failure to
appear within 10 days after the Administrative Law Judge mails
the claimant a notice asking why he did not appear (20 CFR
404.957(b)(2) and 416.1457(b)(2)).  A Notice to Show Cause for
Failure to Appear was mailed to the claimant on November 23,
1994.

No response to the Notice to Show Cause for Failure to Appear
request was received.

**REDACTED**

G.04

Bruce C. Webster

2

Accordingly, the claimant has not established a good reason for the failure to appear at the scheduled hearing. Therefore, the request for hearing is hereby dismissed and the determination dated April 5, 1994 remains in effect.

JOHN HECK GOREE
Administrative Law Judge

JAN 25 1995
Date

**REDACTED**

G.05

## LIST OF EXHIBITS

Bruce C. Webster
_____
(Claimant)

_____
(Social Security Number)

Willie L. Webster
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94, with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration - Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

REDACTED

G.06

## LIST OF EXHIBITS

Page 2

Bruce C. Webster



_____
y          (Claimant)

(Social Security Number)

Willie L. Webster    ████████████████

_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

G.07

SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS
REGIONAL OFFICE
1200 MAIN TOWER BLDG., ROOM 1135
DALLAS, TEXAS  75202

RESUME OF EXPERIENCE AND BACKGROUND

7-1-93
DATE

Print or type all entries, attach extra sheets as needed and submit in duplicate.

HOME PHONE: ███████████          SOCIAL SECURITY NO. ████████
(Area Code)                                      (Mr.)
OFFICE PHONE: 624-4411                            Ms.
                                                 Mrs.
1.  NAME: Massey          F.   John (Jr) Miss
          (Last)        (First)  (Middle)  Dr.

2.  MAILING ADDRESS: Hot Springs Rehabilitation Center
    P.O. Box 1358, Hot Springs, AR. 71902
                                    (Zip Code)

3.  PRESENT EMPLOYMENT
    ARKANSAS
    Present Employer Rehabilitation Services          Date Employment Began 7-1-93

    Your Position or Title & Description of Duties Rehabilitation Assistant
    Administrator for client Services at the Hot Springs Rehabilitation Center.
    Responsible for managing all aspects of a major client service program
    including personnel management for approximately 120 staff members and all
    fiscal and administrative services necessary to support the work unit.

4.  PREVIOUS EXPERIENCE — Begin with your next most recent employment in rehabilitation

    Position or Title              Employed              Institution or Firm

    (a) Rehabilitation Field Supervisor   July 1986 - July 1993   Arkansas Rehabilit.
                                                                  Services /State of
    Duties Supervised 8 masters degree Counselors and placement workers in two field offices

    (b) Vocational Rehabilitation Counselor   June 1967 - July 1986   Arkansas Rehabilit
                                                                      Services /State of A
    Duties Evaluate disabled clients, Determine Eligibility, Arrange Vocational & medical
    services and provide placement SERVICE EXHIBIT NO 25 (1) PAGES

REDACTED  G.08

DEPARTMENT OF HEALTH AND HUMAN SERVICES          Social Security Administration

Office of Hearings and Appeals
700 West Capitol, Room 2418
Little Rock, Arkansas 72201
Telephone: (501) 324-6381

October 25, 1994

F. J. Massey, Jr.
P. O. Box 1358
Hot Springs, AR 71902

Dear Mr. Massey:

The claimant named below has an application for Child's Insurance Benefits and Supplemental Security Income.

A hearing on the claim is scheduled, date and time shown below.

Claimant: Webster, Bruce C.  Social Security Number: █████████████

1:45 p.m. on Wednesday, November 16, 1994, at Federal Building, Room 3611, 8th and Main Streets in Pine Bluff, Arkansas

You are requested to give testimony as a vocational expert, primarily to cover the following period:

ALLEGED ONSET DATE

5/31/89   TO   date of hearing

Your presence throughout the hearing is desired since your testimony will be based, in part, on the testimony given by the claimant and any other witnesses, including a medical expert if needed.  Enclosed are copies of some of the pertinent exhibits tentatively selected for inclusion in the record of this case.  Please bring this material to the hearing.  For additional information concerning your testimony, please see the attached notice.

Your charges for this service should be submitted in accordance with your contract with the Department of Health and Human Services.

Enclosures: Exhibit File

Sincerely yours,

John Heck Goree
Administrative Law Judge

cc:

EXHIBIT NO._24_ (2) PAGES

REDACTED   G.09

# IMPORTANT INFORMATION

<u>NOTE:</u> IT IS REQUIRED THAT YOU DISQUALIFY YOURSELF IF YOU HAVE HAD ANY PRIOR KNOWLEDGE OF THIS CLAIMANT OR EXPERIENCE IN THIS CASE <u>OTHER</u> THAN AS A VOCATIONAL EXPERT FOR THE OFFICE OF HEARINGS AND APPEALS.

While medical factors alone may justify a finding that the claimant is or is not disabled, it is necessary in some cases to consider vocational factors in order to determine whether or not the claimant is able to engage in any substantial gainful activity. Two basic questions will be presented to you at this hearing.

The first question pertains to the kind of work, if any, the claimant can do in light of prior work activity and residual functional capacity considering age, education, training and work experience. Your testimony will be predicated on various assumptions, posed at the hearing, with respect to the claimant's residual functional capacity. You will not be expected to testify as to whether or not the claimant is under a disability, since you do not have the responsibility for deciding this ultimate legal issue. You should not express any opinion regarding the impairments involved and their effects on residual functional capacity, since these are medical matters. You will be requested to furnish a rationale and complete explanation for your opinions. In forming your judgement as to whether or not the claimant could transfer vocational skills to any other type of work, please consider only work which the claimant could perform after a normal period of training, usually given to new employees, rather than after extended vocational rehabilitation.

The second question is whether such work exists in the "national economy", i.e., whether it exists in significant numbers either in the region where the claimant lives or in several other regions of the country. You should be prepared to testify from personal knowledge gained from vocational surveys of businesses and industries (whether such surveys were made by you or by other vocational experts) and from other current vocational resource materials.

Questions may also be asked of you by the claimant (or representative, if any).

G.10



# PALAVER, INC.

Rt. 1, Box 29A
DeValls Bluff, Arkansas 72041
501-998-7206      1-800-844-4425

## EVALUATION FOR MENTAL DISORDERS

**RECEIVED**
JAN 0 4 1994

**BRUCE WEBSTER**
~~████████████~~

**PINE BLUFF, ARKANSAS   71603**

DISABILITY DETERMINATION

**SSN:** ~~████████~~
**DOB:** ~~████~~73

DECEMBER 22, 1993

REASON FOR REFERRAL:

Client was referred for a psychological evaluation in order to better ascertain eligibility for Social Security benefits.

OBSERVATIONS:

Client was brought by his mother. He was a thin fellow, of average height and twenty years of age. He was clean, neatly dressed and groomed. Posture and gait were nonremarkable.

PRESENT ILLNESS:

When asked how he was disabled he said he sneezes, his eyes water and his head hurts. It makes him mad. He said he is also slow to learn.

He worked one time helping pour cement but he was vague about his work history. Generally he was vague and did not seem to have a good grasp on things.

PAST HISTORY OF MENTAL DISORDERS:

In 1992 he said they tried to admit him to the third floor of the hospital. That is the psychiatric wing but he refused to go. "They acted like my mind wasn't right". He said he went to mental health for a few weeks and they gave him some pills but he was not able to tell much about it. He had no insight as to what they were trying to do or why he had gone.

12/22/93

EXHIBIT NO. 23-(3) PAGES

**REDACTED**   G.11

Bruce Webster
Page 2

**FAMILY, SOCIAL AND ENVIRONMENTAL HISTORY:**

He went to the eighth grade.  He is single and has one child.

He was in prison in 1992 for two months for having an automatic weapon.  When they caught him with the weapon he was on probation for jumping on a policeman.

**MENTAL STATUS EXAMINATION:**

Client was a poor historian.  He was mostly coherent and relevant but at times it was hard to follow him.

Ideation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness.  He came across as a slow fellow who did not know much and did not know how to communicate well.

Contact with reality appeared adequate.  He said he sometimes worries about his brother in law killing him.  "Last year my brother in law killed my brother and now I think he looks at me lots.  I'm kind of afraid of him".  Client is not suicidal and he said he was hard to sleep nights because he sleeps a lot during the day.  He denied any hallucinations or delusions.

Affect was appropriate and mood was essentially normal.  He said he gets sad over the loss of his brother last year but otherwise did not express any depression or anxiety.  He said he gets mad a lot.  "Nobody listens to me.  They think I'm dumb".

**INTELLECTUAL FUNCTIONING:**

Client was oriented times three.

He could repeat four digits forward and three backward.

He was not able to register three objects.

Cities named were Pine Bluff and Little Rock.

He was not able to do simple calculations.

He did not know what the sayings meant.

G.12

Bruce Webster
Page 3

He was able to handle similarities and differences adequately.

If he found an envelope he would keep it.
If he saw a fire in a theater he would put it out.

**ESTIMATED IQ:**

  69 or lower

**CURRENT LEVEL OF FUNCTIONING:**

He lives with his mother. He watches television, listens to the
radio and goes walking. He has a girlfriend and he likes to kiss
and hold her hand. He has friends. He said he likes to drive,
then he laughed and said he sometimes steals his mother's car out
of the garage. He goes shopping sometimes. He accompanies his
mother to church. He does no chores around the house. Mostly he
seems to be idle around the house and on the streets.

He gets along alright with others.

**CURRENT MEDICATION:**

He takes no medication.

**DIAGNOSIS:**

1.   Mental Retardation
2.   Antisocial Personality by History

**PROGNOSIS:**

Client will not get any better

He is not competent to manage funds, if awarded.

There was no evidence of exaggeration or malingering.

Charles M. Spellmann, Ph.D.
Psychologist

G.13

## MEDICAL REPORT

### INFORMATION FURNISHED BY:

This information was secured by telephone by the DDS representative signing the form. A copy of this report was sent to the doctor for signature on_____11-10-93_____

Claimant's Name:_____Bruce C. Webster_____  SSN:____ ▓▓▓▓▓▓▓▓▓▓▓

Dr. Hackett provided the following additional information:

The claimant was quite verbal.  There may have been some malingering, however, Dr. Hackett could not be sure.  The IQ scores are not normal considering history. The claimant was viewed as a somewhat mild retarded con man, but very street wise.

The claimant could follow instructions as far as the test was concerned.  He had some locomotion and ability to direct himself.  He was not distressed.  Dr. Hackett described him as being a predator, in that he could not be functional in a community setting.  He would take advantage of other people.  He would also not function well in the work place.

Dr. Hackett did not feel that the claimant could manage his own benefits.  His behavior was somewhat bizaar.  On the IQ scores performance was estimated lower than verbal.  A person that displays antisocial personality usually scores higher on performance.

Dr. Hackett felt some organic function may be involved.

RECEIVED

NOV 19 1993

DISABILITY
DETERMINATION

Please proofread, make any necessary corrections or additions, sign and return to this office

Signature___*Edward V. Hackett*___
Edward V. Hackett, Ph.D.
11/10/93

11/3/93 & 11/10/93

Signature____*Joyce Franey*_____      Date_____
Joyce Franey, Medical Relations

EXHIBIT NO.____22___(3) pages

**REDACTED**      G.14

*900*

EDWARD V. HACKETT, PH.D.
PSYCHOLOGIST
510 Greenbriar
Pine Bluff, AR 71603
(501) 536-5812

**RECEIVED**

**NOV 5 1993**

DISABILITY DETERMINATION

### PSYCHOMETRIC EVALUATION

Name: Bruce C. Webster                  Examiner:  Edward V. Hackett, Ph.D.
SSN:                                               Psychologist
DOB:          73                        Date of Examination: October 22, 1993
Age:                                    Date Transcribed: November 3, 1993

**Referral:**

Bruce Webster drove himself to the evaluation. He was dressed
appropriately in khaki pants and a t-shirt. He appeared to be somewhat
cocky from the start, which eventuated in personal comments toward the end.
Example: he wanted to know if he could have the change on my counter (the
answer was no). He made several sexual references which seemed untoward.
He stated that he had been in the Arkansas Department of Correction -
Tucker Unit, for assaulting an Arkansas State Police officer.

**Test Administered:**

Wechsler Adult Intelligence Scale - Revised (WAIS-R)

**Results:**

#### WAIS-R Subtest Scaled Scores

| Verbal | | Performance | |
|---|---|---|---|
| Information | 3 | Picture Completion | 1 |
| Digit Span | 6 | Picture Arrangement | 1 |
| Vocabulary | 4 | Block Design | 1 |
| Arithmetic | 4 | Object Assembly | 3 |
| Comprehension | 4 | Digit Symbol | 1 |
| Similarities | 6 | | 7 |
| Sum | 27 | | |

| | |
|---|---|
| Verbal IQ | 71 |
| Performance IQ | 49 |
| Full Scale IQ | 59 |

**REDACTED**

G.15

PSYCHOMETRIC EVALUATION
████████████████
SSN: ████████████████
Page 2

Evaluation:

Mr. Webster manifested many inconsistencies regarding his street behavior and current attempts to seek employment. He was referred for evaluation by his parents and friend. He is mildly retarded, but is also antisocial. His diagnoses are as follows:

    Axis I:  Mild Mental Retardation (317.00)
           Antisocial Personality Disorder (301.70)  (by history)

Mr. Webster manifests no signs of wanting to improve or to seek employment. He appears to be a user of others.

Edward V. Hackett, Ph.D.
Psychologist

EVH/ks

**REDACTED**

G.16

# *Watson Chapel Schools*

**MEMBER OF NORTH CENTRAL ASSOCIATION**
4100 CAMDEN ROAD
PINE BLUFF, ARKANSAS 71603
Phone 879-0220  879-0221
FAX 879-0588

**DIRECTORS**
**JIM JOHNSON**
**PRESIDENT**
**BILL THOMPSON**
**VICE PRESIDENT**
**RONNIE TERRELL**
**SECRETARY**
CALVIN JOHNSON
**J.J. JONES**
**MAXINE NELSON**
**HAROLD POINTER**

**CHARLES D. KNIGHT**
**SUPERINTENDENT**
**ED W. HARRIS**
**ASSISTANT SUPERINTENDENT**
**C. C. STUART**
**ASSISTANT SUPERINTENDENT**
**ROBERT HALL**
**FEDERAL PROGRAMS/TRANSPORTATION**

November 8, 1993

Disability Determination For
   Social Security Administration
701 Pulaski Street
Little Rock, AR  72201

Attn:  Ms. Helen Rumpf, Adjudicator

                    Re:  Bruce C. Webster
                         SSN: █████████
                         DOB: ██████/73

The above student's Special Education records were destroyed
in 1988.  A letter was mailed to parents  at the last known
address, telling them they could have the records if they
wanted them.  There was no response to the letter.

                              Sincerely,

                              *Lou Jackson*
                              Lou Jackson
                              Special Educaiton Supervisor

LJJ/pc



RECEIVED

NOV 11 ^ 1993

DISABILITY
DETERMINATION

11/8/93

EXHIBIT NO 2-1  /1 PAGES

REDACTED          G.17

*900*

## DISABILITY DETERMINATION FOR SOCIAL SECURITY ADMINISTRATION
### 701 Pulaski Street - Little Rock, Arkansas 72201

## GENERAL PHYSICAL EXAMINATION

RECEIVED
OCT 27 1993
DISABILITY DETERMINATION

| APPLICANT'S NAME | DATE OF BIRTH | SSN | DATE OF EXAM |
|---|---|---|---|
| Bruce Webb | ████/23 | ████████ | 10-21- |

**ALL PROCEDURES MUST BE AUTHORIZED BY A STATE AGENCY EXAMINER OR PHYSICIAN.**
Call this office for authorization prior to performing any procedure not listed on the authorization.
Local: 682-3030 or Long Distance Toll Free: 1-800-482-9950.

Please ask for _Helen Fling_ 900 _____,DDS Claims Examiner.

ALLEGED IMPAIRMENTS: _Sinuses + headache_

HISTORY: (Please include onset of significant problems)

20 YEAR OLD BLACK MALE HAS PROBLEMS WITH SINUS DRAINAGE AND HEADACHES.   HE HAS HAD IT FOR A NUMBER OF YEARS.   HE HAS NOT SEEN ANY PHYSICIANS AND ONLY TAKES OVER-THE-COUNTER MEDICATION WITH TEMPORARY RELIEF.   HE HAS NEVER BEEN HOSPITALIZED.   HE QUIT SCHOOL IN THE 8TH GRADE, SAID HE WAS ASKED TO LEAVE.   HE JUST GOT OUT OF PRISON AFTER AN ELEVEN MONTH SENTENCE.   I DON'T KNOW THE REASON FOR THAT.   HE IS NOT WORKING BUT STAYING AT HOME WITH AN ELDERLY GRANDMOTHER.

Myocardial Infarctions: _None_

Previous stress testing or angiograms: _None_

Surgical: _No_

Present Medications: _No_

REVIEW OF SYSTEMS (Fill in if relevant)

HEENT: _Sinus drainage_

RESPIRATORY: _Neg_

_____. If asthmatic, number of severe attacks

requiring IPPB or I.V. drugs during the past year: _____

10/25/93

EXHIBIT NO. _20_   ( _8_ ) PAGES

**REDACTED**   G.18

**GASTROINTESTINAL:** _NEC_

If present, give frequency and duration of:

Jaundice: _No_

Hematemesis: _No_

Ascites: _No_

Bloody Stools: _No_

**ORTHOPEDIC:** _NEC_

If there is a history of significant joint pain, swelling, heat, and tenderness, give the joints involved and the duration of active inflammation: _No_

**NEUROLOGICAL:** _NEG_

If seizures are alleged, describe a typical episode, postictal manifestations, and give frequency of attacks: _No_

If seizures are not controlled, is the patient seeking treatment? _____

**Previous EEG?** _No_

**PSYCHIATRIC:** (Is there a past history of hospitalization or outpatient treatment?)
_No_

**PHYSICAL EXAMINATION**

**VITAL SIGNS:**
Height (without shoes) _67.5"_ Weight _136_ Pulse _76_ Blood Pressure _118/74_ Respiratory Rate _18_

**GENERAL APPEARANCE:** _WDWN_

**EYES** _NEC_

**FUNDI** (Check if present):

|  | Neovascularization | Hemmorrhages | Exudates | Papilledema | Normal |
|---|---|---|---|---|---|
| O.D. |  |  |  |  | ✓ |
| O.S. |  |  |  |  |  |

Central Visual Acuity: Uncorrected - O.D. _20/20_    O.S. _20/20_

(Snellen)    Corrected - O.D. _____    O.S. _____

(3)

G.19

**PASSIVE** Range of Motion (In Degrees)

| | Right | Normal | Left | Heat | Swelling |
|---|---|---|---|---|---|
| Elbows: | | 0°—150° | | | |
| Wrists: Dorsiflexion | | 0°—70° | | | |
| Palmar Flexion | | 0°—70° | | | |
| Hands: DIP | | 0°—80° | | | |
| PIP | | 0°—100° | | | |
| MP | | 0°—90° | | | |
| Hips: Forward Flexion | | 0°—115° | | | |
| Rotation—Internal | | 0°—45° | | | |
| Rotation—External | | 0°—45° | | | |
| Knees: | | 0°—135° | | | |
| Ankles: Dorsiflexion | | 0°—20° | | | |
| Plantar Flexion | | 0°—50° | | | |

Describe any other joint abnormalities, deformities, instability, anklylosis, contractures, etc: _____

_____ None _____

_____

Is there any purulent drainage or inflammation from possible osteomyelitis? _____

_____ No _____

**NEUROLOGICAL:**

Cranial Nerves: ___ Normal _____

| Reflexes: | Right | Left |
|---|---|---|
| Biceps: | 2+ | 2+ |
| Triceps: | 1+ | 1+ |
| Patellar: | 3+ | 3+ |
| Achilles: | 1+ | 1+ |

Muscle Weakness: (be specific) ___ No _____

Muscle Atrophy: ___ No _____

If atrophy is present, measure extremity circumference: _____

Sensory Abnormalities: ___ None _____

(5)

**VEINS**

Varicose Veins: _____ No _____

Stasis Dermatitis: _____ No _____

Brawny Edema: _____ No _____

Active Ulcers: _____ No _____

Scars from Healed Ulcers: _____ No _____

**MENTAL STATUS:**

Is the applicant oriented to time, person, place? _____ Yes _____

Any evidence of psychosis (such as hallucinations or delusions) or of serious mood disorder? _____ No _____

**LAB STUDIES, X-RAY RESULTS, ETC:** _____

**DIAGNOSIS:** MENTAL RETARDATION.   FLAT FEET.   CHRONIC SINUS PROBLEMS AND ALLERGIES
BY HISTORY.

(7)

G.21

CARDIOVASCULAR: _____ *NEG* _____

Chest Pain _____ Yes _____ No

Please give a detailed current description of chest pain, if present:

Location and radiation: _____

Quality of Pain: (sharp, dull, tightness, etc.) If pain is "sharp", specify if this means a rhythmic pain, e.g., "stabbing", "jabbing", or "throbbing". _____

_____

Precipitating Factors: Is the above pain predictably exertional? _____ Yes _____ No
If yes, specify type and amount of exertion that produces pain, giving three examples.

TYPE _____   (1)_____ AMOUNT

      _____   (2)_____

      _____   (3)_____

Is the above chest pain brought on by any of the following items? a) Deep breathing _____
b) Eating _____ c) Twisting/Turning movements _____ d) Palpation of chest wall _____
e) Other _____

Mode of Relief: Nitroglycerin _____ In minutes, duration until relief _____ Number of
tablets in last month _____ Rest _____ In minutes, duration until relief _____
Any unusual mode of relief such as antacid or belching? _____ Yes _____ No

Frequency of above chest pain (three times per day, or week, or month, etc.) _____

How long has above pain been present? _____

Pertinent associated symptoms: _____

PND _____ Orthopnea _____ Edema _____

SYNCOPE _____ If yes, give description and frequency: _____

_____

INTERMITTENT CLAUDICATION _____ If yes, how far can patient walk before symptoms start?

_____

Quality of pain _____ Location of pain _____

Any radiation of pain, where? _____ Pain Duration _____

Mode of relief _____

HEMATOLOGY: _____ *NEG* _____

Give frequency of transfusions in the past year: _____

(2)

G.22

EARS _N̲e̲c̲_

Can the patient hear normal conversation? _yu_

Estimate % auditory loss if noted: _0%_

OROPHARYNX: _Nec_

If speech is impaired, describe ability to carry on speech which can be understood and sustained:

NECK _Nst_

Neck Vein distention: _NO_ Adenopathy _NO_

LUNGS: Normal breath sounds _yu_ Increased A.P. Diameter _NO_ Hyper-resonance _NO_

Prolonged expiration _NO_ Wheezing _NO_ Other _____

HEART (Clinical enlargement, murmurs, gallops, etc.): _Normal_

ABDOMEN: _Nec_

Ascites: _NO_ Organomegaly: _NO_

SKIN CHANGES: _NO_

Cyanosis _NO_ Clubbing _NO_ Jaundice _NO_

ORTHOPEDIC: (If joint motion is limited by more than 30%, please call for authorization to perform X-ray)

| SPINE | | Normal Motion | Range of Motion (In Degrees) |
|---|---|---|---|
| Cervical Spine: | Forward Flexion | 0° — 40° | |
| | Flexion | 0° — 30° | |
| | Extension | 0° — 30° | |
| | Rotation | 0° — 40° R & L | |
| Lumbar Spine: | Flexion-Extension | 0° — 90° | |
| | Lateral Flexion | 0° — 20° R & L | |

Muscle Spasm: _NO_

EXTREMITIES:

PASSIVE Range of Motion (In Degrees)

| | Right | Normal | Left | Heat | Swelling |
|---|---|---|---|---|---|
| Shoulders: Abduction | | 170° | | | |
| Forward Elevation | | 170° | | | |

(4)

G.23

Gait and Coordination: (indicate specific abnormal findings) _____

_____ *Normal* _____

_____

Romberg: _____ *Neg* _____ Tremor: _____ *No* _____

Ataxia: _____ *No* _____ Cogwheel Rigidity: _____ *No* _____

Heel to Shin: _____ *yes* _____ Bradykinesis: *No* _____

Finger to Nose: _____ *yes* _____ Past Pointing: *NO* _____

Proprioception: _____ *yes* _____

LIMB FUNCTION: Describe ability to:

1. Hold a pen and write _____ *yes* _____

2. Touch fingertips to palm: _____ *yes* _____

3. Grip (estimate % of normal) _____ *100%* _____

4. Oppose thumb to fingers: _____ *yes* _____

5. Abduct and flex arms at the shoulders 90 degrees or more: _____ *yes* ____

6. Stand and walk without assistive devices: _____ *yes* _____

_____

7. Ability to walk on heel-toes _____ *yes* _____

8. Squat and arise from a squatting position: _____ *yes* _____

CIRCULATORY:

Pulses: (Absent, decreased or normal)

| | right | left |
|---|---|---|
| Carotid: | *N* | *N* |
| Radial: | | |
| Femoral: | | |
| Popliteal: | | |
| Dorsalis Pedis: | | |
| Posterior Tibial: | | |

Hair Loss: _____ *No* _____ Skin Temperature _____ *Normal* _____

Edema: _____ *No* _____

(6)

G.24

**FOLLOWING YOUR EXAMINATION, PLEASE ANSWER THESE SPECIFIC QUESTIONS:** _____

THE PATIENT APPEARED TO BE HEALTHY WITH NO ABNORMAL PHYSICAL FINDINGS.

**REPORTING PHYSICIAN'S SIGNATURE, AND DATE**

Signature: _C.M. Rittelmeyer_ Date: 10-25-93

C. M. Rittelmeyer M.D.

(8)

G.25

Form Approved
OMB No. 0960-0316

## CLAIMANT'S STATEMENT WHEN REQUEST FOR HEARING IS FILED
## AND THE ISSUE IS DISABILITY

Print, type or write clearly and answer all questions to the best of your ability. Complete answers will aid in processing the claim. IF ADDITIONAL SPACE IS NEEDED, ATTACH A SEPARATE STATEMENT TO THIS FORM.

CLAIMANT'S NAME  *Bruce C Webster*

SOCIAL SECURITY NUMBER

WAGE EARNER (Leave blank if name is the same as the claimant's)  *Willie Webster*

SOCIAL SECURITY NUMBER

PRIVACY ACT AND PAPERWORK ACT NOTICE: The Social Security Act (section 205(a), 702, 1631(e)(1)(A) and (B), and 1869(b)(1) and (c), as appropriate authorizes the collection of information on this form. We will use the information on your recent activities, condition, medical treatment, and medications to help us decide if we need to obtain more information. You do not have to give it, but if you do not you may not receive benefits under the Social Security Act. We may give out the information on this form without your written consent if we need to get more information to decide if you are eligible for benefits or if a Federal law requires us to do so. Specifically, we may provide information to another Federal, State, or local government agency which is deciding your eligibility for a government benefit or program; to the President or a Congressman inquiring on your behalf; to an independent party who needs statistical information for a research paper or audit report on a Social Security program; or to the Department of Justice to represent the Federal Government in a court suit related to a program administered by the Social Security Administration.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security Office.

### TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 15 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0316), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

1. Have you worked since ___3-17-94___, the date your request for reconsideration was filed? *(If yes, describe the nature and extent of work.)* → [ ] Yes [✓] No

2. Has there been any change in your condition since the above date? *(If yes, describe the change.)* → [✓] Yes [ ] No

   *my sinus condition is worse*

3. Have your daily activities and/or social functioning changed since the above date? *(If yes, describe the changes.)* → [✓] Yes [ ] No

   *I sleep more because of medication -*

4a. Have you been treated or examined by a physician (other than as a patient in a hospital) since the above date? *(If yes, complete the following.)* → [✓] Yes [ ] No

NAME OF PHYSICIAN  *Dr Andrea Worrell*

ADDRESS (Include ZIP Code)  *Pine Bluff Ar 71603*

AREA CODE AND TELEPHONE NUMBER  *501 -*

HOW OFTEN DO YOU SEE THIS PHYSICIAN  *Only been to see him once -*

DATES YOU SAW THIS PHYSICIAN  *4/94*

REASONS FOR VISIT  *Sinus*

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)  *Gave medication - Fedahist - Ancenase AQ*

Form HA 4486 (2-92) Prior editions may be used until supply is exhausted

(OVER)

*19 u*

G.26

REDACTED

4b. Have you seen any other physician since the above date? ⟶ ☐ Yes   ☑ No
   If "Yes," show the following:

| NAME OF PHYSICIAN | ADDRESS (Include ZIP Code) |
|---|---|
| AREA CODE AND TELEPHONE NUMBER | |
| HOW OFTEN DO YOU SEE THIS PHYSICIAN? | DATES YOU SAW THIS PHYSICIAN |

REASONS FOR VISITS

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have seen other physicians since you filed your claim, attach a list of their names, addresses, dates and reasons for visits.

5. Have you been hospitalized, or treated at a clinic or confined in a nursing home or extended care facility for your illness or injury since the above date? ⟶ ☐ Yes   ☑ No
   If "Yes," show the following:

| NAME OF FACILITY | ADDRESS OF AGENCY (Include ZIP Code) |
|---|---|
| PATIENT OR CLINIC NUMBER | |

WERE YOU AN INPATIENT? (Stayed at least overnight)
☐ Yes   ☐ No   IF "YES," SHOW ⟶   DATES OF ADMISSIONS AND DISCHARGES

WERE YOU AN OUTPATIENT?
☐ Yes   ☐ No   IF "YES," SHOW ⟶   DATES OF VISITS

REASON FOR HOSPITALIZATION, CLINIC VISITS, OR CONFINEMENT

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have been in other hospitals, clinics, nursing homes, or extended care facilities for your illness or injury, attach a list of the names, addresses, patient or clinic numbers, dates and reasons for hospitalization, clinic visits, or confinement.

6. Have you received medical or vocational services from a community agency since the above date? ⟶ ☐ Yes   ☑ No

7. Are you now taking any prescription drugs or medications? ⟶ ☑ Yes   ☐ No
   (If yes, list them below.)

| NAME OF MEDICATION(S) | DOSAGE BEING TAKEN | NAME OF PHYSICIAN(S) |
|---|---|---|
| Fedahist Gyrocaps | 2x day | Dr Aubrey Worrell |
| Vancenase AQ | 2x day | Dr Aubrey Worrell |

8. Are you now taking any nonprescription drugs or medications? ⟶ ☐ Yes   ☑ No
   (If yes, list them below.)

| NAME OF MEDICATION(S) | DOSAGE BEING TAKEN |
|---|---|
| | |

Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law, I certify that the above statements are true.

| SIGNATURE OF CLAIMANT OR PERSON FILING ON THE CLAIMANT'S BEHALF | DATE SIGNED |
|---|---|
| SIGN HERE ▶ /Bruce White | 4-13-94 |

Form HA-4486 (2-92)   *U.S. Government Printing Office: 1992 — 312-183/60009

G.27

DEPARTMENT OF
HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION

# STATEMENT OF CLAIMANT OR OTHER PERSON

| NAME OF WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT | SOCIAL SECURITY NUMBER |
|---|---|
| NAME OF PERSON MAKING STATEMENT (if other than above wage earner, self-employed person, or SSI claimant) | RELATIONSHIP TO WAGE EARNER, SELF-EMPLOYED PERSON, OR SSI CLAIMANT |

Understanding that this statement is for the use of the Social Security Administration, I hereby certify that— the information below is correct

A. Describe your pain (or other symptoms) _it causes me to get up set easily head hurts diffietnt of breath_

1. What does it feel like? _It feels real bad_

2. Where does it hurt? _all in my head nose, Eyes_

3. What activities cause the pain (or other symptoms)? _dust grass colgne sprah being out_

4. How long does it usually last? _sometimes side wind bo_

B. Medications

1. Please list the medications you are taking now for your pain and/or other symptoms. _Sinutab_

| Name of Medicine | Date 1st prescribed | Dosage (how often) |
|---|---|---|
| a. _Sinuatab_ | _wasnt_ | |
| b. | | |
| c. | | |
| d. | | |

2. Do you have any side effects of the medicine you are taking?

No _____ Yes _X_  If yes, please explain:

_I sleep better_

Form SSA-795 (2-76)          (OVER)

G.28

C. Names and addresses of drug stores where prescriptions have been filled.

(If more information about these prescriptions is needed to make a decision on your claim, we will contact these drug stores):

*NONE*

D. Do you require any special treatment or equipment (such as braces, oxygen, physical therapy, etc.)? No ✓ Yes _____ If yes, please describe: *I have not been in a long long time*

I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law and/or State law. I affirm that all information I have given in this document is true.

## SIGNATURE OF PERSON MAKING STATEMENT

| Signature (First name, middle initial, last name) (Write in ink) | Date (Month, day, year) |
|---|---|
| SIGN HERE ✓ | |
| | Telephone Number (Include Area Code) |

Mailing Address (Number and street, Apt. No., P.O. Box, Rural Route)

| City and State | ZIP Code |
|---|---|

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the individual must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street, City, State, and ZIP Code) | Address (Number and street, City, State, and ZIP Code) |

☆U.S. G.P.O. 1985-491-273/20103

ACI-6116

G.29

DISABILITY
SUPPLEMENTAL INTERVIEW OUTLINE

Name: _Bruce Webster_   SSN: ████████

1.A.   Describe what you do on an average day.  Tell what you usually do in the mornings, what takes most of your time during the day, etc.

_I sleeps look at cartoon_

B.   Describe any changes in your routine since your condition began:

_get upset easy_

2.A.   How many hours do you usually sleep each night?

_don't sleep to good at night wakes up sneesing, couhing_

B.   Describe any problems you have sleeping:

_don't know_

C.   Describe any changes in your sleeping habits since your condition began:

_sneesing, couhing, running nose headach_

3.A.   Describe where you live (house) apartment, etc.):

B.   Who lives in your household with you?

_Mom, Dad, grandma chimeka_

C.   Do you get along well with these persons?

_every once in awhile_

D.   Do you get along well with other persons in general?

_NO_

E.   Describe any changes in these things since your condition began:

_aint got no chang_

SS-RVI-400                                    - 1 -            EXHIBIT NO. _18_ ( 6 ) PAGES

REDACTED                                                                       G.30

4. Personal Needs and Grooming

Do you need help taking care of your personal needs or grooming?   |‾| Yes   |≠| No

If yes, what kind of help do you need? _____

_____

_____

Who helps you? _____

_____

Describe any changes in your ability to take care of your personal needs since your condition began: _N O_____

_____

5. Meals

Do you prepare your own meals?   |‾| Yes   |✓| No

If yes, which meals do you prepare? _____

_____

How often do you cook? _don't cook_____

_____

How long does it take you? _____

_____

If no, describe why not: _moma cook it_____

_____

_____

Describe any changes in cooking habits since your condition began: _____

_moma cook it_____

_____

_____

- 2 -

G.31

6. Household Maintenance

Do you clean your house, launder clothes, or do any other work around the house?
|✓| Yes |_| No

If yes, describe which of these things you do: _make my room_

Do you need help doing these things? Explain: _Nope_
_Just make my room_

How much time do you spend to do these? _____
_I doin't know_

If no, describe why not: _I doin't know_

Describe any changes in household maintenance since your condition began:
_I told you I make my room_

7. Shopping

Do you do any shopping? |✓| Yes |_| No

If yes, describe what you shop for: _potato ships, pops_
_kookies_

How often do you shop? _not much_

How long does it take you? _hours_

Do you need help shopping? Explain: _every once_
_a while it taks hours_

If no, describe why not: _____

Describe any changes in shopping since your condition began: _Nope_
_changes_

- 3 -

G.32

Recreational Activities and Hobbies

A. Do you do any reading? [✓] Yes [ ] No

If yes, describe what you read: _Playboy naKed_
_books_

How often and how long do you read? _____
_long times_

If no, describe why not: _____

B. Do you watch television or listen to the radio? [✓] Yes [ ] No

If yes, describe what you watch or listen to: _cartoons._
_BET cinamacks rap musics_

How much time do you spend doing this? _____
_lots of times_

If no, describe why not: _____

C. Do you have any hobbies or pastimes? [✓] Yes [ ] No

If yes, describe the things you do: _radio, tv past_
_my times_

How often do you do these things? _every day_

How much time do you spend doing these? _a lots of_
_time_

If no, describe why not: _____

D. Describe any changes in these activities since your condition began:
_thats my every day thang_

- 4 -  IPR 24313

G.33

| 9.Social Activities |
|---|

A.  Do you go out and visit friends or relatives? ☑Yes ☐No

If yes, describe how often you visit: _Sometimes_
_I visit my sister and brothers_

How much time do you spend visiting?

_all night_

Does anyone help you go visiting? _NOPE_

If no, describe why not: _I go by my self_

B.  Do you drive? ☑ Yes ☐ No

If yes, can you drive on unfamiliar routes? _NOPE_

Do you need help driving? _NOPE_

If no, explain why not: _I do'nt go that far_

C.  Are you active in clubs, or other groups? ☑ Yes ☐ No

If yes, explain the activities that you do: _I walk_
_around in the club_

How often do you do these activities? _Every_
_once in awhile_

Do you need any help doing these? _nope_

If no, describe why not: _I don't need help_
_walking around_

D.  Describe any changes in social activities since your
condition began: _____
_I don't social much_

-5-

G.34

10. Please provide the names, addresses, phone numbers and relationships of other persons (not doctors) we can contact who know about your condition:

A. Mother ████████████████████
████████ ████████ ████████ ████████

B.

11. Remarks — Use this space to complete any previous answers:

## DO CERTIFICATION

The information shown on this outline was obtained during an interview with the following individual(s):

_____          (Show relationship to claimant if an
_____           individual other than the claimant
_____           furnished the information).

Interviewer Signature _____

                Title _____

      District Office _____

                 Date _____

- 6 -

REDACTED

G.35